AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>BERNHARD EUGEN FRITSCH | DOCKET NO.<br><br>17MJ01913 |
|---|---|
| | MAGISTRATE'S CASE NO.<br><br>FILED<br>CLERK, U.S. DISTRICT COURT<br>AUG - 2 2017<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |

Complaint for violation of Title 18, United States Code, Section 1343

| NAME OF MAGISTRATE JUDGE<br><br>HONORABLE JEAN P. ROSENBLUTH | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br><br>January 25, 2016 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

### [18 U.S.C. § 1343]

On or about January 25, 2016, in Los Angeles County, within the Central District of California, defendant BERNHARD EUGEN FRITSCH, having devised a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations, and promises, caused to be transmitted by means of wire in foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

LODGED

2017 AUG -2 AM 9: 09
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>**GREGORY L. AUSTIN**   /s/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[(1)]<br><br>**JEAN P. ROSENBLUTH**     JEAN P. ROSENBLUTH | DATE<br><br>August 2, 2017 |
|---|---|

[(1)] See Federal Rules of Criminal Procedure 3 and 54

AUSA Karen Escalante  x3358     REC: Detention

# AFFIDAVIT

I, GREGORY L. AUSTIN, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 2010. Since September 2016, I have been assigned to the Complex Financial Crime squad of the Los Angeles Field Office where I specialize in investigating complex financial crimes. Prior to my current assignment, I worked counterintelligence matters for the Los Angeles Field Office. I completed approximately 21 weeks of formal training in investigative techniques and white-collar matters at the FBI Academy in Quantico, Virginia. Since joining the FBI I have participated in investigations of white collar crime, including corporate and securities fraud, as well as numerous counterintelligence investigations.

2. I received a Masters in Business Administration with Distinction from Harvard Business School and a Bachelor of Arts degree in economics from Duke University. I also completed graduate-level coursework in economics, investments, and accounting from the University of Chicago Booth School of Business. Prior to joining the FBI, I worked in the securities industry for approximately five and three-quarters years.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of the following:

a. a criminal complaint against, and arrest warrant for, BERNHARD EUGEN FRITSCH ("FRITSCH") for a violation of Title 18, United States Code, Section 1343 (Wire Fraud); and

b. an application for a warrant to search the business premises of StarClub, Inc. ("StarClub") and US Mastertec, LLC ("Mastertec"), both of which share the office space located on the third floor of 228 Santa Monica Boulevard, Santa Monica, California 90401 (the **"SUBJECT PREMISES"**), as described more fully below and in Attachment A, for evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 1343 (wire fraud), 1956 (money laundering), and 1957 (monetary transactions) (collectively, the "SUBJECT OFFENSES"), as set forth in Attachment B.

c. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, my review of documents and financial records obtained during the course of the investigation, and information obtained from various law enforcement personnel and witnesses I have interviewed throughout the investigation. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. APPLICABLE LAW

5.    Based on my training and experience and my
conversations with other law enforcement officers, I know that:

a.    Title 18, United States Code, Section 1343, makes
it a crime to devise or intend to devise any scheme or artifice
to defraud, or for obtaining money or property by means of false
or fraudulent pretenses, representations, or promises, and
transmit or cause to be transmitted by means of wire, radio, or
television communication in interstate or foreign commerce, any
writings, signs, signals, pictures, or sounds for the purpose of
executing such scheme or artifice.

b.    Title 18, United States Code, Section 1956(a)(1),
makes it a crime to knowingly conduct, or attempt to conduct, a
financial transaction with proceeds from specified unlawful
activity with the intent to promote the carrying on of specified
unlawful activity or to evade taxes or knowing that the
transaction is designed to conceal the nature, location, source,
ownership, or control of the proceeds of specified unlawful
activity.

c.    Title 18, United States Code, Section 1956(a)(2),
makes it a crime to transport, transmit, or transfer, or attempt
to transport, transmit, or transfer, monetary instruments or
funds from the United States to or through a place outside the
United States, or to the United States from or through a place
outside the United States with the intent to promote the
carrying on of specified unlawful activity or knowing that the
monetary instruments or funds involved represent the proceeds of

3     [Instrumentality Protocol]

some form of unlawful activity and knowing that the movement is designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

       d.    Title 18, United States Code, Section 1957 makes it a crime to knowingly engage, or attempt to engage, in a monetary transaction with proceeds of a specified unlawful activity in an amount greater than $10,000 by, through, or to a financial institution.

### IV. SUMMARY OF PROBABLE CAUSE

    6.    StarClub is a Santa Monica-based company that purports to develop computer software applications that assist social media influencers, such as celebrities, athletes, and individuals with a large social media presence, in monetizing their brand endorsements. The FBI has been investigating allegations of a fraudulent scheme through which certain officers, employees, and associates of StarClub have obtained money from investors on the basis of false representations, pretenses, and promises.

    7.    Based on the results of the investigation to date, including database searches, my review of documents, and interviews of witnesses, I know that FRITSCH is a 56 year-old German national and US legal permanent resident who lacks a California driver's license, but possesses a Connecticut driver's license. Based on the investigation to date, the FBI believes that FRITSCH currently resides in Malibu, California,

at 3229 Rambla Pacifico (the "Rambla Pacifico property"), a
residence he purchased in November 2008.

8.    During the period from January 2014 through December
2016, StarClub raised approximately $35,818,443 from a number of
investors.  To date, the FBI has interviewed five of those
investors who, together, contributed the majority of funds that
StarClub received during this period.  These investors were
informed that the money would be used to build, market, and
develop StarClub's software application and for working capital
and general corporate purposes.  Further, some of their
investments were induced by FRITSCH's multiple
misrepresentations that several entertainment companies and
investment funds were on the verge of acquiring part or all of
StarClub, or planning commercial partnerships with StarClub.
During the period from January 2014 through December 2016,
however, approximately $7,903,500 of investor money was
transferred by FRITSCH directly into non-StarClub business
entities controlled by FRITSCH and his associates.  Those
entities used the funds for a wide range of non-business
purposes, including but not limited to residential mortgage
payments, residential property tax payments, cars, medical care,
clothing, and travel.

## V.  STATEMENT OF PROBABLE CAUSE

### A.  Background: StarClub

9.    Based on my review of the Amended and Restated
Articles of Incorporation of StarClub, Ltd. ("StarClub
Articles") filed with the Delaware Secretary of State on March

21, 2013, and my review of a Statement of Information ("SoI") for StarClub filed with the California Secretary of State ("SoS") on November 2, 2016, I know the following:

      a.    StarClub was incorporated in Delaware on June 17, 2011.  In 2013, StarClub changed its corporate name from "Starclub, Ltd." to "StarClub, Inc."[1]

      b.    StarClub's corporate headquarters and business address are located at the **SUBJECT PREMISES**.  StarClub's Board of Directors (the "Board") is comprised of three directors: FRITSCH, Michael RAVIN ("RAVIN"), and Ike Lee.

      c.    StarClub's officers include Chief Executive Officer ("CEO") FRITSCH, Secretary RAVIN, and Chief Financial Officer ("CFO") James POLSEN ("POLSEN").  Based on my review of an e-mail I received from former StarClub employee Gavin O'Reilly ("O'Reilly") on December 15, 2016, I also know that Ruben Mamann ("Mamann") is StarClub's Chief Operating Officer ("COO").

    10.    Based on my interviews with O'Reilly on July 20, 2017, and then-current, but now-former[2] StarClub employee Aahmek Richards ("Richards") on December 21, 2016, I also know that Ian Cartwright ("Cartwright") was StarClub's Chief Technology Officer ("CTO") around December 2015 and January 2016.

---

[1] On or about December 29, 2016, I reviewed StarClub's website, available at www.starclubltd.com.  Based on my review of the website, I know that StarClub's website still occasionally refers to StarClub as "StarClub, Ltd."

[2] Based on my review of StarClub payroll records, I know that Richards' termination date was February 3, 2017.

According to Richards, Cartwright is no longer StarClub's CTO and now lives in Germany.

11. Based on my review of payroll records for StarClub, I know the following:

a. As of October 16, 2016, StarClub had the following nine full-time, regular (i.e., non-1099 MISC)[3] employees in an active status: Henry E. Lesniak ("Lesniak") with a hire date of October 28, 2012; Cary O'Neal ("O'Neal") with a hire date of February 16, 2014; Mamann with a hire date of February 16, 2014; Kimberly Fredricks ("Fredricks") with a hire date of February 20, 2014; Richards with a hire date of April 15, 2015; Carmen Rivera with a hire date of November 16, 2015; Omid Rahmat with a hire date of July 1, 2016; Benjamin McAllister ("McAllister") with a hire date of November 1, 2016; and Kaydee C. Kesterson ("Kesterson") with an initial hire date of January 1, 2012, and a most recent hire date of February 1, 2017.

b. As further discussed below, based on my interview with Lesniak on February 9, 2017, I know that Lesniak processes StarClub's payroll.

c. Based on my interview with former StarClub employee O'Reilly on July 20, 2017, I know that O'Neal served as a receptionist for StarClub and sometimes chauffeurs FRITSCH. Based on that same interview, I also know that a non-StarClub

---

[3] On or about July 28, 2017, I reviewed the Internal Revenue Service's ("IRS") publically available website and understand that a Form 1099-MISC is filed by a non-employee who performs services.

employee, George Mederos ("Mederos"), also chauffeurs FRITSCH. According to O'Reilly, Mederos or O'Neal generally drove FRITSCH to StarClub.

       d. As noted above, Mamann is StarClub's COO.

       e. According to Richards, who I interviewed on December 21, 2016, Fredricks is a secretary. According to McAllister, who I interviewed on December 29, 2016, Fredricks is FRITSCH's former secretary. According to StarClub payroll records, as of April 11, 2017, Fredericks was an active StarClub employee.

       f. Based on my interview with McAllister on December 29, 2016, I know that McAllister started working for StarClub on a contract basis around 2009. According to McAllister, he became a full-time employee about two or three years later, and McAllister's current position is analogous to "Creative Director."

       g. Based on my review of audio recordings of a meeting held on December 14, 2016, at the **SUBJECT PREMISES** between StarClub investor D.G. (discussed below), two associates of D.G.'s, FRITSCH, and POLSEN, I know that POLSEN explained that Kesterson is currently paid "as a favor to her" because she "didn't get paid much" while she was employed at StarClub in an administrative role. According to former StarClub employee Richards, who I interviewed on December 21, 2016, Kesterson is FRITSCH's girlfriend; but, according to current StarClub employee McAllister, who I interviewed on December 29, 2016, Kesterson is FRITSCH's ex-girlfriend.

[Instrumentality Protocol]

**B.    Background: Mastertec**

12.    Based on my review of a SoI for Mastertec filed with the California SoS on January 19, 2017, I know the following:

   a.    Mastertec was formed in Delaware on July 13, 2011.  Mastertec's business address is also at the **SUBJECT PREMISES**.  Mastertec's CEO is RAVIN (who, as noted above, is also StarClub's Secretary) and its type of business is "IT Developer."  Based on my interview with former StarClub employee O'Reilly on July 20, 2017, I also know that Cartwright, StarClub's former CTO, served on Mastertec's board.  According to O'Reilly, as of late 2016, Cartwright was no longer a director of Mastertec, but was working on a project-by-project basis as an independent contractor with Mastertec.

13.    Based on my interviews in December 2016, with former StarClub employees O'Reilly and Zach Lisabeth ("Lisabeth"),[4] and then-current StarClub employees Richards and McAllister, I know the following:

   a.    StarClub and Mastertec are located in the same office.  StarClub's organizational structure is split between StarClub, which oversees areas like vision and marketing, and Mastertec, which employs four or five technical employees.  StarClub performs media and marketing functions while Mastertec does technology development for which it bills StarClub.  McAllister also told me that he heard that Mastertec owns intellectual property that it licenses to StarClub.  Based on my

---

   [4] According to StarClub payroll records, Lisabeth's termination date was February 28, 2015.

review of patents obtained from the United States Patent and
Trademark Office ("USPTO") website, however, I know that no
patents have issued in Mastertec's name, but that four patents
have issued in FRITSCH's name.

14.  Based on my review of audio recordings of a meeting
held on December 14, 2016, at the **SUBJECT PREMISES** between D.G.,
two associates of D.G.'s, FRITSCH, and POLSEN, I know that
FRITSCH represented that Mastertec was a "supplier" and that
Mastertec was owned by a "technology development group" that is
from "all over the world."

15.  Based on my review of audio recordings of a meeting
held on May 24, 2017, at the **SUBJECT PREMISES** between D.G., an
undercover ("UC") FBI SA, and FRITSCH, among other StarClub
employees as discussed in more detail below, I know that FRITSCH
represented that StarClub worked with Mastertec.

C.  **The Scheme To Defraud**

Information Provided by Victim-Investor D.G.

16.  On or about December 14, 2016; May 4, 2017; May 24,
2017; June 2, 2017; and July 21, 2017, I interviewed D.G.  D.G.
has also provided me with StarClub subscription and purchase
agreements between StarClub and D.G.'s asset management
companies, Harrington Global Limited ("Harrington") and Salida
Strategic Growth Fund ("Salida"); other StarClub stock and unit
purchase agreements; wire records; and copies of e-mails he
exchanged with FRITSCH and/or POLSEN or which otherwise relate
to StarClub.  Based on my interviews with D.G. and my review of
the agreements, e-mail correspondence, and other financial

records, I know the information set forth in paragraphs 17 - 50 below regarding D.G.'s investments in StarClub:

> *a.   D.G.'s Initial January and June 2014 Investments*

17.   D.G. owns Harrington, a Bermuda-based investment fund. D.G. owns more than fifty percent of Harrington's assets. Harrington is an offshoot of Salida.   D.G. also owns the majority of Salida.

18.   D.G. was first introduced to Mark Valentine ("Valentine") by G.C. (D.G.'s business partner who ran Harrington's Canadian operations) and C.B (a colleague of D.G.'s).   In late 2013 or early 2014, D.G., G.C., and C.B. met with Valentine at Harrington's Toronto office.   At that meeting, Valentine said he had invested in StarClub.

19.   About one week later, FRITSCH met with D.G., Valentine, G.C., and C.B. in Harrington's Toronto office. During that meeting, FRITSCH said that he had sold the technology that became iTunes and the iPad to Steve Jobs for $300 million.   FRITSCH said that his next project was StarClub and represented that he had patented technology that allowed the posting of celebrities' advertisements to social media and facilitated the tracking of advertisement dollars directly to celebrities.   FRITSCH said he owned a large portion of StarClub and was seeking to grow its celebrity network.   FRITSCH also represented that StarClub was generating revenue.

20.   FRITSCH further represented that StarClub had raised $50 million and that it was seeking to raise an additional $5 million at an implied $100 million valuation.

21.   At some point prior to D.G.'s initial investment, FRITSCH showed D.G. a sheet of paper listing StarClub's patents. Based on my review of patent applications and patents obtained from the USPTO website, however, I know that no patents have issued in StarClub's name, but that StarClub is an applicant on one patent application and an assignee on a second patent application.   Further, as noted above, I also know that four patents have issued in FRITSCH's name.

22.   Based on my review of two separate StarClub subscription agreements with a requested execution date of January 14, 2014, I know the following:

a.   Salida executed two subscription agreements on January 16, 2014.   One subscription agreement was for 500 units and an aggregate subscription amount of $500,000, and the other subscription agreement was for 2,000 units and an aggregate subscription amount of $2,000,000.

b.   Term sheets that are attached and incorporated to each subscription agreement contain terms for the Use of Proceeds.   Specifically, both term sheets provide that StarClub "will use the net proceeds of the Offering: (i) to launch vertically integrated and interactive social media platforms ("Channels") for talent partners, celebrities and global brands; (ii) for technology enhancements related to the Channels; and (iii) for working capital and general corporate purposes (other

than debt reduction including in respect of the current indebtedness and any other shareholder loans)."

23.   On January 24, 2014, StarClub received a private placement investment of $4,566,700 (the "First Private Placement Deal") from a group of investors.   The funds for the First Private Placement Deal were placed in JPMorgan Chase checking account number 211777995 (the "StarClub Wire Account") via Fidelity Clearing Canada.   This was the first financing round in which D.G. participated.   Based on my review of wire records provided to me by D.G., I know that Harrington wired $500,000 to Fidelity Clearing Canada ULC on January 22, 2014, and that Salida wired $2,000,000 from Credit Suisse Securities Canada to Fidelity Clearing Canada ULC on January 17, 2014.

24.   Based on my review of a StarClub subscription agreement with a requested execution date of June 23, 2014, I know the following:

   a.   The identified agent for the subscription agreement was Salman Partners Inc. ("Salman Partners").   On June 20, 2014, Salida executed the subscription agreement for 1,082,371 units and an aggregate subscription amount of $4,113,009.80.

   b.   The subscription agreement referenced a proposed reverse take-over transaction between StarClub and Sabre Graphite Corporation ("Sabre") which, according to the agreement, was publically announced on May 30, 2014.   As noted below (see paragraph 71(c)), the reverse-takeover was cancelled in November 2014.

13   [Instrumentality Protocol]

25.   On July 10, 2014, StarClub received a private placement investment of $9,545,027.05 (the "Second Private Placement Deal") from a group of investors.   The funds for the Second Private Placement Deal were placed in the StarClub Wire Account via Goodmans LLP.   Based on my review of wire records provided to me by D.G., I know that Harrington wired $4,113,009.80[5] to Salman Partners on June 26, 2014.

    b. *FRITSCH'S misrepresentations re:*
      *NBCUniversal*

26.   On July 11, 2014, FRITSCH wrote an e-mail to D.G. and said, in relevant part, "We are in the middle of a set of meetings with NBCUniversal and WME. ( WilliamMorris) this week and this coming week."[6]

27.   On July 29, 2014, FRITSCH wrote, in relevant part, "On the commercial side the Universal deal is with their and our lawyers."

28.   On August 1, 2014, FRITSCH wrote, in relevant part, "Universal deal documents are with the lawyers."

29.   On August 10, 2014, FRITSCH wrote, in relevant part, "The deals Universal and Yucaipa will realistically  close at the end of this month between Aug 22 and 28."

---

[5] Based on my training and experience in the financial services industry, I know that Private placement intermediaries may take commissions prior to transferring funds to companies like StarClub.   Investors' wires to private placement intermediaries, therefore, may be slightly larger than the amount effectively provided to StarClub on a post-commission basis, if applicable.

[6] All statements quoted from e-mails are quoted as they appeared and include typographical errors.

30. On July 20, 2017, I learned from Ted Ragsac, NBCUniversal Media, LLC's ("NBCUniversal") custodian of records, that as of that date, NBCUniversal had not been able to locate any documents related to StarClub or FRITSCH.

c. FRITSCH'S misrepresentations re: Yucaipa

31. Over a series of e-mails in or around July and August 2014, FRITSCH represented to D.G. that the Yucaipa Companies ("Yucaipa") would be investing and lending expertise to StarClub. Based on my knowledge of the finance industry, I know Yucaipa is a Los Angeles-based private equity and venture capital firm and that Ron Burkle is its founder.

32. On July 18, 2014, FRITSCH wrote an e-mail to D.G. and said, in relevant part:

"Richard D'Abo (Ron Burkle's CFO) is putting the deal together.

We spent several hours together at their office and then met with the co-investor Ted Fields.

Monday evening with Ron Burkle."

33. On July 29, 2014, FRITSCH wrote, in relevant part, "I will be meeting with Ron Burkle this week in NYC, Thursday, Friday to complete the discussions about the deal."

34. On July 31, 2014, D.G. asked FRITSCH in an e-mail, "Did deal get done with Burkle?" On August 1, 2014, FRITSCH responded, in relevant part,

"Yes, according to Ron B we have a deal for $9 per share.

Plus get the talent of his management firm for SC.

He cannot get pinned down to the final dollar amount.

I will see him again on Wednesday.  [. . . ]

Paper work will get done by his CFO Richard D'Abo who

called me and asked that we have to work with their speed

but he will get it done … - whatever this means at the end.

Let's stay tuned."

35.   On August 10, 2014, FRITSCH wrote, in relevant part,

"The deals Universal and Yucaipa will realistically  close at

the end of this month between Aug 22 and 28."

36.   On July 14, 2017, I interviewed D'Abo, a partner at

Yucaipa.  D'Abo told me that during a June or July 2014 meeting

at the **SUBJECT PREMISES**, FRITSCH told him that StarClub was

going public in Canada at $9 per share and had stock to offer at

$7.50.  After D'Abo reviewed StarClub's investor materials, he

concluded that StarClub was "very fishy" and that its valuation

was "stupid."  D'Abo said that the Yucaipa-StarClub talks never

progressed to any level of diligence and Yucaipa never indicated

to StarClub that it was planning to invest.  According to D'Abo,

Burkle never told FRITSCH that Yucaipa had a deal with StarClub,

and D'Abo never told FRITSCH that he was completing paperwork or

that StarClub would have to work with Yucaipa's deal speed.

D'Abo further said that it was not accurate for anyone to

conclude that a deal between StarClub and Yucaipa would close in

August 2014.

37.   On April 20, 2017, I interviewed Henry Orren, an

attorney at Yucaipa.  Orren told me that he spoke to Burkle, and

that Burkle had heard of FRITSCH but did not recall meeting

FRITSCH or anyone from StarClub.

d. *FRITSCH'S misrepresentations re: WME*

38. As noted above, on July 11, 2014, FRITSCH wrote an e-mail to D.G. and said, in relevant part, "We are in the middle of a set of meetings with NBCUniversal and WME. ( WilliamMorris) this week and this coming week." Based on my open-source research and interviews as part of this investigation, I know that WME (alternatively, "William Morris Endeavor" or "WME-IMG") is a talent agency based in Beverly Hills.

39. On August 1, 2014, FRITSCH wrote, in relevant part, "WME: we are proceeding here as well . Once they have solved their internal conflicts we can close."

40. On April 13, 2017, Evan Kass ("Kass"), a WME attorney, told me that Kathi Sharpe-Ross ("Sharpe-Ross"), a StarClub consultant introduced WME to StarClub. Based on my conversation with Kass, I know the following:

a. WME employees met with StarClub employees twice in meetings of an introductory and informational nature. Only one WME employee attended the first meeting. Following the second meeting, which two or three WME employees attended, the WME employees decided that WME would not pursue any commercial opportunities with StarClub.

b. According to Kass, it would not have been reasonable for anyone to represent that WME was seriously considering an investment in StarClub.

41. On April 25, 2017, Kass provided me with an email exchange between WME employee Matt Edelman and Sharpe-Ross on September 8, 2014. In the email, Edelman wrote to Sharpe-Ross,

17   [Instrumentality Protocol]

in relevant part, "As I mentioned when we talked after the
meeting here, the folks who joined just were not compelled by
the opportunity." In response, Sharpe-Ross wrote, in relevant
part, "All good."

> e.   *FRITSCH'S misrepresentations re: Jeffrey Lo*

42.   On September 15, 2014, FRITSCH wrote an email to D.G.
and said, in relevant part, "Jeffrey Lo, MD and partner at
Fortress is son of the wealthy Lo bankers-family in Hong Kong.
He is a big fan StarClub and the new and possible COO Ray Lee
for SC. Sat with Jeff in NY for a long time. He offered to
attend the GS meeting, as he would love fund the US$ 40MM for SC
either at Fortress or other avenues of his rolodex and have GS
to produce the exit."

43.   I interviewed Jeffrey Lo on May 5, 2017, and based on
that interview, I know the following:

a.   Lo never expressed an interest in investing in
StarClub. Lo declined StarClub's offer to provide him a small,
free equity stake in StarClub in exchange for Lo's advisory
services.

b.   Lo was introduced to StarClub because of
StarClub's aborted plan to acquire one of his portfolio
companies. Lo was immediately skeptical of StarClub, which he
described as "a scam."

c.   On June 2, 2017, Raymond Lee, a former StarClub
employee and former business associate of Lo, told me that Lo
never expressed any interest in making a large investment in
StarClub.

          f.    FRITSCH'S misrepresentations re: Access

     44.   On December 8, 2014, FRITSCH represented to D.G. that

Access Industries, Inc. ("Access") was interested in investing

in StarClub and also asked D.G. to invest in StarClub through

D.G.'s company, Salida.  Specifically, in an e-mail to D.G.,

FRITSCH said, in relevant part:

     "Here is the update:

     1) ACCESS: Best introduction Goldman made. GREAT, GREAT,

     GREAT!! -- We will get 3 investors out of their group

     between $ 10MM and $ 20MM by Jan 15.

     [ . . .]

     5) Salida: If we could close on the US$ 2.7 at $ 4/share in

     escrow, at the end of this week, this would be very

     helpful."

     45.   Prior to this e-mail, in June 2014, D.G. had

introduced a contact from Goldman Sachs to FRITSCH to assist

FRITSCH with introductions to other asset managers and direct

celebrities to FRITSCH for future business.

     46.   Directly in response to FRITSCH'S December 8, 2014 e-

mail, D.G. asked FRITSCH to send him the purchase and sale

agreement with wire instructions.

     47.   On December 10, 2014, FRITSCH sent D.G. an e-mail

attaching a capitalization table as of November 20, 2015,

showing the number of issued and outstanding StarClub shares,

and other StarClub securities, as well as a separate table

showing the number of StarClub shares and other StarClub

securities held by Harrington.  According to a December 10,

                              19    [Instrumentality Protocol]

2014, e-mail, FRITSCH also sent D.G. a stock purchase agreement. Based on my review of an unexecuted copy of a stock purchase agreement dated December 10, 2014, and provided to me by D.G., I know that the unexecuted stock purchase agreement noted that a group of original investors, including Alpha Capital Anstalt ("Alpha") entered into a Settlement Agreement with StarClub on May 6, 2014, and that pursuant to that settlement agreement, StarClub had agreed to repurchase all of the stock and warrants from those original investors for $2,797,504. The stock purchase agreement further provided that Salida agreed to buy all of the stock held by the original investors for a total amount of $2,797,504, and that StarClub would use $1,529,504 of the proceeds to pay off the outstanding settlement account.

48. Based on my review of account records for the StarClub Wire Account, I know that on December 15, 2014, Salida wired $2,797,504 to the StarClub Wire Account.

49. On December 23, 2014, D.G. sent an e-mail to FRITSCH and asked whether FRITSCH "close[d] part of the placement early." In response, FRITSCH wrote:

> "Nothing has closed yet. Since Dec 18 everyone who was in the pipeline is gone on holiday vacatio nand [sic] back on Jan 6. I am confident that we will close in Jan/fFeb [sic] as scheduled. It does not change the fact that we need cash now to produce revenues, which is highly important as revenues will drive up the share price tremendously. In fact .... ACCESS in London - I found out - is nervous that our revenues will go up in Jan/Feb before they can write a

20     [Instrumentality Protocol]

check and then the share price would be possibly way over $ 20/share.

The new Instagram evaluation of US$ 35 Biillion and the news that Maker Studios ( Disney) is planning to enter into a commercial transaction with StarClub by Feb did light a fire under everyone's ... ."

50. During my aforementioned interview of Lo on May 5, 2017, Lo said FRITSCH had told him that StarClub was in talks with Access and insinuated that Access was investing in StarClub, which shocked Lo. FRITSCH told Lo that his Access point of contact was in London.

   a. As discussed further below, on May 25, 2017, I interviewed J.M., a London-based partner at Access Media, LLC and learned that J.M. invested in StarClub in his personal capacity. J.M. told me that he never introduced FRITSCH to Access because J.M. considered StarClub too speculative of an investment for Access. J.M. also told me that Access never invested in StarClub.

   b. On May 9, 2017, David Sebastiani, the current Vice President of Business Affairs ("VP – Business Affairs") at Access, told me that Access never invested in StarClub. Sebastiani spoke to one of Access's investment executives, who referred Sebastiani to J.M. because J.M. is familiar with Access' investments.

   g.   *FRITSCH'S misrepresentations re: Disney*

51. Based on my interviews with D.G. and my review of e-mail correspondence provided to me by D.G., I know that FRITSCH

represented that the Walt Disney Company ("Disney") was interested in a commercial partnership with StarClub. Specifically, I know that on August 15, 2014, FRITSCH wrote an email to D.G. and said, in relevant part:

"I just got back from a long an [sic] intense but very positive meeting with Disney:

1) They are willing to proceed on the deal

2) they are going back and running the numbers now

3) They do not have a conflict with Aaron Siegel from GS

4) They want us to perfect the business model between StarClub and Marvel and StarClub and ESPN. - I have to go to back to NYC fort [sic] this.

5) Thumbs up! - Timing? - We need to get some numbers from them in order to understand this better but we are on a perfect track!"

52.   As noted above, on December 23, 2014, FRITSCH wrote, in relevant part, "the news that Maker Studios ( Disney) is planning to enter into a commercial transaction with StarClub by Feb did light a fire under everyone's ... ."

53.   On January 27, 2015, FRITSCH wrote, in relevant part:

"I like to encourage us to complete the US$ 10 Million fund raise for the company this week. - I have attached the deal document which protects investor as well as the company in an acceptable dimension.

The meeting with Disney was better than expected: We decided to engage an investment banker whom we both know and trust from Moellis & Company ( not Goldman Sachs) and

start the process of the M&A transaction. Key and basis of the evaluation will be the amount of video views more than revenue or reach. This is why it is now even more important that we launch as many channels as fast as we can and trigger the video views. Those come through the content which we need to make sure to able to provide and can provide as soon as we will have the funds available to inject into the system. THIS IS GOING TO BE BETTER THAN EXPECTED!"

54. An associate general counsel at Disney, Gordon Goldsmith, told me on April 14, 2017, that in 2014 or 2015, a third party introduced StarClub to a Disney representative, who in turn introduced StarClub to other Disney employees. Those Disney employees met with the StarClub CEO one time. Although the StarClub concept was interesting, the presentation "led to zero interest" and the StarClub employees were "not impressive." The meeting "never went anywhere." Goldsmith also told me that StarClub's CEO, i.e., FRITSCH, visited Disney again in roughly 2016.

55. On July 25 2017, Courtney Holt, a then-executive at Maker Studios, which was acquired by Disney in 2014, told me that he was introduced to FRITSCH via email in approximately February or March 2015. Holt met with FRITSCH in approximately March 2015. Holt concluded that Maker Studios already did what StarClub did and gave StarClub "a little bit of a brush off." Holt told me that he definitely would have known if Disney had considered investing in, or acquiring, StarClub, which would

have caused Holt to run a completely different process with StarClub.

> h.  D.G.'s January and November 2015 Investments in StarClub

56.  Based on my review of account records for the StarClub Wire Account, I know that on January 30, 2015, Salida wired $7,000,000 to the StarClub Wire Account.

57.  Based on my review of e-mails provided to me by D.G., I also know that:

a.  On August 6, 2015, FRITSCH sent D.G. an e-mail attaching a capitalization table showing issued and outstanding StarClub shares, and other StarClub securities, as of August 4, 2015.  On August 12, 2015, FRITSCH sent D.G. an e-mail in which he attached a financial presentation.  According to a slide titled "Historical Results," StarClub's 2014 total Revenue was $803,525; its Cost of Goods sold was $320,155, resulting in a Gross Profit of $483,371 [sic].  StarClub's "Selling, General and Administrative Expenses," were listed at $9,748,508.

b.  On October 1, 2015, FRITSCH sent D.G. an e-mail containing an analysis of projected results from capital injections of $25 million, $50 million, and $100 million.

c.  On November 17, 2015, FRITSCH sent D.G. a Unit Purchase Agreement, an 8% secured convertible note, and a warrant form.  The Unit Purchase Agreement provides the following regarding the Use of Proceeds: "The proceeds of the Units shall be used for general corporate purposes, including without limitation to launch vertically integrated and

interactive social media platforms (the "Channels") for talent partners celebrities, influencers and global brands and for technology enhancements related to such Channels." On November 18, 2015, and again on November 20, 2015, POLSEN re-sent the documents to D.G.

     d. According to a November 23, 2015, e-mail Harrington returned the executed Unit Purchase Agreement, note, and warrant back to StarClub, and that same day, POLSEN returned the documents back to Harrington with StarClub's signature. On November 24, 2015, D.G. told FRITSCH via e-mail that he had wired $6 million. On November 24, 2015, FRITSCH confirmed that StarClub received the $6 million.

     *i.  FRITSCH's failure to provide financial statements*

58. As further discussed below, I know from my interviews with O'Reilly, StarClub's former Chief Marketing Officer, that D.G. introduced O'Reilly to StarClub. From those interviews, I also know that O'Reilly only worked for StarClub for a few months and that, after O'Reilly left StarClub, D.G. contacted O'Reilly. Based on my interviews with D.G., I know that D.G. recalled that O'Reilly told him, "[D.G.], there's nothing there . . . Get a lawyer."

59. Based on my interviews with D.G., I also know that following a conversation with O'Reilly in early 2016, D.G. began to ask FRITSCH for StarClub's audited financial statements from 2014 through 2016. In particular, on April 14, 2016; April 19,

2016; and June 9, 2016, D.G. sent POLSEN emails asking for
StarClub's audited financials.

60.  Based on my review of e-mails provided to me by D.G.,
I know the following: On June 11, 2016, POLSEN sent D.G. an
email with a StarClub balance sheet as of December 31, 2013, and
a StarClub statement of operations for 2014.  The statement of
operations itemized a total of $9,683,470 in operating expenses,
broken down into categories including, but not limited to:
$682,663 for payroll; $99,460 for payroll tax; $951,801 for
"Consultants and Outside Contractors;" $64,439 for "Professional
Fees – Accounting;" $1,882,540 for "Professional Fees –
Investment Banking"; $1,242,773 for "Professional Fees – Legal";
and $288,956 for "Professional Fees – Other".  The statement did
not include any other compensation-related categories.

a.  As described further below, based on my review of
a July 2017 FBI forensic accounting, in 2014 StarClub
transferred $1,145,000 from the StarClub Wire Account (to which,
as noted below, FRITSCH is the only signatory) to an account for
Greenwich Music Inc.  As further noted below, according to
payroll records for Greenwich Music Inc., FRITSCH is the only
person who receives a salary from Greenwich Music Inc.  In 2014,
StarClub also transferred $1,105,000 from the StarClub Wire
Account to accounts associated with 3229 Rambla Pacifico, Inc.
during 2014.  As noted below, 3229 Rambla Pacifico, Inc. is an
entity that currently owns the Rambla Pacifico property that
FRITSCH purchased in 2008.  In total, in 2014, StarClub

transferred $2,250,000 to accounts for Greenwich Music Inc. and 3229 Rambla Pacifico, Inc.

      b.    On June 15, 2016, POLSEN sent D.G. an email containing consolidated financial statements and an "Independent Auditor's Report," prepared by MNP LLP ("MNP"), a Canadian accounting firm. According to the MNP report, MNP provided financial statements for StarClub for years 2011, 2012, and 2013, and StarClub paid a total of $741,000 in fees in 2013 to the CEO, CFO, "and additional advisors to the Company."

      61.    On November 2, 2016, D.G. wrote an email to FRITSCH asking for, among other things, a new board and audited financials. D.G. also asked, in relevant part, "Where did all the money go?" and sought confirmation of StarClub's corporate structure and contracts.

      62.    On November 2, 2016, FRITSCH responded via e-mail to D.G. and said, in relevant part, "90% of focus and funds are going towards tech development. Yes, we will improve corporate structure, reports, CFO, and COO ."

      63.    On November 14, 2016, D.G. again sent FRITSCH an e-mail requesting StarClub's financial statements. D.G. also wrote, in relevant part, "I don't understand where all the money has gone when this system was suppose to be done last year. It doesn't add up. Also, these contracts are only paid if you convert revenue for the clients. Contrary to what was said in Nyc. How realistic is that? This frankly isn't what was advertised to me at any point […] It's been 2 plus years since we invested in this company and nothing has happened but

millions have been spent. Where is Spotify, Disney Bertelsmann and the rest ? They haven't bought it because the system isn't built and isn't what is advertised. Tell me I am wrong?"

64.   In response, on November 14, 2016, FRITSCH wrote to D.G., "I am glad to say that you are wrong," and said that he would call D.G. the next day.

65.   In late 2016, D.G. attended an investor presentation led by FRITSCH at the offices of Goldman Sachs in New York City that an associate of his who also attended, recorded. Based on my review of the audio recording of this meeting, I know that FRITSCH said that StarClub had spent $62 million raised by 32 investors and that StarClub needed an additional $20 million.

Information Provided by Victim-Investor I.M.

66.   On March 13, 2017, I interviewed I.M.  I.M. has also provided me with copies of e-mail correspondence between him and FRITSCH, other StarClub employees, and D.G., as well as the original pitch materials that I.M. received from StarClub. Based on that interview and my review of the documents provided by I.M., I know the following:

a.   D.G. introduced I.M. to StarClub in 2015.

b.   In January 2016, I.M. attended a presentation by FRITSCH at the **SUBJECT PREMISES**. At that presentation, FRITSCH said that StarClub would close a big deal that year.  I.M. also met with POLSEN during his visit.

c.   Based on my review of StarClub materials dated October 2015 which I.M. provided to me on or about March 13,

2017, and which I.M. described as "the original pitch document"
he saw and "what we all invested in," I know the following:

      i.    StarClub describes itself as "the world's
first, agnostic and fully automated Social Media Broadcast
Network, aggregating celebrity influence (and curated) content
and delivering verifiable reach and views, though all Social
media channels."

      ii.    The pitch materials represent that StarClub
is led by FRITSCH and "has invested 4 years and $90m developing
its own proprietary enabling technology/IP through its wholly
owned StarSite® system – with 9 patents filed and 6 patents
issued." As noted above, StarClub does not have any patents
issued in its name, but FRITSCH has four patents issued in his
name.

      d.    The pitch materials further represent that
"Current investors include Access Industries, Credit Suisse,
Harrington Global, Warner and others." As noted above,
according to Sebastiani, VP – Business Affairs for Access, and
J.M., an Access employee who invested in StarClub in his
personal capacity, Access never invested in StarClub. On or
about April 19, 2017, Credit Suisse Securities (USA) LLC,
informed me that it had not been able to locate records to
indicate that it had considered a transaction with StarClub or
FRITSCH. As discussed below, J.M. told me that he introduced
FRITSCH to Warner UK. On July 8, 2017, Brad Cohen, Vice
President and Senior Litigation Counsel at Warner Music Group,
told me that Warner Music Group never invested in StarClub.

67. Based on my review of e-mail correspondence provided to me by I.M. between I.M. and StarClub employees, I know that on January 25, 2016, I.M. told POLSEN that it had been great to meet him last week and that I.M. had gone to his bank to wire $1 million to StarClub. On January 27, 2016, POLSEN confirmed receipt of the funds.

68. Based on my interview with D.G. on July 21, 2017, I know the following:

a. In January 2016, D.G., I.M., and one additional investor, D.C., attended the January 2016 meeting with FRITSCH at the **SUBJECT PREMISES.** The purpose of the meeting was to close D.C. and I.M.'s investments and obtain an update about StarClub.

b. POLSEN attended the portions of the meeting involving finance, strategy, and pilot projects. StarClub employees Richards, Lisabeth,[7] O'Reilly, and Cartwright, StarClub's then-CTO, attended various portions of the meeting.

69. Based on my interview with then-current StarClub employee Richards on December 21, 2016, I know the following:

a. Richards was an application developer for StarClub. In January 2016, he assisted in setting up the January 2016 investor presentation, but did not attend the financial portion of the presentation because FRITSCH asked him to leave the room.

---

[7] As noted above, according to StarClub payroll records, Lisabeth's termination date was February 28, 2015.

b.     After the meeting, Cartwright, StarClub's then-CTO, was livid because FRITSCH said that StarClub had spent $90 million on technology development when answering D.G.'s question about why StarClub needed more money.  According to Richards, Cartwright told Richards that StarClub had barely spent $2 million on development and that Cartwright did not want to be associated with the $90 million figure.

### Information Provided by Former StarClub Employee Gavin O'Reilly

70.     On December 14, 2016, and July 20, 2017, I interviewed O'Reilly, a former StarClub employee.  Based on those interviews, I know the following:

a.     O'Reilly's brother introduced O'Reilly to D.G. D.G. told O'Reilly's brother, in whose company D.G. was an investor, that O'Reilly should meet FRITSCH.  Around May 2015, O'Reilly met with FRITSCH at the **SUBJECT PREMISES**.  O'Reilly joined StarClub in September 2015 as its Chief Marketing Officer.  FRITSCH promised O'Reilly a compensation package that included an eventual salary of $25,000 per month and 200,000 options, which O'Reilly valued at several million dollars. According to O'Reilly, FRITSCH failed to uphold the financial promises he made.

b.     In approximately December 2015, Cartwright, StarClub's then-CTO, told O'Reilly that StarClub had not even spent $5 million on technology, despite FRITSCH'S claims that the number was $90 million.

c.   In mid-January 2016, D.G. and I.M. attended a presentation at the **SUBJECT PREMISES**; FRITSCH told StarClub's employees to be present in their offices and look busy during D.G. and I.M.'s visit. Although O'Reilly expected to be included in the financial portion of the presentation, he was not invited. O'Reilly was present during the non-financial portion of the presentation. O'Reilly became aware that FRITSCH told D.G. and I.M. that StarClub's revenue was at least $15 million.

i.   According to D.G., whom I interviewed on July 21, 2017, one of the slides presented during the meeting indicated that StarClub had generated $15 million in 2015 revenue.

ii.   According to Richards, whom I interviewed on December 21, 2016, Richards assisted in setting up the January 2016 investor presentation, which involved moving material from POLSEN'S memory stick to the presentation computer. Richards saw that the presentation he moved to the computer stated that StarClub made a $15 million profit in 2015, which Richards knew was too high. When the meeting turned to financial discussions, FRITSCH asked Richards to leave the room. According to Richards, shortly after the meeting, POLSEN demanded that Richards delete the information he had transferred from the memory stick to the presentation computer and POLSEN watched Richards to ensure he did so.

d.   Following the January 2016 meeting, O'Reilly asked FRITSCH for StarClub's revenue figures. In response,

FRITSCH said that StarClub's 2015 revenue was $10 million.  When O'Reilly pointed out that FRITSCH had told D.G. $15 million the week prior, FRITSCH said he wanted to be on the safe side. FRITSCH then advised O'Reilly to describe StarClub's revenue as greater than $1 million.

  e. Based on my review of an e-mail I received from O'Reilly on December 15, 2016, I also know that in or around January or February 2016, FRITSCH told O'Reilly that the balance in a JPMorgan StarClub account was greater than $6 million prior to the first quarter investment round for an additional $10 million.  FRITSCH also showed O'Reilly the JPMorgan account balance from FRITSCH'S computer and told O'Reilly that the monthly run rate on costs was $600,000.

  f. In February 2016, O'Reilly left StarClub after securing a separation settlement.[8]  Around that time, D.G. repeatedly contacted O'Reilly in an attempt to confirm whether there was value in StarClub, as well as to ask about the status of StarClub's deals with companies like Universal and Disney. After securing a separation settlement from StarClub, O'Reilly told D.G. in March or April 2016 that FRITSCH was a "bullshitter."

Information Provided by Victim-Investor R.P.

  71. On March 21, 2017, and July 23, 2017, I interviewed R.P.  Based on those interviews, I know the following:

---

[8] According to StarClub payroll records, O'Reilly's termination date was March 31, 2016.

a.    R.P. was introduced to StarClub by G.C., or possibly another associate of D.G.'s.    Prior to R.P.'s StarClub investment, R.P. participated in a conference call with FRITSCH in which FRITSCH said that StarClub was about to go public via a reverse merger through Sabre.

i.    According to a May 29, 2014, auditors' report prepared by MNP for 2011, 2012, and 2013, and which I have reviewed, on January 21, 2014, StarClub entered into a letter of intent with Sabre for a reverse merger.

ii.    Further, as noted above, the StarClub subscription agreement with a requested execution date of June 23, 2014, referenced the Sabre reverse take-over transaction.

b.    According to R.P., in early 2014, R.P. invested $546,228 in StarClub in his personal capacity in conjunction with the First Private Placement Deal.    R.P's sister and two business associates also invested at that time.    Based on my review of wire confirmation records provided by R.P., I know that on May 30, 2014, R.P. wired $380,000 to Goodman's for the purchase of 100,000 StarClub shares.

c.    According to R.P., StarClub canceled its reverse merger plans soon after R.P.'s investment.    Based on my review of a press release found on MarketWatch.com, I know that Sabre announced it had terminated the reverse merger on November 18, 2014.

d.    In around December 2016, R.P. recorded a telephone call between R.P., M.B. (another investor known to

34    [Instrumentality Protocol]

R.P.), and POLSEN.  Based on my review of the audio recording of
that telephone call, I know the following:

    i.   POLSEN represented to R.P. that German
companies had signed contracts and that StarClub had been in
discussions with Disney.  As noted above, FRITSCH visited Disney
once in 2016, and although Disney employees met with StarClub
one time around 2014 or 2015, the meeting "never went anywhere."

    ii.  POLSEN said that StarClub was likely to earn
"low eight figures" in fiscal year 2016 revenue.  POLSEN also
represented that since inception, StarClub had raised $60
million.

    iii. When R.P. asked POLSEN for financial
statements, POLSEN declined by saying, "How do I say this . . .
I understand, I and this, please hear me out on this.  We sent
out documents that – and I'm not picking on you, just, just hear
me out for a second – w-we sent out documents to people that
were under NDA as well and, and much to our dismay, these
documents ended up in, in a, a certain person's hands . . . ."

    e.   Following the December 2016 telephone call,
neither POLSEN nor anyone at StarClub sent financial statements
or any material to R.P.

    f.   In approximately early July 2017, R.P. contacted
POLSEN to inquire about conversion options for holders of
StarClub warrants facing expiration.  POLSEN never responded.
In R.P.'s experience, a real company would have responded to
such an inquiry.

Information Provided by Victim-Investor J.M.

72. On May 25, 2017, I interviewed J.M. Based on that interview, I know the following:

a. J.M. was introduced to StarClub in late 2014 by Goldman Sachs employee M.R. M.R. described StarClub to J.M. as amazing and almost too good to be true.

b. J.M. met with FRITSCH in London during the first half of 2015. FRITSCH hinted that Disney was interested in buying StarClub and said that Disney needed a more effective platform and that a senior Disney official was coming to StarClub a lot.

c. J.M. introduced FRITSCH to J.M.'s contacts at Warner UK, Spotify, ProSieben, and Morgan Stanley. J.M. never introduced FRITSCH to Access because J.M. considered StarClub too speculative of an investment for Access.

d. J.M. invested approximately $500,000 in StarClub in April 2015 in a personal capacity.

e. In late 2015 or early 2016, FRITSCH told J.M. that Spotify was very close to making a nine-figure offer for StarClub and that an unidentified German company was also in active negotiations to buy StarClub.

f. StarClub never provided J.M. with any financial documents. When J.M. asked for StarClub financials in response to a request from FRITSCH for more money, FRITSCH dropped the subject.

g.     In October 2016, FRITSCH asked J.M. to participate in a fundraising round for StarClub.  J.M. ignored FRITSCH's request.

h.     According to records provided by Access, on October 27, 2016, FRITSCH wrote in an email to J.M., "We have now closed 3 major B-t-B deals  with US $ 50 Million in revenue each. But we need to acquire therefor a couple of companies in complete certain development which requires US$ 20 Million in funding. Any thoughts are welcome, we need $ 5MM of this during the course of this year to perform on the deals. We have currently over 100 developers – just FYI. It has become a real tech company."

i.     Based on my review of StarClub payroll records, however, I know that on October 27, 2016, StarClub had 12 active employees, three of whom were 1099-Misc employees.

j.     According to former StarClub employee O'Reilly, who I interviewed on December 14, 2016, Mastertec employs four or five technical employees.

### Information Provided by Henry Eugene Lesniak

73.   On February 9, 2017, I interviewed Lesniak and learned the following:

a.     Lesniak was an accountant for SKMC, LLP.  Based on my review of the results of a Google search, I know that SKMC is an accounting and bookkeeping service in Los Angeles, California.  StarClub was a client of SKMC and in October 2012, SKMC introduced Lesniak to POLSEN.  Between approximately October 2012 and October 2013, Lesniak performed bookkeeping

work for StarClub. In October 2013, Lesniak became CFO of AAA
Flag & Banner, but retained responsibility for processing
StarClub's payroll. At the time of the interview, LESNIAK
remained responsible for processing StarClub's payroll.

     , b.   Lesniak's responsibilities are limited to
bookkeeping; POLSEN prepares StarClub's financial documents.
POLSEN works from his home and StarClub's financials are stored
on POLSEN's home computer, while basic bookkeeping records are
stored on QuickBooks at the **SUJBECT PREMISES**.

     c.   Lesniak described the sharing of StarClub's
financial information as "about as air-tight as it gets."
According to Lesniak, FRITSCH and POLSEN are very careful about
disseminating information, including, for example, refusing to
identify StarClub's investors, providing only minimal detail for
expense ledger entries, and retaining strict control over
StarClub wires and checks.

Undercover Investigation with Potential Investor

   74.   On May 24, 2017, D.G. and an FBI SA acting as a
potential investor in a UC capacity met with FRITSCH, POLSEN,
Charles Sanders ("Sanders"), and Mamann at the **SUBJECT PREMISES**.
Based on my review of the State Bar of California Website and of
an e-mail I received from O'Reilly on December 15, 2016, I know
that Sanders is a New York-based attorney licensed to practice
law in California. As noted above, based on my review of a
December 15, 2016, e-mail from O'Reilly, I also know that Mamann
is StarClub's COO. Based on my review of the audio recordings

from that meeting, and my conversations with the undercover FBI
SA and D.G., I know the following:

       a.    During the meeting, FRITSCH, Sanders, and Mamann
gave an investor presentation to D.G. and the UC FBI SA.

       b.    During the investor presentation, the UC FBI SA
asked FRITSCH if he was taking a salary from StarClub. FRITSCH
responded, "So-so what we're doing, we run this thing here. Ten
thousand a month. Ten thousand a month, ten thousand a month,
ten thousand a month. That- that's how it works. And it's
sellable also to . . . break people, that used to take a
million."

       c.   During the investor presentation, FRITSCH also
said that StarClub had a dialogue going with Disney and Spotify.

       d.    After the conclusion of the investor
presentation, the UC FBI SA spoke with POLSEN. POLSEN told the
UC FBI SA that he did more of the "finance stuff" and the
"accounting" at StarClub, but that he also got involved in HR.
POLSEN added, "So I-I review all the agreements, you know even
before the lawyers get a mixture of what's in there. I know the
right, I know where all the- what the deal terms are . . . so .
. . you know from what I do...we're not in bad shape." When the
UC FBI SA asked whether POLSEN was "pretty hands on," POLSEN
responded, "I have to be." POLSEN said that he had "been with
Bernhard for ten years," and that FRITSCH was a "good guy."
POLSEN also said, with regards to FRITSCH, "I mean I respect him
not only on his intellect but I respect him as well as an asset
and that's important to me that's the way I was raised."

e.    Following the investor presentation, and around the time that the UC FBI SA was speaking with POLSEN, FRITSCH spoke privately with D.G. in FRITSCH's office.  During that audio-recorded conversation, FRITSCH told D.G., "So let me make sure you get a chunk of that money back."  FRITSCH then asked D.G., "Do you think [the UC FBI SA is] good for 25 million?"  After D.G. said that the UC FBI SA was, FRITSCH said, "So, um, if he's good for 25 million, so let me see, let me get you maybe 20 percent of that back, 25 percent, 5, 6, 7, million how's that sound?"  FRITSCH added, "So do the math, 25 percent of 25 gives you. . . ."  D.G. agreed to FRITSCH's proposal and responded, "I think I can get other guys to come in, Bernhard," to which FRITSCH responded, "Well we can play this game all night long. You take 20, 30 percent of what comes in."

f.    After FRITSCH and D.G. concluded their conversation, FRITSCH, D.G., Sanders, and Mamann had lunch at a nearby restaurant.  The UC FBI SA did not attend the lunch. During the lunch, which was audio-recorded, FRITSCH told D.G., "We're there.  And everything we discussed in my office we will execute as discussed."

**D.    Use of Interstate or Foreign Wire**

75.    Based on my review of account records for the StarClub Wire Account and related bank accounts, as well as Federal Reserve Bank of New York records, I know that on January 25, 2016, I.M. wired $1,000,000 to the StarClub Wire Account via Wells Fargo Bank.  The originator of the $1,000,000 wire above was located in Smiths, Bermuda.  The originating financial

institution was the Bank of Butterfield & Son Limited in Hamilton, Bermuda. The sending financial institution was Wells Fargo, and the receiving financial institution was Washington Mutual. This wire followed numerous misrepresentations made by FRITSCH, and others acting on FRITSCH's behalf, to I.M. (see paragraphs 66-67, 70(c)-(d) above) including misrepresentations as to the number of patents owned by StarClub, the amount of money StarClub spent on technology development, StarClub's current investors, and StarClub's revenue, and therefore establishes probable cause for a violation of Title 18, United States Code, Section 1343 (wire fraud) as alleged in the criminal complaint against FRITSCH.

### E. Financial Analysis

76. Based on my review of account records for the StarClub Wire Account (see paragraph 23 above) and related bank accounts, I know the following:

a. On May 8, 2013, StarClub opened the StarClub Wire Account. The StarClub Wire Account is a Chase business checking account for StarClub. The sole account signatory is FRITSCH.

b. On May 8, 2013, StarClub also opened a business checking account with Chase, account number 211786339 ("the StarClub Checking Account"). The current account signatories are FRITSCH, Lesniak, and Fredricks. Margaret Gonsalves, a non-StarClub employee, was a signatory from the inception of the account until February 17, 2016.

c. On October 21, 2013, StarClub opened a business savings account with Chase, account number 3601239717 (the

"StarClub Savings Account"). The sole signatory of the account is FRITSCH.

77. Based on my review of underlying financial records for the StarClub Wire Account, the StarClub Checking Account, the StarClub Savings Account, and two other known StarClub accounts that were open as of January 1, 2014, I know the following:

a. As of January 1, 2014, before StarClub received any of the investments described herein, StarClub had approximately $944,575.02 in its accounts. Based on my review of a July 2017 FBI forensic accounting, I understand that from January 1, 2014, through December 31, 2016, approximately $35 million was wired or otherwise transferred into the StarClub Wire Account by known and unknown investors. Over the same period, as depicted in the chart below, StarClub, i.e., FRITSCH, made the below-listed transfers from the StarClub Wire Account or StarClub Savings Accounts to accounts for Greenwich Music Inc. and 3229 Rambla Pacifico, Inc.

| Transfers from StarClub accounts to Greenwich and Rambla Pacifico accounts (01/01/2014 - 12/31/2016) | | | | | |
|---|---|---|---|---|---|
| Sender | Receiver | 2014 | 2015 | 2016 | Total |
| StarClub Wire Account | Rambla Pacifico x6803 | $0 | $350,000 | $660,000 | $1,010,000 |
| StarClub Wire Account | Rambla Pacifico x7568 | $870,000 | $446,000 | $402,500 | $1,718,500 |
| StarClub Wire Account | Rambla Pacifico x6377 | $135,000 | $195,000 | $265,000 | $595,000 |
| StarClub Wire Account | Rambla Pacifico x6313 | $100,000 | $0 | $0 | $100,000 |
| StarClub Wire Account | Greenwich Music | $1,145,000 | $1,230,000 | $1,595,000 | $3,970,000 |
| StarClub Savings Account | Rambla Pacifico x7568 | $0 | $130,000 | $0 | $130,000 |
| StarClub Savings Account | Rambla Pacifico x6377 | $0 | $40,000 | $0 | $40,000 |
| StarClub Savings Account | Greenwich Music | $0 | $340,000 | $0 | $340,000 |
| | | | | Grand total: | $7,903,500 |

78.   Based on my review of California SoS Records, I know that Greenwich Music Inc. ("Greenwich Music") was incorporated in Delaware on June 21, 2012.  Hubertus von Hesse is listed as its President.  Greenwich Music's principal office is located at 650 North Sepulveda Boulevard, Los Angeles, California 90049.

79.   According to JPMorgan Chase records, Greenwich Music has a business checking account, account number xxxxxxxx48-65 (the "Greenwich Music Account"), which was opened on September 10, 2004.  FRITSCH has been a signatory on the account since its inception, and non-StarClub employee Miraflor Stemman was added

as a signatory on February 28, 2014.  From February 28, 2014,
until February 17, 2016, Mederos was a signatory on the account.

80.  Based on my review of California SoS Records for 3229
Rambla Pacifico, Inc., I know that 3229 Rambla Pacifico, Inc.
was incorporated on July 16, 2008.  RAVIN is listed as its CEO,
Secretary, and CFO.  Its corporate address is 6017 Bristol
Parkway, Culver City, California 90230.

81.  Based on my review of publically available records for
the Rambla Pacifico property, I know the following:

a.  FRITSCH purchased the property on November 21,
2008 for $4.56 million.  On November 24, 2008, the Rambla
Pacifico property was nominally transferred to "3229 Rambla
Pacifico Inc."  Based on my review of account records from
Deutsche Bank and property tax records for the Rambla Pacifico
Property, I know that Deutsche Bank currently holds the mortgage
for the Rambla Pacifico Property.

82.  According to JPMorgan Chase and Wells Fargo records,
between January 2014 through December 2016, 3229 Rambla
Pacifico, Inc. had at least four accounts (collectively, the
"four Rambla Pacifico accounts"):

a.  Chase business checking account xxxxx6803 (the
"Rambla Pacifico x6803 Account"), to which FRITSCH and Mederos
are signers, and which was addressed as of October 2016 to the
Rambla Pacifico property;

b.  Wells Fargo business checking account xxxxxx7568
(the "Rambla Pacifico x7568 Account"), which was addressed as of
February 2017 to C/O RAVIN at the Rambla Pacifico property, and

which was associated by Wells Fargo with Mederos, RAVIN, Gustavo Rendon, Lisa SHORT, and Miraflor Stemmann.

      c.    Wells Fargo business checking account xxxxxx6377 (the "Rambla Pacifico x6377 Account"), which was addressed as of March 2017 to the Rambla Pacifico property, and which was associated by Wells Fargo with RAVIN and Gustavo Rendon; and

      d.   Wells Fargo business checking account xxxxxx6313 (the "Rambla Pacifico x6313 Account"), which was addressed as of March 2014 to C/O RAVIN, 228 Santa Monica Boulevard, Santa Monica, California 90401 (which is the address of the **SUBJECT PREMISES** without reference to the third floor suite), and which was associated by Wells Fargo with RAVIN and Gustavo Rendon.

<u>Payments to Greenwich Music, Inc.</u>

83.    Based on my review of account records for the StarClub Wire Account and related bank accounts, I know the following:

      a.    From January 1, 2014 through December 31, 2016, the StarClub Wire Account (to which only FRITSCH is a signatory) transferred approximately $3,970,000 to the Greenwich Music Account.

      b.    From January 1, 2014 through December 31, 2016, the StarClub Savings Account (to which only FRITSCH is a signatory) transferred approximately $340,000 to the Greenwich Music Account.

84.    According to a July 2017 FBI forensic accounting of the Greenwich Music Account:

      a.    The largest use of funds between January 2014 and December 2016 was approximately $1,088,807.26 in payments to an

American Express credit card ending in x32005.  Based on my review of American Express records, I know that the American Express card ending in x32005 is issued to Greenwich Music Inc. and FRITSCH.  Categories of expenses incurred on this credit card are for expenses such as travel expenses for FRITSCH, FRITSCH's associates, such as Kesterson and Short; retail expenses; medical services and pharmaceutical expenses; and jewelry expenses, among other categories of expenses.

b.   The second largest use of funds was payroll, taxes, and processing charges that totaled approximately $517,793.31 during this period.  According to payroll records for Greenwich Music Inc., the only person receiving a salary from Greenwich Music Inc. is FRITSCH.

c.   The third largest use of funds was payments to POLSEN, which totaled approximately $341,000.  Other uses of funds include, but are not limited to, approximately $200,000 to Rusnak Pasadena (which appears to be associated with the purchase of a Rolls Royce as discussed in paragraph 91); approximately $182,960 to Der Hut LLC (according to JPMorgan Chase records, Kesterson is a signatory on Der Hut LLC's JPMorgan Chase account); approximately $138,533 to the Bennett Law Office ("Bennett Law") (which, as noted below, is the law firm that established a Montana entity to which a McLaren and Rolls Royce purchased with StarClub funds are currently registered); approximately $87,955 to Menlo College; approximately $80,000 to Beverly Hills Institute and Dental; and approximately $74,780 to Mercedes Benz.

### Payments to 3229 Rambla Pacifico, Inc.

85.   Based on my review of account records for the StarClub Wire Account and related bank accounts, I know the following:

a.   From January 1, 2014 through December 31, 2016, the StarClub Wire Account (to which only FRITSCH is a signatory) transferred a total of approximately $3,423,500 to the four 3229 Rambla Pacifico accounts.

b.   From January 1, 2014 through December 31, 2016, the StarClub Savings Account (to which only FRITSCH is a signatory) transferred approximately $170,000 to two of the four Rambla Pacifico accounts.

86.   According to a July 2017 FBI forensic accounting of the four Rambla Pacifico accounts, the largest use of funds between January 2014 and December 2016 include, but are not limited to, approximately $306,500 to PM Construction; approximately $254,132 to Deutsche Bank, which appear to be mortgage payments for the Rambla Pacifico Property; approximately $171,729.59 to the Los Angeles County Tax Collector, which appear to be property tax payments for the Rambla Pacifico Property; $147,605 to Jorge Barreto; and $135,150 to Bennett Law.

### Payments to Mastertec

87.   Based on my review of account records for the StarClub Wire Account and related bank accounts, I know the following:

a.   On September 9, 2011, Mastertec opened a business checking account, account number xxxxx3199 (the "US Mastertec, LLC Account"). Current signatories, since February 19, 2014,

47   [Instrumentality Protocol]

are non-StarClub employees Mederos and Stemman.  Prior to that period, RAVIN and Kesterson were account signatories.  The address provided on the US Mastertec, LLC Account is 650 N Sepulveda Blvd., Los Angeles, California 90049 (the same address associated with Greenwich Music). *According to JP Morgan Chase account records dated May 31, 2017,*

88.  Based on my review of a forensic accounting analysis *U.S. Mastertec LLC now has the address 228 Santa Monica, CA (the SUBJECT PREMISES).* conducted by the FBI in July 2017 of the US Mastertec, LLC Account and related accounts, and of the underlying financial records, I know the following:

*On Aug. 2, 2017, FBI agents saw POLSEN entering the subject premises.*

a.    Between January 2014 and December 2016, StarClub transferred $4,636,500 from the StarCLub Wire Account to the US Mastertec, LLC Account, and the StarClub Savings Account transferred $545,000.

b.    Mastertec then transferred money from the US Mastertec, LLC Account to, or for the benefit of, several individuals affiliated with StarClub, including the following transactions:

i.    On February 21 and 24, 2014, Mastertec made two wire transfers of $50,000 each from the US Mastertec, LLC Account to the Euro-Dutch Trust Company ("Euro-Dutch Trust") in the Bahamas.  Based on my review of the Euro-Dutch Trust's website on January 3, 2017, I know that the Euro-Dutch Trust focuses on high net worth individuals, professionals, and corporate clients with special trust needs.  Euro-Dutch Trust's website highlights its ability to anonymize an individual's assets by holding them in a company's name.

48    [Instrumentality Protocol]

ii.   On March 11, 2014, Mastertec wired $30,000 from the US Mastertec, LLC Account to a Wells Fargo account in the name of RAVIN.

iii. From May 2014 through April 2017, Mastertec wired $4,167 from the US Mastertec, LLC Account to Lisa SHORT on an approximately monthly basis.  Based on my review of records from Thomson Reuters' CLEAR database, I know that FRITSCH and SHORT were married on January 11, 2002.

iv.   Between March 28, 2016 and May 10, 2016, Mastertec wired a total of $96,750 from the US Mastertec, LLC Account to Der Hut, LLC in Kilgore Texas.  According to JPMorgan Chase records, Kesterson is a signatory on Der Hut LLC's JPMorgan Chase account.  Additionally, on February 28, 2014, one wire transfer of $30,000 was made from the US Mastertec, LLC Account to Raymond James & Associates UTMA account xxxx6383 for the benefit of Kennedy A. Kesterson.

v.   Between December 15, 2014 and June 15, 2015, approximately nine checks for $2,500 each were written from the US Mastertec, LLC Account to Mederos.  Another check for $4,152 was written from the US Mastertec, LLC Account to Mederos on May 4, 2015 for a health insurance payment.  The US Mastertec, LLC Account also made a number of wires to Trouble Stunts, LLC in Baton Rouge, Louisiana; according to a LinkedIn profile appearing to belong to Mederos that I reviewed on July 11, 2017, Mederos's occupation is listed as "Stunt Performer at Trouble Stunts".

Transfers to US Mastertec, Inc. and LBG
Enterprises for non-StarClub expenses

89.   Based on my review of account records for the StarClub
Wire Account, the StarClub Checking Account, the US Mastertec,
LLC Account and related bank accounts, as well as Federal
Reserve Bank of New York records, I know the following:

  a.   On July 10, 2014, $9,545,027.05 was wired into
the StarClub Wire Account from the Second Private Placement
Deal.   The StarClub Wire Account's balance at the beginning of
the statement period was $157,209.12.

  b.   Between August 15, 2014, and August 21, 2014,
StarClub transferred a total of $195,000 to the US Mastertec,
LLC Account ($120,000 from the StarClub Wire Account and $75,000
from the StarClub Checking Account.)   As noted above, only
FRITSCH is a signatory to the StarClub Wire and Checking
Accounts, and non-StarClub employees Mederos and Stemman were
signatories to the US Mastertec, LLC Account at this time.

  c.   On August 22, 2014, Mastertec transferred $50,000
from the US Mastertec, LLC Account (to which non-StarClub
employees Mederos and Stemman are signatories) to a Comerica
account in the name of "US Mastertec, Inc.," account number
xxxxxx9358 (the "US Mastertec, Inc. Account").   The balance of
the US Mastertec, Inc. Account was zero at the beginning of the
statement period.

  i.   According to Comerica Bank records, "US
Mastertec, Inc." opened the US Mastertec, Inc. Account on August

4, 2014.  Its signatories are RAVIN and FRITSCH, and its account address is a post office box in Arizona.

        ii.  On or about August 25, 2014, RAVIN wrote a $50,000 check from the US Mastertec, Inc. Account to JPMorgan Chase account xxxxxxxx4865 (the "LBG Enterprises Account").  The LBG Enterprises Account is in the name of LBG Enterprises, Inc. ("LBG Enterprises").  The balance of the LBG Enterprises Account was $2,627.03 at the beginning of the statement period.  To date, the FBI has not been able to locate incorporation articles for LBG Enterprises.  As of May 2017, the LBG Enterprises Account's address was 228 Santa Monica Boulevard, Santa Monica, California 90401 (which is the address of the **SUBJECT PREMISES** without reference to the third floor suite).  FRITSCH is currently the sole signatory on the account, but from April 22, 2009, to February 17, 2016, RAVIN was a signatory on the LBG Account.

        d.  On or about August 25, 2014, RAVIN wrote a $27,325 check from the LBG Enterprises Account to High Tech Roofing Restoration and a $7,000 check to Atlantic Home Restoration.

        e.  On or about August 28, 2014, StarClub transferred $75,000 from the StarClub Checking Account to the US Mastertec, LLC Account.  On September 3, 2014, Mastertec transferred $55,000 from the US Mastertec, LLC Account to the US Mastertec, Inc. Account.  On September 4, 2014, RAVIN wrote a $50,000 check from US Mastertec, Inc. to the LBG Enterprises Account.  That same day, RAVIN wrote a $27,325 check from the LBG Enterprises

Account to High Tech Roofing Restoration, a $4,000 check to
Atlantic Home Restoration, and a $1,605.73 check to Ricardo
Garcia Landscaping.

   f. US Mastertec, Inc. made additional deposits to
LBG Enterprises in October 2014, January 2015, April 2015, and
May 2015 while receiving wires from US Mastertec, LLC during
that same period.

### Purchase of McLaren

  90. Based on my review of account records for the StarClub
Wire Account and related bank accounts, American Express
records, and McLaren Scottsdale sales file records, I know the
following:

   a. Greenwich Music, LLC of 124 W Pine Street,
Missoula, Montana 59802 ("Missoula-based Greenwich Music, LLC")
purchased a 2015 McLaren 650S Spyder for $292,510 on or about
January 21, 2015 from McLaren Scottsdale. As of July 7, 2017,
the McLaren is registered in Montana to Greenwich Music LLC, 9
Bradshaw Ln, Drummond, Montana 59832.

   b. The articles of incorporation for the Missoula-
based Greenwich Music, LLC were signed by John Bennett of
Bennett Law on January 29, 2015. A January 29, 2015, letter
from Bennett Law regarding the LLC registration was sent to
FRITSCH, care of Mederos, 228 Santa Monica Blvd, Santa Monica,
California 90401 (which is the address of the **SUBJECT PREMISES**
without reference to the third floor suite).

c.   On January 17, 2015, Mederos used a StarClub American Express credit card ending in x1067 for a $1,000 charge at McLaren Scottsdale.

d.   On December 15, 2014, Salida – D.G.'s asset management vehicle – wired $2,797,504 to the StarClub Wire Account.  The StarClub Wire Account's balance at the beginning of the statement period was $41,695.17.

e.   On January 20, 2015, StarClub transferred $20,000 from the StarClub Wire Account to the Rambla Pacifico x7568 Account.  On January 21, 2015, the Rambla Pacifico x7568 Account, which Wells Fargo associates with Mederos, RAVIN, Gustavo Rendon, SHORT, and Stemmann, wired $20,000 to McLaren Scottsdale.

f.   That same day, StarClub transferred $150,000 from the StarClub Wire Account to the Rambla Pacifico x6803 Account. On January 30, 2015, the Rambla Pacifico x6803 Account (to which FRITSCH and Mederos are signatories) wired $135,000 to Bennett Law.

g.   On January 28, 2015, StarClub transferred $135,000 from the StarClub Wire Account to the Greenwich Music Account.  On January 30, 2015, the Greenwich Music Account (to which FRITSCH and Mederos were signatories at that time) wired $138,035 to Bennett Law.

h.   The payments to the American Express credit, McLaren Scottsdale, and Bennett Law total $295,035 (slightly higher than the cost of the McLaren).

## Purchase of Rolls Royce

91.    Based on my review of account records for the StarClub
Wire Account and related bank accounts, American Express
records, and Rusnak/Pasadena sales file records, I know the
following:

    a.    Missoula-based Greenwich Music, LLC, purchased a
2016 Rolls-Royce Dawn on or about August 18, 2016 for
$405,973.07.  That same day, Mederos sent an email to Bennett
Law and asking, "Can you please advise what's our next step to
get this car registered and insured like the McLaren and what
the fees are."  As of July 7, 2017, the Rolls Royce is
registered at the same address as the McLaren.

    b.    On August 1, 2016, StarClub transferred $50,000
from the StarClub Wire Account to the Rambla Pacifico x6803
Account.  On August 8, 2016, Rambla Pacifico x6803 Account (to
which FRITSCH and Mederos are signatories) wired $30,000 to
Rusnak/Pasadena with a reference to the Rolls-Royce.

    c.    On August 18, 2016, FRITSCH used an American
Express card ending in x61004 for two charges as part of the
aforementioned Rolls-Royce purchase: one for $90,000 and one for
$85,973.07.  Based on my review of American Express records, I
know that the American Express card ending in x61004 is issued
to Greenwich Music Inc. and FRITSCH.

    d.    On September 26, 2016, StarClub transferred
$150,000 from the StarClub Wire Account to the Greenwich Music
Account (to which FRITSCH and Mederos were signatories).  The
next day, on September 27, 2016, StarClub transferred $145,000

from the StarClub Wire Account to the Greenwich Music Account.
That same day, the Greenwich Music Account made a $180,998.49
payment to the aforementioned American Express card.

   e. Between August 2, 2016 and August 18, 2016, the
StarClub Wire Account made five transfers totaling $260,000 to
the Greenwich Music Account.  On August 19, 2016, the Greenwich
Music Account wired $200,000 to Rusnak Pasadena with a reference
to the Rolls-Royce's VIN number.

Recent Account Activity

  92. On July 23, 2017, I reviewed updated account records
for the StarClub Wire Account covering the period from
approximately January 2017 through early July 2017.  I
identified four transfers totaling $400,000 from the Rambla
Pacifico x6803 Account back to the StarClub Wire Account during
approximately late January 2017 through February 2017.  I
further identified a total of approximately $465,000 in
transfers from the StarClub Wire Account to the Greenwich Music
Account during the period between January 2017 through June
2017, as well as $121,000 in wires from the StarClub Wire
Account to one or more Rambla Pacifico accounts during the same
period.

  **F.** **Probable cause to Believe Evidence of the Fraudulent**
    **Scheme will be Found at the SUBJECT PREMISES,**
    **Including Digital Devices Located There**

  93. In addition to the foregoing facts, I have learned
during my tenure as an FBI agent that individuals involved in
complex fraud schemes, such as wire fraud and money laundering,
often use computers, cellular telephones, and mobile "smart

phones" to conduct their fraudulent transactions. For example, such individuals often use computers, cellular telephones, and mobile smart phones to conduct online banking, the records of which may be stored on digital devices rather than paper records. Because StarClub purports to be a technology company, I believe its employees are particularly likely to make use of digital technology to facilitate financial transactions.

94. I also know that persons who carry out complex fraud schemes may use computers, cellular telephones, and mobile smart phones to communicate with potential or actual victims. As discussed above, FRITSCH has sent numerous emails to StarClub investors. I know from my review of FRITSCH's emails with D.G., that the phrase "Sent from my iPhone" appears at the bottom of several emails sent by FRITSCH. Based on my training and experience, I also know that Apple manufactures mobile smart phones known as "iPhones," and one of the iPhone's default settings is to include the phrase "Sent from my iPhone" when an on outgoing email message is sent through an iPhone. As a result, I know that the phrase frequently appears on emails sent via an iPhone.

95. Based on my training and experience, individuals involved in complex financial crimes, such as wire fraud and money laundering, often use USB storage devices (commonly referred to as thumb-drives or memory sticks) and external hard drives to store financial records, including banking records and statements, other financial account records, checks, balances, transactions, records of purchases, records reflecting the

transfer of assets, and records which are maintained, stored, and utilized to conduct online banking activities. Individuals involved in complex financial crimes sometimes also use such devices to store "pitch" material provided to potential investors and potential commercial partners. Such information is easily transmitted to and from electronic storage devices, such as USB drives and external hard drives without ever printing or maintaining a paper or printed record and in lieu of receiving such records via regular U.S. mail or domestic mail services. In this investigation, I know that StarClub has utilized electronic presentations to potential investors during meetings on the **SUBJECT PREMISES**. As discussed above, FRITSCH has also sent emails to StarClub investors attaching presentations that include financial analyses and other records such as capitalization tables. According to O'Reilly, a former StarClub employee, FRITSCH has also used his computer to access StarClub's bank records. Further, Richards, a former StarClub employee, told me that he assisted POLSEN in moving financial information from POLSEN's memory stick to a computer in preparation for the aforementioned January 2016 meeting at the **SUBJECT PREMISES**. Although POLSEN later asked Richards to delete the material from the presentation computer, based on the fact that FRITSCH also appears to have access to financial material as evidenced in the emails he sent, I believe that financial records may nevertheless be found on the **SUBJECT PREMISES**.

96.   Based on my training and conversations with other law enforcement agents who have investigated complex fraud schemes, I know that some businesses maintain servers that host email accounts for their employees, and that emails may be stored exclusively on those servers.

97.   Based on my training and conversations with other law enforcement agents who have investigated complex fraud schemes, I know that individuals who engage in such schemes often keep records of their fraudulent activities, including financial records, fraudulent documents, and electronic communications, on computers, USB drives, external hard drives, servers, or other digital devices for years after the fraudulent scheme has been completed.

98.   Based on my training, experience, and conversations with other law enforcement agents who have investigated complex fraudulent schemes, I know that businesses commonly maintain paper records like bank statements, wire records, receipts, expense reports, ledgers, balance sheets, income statements, stockholder records, investment agreements, pitch materials and other financial documents commonly used in fraudulent schemes on their premises.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

99.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as

telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

onto a hard drive, deleted, or viewed via the Internet.[9]
Electronic files saved to a hard drive can be stored for years
with little or no cost. Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools. Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data. Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten. In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file. Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache. The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content. Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive

---

[9] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence

in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

        g.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

100. As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor.  Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID."  Once a user has set up the fingerprint sensor feature in the security settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the

device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

101. In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device. For example, with Apple, Touch ID will not work if (1) more than 48 hours have passed since the device has been unlocked, (2) the device has been turned on or restarted, (3) the device has received a remote lock command, or (4) five attempts to match a fingerprint have been unsuccessful. Other brands have similar restrictions. I do not know the passcodes of the devices likely to be found at the **SUBJECT PREMISES**.

102. For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of FRITSCH, who is believed to be a user of fingerprint sensor-enabled device(s) to attempt to gain access to the device(s) while executing the search warrant. The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of FRITSCH during the execution of the search on fingerprint sensor-enabled device(s) that are located at the **SUBJECT PREMISES** and falls within the scope of the warrant. The government may not be able to obtain the contents of the device(s) if FRITSCH's fingerprints are not used to access the

device(s) by depressing them against the fingerprint sensor at the time of the search. Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

103. An off-site review of the data will likely be necessary for multiple reasons. As previously mentioned, StarClub is a purported technology company and computer application developer; consequently, the size and sophistication of its digital devices are likely to be high. Second, StarClub's fraudulent scheme has been underway since at least January 2014. Third, given StarClub's attempted commercial transactions, some digital devices likely contain attorney-client privileged information, which will require the use of a Privilege Review Team and the search protocols set forth in Attachment B.

104. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

105. For all the reasons described above, I respectfully submit that there is probable cause to believe that:

(1) FRITSCH has committed a violation of Title 18 United States Code Section 1343, by obtaining money from investors on

the basis of false or fraudulent pretenses, representations, or promises that were material and causing I.M. to wire $1,000,000 to StarClub on January 25, 2016; and

(2) the items listed in Attachment B, which constitute evidence of violations of the SUBJECT OFFENSES, will be found during a search of the **SUBJECT PREMISES**, as further described above and in Attachment A of this affidavit.

/s/

GREGORY L. AUSTIN,
Special Agent
FEDERAL BUREAU OF INVESTIGATION

Subscribed to and sworn before me
this __2__ day of August, 2017.

**JEAN P. ROSENBLUTH**

HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

PREMISES TO BE SEARCHED

The premises to be searched are the business premises of StarClub, Inc. ("StarClub") and US Mastertec, LLC, ("Mastertec"), both of which are located on the third floor of 228 Santa Monica Boulevard, Santa Monica, California 90401, and which share office space (hereinafter, the **"SUBJECT PREMISES"**). The **SUBJECT PREMISES** are described more specifically as follows:

The building is a mixed-use retail and office building, approximately three (3) stories tall and tan colored. The retail store Anthropologie occupies the first and second floors. StarClub and Mastertec occupy the offices located on the third floor.

The entrance to the **SUBJECT PREMISES** is on the south side of Santa Monica Boulevard between 2nd Street and 3rd Street. The door is glass with a brown metal frame and is labeled with the number 228. A logo visible through the glass door is consistent with the StarClub logo included on StarClub marketing materials. The mailbox next to the door is also labeled with the number 228. A keypad is located on the left side of the door.

**ATTACHMENT B**

I.    ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband,
fruits, or instrumentalities of violations of Title 18, United
States Code, Sections 1343 (wire fraud), 1956 (money
laundering), and 1957 (monetary transactions) (collectively, the
"SUBJECT OFFENSES"), namely:

a.    Records, documents, programs, applications, or
materials, from January 1, 2014 though the present, which
pertain to financial transactions engaged in by, or involving,
BERNHARD EUGEN FRITSCH ("FRITSCH"); or StarClub, Inc.
("StarClub"); or, US Mastertec, LLC, ("Mastertec"), US
Mastertec, Inc., Greenwich Music, Inc., ("Greenwich") 3229
Rambla Pacifico, Inc. ("Rambla Pacifico"), or LBG Enterprises,
Inc. ("LBG") (collectively, the "StarClub affiliates"), such as
bank statements and records, deposit slips, cancelled checks,
wire transfer orders or advisements of wire transfers, records
of money orders or other money transfer records;

b.    Records, documents, programs, applications, or
materials, from January 1, 2014 though the present, consisting
of financial accounting records or statements, including balance
sheets, profit and loss statements, income statements, or
revenue statements and projections, and supporting documentation
for StarClub or the StarClub affiliates;

c.    Records, documents, programs, applications, or
materials, from January 1, 2014 though the present, consisting
of internal accounting records including charts of accounts or

ledgers, including general, petty, or accounts payable and accounts receivable ledgers for StarClub or the StarClub affiliates;

        d.    Records, documents, programs, applications, or materials, from January 1, 2014 though the present, showing use of proceeds including purchase and sale records, records of expenditures and receipts, account opening records, or loan applications for FRITSCH, StarClub or the StarClub affiliates;

        e.    Records, documents, programs, applications, or materials, from January 1, 2014 though the present, that pertain to FRITSCH's net worth;

        f.    Records, documents, programs, applications, or materials, from January 1, 2014 though the present, that pertain to employment costs including compensation or payroll records for StarClub or the StarClub affiliates;

        g.    Records, documents, programs, applications, or materials reflecting articles of incorporation, by-laws, stock registers, fictitious business statements, and meeting minutes and other documents showing the ownership, management, control, or organizational structure of StarClub or the StarClub affiliates;

        h.    Records, documents, programs, applications, or materials tending to show, reflecting or referencing relationships between FRITSCH, James POLSEN ("POLSEN"), Michael RAVIN ("RAVIN"), George Mederos ("Mederos"), StarClub, or the StarClub affiliates, including contracts, agreements, or powers of attorney;

ii    [Instrumentality Protocol]

i.   Deeds, contracts, promissory notes, powers of
attorney, leases, lien documents, title documents, or other real
property records, from January 1, 2014 though the present, in
the names of FRITSCH, StarClub, or the StarClub affiliates;

j.   Records, documents, programs, applications, or
materials, from January 1, 2014 though the present, relating to
the actual or contemplated transfer or disposition of any money,
property, or assets in the names of FRITSCH, RAVIN, StarClub, or
the StarClub affiliates;

k.   Corporate or financial institution letterhead and
logos, and any copies or images of corporate or financial
institution letterhead and logos;

l.   Records, documents, programs, applications, or
materials, from October 1, 2013 through the present, relating to
StarClub investors, including subscription agreements, stock
certificates, and shareholder lists, and communications or
correspondence relating to investors or between investors and
FRITSCH, POLSEN, StarClub, or the StarClub affiliates;

m.   Records, documents, programs, applications, or
materials, from October 1, 2013 through the present, relating to
StarClub investor pitch presentations;

n.   Records, documents, programs, applications, or
materials, from January 1, 2014 though the present, including
contracts, agreements, proposed agreements, payments, and
communications or correspondence referencing or relating to
potential commercial partners or investors or acquirers,
including but not limited to the Walt Disney Company, Access

iii   [Instrumentality Protocol]

Industries, Inc., Warner Music Group, WME (alternatively, "William Morris Endeavor" or "WME-ING"), Jeffrey Lo, the Yucaipa Companies, Richard D'Abo, Ron Burkle, NBCUniversal, Spotify, Goldman Sachs, and Credit Suisse;

   o. Records, documents, programs, applications, or materials, from January 1, 2014 though the present, including communications or correspondence via electronic mail, text messages, or instant messages, by or to FRITSCH, POLSEN, RAVIN, Mederos, StarClub, or the StarClub affiliates, which relate to investments or financial transactions of StarClub or the StarClub affiliates;

   p. Calendars, appointment books, telephone message pads, day planners, address books, and contact lists, from October 1, 2013 though the present, of FRITSCH, StarClub, or the StarClub affiliates;

   q. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

   r. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

   i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II. SEARCH PROCEDURES FOR HANDLING POTENTIALLY PRIVILEGED INFORMATION

4.   The following procedures will be followed at the time of the search in order to avoid unnecessary disclosures of any

privileged attorney-client communications, work product, or
marital communications:

Non-Digital Evidence

5.    Prior to reading any document or other piece of
evidence ("document") in its entirety, law enforcement personnel
conducting the investigation and search and other individuals
assisting law enforcement personnel in the search (the "Search
Team") will conduct a limited review of the document in order to
determine whether or not the document appears to contain or
refer to communications between a spouse, including Lisa Short,
and any person, or between an attorney, including Charles J.
Sanders, Thaddeus J. Brinkman, or Bennett Law Office P.C., and
any person, or to contain the work product of an attorney and
any person, or ("potentially privileged information").  If a
Search Team member determines that a document appears to contain
potentially privileged information, the Search Team member will
not continue to review the document and will immediately notify
a member of the "Privilege Review Team" (previously designated
individual(s) not participating in the investigation of the
case).  The Search Team will not further review any document
that appears to contain potentially privileged information until
after the Privilege Review Team has completed its review.

6.    In consultation with a Privilege Review Team Assistant
United States Attorney ("PRTAUSA"), if appropriate, the
Privilege Review Team member will then review any document
identified as appearing to contain potentially privileged
information to confirm that it contains potentially privileged

information. If it does not, it may be returned to the Search Team member. If a member of the Privilege Review Team confirms that a document contains potentially privileged information, then the member will review only as much of the document as is necessary to determine whether or not the document is within the scope of the warrant. Those documents which contain potentially privileged information but are not within the scope of the warrant will be set aside and will not be subject to further review or seizure absent subsequent authorization. Those documents which contain potentially privileged information and are within the scope of the warrant will be seized and sealed together in an enclosure, the outer portion of which will be marked as containing potentially privileged information. The Privilege Review Team member will also make sure that the locations where the documents containing potentially privileged information were seized have been documented.

7. The seized documents containing potentially privileged information will be delivered to the United States Attorney's Office for further review by a PRTAUSA. If that review reveals that a document does not contain potentially privileged information, or that an exception to the privilege applies, the document may be returned to the Search Team. If appropriate based on review of particular documents, the PRTAUSA may apply to the court for a finding with respect to the particular documents that no privilege, or an exception to the privilege, applies.

Digital Evidence

8.   The Search Team will search for digital devices
capable of being used to facilitate the subject offenses or
capable of containing data falling within the scope of the items
to be seized.  The Privilege Review Team will then review the
identified digital devices as set forth herein.  The Search Team
will review only digital device data which has been released by
the Privilege Review Team.

9.   The Privilege Review Team will, in their discretion,
either search the digital device(s) on-site or transport the
device(s) to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

10.   The Privilege Review Team and the Search Team shall
complete both stages of the search discussed herein as soon as
is practicable but not to exceed 180 days from the date of
execution of the warrant.  The government will not search the
digital device(s) beyond this 180-day period without first
obtaining an extension of time order from the Court.

11.   The Search Team will provide the Privilege Review Team
with a list of "privilege key words" to search for on the
digital devices, to include specific words like Charles J.
Sanders, Thaddeus J. Brinkman or Bennett Law Office P.C., or
Lisa SHORT or their email addresses, and generic words such as
"privileged" or "work product".  The Privilege Review Team will
conduct an initial review of the data on the digital devices
using the key words, and by using search protocols specifically
chosen to identify documents or data containing potentially

privileged information.  The Privilege Review Team may subject to this initial review all of the data contained in each digital device capable of containing any of the items to be seized. Documents or data which are identified by this initial review as not potentially privileged may be given to the Search Team.

12.  The Search Team will also provide the Privilege Review Team with a list of "scope key words" to search for among the documents and data that are identified by the initial review described above as potentially privileged, to include words relating to the items to be seized as detailed above.  The Privilege Review Team will conduct a review of these documents and data using the scope key words, and by using search protocols specifically chosen to identify documents and data that appear to be within the scope of the warrant.  The Privilege Review Team may also do a more detailed quality check of the documents and data, to ensure that the scope key word search is effective. Documents and data that are identified by the scope key word search, after quality check, as not within the scope of the warrant will be maintained under seal and not further reviewed absent subsequent authorization.

13.  Documents or data identified by the key word searches as potentially privileged and within the scope of the warrant will be reviewed by a Privilege Review Team member to confirm that they contain potentially privileged information.  Documents or data that are determined by this review not to be potentially privileged may be given to the Search Team.  Documents or data that are determined by this review to be potentially privileged

x    [Instrumentality Protocol]

will be given to the United States Attorney's Office for further review by a PRTAUSA.  Documents or data identified by the PRTAUSA after review as not potentially privileged may be given to the Search Team.  If, after review, the PRTAUSA determines it to be appropriate, the PRTAUSA may apply to the court for a finding with respect to particular documents or data that no privilege, or an exception to the privilege, applies.  Documents or data that are the subject of such a finding may be given to the Search Team.  Documents or data identified by the PRTAUSA after review as privileged will be maintained under seal by the investigating agency without further review absent subsequent authorization.

14.  The Search Team will search only the documents and data that the Privilege Review Team provides to the Search Team at any step listed above in order to locate documents and data that are within the scope of the search warrant.  The Search Team does not have to wait until the entire privilege review is concluded to begin its review for documents and data that are within the scope of the search warrant.  The Privilege Review Team may also conduct the search for documents and data that are within the scope of the search warrant if that is more efficient.  In conducting its review, the Search Team will first conduct a key word search using the scope key words and related searches, and quality check, discussed above.  The Search Team may also conduct a second scope review intended only to ensure that the initial scope review successfully eliminated non-responsive data from seizure.  Documents or data that are

identified after these scope reviews as not within the scope of the warrant will be maintained under seal and not further reviewed absent subsequent authorization.

15. In performing the reviews, both the Privilege Review Team and the Search Team may:

a. search for and attempt to recover deleted, "hidden," or encrypted data;

b. use tools to exclude normal operating system files and standard third-party software that do not need to be searched; and

c. use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

16. If either the Privilege Review Team or the Search Team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, they shall immediately discontinue the search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

17. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

18. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

19. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access data falling outside the scope of the items to be seized (after the time for searching the device has expired) absent further court order.

20. The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

21. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

22.   In order to search for data capable of being read or interpreted by a digital device, the Search Team is authorized to seize the following items:

a.   Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

23.   During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprint of BERNHARD EUGEN FRITSCH ("FRITSCH") at the **SUBJECT PREMISES** during the execution of the search and who is

reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the **SUBJECT PREMISES** and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

24.  The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.