CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JAMES S. THREATT (Bar No. 325317)
(E-Mail: jimmy_threatt@fd.org)
REBECCA ABEL (Bar No. 298604)
(E-Mail: rebecca_abel@fd.org)
JONATHAN C. AMINOFF (Bar No. 259290)
(E-Mail: jonathan_aminoff@fd.org)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
BERNHARD EUGEN FRITSCH

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 17-CR-00520-DSF |
| Plaintiff, | |
| v. | **DEFENDANT BERNHARD EUGEN FRITSCH'S POSITION REGARDING SENTENCING; EXHIBITS A–D** |
| BERNHARD EUGEN FRITSCH, | |
| Defendant. | Sentencing Date: October 20, 2025<br>Sentencing Time: 8:00 a.m. |

Defendant Bernhard Fritsch, through undersigned counsel, hereby submits his position regarding sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  September 29, 2025      By  _/s/ James S. Threatt_

JAMES S. THREATT
REBECCA ABEL
JONATHAN C. AMINOFF
Deputy Federal Public Defenders
Attorneys for Bernhard Eugen Fritsch

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ...........................................................................................1

II. MR. FRITSCH SHOULD NOT BE SENTENCED IN ABSENTIA.........................2

III. OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT..............3

    A.    A 20-Level Enhancement Applies for Loss Under 2B1.1(b)(1) Because the Loss Amount is Not More Than $25 Million. ......................................3

        1.    Consistent with the Jury's Verdict as to Investor Ian Mann, None of the Investor Funds Other than Danny Guy's Should be Considered Losses. ....................................................................3

    B.    There Are Not Ten or More Victims. ...........................................5

    C.    The Sophisticated Means Enhancement Does Not Apply ........................6

    D.    Mr. Fritsch Should Not Be Required to Pay Restitution Within Ninety Days.........................................................................................7

IV. RESPONSE TO THE GOVERNMENT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT .........................................................8

    A.    The PSR Correctly Applies the Two-Level Reduction for Being a Zero-Point Offender. ...................................................................8

V. THE ADVISORY GUIDELINES RANGE ..................................................8

VI. THE APPROPRIATE SENTENCE ...........................................................8

    A.    The Nature and Circumstances of the Offense Justify a Custodial Sentence of 70 Months.................................................................9

    B.    The History and Characteristics of Mr. Fritsch Weigh in Favor of a Custodial Sentence of 70 Months. ...........................................10

VII. CONCLUSION ...................................................................................11

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Gall v. United States,*
552 U.S. 38 (2007)...............................................................................................9

*Illinois v. Allen,*
397 U.S. 337 (1970).............................................................................................1

*Koon v. United States,*
518 U.S. 81 (1996)...............................................................................................9

*Rita v. United States,*
551 U.S. 335 (2007).............................................................................................9

*The Supreme Court in Kimbrough v. United States,*
552 U.S 85 (2007)................................................................................................9

*United States v. Augare,*
800 F.3d 1173 (9th Cir. 2015) .............................................................................7

*United States v. Booker,*
543 U.S. 220 (2005).............................................................................................9

*United States v. Carty,*
520 F.3d 984 (9th Cir. 2008) ...............................................................................9

*United States v. Cortes-Correa,*
71 F. App'x 625 (9th Cir. 2003) ..........................................................................8

*United States v. Horob,*
735 F.3d 866 (9th Cir. 2013) (per curiam) ..........................................................7

*United States v. Lucinda Manera,*
25-MJ-5995 (C.D. Cal.).......................................................................................1

*United States v. Montano,*
250 F.3d 709 (9th Cir. 2001) ...............................................................................6

*United States v. Patterson,*
No. 22-10113, 2023 WL 3073103 (9th Cir. Apr. 25, 2023) ................................7

*United States v. Tanke,*
743 F.3d 1296 (9th Cir. 2014)..............................................................................7

ii

## <u>TABLE OF AUTHORITIES</u>

Page(s)

*Williams v. New York,*
    337 U.S. 241 (1949)...................................................................................................9

**Federal Constitution and Sentencing Guidelines**

U.S. Const. Amends. V, VI, XIV ....................................................................................1

U.S.S.G. § 2B1.1........................................................................................................*passim*

U.S.S.G. § 1B1.3(c) .........................................................................................................2

U.S.S.G § 3553 ................................................................................................................9

**Federal Rules**

Fed. R. Crim. P. 43 ..........................................................................................................1

## I.INTRODUCTION

Following eight days of evidence, Bernhard Eugen Fritsch was convicted at trial on only one of the five counts originally contained in the Indictment.  Although Mr. Fritsch was convicted of defrauding Danny Guy, the evidence adduced at trial showed that StarClub, Inc. was a legitimate company with a real product, real employees, real offices, and real intellectual property.  The evidence at trial also established that Mr. Fritsch poured his heart and soul into this company—confirmed by his employees and even his ex-wife—working at all hours and always striving to make StarClub a better company with a better product.  The Court heard testimony from a raft of employees who worked at StarClub in various capacities and attested to the company's bona fides.  There was testimony from executives at Fortune 500 companies like Disney about the numerous meetings they held with Mr. Fritsch and other StarClub employees.  The enterprise was so legitimate, in fact, the government expressly disavowed specious allegations contained in the Indictment, such as that the company had no patents and had not spent $90 million on technology development.

Now, the Court must sentence Mr. Fritsch for his conviction on a single count. The PSR's Guidelines calculations are unreasonably high, recommending a sentence of 11 to 14 years for a non-violent, first-time offender who was acquitted on one of the two counts on which he was tried.  The defense position is that the Guidelines range is instead 70 to 87 months, and that a sentence at the low end of that range properly reflects the seriousness of this offense in comparison to other fraud offenses.  The sole victim who Mr. Fritsch has been convicted of defrauding is a hedge fund.  It is a sophisticated investor backed by legions of lawyers, advisers, and bankers like Goldman Sachs.  This case did not involve common people investing in the stock market or being swindled to invest in a company that existed only on paper.

The PSR identifies other "victims" but this is not a case where the government's entire theory was vindicated at trial by a conviction on all counts.  Instead, as the Court well knows, Mr. Fritsch was acquitted of defrauding a second investor, Ian Mann.  The

jury was not asked to reach a verdict on any of the other investors identified in the PSR; however, they are all similarly situated to Ian Mann and not Danny Guy. Like Ian Mann, many of them invested based on representations made by Guy and had minimal, if any, contact with Mr. Fritsch. And even if those individuals could be considered "victims," there is no indication in the PSR that any of them lost their life savings are otherwise had their quality of life negatively impacted by investing in StarClub.

To put it bluntly, this is a case that in many instances would have been resolved in civil litigation with the filing of a lawsuit. A prison sentence of 11 to 14 years is too severe for such conduct. This is especially true given the evidence introduced at trial about Mr. Fritsch's devotion to his family, in particular his three children. For the reasons summarized above, and discussed further below, the defense respectfully requests a custodial sentence of 70 months.

## II. MR. FRITSCH SHOULD NOT BE SENTENCED IN ABSENTIA

Because Mr. Fritsch is unlikely to be present for sentencing, it should not go forward. The United States Constitution protects the right to be present at one's trial and sentencing. *See* U.S. Const. amends. V, VI, XIV; *Illinois v. Allen*, 397 U.S. 337, 338, (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."). Federal Rule of Criminal Procedure 43 requires that "the defendant must be present at . . . every trial stage," including "sentencing." Fed. R. Crim. P. 43(a)(2)–(3).

Although Rule 43(c) provides an exception to the above when "the defendant is voluntarily absent during sentencing," the defense respectfully submits that it would be more prudent and a better use of judicial resources to postpone sentencing until Mr. Fritsch is arrested on the Court's bench warrant. The United States Attorney's Office is apparently working on securing his appearance, as reflected by the recent arrest of an associate, Lucinda Manera, and the cooperation of two unnamed individuals. (*See, e.g.*, *United States v. Lucinda Manera*, 25-MJ-5995, ECF No. 1 (C.D. Cal. Sept. 29, 2025).)

2

Given the government's ongoing efforts, the defense believes it does not make sense to go forward with sentencing in absentia, at least at this juncture.

**III.OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT**

**A.  A 20-Level Enhancement Applies for Loss Under 2B1.1(b)(1) Because the Loss Amount is Not More Than $25 Million.**

  **1.  Consistent with the Jury's Verdict as to Investor Ian Mann, None of the Investor Funds Other than Danny Guy's Should be Considered Losses.**

The loss amount should be reduced from 22 levels to 20 levels.  The Probation Office claims that the loss amount in this matter is $25,867,813,80, based on the losses of Danny Guy, as well as 6 other investors, including Ian Mann.  (PSR ¶¶ 36–40, 50.)  The PSR applies a 22-level enhancement because the loss amount is greater than $25,000,000.  (PSR ¶ 50.)  The government claims the loss is $26,967,813.30, adding two additional investors, for a total of 8 investors aside from Danny Guy.  (Dkt. No. 550 at 4.)  It concurs with the 22-level enhancement.  The defense objects to the inclusion in the loss amount of any investments made by anyone other than Danny Guy, which reduces the loss amount below $25 million, warranting a 20-level increase.

At trial, the jury was presented with two counts.  The first concerned an investment of $7 million made by Danny Guy, for which the jury found Mr. Fritsch guilty.  (Dkt. No. 516.)  The second concerned an investment of $1 million made by Ian Mann, for which the jury found Mr. Fritsch not guilty.  (*Id.*)  Pursuant to § 1B1.3(c), the Guidelines prohibit considering any "acquitted conduct."  That provision states that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court."  U.S.S.G. § 1B1.3(c).  Therefore, Ian Mann's investment cannot be included in the loss amount.  Subtracting this amount from the Probation Office's calculation, reduces the loss amount below $25,000,000, warranting a 2-level reduction in offense level.  *See* U.S.S.G. § 2B1.1 (loss amount between $9,500,000 and $25,000,000 warrants an enhancement of 20 levels).

Moreover, the acquittal on count two, which concerned Ian Mann, demonstrates that the jury did not agree with the government that Mr. Fritsch was responsible amounts invested by those other than Danny Guy. The government's theory at trial and at sentencing is that Mr. Fritsch is accountable for the investments by those beyond D.G. because these "victims were introduced to Frisch [sp] by victim D.G." (Dkt. No. 550 at 4.) That was the exact theory that the government advanced at trial. The government argued that Ian Mann was a victim because he was introduced to Mr. Fritsch by Danny Guy. The jury rejected that theory. For this reason, § 1B1.3(c) prohibits the inclusion of any investor funds by anyone other than Danny Guy.

Finally, there is no evidence that these investors were defrauded. For example, the PSR includes the amount of invested by Jorg Mohaupt, who was deposed in this matter and whose testimony was introduced at trial. Mr. Mohaupt specifically stated that he did not believe Mr. Fritsch was defrauding him; he was "fully prepared to lose [his] money." (Dkt. No. 355, J.M. Depo at 205:3-16, 143:9-23.) In addition, the alleged misrepresentations that formed the basis of the sole count of conviction—for example, misrepresentation regarding revenue—were not conveyed to Mr. Mohaupt. (Id. at 32:8-15, 112:25-113:15.) Beyond J.M., the other investors in the PSR, like Ian Mann, had little if any contact with Mr. Fritsch and were solely brought in by Danny Guy. (See, e.g., Ex. A, R.P. 302 ("considers Starclub to have been sponsored by Guy" and having one call with Fritsch in which none of the tried misrepresentations were made); Ex. C, S.B. 302 (noting he only ever spoke with Mr. Fritsch once for 5-10 minutes and has no memory of the call), Ex. D, F.S. 302 (relying solely on information conveyed by D.G.)

Just like Ian Mann at trial, there is no evidence these investors received the one-pager, were conveyed any information regarding StarClub's revenue, were told anything about potential acquisitions by Disney or Yucaipa, or were told that investments would be used for specified purposes. (Trial Exs. 43, 201.) For this independent reason, there is no evidence that these investors were defrauded via any

4

conduct proved at trial.  Thus, their investments should not be included in the total loss amount.

For the foregoing reasons, the total loss amount is less than $25,000,000 and the enhancement for the loss amount is 20 levels.

**B.      There Are Not Ten or More Victims.**

For the same reasons discussed at Section III(A)(1), the sole victim in this case is Danny Guy.  The remaining investors are not victims because they did not "sustain[] any part of the actual loss determined under" § 2B1.1(b)(1).  U.S.S.G. § 2B1.1, n.1.  As discussed above, there is no evidence their investments were obtained via the fraud on which the jury convicted.  To the contrary, all of the investors other than Danny Guy sit in the same position as Ian Mann, on whom the jury acquitted.  Therefore, their investments are not "actual losses" and the investors are not victims.

Moreover, the PSR claims that the enhancement applies because there are 10 or more victims.  But, even including all of the non-Danny Guy investors it lists, the PSR fails to identify 10 victims.  (PSR ¶ 36 (identifying 7 alleged victims, one of which is Ian Mann).)  The government claims that there are two additional victims: Clarrence A.G. and Brian O'Hea.  (Dkt. No. 550 at 4.)  Brian O'Hea is in the same position as Ian Mann—brought in by Danny Guy—and there is no evidence he was defrauded, as he was apparently never interviewed.  (D.G. Trial Tr., Dkt 519:43-44.)  The government relies on an interview with David Cohen to substantiate the alleged fraud on Clarrence A.G., but Mr. Cohen told the government he "is neither an investor in Clarrence nor an investment adviser to Clarrence" and he could not say whether Clarrence relied on Cohen.  (*See* Ex. B, D.C. 302 at 474.)  Regardless, even if both Brian O'Hea and Clarrence are A.G. were theoretically "victims," that leaves a total of 9 alleged

victims—not the 10 required to apply this enhancement. Therefore, the 2-level enhancement under § 2B1.1(b)(2)(i) does not apply.[1]

## C. The Sophisticated Means Enhancement Does Not Apply

The PSR applies a two-level enhancement for sophisticated means. The stated basis is that "Fritsch used shell companies and accounts to which he had access to hide or dispose of the investor funds he obtained." (PSR ¶ 53.)

The sophisticated means enhancement applies if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. Section 2B1.1(b)(10)(C). The Commentary then elaborates that this enhancement applies to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense." U.S.S.G. Section 2B1.1(b)(10)(C) cmt. n.9(B). The Ninth Circuit has emphasized that the key consideration is whether the scheme had aspects that made it "especially sophisticated" compared to offenses of that type. *See United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001).

Here, the scheme was "not especially sophisticated" relative to other frauds. To the contrary, this is the rare case where the defendant had a real company, real offices, real employees, and a real product. The company itself was not fraudulent nor was this a case where the alleged scheme was overly complex. The PSR's conclusion seems to rest entirely on the alleged involvement of "shell" companies. The evidence at trial, however, established that the various corporate entities had legitimate purposes, and many even pre-dated the alleged fraud. For example, the primary corporate entity referenced in the PSR is 3229 Rambla Pacifico, Inc., which owned the Malibu Property. That is a common ownership structure for expensive pieces of real property. And, according to the evidence at trial, that property served as the sole StarClub offices

---

[1] The PSR in one location does appear to identify four other victims. There is, however, no information provided about these individuals, including even how much they allegedly invested in StarClub. (*See* PSR ¶ 25.)

6

for part of the company's existence and even during later years was one of two locations where employees performed work.  The only other corporate entity that is even mentioned in the PSR is a Montana company that owned two vehicles purchased by Mr. Fritsch.  Even assuming that entity was in fact a "shell" company, its ownership of the two vehicles did nothing to facilitate or otherwise conceal the alleged fraud charged in Count One of the Indictment.  Another of the "shell" companies discussed at trial, though not mentioned in the PSR, was US Mastertec, which was also a legitimate part of the StarClub business; employees of that company testified at trial about the work they performed.

To put it differently, the companies were not "shell" companies and, in any event, did not facilitate the fraud charged in Count One of the Indictment.  That fraud involved alleged misrepresentations by Mr. Fritsch to Danny Guy, and Guy's transfer of $7 million to a StarClub, LLC account.  As the CEO and person with signatory authority over the StarClub accounts, Mr. Fritsch easily could have purchased, for instance, the two vehicles using funds directly from the StarClub account.  None of the investors had any visibility into the StarClub corporate bank accounts.  Therefore, the alleged fraud was not furthered by the transfer of funds to other companies' accounts before used on arguable personal expenses like the purchase of cars.

**D.  Mr. Fritsch Should Not Be Required to Pay Restitution Within Ninety Days.**

The PSR also indicates that Mr. Fritsch should be required to pay full restitution in the amount of $25,867,813.80 within 90 days.  (PSR ¶ 87.)  The Court should not order restitution to be fully paid within 90 days.  Mr. Fritsch had appointed counsel at trial, and for much of the duration of his case since April 19, 2022.  (Dkt. 216 (Notice of Appearance for DFPD David Wasserman).)  Moreover, as the Court knows, the Malibu Property, which has been the main asset belonging to Mr. Fritsch, is now in bankruptcy.  That seems to be a primary basis on which the PSR recommends immediate restitution payments.  (*See* PSR ¶ 84(a)-(b).)  The other four properties listed

in the PSR are located in Connecticut and it is not clear that Mr. Fritsch still has any ownership interests in those properties.  (*See* PSR ¶ 84(c)-(f).)

## IV. RESPONSE TO THE GOVERNMENT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT

### A.    The PSR Correctly Applies the Two-Level Reduction for Being a Zero-Point Offender.

The PSR correctly applies a two-level reduction for Mr. Fritsch being a zero point offender.  (PSR 63–64.)  In its response to the PSR, the government indicated that it might oppose application of this reduction on the basis that Mr. Fritsch personally caused substantial financial hardship to at least one victim.  (Dkt. 550 at p.5.)  As of the time of filing, however, the government still has not provided the defense with evidence that any of the alleged victims suffered any financial hardship.  To the extent the government tries to prove up that any of the victims suffered substantial financial hardship, the defense respectfully requests an evidentiary hearing and reserves the right to further supplement its objections to the PSR in writing.

## V. THE ADVISORY GUIDELINES RANGE

If the Court sustains each of the defense objections, then the total offense level would be 27 (as opposed to 33) and the advisory Guidelines range, based on Category I, would be 70 to 87 months.

## VI. THE APPROPRIATE SENTENCE

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime."  *Williams v. New York*, 337 U.S. 241, 247 (1949).  The Supreme Court in *Kimbrough v. United States*, 552 U.S 85, 101 (2007), noted that the "overarching provision" in section 3553(a), as modified by *United States v. Booker*,

543 U.S. 220 (2005), is the requirement that courts "impose a sentence sufficient, but not greater than necessary to accomplish the goals of sentencing."

Although the United States Sentencing Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guideline range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49-50 (2007); Rita v. United States, 551 U.S. 335 (2007). Accordingly, the Ninth Circuit has found that the Guidelines range should not be given greater weight than the section 3553 factors. *See United States v. Carty*, 520 F.3d 984, 993–94 (9th Cir. 2008).

Mr. Fritsch is a devoted family man who, in his enthusiasm, got out over his skis with respect to StarClub. He made overly optimistic statements to Danny Guy that the jury decided veered into the territory of fraud. But this was not a fraud in the classic sense with a company that existed only on paper. There was very much a real company behind the StarClub logo. And Mr. Fritsch poured his blood, sweat, and tears into making his vision for the company a reality. Paired with this is Mr. Fritsch's lack of any criminal history whatsoever and the fact that this was a non-violent offense with the only definite victim being a wealthy hedge fund. The defense respectfully submits that a custodial sentence of 70 months is sufficient, but not greater than necessary, to accomplish the goals of federal sentencing.

## A.    The Nature and Circumstances of the Offense Justify a Custodial Sentence of 70 Months.

Fritsch was convicted at trial of one count of defrauding investor Danny Guy. Fritsch was acquitted of the only other fraud count charged with respect to other investors.

With respect to Danny Guy, the evidence at trial established that Guy was a reckless investor. He ran a hedge fund that had lost a phenomenal amount of money in the years leading up to his investment in Fritsch's company StarClub. When Fritsch and Guy began to communicate, Guy asked Fritsch whether Guy could send investment

materials to Guy's contacts at Goldman Sachs, to which Fritsch agreed. (RT 53.) Guy was warned in writing that StarClub was a risky investment (RT 144–145), and Guy's contacts at Goldman Sachs repeatedly warned him that StarClub was in its very early stages and needed considerable capital to build out its platform. Knowing all this, Guy invested and continued to invest. While Fritsch certainly embellished facts, those embellishments were more akin to half-truths than lies. For example, the government made much of Fritsch's optimistic reports of potential deals with large companies that never materialized. However, the evidence at trial established that Fritsch had multiple meetings with these companies, and the company insiders with whom he was in contact sent him positive emails indicating that a partnership as possible. Certainly it was inaccurate to report that companies like Access had already invested in StarClub, but the fact that senior people at those companies had invested in StarClub in their individual capacity, contextualizes these statements as half-truths, not lies.

At bottom, Fritsch was desperately trying to get his company off the ground. This was not a fraud in the classic sense. Fritsch had a real company (StarClub) with a real product. He had office space, employees, clients, and a legitimate plan to grow his business. While the jury concluded that he made at least one actionable misrepresentation to Danny Guy, this was not the sort of classic fraud case where investors put their money in a company that exists only on paper and none of their funds are put toward legitimate business activities. What happened here was certainly not that, and this consideration counsels strongly in favor of a sentence at the low end of the Guidelines range.

**B.     The History and Characteristics of Mr. Fritsch Weigh in Favor of a Custodial Sentence of 70 Months.**

As the parties have poured over Fritsch's digital devices and reviewed all of his communications, one thing that is painfully obvious is that Fritsch rarely stopped working. StarClub was his life, and he spent most of his waking hours attempting to build this company.

10

Outside of work, Fritsch was a devoted father to his children.  When his ex-wife needed help, Fritsch moved her into his home and supported her and his children.  Even the government's own evidence of the alleged fraud confirmed his devotion to his family.  As the Court surely recalls, the government elected to call a gentleman who used to be the high school math tutor for Mr. Fritsch's intellectually disabled son.  George Mederos, another key government witness, often drove Mr. Fritsch's children to school and picked them up.  A custodial sentence of 70 months would significantly punish Mr. Fritsch, who has never before served a prison sentence, while allowing him to more quickly re-assume a significant role in the lives of his children.

## VII.CONCLUSION

For the foregoing reasons, the defense respectfully requests a custodial sentence of 70 months.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  September 29, 2025    By  */s/ James S. Threatt*

JAMES S. THREATT
REBECCA ABEL
JONATHAN C. AMINOFF
Deputy Federal Public Defenders
Attorneys for Bernhard Eugen Fritsch

11

# EXHIBIT A

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/24/2017

Robert POLLOCK was interviewed telephonically.  After being advised of the identity of the interviewing agent and the nature of the interview, POLLOCK provided the following information:

POLLOCK is one of five partners who own Primary Capital, a broker-dealer that has done business with Danny GUY's Salida fund.

POLLOCK was introduced to the StarClub investment opportunity by Greg CAMERON, or possibly someone else in GUY's office. POLLOCK meets with many companies seeking funding, many of which are "sponsored" by someone he knows. POLLOCK considers StarClub to have been sponsored by GUY and CAMERON.

Shortly before StarClub's early 2014 private placement, POLLOCK participated in a conference call with Bernhard FRITSCH. POLLOCK does not recall the other participants on the call. During the call, FRITSCH said that StarClub was about to go public via a reverse merger through Sabre.  POLLOCK does not recall FRITSCH's other comments during the call.

POLLOCK decided to invest in StarClub because it was going public. POLLOCK invested in StarClub in his personal capacity, as did his colleagues Michael BESTER and Tim SORENSEN, and his sister, Sherrie Ann POLLOCK. POLLOCK purchased 172,992 StarClub units for $546,228. POLLOCK's investment bought him StarClub warrants that expire in July 2017.

BESTER invested the same amount; SORENSEN invested about half as much. Sherrie Ann POLLOCK invested approximately $150,000. POLLOCK is close with his sister, who sometimes makes investments solely on POLLOCK's recommendation, which she did in the case of StarClub. POLLOCK was probably combining his and his sister's investments when he previously estimated investing about one million Canadian dollars. POLLOCK, BESTER, SORENSEN, and Sherrie Ann POLLOCK's investments all occurred in the same private placement as GUY's initial investment.

To make his personal StarClub investment, POLLOCK believed he wired money from Dundee (ph), his broker, to Fidelity Clearing about a week before the private placement closed. Dundee has since become Echelon (ph).

Investigation on   07/23/2017    at   Los Angeles, California, United States (Phone)

File #   Redacted    Date drafted   07/23/2017

by   Gregory L. Austin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT A - Page 1 of 2

FRITSCH_00000047

FD-302a (Rev. 05-08-10)

Redacted

Continuation of FD-302 of (U) Interview of Robert POLLOCK_____, On 07/23/2017 , Page 2 of 2

Soon after POLLOCK's investment, StarClub canceled its plans to go public. Most of POLLOCK's contact with StarClub thereafter occurred with Jim POLSEN. BESTER and SORENSEN also had contact with FRITSCH and POLSEN.

POLSEN once told POLLOCK about a big Middle Eastern contract. POLSEN may have said this during POLLOCK's in-person meeting at StarClub a while ago. POLSEN also told POLLOCK at some point that StarClub had hired an investment banker who had worked at Morgan Stanley, or possibly another bulge bracket firm, to help StarClub secure partnerships.

POLLOCK recorded a phone call with POLSEN about six months or so ago. BESTER was also on the call. This was approximately the third investor update call that POLLOCK had held with POLSEN. During at least one of his calls, POLSEN said that StarClub was meetings its numbers. POLLOCK decided to tape the call after speaking with GUY. GUY told POLLOCK that he'd love to be on the POLSEN call, but that POLLOCK should see what POLSEN says in the absence of GUY. POLLOCK told GUY that he would make a copy of the call.

StarClub did not send anything to POLLOCK following the call. POLLOCK has had no contact with FRITSCH in a long time.

POLLOCK contacted POLSEN about two weeks ago about conversion options for holders of StarClub warrants facing expiration. POLLOCK had no interest in converting his warrants, but wanted to know what POLSEN would say. POLSEN never responded. A real company would have responded to such an inquiry. POLSEN usually takes about a month to respond to POLLOCK.

StarClub is very careful about releasing information and commonly characterizes information as confidential, which is weird because POLLOCK has signed a non-disclosure agreement.

Someone recently attempted to blow up Mark VALENTINE'S car.

EXHIBIT A - Page 2 of 2

Subject to Protective Order

FRITSCH_00000048

# EXHIBIT B

FD-302 (Rev. 5-8-10)

- 1 of 3 -



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

## FEDERAL BUREAU OF INVESTIGATION

Date of entry        10/24/2017

David COHEN, date of birth ███/1962, citizen and resident of Canada, was interviewed telephonically. After being advised of the identity of the interviewing agent and the nature of the interview, COHEN provided the following information:

COHEN identifies assets that he then finances or operates. It was through that practice that he met Danny GUY approximately 10 years ago. GUY is a good investor. COHEN and GUY had a falling-out in approximately mid-2016.

Clarrence is a Switzerland-based private investment group and a longtime investor in COHEN. COHEN refers investment opportunities to Clarrence. COHEN is neither an investor in Clarrence nor an investment adviser to Clarrence. Although COHEN performed StarClub due diligence for himself, Clarrence probably relied on COHEN's due diligence. COHEN's StarClub due diligence was initially based on GUY's referral, but eventually became independent of GUY. COHEN is not aware of Clarrence performing StarClub due diligence on its own.

In approximately late 2014, GUY told COHEN about StarClub, which GUY characterized as a fantastic opportunity involving the next great advertising medium. GUY said that StarClub was going to be sold in a multi-billion dollar transaction. GUY forwarded a StarClub presentation to COHEN, which was relatively light on details, and introduced COHEN to Bernhard FRITSCH.

In approximately late 2014, COHEN participated in a conference call with FRITSCH. FRITSCH said that he was talking to a number of parties interested in buying StarClub. COHEN told FRITSCH that the StarClub opportunity was not for him.

After GUY again referred COHEN to FRITSCH, and after Clarrence had asked COHEN to keep an eye on StarClub, COHEN attended a StarClub presentation at StarClub's Santa Monica offices in approximately December 2014 or January 2015. The meeting attendees included COHEN, FRITSCH, and Jim POLSEN. StarClub was attempting to raise money at a $250 million valuation, but FRITSCH estimated that StarClub would be sold at a price

Investigation on  10/18/2017  at  Los Angeles, California, United States (Phone)

File # ████████████                                           Date drafted  10/24/2017

by  Gregory L. Austin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PP_FRITSCH_000474

EXHIBIT B - Page 1 of 3

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  (U) Second interview of David COHEN          , On  10/18/2017  , Page  2 of 3

between $500 million and $1 billion.  COHEN was told that StarClub had raised approximately $53 million.  FRITSCH said that Apple was looking quite seriously at StarClub.

Over a series of interactions subsequent to that meeting, FRITSCH told COHEN of approximately seven to nine companies that were going to purchase or invest in StarClub.  The companies included Apple, Bertelsmann, Roc Nation, ProSieben, a Dubai entity, and Spotify.  At various times, FRITSCH said that these companies had purchase and/or joint venture agreements in place with StarClub.  FRITSCH showed COHEN a signed joint venture agreement between StarClub and ProSieben, which FRITSCH said would take off immediately.  FRITSCH told COHEN that the Dubai entity was going to provide a large amount of financing and that the deal was about to close, though it never did.

In approximately late 2015, FRITSCH told COHEN that Warner was investing in StarClub the next week.  FRITSCH said that Access had invested and mentioned Len BLAVATNIK's name.

FRITSCH told COHEN that he had sold iTunes to Steve JOBS.  FRITSCH seemed very impressive.  FRITSCH marketed StarClub as his next idea following iTunes.

FRITSCH said that StarClub had a bunch of third party technology developers and referenced buying a developer.  FRITSCH said that he had developed StarClub's patented technology, but that the technology was owned by StarClub.  One of StarClub's presentations said that StarClub owned its patents.

COHEN believes that a StarClub financial presentation showed StarClub having earned around $8 million to $10 million in 2015 revenue.  StarClub revenue projections always resembled hockey sticks; its financials always projected large revenues the next month.

In approximately January 2015, Clarrence invested $2 million in StarClub.  COHEN believes that Clarrence invested another $1 million around the end of 2015.  The second investment was part of a financing round in which GUY also participated.  Prior to GUY's investment, FRITSCH told COHEN that he would match whatever GUY invested in that round.  After GUY's investment of approximately $4 million or $5 million, FRITSCH told COHEN that he had invested the same amount.  COHEN also saw StarClub financials that showed that FRITSCH had matched GUY's investment.  FRITSCH also wanted COHEN to join StarClub's board.

By late 2015, COHEN started to have doubts about StarClub because its story would change all the time.  But as each of COHEN's doubts emerged,

FD-302a (Rev. 05-08-10)

████████████

Continuation of FD-302 of  (U)  Second interview of David COHEN                    , On  10/18/2017  , Page  3 of 3

FRITSCH would provide a sufficient amount of corroboration to temporarily allay COHEN's concerns.  For example, in approximately the third quarter of 2015, FRITSCH told COHEN about an upcoming meeting between StarClub and Pandora.  COHEN asked to attend the meeting, and felt better after observing a senior Pandora representative meet with StarClub.  But the discussions between StarClub and Pandora fell apart after the meeting.

In early 2016, COHEN met an Apple executive at a social event.  When COHEN asked the executive about StarClub and FRITSCH, the executive responded with a blank stare.  This alarmed COHEN, who subsequently had less frequent discussions with FRITSCH.

FRITSCH told COHEN that he had bought his Malibu house in a distressed sale from a music guy.  FRITSCH said that he spent $6 million or $7 million on the property and had received an offer on the property for $60 million or $70 million.  FRITSCH said that he was independently very wealthy, but wanted to make $1 billion from StarClub.

FRITSCH told COHEN that he had a house and business in the Bahamas.  FRITSCH said he had a deal with the US Government that allowed him to work tax-free from California during a period that was to end in about 2017.  That deal sounded weird to COHEN.

COHEN has not read writer's affidavit and has not spoken to other parties about the case.  COHEN did not know about FRITSCH's legal trouble until he received a call from a woman who requested COHEN's assistance in funding FRITSCH's bond.  The call seemed almost like a scam.

PP_FRITSCH_000476
EXHIBIT B - Page 3 of 3

# EXHIBIT C

FD-302 (Rev. 5-8-10)

OFFICIAL RECORD

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    06/30/2017

Stephen BUCKLEY, date of birth ▮Redacted▮ was interviewed telephonically.  After being advised of the identity of the interviewing agent and the nature of the interview, BUCKLEY provided the following information:

Danny GUY told BUCKLEY about StarClub while the two were attending a Boston Red Sox game.  BUCKLEY had wanted to invest in something to speed along his retirement and possibly purchase a vacation home.  BUCKLEY is an "old fashioned newspaper guy" who sees the way media is tilting, and thought StarClub sounded exciting.

BUCKLEY agreed to purchase StarClub stock in March 2015.  Around that time, probably before he wired money to StarClub, BUCKLEY spoke to Bernhard FRITSCH over the phone for five to ten minutes.  BUCKLEY does not recall details from the call.  BUCKLEY has had no contact with anyone at StarClub since making his investment.

BUCKLEY wired $100,000 to StarClub on April 10, 2015.  BUCKLEY expected that StarClub would use his investment to build an Instagram-like celebrity platform.  BUCKLEY also thought StarClub would be acquired.  BUCKLEY would not have invested in StarClub if he knew, hypothetically, that a significant portion of investor funds would be spent on personal expenses or non-StarClub corporate entities.

BUCKLEY has retained his StarClub stock certificate and wire records.

BUCKLEY is "not rich" and not an experienced investor.  $100,000 is a large portion of his net worth.  He works for a newspaper, owns a 401k worth about $740,000, an IRA worth about $80,000, and a house.

BUCKLEY learned about StarClub's "precarious situation" only today, when Danny GUY called to inform him about suspected fraud and an FBI investigation.

Investigation on    06/29/2017    at    Los Angeles, California, United States (Phone)

File #    ▮Redacted▮                                                      Date drafted    06/30/2017

by    Gregory L. Austin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

EXHIBIT C

Subject to Protective Order                                          FRITSCH_00014803

# EXHIBIT D

FD-302 (Rev. 5-8-10)

- 1 of 2 -



**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     09/18/2017

Francis SCOTLAND was interviewed telephonically.  After being advised of the identity of the interviewing agent and the nature of the interview, SCOTLAND provided the following information:

SCOTLAND contacted writer in order to provide additional information about his StarClub investment after reviewing his files.

SCOTLAND wired $102,000 US dollars to StarClub on 02/06/2015.  The money was wired to Chase account 211777995.  SCOTLAND received a certificate (certificate number 1094) for 12,000 shares of StarClub, dated 02/06/2015, signed by Bernhard FRITSCH and Michael RAVIN.

SCOTLAND was issued another 5,143 StarClub shares on 08/04/2015 via certificate number 1114.  SCOTLAND believes that his original purchase agreement adjusted his purchase price downward if certain targets were not met by StarClub (SCOTLAND could not recall the targets.)  In lieu of getting some of his money back, StarClub, at its discretion, issued SCOTLAND additional stock.

At some point, SCOTLAND received a link and password to a StarClub website from Danny GUY.  The password no longer works.  SCOTLAND reviewed StarClub's website today, which left him the impression that StarClub had consummated deals with major celebrities.

SCOTLAND had located his StarClub securities purchase agreement and will send it to writer.

SCOTLAND thought his investment in StarClub would be used for building out technology.  At the time of his investment, SCOTLAND believed that he was participated in the last round of financing for StarClub, which was very close to being acquired.  According to GUY's conversations with FRITSCH, Disney and other companies were interested in acquiring StarClub.  SCOTLAND believed he had gotten lucky by being able to invest in the tail end prior to StarClub being acquired. StarClub's location in Los Angeles may have swayed SCOTLAND, too.

| | | |
|---|---|---|
| Investigation on | 09/15/2017 | at | Los Angeles, California, United States (Phone) |

File #  3███████

Date drafted   09/15/2017

by  Gregory L. Austin

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

PP_FRITSCH_000034

EXHIBIT D - Page 1 of 2

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  (U)  Second interview of Francis SCOTLAND___ , On  09/15/2017  , Page  2 of 2


    SCOTLAND recalled another conversation, the timing of which he could not recall, in which GUY said that Disney might be gun shy about acquiring StarClub based on Disney's experience with another start-up that it had acquired for about $1 billion.

    SCOTLAND is not an experienced private equity investor.  He is, however, participating in several other deals with people he trusts, including one other deal with GUY.

    SCOTLAND would never have invested in StarClub had he known that it was paying for FRITSCH's home and cars.  SCOTLAND expects little, if any, executive compensation in start-ups, which should incentivize their executives via equity.  In his two other deals, for example, one of the companies pays no salary to its top executives, and the other pays less than $100,000 per year.

PP_FRITSCH_000035
EXHIBIT D - Page 2 of 2