BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
MONICA E. TAIT (Cal. Bar No. 157311)
Assistant United States Attorney
Major Frauds Section
      1100 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2931
      Facsimile: (213) 894-6269
      E-mail:    monica.tait@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>                    v.<br><br>BERNHARD EUGEN FRITSCH,<br><br>              Defendant. | CR No. 17-00520-DSF<br><br>GOVERNMENT'S SENTENCING POSITION; EXHIBITS<br><br>Sentencing date: October 20, 2025<br>Time: 8:00 a.m.<br>Before the Honorable Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Monica E. Tait, hereby files its sentencing position as to defendant Bernhard Eugen Fritsch.

This document is based on the Presentence Report, the Trial Exhibits and testimony, the separate volume of Victim-related exhibits sought to be filed under seal, the files and records of this

//

case, and such further evidence and argument as may be presented at any hearing in this matter.

Dated: September 29, 2025          Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division


_____/s/_____
MONICA E. TAIT
Assistant United States Attorney

Attorney for Plaintiff
UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

I.     INTRODUCTION.................................................2

II.    OFFENSE CONDUCT..............................................2

III.   GUIDELINES CALCULATIONS......................................6

       A.    The Presentence Report's Calculations are Supported by
             the Evidence, and No Timely Dispute Has Been Raised.......6

       B.    The Loss is More Than $25,000,000: +22...................7

       C.    There Are 10 Or More Victims of the Wire Fraud Scheme:
             +2......................................................12

       D.    The Offense Involved Sophisticated Means: +2............13

       E.    Defendant Willfully Obstructed Justice: +2..............14

       F.    The Zero-Point Offender Adjustment Currently Applies:
             -2......................................................15

       G.    Restitution should be ordered...........................15

IV.    BY INTENTIONALLY FLEEING TO MEXICO, DEFENDANT HAS WAIVED
       THE RIGHT TO BE PRESENT AT SENTENCING........................15

V.     The § 3553(a) factors support a sentence of 180 months
       imprisonment.................................................16

       A.    Nature and Characteristics Of the Offense, and History
             and Characteristics of Defendant........................17

       B.    Need for the Sentence to Reflect the Seriousness of
             the Offense, Promote Respect for the Law, and Provide
             Just Punishment for the Offense, and Need to Promote
             Deterrence..............................................17

VI.    CONCLUSION...................................................18

**TABLE OF AUTHORITIES**

**Cases**                                                                **Page(s)**

Crosby v. United States,
   506 U.S. 255 (1993) ........................................ 19

United States v. Lucas,
   101 F.4th 1158 (9th Cir. 2024) ................................ 10

United States v. Ornelas,
   828 F.3d 1018 (9th Cir. 2016) ................................ 19

United States v. Tien Nguyen,
   325 Fed.Appx. 585 (9th Cir. 2009) ............................ 10

United States v. Zolp,
   479 F.3d 715–19 (9th Cir. 2007) .............................. 11

**Statutes**

18 U.S.C. § 3771 ........................................... passim

**Rules**

Fed. R. Crim. P. 32 ........................................... 10

Fed. R. Crim. P. 43 ....................................... 5, 18, 19

**Other**

U.S. Const. amends. V, VI, XIV ................................ 18

U.S.S.G. § 2B1.1 ........................................... 9, 10

U.S.S.G. § 3C1.1 ........................................... 9, 17

U.S.S.G. § 4C1.1 .............................................. 9

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Defendant BERNHARD EUGEN FRISTCH is scheduled to be sentenced on October 20, 2025 for his wire fraud conviction on Count 1 by jury trial.  For more than three years, FRITSCH sold investors shares in his tech company, StarClub, based on false claims about the company's likely buyers, its current investors, its revenue, and its technology expenses.  He also claimed that the millions of dollars of investor money he was raising would be used to fund the company's technology and regular business operations.  In fact, StarClub was defendant's piggy bank, and he sucked millions of dollars out of the company to pay for his profligate spending and support his extravagant lifestyle, leaving the company with less than $100,000 in the bank by July 2017, the month before his arrest in this case.  And after expressly promising this Court on April 3, after the guilty verdict was read, that he "absolutely" would not leave the jurisdiction, Fritsch left the United States in violation of his conditions of release, and fled to Mexico, and is now evading capture.  The Court should find that Fritsch is voluntarily absent for sentencing, and sentence him in absentia pursuant to Fed. R. Crim. P. 43(c), to a sentence of 180 months imprisonment, a 3-year term of supervised release, restitution in the amount of $27,044,739.50, and a $100 special assessment.

### II.    OFFENSE CONDUCT

Defendant was the CEO and sole person in control of StarClub. Defendant claimed StarClub was building a technology application or

"app" through which celebrities could monetize their brand endorsements.  According to Fritsch, celebrities would use the app to promote products pursuant to deals to be negotiated with advertisers. Using StarClub's technology, the celebrities' posts would automatically be placed on multiple social media sites at once, such as Facebook and SnapChat, alongside an advertisement for the brand. The celebrity and StarClub would share in the ad revenue the brand paid.  Fritsch claimed investor money would be used on things like launching celebrity channels, technology development, working capital, and investment banking.

Defendant solicited Danny Guy, an investment fund manager[1], and others, to invest in the company, and succeeded in obtaining from Guy alone investment more than $22.44 million between January 2014 and November 2015, and a total of more than $30 from all investors during the full period of his fraud scheme, January 2014 to August 2017.

In early January 2014, Guy invested his first $2.5 million in StarClub.  The term sheet promised the following "use of proceeds":

> The Company will use the net proceeds of the Offering: (i) to launch vertically integrated and interactive social media platforms ("Channels") for talent partners, celebrities and global brands; (ii) for technology enhancements related to the Channels; and (iii) for working capital and general corporate purposes (other than debt reduction including in respect of the current indebtedness and any other shareholder loans).

---

[1] Guy testified that he managed the funds that became the owners of the StarClub investments he authorized.  The current owner (and victim) is Harrington Global Opportunities Fund Limited.  (Dkt. 519 at 112 (Guy testimony, Day 2).)

3

(TrialEx[2] 192 at 17 (excerpt of subscription agreement for $2 million of the total Guy invested); Dkt. 518 at 33 (Guy's first day of testimony); TrialEx 206 (summary of Guy's investments).)  Guy's first investment funds were transferred to StarClub through an agent, in a bundle with other investors' funds in the same investment round. (See TrialEx 901 (Chase 7995 account to which investor funds were deposited) at 2, line 13.)

Over the course of the next two years, Guy remained in close email and phone contact with Fritsch.  In addition to reiterating that the investment money was going to channel development and other core business purposes, to induce more and more investments Fritch claimed that StarClub was on the verge of commercial deals with big companies like Disney, Yucaipa, and Warner, including potential mergers, acquisitions, investments, or commercial deals with those companies.  Defendant further claimed that other big companies, like Access, Warner, and Credit Suisse, were current investors in StarClub.  Finally, defendant told Guy and other investors that in 2015, the company made $15 million in revenue.  (See, e.g., TrialEx 4, 121, 129, 133, 201 (Access); TrialEx 108, 109, 111, 113 (Yucaipa); TrialEx 4, 115, 127 (Disney); TrialEx 131, 201 (Warner); TrialEx 201 (Credit Suisse); Dkt. 519 at 50-51, 79-81, 82-84, 85-86 and TrialEx

---

[2] "TrialEx" followed by a number refers to an exhibit admitted at trial or shown to the jury during testimony as a demonstrative exhibit; page citations are to the internal pagination of the referenced exhibit, printed under the exhibit number.  Copies (sometimes excerpts) of the TrialEx cited in this memorandum are attached.  "SentEx" refers to other exhibits submitted with this Sentencing Position, and is followed by a capital letter.  Some of the SentEx documents relating to individual victims have been lodged under seal in a separate volume to respect victims' privacy.  "PSR" refers to the Presentence Report disclosed September 4, 2025.

4

171 at 16 (2015 revenue).)  Believing defendant, Guy invested more and more money over the course of five investment rounds, for a total of $22.44 million dollars invested.  (TrialEx 206; SentEx A (grand total of  $22,648,352.00).)  Even after Guy's last investment, defendant continued to deceive Guy through 2016 and 2017 to encourage him to invest more money, and to recruit more investors.  (Dkt. 519 at 85-86, 92-942, 103-105.)

As proved at trial, defendant's statements were false.  The testimony of representatives of Yucaipa, Disney, Warner, Access Industries, and Credit Suisse showed that the deals and agreements defendant touted were fictional, and the big companies were not StarClub investors.  Moreover, StarClub made almost no revenue in 2014, 2015, and 2016.  (TrialEx 909 (incoming non-investor money, summarized).)  Finally, instead of using the investors' money as promised on technology development and growing StarClub, defendant instead looted millions from StarClub, ultimately bankrupting the company.  (See TrialEx 901, 903 (excerpt), 905, 907 (showing that StarClub accounts had less than $100,000 by July 2017).)  Defendant used StarClub as his personal piggy bank, including to purchase a $292,000 McLaren and a $405,000 Rolls Royce; Mercedes Benz vehicles for his ex-wife, girlfriend, and son; and spending more than a million dollars on his Malibu mansion (3229 Rambla Pacifico) and his yacht, the Madame Musique.  (See, e.g., TrialEx 935-36 (McLaren and Rolls), TrialEx 955-958 (charts showing StarClub money sent to Fritsch's other companies:  Greenwich Music Inc., 3229 Rambla Pacifico Inc., and US Mastertec); TrialEx 966, 968 (yacht expenses); TrialEx 967 (overwhelmingly personal/house expenses charged to

StarClub's Amex card in the name of George Mederos).)  Guy and the funds for which he invested did not receive a return on the StarClub investment.  (Dkt. 519 at 105-106.)

Guy also introduced defendant to others who separately invested, or got others to invest, millions more dollars in StarClub, including based on what defendant had told Guy.  (Dkt. 519 at 42-43, 57-58, 71-72, 80; SentEx J at 7.)  Those investors included several listed in the PSR:  RP and SP (Dkt. 519 at 71-72); DC (who brought in Clarrence AG as described below) (id. at 80); FS and SB (id. at 42-43, 80); BOH (id. at 43); and IM, the victim involved in acquitted Count Two.  Guy never would have introduced any other investors to StarClub had he known defendant was lying to him.  (Dkt. 519 at 44, 66, 70-72, 79-81, 85-86.)

**III.  GUIDELINES CALCULATIONS**

**A.    The Presentence Report's Calculations are Supported by the Evidence, and No Timely Dispute Has Been Raised**

The PSR found the following Offense Characteristics and Adjustments:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| <u>Specific Offense Characteristics</u> | | |
| Loss over $25 million | +22 | U.S.S.G. § 2B1.1(b)(1)(L) |
| 10 or more victims | +2 | U.S.S.G. § 2B1.1(b)(2)(a)(1) |
| Sophisticated means intentionally engaged in by defendant | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| <u>Adjustments</u> | | |
| Obstruction of Justice | +2 | U.S.S.G. § 3C1.1 |

| Zero-Point Offender[3] | -2 | U.S.S.G. § 4C1.1(a) |
|---|---|---|
| Total offense level | 33 | 135-168 months |

PSR at ¶¶ 49-65.

"Within 14 days after receiving the presentence report, the parties must state in writing any objections, including objections to material information, sentencing guidelines ranges, and policy statements contained in or omitted from the report."  Fed. R. Crim. P. 32(f).  The PSR was released to the parties on September 4, 2025.  Pursuant to Rule 32(f), the government filed a written response and objection, but defendant has not.  Even after the government filed its PSR response referencing Rule 32(f) (Dkt. 550 at 1, 3), defendant filed neither a late response nor sought to excuse his delay in filing a response.[4]  Absent good cause for the delay, objections to the PSR are waived.  See United States v. Tien Nguyen, 325 Fed.Appx. 585, 587 (9th Cir. 2009) (permitting delayed objections for good cause).

**B.    The Loss is More Than $25,000,000: +22**

Facts in support of sentencing enhancements must be proved by a preponderance of evidence.  United States v. Lucas, 101 F.4th 1158, 1163-64 (9th Cir. 2024).

Loss is the greater of actual loss or intended loss, and "actual loss means the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1(b) nn. A, C.  And "reasonably

---

[3]  As of the date of this filing, the government has not been notified by any victim that he or she suffered substantial financial hardship, such that the zero-point offender reduction should not apply.

[4]  While the parties stipulated to a date for their sentencing positions, they did not alter the Rule 32(f) deadline for separate PSR objections.

foreseeable pecuniary harm means pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense."  U.S.S.G. § 2B1.1(b) n. D.  "The court need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of loss based on the available information."  United States v. Zolp, 479 F.3d 715, 718-19 (9th Cir. 2007).

Here, the investors described below gave StarClub their money based on false representations by, or sourced from, defendant, the only party in control of StarClub.  None of the victims would have invested had they known that defendant was lying about specific facts or was looting the company.  By the time defendant was arrested, there was almost nothing left of StarClub.  Indeed, on the day of his arrest, defendant was desperately trying to stay afloat by defrauding yet another investor out of $25 million; defendant did not know that this effort would fail because the new investor was an undercover FBI agent.  (See Dkt. 319 at 8-11 (Government's Motion In Limine #3 To Admit Defendant Fritsch's (1) Pre-Arrest Statements To Investigators, And (2) Statements Made In Undercover Recordings, describing defendant's recorded statements lying about cash in the bank, his pay, and the relationship between StarClub and US Mastertec).) Accordingly, the victims' entire investments constitute the reasonably foreseeable pecuniary loss defendant caused.

A chart of the victims described below and their losses has been submitted under seal as SentEx K.[5]  This chart is based on victim

_____

[5] The government has lodged SentEx A through J under seal, to protect victims' dignity and privacy.  18 U.S.C. § 3771(a)(8).

8

testimony (in the case of Guy and Jorg Mohaupt); bank-sourced exhibits at trial (TrialEx 901, summarizing the account to which investor money was initially deposited, according to trial testimony of Special Agent Gregory Austin and FBI accountant Travis Bouchard); and StarClub records provided by StarClub's former CFO, James Polsen (including SentEx A (Capitalization table showing "cash" paid by each investor, except Jorg Mohaupt[6]); SentEx B (excerpts from selected subscription agreements for February 2014 investment round (excerpts from); and SentEx C (excerpts from selected subscription agreements for July 2014 investment round).)[7]

Harrington Global:  Danny Guy invested $22.648 million in cash in StarClub, according to Polsen's Capitalization Table.  SentEx A. The government proposes for loss that the Court use the slightly lower number used at trial, $22.44 million, but use the higher number for restitution.  (TrialEx 206.)

| Harrington Global Opportunities Fund Limited | $22,400,000.00 |
| --- | --- |

---

[6] SentEx A sets forth one of several charts attached to Polsen's transmittal email, clearly indicating the "cash" paid by each investor (except Jorg Mohaupt, who testified by video deposition but was omitted from Polsen's chart for reasons unknown).

Similarly, SentEx B, C, and I each set forth a cover email from Polsen to the FBI transmitting another email from StarClub's agent, to which one or more large zip files was attached; excerpts of only some of the documents from the zip files are exhibited in SentEx B, C, and I, sufficient to identify the respective victims' subscriptions.

[7]  The total number of investors and amount of investment during the scheme period of 2014-2017 is much greater than that shown on SentEx K (see TrialEx 955, showing more than $30 million received to the 7995 account from outside sources).  The government's showing is limited to those investors who either spoke to the government directly or who were introduced to the opportunity by such investors.

9

RP, SP, LB, and TS:  RP was introduced to StarClub by Guy. (SentEx D at FRITSCH_00000047, FRITSCH_00000051; SentEx J at FRITSCH_00041778.)  RP believed that all of his money was going into technology development and revenue sharing contracts with celebrities, consistent with StarClub's term sheets.  (SentEx D at FRITSCH_00000051.)  RP would not have invested in StarClub if he knew that significant equity withdrawals or significant executive compensation was occurring.  (Id. (FRITSCH_00000052).)  RP introduced his sister, SP, colleague TS, and LB (wife of colleague MB) to StarClub; they also invested.  (Id. at FRITSCH_00000047.)  According to the 2018 Capitalization Table (SentEx A at PP_FRITSCH_000847 to PP_FRITSCH_000848), in combination with subscription agreement excerpts (SentEx B at FRITSCH_00034351, 34379, 34406, 34433, 34487; SentEx C at FRITSCH_00033928, FRITSCH_00033931), these RP-related victims invested and lost the following amounts in US Dollars:

| | |
|---|---|
| RP (individually and through entity) | $530,000 |
| SP | $150,000 |
| LB (individually and through trust) | $699,151 |
| TS | $194,849 |

Clarrence AG:  Clarrence AG was introduced to StarClub by David Cohen, who in turn was introduced by Danny Guy.  Cohen ultimately spoke to defendant and met with him in person at StarClub in late 2014/early 2015.  (SentEx E, at PP_FRITSCH_000474.) Thereafter, Fritsch made the kinds of claims he made to Danny Guy, that StarClub was going to be purchased by well-known companies, including Warner and Access Industries.  (Id. at PP_FRITSCH_000475.)  Cohen saw a presentation showing that StarClub had earned $8 to $10 million in

10

revenue for 2015 (id.), a claim proved false by the trial financial analysis.  (TrialEx 909.)  As a result of Cohen's interactions with StarClub, Clarrence AG invested $2 million and $1 million with StarClub.  (Id.)  However, the financial analysis could not locate more than the $1 million (on November 25, 2015, see TrialEx 901 at line 287), and it does not appear that the entity invested in one of the bundled offerings like RS and his group of investors.  Accordingly, the conservative approach would be to count $1 million in loss for this victim.

| Clarrence AG | $1,000,000 |
|---|---|

Jorg Mohaupt testified via video deposition that he invested $500,000 in StarClub, understanding that his money would be used  for technology development.  (TrialEx 80 (transcript) at 81 ("My understanding was this was going to be used to further develop the business and for general and working capital purposes."); TrialEx 901 line 227.)

| Jorg Mohaupt | $500,000 |
|---|---|

FS, SB, and BOH:  FS, SB, and BOH were all introduced to StarClub by Danny Guy and each invested around $100,000.  (See TrialEx 130 (Fritsch asks about FS and BOH subscriptions; TrialEx 901 lines 130, 188, 218 (incoming wires).)  Danny Guy unwittingly repeated to FS defendant's lies about StarClub's acquisition talks with Disney and other companies.  (SentEx F at PP_FRITSCH__000034, 000036.)  FS never would have invested had he known defendant was looting the company. (Id. at PP_FRITSCH__000035.)  Though SB didn't know it, he was probably not an appropriately sophisticated investor,

11

because SB's net worth was too low (excluding the value of SB's home).  (SentEx G at FRITSCH_00014803-804.)  (TrialEx 901 line 218.)

| FS | $101,975 |
|---|---|
| SB | $100,000 |
| BOH | $100,002.50 |

Finally, EM was recruited by Mark Valentine, one of the same brokers who introduced StarClub to Guy.  EM spoke to defendant before investing, and defendant falsely described StarClub's salaries and bonuses as low.  (SentEx D at PP_FRITSCH_000044.)  Defendant said big companies were interested in acquiring StarClub.  (Id.)  EM believed his investment would be used to increase StarClub's market penetration.  (Id. at PP_FRITSCH_000045.)  EM never would have invested had he known about defendant's huge personal expenditures using company money.  (Id.)  EM invested $1,020,406.00 under a corporate name, GMP Securities LP.  (See SentEx I at FRITSCH_00033724.)

| EM | $1,020,406 |
|---|---|

The total lost by the above victims is $26,796,387.50, which should be considered the sentencing loss for defendant.[8]  (SentEx K.)

**C.    There Are 10 Or More Victims of the Wire Fraud Scheme: +2**

The victims with loss above total 11.  This understates the true number of victims, because Harrington Global is assumed to be one victim in this calculation.  In fact, Guy suffered a personal loss

_____

[8] Pursuant to a new amendment to the Guidelines' Relevant Conduct definition, "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."  Based on this provision, the government assumes for the loss, number of victims, and restitution calculations that IM, whose $1 million transfer was the subject of acquitted Count Two, should not be considered a victim at sentencing.

12

here, but he is not the sole investor in Harrington Global. (See SentEx J at FRITSCH_00041773, 00041779.) Therefore, there is more than one person who lost money as a result of the investments Guy made in StarClub, further supporting application of this offense characteristic.

### D.    The Offense Involved Sophisticated Means: +2

Defendant's offense was sophisticated. See PSR ¶ 53. Defendant controlled multiple entities that he pretended were arms-length StarClub vendors, including US Mastertec Inc./LLC, Greenwich Music Inc., and 3229 Rambla Pacifico Inc. Defendant set it up this way so that payments he caused his StarClub employees to make to these entities might pass to a cursory eye as payments to vendors, when in fact, they were payments to entities defendant also controlled, including via others like Michael Ravin. This structure allowed defendant to suck millions of dollars out of the company, maintaining the appearance of paying vendors for "technology" when he was really just paying himself and funding his extravagant lifestyle. (See TrialEx 186 (when Guy asks, "Where did all the money go," defendant insisted that "90% of focus and funds are going towards tech development."); see e.g., TrialEx 801 (defendant directing payments to "consulting firm" Der Hut, when payments were in fact for his yacht maintenance). Defendant's lies to agents when confronted with this corporate structure confirm that his purpose was to cover his tracks by manipulating multiple corporations. (SentEx L (transcripts of excerpts from recorded interview, claiming US Mastertec was "a technology service provider," that defendant doesn't know the owner, and doesn't know what else the company does; and that 3229 Rambla

13

Pacifico invoices StarClub for programming and office space); TrialEx 955-958 (summarizing payments from StarClub to Mastertec, Greenwich, and 3229 Rambla).  Accordingly, defendant's offense conduct was sophisticated.

**E.    Defendant Willfully Obstructed Justice: +2**

If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense," two levels are applied to the offense level.  U.S.S.G. § 3C1.1.  This adjustment applies here for multiple reasons.

After requesting to remain on bond pending sentencing, and protesting to the Court in a May 29, 2025 declaration that he would never flee (Dkt. 534), defendant did just that.  As the Court is aware, defendant failed to appear for his bond revocation hearing on June 2, 2025, and an arrest warrant was issued.  The government's investigation shows that defendant fled to Mexico, with the assistance of his girlfriend, Lucinda Manera.  (SentEx M (Complaint affidavit setting forth evidence charging Manera in a conspiracy with Fritsch).)  Two individuals drove defendant across the border to Mexico on the morning of the June 2 hearing.  Knowing what had occurred, defendant's girlfriend lied to defense counsel in this case during a break in the June 2, 2025 hearing to help perpetuate the false narrative that defendant was innocently missing, rather than gone.  By avoiding the hearing on June 2 at which he faced bond

14

revocation, and by escaping to Mexico rather than facing this Court's sentence, defendant has obstructed justice in this criminal prosecution, and U.S.S.G. § 3C1.1 applies.

In addition, the PSR correctly applies the same adjustment for defendant's attempt to prevent seizure of his luxury cars by directing George Mederos to sell the cars, using coded instructions (PSR ¶¶ 26-28) and by transferring and retransferring interests in the Malibu mansion that was supposed to secure his bond, thus endangering (and ultimately negating) the collateral securing his release on bond.  (PSR ¶¶ 29-34.)

**F.    The Zero-Point Offender Adjustment Currently Applies: -2**

Defendant has no criminal history, and the government is not aware of evidence (such as proof of substantial financial hardship to at least one victim) to show why the zero-point offender adjustment should not apply.

**G.    Restitution should be ordered**

Restitution to all the victims listed on SentEx K (except IM) should be ordered, for a total amount of $27,044,739.50.  This is slightly greater than the sentencing loss amount, as it reflects an additional payment to Harrington of $248,352 based on former CFO Polsen's capitalization table of cash invested.

**IV.  BY INTENTIONALLY FLEEING TO MEXICO, DEFENDANT HAS WAIVED THE RIGHT TO BE PRESENT AT SENTENCING**

The United States Constitution protects the right to be present at one's trial and sentencing.  See U.S. Const. amends. V, VI, XIV. And Federal Rule of Criminal Procedure 43 requires that "the defendant must be present at . . . every trial stage," including

15

"sentencing." Fed. R. Crim. P. 43(a)(2)-(3). "But this right, like most rights, can be waived." United States v. Ornelas, 828 F.3d 1018, 1021 (9th Cir. 2016). Rule 43(c) provides that a "defendant who was initially present at trial . . . waives the right to be present . . . in a noncapital case, when the defendant is voluntarily absent during sentencing." Thus, under Rule 43, so long as the defendant's absence is "voluntary," a district court may proceed with trial and sentencing in absentia. Fed. R. Crim. P. 43(c)(1)(B); Ornelas, 828 F.3d at 1021 (citing Crosby v. United States, 506 U.S. 255, 258 (1993)).

The Manera complaint establishes that defendant intentionally fled on June 2, 2025. In addition, most recently, defendant was apprehended by Mexican authorities on September 22, 2025 for an immigration proceeding, and U.S. authorities understood he would be deported. (SentEx N). However, defendant filed an injunction to stop his deportation, was released from immigration custody, and his last known location is a hotel in Mazatlan. (Id.) Defendant possessed a fake ID with the last name of his girlfriend and co-conspirator. Based on all the above, the government seeks sentencing in absentia.[9]

**V.   The § 3553(a) factors support a sentence of 180 months imprisonment**

Assuming the Court finds, as the government urges, that defendant's offense level is 33, the corresponding advisory guidelines sentence is 135-168 months. The government believes a 2-

---

[9] If the Court disagrees that the above showing is sufficient, the Court should continue the sentencing hearing for 60 additional days to allow further development of the flight investigation.

16

level upward increase should apply given the extreme degree of defendant's obstruction of justice in this matter, and that a sentence of 180 months, at the mid-range for offense level 35, is the appropriate sentence in this matter. The government addresses below the most salient of the § 3553(a) factors.

### A. Nature and Characteristics Of the Offense, and History and Characteristics of Defendant

Defendant carried out a fraud scheme for years, and bled StarClub dry in complete disregard for its investors. He treated StarClub as it if was an extension of himself, not a separate entity owned by multiple third parties besides whatever ownership stake he may have held. He left the victims with a bankrupt company, and their shares are essentially worthless. He is solely responsible for the significant losses the victims have suffered as a result of his conduct, and the requested sentence fairly reflects the harm he caused, all to feed to his personal greed and self-aggrandizement. Moreover, the modest 2-level upward variance the government requests is appropriate for defendant's obstruction conduct, to distinguish him from more ordinary recipients of such adjustments for obstruction, where the obstructive conduct is more basic and substantially less serious than exhibited here.

### B. Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense, and Need to Promote Deterrence

The requested sentence sends the right message to would-be tech tycoons: don't steal your investors' money, and don't run from justice. This case illustrates the potentially unchecked power a CEO

may wield over a privately-held company.  A significant sentence is needed to promote deterrence of similar conduct.

**VI.    CONCLUSION**

For the foregoing reasons, the government respectfully requests the Court to sentence defendant to a total of 180 months of imprisonment, a three-year term of supervised release, a $100 special assessment, and restitution in the amount of $27,044,739.50.