BILAL A. ESSAYLI
Acting United States Attorney
JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division
MONICA E. TAIT (Cal. Bar No. 157311)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2931
     Facsimile: (213) 894-6269
     E-mail:    monica.tait@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CR No. 17-00520-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S RESPONSE TO DEFENSE SENTENCING POSITION (DKT. 551); EXHIBITS |
| v. | |
| BERNHARD EUGEN FRITSCH, | Sentencing date: October 20, 2025 Time: 8:00 a.m. |
| Defendant. | Before the Honorable Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Monica E. Tait, hereby responds to Defendant Bernhard Eugen Fritsch's Position Regarding Sentencing, filed as docket no. 551.

//

Dated: October 6, 2025        Respectfully submitted,

BILAL A. ESSAYLI
Acting United States Attorney

JOSEPH T. MCNALLY
Assistant United States Attorney
Acting Chief, Criminal Division


_____/s/_____
MONICA E. TAIT
Assistant United States Attorney

Attorney for Plaintiff
UNITED STATES OF AMERICA

2

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

In his belated objections to the Presentence Report ("PSR") and Sentencing Position ("Deft. Position," Dkt. 551), defendant makes the following objections to the PSR's offense level 33 Guidelines Calculations:  first, he claims that the loss calculation is 2 levels lower, because loss is limited to Harrington Global's $22.4 million invested and is therefore not greater than $25 million (U.S.S.G. § 2B1.1(b)(1)); second, he claims that the number of victims is less than 10, resulting in another 2-level reduction (U.S.S.G. § 2B1.1(b)(2)(A)(i)); and third, he claims his offense was not sophisticated, resulting in another 2-level reduction (U.S.S.G. § 2B1.1(b)(1)(C)).  Defendant calculates the offense level at 27 rather than 33, and does not contest the PSR's upward adjustment for obstruction of justice, nor the restitution amount owed to Harrington Global.  Deft. Pos. at ECF 12; U.S.S.G. § 3C1.1.  Defense counsel urges the Court not to make restitution payable within 90 days, asserting that defendant's asset holdings are unclear.  Finally, defendant urges the court not to sentence defendant in absentia, because he might soon be recaptured.  For the reasons argued below and in the government's original sentencing position, these arguments should be rejected, the Court should find offense level 33, and the Court should sentence defendant to 180 months imprisonment as the government has argued.

## II.    THE COUNT TWO ACQUITTAL DOES NOT PREVENT THE COURT FROM CONSIDERING INVESTORS OTHER THAN DANNY GUY/HARRINGTON GLOBAL IN THE SENTENCING GUIDELINES CALCULATIONS

The jury acquitted defendant on Count Two, which was Ian Mann's wire of $1 million to a StarClub account.  Defendant claims that the government's theory at trial was that Mann was a victim "because he was introduced to Mr. Fritsch by Danny Guy, and urges the Court to construe the acquittal to mean that "the jury did not agree . . . that Mr. Fritsch was responsible [for] amounts invested by [anyone] other than Danny Guy."  Deft. Sent. Pos. (kt. 551) at ECF 8.

Defendant reads the Count Two acquittal too broadly.  The jury instructions were (at defense insistence) tailored to each wire count, particularly on the issue of intent to defraud.  For example, the jury was encouraged to see Count One as limited to Danny Guy, and Count Two as limited to Ian Mann.  See Jury Instructions at 26 (Dkt. 510).  But nothing in the Instructions suggests that the jury, by acquitting on Count Two, rendered a decision on the status of StarClub investors other than Ian Mann.  Accordingly, U.S.S.G. § 1B1.3(c) poses no bar to consideration of other investors for purposes of the Guidelines calculations, because the jury did not acquit regarding those other investors.[1]

---

[1] As contrasted with its Guidelines calculations, when weighing the § 3553(a) factors this Court is not prohibited from considering the acquitted Ian Mann conduct, should it choose to.  18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.")

4

**A.    The Loss is More than $25 million, and There are More Than 10 Victims**

Defendant suggests that the Court is limited to "conduct proved at trial" in reaching its Guidelines calculations.  (Deft. Sent. Pos. at ECF 9.)  To the contrary, relevant conduct under the Guidelines includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . .  that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," and all harm resulting from those acts, and is not limited to the conduct proved at the trial.  U.S.S.G. § 1B1.3(a)(1), (3).[2]

Defendant claims that Jorg Mohaupt was not a victim, because he was prepared to lose all his money, and because he did not testify concerning any misrepresentations like those in Count One.  In fact, Mohaupt testified that he, just like Guy and other investors, understood his investment was going to be used "to further develop the business and for general and working capital purposes," just the same as alleged in Count One.  (TrialEx 80 (excerpt attached) at 81.)  See also Jury Instructions at 26 (Count One alleged false claim that "(2) StarClub would use investor money for certain specified

---

[2] For example, the Court at sentencing can consider defendant's flat out lie that StarClub had spent $90 million on technology development, as alleged in the indictment but not proved at trial. (See TrialEx 201 (ECF 552-2 at 12).)  The government decided not to proceed with the technology expense allegation at trial after the Court entirely excluded the key testimony on this topic of StarClub's former Chief Technology Officer, Ian Cartwright, due to the circumstances relating to his foreign video deposition.  See Cartwright interview report (ECF 257-2 at 2); Deposition of Cartwright excerpts at SentEx O (attached), describing Cartwright's shock at hearing defendant make the false claim about technology expenses.

5

purposes, including . . . (c) for working capital and general corporate purposes.")  The fact that Mohaupt was prepared to lose all his money is irrelevant – this is true for all the investors, including Guy/Harrington.  Investments succeed, and investments fail. What investors did not bargain for here was the fraud:  that they were lied to and that defendant looted the company.

Defendant's challenges to other victims similarly fail.  David Cohen, who introduced victim Clarrence AG to StarClub, had substantial direct contact with defendant, heard some of the same lies concerning Warner and Access as did Danny Guy, and was lied to about StarClub's revenue.  (SentEx E (under seal at Dkt. 557) at PP_FRITSCH_000474-475.)  Cohen indicated that Clarrence probably relied on Cohen's vetting of StarClub, and knew of no separate investigation of StarClub Clarrence did on its own.  (Id.)  This is sufficient for the Court to find that defendant's lies to Cohen were the basis for Clarrence's investment of at least $1 million.  As for R.P., he spoke directly to defendant, and he and those he recruited (S.P., L.B. and her trust, and T.S.) all invested during at least one round in which the investment term sheet repeated the same lies about use of investment proceeds as made to Guy in the same investment round.  (See SentEx B (Dkt. 557 at 30 ("Use of Proceeds")[3]).

And finally, Danny Guy unwittingly repeated defendant's lies to investors BOH, FS, and SB.  (Dkt. 519 (Guy testimony) at 42-43, 80; Sealed SentEx F and G (regarding FS and SB).  It is correct that BOH,

---

[3]  The government notes that Sealed docket entry 557, as provided by the Court's clerk, differs in page count and appearance from the document the government believes it submitted for filing; the government will inquire further with the Courtroom Deputy.

6

another Canadian victim, has not been interviewed.  It is equally correct that defendant relied on Guy to spread the (false) promise of StarClub to Guy's network of associates, including BOH, FS, SB, RP, Cohen, and others.  Given that the charged fraud scheme alleged the misuse of investor funds for personal purposes, and that it appears undisputed at sentencing that defendant in fact looted the company for his personal gain, it is not necessary for an investor Guy unwittingly brought in to have been interviewed in order to find that they are a victim of defendant's fraudulent conduct.[4]

### B.    The Offense was Sophisticated

Defendant argues that the offense was not sophisticated, because StarClub existed and really had employees, and defendant's use of the other entities that defendant controlled to siphon money away from StarClub "did not facilitate the fraud charged in Count One." Defendant argues that defendant "easily could have purchased, for instance, the two vehicles [referring to the McLaren and Rolls Royce described often at trial] . . . directly from the StarClub account[s]" by writing checks directly on StarClub's accounts to pay for these items.  Deft. Sent. Pos at ECF 11.  Because that would not

---

[4] EM was identified in the PSR as a victim.  (PSR ¶ 36, , 40.) EM invested about $1 million and dealt directly with defendant, as described in the government's sentencing position and Sealed SentEx D, I.  Defendant's position raised no specific challenge to counting EM as position as a victim, or his loss amount, so EM's status with respect to loss and counting him as a victim is uncontested (apart from the defense § 1b1.3(c) acquittal argument).

Defendant has also failed to contest the specific loss and restitution amounts the PSR and government have proposed (see Sealed SentEx K), should the Court find that some or all of these victims' losses count for the Guidelines calculations.

7

have been sophisticated means, defendant argues that what actually happened is not sophisticated either.

In fact, the defense example illustrates precisely why and how the offense conduct here was sophisticated.  The government agrees that if defendant had written checks directly from the StarClub accounts to car dealerships to buy his McLaren and Rolls Royce, such conduct would not likely qualify as sophisticated offense conduct. U.S.S.G. § 2B1.1(b)(1)(C), comment. ("'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.")  But that is not what defendant did.  Why did he not?  Because defendant was not the only person who worked at StarClub, nor the only person with a view into its finances.  For example, StarClub had a Chief Financial Officer, James Polsen, as well as bookkeepers and accounts payable personnel (such as trial witnesses K. Fredricks and M. Stemmann). Defendant deliberately used the other corporations defendant controlled (including 3229 Rambla Pacifico LLC, which defendant controlled through Michael Ravin, now deceased) to suck a constant stream of money out of StarClub for himself personally, using the fact that these companies were nominally (and sometimes actually) StarClub vendors to disguise all of the payments as if they were legitimate business expenses.  Had he not done so, defendant ran the risk that Polsen or another StarClub employee, or anyone else defendant might allow to review StarClub's books (such as an investment banker or potential investor) would discover defendant's scheme to suck millions of dollars out of StarClub for his own personal use and alert investors, stopping defendant's gravy train.

8

Defendant's conduct, which took place over the course of more than three years and effectively resulted in the bankrupting StarClub, qualifies as sophisticated for a fraud scheme.  Accord, United States v. Augare, 800 F.3f 1173, 1175 (9th Cir. 2015) (defendant's conduct was sophisticated where he sent money from a source corporate account to another company's account controlled by a co-defendant for services allegedly rendered; the co-defendant sent it back to an account defendant controlled, from which defendant took personal control of it; "Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.") (internal citation and quotation omitted).

**C.    If the Court Finds Defendant is Voluntarily Absent on October 20, 2025, he Should be Sentenced in Absentia That Day**

The government has shown that defendant purposely fled to Mexico to escape this Court's justice.  If he does not appear in Court on October 20, 2025 for sentencing, his absence is voluntary in light of the flight, and he has waived the right to be present for sentencing. Fed. R. Crim. P. 43(a)(2)–(3); United States v. Ornelas, 828 F.3d 1018, 1021 (9th Cir. 2016).

Defense counsel suggests that defendant is on the verge of being caught against his will, so the Court should delay the sentencing. Even if defendant might be caught, that does not change the fact that defendant can still voluntarily appear on October 20, 2025 on his own accord if he so choses.  Defendant's voluntary absence ends the analysis.

As the Court is aware, the United States government does not control foreign governments or their actions abroad.  As of this

filing, undersigned counsel has no reason to believe that defendant's absence is not voluntary (such as that he is dead, or that he is incarcerated somewhere).  If that view changes prior to and including the current October 20, 2025 sentencing date, the government will either advise the Court *in camera* or will advise both the Court and defense counsel.  Accordingly, as long as defendant's absence continues to be voluntary, the Court should sentence defendant as scheduled on October 20, 2025.

## III. THE COURT MAY ORDER FULL RESTITUTION WITHIN 90 DAYS, AS RECOMMENDED BY THE PROBATION OFFICER

The Court shall order full and immediate payment of restitution, unless, in the interest of justice, the Court provides for payment on a date certain or in installments.  18 U.S.C. § 3572(d)(1).  "Immediate payment of restitution is the general rule."  See generally United States v. Ross, 310 Fed. Appx. 160, 162 (9th Cir. 2009) (finding that "immediate repayment is the rule" but that "[e]xceptions may be made in the interests of justice, such as when the defendant is not able to make more than nominal periodic payments," and the defendant carries the burden of proving such inability).

Here, while defendant has been represented since 2023 at taxpayer expense, this Court appears to have already questioned whether defendant's prior *in camera* submission(s) concerning his financial resources have been truthful.  (Reporter's Transcript, June 2, 2025, at 18, 20 (Court has "some concerns about the information submitted to the Court in camera, but I won't put that in the record here . . . . [¶¶ ] Based on information in the government's papers,

10

Mr. Fritsch may not have been truthful with the Court in his filing.")  The burden is defendant's to show that an order for full payment is not appropriate, and he has not carried it.

**IV.   THE 70-MONTH SENTENCE DEFENDANT REQUESTS IS UNREASONABLY LOW**

Having calculated the guidelines offense level at 27, defendant urges a low-end custodial sentence of 70 months, because, he argues, his misrepresentations were mere half-truths in the service of getting StarClub off the ground, and because defendant loves his children.  Def. Sent. Pos. at ECF 13-15.

In light of defendant's many years of fraudulent conduct, his squandering of many millions of dollars, his profligate and arrogant personal spending of investors' money, and his flight from prosecution just as he was finally about to face the Court's justice, a 70-month sentence would be an outlier that would discourage, rather than promote, general deterrence of investment fraud schemes, and would create unwarranted sentencing disparities between defendant and other defendants with similar records found guilty of similar investment fraud schemes.  18 U.S.C. § 3553(a)(2)(B), (6).  Instead, the Court should impose the 180-month sentence recommended by the government in its sentencing position.

11