UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,            )
                                     )
                 Plaintiff,          )
                                     )
     v.                              )  Case No. CR 17-520 DSF
                                     )
BERNHARD EUGEN FRITSCH,              )
                                     )
                 Defendant.          )
_____)


REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY THREE
FRIDAY, MARCH 21, 2025
7:50 AM
LOS ANGELES, CALIFORNIA


_____

MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305


UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

 JOSEPH T. MCNALLY
 Acting United States Attorney
 BY:  JOSEPH DE LEON
 BY:  SARAH S. LEE
 BY:  MONICA E. TAIT
   Assistant United States Attorneys
 312 North Spring Street
 Los Angeles, California  90012


**FOR THE DEFENDANT:**

 CUAUHTÉMOC ORTEGA
 Federal Public Defender
 BY:  JAMES S. THREATT
 BY:  REBECCA M. ABEL
 BY:  JONATHAN C. AMINOFF
   Deputy Federal Public Defenders
 321 East Second Street
 Los Angeles, California  90012


**ALSO PRESENT:**

 ALEX FLORES, paralegal
 CYNTHIA LEE, paralegal

**UNITED STATES DISTRICT COURT**

3

**INDEX OF WITNESSES**

**WITNESSES**                                                    **PAGE**

JÖRG MOHAUPT

  Videotaped deposition played                                    19


GEORGE MEDEROS

  Direct Examination by Ms. Tait                                   24
  Cross-Examination by Ms. Abel                                   130
  Redirect Examination by Ms. Tait                               181
  Recross-Examination by Ms. Abel                                192


DANIEL GERRISON GUY

  Direct Examination by Ms. Tait                                  196

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 104 | E-mail chain | 228 | 229 |
| 107 | E-mail chain | 244 | 244 |
| 108 | E-mail chain | 244 | 244 |
| 109 | E-mail chain | 244 | 244 |
| 110 | E-mail chain | 244 | 244 |
| 111 | E-mail chain | 244 | 244 |
| 113 | E-mail chain | 244 | 244 |
| 114 | E-mail chain | 244 | 244 |
| 191 | StarClub Subscription Agreement | 15 | 15 |
| 192 | StarClub Subscription Agreement | 15 | 15 |
| 194 | StarClub Subscription Agreement | 15 | 15 |
| 206 | Summary Chart | 236 | |
| 316 | Signature cards (pages 2 and 4 only) | 67 | 67 |
| 320 | Signature cards (page 8 only) | 67 | 67 |
| 330 | Checks | 54 | 58 |
| 348 | Signature card (pages 1 and 2 only) | 67 | 67 |
| 351 | Bank records (pages 1-4 and 6-7 only) | 113 | 113 |
| 359-E | American Express records | 75 | 75 |
| 385-E | Chase records | 41 | 42 |

**UNITED STATES DISTRICT COURT**

INDEX OF EXHIBITS, CONTINUED:

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 500 | Rusnak Arcadia records (pages 1-4, 19, 38-39, and 44-45 only) | 100 | 100 |
| 501 | Mercedes-Benz Financial Services records (pages 1, 3, and 5-14 only) | 104 | 104 |
| 502 | Rusnak Pasadena records (pages 1-7 and 24-28 only) | 124 | 124 |
| 507 | Mercedes-Benz records | 93 | 93 |
| 508 | McLaren Scottsdale records (pages 1, 4-6, 16-21, and 24-26 only) | 109 | 109 |
| 509 | Mercedes-Benz records (pages 1, 5-10, and 12-18 only) | 98 | 98 |
| 704 | 05/13/2024 interview report | 187 | |
| 866 | Photograph | 28 | 29 |
| 867 | Photographs | 117 | 118 |
| 868 | Photographs | 128 | 128 |
| 930 | American Express credit card charges | 88 | |
| 1331 | E-mail | 160 | 162 |
| 1332 | Invoice | 161 | 162 |
| 1335 | E-mail | 150 | |
| 1336 | E-mail | 146 | |
| 1338 | E-mail | 143 | |
| 1339 | E-mail | 149 | |

**INDEX OF EXHIBITS, CONTINUED:**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|--------|-------------|------------------------|------------------|
| 1345 | E-mail | 165 | |
| 1346 | Invoice | 166 | |

**UNITED STATES DISTRICT COURT**

FRIDAY, MARCH 21, 2025; 7:50 AM

LOS ANGELES, CALIFORNIA

-oOo-

(Out of the presence of the jury:)

THE COURT:  Good morning.

I was not up at 10:53 PM or 12:26 AM, so I got started on these at about 6:00 when I got here because there wasn't very much traffic at that time.

All right.  So let's start with D.G.  So the Government has listed a number of things and then made general comments.  So to the extent a document or testimony is offered for effect on the listener, that should be indicated when the document or testimony is provided.

MS. TAIT:  Your Honor, how would -- I'm sorry that -- I just want to be clear what the Court would like me to do.  In other words, at the time of offering, say -- the Government should indicate to the Court effect on the listener?

THE COURT:  Yes.  And then the jury will be instructed.

MS. TAIT:  Okay.

MR. AMINOFF:  Your Honor, would you like me to object each time or could the objection --

THE COURT:  I would prefer if you never objected again.

MR. AMINOFF:  Of course, Your Honor.

**UNITED STATES DISTRICT COURT**

But to preserve these objections, is it enough that they're sort of -- been e-mailed or would you like me to -- I don't want to slow down the process if the Court's already made a ruling.

THE COURT:  Well, I haven't because I don't know what they're presenting.

MR. AMINOFF:  Oh, okay.  So then we'll just do it live as we go.

THE COURT:  Well, yes.  To the extent -- because the Government didn't identify specific exhibits for this specific purpose.

MR. AMINOFF:  Oh, I understand.  I'm sorry.  Okay.

THE COURT:  Okay.  So if you then think that it's not admissible for that purpose, then we'll need to resolve it then.

MR. AMINOFF:  Okay.  So I'll raise the objection, Ms. Tait will explain the effect on the listener, and that addresses the Court's concern.

MS. TAIT:  Your Honor, I want to suggest to Mr. Aminoff that perhaps we confer and do a little example before we start so that we can assure ourselves that we're raising it correctly.  We can run it through the two of us together.

Are you going to be --

THE COURT:  Anything you can agree on is probably

going to be fine with me.

And then, again, when other persons are involved in e-mails, the Government says -- I know what generally not offered for the truth is.  Don't offer them if they're for the truth and they're not admissible.

MS. TAIT:  You're right, Your Honor.  Sloppy wording.  I apologize.

THE COURT:  Okay.  Anyway, again, if they're being offered for the effect on the listener, that should be noted.

148, the response to the objection is Mr. Guy received this e-mail chain and can testify that Mr. Mann asked for wiring instructions at a date and time which you say is not a factual assertion.  I don't know what that means.

MS. TAIT:  That's because -- I'm sorry, Your Honor. If the Court has the e-mail handy, it's in, I think, Volume 2. I'm sorry that -- I thought I was being clear by referring to the time stamps in the document.

THE COURT:  Oh, no.

MS. TAIT:  I'm going to go grab my copy, Your Honor, so --

THE COURT:  I don't get it.

MS. TAIT:  If the Court has the exhibit.

THE COURT:  I do have the exhibit.  I looked at the exhibit.  It still doesn't make any sense.  What are you --

MS. TAIT:  I'm sorry?

THE COURT:  I don't know what this -- what this means.  He can testify that Mr. Polsen sent back what?

MS. TAIT:  So, Your Honor, referring to page 1 of Exhibit 43, the second e-mail --

THE COURT:  43.

MS. TAIT:  Page 1 of Exhibit 148, excuse me.  I apologize.

THE COURT:  Yes.

MS. TAIT:  The second e-mail in this chain, Mr. Guy is on this e-mail.  He is the Harrington Global Ltd. item on the e-mail, that it was cc'd to, along with the defendant.

And, here, Mr. Guy can testify that that's Mr. Mann and his e-mail address, requesting from Mr. Polsen, the CFO, wire instructions.  And Mr. Polsen responds, also cc'ing Mr. Guy again, and says, "Attached are the wire instructions." And, in fact, on the third page are the wire instructions for StarClub.

And Mr. Guy received these e-mails and can testify that they happened.  And this --

THE COURT:  He might authenticate it, but it doesn't make it admissible.

MS. TAIT:  Well, it's admissible because they're not making factual assertions.  I think that what we can do -- you know, I would be fine with redacting on page 1 the e-mail from Polsen at the bottom of the page and redacting from page 2 the

contents of the e-mail that's depicted on page 2.

But there's -- I don't see that there's a factual assertion that -- that is for the truth of the matter asserted with respect to the two e-mails on page 1 and the third page of the attachment.  The two e-mails at the top of page 1.

And, also, the effect on Mr. Fritsch in terms of he knows that Mr. Mann is asking for wiring instructions is also part of the -- of the importance of this document because he's also cc'd on it, showing that he knows that Mr. Mann is getting wiring instructions.  The wire that is Count 2 follows a month later.

MR. AMINOFF:  Your Honor, when you're finished reviewing, can I respond?

THE COURT:  Yeah.

MR. AMINOFF:  Your Honor, with respect to any statements made by Ian Mann, I don't think it's appropriate that they come in through Danny Guy.

THE COURT:  Any statements made by Ian Mann.

MR. AMINOFF:  Ian Mann, yes, Your Honor.

That the particular e-mail that I think Ms. Tait's pointing to says that, "You need to send me the wire instructions, please."  I think that is a factual assertion and they are offering it for the truth because then they want to bring in the fact that the wire instructions were sent.

I also have really serious confrontation issues with

this particular witness for the reasons that we've already briefed with the Court and that was the subject for the motion to dismiss Count 2.

So I don't think it's appropriate at all that they're bringing in e-mails and factual statements from Ian Mann through the other victim in this case.

MS. TAIT:  Your Honor, if I could be heard on that.

THE COURT:  Yes.

MS. TAIT:  I don't see how a person asking a question, "Send me the wire instructions, please" -- and he could even delete the second -- we can redact the second portion since these were not included in the original documents, which I could see arguably that is a factual assertion.

The question is, "Send me the wire instructions, please."

The response from Mr. Polsen and Mr. -- cc'ing Mr. Fritsch is, "Attached, please find the wire instructions." The -- he sends a piece of paper which are wiring instructions. We're not introducing that for its truth.

Separately, Mr. Bouchard will testify that these are the wiring instructions -- these are correct wiring instructions for StarClub based on the bank records that will have been certified by the bank.  So none of that is coming in for its truth in terms of this e-mail.

But the fact that it was said, the fact that it happened, the fact that Mr. Fritsch was cc'd on it, all of that is important and it links Mr. Mann as an investor.

THE COURT:  Well, I know that's what you're trying to do.  But whether it's proper to do it this way is a different issue.

MS. TAIT:  Well, I think if we can redact -- for example, since these were not included in the original documents, appearing on page 1, and we can redact the contents of the e-mails below and leave the response from Mr. Polsen and then leave page 3, which are the actual wiring instructions -- because Mr. Guy can testify that he received this e-mail.

MR. AMINOFF:  Your Honor, but he's testifying to what Ian Mann's statements are.  And the fact asserted is Ian Mann saying --

THE COURT:  Well, Mr. Guy won't be testifying to that.  He will just say he received the e-mail, which means it was actually sent.

MS. TAIT:  Yes.  It's true, it is a true thing.  It happened, it's an event.

MR. AMINOFF:  Well, if -- if all that's needed is the fact of the wire instructions being sent, that's one thing.  But the Government's trying to bring in Ian Mann's statement that he needs the wire instructions.  I mean, this just seems like it's testimony for the accountant.

I'm also not sure how it's relevant that Danny Guy received this e-mail.  I mean, if the accountant's going to testify that a wire was sent from X account to Y account --

THE COURT:  It's not relevant that he received the e-mail other than to authenticate it.

MS. TAIT:  The Court is correct.

And it's also relevant, Your Honor, that Mr. Fritsch knew that Mr. Mann was getting wiring instructions, to the extent that the defense is going to make some sort of argument that maybe Mr. Fritsch didn't even know about Ian Mann.

THE COURT:  Right.  So the very narrow e-mail, to the extent it's for effect on the listener, again, you should identify that.  But do the other redactions.

MR. AMINOFF:  Sorry, Your Honor.  When you say -- which e-mail -- I'm a little lost which, exactly, portion is now coming in.

So I just would maintain my objection to any statements by Ian Mann on hearsay and confrontation grounds. If -- is the Court's ruling part of Ian Mann's e-mails coming in or just James Polsen's e-mail that says --

THE COURT:  Just James Polsen's e-mail.

MR. AMINOFF:  Just James Polsen's e-mail.

THE COURT:  And the wire.

MS. TAIT:  So just the top e-mail, Your Honor, not anything below the first graphic line around the center of the

**UNITED STATES DISTRICT COURT**

page there?  So after, "Best, Jim," redact everything else; is that correct, Your Honor?

THE COURT:  Correct.

And that took much more time than I planned.

All right.  191 --

MS. TAIT:  And, Your Honor, page 3, the wiring instructions, that also comes in, Your Honor?

THE COURT:  Yes.

MS. TAIT:  Okay.  Thank you.

THE COURT:  191, 192, 194, those are admitted.

(Exhibit Nos. 191, 192, and 194 for

identification and received into evidence.)

MR. AMINOFF:  And, Your Honor, my objection to that was just relevance, but it sounds like you've overruled it.

THE COURT:  Right.  Okay.

206.

MS. TAIT:  Yes, Your Honor.  206.  That's essentially a summary chart, Your Honor.

THE COURT:  Prepared by Mr. Guy?

MS. TAIT:  Not prepared by Mr. Guy but authenticatable by Mr. Guy.  His testimony is going to go over -- I'm sorry, Your Honor.

THE COURT:  Go ahead.

MS. TAIT:  It's okay?

His testimony is going to review each of these

transactions based on his personal knowledge, his involvement in the transaction, his --

THE COURT:  That -- I'm sorry.  206.  That could be a demonstrative.  It's not evidence.

MS. TAIT:  We were going to offer it as a -- as a summary of voluminous evidence.  Five different transactions, five different stock purchases, multiple different wire transfers.  And that he -- he has reviewed this and he's confirmed that it's truthful and accurate.  And so we were going to submit it as 1006, summary of voluminous evidence.

THE COURT:  106.

MS. TAIT:  1006.  Excuse me.

THE COURT:  1006 has been overused lately.

MS. TAIT:  So just demonstrative, Your Honor?

THE COURT:  Well, I'll hear what the testimony is.  You can show it, but I'll decide later whether -- I assume the defense has all of the exhibits --

MS. TAIT:  Oh, yes, Your Honor.

THE COURT:  -- that underlie this.

MR. AMINOFF:  Yeah.  I'm looking at them now, Your Honor.

THE COURT:  You're okay?

MR. AMINOFF:  I do have the exhibits.  I'm looking at them.

THE COURT:  Okay.  All right.

MS. TAIT:  Your Honor, a moment ago the Court admitted 191, 192, and 194; is that correct?

THE COURT:  Yes.

MS. TAIT:  Thank you, Your Honor.

MR. AMINOFF:  Sorry.  That was 192, 194 --

MS. TAIT:  And 191.

MR. AMINOFF:  And 191 and 195.

MS. TAIT:  195, Your Honor, the Court admitted that as well?

THE COURT:  It says no objection.

MS. TAIT:  No objection.

THE COURT:  And 831, somebody questions if this is the same as 195.  And you say except 831 is countersigned.

Okay.  That's fine.

MS. TAIT:  831 is okay, Your Honor?

THE COURT:  Yes.

MS. TAIT:  Thank you.

THE COURT:  All right.  Do we know how our jury is doing?

THE COURTROOM DEPUTY:  They're here.

THE COURT:  All right.  Let's bring them in.

MR. AMINOFF:  Are there issues about the Mederos exhibits?

MS. TAIT:  Your Honor?

THE COURT:  Yes.

UNITED STATES DISTRICT COURT

MS. TAIT:  Before the jury comes in, the first witness testifying is actually going to be Mr. Mederos, so just so the Court --

THE COURT:  Are you continuing with the depo?

MS. TAIT:  We are continuing with the depo.

THE COURT:  Okay.

MS. TAIT:  So we can discuss Mr. Mederos after the depo or --

THE COURT:  Well, I would say that this business records -- I should say alleged business records document dump is too much.  So you need to go through the records and figure out what you need, what might be admissible through some other means, and what really is admissible under the business records exception.

So there's a ton of documents in there.  I'm not going through each and every one of them.  That's your job.

I think I saw some checks in one of these groups that looked like it was Mr. Fritsch's signature.  Obviously those are statements of a party opponent for the defendant so those can come in.

MS. ABEL:  Your Honor, as to the checks, the defense's objection is to the memo line as a hearsay within hearsay objection but not --

THE COURT:  Well, it is signed by Mr. Fritsch.  It's his statement, so that's --

MS. ABEL:  The witness will testify that Mr. Fritsch did not write any of those statements.  And, actually, none of them are signed by Mr. Fritsch, if -- maybe one --

THE COURT:  That must be the one I hit.

MS. ABEL:  The vast majority are signed either by the witness or by other people.

THE COURT:  I saw that.

MS. ABEL:  But the memo lines are written by not that person.

MS. TAIT:  Your Honor --

THE COURT:  I guess we'll find out.

THE COURTROOM DEPUTY:  All rise.

(In the presence of the jury:)

THE COURT:  Good morning.  Everyone is back.

Does the Government want to continue with its deposition testimony?

MS. TAIT:  Yes, Your Honor.  We're going to continue -- just for the record, we stopped yesterday at page 126 of the Court's transcript of this matter at Exhibit 80.  And we'll continue the deposition of Mr. Mohaupt.

THE COURT:  Thank you.

JÖRG MOHAUPT, called as a witness by the plaintiff, was sworn and testified through videotaped deposition as follows:

(Videotaped deposition played, not reported.)

UNITED STATES DISTRICT COURT

MS. TAIT:  That concludes the deposition, Your Honor.

THE COURT:  All right.  Thank you.

Does the Government have another witness?

MS. TAIT:  Yes, Your Honor.  The Government calls George Mederos.

Your Honor, there is a binder of exhibits just for this witness.  I don't know if the clerk has passed it to you.

THE COURT:  Counsel approach while the witness is being sworn in.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

(At sidebar:)

THE COURT:  Okay.  So the -- I guess you're trying to get this in through Mr. Mederos too.

MS. TAIT:  He has personal knowledge of the transactions with respect to -- are you talking about, Your Honor --

THE COURT:  I think 330 and 385-E, the defense objects to the memo lines.

So unless he can testify as to the memo lines in a way that makes that statement admissible, you've got to redact those.  Now, if he says this is what Bernhard Fritsch told me to write on here, that's a whole different story.  But some of them came from the company's house account.

MS. TAIT:  That is the one that he will testify he was in charge of and that his handwriting is on many of those checks, writing it out.  There are many of the memo lines, not all.  His signature is on all of them.  He will testify as to the -- he will testify as to the process, what Mr. Fritsch told him how to keep records.

THE COURT:  So he needs to do that first.

MS. TAIT:  He did do that.  And then he sometimes, you know, wrote out blank checks and left them for Mr. Fritsch at his instruction and that the check is kept at the Rambla premises in a binder.

With respect to the checks that are made payable to him -- I think that's another one of these exhibits -- he will testify that those are his paychecks.  He endorsed each of them, I believe.  And the memo lines there refer to pay dates, I believe.  I don't think there's -- off memory, I don't recall anything else being there.

So are those memo lines acceptable?  Because he will testify those are his paychecks.

MS. ABEL:  No objection to him testifying as to his

paychecks but -- Rebecca Abel for the defense.

No objection to him testifying that they're his paychecks. But the memo line, I don't believe, was written by him. I believe it was written by somebody else.

THE COURT: That's correct.

MS. ABEL: That's not his statement.

And as you said, he often left blank checks for other people to fill out and they've got -- they could not have been directed to fill out those memo lines by Mr. Fritsch. He would be testifying that someone else was directed by Mr. Fritsch? How would he know that? That's hearsay within hearsay within hearsay.

MS. TAIT: With respect to the paychecks, he did not control that account. He would testify that those are his paychecks.

MS. ABEL: Okay. So the memo line could be redacted because it's a separate hearsay statement.

MS. TAIT: If that's what the Court's ruling is, we can redact it.

THE COURT: Sounds like it to me, yes.

MS. TAIT: How should we do it for -- it's like 30 pages.

THE COURT: What does the memo line say?

MS. TAIT: Pay 1/12/14 to 1/15/14, something like that.

THE COURT:  He's going to testify that that was his pay?

MS. TAIT:  Yes.

MS. ABEL:  There's a whole bunch of other ones that are -- that say things like landscaping or --

MS. TAIT:  Yes.  Those ones are the ones that he -- the ones that are in his handwriting, he will testify that his process pursuant to Mr. Fritsch's instructions were to write that in the memo line and to keep a record of it in the binder.

MS. ABEL:  To the extent that's the testimony, it would have to be limited to the ones written by him.

MS. TAIT:  And then there are some that have his signature that he signed in blank.  He can also -- so as to those, if the memo line needs to be redacted, then I think we'll just have to fish those out.  And I think we can fish those out, but we would just need a little bit of time to do that, Your Honor.

THE COURT:  Okay.  And the -- the stacks of documents, as I said before, you need to go through those.

MS. TAIT:  We have done that.  And we have specific pages that we will be offering from that.

MS. ABEL:  Okay.  I just was handed this.  I cannot take a position --

MS. TAIT:  No, we're doing it on --

MS. ABEL:  Okay.

THE COURT:  All right.  So we'll get started with Mr. Mederos and then --

MS. TAIT:  Thank you, Your Honor.

(In the presence of the jury:)

THE COURTROOM DEPUTY:  Please state and spell your full name for the record.

THE WITNESS:  George Mederos, G-e-o-r-g-e, M-e-d-e-r-o-s.

THE COURT:  You may proceed.

GEORGE MEDEROS,

called as a witness by the plaintiff, was sworn and testified as follows:

**DIRECT EXAMINATION**

BY MS. TAIT:

Q.   Good morning, Mr. Mederos.

A.   Good morning.

Q.   Mr. Mederos, where do you live?

A.   I live in Melbourne, Florida.

Q.   What do you do -- what do you do for a living?

A.   I'm a used car manager/sales manager for Land Rover, Jag, and Lincoln in Melbourne.

Q.   Have you ever lived in California?

A.   Yes, ma'am.

Q.   When did you live in California?

A.   Since date of birth till three-and-a-half years ago.

UNITED STATES DISTRICT COURT

Q.    Okay.  Were you ever in the car sales business in California?

A.    Yes.

Q.    And what years?

A.    From 1991 to 2010.

Q.    And what -- what kind of cars -- what dealerships -- did you work at dealerships?

A.    Yes, ma'am, I started with Nissan at -- or beginning of my career and ended with Mercedes-Benz.

Q.    Okay.  In or about 2012, did you get introduced to a person named Bernhard Fritsch?

A.    Yes.

Q.    And how did that come about?

A.    Um, we have a mutual -- I have a friend who is a stuntman.  I'm also a stunt performer.  And, um, he let me know that he had a client that was looking for a driver and introduced me to Bernhard Fritsch and Kaydee Cox.  And I interviewed with them, and they hired me.

Q.    And what was the job offer?  What was the -- the description?

A.    Um, driver.  I was going to be driving his son, picking up his son in the morning, taking him to school, and then picking him up after school.  And, also, driving Mr. Bernhard Fritsch to work as well.

Q.    Okay.  And so did you take the driver job?

A.    Yes, ma'am.

Q.    So you mentioned a person named Kaydee Cox.  And who was that?

A.    That was Mr. Fritsch's girlfriend -- or fiancée at the time.

Q.    And what's the name of the person -- the student that you were going to be driving?

A.    David Stocker.

Q.    And whose child was that?

A.    That was Bernhard Fritsch's older son.

Q.    Okay.  About how old was he when you took the job?

A.    13, 14, I would say.

Q.    Okay.  So you took the job.  And -- that's correct; right?

A.    Correct.

Q.    And where was the -- what was the driving -- the point of departure and arrival?  Where were you going to and from?

A.    So I would go in the morning to Malibu, to the Malibu house, Bernhard Fritsch's residence.  I would pick up his son and then take him to New Roads High School in Santa Monica.

Q.    All right.  And where was the -- what was the address of that Malibu house?

A.    3229 Rambla Pacifico.

UNITED STATES DISTRICT COURT

Q.    Okay.  And after you dropped -- you took David Stocker to school in Santa Monica, what did you do?

A.    In the beginning, I would just kind of wait around the area, in the house, until I picked him up at 3:30.

Q.    Wait.  You said you would wait in the area of what house?

You drove to Santa Monica.  Did you drive somewhere after that?

A.    Yes.  I came back to the house.

Q.    The Malibu house?

A.    To the Malibu house, correct.

Q.    All right.  And then you would wait; is that right?

A.    Yes.  Yes.  In the beginning, I would leave and meet a friend of mine, Ihan, which was the friend of mine that actually introduced me to Bernhard Fritsch.

And then progressively, I asked Bernhard if I could stay around the house because I reside in Laguna Beach.  So it was a big travel for me just to come back all the way to Laguna Beach and then come back at 3:30 to pick up his son.  So he allowed me to stay around the premises of the house.

Q.    And are you familiar with what 3229 Rambla Pacifico looks like?

A.    Yes, ma'am.

Q.    And can you -- there should be an exhibit book with your name on it on the cart there next to you.  Do you see

that?

Could you please review Exhibits 839 and 866?  One of them may be in evidence.

(Exhibit No. 866 for identification.)

MS. TAIT:  839 is in evidence.  Can we publish that?  Page 1.

Q.    (BY MS. TAIT:)  Do you see what's on the screen in front of you as Exhibit 839, page 1?

A.    Yes, ma'am.

Q.    Do you recognize that?

A.    Yes.  That is the 3229 Rambla Pacifico house.

Q.    And page 2?  Do you recognize that?

A.    Yes.  Same residence.

Q.    All right.  And so -- do you see Exhibit -- without publishing, Exhibit 866 in your book?

A.    Yes.

Q.    And do you recognize that?

A.    Yes.

Q.    What is it?

A.    That's the house as well.

Q.    The same -- 3229 Rambla Pacifico, Malibu; right?

A.    Yes.  Correct.

MS. TAIT:  Your Honor, I offer Exhibit 866.

MS. ABEL:  No objection.

THE COURT:  That's admitted.

(Exhibit No. 866 received into evidence.)

Q.    (BY MS. TAIT:)  So I'll try to call that the 3229 Rambla property as -- as we -- as you testify today.

So you interviewed with who for the job?

A.    Bernhard Fritsch and Kaydee Cox.

Q.    And who hired you?

A.    Bernhard Fritsch.

Q.    Okay.  And you ended up working several years for Mr. Fritsch; correct?

A.    Yes, ma'am.

Q.    And do you see Mr. Fritsch anywhere in the courtroom today?

A.    Yes, I do.

Q.    And could you identify him by some article of clothing he's wearing?

A.    Yes.  The distinguished gentleman with the striped tie, red tie with blue and white stripe.

THE COURT:  Indicating the defendant.

MS. TAIT:  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  So did you soon take on other tasks for Mr. Fritsch?

A.    Yes.

Q.    How did that happen?

A.    When I first started driving for Mr. Fritsch and staying in the house, I realized that he had a contractor there

that was doing -- performing work.  And I noticed the quality of the work wasn't up to par.

So I -- I talked to Mr. Fritsch.  And I explained to him that -- you know, I voiced my concern.  So he -- at that time, I asked him if I could -- if he would share with me what they were charging him and what they were actually supposedly doing.  And, um, in reviewing that -- that invoice or the -- the appraisal, I felt that it was overcharge for the kind of quality of work that it was.

So pretty much after that, um, I think I gained his trust and judgment.  So he allowed me to, um -- to oversee and, um, participate in what that contractor -- what they were doing.  And eventually, we terminated that contractor.  And I was pretty much responsible hiring the contractors to finish the job and then through the years doing other projects at the house, at the residence.

Q.    So did you take on a different role, then, from just being a driver for the --

A.    Yes.  Absolutely.

Q.    And how would you describe your role at that point?

A.    As an estate manager.

Q.    And about how long after you started with the driving job did you transition to the new role?

A.    I would say probably within a few months.

Q.    Okay.  So big picture, what was -- what was your job

once you became estate manager?

A.    Estate manager.

Q.    But what did that mean?  Who did you interact with?
What did you do on a daily basis?

A.    I interacted with Bernhard Fritsch every day, um,
going over whatever projects or whatever was going -- being
done at the house.  I was in charge of anybody who pretty much
did anything at the house, from housekeepers to personal
trainer to vendors, contractors, landscaper, pool cleaning guy,
anything and everything that had to do with the house.

Q.    And so did you supervise those people's work --

A.    Yes.

Q.    -- in some way?

A.    Correct.

Q.    And did you have anything to do with paying them?

A.    Yes.

Q.    All right.  We'll get to that in a moment.

       What was your work schedule?

A.    Monday through Friday, basically from 7:30 to 5:00,
6:00 o'clock.

Q.    Did you continue to drive David Stocker to
Santa Monica as well?

A.    Yes.  I -- I drove David until he was of age driving
himself.

Q.    Okay.  So, again, where did you live at the time?

**UNITED STATES DISTRICT COURT**

A.    I lived in Laguna Beach.

Q.    Is that far from Malibu?

A.    Yes.  Anywhere from an hour and a half drive.

Q.    Were there occasions where you stayed overnight at the Malibu property, 3229 Rambla?

A.    Yes.  Bernhard Fritsch at times allowed me to stay because he knew it was a long travel.  And I also stayed at friends' places around Santa Monica.

Q.    And how about house-sitting?  Did you do any work like that for Mr. Fritsch?

A.    Yes.

Q.    At the 3229 Rambla property?

A.    Yes, when he was out of town.

Q.    So let's turn to -- to banking.

Did Mr. Fritsch give you access to a checking account for use in your role as estate manager?

A.    Yes, ma'am.

Q.    Why?

A.    To pay the vendors -- or the contractors.

Q.    And to pay anybody else?  In other words, to pay people who were doing work on the house; is that right?

A.    Yes.  Yeah.

Q.    What instructions did he give you about the house of that account?

A.    Um, basically when -- when the work was authorized

or work was completed, we -- I would pay, you know, the agreed-upon amount that he agreed to pay the -- the contractor, the vendor.

Q. Who authorized the work in the first place?

A. Bernhard Fritsch did.

Q. And how do you know that he did that?

A. Because he verbally told me he approved it.

Q. Okay. So you couldn't just make a contract on your own?

A. Oh, no. Absolutely not.

Q. Okay. So how was the account set up, the checking account?

A. The checking account was already set up when I started working there. Um, Marguerite Gonzalez, I believe is her name, was actually in charge of that account. And then she quit. And then it was given to me as a duty, to help.

Q. So what kind of vendors did you remember -- do you remember paying for that did work on the house, using the checking account?

A. The landscaper, the pool guy, the cleaning people, Miracle Cleaning, um, Judy, which also is a housekeeper/masseuse, cook, did stuff for Bernhard Fritsch. Any contractor of projects that we did, mostly hardscaping around the property, painters when they -- we did painting on outside and the inside of the house. Pretty much everything

UNITED STATES DISTRICT COURT

that entailed with the -- the house.

Q.    And when you made payments, who authorized them?

A.    Bernhard Fritsch.

Q.    And how did you know how much to pay someone?

A.    It was the agreed amount between him and the contractor.

Q.    Okay.  And did you also supervise the work to make sure that it got done?

A.    Yes.

Q.    And --

A.    That was one of my main duties.

Q.    And did you -- did Mr. Fritsch -- did you report to Mr. Fritsch on that topic that work was done or not done?

A.    Yes.  And he would also -- if -- if he left, like if I took him to his office, I was at the house supervising.  And when he got back that evening, he would -- he would look at what was done and, you know, comment whether he liked it or not or if we should have changed this or changed that.  And then I would convey and deal with the vendor or the contractor.

Q.    Okay.  So you made a -- made a reference to driving Mr. Fritsch.  So was that also part of your job?

A.    Yes.  I would drive him to, um, StarClub in Santa Monica.

Q.    Okay.  And how often -- so you started in 2012.  But focusing on the period of around 2014 to 2017, how many days a

week did you drive Mr. Fritsch to Santa Monica, approximately?

A.    Monday through Friday at times.

Q.    And sometimes did he not drive down to work --

A.    Yes.

Q.    -- during Monday through Friday?

A.    There were times when we were doing bigger projects, I had to stay on the premises and he would drive himself.

Q.    Uh-huh.  And -- but who drove the majority of the time?

A.    I did.

Q.    And what percentage of the time -- did Mr. Fritsch also work at home?

A.    Um, yes.

Q.    In other words, during your business hours, Monday through Friday?

A.    Yes.  He was in his office.

Q.    So focusing on the period between 2014 and 2017, what percentage of the time do you think Mr. Fritsch was working at home versus you driving him to Santa Monica?

A.    Oh, I would probably say 10 percent.

Q.    10 percent being which one?  Home or Santa Monica?

A.    Home.

Q.    Okay.

A.    Being home.

Q.    So you mentioned StarClub.  Did you work there?

A.    No.

Q.    Where was it located?

A.    In Santa Monica.  Um, I believe the address is 228 Santa Monica Boulevard, I believe.

Q.    Okay.  And so how would your -- let me withdraw that.

Did you have anything to do with grocery shopping for the 3229 Rambla property?

A.    Yes.  I mainly did more of the dry goods.  His chef, Lisa Stalvey, would purchase a majority of the groceries that she was using for cooking for the family.

Q.    We'll talk about that in a moment.

Did you also -- you mentioned a housekeeper, Judy?

A.    Yes.

Q.    Do you remember her last name?

A.    Proesl.  Proesl.

Q.    Well, maybe there will be a document that refreshes the spelling there.

But what did she do for the 3229 Rambla property while you were there?

A.    She was hired to do more of a personal keeping, like making the beds every day, tidying up the room, steaming clothes, doing laundry for the family, not just Bernhard Fritsch.

And, um, also, he would utilize her to -- you know,

**UNITED STATES DISTRICT COURT**

maybe she'll make a little breakfast for him and then also masseuse.  She was a masseuse, so he would do -- she would do masseusing for Bernhard Fritsch and the family.

Q.    Were there lots of cars on the Rambla property?

A.    Yes.

Q.    And did you have a role with maintaining the cars?

A.    Yes.

Q.    What was your role?

A.    Um, getting them gassed up, getting them washed, and maintenance --

Q.    Okay.

A.    -- when required.

Q.    Was there a checkbook at the 3229 Rambla property that you had access to?

A.    Yes.

Q.    Can you describe that setup?

A.    It was just a black binder with checks that you would tear with the remittance stub to one side of it.

Q.    And if you had to -- so walk me through how it worked that you used that checkbook to make a payment.

A.    I'm sorry.  Can you repeat that?

Q.    Could you walk us through -- if you needed to make a payment, what would you do when you'd go into the binder?

A.    I would go in the binder, I would write the check out to who it was for.  And then I would also write in the

remittance what the check was for as well as I would write it on the check, on the memo line, and just disburse it.

Q.    Why would you write things on the memo line in the remittance?

A.    Because I wanted to make sure there was -- there was clarification what the check was for.

Q.    Did you get any instructions about that from Mr. Fritsch?

A.    Yes.

Q.    And what was his instructions?

A.    To make sure I filled that out so we would know what the check was for.

Q.    Were there a lot of checks written?

A.    Oh, yes.

Q.    Where was the binder of checks physically located in the 3229 Rambla property?

A.    That was located in Bernhard Fritsch's office.  It was, um -- it was a two -- two-floor office.  It was kind of like a room, and they made it -- converted it into an office. So it had -- the bottom floor was actually where my desk was. And then there was about four steps onto another floor, and that's where his desk was and his office.

Q.    Okay.  Kind of like a split level?

A.    Kind of a split level, yeah.

Q.    So you said you had a desk there; is that right?

A.    Yes.

Q.    And your desk was in the upper portion or the lower portion?

A.    Lower portion.

Q.    Did you ever have a practice of signing blank checks?

A.    There was times when he asked me to leave him blank checks, like on the weekend when he knew I wasn't there in case he needed them.

Q.    And "he" being --

A.    Bernhard Fritsch.

Q.    What was your understanding about why Mr. Fritsch didn't sign those checks himself?

A.    I don't know.  I didn't question it.

Q.    Other than Mr. Fritsch, who else did you answer to when you were making payments relating to your job as estate manager at 3229 Rambla?

A.    Nobody.

Q.    Let's talk about the residence of 3229 Rambla.  Who lived there when you started working for Mr. Fritsch in or around 2012?

A.    Kaydee Cox and David Stocker.

Q.    And Mr. Fritsch -- did he live there?

A.    Yes, and Bernhard Fritsch.

Q.    Okay.  And at some point did Ms. Cox move out?

**UNITED STATES DISTRICT COURT**

A.    Yes.  They dissolved the relationship, and she moved back to Texas.

Q.    Do you know a person named Lisa Short?

A.    Yes.

Q.    Who is she?

A.    That's Bernhard's ex-wife's --

Q.    Mr. Fritsch's ex-wife?

A.    Ex-wife, correct.

Q.    And did Ms. Lisa Short have children with Mr. Fritsch?

A.    Yes.  She has two children, two -- two boys.

Q.    What are their names?

A.    Max and Harry.

Q.    Did there come a time when Ms. Short moved into the property, then?

A.    Yes, ma'am.

Q.    And by herself?

A.    No.  With the two kids.

Q.    Okay.  And around when did that happen?

A.    I want to say around 2013 at some point or --

Q.    You started in 2012?

A.    Yes.

Q.    And was there overlap in the time that Ms. Cox lived at the property and Ms. Short lived at the property?

A.    Um, I -- I would say probably a couple of months

maybe.

Q.    So, in other words, they were both there -- there was some point in time when they were both living there?

A.    Oh, no.  No, no, no.

Q.    Okay.

A.    I'm sorry.  I misunderstood.  No.

Q.    So for your full-time job as the estate manager, how much were you paid?

A.    I was paid 5,000 a month.

Q.    And for approximately how many years did you -- did you work there, if you started around 2012?

A.    About five years.

Q.    So that takes you to around 2017?

A.    Correct.

Q.    Okay.  Mr. Mederos, in your book, could you please review Exhibit 385-E?

(Exhibit No. 385-E for identification.)

Q.    (BY MS. TAIT:)  It's 21 pages.  If you could please review it, look to yourself, don't read it out loud, and let me know when you are done.

(Pause in the proceedings.)

THE WITNESS:  Okay.  I'm done.

Q.    (BY MS. TAIT:)  Okay.  What are -- what do you see in Exhibit 385-E?

A.    These are my payroll checks.

UNITED STATES DISTRICT COURT

Q.    In connection with your job as the 3229 Rambla estate manager?

A.    Yes, ma'am.

Q.    Okay.  What's the company that's making the payments to you?

A.    US Mastertec, LLC.

MS. TAIT:  Your Honor, may I have a moment with my co-counsel?

THE COURT:  Yes.

MS. TAIT:  Okay.

(Off-the-record discussion between counsel.)

MS. TAIT:  Your Honor, I offer Exhibit 385-E unredacted.

MS. ABEL:  Previous objections overruled but preserved.  Preserving them, understanding they're overruled.

THE COURT:  They're admitted.

(Exhibit No. 385-E received into evidence.)

MS. TAIT:  They're admitted.  Thank you.

Q.    (BY MS. TAIT:)  Looking at the first page of Exhibit 385-E, we'll put it up on the screen, Mr. Mederos.

MS. TAIT:  All right.  So if we could blow up the check.

Q.    (BY MS. TAIT:)  So, again, the company paying you is what?

A.    US Mastertec, LLC.

Q.    What's the date on page -- this exhibit on page 1 of Exhibit 385?  What's the date of this check?

A.    The date is March 14th, 2014.

Q.    And who's it paid to?

A.    Paid to me, George Mederos.

Q.    How much is the check for?

A.    2,500.

Q.    And are you endorsed -- is your signature endorsing the back of the check?

A.    Yes, ma'am.

Q.    All right.  What's the account number underneath the signature line?

A.    958563199.

Q.    So the last four digits are?

A.    -3199.

Q.    And the name of the bank that issued this check?

A.    Chase Bank.

Q.    All right.  So what work did you do for US Mastertec, LLC?

A.    I didn't do anything for that company.

Q.    What was the business of that company, if you know?

A.    I have no idea.

Q.    Who controlled that company?

A.    Bernhard Fritsch.

Q.    What makes you say that?

UNITED STATES DISTRICT COURT

A.    Because I worked for him so I'm assuming he controlled it, getting paid from him.

Q.    So why were you paid by a company US Mastertec, LLC?

A.    I -- I don't know.

Q.    Okay.  Do you recognize the company name Trouble Stunts, LLC?

A.    Yes, ma'am.

Q.    What's that company?

A.    That was my own personal company when I was doing stunts.

Q.    Did you sometimes get paid for your estate manager salaries by payments to Trouble Stunts, LLC?

A.    Yes.

Q.    Okay.  What work did Trouble Stunts, LLC, do for any of Mr. -- let's say US Mastertec, LLC?

A.    They didn't do anything.

Q.    And so did you work for StarClub?

A.    No.

Q.    Did Trouble Stunts do any work for StarClub?

A.    No.

Q.    What part of your job as the estate manager at 3229 Rambla was developing technology for StarClub?

A.    Absolutely none.

Q.    Or for any other company?

A.    None.

UNITED STATES DISTRICT COURT

Q.    What part of your job as the estate manager for 3229 Rambla was connecting with advertisers?

A.    None.

Q.    And what part of your job included finding celebrities to use StarClub's app?

A.    None.

MS. TAIT:  Okay.  We can take that down.

So displaying Exhibit 328-E, which is already in evidence, page 1.

Q.    (BY MS. TAIT:)  In your binder, there are 28 pages of Exhibit 328-E.  Could you grab your binder and review those pages?

(Pause in the proceedings.)

THE WITNESS:  Okay.

MS. TAIT:  And -- so let's put up page 1.

Q.    (BY MS. TAIT:)  Do you see your handwriting here anywhere on page 1 of Exhibit 328-E?

A.    Yes.

Q.    Where is your handwriting?

A.    The whole check.

Q.    Oh, okay.  So the date, the pay to the order, the dollar amounts, the for line, and the signature is all of your handwriting?

A.    Yes, ma'am.

Q.    In this case on the endorsement, is that also your

UNITED STATES DISTRICT COURT

handwriting mostly?

A.    Yes.

Q.    There's somebody else's handwriting there too; right?

A.    Yes.

Q.    Okay.  So we'll go over that in a moment.

So did this -- is there some relationship between this check and the checking account that you were describing?

A.    Yes.

Q.    So what -- what are we looking at, then?  Is this an example of payment that you made in connection with your job as the 3229 Rambla estate manager?

MS. ABEL:  Objection.  Leading.

THE COURT:  Overruled.

THE WITNESS:  Yes.  This is the account that I would use to pay vendors.

Q.    (BY MS. TAIT:)  Is this a fairly typical representation of how you would write the checks out?

A.    Yes.

Q.    So when you -- you put in the for line, the purpose of the job?

A.    Yes, what was done.

Q.    Uh-huh.  Right.

So looking at this item, what's the name on the account, up --

UNITED STATES DISTRICT COURT

A.    Rambla Pacifico, Inc., house account.

Q.    And what's the name of the bank?

A.    Wells Fargo.

Q.    Down here under the signature, that's your signature; right?

A.    Yes, ma'am.

Q.    What are the last four digits of this account?

A.    -7568.

Q.    So this particular payment, what's the date?

A.    April 18th, 2014.

Q.    And who is it paid to?

A.    Miguel Sagura.

Q.    How much money?

A.    $3,006.51.

Q.    So do you remember Mr. Sagura?

A.    He was one of the workers that we hired from Jorge, the landscaper.

Q.    What was Jorge's name?

A.    Jorge Barreto.

Q.    Okay.  So what was Miguel Sagura doing to deserve this check?

A.    He was helping landscaping, planting, and hauling of plants and stuff that they did on the premises when we did the hardscape, landscaping.

Q.    At the 3229 Rambla house?

UNITED STATES DISTRICT COURT

A.    Yes.   Correct.

Q.    So looking at the endorsement, it's still on page 1, do you read what it says there?

A.    Yes.   Miguel Sagura paid to the order of George Mederos and my signature.

Q.    And do you remember why that happened?

A.    Yes.   That happened because I had to pay him cash.

Q.    Can you explain?  What do you mean by that?

A.    So I used -- I used my cash to pay him, and then he endorsed the check back to me.

Q.    Okay.  And was Mr. Fritsch aware that you did that?

A.    Yes.   I believe so, yes.

Q.    Was that something that you had to do a lot?

A.    No.   Not a lot.

Q.    Okay.  But for some vendors?

A.    Some vendors, yes.

Q.    So let's turn to page 2 of Exhibit 328-E.   It's going to be on the screen, Mr. Mederos.

      What is -- what do you see in the check on page 2?

A.    Monthly maintenance landscaping to Miguel Sagura on May 5th, 2014, for 700.

Q.    Is this another example of the payment to that same person?

A.    Yes.

Q.    And page 3 of Exhibit 328-E.

**UNITED STATES DISTRICT COURT**

A.    Same.

Q.    "Same" being a payment --

A.    Yes.  A payment for work performed.

Q.    By Miguel Sagura?

A.    By Miguel Sagura, correct.

Q.    On page 4, do you recognize the payee and the purpose?

A.    Yes.  Gianni Ortu.

Q.    And what did that person do?

A.    I believe Gianni was the plaster guy that specialized in Venetian plastering that we did in the lower part of the house and on one of the upper decks, Venetian plastering.

Q.    What's on the upper floors of 3229 Rambla?

A.    The main balcony.  When you come from the main floor out to the back of the house, it was a main balcony there.

Q.    Is there sleeping quarters on that floor?

A.    Yes.

Q.    Are there living rooms, work spaces on that floor?

A.    Yes.  So when you first come in the house, there's a big open living room/dining room.  And then to the right was the stairs to go upstairs.  And then you would walk down these other stairs and to the right was the office, to the left was the kitchen, then there was another room behind the kitchen. Then there was another living room and then there was another

room beyond that.

Q.   That's the first floor you're just describing?

A.   First floor, correct.

Q.   Okay.  And the second floor?

A.   Yes.  Second floor.

Q.   How many rooms on the second floor?

A.   One, two -- three rooms.

Q.   Was there a third floor?

A.   Yes.

Q.   How many rooms were on the third floor?

A.   Third floor was Bernhard Fritsch's master, the boys' room, Lisa Short's room, so three.

Q.   Was there a fourth floor?

A.   No.

Q.   So what's on the second floor?  Are they sleeping quarters or public spaces or what?

A.   The second floor is really the main floor where you would walk in the front door.

Q.   I see.

A.   And then there was a lower level, which is where the theater, the wine room, the -- the bar.  And then it would go out to the swimming pool.

Q.   Okay.  Thank you for that.

So page 5 of Exhibit 328-E.  Do you see a check here that you wrote?

A.    Yes.  Christian Ruiz.

Q.    And who's Christian Ruiz?

A.    He was a glass installer.

Q.    Did he do work on the 3229 Rambla house?

A.    Yes.

Q.    Next page, 328, page 6.

Is this a check that you recognize?

A.    Yes.

Q.    And who's it to?

A.    Mario Ruiz.

Q.    And what did Mr. Mario Ruiz do?

A.    Second deck Marmorino.  I believe that's the same as the Venetian plaster for the second deck.

Q.    Okay.  Turning to page 328-E, page 11 -- I'm sorry, Exhibit 328-E, page 11.

MS. TAIT:  Can you -- let's blow that up a little.

Q.    (BY MS. TAIT:)  What's displayed here?

A.    Um, this check was endorsed to Lisa Short on October 5th for the month of October, 2014.  It was an allowance that Bernhard Fritsch would have me do monthly to her.

Q.    So you said an allowance.  Why did -- what makes you say that?

A.    That's how he described it, as an allowance.

Q.    A monthly allowance?

A.    Monthly allowance.

Q.    You said it was endorsed to Lisa Short, but did you mean that it was paid to the order of Lisa Short?

A.    Yes.  Correct.

Q.    Okay.  What's the dollar amount?

A.    $4,167.

Q.    Let's see.  Page 12, Exhibit 328-E.

What's displayed here?

A.    Another check, paid to the order of Lisa Short, December 1st, 2014, for $4,167.

Q.    And page 13 of Exhibit 328-E?  Go ahead.  What is it?

A.    Another check endorsed to Lisa Short, December 23rd, 2014, for $4,167 for January 2015.

Q.    Again, paid to Lisa Short, not --

A.    Paid.  Yes, paid to Lisa Short.

Q.    Okay.  And so Exhibit 328-E, page 14, what does this show?

A.    Well, shortly after she created a business, 877 East Broadway, LLC.

Q.    "She" being --

A.    Lisa Short.

Q.    Okay.  Continue.

A.    And Bernhard Fritsch had me pay her business instead of paying the check to her personally.

**UNITED STATES DISTRICT COURT**

Q.    Was it still for the allowance?

A.    Yes.

Q.    Well, you write down in the for line, "property management."

A.    He had me -- he had me change it and put property management.

Q.    Did you understand what property she was managing?

A.    No.

Q.    Is that something that you were in charge of making sure the work was done?

A.    No.  Not -- not for this.

Q.    So why did you make checks to 877 East Broadway, LLC?

A.    I was instructed by Bernhard Fritsch.

Q.    Exhibit 328-E, page 17.

       What does this show?

A.    This is another check to 877 East Broadway.

Q.    And, again, who is that?

A.    Lisa Short's company.

Q.    The purpose of this check, based on your memory?

A.    Allowance for $4,167.

Q.    The dollar amount matches the checks made out to her personally?

A.    Yes.

Q.    Did Mr. Fritsch say that Ms. Short was working for

UNITED STATES DISTRICT COURT

him somehow?

A.    No.

Q.    Would you turn your attention in your binder to Exhibit 330.

(Exhibit No. 330 for identification.)

Q.    (BY MS. TAIT:)  And page through that.

MS. TAIT:  Your Honor, I would like to confer with my co-counsel for a moment.

THE COURT:  Sure.

(Off-the-record discussion between counsel.)

Q.    (BY MS. TAIT:)  Let me know when you're done, Mr. Mederos.  It's 25 pages.

(Pause in the proceedings.)

THE WITNESS:  Okay.  I'm done.

Q.    (BY MS. TAIT:)  Okay.  Thank you.

Mr. Mederos, does your signature appear on each one of these pages?

A.    Yes, ma'am.

Q.    And what are these documents?

A.    These are checks that I wrote out to vendors.

Q.    Did you write all of them or you signed all of them?

A.    I signed all of them.

Q.    Did you write most of them?

A.    Yes, ma'am.

Q.    Is this the -- these checks come out of the same

account you've been testifying about, the -- with respect to your job as the estate manager?

A.    Yes, ma'am.

MS. TAIT:  Your Honor, the Government offers Exhibit 330, unredacted.

MS. ABEL:  Objection to the memo lines with specific attention to those that are not written by Mr. Mederos but objection to all.

THE COURT:  So we need to have him testify.

MS. TAIT:  Pardon me?

THE COURT:  Lay a foundation.

Q.    (BY MS. TAIT:)  Mr. Mederos, again, the checkbook for this account, where was it located?

A.    At the residence, 3229 Rambla Pacifico.

Q.    And sometimes you signed blank checks; correct?

A.    That's correct.

Q.    But was it your -- when you come back and see your -- when you'd come back to the checkbook, after having signed blank checks, would you observe that notations had continued to be made in the manner that you're used to for the checks that were made out in your absence?

MS. ABEL:  Objection, Your Honor.  Vague.

Q.    (BY MS. TAIT:)  Mr. Mederos, when you signed blank checks, did you come back to look at the binder of checks after you -- when you came back to work the next time?

A.   Yes.   I would notice that obviously there was no checks and there was no remittance, but I didn't -- I didn't question it because I gave it to Bernhard Fritsch.

Q.   And so when you signed such checks blank, would someone keep track of the purposes of those checks the way you had?

A.   I don't think so.

Q.   Okay.

MS. TAIT:   Then, Your Honor, we offer Exhibit 330, except for -- give me a moment, Your Honor.   Except for page 7 and 8, page 12, and that's it.   Page 9?   Let me see.   No, page -- yes, page -- excuse me.   Page 9 doesn't have an issue. We offer page 9.   So page 7, 8, and 12.   We offer it, other than those three pages, Your Honor.

MS. ABEL:   The defense objects to any that are not in his name, as he just testified he does not have foundation to testify regarding them.

THE COURT:   I'm not sure what the point is of --

MS. TAIT:   We're excising Exhibit 7 -- sorry. Page 7 --

THE COURT:   Sidebar.

MS. TAIT:   Oh, sidebar.   Sorry.

(At sidebar:)

THE COURT:   I don't know what you're doing.

MS. TAIT:   I'm sorry, Your Honor.   I was just

offering the exhibit but for the pages that -- he -- he

doesn't -- according to the objection, he doesn't have

knowledge of the memo lines.  And my understanding is the Court

wants those to come in.  With respect to pages 7 -- I don't

have it in front of me.

THE COURT:  I don't understand the distinction that you're making.

MS. ABEL:  So she's saying -- I'll just explain. She's saying that she's only removing the ones that don't have memo lines.  But he just testified he doesn't have foundation for any of the ones that aren't written in his handwriting.

MS. TAIT:  These are certified bank records, Your Honor.  He signed --

MS. ABEL:  He's never seen the checks before.

MS. TAIT:  He will testify that he knows some of these people, Your Honor.

MS. ABEL:  So we would object to any that are not written in his handwriting.  This, he now has said, is his handwriting, so we don't object to any that are --

THE COURT:  So these are --

MS. ABEL:  So the ones --

THE COURT:  -- brought in as business records.

MS. TAIT:  Yes, Your Honor.

THE COURT:  They're business records.  If they have an indication on the re: line that's not within his knowledge,

he didn't write it, then it's the re: lines that don't come out.

MS. TAIT:  Correct.

THE COURT:  So all the checks can come in, but the re: lines, unless he can support them, don't come in.

MS. LEE:  We'll just redact them.

MS. TAIT:  We won't show them.  We won't display them.

So we'll offer the entire thing and we'll redact these pages.

MS. ABEL:  I do have an objection.

THE COURT:  They're admitted as business records.

MS. ABEL:  Okay.

(In the presence of the jury:)

MS. TAIT:  Your Honor, we offer Exhibit 330, subject to redactions to be placed on page 7, page 8, and page 12.

THE COURT:  All right.  Ladies and gentlemen, "redaction" is just a fancy legal word for we're going to black it out.

You may continue.

MS. TAIT:  Thank you, Your Honor.

It's admitted, Your Honor?

THE COURT:  Yes.

(Exhibit No. 330 received into evidence.)

MS. TAIT:  Thank you, Your Honor.

Could you please display page 1 of Exhibit 330.

Q.    (BY MS. TAIT:)  Mr. Mederos, do you see page 1?

A.    Yes, ma'am.

Q.    What is this document?

A.    This is a check made out to Jorge Barreto, the landscaper, for purchasing four palms.

Q.    How often was the landscaper at 3229 Rambla during the time period -- let's focus on the latter time period between 2014 and 2017?

A.    Pretty much every day.

Q.    Okay.  And what kind of work was he doing?

A.    We were doing all kinds of landscaping and hardscaping on the premises.

Q.    Okay.  Page 2 of Exhibit 330.

And who's this check made out to?

A.    This is made out to --

THE COURT:  You're redacting those.  Or you don't have a problem with those?

MS. ABEL:  We do, Your Honor, but I understood that they -- that objection to be overruled.

Q.    (BY MS. TAIT:)  Mr. Mederos, this is your handwriting --

THE COURT:  This is the re: line.

MS. TAIT:  Okay.

THE COURT:  If it's his handwriting, fine.

**UNITED STATES DISTRICT COURT**

Q.    (BY MS. TAIT:)  This is your handwriting; correct, page 2?

A.    Yes.  That's correct.  That's my handwriting.

Q.    Page 1 was also your handwriting; correct?

A.    Yes.

Q.    Including on the re: line of the check, the for line?

A.    Yes.

Q.    Okay.  Thank you.

      Mr. Mederos, who is this paid to?

A.    Judy Proesl.

Q.    And who is Judy Proesl?

A.    She was the housekeeping, more of the private housekeeper for the family.

Q.    And that's the person you also described as a masseuse?

A.    Yes.  Correct.

Q.    So without displaying it, could you please look at Exhibit -- please don't display -- Exhibit 330, page 12 to yourself?

      MS. TAIT:  Don't display.  Sorry.  You can take down the display.

            (Pause in the proceedings.)

      THE WITNESS:  Yes, ma'am.

Q.    (BY MS. TAIT:)  Okay.  So what is -- without talking

about the re: line, what is the check payable to, Exhibit 330, page 12?

A.    It's Malibu La Costa Owners Association.  It's a private beach, that Bernhard being a resident in that area had access to and that was a membership.

Q.    What's the date on this check?

A.    April 29th, 2017.

Q.    And how much money was it?

A.    $660.

Q.    Are you familiar with payments that you had to make to this organization?

A.    Yes.

Q.    Doing your job as the estate manager?

A.    Yes, ma'am.

MS. TAIT:  All right.  Displaying, please, Exhibit 330, page 15.

Q.    (BY MS. TAIT:)  What's -- what do we see on this page?

A.    This is a house account check that I made out to Casey Hinger and it's for May tutoring.  That was for Bernhard Fritsch's oldest son, David Stocker, tutoring for $900.

Q.    And who told you to pay Casey Hinger?

A.    Bernhard Fritsch.

MS. TAIT:  Okay.  Let's close that down.

UNITED STATES DISTRICT COURT

Q.    (BY MS. TAIT:)  How closely did you keep Mr. Fritsch posted on the checks that you were writing on the bank account we've been reviewing?

A.    He knew every time I wrote a check.

Q.    Did you balance the checkbook?

A.    No, ma'am.

Q.    How did you avoid bouncing checks all over town?

A.    Mr. Bernhardt.  He would reconcile and keep the account.  I didn't have access to statements or anything like that.

Q.    So how do you know he did?

A.    Because I would -- I would place -- when it would come in the mail, I would place it in his office on his office desk.

Q.    And would you ever get concerned that there wasn't enough money in the account to make the payments that you were making?

A.    No.  I mean, I never -- I never bounced a check, so I didn't have any concern.

Q.    How did the money in the bank account -- what was the source of the money in the bank account?

A.    That was Bernhard Fritsch.

Q.    Well, do you know what the source was?

A.    No, I do not.

Q.    Would Mr. Fritsch ever discuss with you that he was

transferring money into that account?

A.    He mentioned it where he had to transfer some money when we did bigger projects.

Q.    I'm going to ask you about a couple of names.  Do you recognize these names?  Evan Mederos.

A.    Yes, ma'am.

Q.    Who is that?

A.    That's my nephew.

Q.    Jordan Mederos.

A.    My son.

Q.    Miguel Mederos.

A.    My other nephew.

Q.    And did they do any work at 3229 Rambla at Mr. Fritsch's direction?

A.    Yes.

Q.    What did they do?

A.    I would -- I would hire them to -- well, for example, my son and Evan, I hired them to move some -- about 30 palm trees.  We got a U-Haul truck that we purchased for the premises for the landscaper.  And I had them go and retrieve the bamboo trees and bring them to the property.

Q.    And so did you make payments to them as part of your --

A.    Yes, for their time and labor.

Q.    So focusing again on the time frame beginning around

**UNITED STATES DISTRICT COURT**

2014, at that point, was -- was the house in -- in terrible disrepair?

A.    No.  Absolutely not.  The house was gorgeous.

Q.    What major construction projects do you remember paying for during that time frame?

A.    Mostly hardscape, meaning when we -- when I first started working for Bernhard Fritsch, he couldn't walk around the premises.  And if you notice on the picture that you brought up earlier, through the years we -- we hardscaped the landscaping that you are able to walk around.  You can enjoy the property because that was one of the -- the downfalls.  He had this beautiful house on a bluff in Malibu, but you couldn't really walk around the property because of the way it sits on this hilltop.  And then through landscaping and hardscaping, we made trails, we made an area where you can actually -- you know, there's sections where you can actually enjoy yourself and have a glass of wine or, you know, look at the sunset, stuff like that.  I mean, that was the whole purpose.

Q.    And what about interior remodeling during the period 2014 forward?

A.    We did remodeling for the kids' rooms, we did remodeling for Lisa Short's room, we did remodeling in the -- we were starting to do remodeling, setting up what is considered the theater room.  We were going to transpose it into a -- a sound room so you can have people come over and

record -- like a recording studio.

Q. And did that finish?

A. No, ma'am.

Q. What about when Ms. Short was getting ready to move into the house? Was there remodeling done to accommodate her?

A. Yes. Yes. We changed carpet, we painted. That's primarily when we did the boys' room and her room.

Q. Did you have an understanding of why those expenses were paid from a corporate account?

A. No.

Q. Let's talk about business use of the 3229 Rambla house.

So focusing again on the last three years, 2014 to 2017, how often did you see, while you were there, business meetings at the home?

A. Very rarely.

Q. Would you estimate for me, like, how many times a month?

A. Maybe once or twice a month.

Q. Let's talk about the chef. I think her name was Lisa; is that right?

A. Lisa Stavley.

Q. Is it Stalvey?

A. Stalvey. Stavley. I'm not sure how you pronounce it. Sorry.

UNITED STATES DISTRICT COURT

Q.    So what did you observe her doing at the property?

A.    She was just a chef, a personal chef.  And she would come in and cook for the family.

Q.    And would she also cater business meetings?

A.    Yes.  When there was business meetings, she would definitely cater the business meetings.

Q.    And were you involved in getting her paid somehow?

A.    Yeah.  Well, I would collect her -- kind of like a timesheet that we had, and then I would turn that in to Kim Fredricks.

Q.    Who is Kim Fredricks?

A.    Kim Fredricks is Bernhard's secretary at StarClub.

Q.    How often was the chef at the 3229 Rambla house from that period of 2014 to 2017?

A.    I would say three to four times a week.

Q.    So I want to show you a few bank records real quick. I think these are not disputed.

MS. TAIT:  Could you please -- the Government offers, I think without objection, Exhibit 316, page 2 and 4; Exhibit 320, page 8; Exhibit 348, page 1 and 2.

No objection?

MS. ABEL:  No objection.

THE COURT:  All right.  Those are admitted.

///

///

UNITED STATES DISTRICT COURT

(Exhibit Nos. 316, pages 2 and 4, 320, page 8, and 348, pages 1 and 2, for identification and received into evidence.)

MS. TAIT:  Could you please display, Mr. Flores, Exhibit 316, page -- page 4 first?

Q.    (BY MS. TAIT:)  Okay.  Mr. Mederos, do you see your signature anywhere on page 4 of Exhibit 316?

A.    Yes, I do.

Q.    And could you -- is it in the upper right quadrant?

A.    Yes.

Q.    What is the name of the -- what is the title up in the top left?

A.    US Mastertec, LLC.

Q.    I'm sorry.  The wrong place.

MS. TAIT:  Mr. Flores, can you take that down?

Q.    (BY MS. TAIT:)  In the top left, what's the title of this form?

A.    Oh, "Business Account and Signers Form."

Q.    And the name of the business it relates to?

A.    US Mastertec, LLC.

Q.    And you're being added as a signer; is that right?

A.    That's correct.

Q.    What's the date?

A.    February 19th, 2014.

Q.    And what is the last four digits of the account

number?

A.    -3377 -- oh, I'm sorry.  Sorry.  -3199.

Q.    Do you have an understanding of why you were added as a signer on this account?

A.    No, I do not.

MS. TAIT:  Could we display page 2, Exhibit 316?

Q.    (BY MS. TAIT:)  Do you see your signature on page 2 of Exhibit 316?

A.    Yes.

Q.    Where is your signature located?  Is it the bottom left corner?

A.    Lower left corner.

Q.    So at the top there where I've indicated, what does it say?  Can you read those words?

A.    Yes.  "Michael Jay Ravin."

Q.    Above the "Michael J. Ravin," what does it say?

A.    "Interoffice mail code."

Q.    Do you see the words "Name of the"?

A.    Anna Christina --

Q.    Oh, I'm sorry.  I'm in the wrong place.

Do you see above the -- immediately above "Michael J. Ravin," what are the words immediately above that?

A.    Oh, the address.  228 Santa Monica Boulevard --

Q.    I'm so sorry.

THE COURT:  It's a document.  It's on the screen.

**UNITED STATES DISTRICT COURT**

If you want to point something out, why don't you just read it.

MS. TAIT:  Yes.

Q.    (BY MS. TAIT:)  After the words "Name of the signer to remove," underneath there, what does it say?

A.    It says "Michael J. Ravin."

Q.    And you signed this form; right?

A.    Yes, ma'am.

Q.    Do you remember why you did that?

A.    No.

Q.    Why you removed Mr. Ravin?

A.    No.

MS. TAIT:  Okay.  Can you please display Exhibit 328, page 8.

I'm sorry.  Wrong exhibit.  Exhibit 320, page 8.

Q.    (BY MS. TAIT:)  All right.  Mr. Mederos, do you see your signature on this page?

A.    Yes.

Q.    Approximately where?

A.    On the right-hand top corner.

Q.    And what's the date you're signing?

A.    February 28th, 2014.

Q.    What bank is this document issued from?

A.    From Chase.

Q.    And the title of the document up here in the left?

A.    "Business Account and Signers Form."

UNITED STATES DISTRICT COURT

Q.    What's the name of the business?

A.    Greenwich Music, Inc.

Q.    And what's the last four digits of the account number?

A.    It looks like -4865.

Q.    What do you remember about why you were a signer on a Greenwich Music, Inc., account at around February of 2014?

A.    I don't.  I -- I had nothing to do with Greenwich Music, Incorporated.

Q.    And with respect to this exhibit and the prior one, do you -- why did you sign these things?

A.    I -- I had no idea I even signed these.  I had no idea.

Q.    But they are your signature; right?

A.    They are.  Looks like my signature.

Q.    Would you agree that it has something to do with your job for Mr. Fritsch?

A.    It has nothing to do with my job for Mr. Fritsch.

Q.    So in other words -- what I meant by that is would you agree that you didn't choose to sign these things yourself?

A.    That's correct.

Q.    Were you instructed to sign these things by somebody?

A.    I -- I don't remember signing these documents.

Q.    Okay.  That's fine.

**UNITED STATES DISTRICT COURT**

MS. TAIT:  Exhibit 348, please, page 1.

Q.    (BY MS. TAIT:)  And do you see your signature on this document?

A.    Yes.

Q.    So what's the title of the document up here?

A.    "Business Signature Card."

Q.    What's the account title?

A.    "Depositor, 3229 Rambla Pacifico."

Q.    Sorry.  Account title over here on the left.

A.    Account title, "Depositor, 3229 Rambla Pacifico, Inc."

Q.    Inc.  Okay.

And under the words "Printed Name," does your name appear?

A.    Yes.  That is my name.

Q.    And --

MS. TAIT:  You can clear that.

Q.    (BY MS. TAIT:)  What is your title in the center of the page there?

A.    It says "Secretary."

Q.    And then there's a date?

A.    The date is May 19th, 2014.

Q.    And your signature, it appears; correct?

A.    That is my signature.

Q.    Were you the secretary for 3229 Rambla Pacifico,

UNITED STATES DISTRICT COURT

Inc.?

A.    No.  But I also would like to add that is not my initials.

Q.    Down at the bottom, that's not your initials?

A.    That is not my initials.

Q.    Right.  No.  Okay.

MS. TAIT:  You can take that down.

Q.    (BY MS. TAIT:)  Mr. Mederos, did you also have a -- an American Express credit card that you were authorized to use in your role as estate manager at 3229 Rambla?

A.    Yes, ma'am.

Q.    And how did you get that card?

A.    I was -- Bernhard Fritsch gave it to me.

Q.    What instructions did he give you, if any?

A.    To use that card whenever he would ask me to, to purchase stuff for the house.

Q.    So that was in connection with your job as estate manager?

A.    Yes.

Q.    Did you ever use it for your own personal expenses?

A.    No, ma'am.

Q.    Did you ever write any checks from the house account we reviewed for your own personal expenses?

A.    No, ma'am.

Q.    So how often did you use this credit card that

Mr. Fritsch gave you?

A.    Quite often.

Q.    How many times a week?

A.    Pretty much at least three, four times a week.

Q.    Mr. Fritsch set any spending limit?

A.    No, I was never given a limit.

Q.    So sky's the limit?

A.    Sky's the limit.  As long as he approved it, sky's the limit.

Q.    What kind of expenses did he -- do you remember him specifically telling you to charge?

A.    Everything that had to do with the house.  From going to Costco, to replenish goods, to getting gas for the cars, car washes, um, buying materials for the house.  Um, whenever he asked me to -- to purchase something, he would have me use that card.

Q.    Who paid the credit card bill, as far as you know?

A.    Bernhard Fritsch.

Q.    Did you pay the credit card bill ever?

A.    Absolutely not.

Q.    Did you have to reconcile your credit card spending in any way, like make reports?

A.    I -- I never even had the ability to open up a statement.

Q.    Okay.  Did you do something with your receipts

**UNITED STATES DISTRICT COURT**

that -- of the charges you made?

A.    Yes.

Q.    What did you do?

A.    I would give those receipts weekly to Kim Fredricks.

Q.    And, again, where does Kim work?

A.    StarClub.

Q.    And who told you to do that?

A.    Bernhard Fritsch.

Q.    What do you know about Lisa Stalvey, the chef, having a credit card for expenses?

A.    I knew she had a credit card of her own to buy the food that she would prepare.

Q.    And how did you know that?

A.    She told me.

Q.    Did you also have something to do with her receipts?

A.    Yes.  I would collect her receipts and turn them in for her --

Q.    To whom?

A.    -- on my way home.

      To Kim Fredricks at StarClub.

Q.    Do you recognize the name of the business PC Greens?

A.    Yes.

Q.    What is that?

A.    PC Greens is a -- a little independent grocery store, kind of like unique, with health foods and stuff like

UNITED STATES DISTRICT COURT

that, kind of like a -- a Trader Joe's, to say, but a lot smaller scale on -- on Pacific Coast Highway in Malibu.

Q.    Near the Malibu property?

A.    Yes.

Q.    So can you -- we're going to display it on the screen.  It's no objection.

MS. TAIT:  Your Honor, the Government offers Exhibit 359-E.  I believe there's no objection.

MS. ABEL:  There's no objection.

THE COURT:  All right.  That's admitted.

(Exhibit No. 359-E for identification

and received into evidence.)

MS. TAIT:  On page 1 of Exhibit 359-E, let's bring that up.

Q.    (BY MS. TAIT:)  You've reviewed Exhibit 359-E before -- correct? -- the 72 pages?

A.    Yes, ma'am.

Q.    And what -- what -- high level, what are they?

A.    I'm sorry.  Can you repeat that?

Q.    Let me just withdraw.

On page 1 of Exhibit 359-E, what does it say at the top level -- the top left?

A.    "Business Gold rewards, StarClub Ltd., Bernhard E. Fritsch."

Q.    This is an American Express statement; right?

A.    Yes.

Q.    What is the closing date at the top there under Bernhard Fritsch's name?

A.    Closing date is April 21st, 2014.

Q.    And what is the balance?

A.    $166,257.76.

Q.    Okay.  So, again, StarClub Ltd., did you work for that company?

A.    No, ma'am.

Q.    But on page 5 of Exhibit 359-E, does your name appear?

A.    Yes, ma'am.

MS. TAIT:  Clear that.

Let's -- yeah, blow up new charges.

Q.    (BY MS. TAIT:)  Do you see your name in the center of page 5 of Exhibit 359-E?

A.    Yes, ma'am.

Q.    And what is the total dollar amount next to your name on this monthly -- this statement?

A.    $48,510.93.

Q.    So does this reflect charges that you made pursuant to Mr. Fritsch's instructions in connection with your job as the property manager?

A.    Yes, ma'am.

Q.    So turning to 359, page E -- sorry -- 359-E,

**UNITED STATES DISTRICT COURT**

page 23.

Do your charges begin at the bottom of the page?

A.    Yes, ma'am.

Q.    And what's the first charge there?

A.    It was a charge from Rusnak Mercedes-Benz.

Q.    So, again, who authorized the expenses you charged to the credit card?

A.    Bernhard Fritsch.

Q.    Let's turn to Exhibit 359-E, page 28.  And directing your attention to the top two charges.

What's the first charge?

A.    First charge was a Disneyland ticket purchase.

Q.    Do you remember what that was for?

A.    Yeah.  That was for one of his sons with Lisa Short was invited to go to Disneyland.

Q.    The second charge, college board SAT.  Do you remember that?

A.    Yeah.  That was the fee for the SAT for David Stocker, his older son.

Q.    And who instructed you to make those charges?

A.    Bernhard Fritsch.

Q.    So turning to Exhibit 359-E, page 58.

MS. TAIT:  At the bottom of the page.  Sorry.  Down here.

Q.    (BY MS. TAIT:)  Do you see a charge on January 8th,

UNITED STATES DISTRICT COURT

2016, to Target in Redwood City, California?

A.    Yes, ma'am.

Q.    And another charge in -- to Starbucks in Palo Alto the same day?

A.    Yes, ma'am.

MS. TAIT:  Turn to the next page, page 59, Exhibit 359-E.  And turning to the first few charges -- thank you.

Q.    (BY MS. TAIT:)  Do you see something at the top to Hertz Car Rental on January 8th, 2016?

A.    Yes, ma'am.

Q.    And where was the rental?

A.    The rental was in San Jose.

Q.    And who's the renter?

A.    Myself, George Mederos.

Q.    I see several more charges in Menlo Park, Palo Alto, Atherton, California.  Do you see those?

A.    Yes.  That's correct.

Q.    So do you remember why you made these charges?

A.    Yes, I was asked by Bernhard Fritsch to help his son move into his dorm at Menlo College.

Q.    The son -- which son was this?

A.    David Stocker, his oldest son.

Q.    Okay.  And where was Menlo College located?

A.    In Northern California, close to San Jose.

UNITED STATES DISTRICT COURT

Q.    So this involved travel?

A.    Yes.

Q.    And who went on the trip?

A.    Just myself and David Stocker.

Q.    What did you do on this trip?

A.    I helped David move into his dorm.

Q.    And what did that entail?

A.    Going shopping and getting supplies for his dorm and setting up -- and I helped him set up his dorm.

Q.    And did you incur expenses?

A.    Yes, ma'am.

Q.    And how did you pay for them?

A.    I paid them with the American Express.

Q.    At whose instruction?

A.    Under the instruction of Bernhard Fritsch.

MS. TAIT:  Okay.  So I'm not going to display this exhibit --

THE COURT:  It looks like it's time for a break.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

We'll take a 20-minute break.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  You can step out, sir.  Don't talk to

anyone you don't recognize, especially if they're wearing a juror's badge.

THE WITNESS:  Okay.

THE COURT:  Anything we need to discuss?

MS. TAIT:  The Government has narrowed down what it plans to offer or seeks to offer from Exhibits -- the Exhibit 500 series.

Oh.  Wrong way.

THE COURT:  I don't know what happens if you go out that door.

MS. ABEL:  I do.

MS. TAIT:  I've given our list to defense counsel, but I don't know if she's had time to review it.

MS. ABEL:  I haven't, Your Honor.  I will do it on the break.

THE COURT:  Okay.  Great.

(Break taken.)

(Out of the presence of the jury:)

THE COURT:  Have you resolved all your issues?

MS. TAIT:  No, not quite, Your Honor, but we have narrowed things down quite a lot.

THE COURT:  Okay.

MS. TAIT:  Can we direct the Court's attention to the exhibits, if the Court has the volume with exhibits -- the 500 series?

THE COURT:  Are they in Mr. --

MS. TAIT:  They're not in -- yeah, they are in the Mederos binder.  Yes, they are.

THE COURT:  All right.

MS. TAIT:  Exhibit 500 is the first one.  We'll just go in order.

MS. ABEL:  No -- sorry.  That's just an error.  That's my error.  Bad circling.  Nothing in 500.

MS. TAIT:  Nothing in 500?  Oh, 500 is fine.

So, Your Honor, 500, no objection.

THE COURT:  Okay.  Great.

MS. TAIT:  We are introducing -- let me tell you what we're introducing.

THE COURT:  I want to get the objections done.

MS. TAIT:  Sure.  We are narrowing what we're going to introduce and, because of that, there will be no objection.

MS. ABEL:  To 500.

MS. TAIT:  Yes.  And so the -- does the Court want to know the pages now?

THE COURT:  No, I want to go on to the next exhibit.

MS. TAIT:  Okay.  Exhibit 501.

THE COURT:  Okay.

MS. TAIT:  The Government is going to seek to introduce pages 1 --

MS. ABEL:  Your Honor, the only page objected to is

3.

MS. TAIT: Yes. And the defense objects to page 3. And the Government notes that this is a lease -- a lease record from Mercedes-Benz regarding --

THE COURT: Is that Mr. Fritsch's signature?

MS. ABEL: This is a third party check.

MS. TAIT: Yes. That -- it does have Mr. Fritsch's signature, Your Honor.

MS. ABEL: But there's no business records exception for this document because the business record was provided by the --

THE COURT: Wasn't it signed by Mr. Fritsch?

MS. ABEL: Yes, Your Honor.

THE COURT: So it's his statement.

MS. ABEL: Okay. Okay. That's fine.

MS. TAIT: In addition, Your Honor, as a lease company, it makes sense that the lease company would rely on the --

THE COURT: Are we still talking about 501?

MS. TAIT: Okay. 501, that's it --

THE COURT: I just ruled on 501.

MS. TAIT: Thank you.

Exhibit 502, Your Honor. There's an objection to pages 34 to 35.

MS. ABEL: No. Sorry. Before that, 24, 25, 26.

MS. TAIT:  Oh, I'm sorry.

MS. ABEL:  These are e-mails between a law firm and Mr. Mederos.  They're trying to admit them as a business record of an automobile.

MS. TAIT:  That's because these e-mails, Your Honor, concern the titling of the automobile.  And the automobile business that produced these records relied upon these e-mails, it's quite obvious, in order to support the titling of the vehicle in the particular corporate name in which they titled it.

MS. ABEL:  All that would be --

MS. TAIT:  They're also instructions, Your Honor.  They're not assertions.

MS. ABEL:  All that would be fine, Your Honor, except the business record declaration that they provided does not state what Government counsel just said.  It does not include a statement that it relied on third party documents, and that is required under the Ninth Circuit's law.

MS. TAIT:  And one more thing, Your Honor.

THE COURT:  Is it required or not?

MS. TAIT:  Is it required?  I don't see the law requiring that it is.  I think the Court can make an independent conclusion based on the type of records that we're looking at that it stands to reason that the company would rely on it.

Let me also indicate, Your Honor, that Mr. Mederos will testify that he coordinated instructions with this particular law firm on the titling of cars at Mr. Fritsch's instruction.

THE COURT:  I don't know why we're even talking about these but okay.

MS. ABEL:  I maintain the objection.  I don't think that these e-mails are an appropriate business record of a retailer for automobiles, including a handwritten document that appears to exist at page 26.  There's no statement by the custodian, and the custodian is not going to testify.  So I can't cross them about that question as to whether or not they would rely on such documentation.  But --

THE COURT:  Is the handwriting Mr. Fritsch's writing?

MS. TAIT:  Mr. Mederos will testify that he recognizes that to be Mr. Fritsch's handwriting.

THE COURT:  That comes in.

What else?

MS. TAIT:  And so, Your Honor, what is the ruling on pages 24 to 25, the law firm e-mails?

THE COURT:  They're in.

MS. TAIT:  They're in?

THE COURT:  Yes.

MS. TAIT:  Okay.  Your Honor, with respect to the

**UNITED STATES DISTRICT COURT**

same exhibits, Exhibits -- sorry -- pages 34 to 35 are objected to.

MS. ABEL:  Based on the Court's prior rulings, we can skip those and go to 506.

MS. TAIT:  Okay.  So those are no longer objected to at this point?

MS. ABEL:  Based only because of the Court's prior ruling.

THE COURT:  Admitted over objection.

MS. TAIT:  Admitted over objection.

Exhibit 506, Your Honor, the Government seeks to admit all of it.  The defense objects to pages 12 to 17.

MS. ABEL:  These checks do not have Mr. Fritsch's signature, at least does not appear to have Mr. Fritsch's signature.  I don't know.

MS. TAIT:  Your Honor, this is, again, lease records from Mercedes-Benz regarding a particular lease with an account number that's on page 1.  And in the same lease records, Mercedes-Benz maintained records of payments that reflect the same account number.

And -- and this -- StarClub was Mr. Fritsch's company.  And Ms. Fredricks is expected to testify that -- that he directed the payments out of the StarClub account.  I believe it's Ms. Fredricks.  Or, no, Mr. Fritsch is a signatory on the account.  I will say that.

UNITED STATES DISTRICT COURT

THE COURT:  All right.  Those will come in.

MS. TAIT:  So Exhibits -- sorry -- pages 12 to 17 come in.

Exhibit 507, there's an objection to pages 15 to 20.

MS. ABEL:  Preserved with -- it's the same issue.  So preserved but under -- over objection, I understand it will be admitted.

THE COURT:  Okay.  Thank you.

MS. TAIT:  Exhibit 508, there's an objection -- several objections.  Page 24 is the first one.

MS. ABEL:  Your Honor, this is a letter from a law firm to Mr. Fritsch containing Articles of -- Articles of Organization for an entity.  It's not something that could reasonably be expected to be relied on by an automobile retailer, absent direction by the custodian that they did rely on it.

This is certainly a third party document that a custodian would not be able to testify ordinarily and that only the author would be able to testify to.  This is not a record regularly kept in business.  This is a letter.

MS. TAIT:  Your Honor, these are instructions.  They were given by the law firm to the dealership, care of George Mederos.  Mr. Mederos is expected to testify that Mr. Fritsch directed him to look to this law firm and to take their instruction and to -- to deal with the purchase of the

car as instructed here.

In fact, the --

THE COURT:  You're wasting so much time on the car.
Those are admitted.

MS. TAIT:  Okay.  Pages 25 to 26 are also tied to
this, and they're also objected to.

MS. ABEL:  Yes.  It's all the same letter.

MS. TAIT:  Is that admitted as well, Your Honor?

THE COURT:  Yes.

I would suggest that you not dump all these
documents on the jury.  Use some common sense.

MS. TAIT:  Okay.

MS. ABEL:  34 and 35 is withdrawn, based on the
Court's prior --

MS. TAIT:  We'll withdraw page 29 as well.

So Exhibit -- the final one is Exhibit 509,
Your Honor.

MS. ABEL:  I think that was the one that just --

MS. TAIT:  And pages -- sorry.

MS. ABEL:  Sorry.  Just so that we don't waste time.
Withdrawn but only because of the Court's prior ruling.  So
admitted over objection is what I understand would be
appropriate.

THE COURT:  All right.  Ready to go?

MS. TAIT:  Your Honor, one thing.  Could I move into

evidence, if we haven't already, Exhibit 81, the video of Mr. Mohaupt, with the understanding it does not go back to the jury?

THE COURT:  Any objection?

MS. ABEL:  No objection.

THE COURT:  All right.

MS. TAIT:  And I think I already moved Exhibit --

THE COURT:  Our witness?  Let's move it along. Jury's waiting.

MS. TAIT:  Thank you.

(In the presence of the jury:)

THE COURT:  Everyone is back.  The witness is back on the stand.

Sir, you are still under oath.

Counsel, you may continue.

MS. TAIT:  Thank you.

Q.    (BY MS. TAIT:)  Mr. Mederos, directing your attention to your binder.  Would you please look at the document behind Exhibit Tab 930.  I think it's the very last document.

(Exhibit No. 930 for identification.)

MS. TAIT:  Your Honor, I do not intend to offer this at this time, but the witness will just review it.

THE COURT:  Okay.

Q.    (BY MS. TAIT:)  Do you have that in front of you,

Mr. Mederos?

A.    Yes, ma'am.

Q.    All right.  So hopefully you've got your glasses on.

A.    Yes.

Q.    Do you see -- do you recognize --

MS. ABEL:  Objection, Your Honor.  She's asking about a document she doesn't intend to admit and the defense does not believe is admissible.

MS. TAIT:  It's just for purposes of identification of names, Your Honor.  I'm just going to ask the witness so that he can see the spelling of names.

THE COURT:  Okay.  Give it a try.

Q.    (BY MS. TAIT:)  Mr. Mederos, did you charge -- did you make American Express charges to a company named Westlake Pro?

A.    Yes, ma'am.

Q.    In connection with your job as the estate manager of 3229 Rambla?

A.    Yes, ma'am.

Q.    What was Westlake Pro?

A.    That was a purchase that we did for studio equipment.

Q.    What kind of studio equipment?

A.    For recording.

Q.    Okay.

A.    For the -- when we were transitioning the theater room into a recording room.

Q.    Do you recognize --

MS. ABEL:  Your Honor, I object to him looking at the document while we're having this conversation.

THE COURT:  I don't know why it takes a document to answer that question.

MS. TAIT:  All right, Your Honor.

Q.    (BY MS. TAIT:)  Mr. Mederos, leaving the document aside, do you recognize a business that you did business with -- or did you do business with a place called Oasis Imports, Inc.?

A.    Yes, ma'am.  That was an outdoor patio or outdoor retail store on Topanga Canyon and Pacific Coast Highway that we would buy outdoor furniture.  We bought outdoor furniture for the pool area and for different parts of the house outdoors.

Q.    Do you recognize a business called Busy Body Fitness?

A.    Yes, ma'am.

Q.    Did you make payments to that company in connection with your job at --

A.    Yes.  That was a purchase for the gym equipment for outside that we developed with these cabanas for Mr. Bernhard Fritsch.

UNITED STATES DISTRICT COURT

Q.    How about TechnoGym?

A.    That's another establishment.  We bought another type of exercise equipment.

Q.    For the 3229 Rambla house?

A.    Yes, ma'am.

Q.    And California Home Fitness?

A.    The same.  Another piece of gym equipment.

Q.    Did you make charges at Giorgio Armani?

A.    Yes, ma'am.

Q.    And what did you buy there?

A.    At Giorgio Armani, I bought clothes that Bernhard Fritsch indicated for me to have picked up for him.

Q.    And how about at Tom Ford?

A.    The same.

Q.    And are you familiar with whether those are budget retailers or -- or something else?

A.    No.  They're high-end clothes retailers.

Q.    Okay.  So, Mr. Mederos, all of the charges that you made on the American Express card that we've been reviewing, they all were in connection with your job at Mr. Fritsch's instructions?

A.    Yes.  That's correct.

Q.    So you mentioned this person's name.  Do you know a person name Mike or Michael Ravin?

A.    Yes, ma'am.  I heard of his name.  I don't know him

UNITED STATES DISTRICT COURT

personally.

Q.    And did you obtain Mr. Ravin's approval for making any payments on the Rambla house account checkbook that we discussed?

A.    Absolutely not.

Q.    Did you obtain his approval for making -- for paying for any work performed by third parties at the 3229 Rambla property?

A.    Absolutely not.

Q.    Did you obtain his approval for any credit card expenses that you charged on the credit card you've discussed?

A.    Absolutely not.

Q.    So let's talk about cars.

I think you said your first job was -- for Mr. Fritsch was starting out as a driver for David Stocker.

A.    Yes.  That's correct.

Q.    And so did you stop driving Mr. Stocker at some point?

A.    Yes.  When Mr. Stocker was at age of -- to drive, Mr. Bernhard Fritsch purchased a vehicle for him.  And he would drive himself to school and back.

Q.    And were you involved in the purchase of that car, the negotiation -- let me rephrase that.

Did you introduce Mr. Fritsch to the car dealer?

A.    Yes, ma'am.

**UNITED STATES DISTRICT COURT**

Q.    And where was that, the car dealer?

A.    Well, one was Calabasas Mercedes and one was Beverly Hills Mercedes.

Q.    And turning your attention to 507.

MS. TAIT:  The Government offers Exhibit 507.  I believe the Court is admitting it.

THE COURT:  All right.

(Exhibit No. 507 for identification and received into evidence.)

Q.    (BY MS. TAIT:)  So looking at page 1 -- let's see. Let's start with page 9 of Exhibit 507.

In your binder, Mr. Mederos, you have pages 9, 10, and 11 of Exhibit 507.  And do you recognize the car -- a car that's described in these pages?

A.    Yes, ma'am.

Q.    What do you recognize it as?

A.    It's a 2014 Mercedes CLA 250 coupe.

Q.    And do you know whose car that was?

A.    That was the vehicle that Bernhard Fritsch purchased for his son David Stocker.

Q.    Looking at page 9 of Exhibit 507 and under the section called "Parties," who is the lessee, the first lessee?

A.    Lessee was StarClub, Incorporated.

Q.    And the second lessee?

A.    Bernhard Fritsch.

UNITED STATES DISTRICT COURT

Q.    So did you observe David ever working at StarClub, David Stocker?

A.    No, ma'am.

Q.    Was he a full-time student at -- on February 9th, 2014?

A.    Yes.

Q.    So up above the date of this lease is February 9th, 2014.  Do you see that?

A.    Yes.

Q.    And so, again, who drove this car?

A.    David Stocker, Mr. Fritsch's older son.

Q.    Turning to page 10 of Exhibit 507.

      Up at the top, what is the total monthly payment for this lease?

A.    499.88.  It's a three-year lease.

Q.    And turning to page 11, the signature area.  Do you recognize any signatures on this document?

A.    Yes.  I recognize Bernhard Fritsch's signature as the guarantee.

Q.    So he's a guarantee on the right.

      Do you see any signatures you recognize on the left?

A.    Yes, also as a lessee.

Q.    Okay.  And turning to page 1 of Exhibit 507.

      No, I'm sorry, I apologize.  Turning back to page 9 at the top of the page.

**UNITED STATES DISTRICT COURT**

MS. TAIT:  Your Honor, I'm going to withdraw that question.

Q.    (BY MS. TAIT:)  Turning to page 4 of Exhibit 507. Do you recognize any signatures on page 4?

A.    Yes, ma'am.

Q.    Whose signature do you recognize?

A.    That's Bernhard Fritsch.

Q.    In the center of the page there?

A.    Yes, ma'am.

Q.    Under guarantor's signature?

A.    Yes, ma'am.

Q.    Look above, under "Employer," what does it say there?

A.    StarClub, Inc.

Q.    And what does it say for "Gross salary or wages"?

A.    2.4 million.

Q.    Okay.  And turning back, I'm sorry, to --

MS. TAIT:  Mr. -- Mr. Flores, could you display page 1?  Here at the top.

Q.    (BY MS. TAIT:)  Do you see the account number -- or do you see a number, Mr. Mederos, a long number ending in 1?

A.    Yes.

Q.    What are those last six digits?

A.    Last six digits are 169001.

Q.    Okay.  So turning to page 15 of Exhibit 507.  What

UNITED STATES DISTRICT COURT

do you see?

A.    I see a check right now to -- from StarClub, Incorporated, to Mercedes-Benz Financial Services on March 1st, 2017, in the amount of $4,578.60.

Q.    And looking at the memo line, the account number, does the number match the number on page 1 of Exhibit 507 that you just read?

A.    Yes, ma'am.  It's account number -- last six, 169001.

Q.    What is the bank upon which this check is drawn?

A.    Chase.  JPMorgan Chase.

Q.    And what's the last four digits of the account number?

A.    -6339.

Q.    Do you remember --

MS. TAIT:  Close that down, please.  Thank you.

Q.    (BY MS. TAIT:)  Do you remember Mr. Fritsch buying a Mercedes for Lisa Short?

A.    Yes, ma'am.

Q.    What do you remember -- or sorry, leasing a Mercedes; correct?  At first.  What do you remember about a Mercedes and Ms. Short?

A.    It was an ML 350 BlueTEC.

Q.    And did it start out as a purchase or something else?

UNITED STATES DISTRICT COURT

A.    No.  It was a lease, and then it was bought out.

Q.    By whom?

A.    By Bernhard Fritsch.

Q.    So how does that work, in real simple layman's terms?

A.    So when you lease a vehicle, you have the option to buy the vehicle out for a residual price at the end of the term.  In that case, you -- like I said, you have the decision. If you want the vehicle, you like the vehicle, then you can turn around and purchase it.

Q.    And did anything like that happen with respect to Ms. Short's vehicle?

A.    Yes, ma'am.

Q.    So what happened?

A.    So they -- they -- they took the vehicle to Rusnak Mercedes-Benz, and they went ahead and purchased the vehicle. They bought it out.

Q.    So initially they leased it?

A.    They -- initially they leased it, and then they bought out the lease at the end of the term.

Q.    And how do you know all this?

A.    Because I -- I gave -- I gave Bernhard Fritsch the contact at Rusnak Mercedes-Benz to do that.

Q.    All right.

MS. TAIT:  The Government -- the Government offers

**UNITED STATES DISTRICT COURT**

Exhibit 509 but only pages 1, 5 through 10, and 12 through 18, pursuant to the certification at Exhibit 444.

I understand those pages are admitted, Your Honor?

MS. ABEL:  Over prior objection, yes.

THE COURT:  All right.  Yes.

(Exhibit No. 509, pages 1, 5-10, and 12-18, for identification and received into evidence.)

MS. TAIT:  Okay.  Thank you.

So could you please, Mr. Flores, display Exhibit 509, page 5?  Yeah.  Page 5.  509.

Q.    (BY MS. TAIT:)  Mr. Mederos, do you see the vehicle information in the top right of this document?

A.    Yes, ma'am.

Q.    Do you recognize the vehicle information as belonging to a particular person?

A.    Yes.

Q.    And what do you recognize this car to be?

A.    It's the 2014 Mercedes ML 350 BlueTEC that Bernhard Fritsch purchased for Lisa Short.

Q.    Okay.  So what is the title of the page we're looking at?

A.    This is a lease contract, purchase contract.

Q.    It actually goes on for three pages -- page 5, 6, and 7 of Exhibit 509.  Actually, the boilerplate goes on for even more pages, but -- am I right?

UNITED STATES DISTRICT COURT

A.    Yes, ma'am.

Q.    Okay.  So looking, again, at page 5 where we are, what's the date of the lease?

A.    March 15th, 2014.

Q.    And who's the lessee, the top lessee?

A.    The lessee is StarClub, Incorporated, and Bernhard Fritsch.

Q.    Did you ever observe Ms. Short working at StarClub, Incorporated?

A.    No, ma'am.

Q.    Did you ever drive her down there with Mr. Fritsch?

A.    No, ma'am.

Q.    So let's look at the VIN number for this vehicle, the last six digits.

A.    364304.

MS. TAIT:  And on page 6, please.

Q.    (BY MS. TAIT:)  Up at the top, what is the total monthly payment for the lease?

A.    $686.24.

Q.    Okay.  So, again, who drove this car?  Do you know?

A.    Lisa Short.

Q.    On page 7 of Exhibit 509, do you recognize signatures at the bottom?

A.    Yes, ma'am.

Q.    Whose signatures do you recognize?

**UNITED STATES DISTRICT COURT**

A.    Bernhard Fritsch.

Q.    Under which section?

A.    Under the lessee.

Q.    Okay.  On page 1 of Exhibit 509 at the top, is there a long number ending in 1?

A.    Yes, ma'am.

Q.    Okay.  Actually, let me withdraw that.

Let's look at Exhibit 500.

MS. TAIT:  Your Honor, I believe Exhibit 500, the Government is only offering pages 1 through 4, page 19, page 38 to 39, page 44 to 45.  And I believe it's been admitted but subject to objection to page 39.

MS. ABEL:  Subject to prior objections.

THE COURT:  Go ahead.

(Exhibit No. 500, pages 1-4, 19, 38-39,

and 44-45, for identification and

received into evidence.)

MS. TAIT:  Okay.  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  Mr. Mederos, looking at Exhibit 500, pages -- page 1.  Graphically, this is hard to read, unless you blow it up.

Do you see it now on your screen?

A.    Yes, ma'am.

Q.    Do you recognize what kind of document this is?

A.    Yes.  This is the document for the 2014 ML 350 when

UNITED STATES DISTRICT COURT

it was purchased -- when it was purchased out of lease.

Q.   So a lease buy-back?

A.   A lease buyout, yes.

Q.   So, again, whose vehicle was this?

A.   Lisa Short.

Q.   So pages 1 to 2, that's the retail installment sales contract; right?

A.   Yes, ma'am.

Q.   And who is the buyer at the top?

A.   The buyer is Bernhard Fritsch.

Q.   But really, who drove this car?

A.   Lisa Short.

Q.   Again, the year, make, and model?

A.   2014 ML 350 BlueTEC.

Q.   What brand?

A.   Mercedes-Benz.

Q.   And the VIN number, last six digits?

A.   364304.

Q.   Does this match the VIN number of the leased car that you looked at before?

A.   Yes, ma'am.

Q.   And so -- so this is a sale, not a lease; right?

A.   This is a purchase, correct.

Q.   Do you see -- scroll down.  Oh, yes.  Do you see the, um, total sales price under the Federal Truth and Lending

Disclosure section, in the boxes here?

A.    Yes.

Q.    What is the total sales price?

A.    42,154.

Q.    Turning your attention to page 4.

Do you see here a -- a reference to a wire amount --

A.    Yes, ma'am.

Q.    -- in the center of the page?

What is the wire amount?

A.    42,154.

Q.    That matches the number you just mentioned for the purchase price; right?

A.    Yes, ma'am.

Q.    Who is the party originating this wire?

A.    StarClub.

Q.    And what is the date, value date?

A.    Value date is August 8th, 22 -- 2016.

Q.    And above the wire amount, whose account are they crediting?

A.    They're crediting Rusnak Arcadia.

Q.    And is that the seller of the car?

A.    That is Mercedes -- yes, that is the Mercedes-Benz dealership.

Q.    So, again, this relates to Lisa Fritsch's *[sic]* Mercedes?

A.    Yes, ma'am.

Q.    Okay.  Turning to page 44 to 45 of Exhibit 500.

Do you recognize any signatures on page 44?

A.    Yes.  Under "Buyer" is Bernhard Fritsch.

Q.    And the top of the document, what is this document?

A.    That is a Vehicle Transfer and Reassignment Form for title.

Q.    For -- is that with the California state agency?

A.    Yes.  That's for California title.

Q.    Okay.  Does the VIN match the number, last six digits match the VIN number we've been talking about?

A.    Yes.  364304.

MS. TAIT:  Okay.  We can close that down.

Q.    (BY MS. TAIT:)  You mentioned a person named Kaydee Cox?

A.    Yes, ma'am.

Q.    And she was, again, who?

A.    She was Bernhard's fiancee at one point.

Q.    Okay.  Were you aware that she also acquired a Mercedes during the time you knew her?

A.    Yes, ma'am.

Q.    What do you remember about that?

A.    Um, well, her lease was up on her Range Rover, and then Bernhard bought her an S-Class.

MS. TAIT:  Okay.  The Government offers Exhibit 501,

UNITED STATES DISTRICT COURT

just pages 1, 3, and 5 to 14, subject to prior objection to page 3.

THE COURT:  It's admitted.

(Exhibit No. 501, pages 1, 3, and 5-14, for identification and received into evidence.)

Q.    (BY MS. TAIT:)  So turning to page 5 of Exhibit 501. So pages 5, 6, 7, 8, 9 -- do you see those?

A.    Yes, ma'am.

Q.    This is -- we've seen this kind of a document before; right?  What is it?

A.    Yes.  It's a lease contract.

Q.    Okay.  For Mercedes-Benz Financial Services; right?

A.    That is correct.  It's a two-year lease contract. The dealership was -- the lessor was Mercedes-Benz of Calabasas, and it was for a 2013 Mercedes 350.

Q.    And who drove that car, if you know?

A.    This car was for Kaydee Cox.

Q.    And the date of the lease?

A.    Date of the lease is June 18th, 2013.

Q.    Do you see the handwritten number at the top here?

A.    Yes, ma'am.

Q.    What is that number?  Can you read it aloud?

A.    7003676697.

Q.    Turn to page 3 of Exhibit 501.

Do you see something depicted here on page 3?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    What is it?

A.    That's a check drawn out from Greenwich Music, Inc., dated March 4th, 2015, to Mercedes-Benz Financial in the amount of $73,495.12.

Q.    Looking at the "For" line, it says -- there's a long string of numbers.  Do you see that?

A.    That's the account number for the lease, 7003676697.

Q.    Does that match the numbers that you just read out for Ms. Cox's lease?

A.    Yes, ma'am.

Q.    And, again, the last four digits of the account number for this check?

A.    -4865.

Q.    Do you recognize the signature above the account numbers?

A.    Yes.  That is Bernhard Fritsch's signature.

Q.    Does it look like a hand signature?

A.    Yes, it does.

Q.    Or does it maybe look like a stamp?

A.    Well, yeah.  It looks like a stamp of his signature.

Q.    But you recognize the signature to be consistent with his signature?

A.    Yes.  Absolutely.

Q.    All right.  At some point did Mr. Fritsch buy a

**UNITED STATES DISTRICT COURT**

McLaren vehicle?

A.    Yes, ma'am.

Q.    Okay.  Well, how did that come about?

A.    Um, he just mentioned to me at one point that he was -- he was really looking at a McLaren that he wanted to purchase.  And he asked for my -- my opinion, um, because I have prior experience as a used car manager to evaluate vehicles.

Since it was a used McLaren, he wanted me to make sure that it was what they were representing.  So he had me -- he had me fly out to Scottsdale McLaren.  And I had the shop put the vehicle up on the rack, and I went through and checked the car out to make sure it was okay as represented.

Q.    So who picked out the car?

A.    Mr. Bernhard Fritsch.

Q.    And who paid for your travel to Scottsdale?  That's in Arizona; right?

A.    Yes, ma'am.

Q.    Who paid for your travel?

A.    Bernhard Fritsch.

Q.    And what did you find when you got there?

A.    I found the 2015 McLaren 650S, that they were selling to Bernhard Fritsch.

Q.    And did you indicate -- were you satisfied with what you saw?

**UNITED STATES DISTRICT COURT**

A.    Yes.  Yes.  We -- like I mentioned, they put the car up on the rack.  I visually did my inspection, and I cleared it for Bernhard to purchase it.

Q.    Okay.  So did you find the McLaren dealer?

A.    No.

Q.    Who did?

A.    Bernhard found the car and the dealership that was selling it.

Q.    Okay.  So what -- how common are McLarens?

A.    Um, they're -- they're -- they're more common now.  But back then, they weren't very common.  It was pretty much -- they just came into the automobile industry as an exotic car, which is a higher -- a higher step than what we consider a high-line, "high-line" being like BMW, Mercedes, Lexus.

So McLaren sits in the evaluation of like a Lamborghini, that kind of exotic, Ferrari.

Q.    And did you have -- did you -- were you involved in the purchase logistics?

A.    Yes.

Q.    So do you know the name of a company Bennett Law in Montana?

A.    Yes, ma'am.

Q.    And what do you know about that in relation to the McLaren?

A.    That -- that law firm was given to me by

UNITED STATES DISTRICT COURT

Bernhard Fritsch to contact them and start the process to have -- when he purchased the McLaren, to have it registered there.

Q. Registered where?

A. In Montana.

Q. Instead of California?

A. Yeah. Not in California.

Q. Did you have any reason to -- did you see any evidence that Mr. Fritsch lived in Montana?

A. No, he does not.

Q. And from your personal experience as a car salesperson, do you know any benefit to registering a car in Montana?

A. Yeah. The number one benefit of registering a car in Montana is to avoid state tax where you reside, if it's -- if it's a state that has tax.

Q. So if you buy a car in California -- if you're a Californian, do you have to pay state tax when you buy a car?

A. Yes, ma'am.

Q. Is the tax based on something, like the value of the car?

A. Yes, ma'am.

MS. ABEL: Objection, Your Honor.

THE COURT: Sustained.

Q. (BY MS. TAIT:) So did you find Bennett Law?

UNITED STATES DISTRICT COURT

A.      No.  Bernard Fritsch did.

Q.      But did you communicate with Bennett Law?

A.      Yes, I did.

MS. TAIT:  The Government offers Exhibit 508 but only pages 1, 4 through 6, 16 to 21, 24 to 26, subject to prior objection.

THE COURT:  All right.

(Exhibit No. 508, pages 1, 4-6, 16-21, and 24-26 for identification and received into evidence.)

MS. TAIT:  To be clear, I think the prior objection was only to certain of those pages.

Q.      (BY MS. TAIT:)  So, Mr. Mederos, looking at what's been received as page 1 of Exhibit 508.

Do you see -- what is this document called, the title?

A.      It's a "Retail Buyers Order."

Q.      And where is -- who is the dealership?

A.      McLaren of Scottsdale.

Q.      Is that the place that you bought the McLaren?

A.      Yes, ma'am.

Q.      All right.  And --

A.      Well, I didn't buy the vehicle.

Q.      Sorry.  You're right.  It's the place you went to look at the vehicle?

A.      Yes, ma'am.

Q.    Okay.  Down below, though, is that your signature at the bottom?

A.    Yes, ma'am.

Q.    Why did you sign this form?

A.    It's just a form -- this is a form, just acknowledgment of the vehicle.  It's not a binding contract.

Q.    Okay.  So looking up above, who is the customer name?

A.    Greenwich Music, LLC.

Q.    And where is this LLC located?  What city and -- and state?

A.    124 West Pine Street.

Q.    Sorry.  Down here.  What city and what state?

A.    Missoula, Montana.

Q.    And what was Greenwich Music, LLC?

A.    I'm assuming one of Bernhard Fritsch's companies.

Q.    Well, did you have something to do with the Bennett Law Firm and that entity?

A.    Yeah.  That we set up -- through Bennett Law Firm, we set up the Greenwich Music, LLC.

Q.    At whose --

A.    As our company.

Q.    At whose instruction?

A.    At Bernhard Fritsch's instruction.

Q.    So looking over here, what's the date of delivery?

A.    To be delivered on or about January 21st, 2015.

Q.    And what is the cash price of the vehicle?

A.    292,000.

Q.    And down below, is the total price a little higher than that?

A.    Yes.

Q.    What is that?

A.    $292,510.

Q.    Okay.  Turning to page 4 through 6 of Exhibit 508. And displaying just page 4.

Do you recognize this document?

A.    Yes, ma'am.  This -- this document is a document from Arizona when you buy a vehicle out of state so you're not paying in state taxes.

Q.    To avoid paying taxes in Arizona?

A.    Yes, ma'am.

Q.    Okay.  And so does your signature appear on page 5 of Exhibit 508?

A.    Yes, ma'am.

Q.    And above your signature, who is the purchaser?

A.    Greenwich Music, LLC.

Q.    But you're signing for the purchaser; right?

A.    Yes.

Q.    And why did you do that?

A.    I just signed the document stating that the vehicle

UNITED STATES DISTRICT COURT

wasn't going to be registered under state of Arizona.

Q.    Which was true?

A.    That's correct.

Q.    Yeah.  Okay.

Turning to Exhibit 508, page 24.

And what do you see on this page?

A.    This is from Bennett Law Office.

Q.    It's a letter; correct?

A.    It's a letter.

Q.    What's it dated?

A.    It's dated January 29, 2015.

Q.    And who is it addressed to?

A.    Bernhard Fritsch in care of George Mederos.

Q.    And does this relate to the title for the -- the McLaren?

A.    Yes, ma'am.

Q.    And what do you -- it's care of you.  So what -- why did you -- why was this letter sent care of you?

A.    It was so I could process -- so I could facilitate the processing of the paperwork with Bennett Law Firm for the McLaren.

Q.    And the McLaren dealership?

A.    Yes, ma'am.

Q.    Okay.  At whose instruction?

A.    Under the instruction of Bernhard Fritsch.

MS. TAIT:  Your Honor, I offer Exhibit 351, pages 1, 2, 3, 4, and page 6 through 7, I believe with no objection.

THE COURT:  All right.

(Exhibit No. 351, pages 1-4 and 6-7 for identification and received into evidence.)

Q.    (BY MS. TAIT:)  Mr. Mederos --

MS. TAIT:  You can display Exhibit 351, page 1.

Q.    (BY MS. TAIT:  Do you see your signature on page 1 down below?

A.    Yes, ma'am.

Q.    Okay.  And looking at the top, what's the title of this document?

A.    It's a business depository certificate, corporation.

Q.    From what bank?

A.    From Chase Bank.

Q.    And what is the last four digits of the account number?

A.    -6603.

Q.    Is it -6803?

A.    Or -- um, hold on.

Q.    It might be clearer on another page.

A.    Wait.  Let me look here.

Yes.  -6803, correct.

Q.    And what is the account title?

A.    3229 Rambla Pacifico, Incorporated.

UNITED STATES DISTRICT COURT

Q.    And scrolling down and the date here is -- let's see.  Date -- do you see the date?

A.    Yes.  May 19th, 2014.

Q.    So scrolling down, does your name appear printed in the center?

A.    Yes, ma'am.

Q.    And what's the title given to you?

A.    Secretary.

Q.    Were you the secretary of Rambla -- 3229 Rambla Pacifico, Inc.?

A.    No, ma'am.

Q.    At whose instructions did you sign this form?

A.    From Bernhard Fritsch.

Q.    So turning to page 2 of Exhibit -- wait.  Did I -- yeah.  Page 2 of Exhibit 351.

Do you see your signature on the bottom right quadrant?

A.    Yes, ma'am.

Q.    And what's the title of page 2 at the top?

A.    Business signature card.

Q.    Is it for the same account we were just looking at?

A.    Yes, ma'am.  For 3229 Rambla Pacifico, Inc.

Q.    Turning to pages 6 through 7 of Exhibit 351.

Have you reviewed those?

A.    The wire transfer, yes.

Q.    Okay.  And so -- yeah, what does -- what does this represent?

A.    This was a partial payment for the McLaren, the 2015 McLaren 650S.

Q.    So at the top of page 6, it says "wire" -- do you see those words, "wire transfer"?

A.    Yes.  "Wire transfer sender information."

Q.    And who's the sender?

A.    Myself, George Mederos.

Q.    Are you sending from the account that we've just been looking at at Chase Bank?

A.    Yes, ma'am.

Q.    And in the wire transfer information section, what's the date of the request?

A.    January 29th, 2015.

Q.    What account number is being debited?  What's the last four digits?

A.    Account Number -6803.

Q.    And on the far right, what is the wire amount?

A.    The wire amount is $135,000.

Q.    And who's the recipient?

A.    The recipient was Bennett Law Office, IOLTA.

Q.    IOLTA?

A.    IOLTA.

Q.    Is that Bennett Law Office, is that the name -- do

UNITED STATES DISTRICT COURT

you recognize that name?

A.    Yes.  That's the law firm in Montana.

Q.    You've already testified about that, dealing with the McLaren and that law firm; right?

A.    Yes, ma'am.

Q.    And the money is being sent to what bank?

A.    First Interstate Bank.

Q.    And on page 2, do you see your signature?  Page 2 of Exhibit 3 -- sorry.  Page 7 of Exhibit 351.  Pardon me about that.

A.    Yes, ma'am.

Q.    Whereabouts?  In the middle of the page?

A.    In the middle of the page.

Q.    So why did you send this wire?

A.    I was instructed by Bernhard Fritsch to send the wire to Bennett Law.

Q.    For the purpose of --

A.    For the purpose -- for the purchase of the 2015 650S McLaren.

Q.    Purchasing that; right?

A.    Yes, ma'am.

Q.    Okay.  This is a different account than the one that you pay checks on; right?

A.    Yes, ma'am.

Q.    What else did you do on this account?

A.    Nothing.

Q.    Okay.  So was the McLaren delivered?

A.    Yes.

Q.    And where was it delivered to?

A.    It was delivered to Ron's Tire North Hollywood.

Q.    Why?

A.    At that time, Mr. Bernhard Fritsch wanted to put different wheels and paint the calipers the same color as the car.

Q.    Okay.  What color was that?

A.    Um, orange.

Q.    So were you there when it was delivered -- was it ever delivered to the 3229 Rambla house?

A.    No.  It went from Scottsdale, Arizona, to the wheel shop.

Q.    Oh, yeah.  How did it get from the wheel shop to somewhere else?

A.    When they were done doing the wheels and the calipers, then I went and picked it up and drove it back to the 3229 Rambla Pacifico house.

Q.    Can you look in your book at Exhibit 867.  It's ten pages there.

                (Exhibit No. 867 for identification.)

Q.    (BY MS. TAIT:)  Do you recognize those ten pages?

A.    Yes, ma'am.

Q.   What do they show?

A.   Exhibit 867, page 1, shows --

Q.   In general.  What do the ten pages show, before I can actually seek to admit it?

A.   That's the McLaren 650S.

Q.   Photographs of that.  Am I correct, photographs?

A.   Yes, ma'am.

MS. TAIT:  Your Honor, we offer Exhibit 867.

MS. ABEL:  No objection.

THE COURT:  All right.  That's admitted.

(Exhibit No. 867 received into evidence.)

Q.   (BY MS. TAIT:)  So publishing page 1 of 867.

Do you see a bright orange car in that picture?

A.   Yes, ma'am.

Q.   What is that?

A.   That's the 2015 650S McLaren.

Q.   And who's the person standing right behind it?

A.   That's Bernhard Fritsch.

Q.   And the next page, please.

What's page 2 of Exhibit 867?

A.   That's the 2015 650S McLaren coming down the main driveway to the 3229 Rambla house.

Q.   Page 3.

A.   That is Bernhard Fritsch and Lisa Short standing next to the vehicle, it looks like somewhere in Malibu Canyon.

UNITED STATES DISTRICT COURT

Q.    So it looks like the doors of this vehicle have, like, gull wings?

A.    That's --

Q.    Is that the way you say it?

A.    Yes, ma'am.

Q.    Page 4 of Exhibit 867.  What are we seeing here? There's two vehicles here.

A.    Yes.  This is -- in the picture is the 2015 S63 Mercedes-Benz that Bernhard purchased as well and the 2015 S63 -- McLaren 650S.

Q.    So the S63, we haven't reviewed documents about that; right?

A.    Correct.

Q.    What kind of car was that and who drove it?

A.    That was a Mercedes that Bernhard purchased for himself, and I would drive him in that vehicle.

Q.    So when you drove around to Costco, were you driving that car?

A.    No.

Q.    What car did you drive when you did that as -- part of your work as the estate manager?

A.    My daily car that I drove was a 2005 S430.

Q.    Is that also a Mercedes?

A.    Yes, ma'am.

Q.    Much older car, though?

UNITED STATES DISTRICT COURT

A.   Much older.

Q.   Page 5 of Exhibit 867.

What do you see there?

A.   That's the 2015 McLaren 650S coming up the driveway.

Q.   Of the 3229 Rambla house?

A.   At the 3229 Rambla house, correct.

Q.   Page 6.

Who do we see here?

A.   That's a selfie shot of Bernhard Fritsch with the 2015 650S McLaren behind him.

Q.   Next page, page 7.

A.   Another selfie shot --

Q.   Mr. Fritsch again; right?

A.   -- with the 2015 650S McLaren.

Q.   And Mr. Fritsch is there too?

A.   Yes, ma'am.

Q.   Page 8.

What do you see here?

A.   That's the 2015 650S McLaren parked right out of the garage where we would store it at the 3229 Rambla Pacifico house.

Q.   What are these orange colored things here in the --

A.   That's the calipers.

Q.   Sorry.  Front passenger tire, yeah.

A.   That's the orange calipers that -- that we had that

Bernhard wanted to have powder coated for the vehicle.

Q.    Oh, okay.

Is there a vehicle in the back that you recognize in the upper right-hand corner of this photo?

A.    Yes.  That vehicle is David Stocker's.  That's the Mercedes CLA 250 coupe.

Q.    Next page, page 9.

Again, a photo of --

A.    This is a photo of the 2015 650S McLaren.

Q.    And page 10.

What do you see here?

A.    That's the picture of the 2015 650S McLaren right in front of the garage where we'd store it.

Q.    Have you ever looked out that window in the garage?

A.    Oh, yeah.  Beautiful view.

Q.    What do you see?

A.    The Pacific Ocean.

MS. TAIT:  You can put that down.

Q.    (BY MS. TAIT:)  Were you aware that Mr. Fritsch bought a Rolls-Royce at some point?

A.    Yes, ma'am.

Q.    And how did you come to know that?

A.    When I was at -- well, he mentioned that he wanted -- that he was looking into purchasing a Rolls-Royce Dawn.  And he found one that he liked at Rusnak, which happened

to be a sister store of Rusnak Mercedes-Benz where I worked at the -- prior.  And one of my salesmen at the Mercedes store happened to be the salesman for the Rolls-Royce.  So I put them in contact for the purchase.

Q.    And do you remember the model?

A.    Yes.  It was a 2016 Rolls-Royce Dawn convertible.

Q.    So where in the level of Rolls-Royces does that fall in terms of luxury?

A.    That's actually one of the first -- that's actually when the Dawn first came out.  And it was a very high-class convertible.  It's a very high-line brand, Rolls-Royce.  I mean, they -- some people consider it exotic, some people don't because it's not a sports car, per se, but it's a luxury high-line vehicle.

Q.    Let me go back to the McLaren for a minute.

Who drove the McLaren on a day-to-day basis? Anybody?

A.    Bernhard would drive it.  I would drive it to go get gas and get it washed up and that was it.

Q.    Based on your personal knowledge of what you saw, did you see that it was driven around often?

A.    No.

Q.    All right.  Does that make sense, given the kind of car it is?

A.    Yes.  That's very -- very common.  They're more like

UNITED STATES DISTRICT COURT

trophy cars.

Q.    Did anybody other than Mr. Fritsch drive the McLaren?

A.    Just myself that I -- that I knew about.

Q.    Why did you -- why did you drive it?

MS. ABEL:  Objection, Your Honor.  Relevance.  403.

THE COURT:  I'll allow it.

Go ahead.

Q.    (BY MS. TAIT:)  The Court said it would allow it. Why did you drive it?

A.    Oh.  I would drive it to maintain it, to get it washed, gassed up for him to use it and if it needed maintenance.

Q.    No joyriding; right, Mr. Mederos?

A.    No, ma'am.

MS. ABEL:  Objection, Your Honor.  Relevance.

Q.    (BY MS. TAIT:)  Okay.  So let's go back to the Rolls-Royce.

You said you connected Mr. Fritsch with a dealer; right?

A.    Yes, ma'am.

Q.    Okay.  Could you review Exhibit 502?

MS. TAIT:  The Government is offering Exhibit 502, only pages 1, 2, 3 to 5, 6 to 7, 24 to 28.

MS. ABEL:  Objection is preserved.

UNITED STATES DISTRICT COURT

THE COURT:  All right.

(Exhibit No. 502, pages 1-7 and 24-28, for identification and received into evidence.)

MS. TAIT:  Your Honor, I would display page 1 of Exhibit 502.

Q.    (BY MS. TAIT:)  Mr. Mederos, do you recognize the format of this document?

A.    Yes.  This is a purchase agreement.

Q.    For a car?

A.    For a car, correct.

Q.    And what specific car?

A.    2016 Rolls-Royce Dawn.

Q.    Is this the car that Mr. Fritsch bought?

A.    Yes, ma'am.

Q.    So looking up at the buyer name and address, what is the buyer name and address?

A.    Greenwich Music, LLC.  And the address is 124 West Pine Street, Missoula, Montana.

Q.    And so it doesn't say Mr. Fritsch's name there; right?

A.    Correct.

Q.    So is Greenwich Music, LLC, the same firm that bought the McLaren?

A.    Yes, ma'am.

Q.    And the total sales price?

**UNITED STATES DISTRICT COURT**

A.    $405,973.07.

Q.    Okay.  So do you see --

MS. TAIT:  Where do we see the purchase date?  At the bottom of the page -- it's signed down below.  Can we explode here --

Q.    (BY MS. TAIT:)  Do you see any signatures you recognize in the center?

A.    Yes.  That's Bernhard Fritsch's signature.

Q.    Under "Greenwich Music, Inc., by," and there's a signature there?

A.    Yes, ma'am.

Q.    You recognize that to be Mr. Fritsch?

A.    Yes, ma'am.

Q.    Looking down at the lower -- at the very bottom here, the last section.

What is the date that the guarantor signed this?

A.    It looks like August 18th, 2016.

Q.    Is Mr. Fritsch's signature anywhere else on the bottom half here?

A.    Yes.  Right above Greenwich Music, Incorporated.

Q.    Under the line "Other owner signature"?

A.    Yes.  "Other owner signature," correct.

Q.    Turning to page 24 of Exhibit 502, do you see an e-mail from yourself?

A.    Yes.  An e-mail I sent to Gerald Freedman, sales

**UNITED STATES DISTRICT COURT**

representative, at Rusnak Rolls-Royce.

Q.   So does this relate to the purchase of the Rolls-Royce?

A.   Yes, ma'am.

Q.   What's the date?

A.   August 18, 2016.

Q.   What information are you conveying?

A.   This is conveying that MSO, which is a new car title.

Q.   So the -- what the title should be in; is that right?

A.   Yes.  Correct.

Q.   And what are you saying it should be titled to?

A.   I'm saying the title should be to Greenwich Music, LLC.

Q.   And at whose instruction?

A.   Under the instruction of Bernhard Fritsch.

Q.   On page 26 of Exhibit 502, do you recognize the handwriting?

A.   Yes.  That handwriting looks like Bernhard Fritsch's.

Q.   And what does it say?  Could you read it?

A.   Yes.  It says, "I, Bernhard Fritsch" --

MS. ABEL:  Objection.

THE WITNESS:  -- "recognize that the Rolls-Royce" --

UNITED STATES DISTRICT COURT

MS. TAIT:  Your Honor, there was an objection.

MS. ABEL:  Hearsay.

THE COURT:  Overruled.

Read it slowly, please.

THE WITNESS:  Okay.  "I, Bernhard Fritsch, recognize that the Rolls-Royce Motor Cars of Pasadena is making a special accommodation to allow me to use my American Express card to provide partial payment towards the purchase of the Rolls-Royce Dawn, VIN number," and blank.  "In recognition of this accommodation, I agree to give up my right to dispute this charge at any time in the future.

Q.    (BY MS. TAIT:)  You can stop there.

Based on your personal experience as a car salesman, is it unusual to pay for a car with a credit card?

A.    Yes.  It's very unusual.  There's usually a cap amount.  Usually of $5,000.

MS. TAIT:  So we can bring that down.

Q.    (BY MS. TAIT:)  Who was the driver of the -- did the Rolls get delivered?

A.    Yes, ma'am.

Q.    And where was it housed?

A.    At 3229 Rambla Pacifico.

Q.    In Malibu, not in Montana?

A.    No.  In Malibu.

Q.    Look at page -- Exhibit 868 in your book.  This is

just two pages.

(Exhibit No. 868 for identification.)

Q.    (BY MS. TAIT:)   Do you recognize them, what's in there?

A.    Yes, ma'am.

Q.    What are they pictures of?

A.    The first page on Exhibit 868 is --

Q.    Before we look at it, is there a vehicle pictured in both of them?

A.    Yes, ma'am.

Q.    And what's the vehicle?

A.    That's the 2016 Rolls-Royce Dawn.

Q.    The one you were just talking about; right?

A.    Yes, ma'am.

MS. TAIT:  Your Honor, the Government offers Exhibit 868.

MS. ABEL:  No objection.

THE COURT:  That's admitted.

(Exhibit No. 868 received into evidence.)

Q.    (BY MS. TAIT:)   So page 1 of 868.

So what's the vehicle we're seeing here?

A.    That is the 2016 Rolls-Royce Dawn coming out of the garage where we housed it with Lisa Short in the driver's seat.

Q.    And did Ms. Short often drive this car?

A.    No.

**UNITED STATES DISTRICT COURT**

Q.    Who was the primary driver of this car?

A.    Bernhard Fritsch.

Q.    Did you get to drive it?

A.    Yes, ma'am.

Q.    Why?

A.    Just like the McLaren, if it needed to get gassed or washed up or maintenance.

Q.    Okay.  And the next page, what do you see here?

A.    That's a picture of Bernhard standing next to the vehicle, the 2016 Rolls-Royce Dawn in a parking lot.

MS. TAIT:  One moment while I confer with my colleagues, Your Honor.

(Off-the-record discussion between counsel.)

MS. TAIT:  Your Honor, just one more thing.

Q.    (BY MS. TAIT:)  Exhibit 502 again, page 1.

Mr. Mederos, what was the total sales price of the Rolls-Royce 2016 Dawn?

A.    It was $405,973.07.

MS. TAIT:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MS. ABEL:  Your Honor, may I approach with the exhibits?

THE COURT:  Yes.

///

///

**CROSS-EXAMINATION**

BY MS. ABEL:

Q. Good morning, Mr. Mederos. You don't need to take a look at that now. You can just set it aside. I'll let you know if we need it, but we don't need it right now.

I think it's still morning. Yes. Good morning.

A. Good morning.

Q. So today was not your first time speaking with the prosecutor, was it?

A. No, ma'am.

Q. The Government prepared you for your testimony today?

A. I spoke with them on the phone and in person.

Q. Okay. And when you say "them," who are you referring to?

A. Um, Agent Christy and Monica.

Q. And because the jury may not know, Ms. Tait, was she the one that was just questioning you?

A. Yes, ma'am.

Q. And when you say Agent Christy, is that an FBI agent?

A. Yes, ma'am.

Q. And did you speak to her -- them yesterday?

A. Yes, ma'am.

Q. And, um, did you speak to them also in November?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    And was that an in-person or Teams?

A.    In-person.

Q.    In-person.

And did they come to you?

A.    Yes, ma'am.

Q.    And you're in Florida?

A.    Yes.

Q.    So Ms. Tait and Agent Hamada --

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

Q.    (BY MS. ABEL:)  -- flew to Florida to meet with you?

A.    Yes, ma'am.

Q.    To prepare you for today?

A.    To ask me questions and regarding this case, yes.

Q.    And you reviewed many of the same documents you went through today?

A.    Yes, ma'am.

Q.    And talked about what -- what you thought about those documents?

A.    Yes, ma'am.

Q.    And that, in fact -- was that many hours?

A.    Yes.

Q.    I'm sorry.  I'll clarify.  Was that meeting when they -- the agent and the prosecutor came to meet with you, was

that meeting several hours long?

A.    Yes, ma'am.

Q.    And there was another time before that and another time before that, maybe for a total of five or six times that you've met with the prosecutor or Government over the years?

A.    I met with them only twice, in person.

Q.    Twice in the last year?

A.    Yes.

Q.    But there were some times in 2017 and 2018 as well?

A.    2017 only.

Q.    Okay.  So you've had a lot of opportunities to talk to the Government.  But you and I, we're meeting here for the first time?

A.    Yes, ma'am.

Q.    We've never spoken before?

A.    Never.

Q.    You -- you testified on direct that you took a job with Mr. Fritsch in 2012; is that right?

A.    That's correct.

Q.    And would you describe that job as being Mr. Fritsch's right-hand man?

A.    For the household, yes.

Q.    Okay.  And you -- you previously worked as a stuntman; is that right?

A.    That's correct.

Q.    And you have an entity that you said you use for that work; is that right?

A.    Yes.

Q.    What's that called?

A.    Trouble Stunts.

Q.    And what type of entity is that?

A.    For stunts.

Q.    Sorry.  Let me clarify.  What type of corporate entity is that?

A.    LLC.

Q.    An LLC.  Okay.  So you had to register that?

A.    Yes, ma'am.

Q.    Do you know what state you registered that in?

A.    I believe it's either California or Louisiana.  I don't remember.

Q.    It's Louisiana.  But if it is, do you live in Louisiana?

        MS. TAIT:  Objection.  Relevance.

        THE WITNESS:  I did.

Q.    (BY MS. ABEL:)  You did live in Louisiana?

A.    Yes, ma'am.

Q.    In 2012?

A.    In 2012, I believe I still had an apartment there, yes.

Q.    While working for Mr. Fritsch?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    Okay.  And you testified on direct that Mr. Fritsch occasionally paid your salary to Trouble Stunts.  Is that right?

A.    Yes, ma'am.

Q.    So that means that your paycheck was made out to Trouble Stunts, LLC?

A.    Correct.

Q.    And who wrote those checks?

A.    I -- I don't know.

Q.    Did Mr. Fritsch write those checks?

A.    I have no idea.

Q.    Okay.  Well, would he have known the name of your LLC?

A.    I believe so.

Q.    Who would have told him that?

A.    I would have.

Q.    So in order for him or anyone to write a check to your LLC, you would have had to give them that information?

A.    That's correct.

Q.    So presumably you directed them to pay your salary to Trouble Stunts, LLC?

A.    Yes.

Q.    Okay.  Why would you do that?

A.    That was the only bank account I had.

Q.    You had no bank account in your personal name?

A.    No, ma'am.

Q.    Did you have a bank account in your personal name when the checks that the Government reviewed with you occurred? And I'm happy to bring them up if you --

A.    At this time now?

Q.    No.  We can clarify.

I believe they were in 2014.  The Government reviewed with you several checks for your salary that were made out in your name.

A.    Yes.  But -- but -- yeah, Trouble Stunts was under my -- George Mederos.  I would deposit in there.

Q.    So you used them interchangeably?

A.    Yes.

Q.    Okay.  So I understand that you testified several times that you previously worked -- and currently work for a car dealership?

A.    Yes, ma'am.

Q.    And one of those car dealerships was Rusnak; is that right?

A.    Yes.

Q.    And I believe -- much talk of cars, there was a Rusnak in that list, wasn't there?

A.    Yes, ma'am.

Q.    And so did you refer Mr. Fritsch to a dealership to

which you previously worked?

A.    Yes, ma'am.

Q.    Okay.  And --

A.    Well, the same company I worked for.  They're sister stores.

Q.    Understood.

And -- because you sold Mercedes; is that right?

A.    Yes.

Q.    So you were a Mercedes dealer?

A.    Yes, ma'am.

Q.    I think you testified you're now a dealer of other luxury vehicles; is that correct?

A.    That is correct.

Q.    Land Rover --

A.    Jaguar and Lincoln in Melbourne.

Q.    Okay.  So you have experience with selling luxury vehicles?

A.    Yes, ma'am.

Q.    Turning back to your work with Mr. Fritsch, you said you worked Monday through Friday generally?

A.    Yes.

Q.    And you -- you were, it sounds like, there 60-plus hours a week?

A.    That's correct.

Q.    And many of those hours were spent in the Malibu

property?

A.    Yes, ma'am.

Q.    And I think you also testified you were responsible for driving Mr. Fritsch on a regular basis?

A.    That is correct.

Q.    Nearly anytime he went into the office, you were taking him?

A.    Yes.  I would drop him off.

Q.    And so he went to the office a lot?

A.    Yes, ma'am.

Q.    About what time would you take him in the morning?

A.    About 9:00 in the morning.

Q.    And you drove him to the offices in Santa Monica?

A.    Yes.

Q.    And those were the StarClub offices?

A.    Yes, ma'am.

Q.    And you -- you also drove him to meetings?

A.    Yes, I did.

Q.    And how did you know when those meetings would be?

A.    He would mention it to me.  He would tell me.

Q.    Did you ever receive a schedule from Kim Fredricks?

A.    No.

Q.    Would it refresh your recollection to look at a document of -- indicating --

THE COURT:  He didn't say he didn't remember.

**UNITED STATES DISTRICT COURT**

MS. ABEL:  Excuse me.  Thank you.

Q.    (BY MS. ABEL:)  Let me ask a separate question.

You were expected to take Mr. Fritsch to those meetings; is that right?

A.    Yes.

Q.    Meaning if there was a meeting, you were most often driving?

A.    Yes.

Q.    And those meetings were a variety of times; right?

A.    Yes.  Sometimes in the evening, sometimes in the middle of the day, sometimes in the morning.  Correct.

Q.    And -- and often in -- at other businesses?

A.    Yes.

Q.    Other corporate -- corporate locations?

A.    Yes.  Correct.

Q.    If you recall, do you remember taking him to Disney?

A.    Yes.

Q.    You did take him to Disney?

A.    Yes.

Q.    More than once?

A.    Yes, ma'am.

Q.    Did you take him to Maker Studios, if you recall?

A.    Yes, ma'am.

Q.    More than once?

A.    Yes, ma'am.

Q.   What about Warner Music Group?  Does that sound familiar?

A.   It does.

Q.   Did you take him there?

A.   I believe so.

Q.   Same thing, more than once?

A.   I would say yes.

Q.   Okay.  So a lot of business meetings?

A.   Yes.

Q.   Did you take him to meet with talent ever?

A.   Yes.

Q.   Did he ever meet with Tyrese Gibson?

A.   Yes, he did.

Q.   Were you present?

A.   Yes, ma'am.

Q.   Did he ever meet with Charlie Sheen?

A.   Not personally, no.

Q.   Charlie Sheen's management or agents?

A.   I don't think so.

Q.   Okay.  Do you remember any other talent that he met with off the top of your head?

A.   I know he met with Wesley Snipes.

Q.   Uh-huh.  Were you present for that?

A.   I'm sorry?

Q.   Excuse me.  Were you present for that?

**UNITED STATES DISTRICT COURT**

A.    Yes.  I went to -- he had a party for him at StarClub, and I was invited.

Q.    Okay.  Any others that you can think of, any other talent that you remember him meeting with or you were present for?

A.    The other one was a woman from Germany.  I don't -- I know I'm going to chop up her name.  I'm not exactly sure.  It --

Q.    Would you like me to try?  No.  If you don't recall, that's okay.

A.    I want to say Fiola but it's not Fiola.  It's Fernona or --

Q.    Verona?  Could it be Verona?

A.    Yes.

Q.    Verona -- do you recall a last name?

A.    Verona.  No, I do not.  But I know she was from Germany.

Q.    And she was -- what do you recall her to be?

A.    Either an influencer or an actress of some sort.  I know very heavy accent, German.  And I know we -- I took Bernhard to do a photo shoot that he set up for her and stuff like that.  I drove him there.

Q.    Understood.

Did you also take some of StarClub's business partners to the -- to the airport?

UNITED STATES DISTRICT COURT

A.    Yes.  I would -- I would pick up some -- he would ask me to pick up some -- some clients, I assume, from the airport.

Q.    And you took him to the airport as well?

A.    Oh, yes.

Q.    You did testify on direct that you do know who Kim Fredricks is; is that right?

A.    That is correct, ma'am.

Q.    And who is that?

A.    She's Bernhard's secretary at StarClub.

Q.    And did you communicate with her?

A.    Yes.

Q.    Did you communicate with her about Mr. Fritsch's schedule?

A.    Um, not really.

Q.    Okay.

A.    Unless there's some kind of specialty something. But, no, it wasn't like I would call her every morning and find out what his schedule was.

Q.    Did you have access to his calendar?

A.    No.

Q.    But he had so many meetings.  How did you keep track of them?

A.    I would talk -- when I got there in the morning or maybe before I left the day prior in the evening, he would tell

me, you know, Can you take me to this meeting?  Especially if it was after hours, right, after I was done at the house in Malibu, he would ask me if I could take him to a meeting or drop him off for dinner or so forth.

Q.    Understood.

Ms. Fredricks -- did she sometimes work at the Malibu property?

A.    Yes.

Q.    And where did she work when she came to the offices?

A.    To the office.

Q.    Thank you.

So she worked in the office of the Malibu --

A.    In the office at 3229 Rambla Pacifico, yes.

Q.    Thank you.

And I understand you described two desks, kind of an upper one and a lower one.  One was yours and one was his.

Where would she sit?

A.    She would be at the top office where his desk was.

Q.    Okay.  Where his desk was.

And that's also where you left the mail?

A.    Yes, ma'am.

Q.    Uh-huh.  And did she review that mail?

A.    I have no idea.

Q.    What kind of work did you see her do at the property, if you can recall?

A.    My only -- what I know is just filing and reconciling.

Q.    What does that mean, reconciling?

A.    Like, accounts.

Q.    Accounts.  Like -- like, statements?

A.    I'm assuming so, yes.

Q.    You also worked for StarClub; isn't that right?

A.    No, ma'am.

Q.    So on direct, you also stated that you -- you never worked for StarClub.  You never recruited celebrities?

A.    No.

Q.    You never engaged with any business partners of StarClub?

A.    No.

Q.    So it would be incorrect to say that you represented StarClub in partnering artists and athletes?

A.    That's correct.

Q.    I'm going to direct you to 1338.

       (Exhibit No. 1338 for identification.)

Q.    (BY MS. ABEL:)  Sorry.  In the binder.  Now you can open it.

       You see an e-mail from yourself at the bottom?

A.    Yes, ma'am.

Q.    "Good morning."  Is that -- do you see that down there?  Do you see the date, May 1st, 2015?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    All the way at the bottom, last paragraph, do you see that -- sorry.  I didn't mean to -- do you see that last paragraph at the bottom of that first page of 1338?  "I have come on board" --

MS. TAIT:  Objection to the reading.

THE COURT:  The document is not in evidence.

MS. ABEL:  Thank you, Your Honor.

Q.    (BY MS. ABEL:)  Do you see that paragraph?

A.    Yes, I do.

Q.    Did you write that paragraph?

A.    No, ma'am.

Q.    Is this an e-mail from you?

A.    Yes, it is.  Well, the top of the paper says it's from me.

Q.    Do you see in the middle there where it says on May 1st, 2015, and then it says -- has your e-mail address?

A.    Yes.

Q.    And that you wrote the following?

A.    I don't -- I see what you're showing me, but I didn't compose this e-mail.

Q.    Okay.  So you didn't come on board to build the business?

MS. TAIT:  Objection to -- improper impeachment.

MS. ABEL:  I'm not --

UNITED STATES DISTRICT COURT

THE COURT: Go ahead.

MS. ABEL: Thank you.

THE COURT: Overruled.

Q.   (BY MS. ABEL:)  So you don't know what Monarch Management is?

A.   No.

Q.   You've never worked with Monarch Management?

A.   No, ma'am.

Q.   Okay.  What about Carissa Rosario?  Do you know who that is?

A.   Yes, I do know Carissa.

Q.   Who is that?

A.   She was a friend of mine.

Q.   Okay.  What kind of work did she do in 2014/'15 time frame?

A.   She was a -- an influencer at that time or trying to be an influencer who was a -- a cousin of a good friend of mine.

Q.   Did you recruit her to StarClub?

A.   I did not.  What I -- I didn't recruit her.  I gave her the information of StarClub for them to be able to maybe conduct business together.

Q.   So you -- you never engaged with StarClub about Carissa Rosario?

A.   No.  I just -- it was just a referral.

UNITED STATES DISTRICT COURT

Q.    Can I direct you to 1336?

(Exhibit No. 1336 for identification.)

Q.    (BY MS. ABEL:)  Is that an e-mail from you to Mr. Fritsch?

A.    Yes, ma'am.

Q.    "StarClub talent" in the subject line?

MS. TAIT:  Objection to reading.

THE COURT:  You can't read from a document that's not in evidence.

Q.    (BY MS. ABEL:)  Do you see that document, sir?

A.    Yes.  I'm looking at it.

Q.    Is it still your testimony that you didn't recruit Ms. Carissa Rosario as talent for StarClub?

A.    No, I didn't recruit her.  I just simply referred her to StarClub, and they -- I would assume they got in contact with her to try to do business with her.

Q.    Did she complain to you about some missing payments from StarClub?

A.    Probably.  I don't -- I don't recall.  Maybe.

Q.    Would it refresh your recollection to read the e-mail?

A.    Sure.

Q.    Go ahead.

(Pause in the proceedings.)

THE WITNESS:  Okay.

UNITED STATES DISTRICT COURT

Q.    (BY MS. ABEL:)  Thank you.  You've read it.

Did that refresh your recollection that you communicated with --

A.    Yes.  It's --

Q.    Go ahead.

And what do you recall?

A.    It -- from reading the e-mail, it seems that she was complaining --

MS. TAIT:  Objection, Your Honor.  Improperly refreshed.

THE WITNESS:  -- of not getting paid.

MS. ABEL:  Stop.  Sorry.  I think we just miscommunicated.

Q.    (BY MS. ABEL:)  Did the e-mail refresh your recollection as to your interactions with Carissa Rosario?

A.    Well, on the e-mail, it states --

Q.    You don't need to read from the e-mail.

THE COURT:  Stop.  Stop.  Listen carefully.  Okay? The question is not what the e-mail says.  The question is: Now that you have looked at it, do you remember something, the something that counsel is asking.

Q.    (BY MS. ABEL:)  So do you remember --

A.    Yes.  Yes.

Q.    Go ahead and tell us what you remember.

A.    Well, from reading the e-mail --

THE COURT:  Just tell us --

Q.    (BY MS. ABEL:)  Just tell us what you remember.

THE COURT:  Tell us what you remember.

THE WITNESS:  Amik was a person that worked at StarClub that obviously was corresponding with her.  Then she was complaining to me of not getting paid in this e-mail.

Q.    (BY MS. ABEL:)  And -- and what were you doing? What did you decide to do about that?

A.    It looks like I sent the e-mail to Bernhard so he can react.

Q.    Okay.  Do you know, did Ms. Rosario post -- post to the StarClub website?  Do you know?

A.    I don't know.

Q.    Okay.  What about KWL Enterprises?  Do you know who that is?

A.    No.

Q.    You don't know who that is?

A.    KLW?

Q.    KWL.

A.    KWL, no.

Q.    You didn't reach out to them on behalf of StarClub?

A.    Not that I remember.

Q.    I think we also talked about Monarch Management.  Do you recall Monarch Management?

A.    No, I do not.

Q.    Can I ask you to -- would it refresh your recollection, excuse me, to review a document about Monarch Management?

A.    Yes.

Q.    Can you turn --

MS. TAIT:  Objection.  Relevance.

THE COURT:  He didn't say he didn't remember.

MS. ABEL:  I thought he did, Your Honor.

MS. TAIT:  Your Honor, we don't think the witness did.

Q.    (BY MS. ABEL:)  Do you remember Monarch Management?

A.    No, I do not.

Q.    Would it refresh your recollection to review a document about Monarch Management?

A.    Sure.

Q.    1339.  Can you take a look at that?

(Exhibit No. 1339 for identification.)

Q.    (BY MS. ABEL:)  Are you looking at an e-mail from you, dated April 18th, 2015?

MS. TAIT:  Objection to reading from the e-mail.

THE COURT:  Do not do that again.

MS. ABEL:  Just making sure we're looking at --

THE COURT:  Do not do that again.

MS. ABEL:  Okay.

THE WITNESS:  Yes, I see --

**UNITED STATES DISTRICT COURT**

Q.    (BY MS. ABEL:)  You see it.  Go ahead and read it and --

THE COURT:  To yourself.

(Pause in the proceedings.)

THE WITNESS:  Yes.

Q.    (BY MS. ABEL:)  Does that refresh your recollection that you pursued a deal with Monarch Management?

A.    Um, I don't know who Monarch Management --

THE COURT:  The answer is yes or no, sir.

THE WITNESS:  No.

Q.    (BY MS. ABEL:)  Okay.  Does not refresh your recollection.  All right.

Did you have a StarClub business -- StarClub business card with your name on it?

A.    Not that I remember.

Q.    So you don't recall?

A.    No.

Q.    Would it refresh your recollection to look at a document about a StarClub business card?

A.    Sure.

Q.    Can you turn to 1335?

(Exhibit No. 1335 for identification.)

Q.    (BY MS. ABEL:)  Go ahead and read that and look up when you're done.

A.    Okay.

**UNITED STATES DISTRICT COURT**

Q.    Does that refresh your recollection about any of the things you've now forgotten?

A.    Yes, ma'am.

Q.    What do you now recall?

A.    I was asking Kim if she can provide me a business card.

Q.    For -- what kind of business card?

A.    I don't know.  To come up with a good title that they would think appropriate.

Q.    Okay.  I'm not asking you to read the document.  I'm just asking you whether you remember asking for a StarClub business card.

A.    Yes.

Q.    Okay.  Does it refresh your recollection about anything else we've discussed?

A.    Yes.

Q.    Okay.  What does it refresh your recollection about?

A.    That I referred Carissa Rosales to StarClub.

Q.    So you do agree that you referred Carissa Rosales to StarClub?

A.    Yes, ma'am.

Q.    Okay.  You can set that aside.  Thank you.

So stepping back, talking about the cars, you -- you described that you assisted with management of cars used by Mr. Fritsch and others?

A.    Yes.

Q.    And the Government went over with you some cars that you assisted with the purchase of; is that right?

A.    Correct.

Q.    But StarClub employees did have company cars; is that true?

A.    Yes, they did.

Q.    And you acquired the leases for those cars?

A.    I didn't acquire the leases.  I simply had Bernhard Fritsch talk to the contact at the dealership.

Q.    You helped to arrange the lease is probably a better way.  Is that a fair statement?

A.    That is a better statement.

Q.    Okay.  You helped to arrange the lease for those cars?

A.    Yes, ma'am.

Q.    And did you help to arrange the lease for Ian Cartwright?

MS. TAIT:  Objection.  Vague.

THE COURT:  Overruled.

THE WITNESS:  No.

Q.    (BY MS. ABEL:)  I'm sorry.  Did you help to arrange the lease for StarClub employee Ian Cartwright?

A.    Yes.

Q.    Who is Ian Cartwright?

A.    He worked for StarClub.

Q.    Do you know in what role?

A.    No.

Q.    And did you help to arrange the lease for Ruben Mamann?

A.    Yes.

Q.    And who is Ruben Mamann?

A.    He worked at StarClub as well.

Q.    Do you know what role he had?

A.    No.

Q.    You also assisted with the purchase of the McLaren and the Rolls-Royce we discussed at length?

A.    Yes.

Q.    And Mr. Fritsch knew you had experience selling cars?

A.    Yes, ma'am.

Q.    To the extent you know, is that why he relied on you in this process?

A.    I believe so.

Q.    Turning now to the 3229 house and the work you did at the house.

A.    Yes, ma'am.

Q.    So you testified you were the estate manager of the home; is that right?

A.    Yes, ma'am.

Q.    You had a desk at that house, we've been over; is that right?

A.    I'm sorry?

Q.    You had a desk at that house?

A.    Yes, ma'am.

Q.    And you kept files for the property?

A.    What do you mean by "files"?

Q.    Did you -- did you keep records related to the property?

A.    Yes, ma'am.

Q.    What kind of records did you keep?

A.    Just the remittance stubs and whenever I wrote out a check.

Q.    So only check-related records?

A.    Check-related records.

Q.    Not insurance or -- insurance?  Did you keep insurance records?

A.    No.  Bernhard had those.

Q.    Okay.  And you testified you handled payments for the property; is that right?

A.    Yes.

Q.    And you handled the binder of checks you talked about?

A.    Yes, ma'am.

Q.    And that binder was kept on your desk?

**UNITED STATES DISTRICT COURT**

A.    Yes, ma'am.

Q.    And in that binder, you used those checks to issue payments for cleaning?

A.    Yes, ma'am.

Q.    For landscaping?

A.    Yes, ma'am.

Q.    And you testified you oversaw construction on the property?

A.    Correct.

Q.    You obtained estimates?

A.    Yes, ma'am.

Q.    You managed the contractors?

A.    Yes, ma'am.

Q.    And you issued payments to those contractors?

A.    Yes, ma'am.

Q.    On direct, you testified a bit about some of the renovations that were done.  And there were renovations done to the main floor?

A.    Yes, ma'am.

Q.    And you described the floors, but I understand the main floor to be the second floor?

A.    Yes.

Q.    And that's the area where, if I was coming into the home, I would find myself?

A.    Yes.

Q.    Did you also do renovations to the exterior patio?

A.    Yes.

Q.    And is that a place where people can gather?

A.    Yes, ma'am.

Q.    Was there a StarClub logo in the home?

A.    I believe so.

Q.    Do you recall where it was?

A.    I want to say it was hanging up on one of the walls.

Q.    If you -- I see you picturing it in your mind.

How big would you say it is?

A.    I want to say it was probably 3 feet by 5 feet.

Q.    Okay.

A.    I think.

Q.    You testified on direct about some business meetings for StarClub that were held at the Malibu house; is that right?

A.    Yes, ma'am.

Q.    You recall StarClub employees coming to the home?

A.    Yes.

Q.    You recall that business guests came to the home?

A.    Yes.

Q.    Nonemployees, other people who you knew were related to the business?

A.    Yes.

Q.    Did any of these meetings involve talent, celebrities?

A.    Yes.

Q.    Can you recall any talent or celebrities that came to the home?

A.    Wesley Snipes came.  I remember him coming one time. Um, Verona.

Q.    Verona Pooth?

A.    Oh, is that her last name?

Q.    I'm asking.  Was her last name Pooth?

A.    I don't remember.  I don't know.

Q.    But you recall --

A.    I know her as Verona.  I don't know her last name.

Q.    Understood.

Anyone else you can recall that you met at the house?

A.    No.  That would be it.

Q.    Were there meetings involving other people from the entertainment industry and agents or managers, things like that?

MS. TAIT:  Objection.  Foundation.

THE COURT:  Lay some foundation, counsel.

MS. ABEL:  Sure.

Q.    (BY MS. ABEL:)  When you were at the house, you witnessed these StarClub business meetings?

A.    Yes, ma'am.

Q.    And you would witness the participants, greet them

often, in fact; is that right?

A.    Yes.

Q.    You greeted people who came to the home?

A.    Yes.

Q.    And did you then, therefore, see that any of those people who came to the home were in the entertainment industry, like talent or -- I'm sorry, like managers or agents?

A.    Yes.

Q.    To your recollection, when you greeted the people coming to the home, did they arrive in a vehicle?

A.    Yes.  Sometimes.

Q.    Okay.  Do you recall that people who came to the house often drove nice cars?

A.    Yes.

Q.    And that you were describing on direct the kind of different levels of cars, high-line and then exotic?

A.    Right.

Q.    And then did you see high-line and exotic cars being driven to the home by the people who came to visit for StarClub purposes?

A.    High-lines, not exotics.

Q.    Okay.  And when these meetings and events happened, where in the home did they occur?

A.    On the main floor.

Q.    Okay.  Ever outside in the patio area?

A.    Yes.

Q.    Okay.  So patio or the main floor.

And what was on the main floor?

A.    Main floor is the main entrance and then there was a dining room table and that was it.

Q.    So if StarClub executives were coming over to do a team meeting, where would they have that?

A.    They would be there on the main floor.

Q.    And in what room?

A.    The dining room area or the patio.

Q.    Okay.

A.    Everybody always gravitated to the patio because of the view.

Q.    Got it.

And it's a large space?

A.    Yes.

Q.    And I think you testified that food was often provided at these kinds of meetings?

A.    Yes, ma'am.

Q.    And that Lisa Stalvey cooked for them, the events?

A.    Yes, she did.

Q.    She prepared -- I think you testified on direct that she prepared invoices for her work?

A.    Yes, ma'am.

Q.    And you reviewed those invoices as part of your job?

A.    No, I would just collect them and give them to Kim.

Q.    So you did -- you did collect them as part of your duties?

A.    Yes.

Q.    Okay.  And this was part of your regular work for the Malibu house?

A.    Yes.

Q.    Okay.  Can you open the binder to 1331?

(Exhibit No. 1331 for identification.)

Q.    (BY MS. ABEL:)  Do you see that document?  And I just want you to focus on the very top.  Actually, it's all about the same thing but -- can you -- can you take -- did you take a look at that?

A.    Yes.

Q.    Do you recall this e-mail?  Or do you recall e-mails like this?

A.    Not very often but yes.

Q.    Okay.  So you do see that e-mail?

A.    Yes.

Q.    And you recognize it to be your e-mail address, George Mederos -- GMederos33@gmail.com?

A.    Yes, I do.

Q.    And you recognize who it's from?

A.    Yes.  Kim Fredricks.

Q.    Okay.  And you recognize the date?

A.    Yes.

MS. ABEL:  Move to admit 1331.

MS. TAIT:  Objection.  Hearsay, Your Honor.  Also, it's incomplete.  It doesn't have an attachment.

MS. ABEL:  The attachment is at 1332.

(Exhibit No. 1332 for identification.)

MS. TAIT:  Then definitely hearsay.

MS. ABEL:  Your Honor, he's just established the elements of a business record for the 1332.  And the 1 -- the 1331 is not an assertion of any kind.

MS. TAIT:  Your Honor, he's not a custodian of this record, and he can't possibly certify it.

MS. ABEL:  He reviewed it regularly in conducting his business activities.

MS. TAIT:  Your Honor, this -- this witness -- there's no testimony indicating this witness knows that the item at 1332 is accurate or correct at all.

MS. ABEL:  I can certainly lay that foundation, Your Honor.

THE COURT:  Why don't you do that.

Q.    (BY MS. ABEL:)  You -- you reviewed -- Ms. Fredricks would ask you to review invoices prepared by Ms. Stalvey?

A.    Yes, ma'am.

Q.    And you did review those invoices?

A.    Yes, ma'am.

UNITED STATES DISTRICT COURT

Q.    And what were you looking for?

A.    Just the -- the date that would correspond.

Q.    To confirm that she did the work on those dates?

A.    Yes, ma'am.

Q.    Because you were in the home every day?

A.    Pretty much.

Q.    So you knew generally the dates she was there?

A.    Yes.

Q.    And that was part of your regular job at 3229 Rambla?

A.    Yes, ma'am.

MS. ABEL:  With that, Your Honor, again move to admit 1331 and 1332.

MS. TAIT:  Same objection, Your Honor.

THE COURT:  I'll allow it.

(Exhibit Nos. 1331 and 1332

received into evidence.)

MS. ABEL:  Thank you.

Q.    (BY MS. ABEL:)  So you see that e-mail.

MS. ABEL:  And can we bring up 1331 for the jury?

And then just zoom in on the top since they haven't had the chance to see it.

Q.    (BY MS. ABEL:)  So that, again, is the e-mail from Kim Fredricks to you.  And you can see there's an attachment invoice for StarClub and a request to please review.

MS. ABEL:  And then if we can just go down to the next e-mail so we can see who it's from.  Yeah.  Just right there.  Yeah.  Thank you.

Q.   (BY MS. ABEL:)  And that original e-mail is from Lisa Stalvey, "invoice sending anyway" to Kim at StarClub?

A.   Yes, ma'am.

Q.   Okay.  And so then there is an attachment.  You see that there's an attachment?  Or you see an attachment -- there was an attachment forwarded to you?

MS. ABEL:  And if you turn to 1332.

Q.   (BY MS. ABEL:)  Is that -- is that an invoice from Lisa Stalvey?

A.   Yes, ma'am.

Q.   And down below, there are some -- there's a "Description" column.  Do you see that?

A.   Yes.

Q.   And there are various dates there.  Do you see those?

A.   Yes, ma'am.

Q.   And is that what you were reviewing as part of your duties to review this invoice?

A.   Yes.

Q.   And those dates have an indication of what occurred, a staff lunch.  Do you see that, on May 13th?

A.   Yes, ma'am.

UNITED STATES DISTRICT COURT

Q.   A client lunch on May 17th?

A.   Yes, ma'am.

Q.   Another client lunch on May 20th?

A.   Yes, ma'am.

Q.   And then another staff lunch on May 24th?

A.   Yes, ma'am.

Q.   I believe on direct you testified that there were only one or two StarClub meetings at the house each month.

MS. TAIT:  Objection.  Foundation as to whether this occurred at the house versus elsewhere.

THE COURT:  Sustained.

Q.   (BY MS. ABEL:)  Mr. Mederos, Ms. Stalvey cooked in the Malibu home?

A.   Yes, ma'am.

Q.   Did -- could she have cooked at the StarClub property?

A.   I don't know.

Q.   Was there -- you've been -- I'm sorry.  Was there -- in the StarClub offices, you've been there?

A.   Yes, ma'am.

Q.   Was there a kitchen in there?

A.   No.

Q.   Okay.  So -- and Ms. Stalvey -- you can see here who we're billing it to.  Do you see there, billed to StarClub?

A.   Yes, ma'am.

UNITED STATES DISTRICT COURT

Q.    So to the extent these are for StarClub -- StarClub meetings -- or StarClub events, would it be reasonable to believe they occurred at the Malibu home?

A.    Yes.

Q.    Okay.  So maybe in this particular invoice, it looks like there were at least four in the month of May.  Is that fair?

A.    Yes, ma'am.

Q.    Okay.  Can I have you take a look at 1 -- excuse me -- 1345?

(Exhibit No. 1345 for identification.)

MS. TAIT:  I don't see 1345.

MS. ABEL:  Oh, I'm sorry.  I might be hiding it. It's right here.  Sorry about that.

Q.    (BY MS. ABEL:)  Mr. Mederos, do you see 1345?

A.    Yes, ma'am.

Q.    And does that look like a very similar e-mail to the one we previously reviewed?

A.    Yes, ma'am.

Q.    It's an invoice regarding Lisa Stalvey's services that was forwarded to you with the -- with the question, "Is this approved?"

A.    Yes.

Q.    And it was from Kim Fredricks?

A.    Yes.

**UNITED STATES DISTRICT COURT**

Q.    To you?

A.    Yes.

Q.    And it says -- and then that was August 11th, 2016, the date of the top e-mail?

A.    Yes.  August 11th, 2016.

Q.    And then there's -- it says that there's an attachment invoice for StarClub, August 10th, 2016.  And if you'll take a look at 1346, I believe you'll find that attachment.

(Exhibit No. 1346 for identification.)

Q.    (BY MS. ABEL:)  Do you see that?

A.    Yes, ma'am.

MS. ABEL:  Okay.  Move to admit 1345 and 1346.

MS. TAIT:  Same objections, Your Honor.

THE COURT:  Yeah.  I think I was mistaken before. So the objection is sustained to this document.

Q.    (BY MS. ABEL:)  Okay.  Mr. Mederos, on direct, you testified that maybe there were only one or two events at the star -- at the Malibu property.  Based on the exhibit we just reviewed, does that have any -- do you have any different opinion now?

A.    For those current months, yes.

Q.    Okay.  So there were some months when there were more than one or two?

A.    Yes, ma'am.

UNITED STATES DISTRICT COURT

Q.    Okay.  And many events didn't have food; is that right?  Sometimes they didn't have a lunch?

A.    That's correct.

Q.    Okay.  You testified on direct that you collected receipts for certain expenses for the property?

A.    Yes, ma'am.

Q.    And you gave those to Mr. Fritsch?

A.    Yes.

Q.    Or sometimes you gave them to Ms. Fredricks; is that right?

A.    That is correct.

Q.    And based on what you know, you understood you were giving them so that they could keep track of the expenses?

A.    Yes.

Q.    I'm going to transition to talking about -- about the vehicles that the Government discussed.  I think we've talked about how you have substantial experience with -- with -- with luxury vehicles.

In your experience, is it uncommon for a vehicle to be purchased in the name of a company?

A.    I'm sorry.  Say that again.

Q.    In your experience with the many years of selling cars, do -- do people sometimes purchase cars in the name of an entity?

A.    Oh, yes.

**UNITED STATES DISTRICT COURT**

Q.    Like an LLC?

A.    Yes.

Q.    Pretty common?

A.    Very common.

Q.    Do you know why people do that?

A.    They put it in their business name.

Q.    And why?

A.    I -- maybe to --

MS. TAIT:  Objection.  Improper opinion.

THE COURT:  Sustained.

Q.    (BY MS. ABEL:)  Have you ever purchased a vehicle under the name Trouble Stunts, LLC?

A.    No, ma'am.

Q.    I think you also testified about how common it is -- or you testified why people register cars in Montana.  Do you recall that?

A.    Yes, ma'am.

Q.    And can you repeat that just for -- for refreshment. Why do people register cars in Montana?

A.    To -- to avoid state tax.

Q.    To save money?

A.    To save money.

Q.    Okay.  On direct you testified a little bit about Lisa Short.  Do you recall that?

A.    Yes, ma'am.

UNITED STATES DISTRICT COURT

Q.    And for the jury's memory, that is Mr. Fritsch's ex-wife; correct?

A.    Correct.

Q.    You're not familiar with all her activities, are you?

A.    No.

Q.    You don't know what she was doing for work?

A.    Um, all I know, she was taking care of her sons and she was doing yoga to get her license.

Q.    So she was pursuing a yoga license?

A.    That's correct.

Q.    Was she also helping with renovations to the house?

A.    Yeah.  She -- her and Bernhard would speak often on some designs and picking colors and stuff like that, yes.

Q.    And she was a part of those conversations?

A.    Yes, ma'am.

Q.    She took a leader -- leading role in some of those discussions?

A.    Um, I wouldn't say a leading role, no.

Q.    What role did she take in those discussions?

A.    Just advice.

Q.    Okay.  So she was consulting on the renovations to the house?

A.    An opinion.

Q.    I'm sorry?

UNITED STATES DISTRICT COURT

A.    An opinion.

Q.    She was offering her opinion on --

A.    That's correct.

Q.    Okay.  Offering her opinion on what the -- the renovations to the house should look like?

A.    Yes.

Q.    Did she meet with the architects?

A.    She -- I believe so.  She might have met with the designer.

Q.    Okay.  How many checks do you think you wrote per week?

A.    I don't know.

Q.    We'll give some ballparks.  More than ten?

A.    Yes.

Q.    More than 20?

A.    No.

Q.    So somewhere between 10 and 20 checks per week?

A.    I would think so.

Q.    And you were mostly there during the day; right?  Their primary hours were 9:00 to 5:00?

A.    Yes, ma'am.

Q.    And during that time, Mr. Fritsch was at work for the most part?

A.    For the most part.

Q.    For the most part.

UNITED STATES DISTRICT COURT

But your testimony is that he instructed you how to fill out every memo line on every check?

A.    Well, not every -- he would -- in the beginning, he told me just to make sure you write down in the memo line --

Q.    Okay.

A.    -- what the check was for.

Q.    Okay.  You also testified that you -- you got the mail for the home?

A.    Yes, ma'am.

Q.    And where was the mail?  Like, how did you -- where did you go to pick it up?

A.    The mailbox?

Q.    Yeah.

A.    It was in the very top of the -- up on the driveway, at the very top past the gate.

Q.    So you had to leave the house to get it; is that right?

A.    Yes.  Correct.

Q.    And you would bring it back into the home.  And where would you put it?

A.    I would put it in Bernhard's office.

Q.    In his office?

A.    Yeah, on his desk.

Q.    On his desk.  Okay.

You did not open it, though?

A.    No.  Absolutely not.

Q.    Did you ever see Mr. Fritsch open the mail?

A.    I don't recall.

Q.    Okay.  So you don't know if he ever opened those documents?  You don't know what he did with the mail once it came?

A.    I do not.

Q.    Okay.  You testified also that some of the renovations to the home were to have a recording studio.  Is that right?

A.    That's correct.

Q.    Do you know -- if you know, what was the purpose?  What was going to be the purpose of that recording studio?

A.    To record music.

Q.    Is Mr. Fritsch -- would it be Mr. Fritsch's music?

A.    No.  I think it would -- it was going to be for other people to come to the house and record.

Q.    Like talent, like celebrities?

A.    Talent and celebrities, that's correct.

Q.    You also testified on direct that one of the signatures we've reviewed was a stamp of Mr. Fritsch's; is that right?

A.    It looked like a stamp, yes.

Q.    Uh-huh.  Did you have the stamp for Mr. Fritsch's signature?

A.    No, ma'am.

Q.    Do you know who did?

A.    No.

Q.    Okay.  I'm going to talk -- transition.

You were the defendant in a lawsuit by Harrington Global; is that right?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Counsel approach.

(At sidebar:)

THE COURT:  What's this about?

MS. ABEL:  He was one of the -- excuse me. Rebecca Abel for the defendant.

He was one of the people sued by Danny Guy in the lawsuit that the Court has already acknowledged is relevant to this case.  It involved Mr. Mederos as well as many other StarClub employees.  And he was the subject of that suit.

He then provided all of his text messages and e-mails to Mr. Guy's attorneys, and then they agreed to dismiss that.  I think that goes to bias, motive.

MS. TAIT:  I don't know if he -- I was never able to confirm from the attorneys that they received those things.

MS. ABEL:  He stated --

MS. TAIT:  I asked --

THE COURT REPORTER:  Counsel, one at a time, please.

MS. ABEL:  He told the Government at least twice

**UNITED STATES DISTRICT COURT**

that -- Rebecca Abel.

He told the Government at least twice that he provided his text messages and his e-mails. And in exchange -- concerning StarClub and Mr. Fritsch. And in exchange, they dismissed that lawsuit.

MS. TAIT: Your Honor, it shows that he was cooperative. It doesn't show that he had any bias.

MS. ABEL: It certainly goes to the fact that he wanted to help Danny Guy and not Mr. Fritsch.

MS. TAIT: Your Honor, it shows --

MS. ABEL: For the same reason it's relevant to Mr. Guy, it's relevant to Mr. Mederos.

MS. TAIT: I don't recall the ruling with respect to the relevance of the civil lawsuit against Mr. Guy. But I can say that with respect to Mr. Mederos, they accused him of taking Mr. Guy's money and he gave him all his messages.

And they decided that, apparently according to him, that he wasn't going to be an appropriate defendant because he didn't take Mr. Guy's money.

MS. ABEL: I think there's two ways to draw an inference from that -- he's certainly assisting Mr. Guy. He already made clear to the jury he was not assisting.

MS. TAIT: Being a defendant in a lawsuit and being told by the plaintiff, I want to see your e-mails, will you cooperate, is not assisting.

MS. ABEL:  I'm not sure how it's not.  He did not do so with the advice of counsel.  He voluntarily and at their request provided his e-mails and text messages with Mr. Fritsch for one year in order to get dismissed from the case.  And that's who -- all StarClub employees --

MS. TAIT:  I don't know if his 302 says that he knew that that's what was going to happen if he did that.

MS. ABEL:  I think that his motive or intent is relevant.  But regardless, that is, in fact, what happened.  Certainly he would be partial to Mr. Guy as a result of him being agreeably dismissed from the suit and less partial to Mr. Fritsch for having been --

THE COURT:  Whether he's partial to Guy is irrelevant.  We haven't heard anything about that.

MS. TAIT:  There's nothing in the direct about Guy.  I don't believe he knows Guy.  I don't know the answer to that question.

MS. ABEL:  That was my next question.

THE COURT:  What was your next question?

MS. ABEL:  Do you know Danny Guy?  What is Harrington Global?  Do you know who Harrington Global is?

He does.  He met with three Canadian investors on the patio, and he identified them in the 302.  He identified that there were three Canadian investors with Harrington Global.

THE COURT:  He was sued by Danny Guy.  I don't get the connection.  It's very weak.

MS. ABEL:  I'm not sure what you're asking, Your Honor.  This lawsuit is based --

THE COURT:  How does it show bias?

MS. ABEL:  It shows bias against Mr. Fritsch and for Danny Guy because he has chosen to cooperate with Danny Guy's attorneys in order to be dismissed from the lawsuit. Certainly, if he turned around today and said, actually, Mr. Fritsch is great and he did nothing wrong and I -- I am -- I love him dearly, they could reverse their position on whether he's appropriately dismissed from the lawsuit.

MS. TAIT:  I don't think the evidence shows that.  I think it's also 403, in addition to the lack of relevance.  But the fact that someone gives over their e-mails, he wasn't asked to --

MS. ABEL:  He was asked to give his e-mails and texts specifically.

MS. TAIT:  Right.  But he wasn't asked to agree with Mr. Guy in any way.

MS. ABEL:  It still can go to bias and motive as to whether or not he -- I'm sure he was relieved to not be a defendant in that lawsuit.

MR. AMINOFF:  It's certainly relevant; right?  Can't the jury consider it?

**UNITED STATES DISTRICT COURT**

THE COURT:  That's what I'm trying to figure out, whether it's relevant.

MS. LEE:  Your Honor, Sarah Lee.

I think the fact that he was sued by Mr. Guy goes to his bias against Mr. Guy, even if that was ultimately dismissed.

If someone sues me, I'm going to be biased against him even if it's ultimately dismissed because I had to go through a legal process where I felt like I was unjustly --

THE COURT:  I'm not going to allow it.

(In the presence of the jury:)

Q.    (BY MS. ABEL:)  We're nearly done, Mr. Mederos. Just one moment.

Mr. Mederos, do you know who Danny Guy is?

A.    I've heard the name.

Q.    Have you met him?

A.    No.

Q.    Do you know the name Anthony Inder Reiden?

A.    Doesn't ring a bell.

Q.    Do you know what Euro-Dutch Trust is?

A.    I believe that's Bernhard's -- one of Bernhard's businesses.

Q.    What about Rich Mountain Trust?  Does that sound --

MS. TAIT:  Objection.  Beyond the scope.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q.    (BY MS. ABEL:)  You testified on direct about Michael Ravin.  Do you recall that?

A.    Yes, ma'am.

Q.    You've met Michael Ravin three or four times?

A.    No, I have not met Michael Ravin at all.

Q.    You've never met him?

A.    I spoke to him one time on the phone and that was it.  He was looking for Bernhard Fritsch at the house.

Q.    Okay.  He -- he never came to the property?

A.    Not to my knowledge.

Q.    And what -- you said on direct.  What did you understand his relationship was?

MS. TAIT:  Your Honor, misstates -- I don't believe he said anything about what his relationship was.  Beyond the scope.

THE COURT:  Just -- you can ask.

Q.    (BY MS. ABEL:)  What do you understand Mr. Ravin's relationship to be to Mr. Fritsch?

A.    A partner.

THE COURT:  Don't guess.

THE WITNESS:  A partner.

Q.    (BY MS. ABEL:)  A partner.  A partner in what?  Do you know?

A.    In the Rambla house.

Q.    Okay.  So you understand him to have some

association with the Rambla house?

A.    Correct.

Q.    Did he pay any of the bills for the Rambla house?

A.    Not that I'm aware of.

Q.    Okay.  At one time you and Mr. Fritsch had a close relationship; is that right?

A.    No.  We didn't have a close relationship.

Q.    You saw each other nearly every day?

A.    Yes, we did.

Q.    You spent a significant amount of time together?

A.    No.

Q.    Certainly there was some long car trips from Malibu to Santa Monica in rush-hour traffic?

A.    Yeah, but he was mostly on the phone or to himself.

Q.    Okay.  On the phone, like, taking meetings.  Is that what --

A.    I believe so.

Q.    You had a close enough relationship, though, to ask Mr. Fritsch to use his house for your wedding?

A.    Yes.  That's correct.

Q.    Okay.  So you felt comfortable enough asking that?

A.    Yes, ma'am.

Q.    Okay.  Did -- did you, in fact, do that, have your wedding at his home?

A.    Yes, I did.

**UNITED STATES DISTRICT COURT**

Q.    At the Malibu property?

A.    Yes, ma'am.

Q.    Why did you choose the Malibu property?

A.    Because it's a beautiful property.  It's a beautiful location.  And I felt that with all the time that I've put into that -- into that house and preparing it and doing what I did for him, that he would give me the opportunity to have my wedding there.

Q.    And he did?

A.    Yes.

Q.    And -- and so I understand you to say you used the house because it was impressive?

A.    Yes.

Q.    Did your guests feel that way, if you know?

A.    Yes.  Absolutely.

Q.    And when was that wedding?

A.    September 2nd of 2017.

Q.    Did you have to pay for the use of that property?

A.    No, I did not.

Q.    So Mr. Fritsch didn't charge you to have your wedding at his home?

A.    No, he did not.

Q.    Thank you.

A.    That was his gift.

Q.    Thank you very much.

**UNITED STATES DISTRICT COURT**

THE COURT: Is there going to be redirect?

MS. TAIT: Yes. Just a little, Your Honor.

THE COURT: Time estimate?

MS. TAIT: Five minutes.

THE COURT: Okay.

**REDIRECT EXAMINATION**

BY MS. TAIT:

Q. With respect to Michael Ravin, why did you think that he was a partner in the Rambla house? Who told you that?

A. Lisa Stalvey told me that, that he was a partner with Mr. Fritsch.

Q. So the chef told you?

A. Yes, ma'am.

Q. Okay. And talking about Lisa Stalvey, did she have a wedding also at the property?

A. Yes, she did.

Q. And what did she pay for her wedding, if you know?

A. She didn't pay anything.

Q. And when did that wedding occur?

A. I want to say probably a year before mine.

Q. Okay. So would it be fair that her wedding gave you the idea, hey, maybe I can ask for a wedding there too?

A. Absolutely.

Q. Okay. Do you recall whose idea it was -- going back to the way you got paid. Usually you were paid in your own

name?

A.    Yes.

Q.    But there was a time when you were paid through Trouble Stunts?

A.    Correct.

Q.    Do you recall whose idea that was that you get paid that way?

A.    That was Bernhard Fritsch's idea.

Q.    Do you recall why?

A.    Yeah.  Because, that way, I wouldn't have to be connected as an employee and -- and he wouldn't have to pay for my healthcare.

Q.    He wouldn't have to pay for your healthcare?

A.    That's correct, as an employee.

Q.    Oh.

A.    Or as an employer.

Q.    Did your salary go up as a result?

A.    No, ma'am.

Q.    So with respect to any meetings on the property where you were introduced to people from the entertainment industry, you greeted people?

A.    I -- I pretty much greeted anybody that came to the house.  And I brought them in, sat them down, and let Bernhard Fritsch know that his guest was there.

Q.    Did you attend any of those meetings?

**UNITED STATES DISTRICT COURT**

A.    No, ma'am.

Q.    Do you know what went on in any of those meetings?

A.    No, ma'am.

Q.    With respect to driving Mr. Fritsch to places like Disney, Warner, Maker Studios, did you attend any of those meetings?

A.    Absolutely not.

Q.    Did you ever hear that Mr. Fritsch had -- well, did you -- did you negotiate any deals at those meetings?

A.    No.  Absolutely not.

Q.    Okay.  With respect to the person named Verona --

A.    Yes, ma'am.

Q.    -- there was a photo shoot that you testified about?

A.    That's correct.

Q.    Was she having a relationship with Mr. Fritsch?

MS. ABEL:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    (BY MS. TAIT:)  And so I think you were asked about a person that you referred to StarClub?

A.    That's correct.

Q.    So was that person -- why did you do that?

A.    Um, it was a friend of mine that, um, I knew.  And she was big -- she's married to a famous NFL player that played for the New Orleans Saints.  And I knew that it would be probably a good fit for StarClub for what their foundation was,

about influencers and social media.  So I just tried to pair them together.

Q.    Did you do that out of friendship?

A.    Absolutely.

Q.    So not as a business opportunity?

A.    Absolutely.

Q.    Okay.  You were asked about Mercedes or cars that were purchased for other -- or leased for other StarClub employees.  Do you recall that?

A.    Yes, ma'am.

Q.    None of those cars were covered in your questioning with me; right?

A.    Absolutely.

Q.    The questioning when -- you were doing on direct, that was about David Stocker's Mercedes?

A.    Yes.

Q.    And Kaydee Cox's Mercedes?

A.    Yes.

Q.    And Lisa Short's Mercedes?

A.    Correct.

Q.    Right.  Okay.  And a McLaren and a Rolls?

A.    Yes, ma'am.

Q.    Okay.  With respect to the defense Exhibit 1332 -- let me bring it up.

So do you have that handy?  That's the service

UNITED STATES DISTRICT COURT

invoice.  Let me pull it up.

A.    Yes, I have it in front of me.

Q.    1950s technology.  How do you get it to focus?

Oh, it's okay.

So looking at this invoice, it's dated May 25th, 2016.  And I don't see any breakfasts on there.  Do you?

A.    No, ma'am.

Q.    I don't see any dinners on there.  Do you?

A.    No, ma'am.

Q.    But was it common for Ms. Stalvey to be making breakfasts and dinners at the 3229 Rambla house at this time?

A.    Yes, ma'am.

Q.    And was Ms. Stalvey -- did you see her load food into her car for delivering?

A.    No, ma'am.

Q.    Was -- to the extent that Ms. Stalvey was catering at StarClub, would you know it at all -- at the StarClub offices at this address in Santa Monica, would you know that?

A.    No, I would not.

Q.    Because you weren't there; right?

A.    That's correct.

Q.    And so, also, with respect to the e-mail that was transmitting this invoice, that's Exhibit 1331.

MS. TAIT:  Oops.  Sorry.  Try it this way.  There we go.

Q.    (BY MS. TAIT:)  Are you the only person that Ms. Fredricks sent this e-mail to?

A.    No.  She sent it to Bernhard.

Q.    And whose job would it be to approve this invoice?

A.    Well, it would be Bernhard would approve that -- that -- that she -- she did do the -- it was Bernhard's approval that she did do the catering or the dinner or whatever.  But for the most part, these invoices went to Kim. The -- the receipts that I would give Kim from Lisa were the actual receipts for food.

Q.    So the invoices like this were a common occasion or not?

A.    They were not.

Q.    And, again, what percentage of time did you observe Ms. Stalvey, the chef, making food for the family versus food for business meetings?

A.    The majority of the time.

Q.    Like, could you put a number on it?

A.    I would probably say 80, 90 percent of the time.

Q.    It's family 80 to 90 percent of the time?

A.    Yes.

Q.    Okay.  How often did Kim Fredricks work at the Rambla house during the years 2014 to 2017 when StarClub also had an office in Santa Monica?

A.    Not very often.

Q.    Like how many times a month?

A.    Maybe once or twice she would come.

Q.    When Lisa Short consulted regarding activity or construction on the property, was she doing that as a professional or more like a resident of the property?

A.    No.  I think it was just -- Bernhard would utilize her opinion as a woman, I think, mostly for design and color schemes and stuff like that.

Q.    Okay.  Now, you met --

MS. TAIT:  Let me consult my colleagues just briefly, Your Honor, for one more item.

(Off-the-record discussion between counsel.)

Q.    (BY MS. TAIT:)  Mr. Mederos, I think you testified that you only met Mr. Ravin one time.  Is that correct?  That's what you said?

A.    That's correct.

Q.    Okay.  Would you have a look at Exhibit 704, page 6, and read it to yourself?  Look up and tell me when you're done.

(Exhibit No. 704 for identification.)

MS. TAIT:  Counsel, we may have to give him Exhibit 704.

One moment, Mr. Mederos.  We'll provide that exhibit to you.

Your Honor, may we approach and deliver it to the witness?

UNITED STATES DISTRICT COURT

THE COURT:  Yes.

MS. TAIT:  Thank you.

Q.    (BY MS. TAIT:)  So are you -- do you remember precisely how many times you met Mr. Ravin, sitting here multiple years later?

A.    I -- I think I only met him once.

Q.    So before you open that book -- so you think you only met him once.  But can you be sure sitting here that during this employment, which ended more than seven years ago, that you only met him once?

A.    No.  I mean, I don't even know.  I can't even picture in my mind, to be honest with you, what he looks like.

Q.    But you can't be sure how many times that you met him; is that right?

A.    That's correct.

Q.    So if you could look at Exhibit 704, page 6, the bottom two paragraphs.  Don't read it aloud.  Just close the book when you're done.

A.    Page what?

Q.    Page 6.

A.    Page 6.

Q.    Again, don't read it aloud.  Just tell me when you're done.

(Pause in the proceedings.)

THE WITNESS:  Okay.  I'm done.

UNITED STATES DISTRICT COURT

Q.    (BY MS. TAIT:)  Okay.  Close the book, please.

So has your memory been refreshed at all as to whether you met Mr. Ravin, the number of times you met him?

A.    Yes, ma'am.

Q.    And so how many times do you think you met him?

A.    Three or four times.

Q.    Okay.  And you did meet with the Government a few times before testifying today; right?

A.    Yes, ma'am.

Q.    And did the Government tell you what to say today?

A.    Absolutely not.

MS. TAIT:  Okay.  Thank you, Your Honor.

THE COURT:  Recross?

MS. ABEL:  I do, Your Honor, but maybe we should take a break.

THE COURT:  It is time for a break.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

We'll take a 20-minute break.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  You can step down, sir.  Again, don't talk to anyone that you don't recognize.

Anything we need to talk about?

UNITED STATES DISTRICT COURT

MS. ABEL:  Thank God, no, Your Honor.

THE COURT:  All right.

MS. ABEL:  I need to sit down.

MR. DE LEON:  Thank you, Your Honor.

MS. LEE:  Thank you, Your Honor.

(Break taken.)

(Out of the presence of the jury:)

THE COURT:  Let's get our witness back in, please.

MS. TAIT:  Your Honor?

THE COURT:  Yes.

MS. TAIT:  I was just discussing with Mr. Aminoff some of the e-mails.  If I could address that issue with the next witness, Mr. Guy.

So, again, I think what the Court told us is that, to the extent I'm offering something for -- not for its truth, in other words, not a statement of the defendant, I will just so indicate that.  And we're not going to be doing line-by-line redactions of these maybe 55 e-mails.

THE COURT:  I don't want to have anything to do with 55 e-mails.

MR. AMINOFF:  I thought what Your Honor wanted me to do was object.  You say you're offering it for the effect on the listener.

MS. TAIT:  Right.

MR. AMINOFF:  And then if the Court was inclined to

admit it.

THE COURT:  Well, if you have an objection to it being admitted for the impact on the listener, then you should make one, but --

MR. AMINOFF:  But to preserve the hearsay objection, Your Honor.  I understood that the Court was not going to -- when we were talking about all this this morning, obviously the Court had not seen everything.  So I thought to preserve this, you would prefer that I just go ahead and make the objection, make the hearsay exception.

THE COURT:  It's fine with me.  I'm just saying if it's a legitimate objection --

MR. AMINOFF:  Yes.  I would never make a nonlegitimate objection.

THE COURT:  Well, you seem like, as a matter of course, I'm now going to stand up and object.

MR. AMINOFF:  I get it.  Thank you, Your Honor.

THE COURT:  So, in other words, if Ms. Tait says I'm offering this for the effect on the listener and you agree that it's admissible for the effect on the listener, you shouldn't object.

MR. AMINOFF:  Okay.  So if that's how we're going to do it, that's fine.  I understand.

MS. LEE:  Your Honor, would the Court instruct the witness not to look at documents in the binders.

THE COURT:  Yes.

Don't look at documents in the binders.

Let's find our jury, please.

(In the presence of the jury:)

THE COURT:  Everyone is back.  The witness is back on the stand.

Sir, you're still under oath.

Ms. Abel.

MS ABEL:  Thank you, Your Honor.

**RECROSS-EXAMINATION**

BY MS. ABEL:

Q.    Mr. Mederos, two questions.

Um, the first, you were paid by check for a while. I understood the Government to ask you about those checks.

A.    Correct.

MS. TAIT:  Objection.  Beyond the scope.

MS. ABEL:  I believe it arose.

Q.    (BY MS. ABEL:)  Let me follow up with:  At some point, did you switch to becoming a W-2 employee?

A.    No.

Q.    You were never a W-2 employee?

A.    No.

Q.    You've never -- do you recall specifically that you were never a W-2 employee?

A.    Yes.  I know that for a fact because, when I had to

UNITED STATES DISTRICT COURT

do my taxes later, I got -- I got in trouble and had to pay extra for it.

Q.    So you were never paid by StarClub as a W-2 employee?

A.    Not that I'm aware of, no.

Q.    All right.  The other thing is on -- when the Government asked you some questions, you were talking about your wedding.  Do you recall that?

A.    Yes.

Q.    And you indicated that he -- Mr. Fritsch provided you the use of the house as a friendship.  Do you recall that?

A.    For the wedding?

Q.    Yeah.  The Government asked you -- the prosecutor asked you why did he provide you the house for your wedding.  And do you recall your response?

A.    Yes.  I asked him if I could have my wedding there.

Q.    Uh-huh.  And the question was whether you stated previously that you -- that he provided you the house out of friendship.  Do you remember that?

A.    I do not.

Q.    Do you think he provided you the house out of friendship?

A.    Yeah, I would think so.

Q.    But I believe when I questioned you and I asked you if you were close with Mr. Fritsch, your response was no.

A.    Well --

Q.    So are you close or are you friends or are you not or --

THE COURT:  That's multiple choices.  Why don't you ask a different question.

Q.    (BY MS. ABEL:)  Are you close?

A.    No.

Q.    Are you friends?

A.    No.  I think we're more business-related friends or business -- engagement from an employer to an employee.

Q.    So he provided you the house out of business?

A.    That's correct.

Q.    Okay.  But you didn't pay for it?

A.    No.

MS. ABEL:  Okay.  Thank you so much.

THE COURT:  May the witness be excused?

Don't go anywhere until I tell you to.

May the witness be excused?

MS. TAIT:  Yes, please, Your Honor.

MS. ABEL:  No, Your Honor.  He is subject to defense subpoena and subject to recall.

MS. TAIT:  Oh, I see.

THE COURT:  Didn't we have some agreement on --

MS. TAIT:  I thought we had an agreement, yes, Your Honor.

MS. ABEL:  Yes, Your Honor.  But given the Court's rulings and the potential that he may become relevant to subsequent issues that arise in the case, we do want to keep him subject to recall.

THE COURT:  All right.  Sir, you're subject to recall.  You're excused for now.

Does the Government have another witness?

MS. TAIT:  We do, Your Honor.  The Government calls Daniel Guy.

THE COURTROOM DEPUTY:  I'm going to have you stand right here.  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

Please state and spell your full name for the record.

THE WITNESS:  Daniel Gerrison Guy, D-a-n-i-e-l, G-e-r-r-i-s-o-n, G-u-y.

THE COURT:  You may proceed.

MS. TAIT:  Thank you, Your Honor.

///

///

DANIEL GERRISON GUY,

called as a witness by the plaintiff, was sworn and testified

as follows:

**DIRECT EXAMINATION**

BY MS. TAIT:

Q.    Good afternoon, Mr. Guy.

A.    Good afternoon.

Q.    Mr. Guy, where do you live?

A.    I currently reside in Bermuda.

Q.    What do you do for a living presently?

A.    I run a -- a fund management company called Harrington Global Limited.

Q.    Okay.  So where were you born?

A.    I was born in Canada.  I grew up in Shelburne, Nova Scotia, which is a fishing town two hours south of Halifax, Nova Scotia.

Q.    All right.  So after high school, did you get any post high school education?

A.    I did.  I got an undergrad in commerce at St. Mary's University in Halifax.

Q.    So your major was commerce?

A.    Business, yes.

Q.    Okay.  When -- when did you graduate?

A.    1993.

Q.    When you graduated, after college, just real high

level, did you go out and get a job?

A.    I did.  I went to Bay Street in Toronto where all the financial brokerage houses reside.  And I -- and I got a job there at a company called Richardson GreenShields, which was run by the Richardson family out of Winnipeg.

Q.    Okay.  And you said Bay Street in Toronto.  Is there something like Bay Street in the United States?

A.    Yeah.  Bay Street would be the equivalent of Wall Street in the U.S.

Q.    Okay.  So after Richardson -- so really high level, one or two sentences, what did you do there?

A.    I started -- I was a junior analyst.  I worked with two of the senior analysts in the oil and gas space.  So I would help them model companies, interview companies, do all the financial predictions.

Q.    Did that have something to do with the stock market?

A.    It did.  We did all that to basically be able to pick stocks and recommend the stocks to buy or sell to the client base of the firm.

Q.    Okay.  And did you continue, after leaving that job, to work in the area of stock trading?

A.    I did.  Yeah.  So after Richardson GreenShields, I went to First Marathon Securities, another firm in Toronto, where I did the same thing.  I supported a senior analyst and then I got to cover companies on my own.

THE COURT:  Sir, I'm going to ask you to slow down, please.

THE WITNESS:  Yes, ma'am.

Q.    (BY MS. TAIT:)  And after that, did you start working at a hedge fund?

A.    Yeah, I went to the trading desk at First Marathon where I covered a lot of the New York hedge funds.  And we traded proprietary for the firm.  And then in 1998 --

Q.    Slow down.

A.    And then in 1998, I went to a firm called Banfield Capital.

Q.    And really layman's terms, what did you do there?

A.    I was a research analyst, traded stocks, picked the companies, met with the companies, monitored the portfolio, decided on portfolio weights.

Q.    Okay.  Did you make recommendations on what companies to buy and sell?

A.    Yes, I did.

Q.    To the clients of the firm?

A.    Well, we would -- yeah.  Which were in the fund, yes.

Q.    And so at some point did you start your own fund, Salida Capital, in Canada?

A.    I did.  In 2001, Salida was started, yeah.

Q.    And, again, very high level layman's term, what was

Salida Canada?

A.    Well, Salida was the Canadian management firm, advised the funds that we managed.  We started with $15 million and it grew to roughly 1.4, 1.5 at the peak.

Q.    1.4, 1.5?

A.    Billion.

Q.    Billion?

A.    Yeah.

Q.    And so what is -- in layman's terms, what is a fund?

A.    A fund is a pool of capital where multiple investors would invest to be managed by the manager.

Q.    Okay.  Stop you right there.

And so when you say the words "capital" -- and sometimes -- if we're laypeople, is "money" another word for "capital"?

A.    Yes, it is.

Q.    Okay.  So after the 2008 financial crisis, did you roll that company into another Salida company?

A.    Yep.  Salida Capital International.  So I moved to London in 2010 and started -- you know, Salida Capital International was basically born around the same time.

Q.    So before you described yourself as an analyst, did your job position change by the time -- we're at Salida Capital International?

A.    No, I was the chief investment officer of Salida

from when we started, from 2001.  So the job description didn't change.

Q.    Oh, I see.  But it is a different description than an analyst?

A.    Yes.

Q.    Yes.

So what does the chief investment officer -- what did you do there as a chief investment officer?

A.    So I had to have the final say in picking the stocks for selection within the portfolio, managing the leverage within the fund, you know, when to sell, when to buy, what companies to invest in.

Q.    Okay.  And at some point did Salida Capital International transition to Harrington Global?

A.    It did, yeah.  In 2014, I moved to Bermuda and -- and then I moved the fund to Bermuda and we changed the name to Harrington Global Limited, yeah.

Q.    And were you still the fund manager/chief investment officer at Harrington Global?

A.    I was.

Q.    Okay.  Is there anybody at Harrington Global that -- other than you that makes the final decisions on which companies to invest in?

A.    No.  No.  The final decision rests with me.

Q.    Okay.  So as a fund manager -- and I'm referring to

both the time at Salida and then later Harrington Global, just big picture, where is -- where does the money come from that's in the fund?

A.    It comes from outside investors and from, you know, internal capital as well, from people that work at the -- at the fund.

Q.    At the business.  Okay.

So how long have you been a fund manager, then, in your career?

A.    Um, really since '96 at First Marathon but effectively from '98 onward.

Q.    People may have heard about hedge funds in the news.

Were Salida and Harrington -- or are they hedge funds?

A.    Yes, they are.

Q.    So in two sentences, if you could, what's a hedge fund?

A.    A hedge fund allows the manager greater range in deploying the capital across multiple asset classes.

Q.    So is another way of saying that, that if it's a hedge fund, you can invest in different kinds of companies than other kind of funds?

A.    Yes.

Q.    For example, like, how is it different from, you know, what people might own shares of a mutual fund, like at

**UNITED STATES DISTRICT COURT**

Vanguard, how is a hedge fund different?

A.    A hedge fund, I can invest across multiple sectors, I can invest in private companies, I can invest in commodities. The mandate is large.  So -- so it gives the manager flexibility to -- to try to garner outsized returns for the clients.

Q.    Is there a difference in the level of risk that hedge funds can -- can engage in what they're investing than mutual funds, say?

A.    Potentially, yeah.  It's -- when you use leverage and --

Q.    I don't want to get into leverage.  But, I mean, are some of the investments that a hedge fund can make, would it be fair to say that they could be riskier investments?

A.    They can be, yes.

Q.    So in or about late 2013, early 2014, was there a part of the economy in particular that was -- at that time, it was Salida -- was Salida's area of investment focus?

A.    Yeah.  So we're from Canada, so we had a large resource background.  So --

Q.    What's resource mean?

A.    So mining stocks, oil and gas stocks, agriculture, things of that nature.  So from 2001 to 2008, roughly, we went up 1100 percent in that resource space.  And then '9 and '10, we were up 450 percent.  And so our -- our focus was resources,

**UNITED STATES DISTRICT COURT**

yeah.

Q.    So that means the companies that Salida invested in was mostly resource -- oil and gas and mining companies?

A.    Yes.  Yes.  Not exclusively but the bulk of it.

Q.    Not exclusively.

And did Salida invest -- so you're familiar with, you know, the stock market, like the New York Stock Exchange or the Toronto Stock Exchange?

A.    Yes.

Q.    And companies that are traded on those exchanges?

A.    Yes.

Q.    So are those public companies, or are they private companies that are traded on those exchanges?

A.    They are public companies.

Q.    And what does it mean to be a public company where the stock is traded on an exchange in terms of, like, who can buy it?

A.    Well, as a public company, the -- the general public through the exchange can -- can participate by buying the shares of the company.  And a private company, there is no liquidity, there's no daily liquidity, and you can't really sell your stock.

Q.    That's what liquidity means; right?

A.    Yes.  Yes.

Q.    So did Salida -- at around late 2013, early 2014,

did Salida invest in a lot of private companies?

A.    We had, yeah.  I wouldn't say a lot but a few, yeah.

Q.    And that was your decision as the fund manager to invest in those companies?

A.    Correct.  Yes.

Q.    What's the practical differences that you encountered as a fund manager back in this time frame, 2013, '14, between investing in a public company versus a private company?

A.    Well, with a public company, you have certain reporting standards that -- that are mandated by the regulators.

Q.    The Government?

A.    The Government, yep.  Yep.  Including audited financials and quarterly reporting.  That's made public to shareholders, and there's all kinds of rules.

Q.    How about private companies?

A.    Yeah, around being a public company.

Whereas a private company, you're really -- you're limited.  And usually people that invest in private companies will take board seats or try to get 51 percent control to provide some control over what happens within that private company.

Q.    How about information flow?  What's the difference there?

UNITED STATES DISTRICT COURT

A.    As a public company, you have to -- any -- any significant announcement has to be disclosed to the public.

Q.    And what about private companies?

A.    They don't.

Q.    So taking us to late 2013, early 2014, how did you find companies in which to invest the fund's money?

A.    Same way we had done from the beginning.  Because, you know, we were relatively important clients to a lot of the firms and we paid a lot of commissions.  We would have companies coming through the offices on a daily basis, you know, eight, nine, ten companies a day walking through, usually hour meetings.  And, you know, we're -- with entrepreneurs pitching us to invest in their company.

Q.    And in that case, invest means give them money; right?

A.    Give them money, yes.  That's correct.

Q.    And in exchange for the money, you would get some sort of -- your fund would get some sort of interest in the company?

A.    Correct.

Q.    I'll let you take a sip of water, if that's what you're doing.

So at Harrington Global and before that at Salida, what was your day-to-day role as the fund manager in that period of between, like, 2013 to 2017?

A.    Oh, meeting with companies, managing the portfolio, doing -- you know, looking at potential trades, doing potential trades.

Q.    What does it mean to manage the portfolio?

A.    To decide what companies or what -- how much capital goes into each company and what weight that company would represent within the -- in the overall portfolio.

Q.    So how much money to invest in each company?

A.    Yes.

Q.    Okay.  And did it also include finding new investments?

A.    Yes.  Absolutely.

Q.    And did your day-to-day role also include keeping tabs on current investments?

A.    Yes.

Q.    And how did you keep tabs on, say, the private companies that the funds were invested in during that time frame?

A.    Constant contact with the management team.

Q.    Okay.  And who's the management team of a company, in general?

A.    I usually -- you know, the CEO and the CFO and potentially board members.

Q.    So they take your call?

A.    Usually when you give them money, yes.

Q.    So in general, in those private companies that you invested in during that time frame, 2013 to 2017, was there a lot of public information available on their financial status?

A.    No.  Not as private companies.  You have to rely on the management team to basically give you what's going on, tell you what's going on within the company and how it's doing.

Q.    Okay.  So in late 2013, were you introduced to StarClub as a potential investment?

A.    I was.

Q.    And this was Salida Capital International at that time; right?

A.    Yes, it was.

Q.    And how did you get introduced?

A.    I got introduced through a broker by the name of Campbell Becher and a gentleman by the name of Mark Valentine.

Q.    And are those people Canadians?

A.    They are.

Q.    Okay.  And did you know either of those people already?

A.    Campbell, I did, yes.

Q.    You didn't know this other -- Mark Valentine?

A.    I did not.

Q.    Okay.  And after the initial introduction -- the introduction in that sense meant they just tell you, oh, hey, there's this company?

UNITED STATES DISTRICT COURT

A.    Yeah.  They came in and they talked about the company, thought it was a good investment, and they said, Would you like to hear the story from the CEO?

Q.    And what did you say?

A.    Yes.

Q.    So did you hear the story from the CEO?

A.    We did, yeah.

Q.    And who was the CEO?

A.    Mr. Bernhard Fritsch.

Q.    So did you meet him at -- early before you invested?

A.    We did.

Q.    Where was the meeting?

A.    I recall it was in Toronto.

Q.    Toronto, Canada?

A.    Yes, at our offices.

Q.    And so did you understand why Mr. Fritsch was meeting with you?

A.    Well, my understanding was he had met Mr. Valentine in the Bahamas and --

Q.    Why was he meeting with you, though?

A.    Oh, to -- to bring -- he needed capital, so he needed --

Q.    Money?

A.    Money.  Yes, he needed money.  And so, you know, he was coming to us to pitch his -- pitch his story.

UNITED STATES DISTRICT COURT

Q.    Okay.  So how was the StarClub opportunity explained to you by Mr. Fritsch before you first invested?

A.    Well, he said he had past success in the tech space and that he had a patented platform that would allow celebrities and stars and athletes to be able to post video -- videos, video reviews and to be able to garner advertising dollars, not only on his site but across the entire spectrum of social media.

Q.    Okay.  And so not only on his site but on other sites, like what other sites?

A.    Facebook, Twitter, Snapchat, Instagram.

Q.    And so how does that make any money?  What was the pitch on how that makes any money?

A.    It's all through advertising dollars, you know, from the advertisers coming back through the sites, through to -- to the celebrities and to StarClub.

Q.    Okay.  And was -- was this pitched as a new and different idea?

A.    Well, it was sort of the start of the social media phase or whatever.  So, you know, he pitched it as he had patented technology that allowed him to do that.  I mean, these guys were getting advertising dollars as it were.  But his platform was -- was that the stars could -- could garner more of that advertising dollars directly.

Q.    And how would StarClub earn any money?

**UNITED STATES DISTRICT COURT**

A.    Well, they would take their percentage of the -- of the advertising dollars.

Q.    Of the advertising dollars?

A.    Yes.

Q.    Okay.  Was StarClub then a publicly traded company?

A.    It was -- it was not.  It was private.

Q.    And have you -- so you met Mr. Fritsch that one time.  Did you meet him since?

A.    Over what period --

Q.    Did you meet him more than once in your life?

A.    Yes.

Q.    And do you see Mr. Fritsch in the courtroom today?

A.    Yes, I do.

Q.    Could you identify him by an article of clothing?

A.    Brown tie, glasses.

Q.    Sitting where?

A.    To the right of me.

Q.    How many people at the table?

A.    Four -- five.

Q.    And which person is he?

A.    The first one.

Q.    Closest to --

A.    Myself.

Q.    Okay.

THE COURT:  Indicating Mr. Fritsch.

MS. TAIT:  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  Mr. Guy, did you have a standard set of questions that you posed to CEOs when they were pitching and asking for money from you?

A.    Yes.  Yes.  I mean, so -- you know, over the course of, you know, a 34-year career of managing money, we have standard questions that we would ask all companies.

Q.    And what -- what were some of the standard questions you usually asked?

A.    How many shares outstanding?  What's the size of the company?  Is there any debt in the company?  Who are the shareholders?  What percentage of the company does management own?  What's the burn rate?

Q.    Let me stop you there because you said a few things.
How does shares outstanding influence your decision on whether to invest in a company?

A.    Because that -- that times the price will give you the market cap.

Q.    What's market cap?  That's a fancy word.

A.    Total value of the company, not including the debt.

Q.    What is burn rate?  What does that mean?

A.    Burn rate is if they are not profitable, that the expenses outweigh the revenues.  So the burn rate would be the difference between that.

Q.    Is that like how fast you're burning through cash?

**UNITED STATES DISTRICT COURT**

A.    Yes, to get to -- to get to your break-even revenue numbers, yes.

Q.    So you said "revenue" a couple of times.

Do you know what revenue is?

A.    Sales.

Q.    And so can you define -- can you explain in layperson's terms what -- you know, in reference to something you buy at the grocery store, what revenue is to a company like to -- to a grocery store, selling bananas?  What part of the sale is revenue?

A.    It's the -- it's the -- it's the first part of the transaction.  So as a grocery store, if I sell bananas for a buck a banana, I sell ten bananas, the revenue will be 10 bucks.

Q.    So that's different than profit; right?

A.    Yes.

Q.    So you're an investor and you give -- you -- you pay money to companies when you invest; right?

A.    Yep.  We give them money to help them grow.

Q.    Is that revenue, when you invest money in a company?

A.    No.  No.  But usually it leads to greater revenue.

Q.    It might lead -- investment could lead to greater revenue?

A.    Usually.  Yes.

Q.    And how would it do that?

**UNITED STATES DISTRICT COURT**

A.   It will help them power their -- their sales program to -- to generate high revenues.

Q.   Help them grow?

A.   Yes, help them grow.

Q.   So did you ask your standard set of questions to Mr. Fritsch?

A.   I did.

Q.   So now this is more than ten years ago.  Sitting here today, do you remember all of his specific answers?

A.   No.  I can't say I do.  But -- but we invested, so the answer -- the answers I got would have passed the smell test, yes.

Q.   What impression did Mr. Fritsch make on you in the first time you met him?

A.   He seemed like many of the entrepreneurs that we see, a guy looking for capital to grow his business.  You know, I didn't -- didn't think one way or another.  I thought -- I thought -- I thought he was a respectable guy.

Q.   And what did you think about the opportunity StarClub presented?

A.   Well, so Salida was always investing in resources, and we were trying to find other ideas that would be outside the resource space so --

Q.   Again, the resource space, that's oil and gas?

A.   Gas, natural resources, yeah.

Q.   Okay.

A.   So -- and so this kind of fit the bill.  And so we liked what we heard, we liked what we saw, and we thought it was worth making an investment.

Q.   About how long between the time you first talked to Mr. Fritsch and the time you decided -- you actually made an investment?

A.   Weeks to a month maybe, yeah.

Q.   Okay.  So, Mr. Guy, you're going to be getting a workout today with some binders.

A.   Okay.

Q.   There's a binder next to you on your left side.  If you could reach for Volume 3.

A.   Sorry.  Volume 3?

Q.   Yeah.  Do you see the cart?

A.   Yeah.  I found it.

Q.   Do you have Volume 3?

A.   I do.

Q.   You can clear away any other binders that are on your desk.

A.   Okay.  Thank you.

Q.   Like the small binder -- yeah, just put those on the cart.

Do you have Volume 3?

A.   I do.

Q.    All right.  Would you please review to yourself Exhibits 191 and 192?

To yourself.  And then when you're done, let me know.  Just let me know orally.

(Pause in the proceedings.)

THE WITNESS:  Okay.

Q.    (BY MS. TAIT:)  All right.  And what are these documents?

A.    These are subscription agreements for an investment made into StarClub.

Q.    By Salida?

A.    Yes.

Q.    Okay.

MS. TAIT:  Your Honor, I think these have already been admitted into evidence --

THE COURT:  All right.

MS. TAIT:  -- Exhibits 191 and 192.

Q.    (BY MS. TAIT:)  Mr. Guy --

MS. TAIT:  And Mr. Flores.

Q.    (BY MS. TAIT:)  -- let's turn to Exhibit 192 first. Let's look at the first page.

So at the top, under the logo StarClub, what does it say?

A.    "StarClub, Inc., Private Placement."

Q.    Layperson's term, do you know what a private

placement means?

A.    Yeah.  It's just a -- a placement in a private company, an investment into that company.

Q.    Okay.  On page -- so let's skip ahead to page 3 of Exhibit 192.

And on page 3, on the left side, it says "Full Legal Name of Subscriber."  Can you read that?

A.    Yes.  "Salida Accelerator Fund S.A.R.L."

Q.    And what was the Salida Accelerator Fund S.A.R.L.?

A.    It was one of the funds that we managed.

Q.    And you were the fund manager for that; right?

A.    I was.

Q.    And the signatory, who is that?

A.    Ian Clark.  So he worked with us in the Toronto office.  And he had signing authority on behalf of the funds to help the -- transferring the wires to go smoothly.

Q.    And who told him to sign this subscription agreement?

A.    I did.

Q.    Okay.  It was on your -- your authority; right?

A.    Yes.

Q.    So on the right side, there's a box that says "Number of Units."  Do you see that?

A.    I do.

Q.    How many units does this involve?

**UNITED STATES DISTRICT COURT**

A.    2,000 units.

Q.    And times how much money?

A.    It's $2 million U.S.

Q.    So 2,000 units at a thousand dollars a unit?

A.    Yep.

Q.    And the total amount is $2 million, did you say?

A.    $2 million, yes.

Q.    Okay.  And going back over near the Ian Clark section to the left, where it says here -- under his name, do you see where it says "Official Capacity Or Title" and there's handwriting below that?

A.    I do.

Q.    What does it say there?

A.    "Salida Capital International as investment manager to Salida Accelerator Fund S.A.R.L."

Q.    So what's the difference?  Who's Salida Capital International?  Who's Salida Accelerator Fund?  Just real simple layperson's terms.

A.    Salida Capital International is the fund manager, and Salida Accelerator Fund is the fund.

Q.    I see.  So they're, like, separate legal entities?

A.    Yes.

Q.    So the purchaser, though, is the fund?

A.    Correct.

Q.    Okay.  So turning to Exhibit 191, page 1.  And it's

UNITED STATES DISTRICT COURT

going to be on the screen, Mr. Guy.

Do you agree this -- you've seen these documents before; right?

A.    I have.

Q.    And you agree they're essentially identical or substantially identical in terms of, like, the typed information?

A.    Yes.

Q.    All right.  So the first page, again, is a Private Placement; right?

A.    It is.

Q.    And going to page 3, is there a different strategic -- sorry -- Salida fund involved in this agreement?

A.    Yes.  Salida Strategic Growth Fund, S.A.R.L.

Q.    All right.  And Mr. Clark is signing again for it?

A.    He is.

Q.    And is it, again, the fund manager Salida Capital International is what Mr. Clark signs for?

A.    Yes, on behalf of the fund.

Q.    So here, it's a slightly different fund with the same name Salida but it's a different fund?

A.    It's a separate fund, correct.

Q.    And how much -- how many units did this -- did the fund -- this fund buy?

A.    500 units at a thousand dollars a unit for

500,000 U.S.

Q. Okay. So how did Salida -- referring to, I guess, the collection of Salidas, how did Salida obtain these agreements in order to sign them?

A. They were sent to us, I think, in this particular case by the broker who was doing the transaction. I think it was Byron Capital, I think, this one.

Q. Okay. And looking at -- let's look at the dates of these agreements. So Exhibit 191, page 26, since we're on Exhibit 191.

What is the date listed of this document?

A. January 16th, 2014.

Q. And who's signing there?

A. It's Ian Clark.

Q. On behalf of?

A. The Salida Strategic Growth Fund S.A.R.L.

Q. And Exhibit 192 also has a page 26.

And who is signing this form?

A. Mr. Clark again, same date.

Q. January 16th, 2014?

A. 2014. And this one is for the Salida Strategic Growth Fund S.A.R.L.

Q. So taking that down, who made the decision to have Mr. Clark execute these agreements?

A. I did as the portfolio manager and chief investment

officer.

Q.    Okay.  And you agree that these agreements -- sorry.  Let me withdraw that.

So let's look at the $2 million agreement.  So between the two of them, how much money is involved here?

A.    2.5 million.

Q.    Okay.  So let's look at the $2 million agreement, Exhibit 192.  Just a few things.

So looking at page 6, the paragraph 4.1 called "Closing."

MS. TAIT:  Can we blow that up, 4.1.  192.  192, page 6.  Can you blow up, "Closing," 4.1, the little paragraph there?

Q.    (BY MS. TAIT:)  What does -- what does "Closing" mean, just in layperson's terms?

A.    The date and time, the place of closing of the -- of the Private Placement.

Q.    Like the finalization of the deal?

A.    Yes.

Q.    Okay.  So in this paragraph, 4.1, could you read the first sentence?

A.    "Delivery and sale of the subscribed securities and payment of the subscription amount will be completed, the closing, at the offices of the corporation's counsel, Goodmans LLP, Bay-Adelaide Center" --

**UNITED STATES DISTRICT COURT**

Q.    You don't need to read the address.

A.    -- "Suite 3400..."

Q.    And what is the closing -- after the word "Closing Time," does it have a date?

A.    It does.  January 16, 2014.

Q.    All right.  And so in this sentence, the corporation is which corporation?

A.    StarClub, Inc.

Q.    Okay.  So -- and Goodmans LLP is counsel for that corporation?  Is that what that's saying?

A.    Yes.

Q.    So -- so is this basically saying that the money that you invest isn't going straight to the corporation?

MR. AMINOFF:  Objection, Your Honor.  I think the document speaks for itself.

THE COURT:  Overruled.

You can answer.

Q.    (BY MS. TAIT:)  I'll repeat it.

Is this basically saying that the company directly -- doesn't get the money directly?  It goes through somebody else first?

A.    It goes through counsel first, yep.

Q.    And in this case, counsel is identified as Goodmans LLP?

A.    Correct.

UNITED STATES DISTRICT COURT

Q.    Okay.  And let's look at paragraph 8.1, which is on page --

MS. TAIT:  Sorry about that.  Turn the page. Page 13, please.

Q.    (BY MS. TAIT:)  "Agent's Commission."  And regarding agent's commission, could you read the first couple of lines?

A.    "Commissioned to the agent.  The subscriber" --

Q.    Slower, please.  Slower.

A.    "The subscriber understands that in connection with the issue and sale of the units pursuant to the offering, the agent will receive from the corporation on closing a cash commission equal to 7 percent of the aggregate proceeds of the offering and" --

Q.    You can stop there.

So does that mean that when you give 2.5 million -- pay $2.5 million, the company has to pay a commission and doesn't get all the $2.5 million?

A.    That is correct.

Q.    Because it has to pass through the agent beforehand?

A.    To the broker, yes.

Q.    Okay.  So page 11 of Exhibit 192, please, paragraph little L.

So could you read the sentence I've highlighted here, beginning with the word "The"?

A.    "The subscriber's decision to subscribe for the

**UNITED STATES DISTRICT COURT**

units was based solely upon the term sheet."

Q.    Let's cut that off right there.

So page 17 of Exhibit 192.  And do you see that?

A.    I do.

Q.    What is this?  What's the title?

A.    It's StarClub Term Sheet.

Q.    Term Sheet.  Is that the Term Sheet that was just referred to in the contract?

A.    Yes.

Q.    All right.  And so what's a Term Sheet, just layperson's terms?

A.    It just lays out the terms of the transaction, the amount of capital the broker is trying to raise, the broker, the agent involved, currency.

Q.    So let's look at some of these items, then.  So the issuer is?

A.    StarClub, Inc.

Q.    And the agent is?

A.    Byron Capital Markets.

Q.    That's the people who are going to get some commission; right?

A.    Correct.

Q.    And the offering size is?

A.    Up to $8 million.

Q.    So you didn't invest $8 million this time; right?

A.    I did not.

Q.    So does that mean this is offered to other people potentially?

A.    Yes.

Q.    Okay.  And the units -- what's described on "Offer" here?

A.    In this particular investment, it is -- it is convertible debentures.  So it's debt --

Q.    That's a fancy word.  What is a simple word for a debenture?

A.    That can be converted to equity, shares.

Q.    What is a simple word for equity?

A.    Money, shares.

Q.    Shares.  Like shares of stock is equity?

A.    Correct.

Q.    Okay.  And little paragraph 2 in that same paragraph, there's also 70 shares of common stock per unit; right?

A.    Yes.  In this particular transaction, that's correct.

Q.    And the issue price?

A.    A thousand dollars per unit.

Q.    Okay.  So let's look at page 19 of Exhibit 192.

Again, this is the $2 million subscription agreement.  But they're both the same, aren't they?  You looked

at them before?

A.    Yes.

Q.    Okay.  Page 19, there's two paragraphs at the bottom.  Do you see the one that's called "Use of Proceeds"?  Could you read that, please?

A.    "The company will use the net proceeds of the offering, one, to launch vertically integrated and interactive social media platforms, channels, for talent partners, celebrities and global brands; two, for technology enhancements related to channels; and, three, for working capital and general corporate purposes..."

Q.    I think it goes on to say "other than" --

A.    "...other than debt reduction, including the respective current indebtedness and any other shareholder loans."

Q.    Okay.  So is that basically the promise of how the money is supposed to be used?

A.    Yes.

Q.    So looking at page 2 of Exhibit 192, was there a deadline in italics at the top of this -- on this offer?

A.    "Subscriber should complete and return an originally executed copy of this subscription agreement by no later than January 14th, 2014, at 4:00 PM Toronto time."

Q.    Okay.  So in mid-January 2014, did you cause $2.5 million to be sent to Fidelity Clearing Canada to invest

in StarClub, according to the subscription agreements in Exhibits 191 and 192?

A.    I did.

Q.    So going back to your entity name, Salida, I happen to know Spanish.  And does Salida have a meaning in Spanish?

A.    It does.  It means exit.

Q.    So exit, was that indicative of your strategy here, like, is there some double meaning?

A.    Look, you know, when you set up these companies, you have to come up with a name, a lot are taken.  And so we were sitting in the Miami Airport and we came up with Salida because we were usually nimble, we're nimble, we could get in and out and make these decisions and find out if there's trouble and exit the positions.

Q.    When you exit the position, what does that mean in layperson's term?

A.    You sell the position.

Q.    You sell it.  Okay.

And so if it's stock, you would sell the stock?

A.    Correct.

Q.    And so was that your intention, to make a quick exit from StarClub when you first invested?

A.    No.  No.  With private companies, you can't do that.

Q.    Okay.  So you had a more buying it and holding it intention?

UNITED STATES DISTRICT COURT

A.     Yeah.  I mean, you know the bulk -- we were up 1100 percent.  It was because we bought and held the right companies during that time period.

Q.     Okay.  So now Salida is an investor in StarClub. What did you do, if anything, to check up on the investment, see how it was doing?

A.     Oh, constant contact with Mr. Fritsch through phone and e-mails.

Q.     Is that consistent with what you did with the other companies you were then investing in?

A.     Yes.

Q.     So does the fact that StarClub was -- it was not a public company; right?

A.     It was not.

Q.     So the fact that it was a -- not a public company, did that influence how you kept tabs on the investment?

A.     Yeah.  You have to monitor it more carefully and be in constant contact with the management team because there's no publicly traded quote.  And so --

Q.     So can you share -- can you sell the shares that you bought during this first round?  Can you just sell them to anybody easily?

A.     No.

Q.     And why not --

A.     Because --

**UNITED STATES DISTRICT COURT**

Q.    -- layperson's terms?

A.    There's no liquid market for the securities.

Q.    Okay.  Did there come a time in 2014 where you were communicating with Mr. Fritsch regularly?

A.    Yes.

Q.    And so where were you located around then?

A.    I was -- 2014, mostly Bermuda but Bermuda, Toronto, and probably a little bit of London.

Q.    So how did you communicate?  Because he's not there.

A.    In e-mails, only in e-mails.

Q.    Did you also communicate by phone?

A.    Yes.

Q.    Did you have short calls?  Long calls?

A.    I kind of -- it kind of varied, you know, during that time frame.

Q.    Okay.  Okay.  Mr. Guy, would you please review Exhibit 104 in your notebook?  It should be in Volume 2.

            (Exhibit No. 104 for identification.)

            THE WITNESS:  Sorry.  What number again?

Q.    (BY MS. TAIT:)  Exhibit 104.

A.    104.

            (Pause in the proceedings.)

Q.    (BY MS. TAIT:)  Don't read it aloud.  Just tell me when you have it.

A.    I have it.

UNITED STATES DISTRICT COURT

Q.    And do you recognize this document?

A.    I do.  It's an e-mail between myself and Mr. Fritsch.

Q.    Did it concern your investment in StarClub?

A.    It did.

MS. TAIT:  Your Honor, the Government offers Exhibit 104.

MR. AMINOFF:  No objection, Your Honor.

THE COURT:  All right.  That's admitted.

(Exhibit No. 104 received into evidence.)

Q.    (BY MS. TAIT:)  All right.  We're going to display it on the screen now, Mr. Guy.

So let's start -- before we blow anything up, I see the name at the top left, Raquel Melo.  Who is that?

A.    She was the office manager in Toronto.

Q.    And do you have an understanding of why her name is on this?

A.    I think Ian tasked her with getting all e-mails from the servers in the Cloud.

Q.    So Ian Clark; is that right?

A.    Yes.

Q.    At whose direction was that done?

A.    At my direction.

Q.    All right.  So she basically worked for -- for Harrington.  She did work for Harrington?

A.    In the Canadian office, yeah.

Q.    So what's the -- who's it from?  Who's the e-mail from?

A.    It's from me.

Q.    So it's -- the name is Danny Guy.  Do you go by Danny?

A.    I do.

Q.    Okay.  And what's the date?

A.    Sunday, May 25th, 2014.

Q.    Who is it sent to?

A.    Mr. Bernhard Fritsch.

Q.    And the subject?

A.    Danny -- subject says "Danny Guy."

Q.    Okay.  So actually, that's like the last e-mail in the chain.  I think we need to start reading it from the bottom up.  But before we do that, I wanted to ask you.

      You provided e-mails of your history with Mr. Fritsch to the Government at various stages; right?

A.    We did.

Q.    And was it the case that you had very few e-mails before May of 2014, if any?

A.    Um, we -- we moved over from a server to the Cloud, and so we don't know exactly if everything got moved over at that time frame.

Q.    So you had some data loss in mid 2014?

A.    Yes.

Q.    Okay.  But after that, no data loss?

A.    Not to my knowledge, no.

Q.    Okay.  So let's start with the first e-mail, which is actually -- the first in time is really the last e-mail. And I think all the e-mails are organized this way, where the first e-mail is actually the bottom e-mail and you work your way up.

So the first e-mail is blank.  It's from you; right?

A.    Yes.

Q.    But the second e-mail, could you read the date and who it's from?

A.    May 23rd, 2014, from Mr. Fritsch.  "Hi, Danny. Thank you for coming in yesterday.  I am very pleased that we together proceed on our deal in the right direction.  Let's stay in touch and plan your L.A. trip and feel free to connect with me anytime.  Very best.  Bernhard."

Q.    So this e-mail address that you see here, Bernhard@StarClubLtd.com, do you see that?

A.    I do.

Q.    Were you able to reach Mr. Fritsch reliably on that e-mail address?

A.    Yes.

Q.    And you respond to him a couple of days later; is that right?  That's the top e-mail?

**UNITED STATES DISTRICT COURT**

A.    Yes.  Sunday, May 25th, at 8:06 AM.

Q.    What do you say there?

A.    "As soon as I can get a committed date from the TD guys, I will be in touch to coordinate a date to come down. They probably need to do some work, et cetera.  I look forward to helping you grow this into what you think it could become. Very exciting stuff.  Danny."

Q.    Is that true?  Is that how you felt about it?

A.    Yeah.  Absolutely.

Q.    Okay.

MS. TAIT:  The Government would offer -- before I do that.

Q.    (BY MS. TAIT:)  When Mr. Fritsch says in his e-mail, "I am pleased that we together proceed on our deal in the right direction," do you know specifically what deal he's talking about?  Because you already invested in them.

A.    Um, I think he needed additional capital at this time, but I think you'd have to refresh my memory.

Q.    Okay.  We may get to an e-mail that talks about that.

MS. TAIT:  So the Government would offer Exhibit 194, which I believe has been admitted.

THE COURT:  Yes.

Q.    (BY MS. TAIT:)  That's in Volume 3, Mr. Guy.  Well, actually, you don't have to because it's been admitted, so we

can show it to you on the screen.

So -- so looking at Exhibit 194 -- let's do similarly -- page 1.  Again, what's under the StarClub logo?  Read those words.

A.    "StarClub, Inc., Private Placement."

Q.    Okay.  And on page 2, similarly, is there an italicized closing date?

A.    June 23rd, 2014, at 4:00 PM Toronto time.

Q.    And so this is a separate investment round than the first investment round you invested in; right?

A.    It is.

Q.    Okay.  And let's see.  On page 3, do you see who the full legal name of the subscriber is?

A.    Salida Strategic Growth Fund S.A.R.L.

Q.    And is there a signature below there?

A.    Again, Mr. Clark's.

Q.    Ian Clark?

A.    Yes.

Q.    And he's representing -- he's signing on its behalf; right?

A.    Correct.

Q.    How much -- how many shares is the -- is the fund buying in Exhibit 194, page 3?

A.    Number of -- 1,082,371 shares.

Q.    Let me correct that.  You're right.  It says number

of units.  We haven't defined what the units are.  So go ahead.  Units?

A.   At $3.80 per share or unit for an aggregated subscription price of $4,113,009.80 U.S.

Q.   So that 4,113 number is a dollar amount.  It's just not -- there's no dollar sign in front of it?

A.   Correct.

Q.   So is that U.S. dollars?

A.   U.S. dollars.

Q.   Okay.  And looking at -- similarly to what we did before, page 6, section 4.1.  Can we look at page 6, "Closing"?

Do you see that?

A.   I do.

Q.   And is it correct that the closing is, again, being handled by a third party, the counsel?

A.   Goodmans LLP, correct.

Q.   Okay.  So, again, that means the money is not going to go straight to the company?

A.   Correct.

Q.   It's going to go through somebody else, an agent?

A.   Yes.

Q.   Okay.  And let's see.  On page 5 of Exhibit 194.  So we talked about -- you bought more than a million units of something.  At the bottom, section 3.2, what are the units consisting of?  Do you see that, description of units?

UNITED STATES DISTRICT COURT

A.    Each unit consists of one common share and one-half -- one-half of one warrant.

Q.    So a common share is a share of stock; right?

A.    Yes.

Q.    And can you give a real simple explanation of what a warrant is?  Because I think it's complicated.

A.    It gives you the right to buy a share at -- usually at a higher price.

Q.    Okay.  At a certain time?

A.    Within a certain time period.

Q.    Within a certain time period.  Okay.

So as a result of Exhibit 194, did you -- did you cause this to be executed?

A.    I did.

Q.    Turning to page 22 of Exhibit 194, is there a date of execution?

A.    June 20th, 2014.

Q.    And the name of the subscriber?

A.    That's Mr. Clark's signature and Salida Strategic Growth Fund S.A.R.L.

Q.    Okay.  So pursuant to this agreement, did you cause $4,113- -- -113,009.80 to be transferred from -- at this point -- to be transferred to -- to an agent for StarClub in about June 2014?

A.    I did.

UNITED STATES DISTRICT COURT

Q.    Let me point out the agent here.  Hold on a moment.

So on page 1 -- let's see.  On page 1 -- let's see.

No.  Page 2, excuse me.  Is there a reference to

Salman Partners, the agent?

A.    Yeah.  Campbell Becher had moved to Salman Partners

at that time.

Q.    So Salman Partners had something to do with the fund

transferring of this -- this offering?

A.    They were the agent --

MR. AMINOFF:  Your Honor, I object on relevance at

this point.

THE COURT:  Why don't you move on, Ms. Tait.

MS. TAIT:  Pardon me, Your Honor?

THE COURT:  Move on, please.  I don't think we need

all this detail.

Q.    (BY MS. TAIT:)  Okay.  So, Mr. Guy, in your book,

the same volume, could you please review Exhibit 206?  Could

you just have that open to yourself without saying anything

about it?  Let me know when you're there.

(Exhibit No. 206 for identification.)

THE WITNESS:  Can you -- what volume is that again?

Q.    (BY MS. TAIT:)  It's the same volume that you were

just in, Volume 3, Exhibit 206.

A.    I've got to grab the other binder.  Bear with me.

Q.    You're not in --

UNITED STATES DISTRICT COURT

A.     I had two.  I apologize.  There's a lot.

Q.     It should be Volume 3.

A.     206?

Q.     Yes.  Exhibit 206.

A.     Okay.

Q.     Have you seen this document before?

A.     I have.

Q.     And have you reviewed it prior to today?

A.     Yes.

Q.     Does it reflect information that's based on multiple rounds of investments by Salida and Harrington into StarClub?

A.     It does.

Q.     Over the course of, like, 18 months; correct?

A.     Correct.

Q.     Does it summarize the results of the kinds of offering memoranda that we just looked at, several of them?

A.     It does.

Q.     Like at least five or six types of those things?

A.     Yes.

Q.     Is it also based on your knowledge and review of Harrington's bank records from multiple wire payments?

A.     Yes.

Q.     And is the information that you -- that Harrington has on these transactions, is it -- is it accurate?

A.     Yes.

**UNITED STATES DISTRICT COURT**

Q.   So does Harrington rely on that information in order to do its business?

A.   Yes.

MS. TAIT:  Your Honor, I offer Exhibit 206 as a summary of voluminous records.

MR. AMINOFF:  Same objections as before, Your Honor.

THE COURT:  All right.  Well, I'll admit it as -- well, it's a demonstrative for now.

MS. TAIT:  Okay.  Thank you, Your Honor.  So we may display it, then?

THE COURT:  Yes.

MS. TAIT:  Yeah.  206, just the top -- okay.  So focusing on the top half.  There we go.  Thank you.

Q.   (BY MS. TAIT:)  Mr. Guy, what's the title of Exhibit 206?

A.   "Salida Harrington, Cash Paid to StarClub."

Q.   Okay.  And does this summarize the rounds of investment that you authorized into StarClub?

A.   It does.

Q.   In terms of the cash that you paid?

A.   Yes.

Q.   Okay.  So Round One, we just reviewed, was what date, approximately?

A.   January 16, 2014, 2.5 million.

Q.   And that went not directly to the company, it went

UNITED STATES DISTRICT COURT

via an agent; right?

A.    Byron Capital.

Q.    Or another agent?

A.    Goodmans, yeah.

Q.    And Round Two went what date?

A.    June 20th, 2014.

Q.    And how much?

A.    $4,113,009.80.

Q.    That's the one we were just talking about; right?

A.    Yes.

Q.    So now you're 6-and-a-half-million dollars into StarClub --

MS. TAIT:  You can take that down, Mr. Flores.

Q.    (BY MS. TAIT:)  -- right?

A.    Yes.

Q.    So the 4.113 million was a much bigger investment than your Round One investment?

A.    Yes.

Q.    So what influenced your decision to make such a big additional investment?

A.    What we were told was happening with the company by Mr. Fritsch, the potential deals and business transactions he had lined up and the people he was talking to, it was portrayed that, you know, the company was close to exploding customer-wise with lots of interest from third parties.

UNITED STATES DISTRICT COURT

Q.    Okay.  And how often were you talking to Mr. Fritsch about StarClub in mid 2014 when you decided to up your investment?

A.    Quite often, at least weekly.

Q.    Uh-huh.  And who else at StarClub were you talking to at this time?

A.    Mr. Polsen, I think, at this time as well.

Q.    And how often were you talking to Mr. Polsen versus Mr. Fritsch?

A.    It was Mr. Fritsch most of the time.  Polsen, rarely.

Q.    Okay.  So I want to take you back to that Exhibit 194.  It's going to be on the screen, Mr. Guy.  You don't need to go fetch for it.  It's already in evidence.

Let's look at page 10, please.  And we're looking at the all-caps paragraph.

MS. TAIT:  That's good.  Yeah.

Q.    (BY MS. TAIT:)  So, Mr. Guy, would you please -- would you please read item 1?

A.    Item 1.  "The corporation is currently not a reporting issuer under the securities laws and the subscriber's securities, including the common shares underlying the warrants, will have an indefinite statutory hold period."

Q.    Can you stop there?

"Not a reporting issuer."  Is that another way of

saying it's a private company, not a public company?

A.    Yes.

MR. AMINOFF:  Your Honor, objection again.  This is cumulative.  We've covered this.

MS. TAIT:  Your Honor, we're getting to a new point, which is Number 2.

THE COURT:  All right.

MS. TAIT:  Thank you.

Q.    (BY MS. TAIT:)  Mr. Guy, could you please read the next sentence?

A.    "The proposed reverse takeover transaction, the Sabre RTO transaction between the corporation and Sabre Graphite Corp., a Canadian corporation, the outstanding common shares of which are listed on the TSX venture exchange publicly announced by Sabre on May 20th *[sic]*, 2014, pursuant to which on closing of such transaction."

Q.    The securities will become securities of Sabre?

A.    Yes.

THE COURT:  It actually says May 30th.

Q.    (BY MS. TAIT:)  Did you say May 30th, 2014?

A.    May 30th, 2014, yeah.

Q.    Okay.  So --

MS. TAIT:  Can we clear all those highlights?  Okay.

Q.    (BY MS. TAIT:)  So there's a reference there to a "reverse takeover transaction."  What -- what is that?  Do you

remember that?

A.    Yeah.  It's -- so Sabre Graphite was the shell company.  So it really had no business in there, operating business within that shell.  It was listed on the exchange.  But it did have cash.  And so the plan was to merge StarClub in with that listed shell for it to become public.

Q.    And whose -- whose idea was that?

A.    Um, I think that came up early -- early on.  I think we had the shell and we thought it was a good idea to --

Q.    "We" being Salida?

A.    Salida, yeah, someone within our group.  Because that shell had cash and we had to do something with it.  We just thought it was a good way to take StarClub public.

Q.    Okay.  So there was a possibility of taking StarClub public, and that's what this all-capped section is advising of?

A.    Yes.

Q.    So if it went public, that means the shares could be sold?

A.    They'd be traded on an exchange and you could liquid -- you could sell them based on liquidity, yes.

Q.    Okay.  And so was the result that Sabre, then, would take over StarClub?

A.    No.  Sabre was -- you know, I think it had a couple million in cash.  So StarClub was a significantly bigger company than Sabre.  So it's usually a reverse takeover;

StarClub would be taking over Sabre.

Q.    I see.  So that's where the reverse part comes in?

A.    Yes.

Q.    So did Mr. Fritsch at this time like this idea, as he expressed it to you?

A.    He did, yeah.  Yeah.

Q.    Eventually, though, did he not want to go through with that transaction?

A.    He did not, no.

Q.    Okay.  And were you disappointed that he did not want to go through with that transaction?

A.    No.  I know at the time he just thought keeping it private, given what was in front of him on the growth trajectory made more sense to be private while he was going through his negotiations, instead of being a listed public company.

Q.    Okay.  So did you stop investing in StarClub after the reverse takeover fell apart?

A.    I did not.

Q.    It did fall apart later in 2014; right?

A.    Yes.  Yes.

Q.    It was canceled?

A.    It was canceled, yeah.

Q.    All right.  Mr. Guy, could you pull out Volume 2, please?

UNITED STATES DISTRICT COURT

I'm going to ask you to look at a series of exhibits -- Exhibits 107, 108, 109, 110, 111, 113, 114.

(Exhibit Nos. 107 - 111 and 113 - 114 for

identification.)

THE WITNESS:  Okay.

Q.    (BY MS. TAIT:)  Have you reviewed those?

A.    I have.

Q.    And what -- at a high level, what are they?

A.    These are e-mails between myself and Mr. Fritsch.

Q.    And they concern your investment in StarClub?

A.    They do.

MS. TAIT:  The Government offers the e-mails at 107, 108, 109, 110, 111, 113, 114.  And maybe counsel needs a moment.

(Pause in the proceedings.)

MR. AMINOFF:  Thank you, Your Honor.  With the understanding that Mr. Guy's statements are coming in for the effect on the listener, that's fine.

MS. TAIT:  Let me just make sure, Your Honor.  I believe they all are.  Just double-checking.  I wonder why they wouldn't.

Yes, Your Honor, effect on the listener.

THE COURT:  All right.

(Exhibit Nos. 107 - 111 and 113 - 114

received into evidence.)

UNITED STATES DISTRICT COURT

MS. TAIT: Okay. Thank you.

Q. (BY MS. TAIT:) So that's going to display it on the screen, Mr. Guy.

So, again, you just invested another $4.1 million -- right? -- in June of 2014?

A. Yes.

MS. TAIT: So let's put Exhibit 107 on the presenter, please.

Q. BY MS. TAIT: Okay. So the first e-mail --

MS. TAIT: Can you please -- I'm sorry about that.

Q. (BY MS. TAIT:) The very first e-mail is from you; correct?

A. It is.

Q. And what do you say on -- on what date?

A. July 8, 2014, I wrote, "Mark told me about the meetings happening this week. How is that going?"

Q. Mr. Fritsch, did he respond July 11th, 2014?

A. He did. And he said, "Hi, Danny. Things are going extremely well. We are in the middle of a set of meetings with NBC Universal and William & Morris this week and this coming week."

Q. He actually said "WME" and then William Morris; right?

A. Yes.

Q. Okay. "I like to" -- keep going.

UNITED STATES DISTRICT COURT

A.    "I like to pin down one major deal prior to the listing.  Are you still planning to come to L.A. at some point?  It would be good to connect in person.  I could also be on the eastern seaboard between July 20th and 24th.  Just let me know what might be best.  Bernhard."

Q.    And do you have a response up above?

A.    I did.  I -- yeah.  And I respond on July 11th, 2014, 4:27 PM.  "I can come to L.A. if needed or we could meet on the 20th.  Let me know what needs to happen.  If you get a deal done, then it will provide a lot of credibility and I can for sure get the TD guys to come to L.A. with me."

Q.    Do you remember who the TD guys were that you're referring to?

A.    TD Bank.  We had some friends that worked at TD Bank.  And so TD was a -- a bank and a brokerage in Canada that would have an interest in -- in helping the company grow.

Q.    Helping the company grow by doing what?

A.    Raising money.

Q.    So the title of the e-mail, what's the subject?

A.    "Confidential."

Q.    And look at Exhibit 108 on the presenter, please.

The first e-mail, could you please start -- it's from you; right?

A.    It is.  July 17th, 2014.  I wrote, "So how did today go?"

UNITED STATES DISTRICT COURT

Q.    And then the response on July 18, 2014?

A.    Yeah.  "Hi, Danny.  What a day.  Just got back. Richard d'Abo, Ron Burkle's CFO, is putting the deal together. We spent several hours at their office and then we met the co-investor Ted Fields.  Monday evening with Ron Burkle.  Can I give you a ring tomorrow?"

Q.    And you respond --

A.    "Sounds good.  Chat tomorrow."

Q.    Okay.  So were you and Mr. Fritsch talking regularly at about this time?

A.    We were.

Q.    Were you talking about somebody named Ron Burkle?

A.    Yes.

Q.    And what did you remember hearing about Ron Burkle at about this time?

A.    That Ron Burkle wanted to invest in StarClub and use the platform to help promote his businesses.

Q.    So what -- what kind of an investor is Ron Burkle?

A.    Well, he's a high-profile entertainment -- successful investor, entrepreneur.

Q.    And so did Mr. Burkle's interest, according to Mr. Fritsch, influence your behavior in any way?

A.    Absolutely.  I mean, when you hear that, you know --

MR. AMINOFF:  Your Honor, I'm going to object for the reasons previously briefed, just for the record.

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.

Q.    (BY MS. TAIT:)  You may answer.

A.    Yeah.  High-profile guys like that investing in any company gives the company much more credibility and allows them to grow their business quicker, faster.  So --

Q.    Turning to Exhibit 109.  Looks like an e-mail the same day; is that right?

A.    Sorry.  Are we -- yeah.

Q.    Exhibit 109.  It's on the screen, I'm sorry.

A.    Yeah.

Q.    What's the date?

A.    Friday, July 18th.

Q.    Uh-huh.  Who's writing?

A.    Mr. Fritsch.

Q.    What does he say?

A.    It says, "Hi, Danny.  I tried calling your number but probably already at dinner.  I will have full status report by Tuesday morning after the final Burkle meeting on Monday evening.  I can between now and then over the phone.  Have a great weekend."

Q.    Okay.  Did you communicate with Mr. Fritsch this often, like, daily?

A.    Quite a bit during -- yeah, I wouldn't say daily but definitely multiple times a week.

Q.    Okay.  Turning to Exhibit 110.

UNITED STATES DISTRICT COURT

What do you ask on July 27, 2014?

A.    "Anything new on deal?"

Q.    And what does Mr. Fritsch respond on July 29, 2014?

A.    "Hi, Danny.  Yes, we're moving along.  I will be meeting with Ron Burkle this week in New York City, Thursday and Friday, to complete the discussions about the deal."

Q.    You can stop there.

So what kind of deal was under discussion, according to Mr. Fritsch?

A.    A purchase of StarClub shares.

Q.    By whom?

A.    Mr. Burkle.

Q.    And keep going.

A.    "Do you like me to take any other meetings while in New York City?  On the commercial side, the Universal deal is with their and our lawyers.  Things are moving quite well."

Q.    So is there some difference between the Universal deal that's on the commercial side, from what you remember, to the deal with Ron Burkle?

A.    Yeah.  Yes.  Mr. Burkle was -- was supposed to invest directly within the company at a certain price.  And the Universal deal was, as he says here, a commercial deal to use the platform within their business, to drive revenues.

Q.    Okay.  Exhibit 111.

So August 1, 2014, just a couple of days later, what

UNITED STATES DISTRICT COURT

do you write?

A.   August 1st, 2014, "So?  We have a deal?"

Q.   And then August 1st, 2014, what does Mr. Fritsch write back?

A.   "Sorry for late reply, Danny.  Hectic day.  Yes. According to Ron B., we have a deal for $9 per share.  Plus get the talent of his management firm for StarClub."

Q.   Can you stop there?

So Ron B., who did you understand him to be referring to?

A.   Mr. Burkle.

Q.   Ron Burkle of the previous e-mails?

A.   Yes.

Q.   And a deal for $9 per share, is that a commercial deal or an investment deal, did you understand?

A.   That's an investment deal.

Q.   So that means buying a share -- buying shares in the company at $9 per share?

A.   Correct.

Q.   Was that more than you had just paid for the company in June, the company shares?

A.   Significantly, yes.

Q.   Okay.  So keep going.  "He cannot" --

A.   "He cannot get pinned down to the final dollar amount.  I will see him again on Wednesday.  I also asked him

to come to Toronto.  He liked the idea, but it's not confirmed yet.  Paperwork will get done by CFO Richard d'Abo who called me and asked that we have to work with their speed, but he will get it done.  Whatever this means at the end.  Let's stay tuned.  I like this one to get closed as is good for one of us from a credibility point of view."

Q.    "It is a good one for us"?

A.    Sorry, yeah, "a good one for us from a credibility point of view.  WME, we are proceeding here as well."

Q.    Do you remember what WME stands for?

A.    William Morris.

Q.    Okay.  What is William Morris?  Do you know?

A.    I thought it was an advertising company or something back then, but I don't recall.

Q.    Once they --

A.    But, again, one of the deals that he was talking about.

Q.    Okay.  Then the rest of the line there?

A.    "Once they have solved their internal conflicts, we can close.  Universal deal documents are with the lawyers.  Things are looking good.  Even in August, everyone is present and working here in New York City.  I hope you're well."

Q.    And what do you say in response at the top here?

A.    Like anyone would, "Fantastic news."

Q.    What's the subject line of the whole e-mail chain?

A.      "Update."

THE COURT:  All right.  We're going to stop for the day.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

You're ordered to return Tuesday, no later than 8:00 AM.  And you're ordered to have a great weekend.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  You can step out, sir.  You're ordered to return no later than 7:45 on Tuesday morning.

MR. AMINOFF:  Your Honor?  Your Honor, could I ask that the witness and the Government are instructed not to speak to each other?

THE COURT:  Well, they can say hello or goodbye.

MR. AMINOFF:  Sure.  But nothing about the case, please.

MS. TAIT:  We don't plan to speak with Mr. Guy about the case.

THE COURT:  All right.  Then you're ordered not to talk to Mr. Guy about the case.

MS. TAIT:  Just logistical matters, is that all right, Your Honor, just so that he gets to court on time, et cetera?

THE COURT:  Yes.

MS. TAIT:  Thank you.

THE COURT:  Seems like the kind of guy who can do that by himself.

Have a seat.

First, I think I'm expecting some briefing on summary exhibits.

MS. ABEL:  Yes, Your Honor.  We plan to file that over the weekend.

THE COURT:  Okay.  I also would like any -- well, who are the other witnesses going to be on Tuesday?

MS. LEE:  Your Honor, we have Mr. d'Abo and we have some CART forensic examiner witnesses, Ira Bartel and Ben Spinale, and then if there's time, the -- Special Agent Greg Austin.

THE COURT:  All right.  So if there are exhibits relating to those people, you should get them to the defense quickly.  So I would like -- I don't want to wait until Tuesday morning to get the objections for these.  So no later than Monday morning.  That means you need to get them to the defense over the weekend.

MS. LEE:  Yes, Your Honor.

THE COURT:  The objections and your responses to me no later than Monday morning, as I said.

You also need to figure out -- I'm not sure where

your fine line is, Ms. Tait, between the questions that you're asking Mr. Guy and the fact that it's irrelevant whether he relied or anybody relied on representations or misrepresentations.

MS. TAIT:  I think neither.  The Supreme Court case allows to consider whether -- you know, what influenced a person's decision to make an investment.  I think that's fair without saying he was relying on.  But I think that it's fair to ask that question, Your Honor, based on *Nader*.

MR. AMINOFF:  That was what I was objecting to before, Your Honor, so that you obviously picked up on it.

I think at this point, the door is open for our experts to bring the kind of testimony that we were asking for.

THE COURT:  Well, to some degree.  But your expert, as I recall, kept saying sophisticated investor and Danny Guy is a sophisticated investor.  That's not the test.

MR. AMINOFF:  To be clear, I think what he would testify to is a sophisticated investor would do X, Y, or Z and then separately Danny Guy is obviously a sophisticated investor.

THE COURT:  That's not relevant.  It's a reasonable investor at most.

MR. AMINOFF:  But the industry standard for such an expert.

THE COURT:  What do you mean the industry standard?

**UNITED STATES DISTRICT COURT**

MR. AMINOFF:  Well, the industry standard in a situation like this would be a certain level of due diligence, a certain expectation of what -- how someone might --

THE COURT:  But that's not the test for wire fraud. It's what a reasonable investor would --

MR. AMINOFF:  Right.  But I think that reasonable investor is informed by the industry standard.  I think what is material can be informed by industry standard.  I believe that's what the *Lindsey* case said, unless I'm mistaken.

THE COURT:  Well, I'm not quite sure what the *Lindsey* case says sometimes.

MR. AMINOFF:  Fair enough.  But, I mean, I think to the extent something is material, I agree it's a reasonable standard.  But I believe expert testimony can come in about -- about industry standards, which then inform that -- that analysis.

I -- I think that was the Court's -- I thought that was the Court's order, that we could probe that with our -- with our experts and establish what the industry standard is.

THE COURT:  Well, I'll have to look at that again. It's clearly not the wire fraud test.

MS. ABEL:  Your Honor, just to layer a little bit on that --

THE COURT:  Because Mr. Aminoff can't handle it himself?

MS. ABEL:  We've briefed separate issues.  That's all, Your Honor.  There's so many things, we can only take on so much.

But just to layer on that, it's a reasonable investor in the shoes of Mr. Guy.  So it's, you know, like an --

THE COURT:  No, it's not.  There wouldn't have to be a Mr. Guy.

MS. ABEL:  But it takes into account the circumstances of the alleged victim.  So it's someone in his shoes.  It's not just any -- and I'm happy to point Your Honor to the cases that --

THE COURT:  Yes.  Why don't you just do that and do it by certainly no later than Monday morning.

MS. TAIT:  And, Your Honor, if I was toeing too close to the line, I apologize.  I thought that I was within the line of what the Court had done with the order on the expert witnesses.

But I will, you know, make sure to, you know, reevaluate that.  But I thought that with respect to *Nader* that the witness could testify what was -- what influenced the decision, not that he relied upon it but what influenced it.

THE COURT:  All right.  Well, you need to be more careful with your questioning because I think there was some slight inconsistencies in what you said the first time we were

talking about it and what you said the second time.  So --

MS. TAIT:  Okay, Your Honor.  I'll be aware of that. I'm sorry if it came out that way.

THE COURT:  It's all right.

Okay.  Anything else?

MS. LEE:  Your Honor, we've made some revisions to the exhibits.  May we have permission to swap out some exhibits that need updating and adding a few exhibits?

THE COURT:  Sure.  Good luck finding them.

MS. LEE:  Okay.  We'll do it after we go off the record.  Thank you.

MR. THREATT:  Nothing at this time, Your Honor.

THE COURT:  Okay.  All right.  Well, they're all over the floor so you can find them.

MS. LEE:  Thank you.

MR. THREATT:  Thank you, Your Honor.

(Proceedings adjourned at 2:31 PM.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


              I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


                         DATED THIS 24TH DAY OF DECEMBER, 2025.



                         /S/ MYRA L. PONCE
                         _____
                         MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                         FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**