UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,           )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )   Case No. CR 17-520 DSF
                                    )
BERNHARD EUGEN FRITSCH,             )
                                    )
                    Defendant.      )
_____)

REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
TRIAL DAY FOUR
TUESDAY, MARCH 25, 2025
7:45 AM
LOS ANGELES, CALIFORNIA

_____

MYRA L. PONCE, CSR NO. 11544, CRR, RPR, RMR, RDR
FEDERAL OFFICIAL COURT REPORTER
350 WEST 1ST STREET, ROOM 4455
LOS ANGELES, CALIFORNIA  90012
(213) 894-2305

UNITED STATES DISTRICT COURT

2

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

    JOSEPH T. MCNALLY
    Acting United States Attorney
    BY:  JOSEPH DE LEON
    BY:  SARAH S. LEE
    BY:  MONICA E. TAIT
        Assistant United States Attorneys
    312 North Spring Street
    Los Angeles, California  90012


**FOR THE DEFENDANT:**

    CUAUHTÉMOC ORTEGA
    Federal Public Defender
    BY:  JAMES S. THREATT
    BY:  REBECCA M. ABEL
    BY:  JONATHAN C. AMINOFF
        Deputy Federal Public Defenders
    321 East Second Street
    Los Angeles, California  90012


**ALSO PRESENT:**

    ALEX FLORES, paralegal
    CYNTHIA LEE, paralegal

**UNITED STATES DISTRICT COURT**

**INDEX OF WITNESSES**

**WITNESSES**                                                          **PAGE**

DANIEL GERRISON GUY

   Direct Examination (Resumed) by Ms. Tait            13
   Cross-Examination by Mr. Aminoff                   113
   Redirect Examination by Ms. Tait                   230
   Recross-Examination by Mr. Aminoff                 243


RICHARD D'ABO

   Direct Examination by Mr. De Leon                  248
   Cross-Examination by Mr. Threatt                   256

**UNITED STATES DISTRICT COURT**

| | INDEX OF EXHIBITS | | |
| --- | --- | --- | --- |
| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
| 4 | E-mail chain | 29 | 30 |
| 115 | E-mail chain | 19 | 19 |
| 118 | E-mail chain | 22 | 23 |
| 119 | E-mail | 29 | 30 |
| 121 | E-mail chain | 22 | 23 |
| 122 | E-mail chain | 22 | 23 |
| 123 | E-mail chain | 27 | 28 |
| 126 | E-mail chain | 29 | 30 |
| 127 | E-mail chain | 29 | 30 |
| 128 | E-mail chain | 45 | 46 |
| 129 | E-mail chain | 45 | 46 |
| 130 | E-mail chain | 45 | 46 |
| 131 | E-mail chain | 45 | 46 |
| 133 | E-mail chain | 51 | 51 |
| 140 | E-mail chain | 51 | 51 |
| 143 | E-mail chain | 59 | 59 |
| 144 | E-mail chain | 72 | 74 |
| 146 | E-mail chain | 72 | 74 |
| 147 | E-mail chain | 79 | 80 |
| 148 | E-mail chain | 79 | 79 |
| 151 | E-mail | 84 | 84 |
| 152 | E-mail chain | 84 | 84 |

UNITED STATES DISTRICT COURT

**INDEX OF EXHIBITS, CONTINUED:**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 154 | E-mail chain | 84 | 84 |
| 158 | E-mail chain | 91 | |
| 171 | E-mail chain | 94 | 95 |
| 172 | E-mail chain | 94 | 95 |
| 173 | E-mail chain | 94 | 97 |
| 183 | E-mail chain | 105 | 106 |
| 186 | E-mail chain | 105 | 107 |
| 195 | StarClub Purchase Agreement | 40 | 41 |
| 196 | Unit Purchase Agreement | 69 | 69 |
| 201 | E-mail chain | 59 | 59 |
| 203 | E-mail chain | 51 | 51 |
| 831 | Documents seized (excluding page 1) | 40 | 42 |
| 1142 | FBI 302 | 208 | |
| 1143 | FBI 302 | 224 | |
| 1144 | FBI 302 | 225 | |
| 1145 | FBI 302 | 225 | |
| 1146 | FBI 302 | 225 | |
| 1150 | FBI 302 | 226 | |
| 1151 | Danny Guy interview notes | 213 | |
| 1160 | E-mail | 140 | 141 |
| 1161 | E-mail | 146 | 147 |

**UNITED STATES DISTRICT COURT**

**INDEX OF EXHIBITS, CONTINUED:**

| NUMBER | DESCRIPTION | FOR IDENTIFICATION PG. | FOR EVIDENCE PG. |
|---|---|---|---|
| 1166 | E-mail | 218 | |
| 1172 | E-mail | 165 | |
| 1177 | E-mail | 161 | 162 |
| 1178 | E-mail | 165 | 166 |
| 1179 | E-mail | 167 | |
| 1180 | E-mail | 172 | 174 |
| 1182 | E-mail | 180 | 181 |
| 1183 | E-mail | 181 | |
| 1185 | E-mail | 196 | |
| 1186 | E-mail | 188 | 189 |
| 1189 | E-mail | 189 | 191 |
| 1510 | E-mail | 258 | |
| 1514 | E-mail | 259 | |

TUESDAY, MARCH 25, 2025; 7:45 AM

LOS ANGELES, CALIFORNIA

-oOo-

(Out of the presence of the jury:)

THE COURT:  I just e-mailed the objections to Ms. Fredricks' testimony or exhibits.  I indicated that I was going to deny the motion to strike Mr. Guy's testimony because I did not, in fact, instruct him not to speak to the Government.  I only instructed the Government not to speak to him.

That wasn't deliberate.  But checking the transcript, that's what happened.

So you wanted to talk to me?

MS. TAIT:  Yes, Your Honor.  Yesterday the Court indicated that it wanted a proposed limiting instruction regarding victim reliance.  And I think the parties assumed that the Court wanted to deliver that limiting instruction during the witness's testimony; although, that is unusual and I --

THE COURT:  No.

MS. TAIT:  I understand.  Okay.  Thank you, Your Honor.  Then I misunderstood you.

All right.  Well, then, that's not going to be delivered today.  We can set that aside for jury instructions. Thank you.

THE COURT:  Yes.  Anything else?

MR. DE LEON:  Yes.  Good morning, Your Honor.  I understand you had a couple of questions on the revenue charts that was mentioned in the Government's briefing, to admit the summary charts.

I just -- to provide more clarity, should the Court have any questions.  It's going to be Government Exhibit 909.

THE COURT:  What volume is that?

MR. DE LEON:  This is going to be Volume 8, Your Honor.

THE COURT:  This case is kind of off on a tangent. I don't know if the jury knows exactly what we're doing here. So 909.

MR. DE LEON:  Yes, Your Honor.  That's going to be a potential revenue from business operations chart here that the Government expects its forensic accountant to testify about.

THE COURT:  But what is potential revenue?

MR. DE LEON:  The Government expects that Mr. Bouchard will testify that potential revenue would include basically everything that wasn't an intercompany transfer, intercompany being money coming in from another StarClub account or another non-corporate bank account that was -- that was controlled by the defendant.

So it would include intercompany transfers coming in.  It also would include interest that was gained.  And the

UNITED STATES DISTRICT COURT

third --

THE COURT:  Start over again.  I'm not -- I'm not understanding.

MR. DE LEON:  So Mr. Bouchard will testify that he -- that he created this chart and he calculated potential revenue.

THE COURT:  What is potential revenue?  It's revenue that you haven't yet received; right?  Because it's not actual.  It's only potential.  You don't know if it's going to happen.

MR. DE LEON:  Right.

So Mr. Bouchard erred on the side of -- if it wasn't any money coming from another StarClub account or another company related to the defendant, it wasn't interest and it wasn't money from investors, he will testify that he categorized it as potential revenue coming into the -- to the StarClub accounts, these five accounts on the top left.

And the reason for that is, as the Court knows, one of the misreps that the Government is alleging is that the defendant stated that there was 15 million in revenue in 2015.  Therefore, the Government feels that it's very relevant that the jury understand exactly how much potential revenue was coming into each of the StarClub accounts listed on the top left corner.

THE COURT:  Again, potential revenue isn't actual revenue.  It's revenue that hasn't happened yet but it might

happen.  It has great potential.

MR. DE LEON:  Right.  Right.  Which is why -- I mean, the Government expects Mr. Bouchard to say this is all potential revenue that -- giving the defendant the benefit of the doubt, here is all the money coming into these accounts that even if -- whether it's potential or whether it's actual revenue, this is the total amount that would come in that's not from another StarClub account, that's not from investor money, and it's not from interest.

THE COURT:  So this is directly relevant to the representation, as you just indicated, about the --

MR. DE LEON:  $15 million.

THE COURT:  -- multi millions in revenue that he said I think he had.

MR. DE LEON:  Exactly.

THE COURT:  Not potentially.

MR. DE LEON:  That's correct, Your Honor.

THE COURT:  So why are we calling it potential?  I don't understand still.

The number is --

MR. DE LEON:  If the Court -- we could discuss with Mr. Bouchard and ask him if he can conclude that it just be revenue instead of potential revenue.  And he can go about explaining to the jury how he calculated that revenue.

THE COURT:  So these are amounts, anything -- during

**UNITED STATES DISTRICT COURT**

that period from anything other than --

MR. DE LEON: Intercompany transfers from other bank accounts, other StarClub bank accounts, investor money -- this would not include investor money -- and interest gained on those accounts.

THE COURT: All right.

MR. THREATT: Your Honor, I think the Court suggested that the parties have a hearing to discuss this chart and other ones and have a slightly more informed discussion. I think the defense would appreciate that in part because -- I think I follow what Mr. De Leon is saying with respect to 909, but that was not really the primary subject of the recent motion practice.

So if the Court would indulge us, I think we would request a hearing to discuss this one. And perhaps -- I think there are four or five at the end that the Court raised a question about as to whether or not those charts are summarizing voluminous records and, therefore, admissible under 1006.

So I think it may -- we would ask for a chance to take this up -- this one and those up at a later hearing if -- if that's possible.

THE COURT: Well, all right. Let me figure out how to fit it in but, yes, that makes sense.

MR. DE LEON: Thank you, Your Honor.

THE COURT:  Anything else?

MR. AMINOFF:  Your Honor, we -- I just wanted to say before we moved on entirely that the defense had requested that limiting instruction be issued now.  I understand the Court has already ruled, but for the record that was our request.

THE COURT:  I understand.

And just in case, in the chambers e-mail, you were copied on all of my responses to -- where I said those will be docketed?  I assume you understood I meant for you to docket.

THE COURTROOM DEPUTY:  Yes.

THE COURT:  Great.  Thank you.

All right.  We'll see you hopefully in a few minutes.

(Break taken.)

(Out of the presence of the jury:)

THE COURT:  Thank you.  I think they're all here.  So --

THE COURTROOM DEPUTY:  Yes, they are.

THE COURT:  Okay.  Could one of you go get them, please?  Thank you.

MS. TAIT:  Your Honor, shall we bring the witness?

THE COURT:  Yeah.

MS. TAIT:  Thank you.

(In the presence of the jury:)

THE COURT:  Good morning.

**UNITED STATES DISTRICT COURT**

Let me just check in since you've been gone for a couple of days.  Has anyone heard, read, or otherwise seen information about this case since last we spoke?  If so, raise your hand.

All right.  Thank you.

We're all back.  The witness is back on the stand.

Sir, you're still under oath.

Counsel, you may continue.

MS. TAIT:  Thank you, Your Honor.

DANIEL GERRISON GUY, called as a witness by the plaintiff, previously sworn, testified further as follows:

**DIRECT EXAMINATION (RESUMED)**

BY MS. TAIT:

Q.    Good morning, Mr. Guy.

A.    Good morning.

Q.    Mr. Guy, let's briefly reorient where we left off on Friday afternoon.

MS. TAIT:  Your Honor, displaying Exhibit 206, which the Court has permitted to be displayed.

Q.    (BY MS. TAIT:)  So, Mr. Guy, I believe where we left off, we were at -- Round Two had been completed and you had invested another $4.1 million in June of 2014.

Do you recall that?

A.    I do.

Q.    Okay.  And then displaying Exhibit 111, which is already in evidence.

Mr. Guy, the August 1st, 2014, e-mail from Mr. Fritsch to you, do you see that?

A.    I do.

Q.    So, again, recalling where we left off, the line beginning, "Yes.  According to Ron B., we have a deal for $9 per share."

And Ron B. was who?

A.    Mr. Ron Burkle.

Q.    And his company was Yucaipa; right?

A.    Yes.

Q.    And did Mr. Fritsch in oral conversations ever take back the allegation here that there was a deal for $9 per share with Mr. Burkle at this time?

A.    No.  He only enforced it.

Q.    Reinforced it, excuse me?

A.    Reinforced it, yeah.

Q.    So what did you know at this time, August 1st, 2014, about the truthfulness of that statement?

A.    I only had Mr. Fritsch to rely upon.  So whatever he told me, obviously I -- I believed because, you know, I didn't think anyone would lie about these events.

Q.    And $9 per share, you had just invested at a much lower amount than that; is that right?

UNITED STATES DISTRICT COURT

A.    That is correct.

Q.    And so what did it mean that -- this statement regarding $9 per share, what did that mean in relation to the amount that you had just invested at?

A.    Well, again, it gave validation to -- to the company and to what the company had as a business model with somebody of this caliber potentially coming in to invest.  And obviously $9 a share, we would be making money on our investment, which we've invested a lower -- lower level.

Q.    All right.  And just before we leave this exhibit, there is a reference up here to FritschBox@gmail.com.  Do you see that?

A.    I do.

Q.    Is that an e-mail at which you were able to reach Mr. Fritsch reliably at this time?

A.    Yes.

Q.    Okay.  Turning to Exhibit 113, which I believe the Court has admitted.

MS. TAIT:  All right.  And raise it up a little.  Thank you.

Q.    (BY MS. TAIT:)  On Sunday, August 10, 2014, what do you write to Mr. Fritsch?

A.    I wrote, "Are you in Toronto on Tuesday?  Have you firmed that up?  Any clarity on deal?"

Q.    And Mr. Fritsch responds how on August 10th, 2014?

**UNITED STATES DISTRICT COURT**

A.    "Hi, Danny.  Yes, I will be in Toronto this Tuesday all day.  Confirmed.  The deals at Universal and Yucaipa will realistically close at end of this month between August 22 and 28."

Q.    And Yucaipa, what's that deal referring to?

A.    Mr. Burkle.

Q.    Up at the top, what do you say in the last e-mail on August 10, 2014?

MR. AMINOFF:  Objection.  Hearsay.

MS. TAIT:  Your Honor, effect on the hearer.

THE COURT:  This is only for the effect that it had on the person receiving the information.

Q.    (BY MS. TAIT:)  Mr. Guy, I believe you can answer. What do you see -- what is your response at the end of the chain on August 10, 2014?

A.    "You need Burkle deal done."

Q.    And you can stop there.

A.    Okay.

Q.    Mr. Guy, are you familiar with a firm named -- called Goldman Sachs?

A.    I sure am.

Q.    What is Goldman Sachs?

A.    Probably the largest and most successful investment bank in the world.

Q.    What is an investment bank?

A.    An investment bank is where companies go to help the companies raise money to invest in the companies, to grow.

Q.    Big picture, how do investment banks assist with that?

A.    They take the companies around to their client base to raise the capital.

Q.    And their client base are roughly people with money?

A.    Significant sums, pension funds and such, yeah.

Q.    Did you make an introduction to Goldman Sachs on behalf of StarClub and Mr. Fritsch?

A.    Yes, I did.

Q.    And was Goldman Sachs known to you at the time?

A.    Yes.

Q.    You had contacts there?

A.    Correct, yes.

Q.    And as far as you understand, did Mr. Fritsch have any contacts at Goldman Sachs at the time you introduced him?

A.    Not to my knowledge, no.

Q.    Okay.  Did Mr. Fritsch tell you anything about how he felt about you introducing him to Goldman Sachs?

A.    He -- he thought it was a good idea.

Q.    Did he say why?  Do you remember?

A.    Because he needed to merge the companies and do the Burkle deal and have help with potential M&A transactions.

Q.    What does M&A mean?

UNITED STATES DISTRICT COURT

A.    Mergers and acquisitions, so a sale of his company.

Q.    Mr. Guy, can we turn to Exhibit 114, which I believe is also already in evidence?

Okay.  And starting at the bottom, Mr. -- Mr. Guy, what is Mr. Fritsch telling you in the middle here that is confirmed for tomorrow, 5:30 Eastern Standard Time, on August 12th, 2014?

A.    His meeting with Goldman Sachs and the investment banking guys in that group.

Q.    And so is this a -- the introduction -- part of the introduction that you made for Mr. Fritsch on StarClub?

A.    Yes.

Q.    And what do you respond to him?

MS. TAIT:  Your Honor, for effect on the hearer.

THE WITNESS:  At the very top, I say, "Awesome.  Lay it all out for them.  Sell it.  You need a banker because you will be bought.  You need 30 million additional capital. Ron Burkle at the table."

Q.    (BY MS. TAIT:)  Is that a typo, "Ton Burkle," it should be Ron Burkle?

A.    Correct.

Q.    Okay.  Another -- let's see.  One moment.

Okay.  Mr. Guy, would you please review Exhibit 115 to yourself without reading it aloud and tell me when you are done.

**UNITED STATES DISTRICT COURT**

(Exhibit No. 115 for identification.)

Q.    (BY MS. TAIT:)  Oh.  Do you have your exhibit book, Mr. Guy?

A.    I do.

Q.    Okay.

(Pause in the proceedings.)

THE WITNESS:  Okay.

Q.    (BY MS. TAIT:)  Have you seen that?

A.    Yes.

Q.    And what is Exhibit 110, high level -- without revealing the contents, what kind of document is it -- I mean, excuse me.  115.

A.    It's an e-mail between myself and Mr. Fritsch.

Q.    Concerning your investment in StarClub?

A.    Right.

Q.    Yes?

A.    Yes.

MS. TAIT:  Your Honor, the Government offers Exhibit 115.

MR. AMINOFF:  No objection, Your Honor.

THE COURT:  All right.  That's admitted.

(Exhibit No. 115 received into evidence.)

MS. TAIT:  Thank you.

Q.    (BY MS. TAIT:)  Displaying Exhibit 115.

So, Mr. Guy, on August 15th, 2014, what does

Mr. Fritsch say to you?

A.    "Hi, Danny.  I just got back from a long and intense but very positive meeting with Disney.  They are willing to proceed on the deal.  They are going back and running the numbers now.  They do not have a conflict with Aaron Siegel from Goldman Sachs.  They want us to perfect the business model between StarClub and Marvel and StarClub and ESPN.  I have to go back to New York City for this.  Thumbs up.  Timing?  We need to get some numbers from them in order to understand this better, but we are on a perfect track."

Q.    Okay.  Mr. Guy, so what did you understand Mr. Fritsch to be saying in Bullets 1, 2, and 3 referencing Disney and Goldman Sachs GS?

MR. AMINOFF:  Objection, Your Honor.  The exhibit speaks for itself.

THE COURT:  Well, no, I think his understanding is appropriate testimony.

So go ahead and answer, sir.

THE WITNESS:  Yeah.  That this transaction was well advanced to the point where investment bankers had to come in.

Q.    (BY MS. TAIT:)  What kind of a transaction was it when we've talked about in- -- investment and we've talked about commercial deals, what kind did you understand him to be telling you it was?

A.    Um, I -- my understanding that this was a potential

M&A and a potential -- also to grow the Marvel and the ESPN side of the business, that it obviously would have a commercial deal to it as well.

Q.   So when you say "potential M&A," that's mergers and acquisitions?

A.   Yes.

Q.   So that's an investment by Disney?

A.   Or buying the whole company.

Q.   Okay.  What did it matter to you -- to you that Disney, according to this, is running the numbers and consulting with Goldman Sachs?

A.   Well --

Q.   Or excuse me, and referencing Goldman Sachs?

A.   Yeah.  To me, it meant that this -- the discussions were well advanced and obviously very positive for the company because Disney is one of the biggest, most successful companies in the world.  And any association with what StarClub had would be -- would be very positive for shareholders.

Q.   Okay.  And why is that?

A.   Well, because it would either be taking the company out at significantly higher levels or a commercial deal that was going to transform the revenues of the company.

Q.   And so had you known that any one of the statements we've reviewed regarding Yucaipa, Ron Burkle, Disney, so far, had you known any of them had been false, would you have

UNITED STATES DISTRICT COURT

invested any more money in StarClub going forward?

MR. AMINOFF:  Objection.  Leading, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Highly unlikely.

Q.   (BY MS. TAIT:)  I'm sorry?

A.   Highly unlikely.

Q.   Okay.  And why is that?

A.   Because where the company was and what it had and the patents that it has was -- I was misled to where that -- where that stood and --

Q.   My question --

MS. TAIT:  Your Honor --

Q.   (BY MS. TAIT:)  Mr. Guy, my question goes to deals with Burkle, Yucaipa, and Disney specifically.

A.   Yeah.  Of course -- I mean, look, if I knew the deals weren't real, I would not put money in them, 100 percent.

Q.   Mr. Guy, I'm going to ask you to look at three more exhibits to yourself, please.  Exhibits 118, 121, 122.

(Exhibit Nos. 118, 121 - 122 for identification.)

Q.   (BY MS. TAIT:)  Would you please review those exhibits and let me know when you are done.

A.   118, 119, and 120?

Q.   No.  118, 121, 122.

(Pause in the proceedings.)

THE WITNESS:  Okay.

UNITED STATES DISTRICT COURT

Q.    (BY MS. TAIT:)  Have you reviewed those exhibits?

A.    I have.

Q.    And what are they?

A.    E-mails between myself and Mr. Fritsch concerning investments in StarClub.

Q.    Okay.

MS. TAIT:  Your Honor, the Government offers Exhibit 118, 121, 122.

MR. AMINOFF:  Just hearsay objections, Your Honor.

MS. TAIT:  Effect on the hearer, Your Honor.

THE COURT:  All right.  That's -- again, a limiting instruction as to what this exhibit is being submitted for, that is, not for the truth of the content but what effect it would have on the -- we always say listener but reader or hearer as well.

MS. TAIT:  Your Honor, except for Mr. Fritsch's statements; correct?

THE COURT:  Except for the statements by Mr. Fritsch.

MS. TAIT:  Okay.  Thank you, Your Honor.

(Exhibit Nos. 118, 121 - 122

received into evidence.)

Q.    (BY MS. TAIT:)  Displaying Exhibit 118.

Mr. Guy, at the bottom on Thursday, November 27, 2014, what are you asking Mr. Fritsch?

UNITED STATES DISTRICT COURT

A.    "Time for an update call?  How is the book looking?
Regency in for 15.  Access?  Others?  Goldman confirm yet?"

Q.    And Mr. Fritsch responds how?

A.    "Yes.  I can call you in a little bit."

Q.    So where did -- why are you asking about Regency,
Access, Goldman in your first e-mail?

A.    Because they were all at the table looking to put
money into the company.

Q.    Turning to Exhibit 121, Mr. Guy.  According to who,
Mr. Guy?

A.    According to Mr. Fritsch.

Q.    Thank you.

So Exhibit 121, begin -- beginning with the e-mail
from Mr. Fritsch on December 8, 2014.  What does he say to
you -- let's start with the top and read through Bullet 1.

A.    "Hi, Danny.  Here's an update."

"Access.  Best introduction Goldman made.  Great,
great, great.  We will get 3 investors out of their group
between 10 and 20 million by Jan 15.

"2.  Soft bank.  Is only interested in acquisition
of 33 percent of the company in exchange for around
125 million.  Timing, March 2015.  They will come to see the
operation in Santa Monica.

"3.  Regency.  Jonathan Fisher, who is our -- who is
on our deal, was out of the office but asked me to come to his

**UNITED STATES DISTRICT COURT**

office on Wednesday.  I expect that we can close then."

Q.    And skip to Bullet 5.

A.    "Salida.  If we could close on the 2.7 million at $4 a share in escrow at the end of this week, this would be very helpful."

Q.    And he says -- signs off?

A.    "Very best, Bernhard."

Q.    Okay.  So focusing on Bullet Number 1, what did you understand him to be saying about Access?

A.    That -- is that they had met and that they liked what they saw and they wanted to put money in.

Q.    How much money?

A.    Between that 10 to 20.

Q.    10 to 20.  This "MM," you understood that to be millions?

A.    Millions, correct.

Q.    Okay.  And that coming in by January 15?

A.    Yes.

Q.    Does that refer to the following year 20 -- January of 2015?

A.    Yes.  Yes, it does.

Q.    Okay.  And Number 5, Salida.  That's you; right?

A.    That is, correct.  Yeah.

Q.    So what did you understand Mr. Fritsch to be referring to about closing on U.S. 2.7 at $4 per share?  What

UNITED STATES DISTRICT COURT

is that a reference to?

A.    He -- he said there was a longstanding shareholder that needed to get off his position and that I should buy it with everything that's going on.

Q.    That you should buy, um, shares from a -- an existing shareholder?

A.    Existing shareholder, yes.

Q.    And $4 per share is the offer -- the price he was offering them to you at?

A.    Correct.

Q.    And based on that, what you knew at the time from what you had already paid and what you were hearing from Mr. Fritsch, how did you feel about that offer, the dollars per share?

A.    Well, I mean, with everything going on at the -- at the company supposedly, that that could end up being a very cheap price to buy -- to buy shares at.

Q.    With respect to Bullet Number 1, had you known that any part of that was untruthful, would you have invested any more money in StarClub going forward?

MR. AMINOFF:  Objection, Your Honor.  Assumes facts not in evidence.

THE COURT:  Overruled.

Q.    (BY MS. TAIT:)  I think you may answer, Mr. Guy.

A.    No.  And I don't think anyone would.

Q.    Okay.

THE COURT:  Mr. Guy, just answer the question you're being asked.  Don't volunteer any information, please.

THE WITNESS:  Yes, Your Honor.

Q.    (BY MS. TAIT:)  And so Exhibit 122.  This is essentially the same e-mail just a couple of minutes later with a different response from you; right?

A.    Um, yes.

Q.    And what do you say to Mr. Fritsch?

MS. TAIT:  Effect on the hearer, Your Honor.

THE COURT:  All right.

THE WITNESS:  At the top?

Q.    (BY MS. TAIT:)  Yes.

A.    "Can you" -- "Can you send" -- "send me purchase and sale agreement with wire instructions?  Fund name, Salida Strategic Growth Fund S.A.R.L."

Q.    And did you -- so now we're -- let's see.  Around December 15, 2014, did you cause Salida to wire $2,797,504 to a StarClub account to buy those shares of stock pursuant to Bullet Number 5 in Mr. Fritsch's e-mail?

A.    Yes, I did.

Q.    Okay.  And Exhibit -- Mr. Guy, could you review to yourself Exhibit 123?

(Exhibit No. 123 for identification.)

THE WITNESS:  Okay.

UNITED STATES DISTRICT COURT

Q.    (BY MS. TAIT:)  You've done that?

What is Exhibit 123?

A.    E-mails between Mr. Fritsch and myself regarding StarClub.

MS. TAIT:  Your Honor, we offer Exhibit 123.

MR. AMINOFF:  Same objection, Your Honor.  Just hearsay.

THE COURT:  All right.  That's admitted.

(Exhibit No. 123 received into evidence.)

Q.    (BY MS. TAIT:)  Displaying Exhibit 123.

On December 16, 2014, what does Mr. Fritsch say to you?

A.    "Hi, Danny.  The funds have been received for the shares out of escrow transaction.  The shares will be delivered accordingly.  Thank you for being such a great partner and believer in our project.

"I will keep you posted should there be any news over the holidays.

"Very best.  Bernhard."

Q.    Mr. Guy, when he says the funds have been received, is that referring to the 2.7 million you had transferred?

A.    Yes.

Q.    Okay.  Thank you.

So let's bring up Exhibit 206, please, already permitted to be displayed.

UNITED STATES DISTRICT COURT

Where on Exhibit 206 is the recent investment -- that investment we were just discussing displayed?

A.    Round Three.

Q.    Okay.  Then we can take that down.

MS. TAIT:  Your Honor -- oh, no.  Sorry.

Q.    (BY MS. TAIT:)  Mr. Guy, would you please review to yourself Exhibit 4.  You have to go to another volume for Exhibit 4, Mr. Guy.  You have to go to, I think, Volume 1.

(Exhibit No. 4 for identification.)

THE WITNESS:  Okay.

Q.    (BY MS. TAIT:)  Okay.  And then Exhibits 119, 126, and 127 in the volume you were using before.

(Exhibit Nos. 119, 126 - 127 for identification.)

THE WITNESS:  119 to --

Q.    (BY MS. TAIT:)  119, 126, 127.

A.    Okay.

Q.    All right.  And what are the documents that you've just reviewed?

A.    E-mails between myself and Mr. Fritsch concerning StarClub.

MS. TAIT:  Your Honor, the Government offers Exhibits 4, 119, 126, and 127.

MR. AMINOFF:  Just the same objections, Your Honor.

THE COURT:  All right.

MS. TAIT:  Admitted, Your Honor?

THE COURT:  Well, let me look at them.

MS. TAIT:  Oh, thank you.  Sorry.

THE COURT:  Those are admitted.

(Exhibit Nos. 4, 119, 126 - 127 received into evidence.)

MS. TAIT:  Sorry, Your Honor?

THE COURT:  Those are admitted.

MS. TAIT:  Thank you, Your Honor.  Sorry.

Q.    (BY MS. TAIT:)  Displaying Exhibit 119, page 1.

So, Mr. Guy, Exhibit 119, page 1, is on the screen. We're going to go back in time a little.  There is an e-mail here beginning at the bottom, which is November 14, 2014; right?

A.    Yes.

Q.    And what does Mr. Guy say to you regarding financial docs?

A.    Or --

Q.    The bottom e-mail here.

A.    Okay.  Yeah.  "Hi, Danny/Greg.  Attached the StarClub, Inc., investment docs as discussed.  Please check out especially the StarClub investor presentation as directed by Goldman.  I think it came out very well.  I'm sending an update about today and the weekend momentarily."

Q.    All right.  And then going up to the top, without reading -- but there were a number of attachments that

UNITED STATES DISTRICT COURT

Mr. Fritsch then re-forwarded to you -- correct? -- on November 26, 2014?

A.    Yes.

Q.    All right.  So going to the very top, who's Jamal Johnson?

A.    He -- he's the I.T. guy that hauled this off the servers.

Q.    At your instruction?

A.    Yes.

Q.    Okay.  So turning to page 3 of the Exhibit 119.  Not page 3?  Oh, sorry.  I must have the wrong exhibit noted.

Turning to page 4, pardon me.  So this is one of the attachments -- correct? -- a Term Sheet?

A.    Yes.

Q.    And what is the -- what is being offered under "Purchase Price"?

A.    Common shares.

Q.    So this is different from the investment that you -- that you had -- you made ultimately in December of 2014, this is new shares from the company that was being offered to you?

A.    Correct.

Q.    So you were thinking of making an additional investment in new shares at this time?

A.    Yes.

Q.    Okay.  And is this -- is the purchase price an offer

$8.50?

A.    Yes, it is.

Q.    Okay.  And then turning to page 5, in the area "Use of Proceeds," would you read that, please?

A.    "The company intends to use the" proceeds -- "use the net proceeds of the common shares for, one, launching of channels for top stars, celebrities, and global brands; two, marketing and promotion; three, technology enhancements; and, four, working capital."

Q.    Okay.  And on page 7 of Exhibit 119, is there an executive summary document?

A.    Yes.

Q.    And then in that document, on page 11, could you see the paragraph that says "Barriers to entry" and read the first sentence?

A.    Can you blow it up or --

Q.    Yeah.

A.    "Barriers to entry.  With developmental hurdles already overcome, the company's primary barrier to entry is the digital media distribution market is the willing participation of key talent, influencer, and brand partners."

Q.    So what did it mean to you to hear that developmental hurdles were already overcome?

A.    Well, that the platform was -- was market ready.

Q.    Is that consistent with what Mr. Fritsch was also

telling you in your conversations?

A.    Yes.

Q.    So the --

MS. TAIT:  You can take this down.

Q.    (BY MS. TAIT:)  You didn't agree to these particular terms -- correct? -- for your next investment?

A.    No.  I think there was some negotiation on those ones.

Q.    Okay.  So let's review Exhibit 4, which is in evidence now.

So what do you ask Mr. Fritsch at the end of the month, December 23, 2014?

A.    "Did you close part of the placement early?"

Q.    And how does he respond the same day?

A.    "Hi, Danny.  Nothing has closed yet.  Since December 18, everyone who was in the pipeline has gone on holiday, vacation and back on January 6th.

"I am confident that we will close in Jan/February as scheduled.  Does not change the fact that we need cash now to produce revenues which is highly important, as revenues will drive up the share price tremendously.  In fact, access in London, I found it is nervous that our revenues will go up in Jan/February before they can write a check.  And then the share price would be possibly way over $20 per share.

"The new Instagram evaluation of 35 billion in the

**UNITED STATES DISTRICT COURT**

news that Maker Studios (Disney) is planning to enter into a commercial transaction with StarClub by February did light a fire under everyone's..."

Q.    Dot, dot, dot; correct?

A.    Yes.

Q.    So turning to -- turning to the statement -- oops, sorry -- about Maker Studios, Disney, the news that Maker Studios is planning to enter into a commercial transaction with StarClub by February.  What did you know then about the truthfulness of that statement?

A.    Only what Mr. Fritsch had told me.

Q.    Okay.  And returning to the statement that access in London is nervous that revenues will go up before they could write a check, what did you understand that to be saying?

A.    That they really wanted to get in to make an investment in the company.

Q.    And that the share price would be possibly way over $20 a share?

A.    If the revenues had gone up, yep, that's right.

Q.    And so as represented here; right?

A.    As represented here.

Q.    And so had you known -- what did you know about the truthfulness of what access in London was -- was thinking?

A.    Again, only by what Mr. Fritsch had told me.

Q.    And had you known that any of these statements was

not true, would you have invested any more money in StarClub?

A.    No.

Q.    Okay.  Showing Exhibit 126, which is already in evidence, and turning to page 1 at the bottom.  What does Mr. Fritsch say to you on January 23rd, 2015?

A.    "Hi, Danny.  Especially Warner asked not to share electronically any of the agreements.  We have the same with the most of the talent partners deals with the celebs."

Q.    Mr. Guy, let me stop you there.  I erred and I should have had you start on page 2.

A.    Okay.

Q.    So the first e-mail is from you.  And what do you request on January 23, 2015?

A.    "Can I take a look at the draft agreement you have in place and at the lawyers regarding your commercial deal with Warner?"

Q.    Okay.  Thank you.

So now we can go back to page 1 and Mr. Fritsch's response.

A.    "Hi, Danny.  Especially Warner asked not to share electronically any of the agreements.  We have the same with most of the talent partner deals with the celebs."

Q.    And then you can skip the "however" paragraph and keep going, "Also great news today..."

A.    "Also great news today, we just signed the first

UNITED STATES DISTRICT COURT

deal with Warner and now are already working on the upgrade of this deal."

Q.    All right.  And how -- how did these statements impact your feeling about continuing to invest in StarClub?

A.    That -- that the -- that the commercial and -- and M&A transactions were still all at the table and things were moving forward as he had laid out -- laid them out.

MR. AMINOFF:  Your Honor, objection on completeness grounds.

THE COURT:  Overruled.

Q.    (BY MS. TAIT:)  Do you know -- did you know a person at StarClub named Jim?

A.    Mr. Polsen, the CFO, yes.

Q.    Mr. James Polsen; right --

A.    Yes.

Q.    -- the CFO?

And did you speak to Mr. Polsen occasionally or frequently?

A.    Yeah, on the phone and in person, yes.

Q.    And as between Mr. Fritsch and Mr. Polsen, during the course of your investment time with StarClub, who did you speak to more?

A.    Mr. Fritsch significantly more.

Q.    Could you put it in numbers, like --

A.    A hundred times more.

Q.    Than Mr. Polsen?

A.    Yes.

Q.    Okay.  Did you ever observe interactions in person between Mr. Fritsch and Mr. Polsen?

A.    Yes.

Q.    Did you have an impression of who was in charge of that relationship vis-à-vis StarClub?

MR. AMINOFF:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Sustained.

Q.    (BY MS. TAIT:)  Okay.  Other than Mr. Fritsch and Mr. Polsen, did you have regular contact with anyone else at StarClub?

A.    No.

MS. TAIT:  Your Honor, I believe Exhibit 127 is also in evidence.

THE COURT:  Yes.

Q.    (BY MS. TAIT:)  Exhibiting Exhibit 127.

So on January -- let's go down here.  On January 27th, 2015, on page 1, what does Mr. Fritsch write to you?

A.    "Hi, Danny.  I like to encourage us to complete the 10 million fundraise for the company this week.  I have" --

THE COURT:  Sir, you need to, please, especially when you're reading, speak more slowly.

UNITED STATES DISTRICT COURT

THE WITNESS:  Yes, ma'am.

"Hi, Danny.  I like to encourage us to complete the 10 million fundraise for the company this week.  I have attached the deal document which protects investors as well as the company in acceptable dimension."

Q.    (BY MS. TAIT:)  So stop there.

What is he saying here?

A.    He's looking for more money.

Q.    From whom?

A.    Me.

Q.    Okay.  And others too possibly?

A.    Yes.  Yes.

Q.    So keep going.

A.    "The meeting with Disney was better than expected. We decided to engage an investment banker whom we both know and trust, Moelis & Company, not Goldman Sachs, and start the process of an M&A transaction.

"Key and basis of the evaluation will be the amount of video views, more than revenue or reach.  This is why it is now even more important that we launch as many channels as fast as we can and trigger the video views.  Those come through the content which we need to make sure to be able to provide and can provide as soon as we will have the funds available to inject into the system.  This is going to be better than expected."

Q.    That part is in all caps; right?

A.    Right.

"More over the phone.  We will meet tomorrow at Warner all day to train their people how to use the system and for a final due diligence meeting for the Warner Music Group deal."

Q.    And you can stop there; although, there's a little more to the e-mail on the next page.  But --

And at about this time, you were considering investing more money; correct?

A.    Yes.

Q.    What did you then know about the truthfulness of the statements here regarding Disney engaging Moelis & Company as part of an M&A transaction?

A.    I only had one source of information.  That was Mr. Fritsch.

Q.    And so the M&A transaction is mergers and acquisitions; right?

A.    Correct.

Q.    Is that a commercial deal or is that an investment by Disney supposedly?

A.    That's -- that's a buyout of the entire company, StarClub.

Q.    Okay.  And what did that mean to you?

A.    Um, usually these takeout prices are significantly

**UNITED STATES DISTRICT COURT**

higher values than where the stock would be trading on a public company.  So you'd have the stock taken out -- it's definitely a higher price than what you had made investments at.

Q.   "You" being you as an investor?

A.   Yes, investor.

Q.   Could you please review -- you're going to have to grab another exhibit volume as well.  But in the current volume, Exhibit 195 -- and I'll tell you the other volume number in a moment.  And Exhibit -- in this Volume 7, Exhibit 831.  And let me know when you're done.

(Exhibit Nos. 195 and 831 for identification.)

Q.   (BY MS. TAIT:)  I'm sorry.  I was wrong about the current volume.  It will be in --

A.   Volume 3.

Q.   Exhibit 195 will actually be in Volume 3.  And then Exhibit 831 will be in Volume 7.

(Pause in the proceedings.)

THE WITNESS:  Okay.

Q.   (BY MS. TAIT:)  So have you reviewed both of those?

A.   Yes.

Q.   Have you reviewed the signature pages of both of those documents?

A.   Yes.

Q.   And do you -- what are the two documents?

A.   Well, the first one is a Securities Purchase

Agreement.  And the second thing looks like wire instructions.

Q.    Are you on Exhibit 831?

A.    I apologize.  No.  I'm sorry.

Q.    831, I'm going to direct you to pages 2 through 14.

A.    Okay.  Yeah, they're both Securities Purchase Agreements.

Q.    Do you agree that they're the same Securities Purchase Agreement with a slight difference on the signature pages?

A.    Yes.

Q.    And do these agreements represent the terms of your next investment in StarClub?

A.    They do, yeah.

MS. TAIT:  The Government offers Exhibit 195 at this time.

MR. AMINOFF:  No objection, Your Honor.

THE COURT:  That's admitted.

(Exhibit No. 195 received into evidence.)

MS. TAIT:  Your Honor, we will offer Exhibit 831 with another witness.

Q.    (BY MS. TAIT:)  But, Mr. Guy --

THE COURT:  Any objection to 831?

MR. AMINOFF:  Sorry, Your Honor?

THE COURT:  Any objection to 831?

MR. AMINOFF:  It strikes me as cumulative.  But, I

**UNITED STATES DISTRICT COURT**

mean, if one is in, I have no problem.

THE COURT:  All right.  831 is admitted with the exception of the first page.

(Exhibit No. 831 received into evidence.)

MS. TAIT:  Okay.  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  So, Mr. Guy, let's display Exhibit 195, page 1.

And so what is the date of the Securities Purchase Agreement, at the top?

A.    January 29th, 2015.

Q.    Okay.  And let's see.

MS. TAIT:  Can you put that down?  Keep the page, though.

Q.    (BY MS. TAIT:)  And so in the first paragraph where it says "Whereas," what is the thing that is being transacted?

A.    Um, "Whereas, pursuant to the terms of this agreement, the purchasers have agreed to invest as to each purchaser his her its investment and collectively the investments (an aggregate of up to $10 million) in the company in return for the issuance by the company to the purchasers of shares of common stock at a price of $8.50 per share."

Q.    And turning to page 12 of Exhibit 195, what do you see there?

A.    And that is the signature page to the Securities Purchase Agreement.

UNITED STATES DISTRICT COURT

Q.    How many shares -- or sorry.  How many shares are being purchased?

A.    823,530.

Q.    At a price of how much?

A.    $8.50.

Q.    And the date?

A.    January 30th, 2015.

Q.    So the purchaser here is a new company name -- right? -- that we haven't seen?

A.    That's right, yeah.

Q.    It's Harrington Global Opportunities Fund?

A.    Correct.

Q.    And you're the -- you were the fund manager of Harrington; correct?

A.    I am.

Q.    Is this about the time where Salida is transitioning to Harrington?

A.    It is.

Q.    Okay.  So doing the math, going up to the top again, 823,530 shares, $8.50, that's about $7 million; right?

A.    Yes.

        MS. TAIT:  And before I leave that page, can we put Exhibit 831 on the screen, page 13?  Yeah.  831, page 13.

Q.    (BY MS. TAIT:)  And, Mr. Guy, do you agree that page 831, 13, page -- sorry -- Exhibit 831, page 13, is the

UNITED STATES DISTRICT COURT

same document --

MS. TAIT:  Could you zoom out?

Q.    (BY MS. TAIT:)   -- as executed by Harrington but has another signature at the bottom; correct?

A.    It does.

Q.    And whose signature is that at the bottom, at least what's the printed name?

A.    James Polsen.

Q.    And that's the StarClub CFO; right?

A.    Correct.

Q.    Okay.  So at this point, you agreed to pay $8.50 a share; is that right?

A.    Um, I think this was subject to some adjustments, I think.

Q.    Potential adjustments downward from that price?

A.    Yes.

Q.    That you negotiated?

A.    Correct.

Q.    In general, what were the protections that you negotiated?

MS. TAIT:  Let's show page 1, paragraph 2 -- no. Let's go to Exhibit 195, page 1.

Q.    (BY MS. TAIT:)  So with respect to paragraph 2, does that show some of the adjustments that could happen if certain events came to pass or didn't come to pass?

A.    It does.

Q.    So just at a very high level, if certain things did or didn't happen, Salida could -- sorry -- Harrington could get more shares retroactively for the same $7 million?

A.    Correct, yeah.  If he didn't close on a deal, then the transaction value of 8.50, which he wanted because he was negotiating other deals, would be ratcheted down, subject to that paragraph.

Q.    Okay.  So on around January 30th, 2015, did you cause $7 million to be transferred to StarClub based on Exhibit 195 and pages 2 through 14 of Exhibit 831 from the Harrington in London to StarClub?

A.    I did.

Q.    Okay.  So let's put up Exhibit 206.

So where are we now?  What did we just cover?

A.    You're at Round Four, January 30th, 2015.

MS. TAIT:  Okay.  And let's take that down.  Thank you.

Q.    (BY MS. TAIT:)  And could you please review Exhibits 128, 129, 130, and 131?

(Exhibit Nos. 128 - 131 for identification.)

Q.    (BY MS. TAIT:)  Those should be in Volume 2.

A.    Can you repeat those exhibits again, please?

Q.    Sure.  128, 129, 130, 131.

THE COURT:  Any objection to those?

UNITED STATES DISTRICT COURT

THE WITNESS:  Okay.

Q.    (BY MS. TAIT:)  Have you done that?  What are those documents?

A.    E-mails between myself and Mr. Fritsch concerning my investment in StarClub.

THE COURT:  Could you stop and let me get an answer?

MS. TAIT:  Of course.  Sorry, Your Honor.

MR. AMINOFF:  Thank you, Your Honor.  Just the same -- same objections, Your Honor.

THE COURT:  All right.  The objection is overruled.  Those are admitted.

(Exhibit Nos. 128 - 131 received into evidence.)

MS. TAIT:  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  Looking at Exhibit 128.  Focusing on the top e-mail from Mr. Fritsch on February 2nd, 2015, to you.

And what does he tell you?

A.    "Re: Funds.  Thank you for sending the funds, they are received and we are on and cracking here.  We can expect some minor remaining fund contribution today as you mentioned last week?"

Q.    Mr. Guy, is it "can we expect"?

A.    Yes.  Yeah, "Can we expect some minor remaining fund contribution today as you mentioned last week?  Tom English?  Just need to know.  Thank you, Danny.  Funds to Sabre will go out today.  Confirmed."

UNITED STATES DISTRICT COURT

Q.   Okay.  And looking at the date on this e-mail, it's February -- let's -- February 2nd, 2015; right?

A.   It is.

Q.   So what are the funds that Mr. Fritsch is thanking you for?  The $7 million?

A.   Yes.

Q.   There's a reference from Mr. Fritsch.  "Can expect some minor remaining fund contributions today?"  Is he talking about contributions from you or other people?

A.   Other people.

Q.   Were you at this time starting -- trying to recruit other people to invest in StarClub?

A.   Yeah.  I had -- I introduced people to StarClub, yes.

Q.   Okay.  Let's turn to Exhibit 129.

On February 2nd, 2015, what does Mr. Fritsch tell you in this e-mail?

A.   "Hi, Danny.  Just got out of the Maker meeting. Let's chat tomorrow.  Here are the subjects."

Q.   And let's go to Item 4.

A.   "Access will be in L.A. this Thursday."

Q.   Okay.  And let's turn to Exhibit 130.

On February 10 -- so on February 10 at the bottom, you ask Mr. Fritsch what?

A.   "Did you get the other subscriptions?"

UNITED STATES DISTRICT COURT

Q.   And he responds how on the same day?

A.   "Hi, Danny.  I received 2 wires at $100,000 each but no signed subscription document from anyone.  The third wire and subscription from Mike Yaeger is still missing.  Thank you for checking into this."

Q.   And what is Mr. Fritsch expecting from you, if anything, from his e-mail?

A.   To track down the wires and subscription agreements from these three investors.

Q.   And did you have something to do with these three investors investing in StarClub?

A.   Yes.  Yes.  I brought them to the table.

Q.   Okay.  And can we close that down and let's look up above?  On Tuesday -- let's see, these guys up there, the top two e-mails.

On Tuesday, what do you say to Mr. Fritsch?

MS. TAIT:  Effect on the hearer, Your Honor.

THE WITNESS:  "Check your trash folder.  E-mail from Brian O'Hea and e-mail from Francis Scotland.  They both said they sent them."

Q.   (BY MS. TAIT:)  Mr. Fritsch responds how?

A.   "Okay.  Very good.  Found there both.  One was even sent under a different name.  Thanks.  All good on those two. Best."

Q.   Okay.  And Exhibit -- did you recruit a person named

Brian O'Hea as -- or introduced that person to StarClub?

A.    I did.

Q.    And did you introduce a person named Francis Scotland to StarClub?

A.    I did.

Q.    Okay.  As investors; right?

A.    As investors, yes.

Q.    Okay.  Exhibit 131 in evidence.

And what is -- what is Mr. Fritsch telling you in the first e-mail?

A.    Saturday, March 7th.  "Hi, Danny.  Here is a quick update.  Warner on its way to close.  Now Universal wants to make same deal.  Very good.  Progress this coming week with Moelis and Disney."

Q.    And now Moelis, do you recognize the name of that company?

A.    That's the investment bank.

Q.    That's another investment banker, kind of like Goldman Sachs?

A.    Yeah, which was mentioned previously.

Q.    Right.  Right.

And so what did you understand -- "progress with Moelis and Disney," what did you understand him to be telling you about?

A.    Negotiations were deep, deep, you know, and close to

UNITED STATES DISTRICT COURT

closing.

Q.    With respect to a commercial transaction or investment transaction?

A.    And/or a takeout.

Q.    I'm sorry?

A.    Merger -- merger and acquisition.

Q.    A merger and acquisition?

A.    Of StarClub completely in itself.

Q.    By Disney?

A.    Correct.

Q.    So, Mr. Guy, referring to the other investors that you introduced to StarClub, would you have introduced other investors if you had known that any of the statements that Mr. Fritsch had told you up to this time were not true?

A.    Absolutely not.

Q.    And so just for context --

MS. TAIT:  Can we display Exhibit 206 again?

Q.    (BY MS. TAIT:)  So by February 2010, where are you in the rounds of investments you had made in StarClub?

A.    We're past Round Five --

Q.    Excuse me.  Is it Round Four, do you mean?

A.    Yeah, past Round Four of the 7 million and going on to Round Five, where we put a final 6 million into the company.

MS. TAIT:  Okay.  Take this back down.

Q.    (BY MS. TAIT:)  Mr. Guy, could you review to

yourself the following:  Exhibit 133, Exhibit 203, Exhibit 140?

(Exhibit Nos. 133, 140, and 203 identification.)

MS. TAIT:  I think Exhibit 203 will be in Volume 3.

THE COURT:  Any objection to those exhibits?

THE WITNESS:  Okay.

Q.    (BY MS. TAIT:)  And --

MR. AMINOFF:  No -- same objection, Your Honor.

THE COURT:  All right.  Those are admitted.

(Exhibit Nos. 133, 140, and 203

received into evidence.)

MS. TAIT:  Okay.  Thank you.

Q.    (BY MS. TAIT:)  Mr. Guy, displaying Exhibit 133.

MS. TAIT:  The Government has offered these into evidence.

Q.    (BY MS. TAIT:)  On Sunday, April 19, 2015, you write what to Mr. Fritsch?

A.    "This is huge numbers.  Huge news.  Tell me the number.  Don't leave me hanging."

Q.    And what does he respond?

A.    "Sorry.  Just had my phone and e-mail off, as I was in a meeting here with Jorg Mohaupt."

Q.    Is that J-o-r-g Mohaupt?

A.    Yeah.

Q.    Okay.  Keep going.

A.    "200 million plus per annum, starting no later than

January 2016.  Great brands from Pasha Club to Emirates Airlines to Lamborghini to Dubai Expo 2020.  Five-year deal.  Will give you a ring shortly."

Q.    And what did you understand Mr. Fritsch to be telling you there?

A.    That he has a giant commercial deal with -- with this gentleman involving all those brands.

Q.    And why did that matter?

A.    It would drive the valuation of the stock through the roof.

Q.    And specifically why?

A.    Because significant revenues were coming in on a five-year deal, so recurring revenues.

Q.    So 200 million -- you understand "200 MM" to be $200 million of business per year?

A.    Per year, yeah.

Q.    Okay.  And turning to Exhibit 203.

What is Exhibit 203?  It's 26 pages long.

A.    This is an e-mail between myself and Mr. Michael Yaeger of Goldman Sachs.

Q.    It has some attachments; right?

A.    It does.

Q.    Okay.  So are you forwarding to Mr. Yaeger at Goldman Sachs something that Mr. Fritsch sent you?

A.    Yes, I am.

Q.    So what did Mr. Fritsch send you on August 13, 2015?

MS. TAIT:  Can you scroll up, please?

THE WITNESS:  "Hi, Danny.  Please find attached. The current status of the revised financial presentation and the revised letter to Roc Nation.  Please give it a final peek and let me know."

Q.    (BY MS. TAIT:)  So you received these two documents from Mr. Fritsch and then the attachments, and you forwarded them to Mike Yaeger who is a person at Goldman Sachs?

A.    I did.

Q.    And is Mike Yaeger a person you had a prior relationship with before Mr. -- you knew Mr. Fritsch?

A.    Yes.

Q.    Okay.  So at this point, you had already invested more than $16 million into StarClub; right?

A.    Correct.

Q.    And you continued to speak with Mr. Fritsch regularly during 2015?

A.    I did.

Q.    And the same, you e-mailed as you had been frequently?

A.    Yes.

Q.    Also checking in by phone?

A.    Yes.

Q.    So let's turn to the attachment.  Let's look at

UNITED STATES DISTRICT COURT

page 2 first.

And what are we looking at at page 2?

A.   This is the start of the StarClub presentation and its financials, 2015.

Q.   And page 3, let's display that.  Exhibit 203, page 3.

A.   That's the StarClub social media broadcast network with the -- "StarClub network reaches over 1.5 billion people across 100-plus influencer channels."  And then it lists a bunch of the talent partners he had signed up.

Q.   This is what you understood Mr. Fritsch to be saying in this presentation?

A.   Yes.

Q.   Turning to page 5.

And this is -- the reference to quality views.  Is this consistent with what Mr. Fritsch has been telling you?

A.   Yes.

Q.   And then turning to page 16.  That's a slide that says "Financial Information"; right?

A.   It does.

Q.   And page 17.

This is titled "Use of Proceeds"; right?

A.   It is.

Q.   So what was the purpose of him sending this to you and Mike Yaeger?

**UNITED STATES DISTRICT COURT**

A.    It's laying out his use of a $50 million capital raise and what he would use the money for.

Q.    So he's seeking more money; right?

A.    Yes.

Q.    So looking at the U.S. 50 million capital raise on page 17, what does it say the $50 million will be used from -- for?

A.    Launching of channels, 37.5 million; technology development, 5 million; working capital and reserves, 5 million; investment banking fees, 2-and-a-half million, for a total capital of 50 million.

Q.    Does it mention Rolls Royce on there?

A.    It does not.

MR. AMINOFF:  Objection, Your Honor.

THE COURT:  Sustained.

Q.    (BY MS. TAIT:)  Page 19 of Exhibit 203.

What's being shown here?

A.    This is the balance sheet of StarClub unaudited as of December 31st, 2014.

Q.    Did you have any independent way of verifying that any of these numbers were true?

A.    No.

Q.    So were you just relying on what Mr. Fritsch told you?

A.    Yes.

Q.    And turning to page 20 of Exhibit 203.

What is the title?

A.    "Historical Results."

Q.    What does "historical" mean?

A.    Past results.

Q.    So not projections; right?

A.    No.

Q.    So let's look at the top line there, "Sales and Other Revenue" under the column "2014."  What does it say?

A.    Total revenue, $803,525.

Q.    So, again, revenue -- going back to the bananas that you've talked about on Friday --

A.    Yeah.  When you sell 10 bananas in a supermarket for a dollar each, your revenue will be $10.

Q.    So the money received from normal business operations, according to this chart, was $803,525 in 2014; right?

A.    Yes, ma'am.

Q.    Okay.  If you had known that that number was not true, would you have continued to invest any money in StarClub?

A.    Well, the, um -- the answer would be no.  Um --

Q.    What did it matter that there was -- it's not a lot of revenue there, but would it matter that there was revenue?

A.    Yeah.  Revenue allows you to grow your business without constant capital.  And it shows that your platform is

sort of off and running and has the ability to generate
revenue.  And so having revenue in any early stage investment
is pretty important.

Q.    Is it like a proof of concept?

A.    Um, yeah.  It could be looked at that way,
absolutely.

Q.    Let's look at Exhibit 140, which I believe is
already in evidence.

So beginning at the bottom, the date is October 1,
2015; correct?

A.    Yes.

Q.    Mr. Fritsch tells you what?

A.    "Here is what size of capital is getting us to what
result."

Q.    And you could keep going.  "Use of proceeds" --

A.    Yeah, "Results analysis, StarClub, Inc."

Q.    Next page, page 2.  At the top?

A.    "Capital" -- okay.  "Capital injection use of
proceeds results.  $25 million.  This capital raise allows the
company to launch and build out channels for all currently
signed talent partners with a premium content feed.  This raise
also will accelerate the company's business while it is in the
M&A process and stabilize 2 to 3 billion dollar M&A market
cap."

Q.    Let me stop you there.

**UNITED STATES DISTRICT COURT**

Would it be fair to say that the next couple of paragraphs talk about what could be done with 50 million and $100 million if the company raised it?

A.    Yes.

Q.    And so sticking with the 25 million, this raise will accelerate the company's business while it is in the M&A process.  M&A, does that mean mergers and acquisitions in this sentence?

A.    Correct.

Q.    And so what did you understand Mr. Fritsch to be telling you with these three bullets?

A.    That if we -- if we sped up the capital raise, the valuation of business would expand during the M&A process to get a higher valuation.

Q.    And so was this telling you what the plans were for the next money that would be raised under this proposal?

A.    Yes.

Q.    And looking at -- and what did Mr. -- going back to page 1.  What do you say to Mr. Fritsch in response?

A.    "Can I send this to Yaeger?"

Q.    And who's Yaeger?

A.    Michael Yaeger at Goldman Sachs.

Q.    And that's the investment bank that can raise more money from other investors; right?

A.    Which we had introduced him to, correct.

Q.    And up above, what does Mr. Fritsch say?

A.    "Yes, for sure."

Q.    Okay.  So, Mr. Guy --

MS. TAIT:  I'm going to ask Mr. Guy to review Exhibits 201 and 143.

(Exhibit Nos. 143 and 201 for identification.)

THE COURT:  Any objection?

MS. TAIT:  Exhibit 201 -- sorry.  Just to direct the witness as to where it is.

And, counsel, Volume 3, 201.

THE WITNESS:  201 and 143, was it?

MS. TAIT:  Right.  And just wait for the Court's ruling.

MR. AMINOFF:  Just same objection, Your Honor. Thank you.

THE COURT:  All right.  It's admitted.

(Exhibit Nos. 143 and 201

received into evidence.)

Q.    (BY MS. TAIT:)  Let me know, Mr. Guy -- well, they're admitted so --

A.    I'm ready.

Q.    Mr. Guy --

MS. TAIT:  Let's put up Exhibit 201 on the screen. Okay.  Let's go down to the bottom.

Q.    (BY MS. TAIT:)  So what does Mr. Fritsch say to you

**UNITED STATES DISTRICT COURT**

on August 9th, 20 -- sorry -- October 9th, 2015?

A.    "Hi, Danny.  StarClub one-pager attached."

Q.    And on page 2, what does it say is in the brackets as the attachment?

A.    "Intro to StarClub - October 2015."

Q.    Going back to page 1.

And what do you say in response to Mr. Fritsch?

A.    "Can I send this out?"

Q.    And then he says what?

A.    "Yes."

Q.    Exclamation point; right?

A.    Yes.

Q.    What did he title his e-mail up in the subject above?

A.    "StarClub-one pager."

Q.    Okay.  So there's an attachment; right?

A.    Yes.

Q.    And let's go to the attachment, which I think is page 3.

Okay.  So is this the attachment to the e-mail on that date in October 2015?

A.    It is.

Q.    This is before the last time that you invested in StarClub; right?

A.    Correct.

UNITED STATES DISTRICT COURT

Q.   Okay.   So up at the top right, after "Strictly Private and Confidential," is there a date?

A.   October 2015.

Q.   And in the top paragraph that says "Introduction," what does it say?

A.   "StarClub is the world's first agnostic and fully automated social media broadcast network, aggregating celebrity/influencer and curated content and delivering verifiable reach and views through all social media channels.

"Founded in 2009 and led by Bernhard Fritsch, StarClub, Inc., has invested four years and $90 million developing its own proprietary enabling technology/IP through its wholly owned StarSite system.  With 9 patents filed and 6 patents issued, current investors include Access Industries, Credit Suisse, Harrington Global, Warner, and others.  StarSite was soft launched in mid 2014 and already has an audience reach of 2 billion."

Q.   So focusing on the second-to-the-last sentence, "Current investors include," I see Harrington Global listed here.  That's your company; right?

A.   Correct.

Q.   So what information did you have about whether current investors really did include Access Industries?

A.   Only from Mr. Fritsch.

Q.   And that's the company that we had seen in other

e-mails today; correct?

A.   Yeah.  Multiple times, yes.

Q.   What information did you have that Credit Suisse was actually a current investor in StarClub?

A.   Yeah, I don't -- I don't recall on that one.

Q.   Would you have separate information other than what you got from Mr. Fritsch?

A.   No.  No.

Q.   Such as from this statement here in this attachment?

A.   No.

Q.   Okay.  What information source -- what source of information did you have to say whether Warner was or was not an investor, current investor?

A.   You would only have the company.

Q.   Meaning Mr. Fritsch?

A.   Correct.

Q.   And based on the -- your experience as an investor, what difference does it make that current investors include Access Industries, Credit Suisse, and Warner?

A.   Well, it just shows that these other sophisticated investors see the same thing that you did and this thing could potentially be very successful.

Q.   So you like to follow the smart money?

A.   You could say that.  I think it just gives you comfort that other smart people are at the table as well.

Q.    So going back to the e-mail on page 1, you asked Mr. Fritsch, "Can I send this out?"

And he says, "Yes."

Do you see that?

A.    I do.

Q.    Do you remember sending this out to other people or not?  It's been a long time, I know.

A.    No, I definitely did for sure.  Yeah.

Q.    Are you positive?

A.    No, I can't -- no, I can't say that.

Q.    Okay.  If you did send it out, why would you have done so?

A.    Because I brought other people to the table and they were current investors, and I probably would have sent it to --

Q.    Don't speculate.

A.    Yeah.  Okay.

Q.    If -- if you sent out things that Mr. Fritsch sent to you, did you ever change them in any way?

A.    No.

Q.    And so at -- at this time, I want to ask you about a person named Ian Mann.  Do you know him?

A.    I do.

Q.    And who is he?

MR. AMINOFF:  Your Honor, we're going to object to this entire section for reasons already briefed in the

confrontation clause.

THE COURT:  Okay.  Well, I'll hear more specific objections if you have them as we go along.

Q.    (BY MS. TAIT:)  Who is Ian Mann, Mr. Guy?

A.    Ian Mann resides in Bermuda with me.  He is a longtime investor in equities and the stock market.

Q.    You said he resides with you.  You don't mean in your house, do you?

A.    No.  In Bermuda.  In Bermuda.

Q.    And what -- so did you introduce Mr. Mann to StarClub?

A.    I did.

Q.    Without saying what you told him, did you convey the facts that you had learned about StarClub from Mr. Fritsch to Mr. Mann?

A.    I did.

Q.    And so have you seen Ian Mann in the last year?

A.    Yeah.  Yes, once.

Q.    And where is he today?

MR. AMINOFF:  Objection, Your Honor.  This is all hearsay.

THE COURT:  Sustained.

MS. TAIT:  Well, Your Honor --

Q.    (BY MS. TAIT:)  When you saw Mr. Mann, can you describe his physical state?

UNITED STATES DISTRICT COURT

MR. AMINOFF:  Objection, Your Honor.  Same objection and improper opinion.

THE COURT:  No.  I'll allow it.

Q.   (BY MS. TAIT:)  When you last saw Mr. Mann --

MS. TAIT:  Let me rephrase, Your Honor.

Q.   (BY MS. TAIT:)  When you last saw Mr. Mann, what physical state did you observe him to be in?

MR. AMINOFF:  Objection, Your Honor.  This is vague as to time.

Can we approach, Your Honor?

(At sidebar:)

THE COURT:  What is he going to say?

MS. TAIT:  He's going to say that he's frail and he needs medical care and he observed that he's not able to care for himself.  He saw him in a medical facility.

THE COURT:  Okay.  That's not relevant so move on.

MS. TAIT:  Okay.  Your Honor, in light of the defense argument that Mr. Mann is a missing witness when the Court had already ruled in the motion to dismiss, the Government thinks that there should be some explanation from Mr. Guy who has firsthand perceptional knowledge of his condition that is -- you know, that that's the state that he's at.

THE COURT:  That's not an explanation so no.  Move on.

MS. TAIT:  Okay.  Unless you --

MR. AMINOFF:  Your Honor, could we --

THE COURT:  Unless you --

MR. AMINOFF:  No, I was just going to ask if we can have an instruction to the jury to just disregard the statements he's made so far about Mr. Mann.

THE COURT:  That he lives in Bermuda?

MR. AMINOFF:  Yes.

THE COURT:  No.

(In the presence of the jury:)

Q.   (BY MS. TAIT:)  Okay.  So going back to Exhibit 201, page 3.

So after you received this document from Mr. Fritsch, did you end up investing more money in StarClub?

A.   I did.

Q.   Okay.  And Exhibit -- let me show Exhibit 143, already in evidence.

Okay.  And so Exhibit 143 is -- it's like 40 pages; correct?

A.   Yes.

Q.   What is Exhibit -- what does it start with on page 1?

MS. TAIT:  Let's show the top.

Q.   (BY MS. TAIT:)  It's an e-mail from Mr. Fritsch to you on November 17, 2015?

UNITED STATES DISTRICT COURT

A.    It is cc'd to James Polsen and Kim at StarClub.

Q.    And do you remember who Kim was?

A.    I think Mr. Fritsch's assistant.

Q.    Okay.  What does Mr. Fritsch say to you?

A.    "Hi, Danny.  Please find attached the investment documents, convertible with warrants as discussed attached for you to review and to complete with the names and amounts of the respective parties.

"Let's talk tomorrow.

"Best, Bernhard."

Q.    And so there are some attachments to this e-mail; correct?

A.    There are.

Q.    And those are the next 39 pages; correct?

A.    Yes.

Q.    And what is Mr. Fritsch offering here?

A.    To invest in this -- in his company again.

Q.    In other words, he's offering you an opportunity to invest; right?

A.    Yes.

Q.    And this is pursuant to discussions you had been having with him?

A.    Correct.

Q.    So these are the terms he's offering?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    So let's turn to page 26 of the terms he's offering. And paragraph 1.3, what does it say there regarding use of proceeds?

A.    "1.3, Use of Proceeds.  The proceeds of the units shall be used for general corporate purposes, including, without limitation, to launch vertically integrated and interactive social media platforms (the channels) for talent partners, celebrities, influencers, and global brands and for technology enhancements related to such channels."

Q.    Okay.  And did you actually negotiate a slightly different offer than what he made to you?

A.    Uh --

Q.    Would looking at a document refresh your memory about that?

A.    Yes, it would.

MR. AMINOFF:  Your Honor, objection.  He hasn't testified that he didn't recall.

MS. TAIT:  Oh, I'm sorry, Your Honor.

Q.    (BY MS. TAIT:)  Mr. -- Mr. Guy, do you recall whether you accepted this offer or do you recall the terms of any other offer you might have accepted?

MR. AMINOFF:  Objection, Your Honor.  Leading.

THE COURT:  Overruled.

THE WITNESS:  I'm sure I negotiated, as we negotiated the last one, but I just don't recall.

**UNITED STATES DISTRICT COURT**

MS. TAIT:  Could the witness review Exhibit 196,
which I'm going to offer, in any event?

(Exhibit No. 196 for identification.)

THE COURT:  Is there an objection to 196?

MR. AMINOFF:  Your Honor, just the previously made
objection of this being outside the scope.

THE COURT:  That's admitted.

(Exhibit No. 196 received into evidence.)

MS. TAIT:  It's admitted?  All right.  Thank you.

Q.    (BY MS. TAIT:)  Displaying Exhibit 196, page 1.
So have you reviewed Exhibit 196?

A.    Yes.

Q.    And you've reviewed all of the 15 pages; right?

A.    Yes.

Q.    Is this the terms of your last investment in
StarClub?

A.    Yes.

Q.    Okay.  So, again, the date of this investment?

A.    November 20th, 2015.

Q.    And what are -- what are you agreeing to buy, the
highlighted information in the "Whereas" paragraph, the second
paragraph?

A.    This investment was a convertible bond, convertible
note.

Q.    Can you explain that in laymen's terms?

UNITED STATES DISTRICT COURT

A.    Yeah, convertible note has the ability to convert to common shares of the company at -- at a certain price, usually over a certain time period.

Q.    Okay.  So you can convert this investment into shares pursuant to the terms of this particular deal?

A.    Correct.

Q.    But it is an investment into the company, an agreement to invest?

A.    Yes.

Q.    Okay.  So let's look at page 2 of Exhibit 196.

What does this say there in paragraph 1.3 regarding the use of proceeds you're agreeing to?

A.    "The proceeds of the units shall be used for general corporate purposes, including, without limitation, to launch vertically integrated and interactive social media platforms (the channels) for talent partners, celebrities, influencers and global brands and for technology enhancements related to such channels."

Q.    Okay.  So let's turn to -- let's see.  Let's turn to the -- page 13 -- I'm sorry.  Page 14.

And so on page 14, what does it say is the investment amount?

A.    6 million U.S. dollars from Harrington Global Opportunities Fund S.A.R.L.

Q.    Okay.  So what had you learned about the company up

UNITED STATES DISTRICT COURT

until the point that you decided to sign -- or have this agreement signed?

A.    Um, that he needed continued money to sort of grow out the platform, that significant companies were there at the table and made an investment and wanted to continue to discuss both commercial and M&A transactions.

Q.    So on November 24th, 2015, did you cause $6 million to be wired to StarClub from Harrington Global for further investment in StarClub?

A.    I did.

Q.    And so if we could put up Exhibit 206.

So are we at Round Five now?

A.    We are.

Q.    And so -- what is the total cash that you -- that Salida and Harrington, that you had caused them to pay to invest in StarClub?

A.    22.44 million.

Q.    By this point; right?

A.    Correct.

Q.    And you had recruited other people to invest, I think you already talked about?

A.    I did.

Q.    Turning to Exhibit 144 --

MS. TAIT:  Oh, Your Honor, at this time, I do offer Exhibit 206 as a summary of voluminous records, admissible

UNITED STATES DISTRICT COURT

records.

THE COURT:  I will rule on that later.

MS. TAIT:  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  Exhibit 1 --

MS. TAIT:  Could the witness please examine Exhibits -- the Government would be seeking to offer Exhibits 144 and 146.

(Exhibit Nos. 144 and 146 for identification.)

THE COURT:  Any objection?

THE WITNESS:  Okay.

MR. AMINOFF:  Your Honor, no objection to 144. With respect to 146, object to the attachments.

MS. TAIT:  Your Honor, the Government offers the attachments as a statement of a party opponent, Mr. Fritsch.

MR. AMINOFF:  Objection, Your Honor.  It's not clear that it's Mr. Fritsch's statement.

THE COURT:  Sustained.

MS. TAIT:  Sustained with respect to 146, Your Honor?

THE COURT:  The attachment.

MS. TAIT:  The attachment.

Your Honor, may I be heard on that?

(At sidebar:)

THE COURT:  Did I already rule on these?

MS. TAIT:  Excuse me, Your Honor, no, you hadn't

ruled on these yet.

MR. AMINOFF:  I don't think so, Your Honor.

MS. TAIT:  But we did list them in the e-mails that we sent over the weekend.

Your Honor, this is Monica Tait.

Your Honor, the -- the previous e-mail that I'd like to get in from the victim that I also identified in this round asks for a cap table.  He's going to testify that a cap table will show him what the ownership is of the company and where he stands with respect to the ownership of the company.

Mr. Fritsch then responds, "Attached is the cap table post money," meaning --

THE COURT:  All right.

MS. TAIT:  -- after you put your money.

THE COURT:  That's it.

MR. AMINOFF:  Your Honor, this is Jon Aminoff from the defense.

Our position is that that table was not prepared by Mr. Fritsch.  I don't know if he reviewed it, I don't know if he adopted it in any way.  My understanding is it was prepared by the CFO.  So I think he's just forwarding it.

MS. TAIT:  Mr. Fritsch says, I had them break out Harrington's position separately.  And the Government is actually not offering it for its truth.  It's offering it for the fact that Mr. Fritsch sent Mr. Guy something, which, in

fact, is actually -- has false statements in it, honestly, Your Honor.  It has some true statements and some false statements.  But the defendant is adopting it and saying this is what you asked for.  This is --

THE COURT:  I agree.  It's admitted.

(Exhibit Nos. 144 and 146

received into evidence.)

MS. TAIT:  Okay.  Thank you, Your Honor.

(In the presence of the jury:)

Q.    (BY MS. TAIT:)  So displaying Exhibit 144, which I believe is received.

THE COURT:  Yes.

Q.    (BY MS. TAIT:)  Mr. Guy, reviewing Mr. Fritsch's e-mail --

MS. TAIT:  If you can show the top.

Q.    (BY MS. TAIT:) -- e-mail to you on Tuesday, November 24, 2015, what does he say to you?

A.    "Hi, Danny.  We received the 6 million U.S. dollars. Thank you," in capital letters.  "Jim will get out the latest cap table.

"Very best, Bernhard."

Q.    What is a cap table?

A.    It's the capitalization table that shows you the -- the shares outstanding in the company.

Q.    Basically show you who owns the company?

A.    Correct.

Q.    And turning to Exhibit 146, page 1.

What does Mr. Fritsch tell you on December 10, 2015, with the subject "StarClub Cap Table"?

A.    "Hi, Danny.  Attached is the cap table post money of this round.  I also had them break out Harrington's position separately.  As you can see, the fee of 200 units is there as well and might end up with 800 shares.  There is no name allocated to the fees.  Please advise how you like us to allocate those units."

Q.    Okay.  So what is a "cap table post money"?  What did you understand "post money" to refer to?

A.    After the last raise of money or last amount of money goes into the company, what the capital table would look like.

Q.    That included your money that you had sent to the company --

A.    Correct.

Q.    -- just then?

A.    Correct.

Q.    Okay.  And there's -- he references in the next paragraph a fee of 200 units.  Is that kind of a finder's fee for your company?

A.    I don't recall but most likely, yes.

Q.    Okay.  You had been recruiting other investors to

StarClub at about this time; right?

A.    Yes.

Q.    Okay.  So turning to page 2 of Exhibit 146.  This is the cap table; right?

A.    Correct.

Q.    Big picture?

A.    Yes.

Q.    Okay.  And how would you know whether this was accurate or not?

A.    You wouldn't without audited financials.

Q.    You -- would you have to rely on the company, then?

A.    100 percent.

Q.    And turning to page 3 of 12 of Exhibit 146.

The Harrington Global Opportunities Fund, this breaks out what the company thinks your share is; correct?

A.    Yes.

Q.    Turning to page 4 is a list called security holder information for StarClub; right?

A.    Correct.

Q.    And at the bottom, do you see companies with which you are associated, bottom of the list?

MS. TAIT:  Let's scroll down.

THE WITNESS:  Yes.

Q.    (BY MS. TAIT:)  And what are those?

A.    Salida Strategic Growth Fund S.A.R.L.

Q.   So does this show the very first investment that Salida made in StarClub at this approximate time, January 2014?

A.   For that fund, yes.

Q.   For that fund at that time?

A.   Yes.

Q.   Okay.  Did you have any way of knowing whether the other names on page 2 really were common shareholders in StarClub or not?

A.   No, I had to rely on Mr. Fritsch and the company.

Q.   So turning to page 5 of 12, do you recognize some of the names on the list as people that you introduced to StarClub, starting from Pollock Services Corp., around four lines down?

A.   Yes.

Q.   So who do you recognize here as people you introduced to StarClub as investors?

A.   Rob Pollock, Sherrie Ann Pollock.

Q.   Okay.  Rob Pollock again on July 10, 2014?

A.   Sherrie Ann Pollock.  Both.

Q.   And then on July 10, 2014, is Salida.  That's you again; right?

A.   Yes.

Q.   And on January 23, 2015, that's Salida, that's you again; correct?

A.   Yes.

UNITED STATES DISTRICT COURT

Q.    And then, again, the same time, there's more investments from Pollock and Sherrie Ann Pollock?

A.    There is.

Q.    Okay.  Do you recognize any other names?  For example, do you recognize Francis Scotland as someone you introduced to StarClub?

A.    Yes.

Q.    How about Stephen Buckley?

A.    Yes.

Q.    And then your name appears -- I'm sorry.  Your company, Harrington Global, appears again?

A.    Yes.

Q.    Out of date order on July 10, 2014; right?

A.    Correct.

Q.    So referring to the reference to Access Industry Partner and Jorg Mohaupt, did you have any way of knowing this entity and person really were investors?

A.    No.

Q.    And so by this time, in late 2015, you had introduced Mr. Fritsch to Goldman Sachs too; right?

A.    I had, yes.

Q.    So if Goldman Sachs referred people to Mr. Fritsch or to StarClub for investment, that essentially would have come through you as well?

A.    Um, not -- not necessarily --

UNITED STATES DISTRICT COURT

MR. AMINOFF:  Objection --

THE WITNESS:  -- but that relationship would have come from Goldman.

MS. TAIT:  Stop talking.

THE COURT:  And your objection?

MR. AMINOFF:  I believe it lacks foundation and calls for speculation.

THE COURT:  Sustained.

MS. TAIT:  Your Honor, the Government would next offer -- ask the witness to review Exhibit 147 and Exhibit 148, which has been redacted.

(Exhibit Nos. 147 and 148 for identification.)

THE COURT:  Any objection?

MR. AMINOFF:  Yeah.  I object to -- sorry, Your Honor.  Objection to 148.

MS. TAIT:  Your Honor, I believe the -- the Court had resolved the objection to 148 by requiring redaction.

THE COURT:  That's admitted as redacted.

(Exhibit No. 148 received into evidence.)

THE COURT:  And did you have an objection to 147?

MR. AMINOFF:  No objection to 147.  Apologies, Your Honor.

THE COURT:  Thank you.

MS. TAIT:  Are they both in, Your Honor?

THE COURT:  Yes.

(Exhibit No. 147 received into evidence.)

MS. TAIT:  Thank you.

Q.    (BY MS. TAIT:)  Displaying Exhibit 147.

MS. TAIT:  No, 147 is fine.  147 is fine.

Q.    (BY MS. TAIT:)  On Exhibit 147 at the bottom, what do you -- what is shown there on December 15, 2015?  Who's the e-mail from?

A.    It's from Mr. Mann, Ian Mann, to myself.

Q.    And he says?

A.    "Hi, Danny.  Attached are my subscription documents for $1 million" --

MS. TAIT:  Stop, Mr. Guy.

MR. AMINOFF:  I had intended to object to that.  I thought that was redacted.

THE COURT:  Take that off the screen, please.

MS. TAIT:  Your Honor, may we be heard on that?

(At sidebar:)

MS. TAIT:  I'm sorry, Your Honor.  I did not hear an objection from defense counsel.

MR. AMINOFF:  No, I didn't.  I thought that one was -- sorry, Jon Aminoff from the defense.

I thought that one was redacted and so that's why I didn't object.

MS. TAIT:  We had not discussed this.

MR. AMINOFF:  Oh, okay.  Then that's my mistake.  I

had intended to object to that e-mail on the bottom.

MS. TAIT:  So, Your Honor, we're offering it as effect on the hearer because at the top of the e-mail, Mr. Fritsch responds to Mr. Mann's statement about his subscription documents, that it's great.

MR. AMINOFF:  But I think -- my objection is to -- yeah, it's an e-mail from -- it's an e-mail chain between Danny Guy and Ian Mann.

MS. TAIT:  That's the first one.  And then Mr. -- Mr. Guy forwards it to Mr. Fritsch and Mr. Polsen and says, "Great."  And then Mr. Fritsch responds back to the whole chain, "Great."

MR. AMINOFF:  Yeah.  I mean, that's just multiple, multiple layers of hearsay, Your Honor.  I --

THE COURT:  I didn't get how this works.

MS. TAIT:  This one just shows that Mr. Fritsch is acknowledging that he is getting Mr. Mann's StarClub subscription documents and he is acknowledging that he got them.  It's effect on the hearer, Your Honor.

THE COURT:  I don't -- what's your --

MR. AMINOFF:  My objection, Your Honor, is that -- the chain begins with Ian Mann e-mailing Danny Guy, and then Danny Guy responds to Ian Mann and cc's other people.  And then Mr. Fritsch responds to Danny Guy.  So I think we've got three levels of hearsay.

UNITED STATES DISTRICT COURT

And while Mr. Fritsch's statement could be responsive to Danny Guy, it's not responsive to Ian Mann.  So I think at least Ian Mann's e-mail has to go out.  And, I mean -- and it doesn't make any sense because, yeah, Fritsch's response to Guy is just -- they were both just saying, "Great."

MS. TAIT:  Well, Your Honor, I mean, it is -- it's Mr. Fritsch acknowledging the title of the e-mail as StarClub subscription documents, Ian Mann.  Mr. Fritsch acknowledges that.  And it's submitted for the effect on Mr. Fritsch, that he is aware that he's getting subscription documents from Mr. Mann and saying, great, I know this person is -- is sending me subscription documents.  It is the effect on Mr. Fritsch.

THE COURT:  Fritsch isn't particularly relevant.

MS. TAIT:  Well, it's relevant to the extent that the defense's position may be that Mr. Fritsch has no idea where Ian Mann is.  They're claiming that, you know, we're never hearing from Ian Mann --

MS. LEE:  Well, Count 2 is about Ian Mann.

MS. TAIT:  Yeah.  Count 2 is about Ian Mann.

THE COURT:  I understand that.  And I didn't dismiss it.  You said you could prove it.

MS. TAIT:  Right.

THE COURT:  But I don't think this gets there.  So sustained.

MS. TAIT:  Okay.

(In the presence of the jury:)

MS. TAIT:  Your Honor, is -- is 148, as redacted, admitted?

THE COURT:  Yes.

MS. TAIT:  Okay.

Q.    (BY MS. TAIT:)  Showing Exhibit 148.  Mr. Guy -- sorry.  Looking at the screen, so looking at the first page of Exhibit 148, who's this e-mail from?

A.    It's from Mr. James Polsen to Ian Mann and myself. Cc'd is Mr. Fritsch and Kim Fredricks, his assistant.

Q.    And the subject line?

A.    "Wire instructions attached for StarClub."

Q.    And what does Mr. Polsen say?

A.    "Hi, Ian.  Attached please find StarClub wire instructions.  Please let us know if we can be of further assistance.  Thanks.

"Best, Jim."

Q.    And turning to page 3.  And what's displayed on page 3 of Exhibit 148?

A.    Wire instructions for StarClub, Inc.

Q.    And that's a Chase Bank; right?

A.    It is.

Q.    The last four digits of the account are 7995?

A.    Correct.

Q.    Okay.  Did there come a time --

**UNITED STATES DISTRICT COURT**

MS. TAIT:  You can take that down.

Q.    (BY MS. TAIT:)  Did there come a time when you and Ian Mann together visited the StarClub offices in Santa Monica, California?

A.    Yes.

Q.    Was that in or around January of 2016?

A.    If you could give me something to refresh.

Q.    Sure.

MS. TAIT:  The Government will want to offer, in any event, Your Honor, Exhibits 151, 152, 154.

(Exhibit Nos. 151 - 152 and 154

for identification.)

MS. TAIT:  Could the witness -- can we just discuss the admissibility of those?

MR. AMINOFF:  No objection, Your Honor.

THE COURT:  All right.  Those are admitted.

(Exhibit Nos. 151 - 152 and 154

received into evidence.)

MS. TAIT:  Okay.  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  So, Mr. Guy, would you look at Exhibit 151?

And this is an e-mail between you -- from Mr. Fritsch to you; correct?

A.    It is.

Q.    On January 16, 2016?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    What's the subject?

A.    "This coming week, preliminary schedule."

Q.    What does Mr. Fritsch tell you?

A.    "Hi, Danny.  Safe travels tomorrow.  I am looking forward to have you here this coming week.  We can pin down the following times at StarClub Monday with you and Ian Mann, company walk-through from 2:00 to 6:00 PM; Thursday, 11:00 AM to 3:00 AM, same."

Q.    3:00 PM, do you mean?

A.    "To 3:00 PM," yes, "same.  You and I can schedule time together at convenient times in between."

Q.    Okay.  And so --

MS. TAIT:  Taking that down.

Q.    (BY MS. TAIT:)  So was there a time in January 2016 when you and Ian Mann visited StarClub in Santa Monica?

A.    Yes.

Q.    Was there someone else also with you, another potential investor?

A.    Mr. David Cohen.

Q.    And had you recruited Mr. Cohen or introduced him, sorry, to StarClub?

A.    I introduced him, yes.

Q.    So taking yourself back to that visit, what did you -- what did you see when you got to StarClub?  What

happened?

A.    I think we came in, we met the team.  You know, over the next couple of days, we had presentations made to us.

Q.    By whom?

A.    By members of the StarClub team, including Mr. Fritsch, Mr. Polsen, Mr. Cartwright.  And we walked through the business plan and where they were.

Q.    Okay.  So you mentioned -- we've talked about Mr. Fritsch and Mr. Polsen.  Who is Mr. Cartwright?

A.    He was the chief technology officer, if I remember correctly.

Q.    Did you meet any other people, such as Ruben Mamann?

A.    Yes.

Q.    And how about Gavin O'Reilly?

A.    Yes.  Mr. O'Reilly, yes.

Q.    Or anybody else you can remember that you heard presentations from?

A.    No.  No.  Those are the main guys.

Q.    So how many of those presentations that you received did Mr. Fritsch attend?

A.    All of them.

Q.    And was that true for everybody else?

A.    No.  No.  Each guy came in and did his part.

Q.    And then left?

A.    And then left, yeah.

**UNITED STATES DISTRICT COURT**

Q.     So Mr. Fritsch was a constant with you and Mr. Mann?

A.     He was.

Q.     As far as you could observe, Mr. Mann was also attending these presentations?

A.     Yes.

Q.     Did you ask questions during the presentations?

A.     Absolutely.

Q.     Did Mr. Mann ask questions during the presentations?

A.     Yes.

Q.     What kind of questions do you remember asking?

A.     You know, where does the business stand?  What talent partners are you signing up?  What's your revenues look like?  What are the expenses?  Um, you know, all the standard business questions people would ask in -- in a presentation.

Q.     And what -- was Mr. Fritsch present for those questions?

A.     He was.

Q.     And the answers?

A.     Yes.

Q.     And so what do you remember being discussed about revenue in early 2016?

A.     I remember that there was a $15 million revenue number that was historic, that was for -- for 2015.

Q.     Okay.  As far as you remember, was Mr. Mann present for that revenue discussion?

UNITED STATES DISTRICT COURT

A.     He was.

Q.     I know it's been a long time, but what answers do you remember about StarClub coming from Mr. Fritsch personally?

A.     That, you know, things were on track, that the revenues were there, that he was signing up these deals, and -- and the -- you know, the future looked bright.

Q.     What was your impression coming away from the meetings in person in Santa Monica?

A.     Well, not just mine but the other gentleman that put in money were --

Q.     No, no.  Just your impression.

A.     That things were as -- as advertised.

Q.     As advertised up-to-date up to that point to you?

A.     Correct.

Q.     Okay.  And so you visited StarClub in the week of January 18 of 2016; right?

A.     Yes.

Q.     And that's -- you had how many days at StarClub?

A.     Two or three, if I remember correctly.

Q.     And so let's look at Exhibit 152, which I believe is already in evidence.

       And what do you write at the bottom on January 18, Monday, to Mr. Fritsch?

A.     "Ian and I will come to the office for 2 PM today if that still works."

Q.    And who is Ian?

A.    Ian Mann.

Q.    Scrolling up, what does Mr. Fritsch respond the same day?

A.    "Hi, Danny.  Welcome to L.A.  Yes, 2 PM is confirmed.  Kim, please send directions to the office to Danny. I am looking forward to seeing everyone at 2:00 PM.  Bernhard."

Q.    And Exhibit 154, which I believe is in evidence.

On Tuesday, January 19, what do you say in your e-mail?  Oh, let me stop you there.

At the top of Exhibit 154, page 1, what's the subject of the e-mail?

A.    "Some thoughts and follow-up questions."

Q.    And is it fair to say you're sending this to Mr. Fritsch as well as Mr. Polsen?

A.    Yes.

Q.    And so what -- then going back to the bottom again, what do you write to Mr. Fritsch and Mr. Polsen at the bottom?

A.    "Just a follow-up from yesterday.  Do you guys have audited 2014 and '15 financial statements?  What is the yearly burn rate of the company currently?  What would it be if we sped up deployment and hired the people you spoke about?  How much additional capital is needed to invest in the technology? How much additional capital is needed for full growth mode?"

Q.    Next page.

UNITED STATES DISTRICT COURT

A.    "Breakdown of where it would be spent."

Q.    Okay.  And the next page?

A.    "Can you list all the patents specifically?  Can you provide a breakdown of where all the 2015 revenue came from specifically?

"Jim, can I sit down with you and go over the 2016 financial projections so I get a better handle of the costs, inputs, and margins?

"It is clear additional capital could really speed up your deployment."

Q.    And then you can stop there.

Do you then suggest that Mr. Fritsch reach out to somebody at Goldman Sachs in San Francisco?

A.    Yes.

Q.    And what was your purpose in doing so?

A.    Well, through this friend of mine that had the contact at the -- at the venture group --

Q.    I'm sorry.  My question was:  What was your purpose in doing so?

A.    Oh.  To help the company grow.

Q.    By getting more investment money?

A.    Yes.

Q.    So how does Mr. Fritsch respond to you at the top of Exhibit 154, page 1?

A.    "Hi, Danny.  I do not think it makes much sense to

UNITED STATES DISTRICT COURT

zoom back into Goldman Sachs at this stage.  It will take too long to close an investment with them.  We can discuss this afternoon.  We will provide all other points in your e-mail below."

Q.    And as best as you recall, did you discuss your points with Mr. Fritsch after you sent this e-mail?

A.    I'm sure.  I just don't recall.

Q.    Okay.  But you had another meeting at StarClub after this e-mail at the -- the rest of the week, in other words?

A.    Yes.  Yes.

Q.    Okay.  So, again, you continued to seek out new investors and partners for StarClub after the January 26 meeting -- 2016 meeting?

A.    Yes.

Q.    Had you known that the revenue numbers that you had heard about were not true, would you have continued recruiting other people and partners for StarClub?

A.    Absolutely not.

MS. TAIT:  Your Honor, the Government will -- will be next offering Exhibit 158, if the witness can authenticate it.

(Exhibit No. 158 for identification.)

Q.    (BY MS. TAIT:)  Mr. Guy, you can pull it out, but you have to wait for the Court to decide.

MS. TAIT:  Your Honor, it's all effect on the

hearer.

And, Your Honor, it begins on page 4 of 5.  That's the first e-mail in the chain, not offered for the truth.

THE COURT:  What do you mean "it begins on page 4"?

MS. TAIT:  The chain.

THE COURT:  Oh, I see what you're saying.  Okay.

MR. AMINOFF:  Objection, Your Honor.  Just hearsay within hearsay.

MS. TAIT:  Your Honor, it's effect on the hearer in that the defendant is on the chain --

THE COURT:  I'm -- move on.

MS. TAIT:  I'm sorry, Your Honor?

THE COURT:  Denied.  Move on.

MS. TAIT:  It's denied?  Okay.

Q.    (BY MS. TAIT:)  Okay.  Mr. Guy, setting that exhibit aside, were you trying to make another contact for Mr. Fritsch at Goldman Sachs in San Francisco?

A.    I was.

Q.    It was a different Goldman Sachs than the other Goldman Sachs you testified about before; right?

A.    Yeah.  This is the venture group.

Q.    What is the difference, in laymen's terms?

A.    The venture group will make investments directly in companies.

Q.    So do I understand you to be saying that you were

trying to interest Goldman Sachs in Goldman itself directly investing in StarClub?

A.    Correct, yeah.

Q.    Okay.  Did you ever go to any meeting relating to that?

A.    No.  This meeting was set up through a friend and her relationship within the --

Q.    "No" is sufficient, Mr. Guy.

A.    Okay.

Q.    So when you set up meetings like this for StarClub and Mr. Fritsch, did you insist on attending them?

A.    No.

Q.    Okay.  And why not?  Was there a reason?

A.    It would not be my place to do so.

Q.    Why not?

A.    You know, you make these introductions and it's between the company and the -- and the investor to have these meetings.

Q.    Okay.  So did you continue to check in through 2016 -- early 2016 and going on in 2016 with Mr. Fritsch about the company's status?

A.    Yes.

Q.    You continued to be speaking by phone, as you had?

A.    Correct.

Q.    Speaking by e-mail?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    Okay.

MS. TAIT:  Your Honor, the next three exhibits the Government would offer would be Exhibit 171, 172, and 173.

(Exhibit Nos. 171 - 173 for identification.)

THE COURT:  Mr. Aminoff?

MR. AMINOFF:  Yes, Your Honor.  We object to 171 as outside the scope of the charged conduct, not relevant and hearsay.

MS. TAIT:  And, Your Honor --

THE COURT:  Don't talk.

MS. TAIT:  Okay.

MR. AMINOFF:  Is that overruled, Your Honor?

THE COURT:  Pardon?

MR. AMINOFF:  I couldn't hear you.  Was that overruled?

THE COURT:  I told her not to talk.  I just want to hear what your position is on the others.

MR. AMINOFF:  Oh, on the others.  I'm sorry.  172 -- 172, that seems fine.  No objection.

And 173, just on hearsay grounds, Your Honor. Mr. Fritsch is not included on those e-mails.

MS. TAIT:  Your Honor, may I be heard on 173?

THE COURT:  171, objection is sustained.

172 is admitted.

UNITED STATES DISTRICT COURT

(Exhibit No. 172 received into evidence.)

THE COURT:  The purpose for the attachment --

MS. TAIT:  It is not offered for the truth, Your Honor.  It is offered for the effect on the listener, Mr. Guy.

May I be heard on Exhibit 171, please, Your Honor?

(At sidebar:)

MS. TAIT:  Monica Tait, Your Honor.

With respect to Exhibit 171, which the Court has excluded as hearsay, this is Mr. Fritsch sending to Mr. Guy a presentation --

THE COURT:  I think he said outside the scope.

MS. TAIT:  Oh, it's not outside the scope, Your Honor, because the defendant is still trying to include -- to get Mr. Guy to continue to invest throughout 2016.  And within this document, Your Honor --

THE COURT:  What is that one?

MS. TAIT:  This is 171, Your Honor.

(Pause in the proceedings.)

MS. TAIT:  Your Honor, I was going to call out page 16.

THE COURT:  All right.  That's admitted.

(Exhibit No. 171 received into evidence.)

MR. AMINOFF:  Your Honor, could I just say -- just for the record -- this is Jon Aminoff for the defense.

Your Honor, we're objecting to that one because the last charged act with respect to -- to this particular witness, Mr. Guy, was in January of 2015.  This was sent in April 2016.

We don't know if it ever actually went to Spotify.  We don't know if this was a draft.  We don't know who prepared it.

And it's obviously extremely prejudicial because the Government is trying to bring it in to show that Mr. Fritsch made this statement about $15 million three months earlier in this meeting with Mr. Guy.

So for those reasons, we continue to object.

MS. TAIT:  Your Honor, the scheme to defraud charged in the Indictment spans from 2014 until 2017.  The witness will testify that Mr. Fritsch continued to solicit him to bring in new investors, as the witness has already testified he had done.  And this is going to Mr. Fritsch's continuation of his scheme to defraud.  And it is within the charged period.

I also wanted to correct counsel that the last charged wire count was in November of 2015 for Danny Guy, yes, that's right.  And January 26 for Ian Mann, the person that Mr. Guy introduced.

MR. AMINOFF:  That's not right.  Count 1 is January 2015.

MS. TAIT:  Oh, I'm sorry.  I misunderstood.  Not charged, you're right.  Sorry about that.

But the scheme is continuing and that is the scheme that the Government has charged and alleged in its Indictment. And this in particular, the $50 million revenue figure is important because this reinforces all the things he'd been telling Mr. Guy up until that point, including in a January 2016 meeting.

THE COURT:  All right.  I'm getting really tired of this.  You are supposed to identify the documents and objections in advance.  We're wasting a lot of time.

MS. TAIT:  Well, Your Honor, I'm very sorry.  We did identify it over the weekend to counsel.

MR. AMINOFF:  That might have been my fault, Your Honor.  The Government did send us their list.  I think I missed some of them.  There was a lot.  And my apologies.

THE COURT:  All right.

MS. TAIT:  Your Honor, is it admitted?

THE COURT:  Yes.

MS. TAIT:  Thank you, Your Honor.

So, Your Honor, I understand 171, 173, and 172 to be admitted?

THE COURT:  Correct.

(Exhibit No. 173 received into evidence.)

MS. TAIT:  Thank you, Your Honor.

Q.    (BY MS. TAIT:)  Mr. Guy, so throughout 2016, Mr. Fritsch was continuing to urge you to invest more money;

UNITED STATES DISTRICT COURT

correct?

A.    Correct.

Q.    Okay.  And looking at Exhibit 171.

MS. TAIT:  Let's display page 1.

Q.    (BY MS. TAIT:)  So this is an e-mail from Mr. Fritsch to you on April 25, 2016; right?

A.    It is.

Q.    And what is the subject?

A.    Spotify.

Q.    I'm sorry.  The subject?

A.    Sorry.  "Confidential attached."

Q.    And there is an attachment; right?

A.    Correct.

Q.    And what does Mr. Fritsch say?

A.    "Hi, Danny.  Please find attached the outline for the integration plan between StarClub and Spotify.  This is for your eyes only, of course, and not even for internal or external distribution.

"The deal is going towards 450 million plus an earnout procedure where we can pick up another 300 to $500 million.  The figures are vetted by the investment bankers and some who are close to the Spotify regime.

"Let's zoom in to meet tomorrow, Tuesday, around 5:00 PM at the Waldorf Astoria, if that is okay for you."

Q.    Okay.  Let's stop you there.

UNITED STATES DISTRICT COURT

Looking at page 2 of Exhibit 171, this is the cover page; right?

A.    Yes.

Q.    And then turning to page 15 of the presentation, do you see that?

A.    I do.

Q.    And what is the title of this slide?

A.    "StarSite Financials."

Q.    What did you understand StarSite to be?

A.    StarClub.

Q.    What was the difference?  Did you have an understanding?

A.    Um, some subsidiary maybe.  It's the brand.

Q.    Are you guessing?

A.    Yeah.

MS. TAIT:  Move to strike, Your Honor.  He's guessing.

THE COURT:  That will be stricken.

Q.    (BY MS. TAIT:)  Turning to page 16, what is shown -- what is the title of this slide?

A.    "Historical and Forecast Results."

Q.    Okay.  What's the difference between those two words?

A.    Historical is past results and forecast is the future.

UNITED STATES DISTRICT COURT

Q.    So at this point, it's April of 2016.  So which column displayed on page 16 is historical, the past results?

A.    2015.

Q.    And in that column, what is listed for sales and other revenue?

A.    $15.5 million.

Q.    So $15,505,509 *[sic]*; correct?

A.    Correct.

Q.    And was that number roughly consistent with what you heard in California at the meeting in January of 2016?

A.    Yes, it was.

Q.    Okay.  Did you have any way of knowing whether these historical numbers for 2015 were true, other than from what Mr. Fritsch told you?

A.    No.

Q.    And what you learned otherwise from StarClub?

A.    No.

Q.    Did you have any reason to think these numbers -- let me withdraw that.

So looking at Exhibit 172, which is in evidence. Yeah.  Yeah.  172, the bottom e-mail.

So this is the next day -- correct? -- April 26, 2016?

A.    Yes.

Q.    And you -- you write, "See you at 5:00 PM still";

right?

A.     Yes.

Q.     And Mr. Fritsch says what?

A.     "Yes, 5:00 PM at the Waldorf hotel.  Okay with you?"

Q.     And, yes, you respond the same day how?

A.     "Yes.  Ian Mann and Yaeger coming as well.  We can chat in detail after they leave.  That okay?"

Q.     And who's Yaeger in your sentence?

A.     Mr. Yaeger of Goldman.

Q.     What does Mr. Fritsch say in response?

A.     "I was looking forward just seeing you on your own for an hour.  We can meet Ian Mann and Yaeger next week Tuesday or Wednesday here in New York."

Q.     So you said "forward."  I think the word typed there is actually "forest."  I think that was a typo?

A.     Typo, yes.

Q.     And then you -- the same day again, you respond, "Have a drink"?

A.     "Have a drink for 30 minutes with Ian, then we can chat.  Fair enough.  Will tell Mike next week."

Q.     And he responds how?

A.     "I don't drink and I have tons of work to do, my friend.  I will have to leave at 6:00 PM and no time for Ian Mann.  You need to tell me whom you bring to meetings in advance, then we schedule things differently."

**UNITED STATES DISTRICT COURT**

Q.    Then what do you say the same day?

A.    I said, "Bro, he is a shareholder.  I brought him in.  He put in a million dollars.  He lives in the same island as me.  What are you worried about?"

Q.    What does Mr. Fritsch say in conclusion?

A.    "We can use that hour any way which you like, my friend.  No problems.  No issues."

Q.    And do you recall actually meeting with Mr. Fritsch in the Waldorf Astoria at around this time in April 2016 and with Ian Mann?

A.    I do.

Q.    And did Mr. Fritsch ever correct you about Ian Mann, whether he was or was not a shareholder --

A.    No.

Q.    -- at this time?  Okay.

So let's close that down.

THE COURT:  All right.  We're going to take a 20-minute break, ladies and gentlemen.  Don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

We'll see you in 20 minutes.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  You can step out, sir.

Anything we need to discuss?

UNITED STATES DISTRICT COURT

MS. TAIT:  Not from the Government, Your Honor.

MR. AMINOFF:  No, Your Honor.

THE COURT:  All right.  Thank you.

(Break taken.)

(In the presence of the jury:)

THE COURT:  You may be seated.

Everyone is back.  Our witness is back on the stand.

Sir, you are still under oath.

Counsel, you may continue.

MS. TAIT:  Thank you, Your Honor.

Q.   (BY MS. TAIT:)  Mr. Guy, so turning your attention --

MS. TAIT:  Let's display Exhibit 173, which I believe is admitted.

Q.   (BY MS. TAIT:)  So looking at Exhibit 173, this is an e-mail between you and somebody else -- right? -- e-mail chain?  Sorry.

A.   Yes.

Q.   With whom?

A.   Mr. Jim Polsen.

Q.   Okay.  So what do you ask him on the 9th of June, 2016?

A.   "Jim, I have" my financials -- "I have to have my financials posted with the regulators by the end of June.  I need the audited financials on StarClub to do this.  Has 2015

UNITED STATES DISTRICT COURT

been finalized?  Can you send me previous years?"

Q.   And how does Mr. Polsen respond to you on June 11th, 2016?

A.   "Hi, Danny.  Hope all is well.  Attached are our previous years' financial statements.  Will send the 2015 financial statements shortly.  Have a great weekend."

Q.   And pages 2 through 4 of Exhibit 173, if you have them in your book, are those the attachment?

A.   Yes.

Q.   So displaying page 2.

MS. TAIT:  If we can just zoom out so we could see what it looks like.

Q.   (BY MS. TAIT:)  What's on page 2?

A.   It's a balance sheet for StarClub, Inc., for the year ending in December 31st, 2013.

Q.   And what's on page 3?

A.   Statement of Operations, StarClub, Inc., 2014.

Q.   And that goes on to page 4; right?

A.   Yes.

Q.   And so what does pages 3 and 4 communicate?  What's the Statement of Operations for 2014?

A.   On how the company was doing during that time period.

Q.   And so is there revenue listed there?

A.   There is.

**UNITED STATES DISTRICT COURT**

Q.    How much?

A.    $797,354.

Q.    And then there's a bunch of other expenses listed for the company; right?

A.    Yes.

Q.    And at the bottom --

MS. TAIT:  And so let's close that down.

Q.    (BY MS. TAIT:)  So did you receive anything more detailed than this kind of a document for the period in which you invested going forward from this date?

A.    No.

Q.    Okay.

MS. TAIT:  Your Honor, the last two exhibits we'd like to review would be Exhibits 183 and 186.

(Exhibit Nos. 183 and 186 for identification.)

THE COURT:  Any objection?

MS. TAIT:  Actually -- yeah.  No, I'm going to stop there.  183 and 186, Your Honor.

MR. AMINOFF:  Your Honor, we just request that -- object to both of those and request for redactions.  Object to both of them and request for redaction of the top line.

(At sidebar:)

THE COURT:  183 is from Danny to --

MS. TAIT:  To Fritsch, oh, yes.  You'd like to redact the top line?

**UNITED STATES DISTRICT COURT**

MR. AMINOFF:  Yes.

MS. TAIT:  I'm sorry.  I didn't notice that before.  I wish you pointed that out before.  I apologize.  So can we not display that part?  I don't mind redacting the words "Ian Mann," for sure.

MR. AMINOFF:  I think the only -- I believe it's the only reference to Ian Mann here.  So --

MS. TAIT:  No, it's also cc'd to Ian Mann at the top.  So if you really want Mr. Fritsch's writing to both Mr. Guy and Mr. Mann, as you can see.

MR. AMINOFF:  Oh, yes, I see.

MS. TAIT:  So is it okay deleting at the top?

MR. AMINOFF:  I prefer redacting both of them.

THE COURT:  183.  Where are you --

MR. AMINOFF:  Oh, I'm sorry.  At the top there and then the e-mail address here.

MS. TAIT:  Well, the e-mail address -- the witness can testify that that is Mr. Mann's e-mail address and that Mr. Fritsch is e-mailing to both Mr. Guy and to Mr. Mann.  You can see that right here.

THE COURT:  All right.  That's admitted.

          (Exhibit No. 183 received into evidence.)

THE COURT:  And 186?

MS. TAIT:  Yes.  186.  So if 186 is the objection, the top part it references, and --

MR. AMINOFF:  Yeah.

MS. TAIT:  We can redact that part --

MR. AMINOFF:  Okay.

MS. TAIT:  -- because we're really interested in the defendant's response there of November 2nd, 2016, to Danny, cc Ian.  So this portion up here we could redact.  I guess I would propose I could use the ELMO for now and just display that portion, like fold over the page, just fold it over.  Does that clear the objection?

MR. AMINOFF:  I think so.  Yeah.

THE COURT:  Okay.

(In the presence of the jury:)

THE COURT:  All right.  183 and 186 are admitted, subject to the chain -- or the comments at sidebar.

(Exhibit No. 186 received into evidence.)

MS. TAIT:  Don't put it on the screen.  I'll put it on the ELMO.

Your Honor -- thank you, Your Honor.  Give me a moment to start the presenter.

THE COURT:  Sure.

Q.   (BY MS. TAIT:)  Mr. Guy, looking on the screen at Exhibit 183, first looking at the bottom of page 1, what do you write on November 3rd, 2016?  And you have to go on to page 2 to see that on the presenter.

You write to Mr. Fritsch; correct?

A.    I do, yeah.  "As we discussed, we have a two-step process to move this company along.  We need a good board to help grow the company and we need audited financials for a bigger capital raise.

"I have this firm in Toronto that we have used before that helps small start-ups get ready for audits and works with the auditors through the whole process.  I think we should use these guys in parallel to get this done."

Q.    You can stop there, Mr. Guy.

And the top of -- displaying the response from Mr. Fritsch on November 3rd, 2016.  Does this indicate that your e-mail was also cc'd to Mr. Polsen?

A.    It was.

Q.    And whose e-mail address is IHM@NorthRock.bm?

A.    Ian Mann's.

Q.    So what does Mr. -- oh, sorry about that.  Thank you.

So what does Mr. Fritsch say to you?

A.    "Hi, Danny.  Yes, we like that direction a lot.

"We like to continue on the board as with Dr. Marcel Reichart from the Central Board of Bertelsmann who is on our board since six months."

Q.    And then go to the next paragraph.

A.    "From here, we can add on with Alan Yan from Ad-China, now Alibaba, Martin Sorrel from WPP, Philippe Emelet

or Maurice Levy from Publicis, and Christian Schmalzl from Ströer, Steffi Czerny (DLD, Burda Media), Kevin Mayer, Disney. Those are the candidates we have on the burner."

Q.    And then can you move to the paragraph that says "As discussed in New York"?

A.    "As discussed in New York on Tuesday we will send our investment docs at the exact same terms from our last round with revised dates for you and Ian's review."

Q.    So is it fair to say Mr. Fritsch was continuing to solicit investments during this time?

A.    He was.

Q.    And from others as well?

A.    Yes.

Q.    Then turning to -- I'm going to display on the presenter a redacted version of Exhibit 186.

Mr. Guy, page 1 at the bottom, what do you write on November 2, 2016?

Wait.  I'm sorry.  Let's start -- page 2, excuse me, is the first e-mail.  November 2, 2016, Mr. Fritsch wrote what to you?

A.    "Very productive time with you and Ian in New York. Thanks lunch and the good input.  Just landed in L.A.

"Best, Bernhard."

Q.    Okay.  And then you respond with a multi-bullet response on November 2; right?

**UNITED STATES DISTRICT COURT**

A.    Yep.  "LOL.  So we need to move fast, Bernhard, to put this company in a more professional position."

Q.    Okay.  And so to summarize, you asked for audited financials, information about tax revenue, a new presentation; correct?

A.    Correct.

Q.    And you write "Things of concern to you, things of concern to me," that's your quote; right?

A.    Yes.

Q.    And what do you say there?

A.    "No audited financials.  Puts us at risk of not being able to raise money.  This should have been done a long time ago.  Frankly, it makes anyone skeptical.  This is crucial."

Q.    And then what do you say here in your sentence just below there?

A.    "Where did all the money go?  People need to know."

Q.    Okay.  And then does Mr. Fritsch respond to you on the same day?

A.    He did.  Yes.

Q.    And who -- did he cc somebody as well?

A.    Mr. Mann.

Q.    Okay.  And the subject line of this e-mail is?

A.    "New York."

Q.    All right.  What does he say?

A.    "Yes, we have to move very fast.  In fact, the company has been moving fast.  Otherwise, we would not have technology and deals in place.  One reason I wanted you to come to L.A. originally was to meet the team.  It has further improved and especially in the tech and product area.  It is extremely strong and became a powerhouse.  90 percent of the focus and funds are going towards tech development.

"Yes, we will improve corporate structures, reports, CFO, COO.  Let's talk this afternoon."

Q.    Thank you.

So what did you know by that time -- let me rephrase that.  Did you have any visibility by the end of 2016 into StarClub banking information, like their bank accounts?

A.    No.

Q.    Okay.  Through 2017, did Mr. Fritsch continue to encourage you to invest more money?

A.    He did.

Q.    So -- but by August of 2017, what was the status of StarClub and the deals with Disney he had discussed?

A.    They were nowhere.

Q.    And Ron Burkle?

A.    Nowhere.

Q.    How about the deals with Yucaipa?

A.    Nowhere.

Q.    Or Access?

**UNITED STATES DISTRICT COURT**

A.    Nowhere.

Q.    Warner?

A.    Nowhere.

Q.    Did there come a point at which you concluded that the Salida and Harrington investment in StarClub was a loss?

A.    Yes.

Q.    And let's just display Exhibit 206.

And, again, Exhibit 206 summarizes the five rounds of cash that Salida and Harrington invested with StarClub?

A.    It does.

Q.    Okay.

MS. TAIT:  Your Honor, one moment while I confer with my colleagues?

THE COURT:  Yes.

(Off-the-record discussion.)

MS. TAIT:  No further questions, Your Honor.

THE COURT:  Cross-examination.

MR. AMINOFF:  Your Honor, can I approach, please? Could I approach with the binders?

THE COURT:  Why don't you just put it up here.

MR. AMINOFF:  One for the witness.

THE COURT:  Oh.  For the witness?

MR. AMINOFF:  That's fine.

Thank you for your patience.

Proceed, Your Honor?

**UNITED STATES DISTRICT COURT**

THE COURT: Yes.

MS. AMINOFF: Thank you, Your Honor.

**CROSS-EXAMINATION**

BY MR. AMINOFF:

Q.   Good morning, Mr. Guy.

A.   Good morning.

Q.   How are you?

Sir, you're a hedge fund manager; right?

A.   Yes.

Q.   Okay.  And your business depends in part on people trusting you with their money; right?

A.   Absolutely.

Q.   Okay.  So it's important that you present yourself as someone who knows what he's doing with money; right?

MS. TAIT: Objection.  Relevance.

THE COURT: Overruled.

Speak closer to the microphone, please.

THE WITNESS: Yes.

Q.   (BY MR. AMINOFF:)  And you've obviously been very successful?

A.   In a relative basis, yes.

Q.   Okay.  And that's the image you want to convey; right?

A.   I think you earn that image over time.

Q.   Fair enough.

UNITED STATES DISTRICT COURT

But you testified on Friday about your career; right?

A.   Yes.

Q.   And you talked about how you built up Salida?

A.   Correct.

Q.   And you talked about how you started with only -- I mean, only -- but you started with only $15 million?

A.   Yes.

Q.   And then you got it up to 1.4, 1.5?

A.   Correct.

Q.   And Ms. Tait clarified you meant 1.4, 1.5 billion; right?

A.   Billion, yes.

Q.   Okay.  And you said that the fund grew like 100 -- sorry -- 1100 percent; right?

A.   Right.

Q.   I think you mentioned that twice.

A.   I think 1100 between 2001 and 2008, and then I grew it up 450 in '9 and '10.

Q.   I don't remember you clarifying that on Friday, that the 1100 percent was over a limited period of time.

THE COURT:  What you don't remember isn't relevant, please.

Q.   (BY MR. AMINOFF:)  Sorry.

You didn't clarify on Friday that the 1100 percent

UNITED STATES DISTRICT COURT

was over a limited period of time; isn't that right?

A.    I don't recall.

Q.    Okay.  In fact, your fund was down quite significantly in 2008, 2009, was it not?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  You ultimately elected to terminate some of the Salida funds in 2013; is that right?

MS. TAIT:  Objection, Your Honor.  Relevance.

MR. AMINOFF:  Your Honor, if I could respond.

(At sidebar:)

MR. AMINOFF:  Your Honor, this is Jon Aminoff from the defense.  The Government elicited in this witness's background and put this directly at issue.  Part of this goes to his bias.  It is essential to his reputation as a fund manager to establish that he was defrauded, he didn't make a bad investment.

THE COURT:  All right.  I'll allow it.

(In the presence of the jury:)

Q.    (BY MR. AMINOFF:)  So as I was saying, Mr. Guy, your fund went down rather significantly in 2008, 2009; isn't that right?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  2008.

**UNITED STATES DISTRICT COURT**

Q.     (BY MR. AMINOFF:)   Sorry.   I didn't catch your answer.

THE COURT:   Go ahead and answer.

THE WITNESS:   2008, yes, with the financial crisis.

Q.     (BY MR. AMINOFF:)   Yeah.   It went down to around 300 million?

A.     No.

Q.     How much from 1.4, 1.5 did it go down to?

A.     Well, we were primed at Lehman Brothers; right?   So we had onshore and offshore funds.   I don't recall, but I think with Lehman we lost 500.

Q.     Okay.   So it certainly wasn't 1100 percent throughout this whole period.   There's a point at which it declined rather dramatically; right?

A.     I think from the 2001 to 2008 but cumulative return, yes.

Q.     I don't think that was my question, sir.

So I understand there was a period of time in which your success rate was something like 1100 percent.   There was another period of time where it was significantly lower; isn't that right?

A.     What time period are you referring to?

Q.     Well, time period starting in 2008, 2009.

A.     We had a down year in 2008.   And then in 2009 and 2010, we went up 450 percent.

Q.    Okay.  But then you ultimately canceled a couple of
the Salida funds in 2013, didn't you?

A.    Which funds are you referring to?

Q.    Did you cancel any of your Salida funds in 2013,
sir?

A.    Not the offshore funds.  I think we had some onshore
funds, which I didn't manage, which were probably canceled,
yes.

Q.    Was one of those the Salida Wealth Preservation
fund?

A.    Yes.

MS. TAIT:  Objection.  Relevance.  Collateral.  403.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  Your answer was "yes," sir?

A.    Answer?

THE COURT:  Yes.

THE WITNESS:  Oh, yes.  It was an offshore fund run
by another gentleman, yes.

Q.    (BY MR. AMINOFF:)  And the Salida Strategic Growth
Fund was also canceled in 2013?

A.    Well, that turned -- no.  It was not.  No.

Q.    The director of that fund didn't send an e-mail to
the investors canceling that fund in 2013.  Is that your
testimony?

A.    The Salida Strategic Growth Fund -- I'd have to see

documents.  I don't think so because that fund remained.

Q.    Okay.  So your testimony is that fund was not canceled -- or terminated in 2013?

A.    The Salida Strategic Growth Fund which --

Q.    Salida Strategic Growth Fund.

A.    I don't recall.

Q.    How many funds do you have, sir?

A.    Currently one.

MS. TAIT:  Objection. Relevance.

Q.    (BY MR. AMINOFF:)  Currently one?  Okay.

And that one is Harrington Global Unlimited?

A.    Harrington Global Opportunities Fund, Limited, yes.

Q.    That's your only fund today?

A.    Correct.

Q.    Now, when this case was charged in 2017, the Harrington fund had approximately $85 million in it?

MS. TAIT:  Objection. Relevance.

THE WITNESS:  I don't recall.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  You don't recall?  Would perhaps looking at a report from your interview with the FBI refresh your recollection?

MS. TAIT:  Objection.

THE WITNESS:  Yeah.  Absolutely.

Q.    (BY MR. AMINOFF:)  Okay.  If you could turn to

**UNITED STATES DISTRICT COURT**

Tab 1146 in the white binder, please, sir.

A.    Sorry.  What number?

Q.    11 -- excuse me.  1146, one-one-four-six.

I'm going to ask you to just silently read to yourself the second full paragraph on page 1.  Just let me know when you're done.

(Pause in the proceedings.)

THE WITNESS:  Yep.  Okay.

Q.    (BY MR. AMINOFF:)  Is your memory now refreshed as to how much money the fund was managing in 2017?

A.    Um, yeah.  Somewhere between there and 150, I would suspect, yeah.

Q.    Did you tell the FBI, sir, that the fund was managing $85 million in 2017?

MS. TAIT:  Objection.  Extrinsic --

THE COURT:  Sustained.

THE WITNESS:  Yeah, because at that moment in time --

THE COURT:  No, sir.

Ask another question.

Q.    (BY MR. AMINOFF:)  You can close the binder.

Sir, did you also lose $150 million between 2015 and 2016?

MS. TAIT:  Objection.  Vague.

THE COURT:  Sustained.

UNITED STATES DISTRICT COURT

Q.    (BY MR. AMINOFF:)  Did you lose approximately $150 million on a Concordia investment between 2015 and 2016?

MS. TAIT:  Objection.  Relevance.  Collateral.  403.

MR. AMINOFF:  Your Honor, we've --

THE COURT:  Sustained.

Move on.

Q.    (BY MR. AMINOFF:)  Okay.  So you then move to Bermuda; right, sir?

MS. TAIT:  Objection.  Vague as to time.

Q.    (BY MR. AMINOFF:)  You moved to Bermuda in approximately 2014, sir?

A.    Yes, sir.

Q.    Okay.  And that was after closing the Salida funds in 2013?

A.    We were starting up again when I moved to Bermuda, so I moved the funds to Bermuda, yes.

Q.    Okay.  So Harrington is based in Bermuda; is that right?

A.    It is.

Q.    But it's incorporated in Luxemburg?

A.    No.

Q.    It's not incorporated in Luxemburg?

A.    It's not.

Q.    Were the funds held in Luxemburg?

A.    They were not.

UNITED STATES DISTRICT COURT

Q.    What is the relationship between Luxemburg and the fund?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, is Bermuda considered a tax haven?

MS. TAIT:  Objection.  Relevance.  403.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, I think on direct you described yourself as a sophisticated investor; is that right?

MS. TAIT:  Objection.  Misstates the testimony.

THE COURT:  Just answer the question.  If it's not right, you can say so.

THE WITNESS:  Yeah, relatively.

Q.    (BY MR. AMINOFF:)  I'm sorry.  Was the answer "not relatively"?

A.    I said relatively.

Q.    Oh, okay.  I thought that was -- that was fair to say.

Could you -- you defined several terms for Ms. Tait on direct examination.  Do you remember that?

A.    Refresh my memory.

Q.    Do you remember defining any terms for Ms. Tait? Did you define revenue for Ms. Tait?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    Okay.  Fair enough.

Do you remember -- could you define the difference between projected revenue and actual revenue for us?

A.    Projected is the financial projection, actual is your historic results.

Q.    So projected revenue is sort of a guess -- is that right? -- an educated guess?

A.    No, it's not a guess.  It's -- it's put together by companies for their auditing procedures for the coming year. It's definitely not a guess.  It's their best projection of what they believe is going to take place.

Q.    Okay.  So an estimate?

A.    Yeah.  Absolutely.

Q.    Okay.  Fair enough.

So at this point, you -- you testified that you control one fund; is that right?

A.    Yes.

MS. TAIT:  Objection.  Relevance as to what is controlled at this point now in time.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, you run the Harrington Global Unlimited Fund; is that right?

A.    Harrington Global Opportunities Fund, Limited, yes.

Q.    Sorry, sir.  I'm having a hard time hearing you. You said Harrington Global Opportunities?

**UNITED STATES DISTRICT COURT**

A.    Fund, Limited, yes.

Q.    Can you just describe your operation for me.  Do you have a staff working for you?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Did you have a staff working for you during the relevant period of this case, sir?

A.    I did.

MS. TAIT:  Objection.  Vague as to time.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, did you have a staff working for you between 2013 and 2017?

A.    Yes.

Q.    Okay.  What -- what did that look like?  How many people were working for you?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Um, well, the -- roughly, let's see. We had two traders in Toronto, two back office, a secretary, and some other people that were used in the office, yes.

Q.    (BY MR. AMINOFF:)  Were they all based in Bermuda?

A.    No.  They were in Toronto.

Q.    Toronto.

Did you have accountants working for you?

A.    Yes.

Q.    How many?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Two.

Q.    (BY MR. AMINOFF:)  Where were they based?

A.    Toronto.

Q.    And did they conduct audits or did you have auditors separately?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yeah, we had auditors to audit the funds, yes.

Q.    (BY MR. AMINOFF:)  And you had lawyers?

A.    Yes.

Q.    And where are your lawyers based?

A.    Kind of depends where we operate.  So Bermuda, Toronto.

Q.    California?

A.    Well, only when this happened.

Q.    You separately have lawyers in Northern California; right?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

THE WITNESS:  Are you speaking about the gentleman who's involved in the organized crime?  Is that who you're talking about?

MS. TAIT:  Your Honor, move to strike.  Objection.  Relevance.  Vague as to time.  It's not clear what time period we're discussing.

THE COURT:  Be more specific as to time, Mr. Aminoff.

And just answer the question you're being asked, Mr. Guy.

Q.    (BY MR. AMINOFF:)  Did you have lawyers in the Northern District of California in 2014?

A.    2014?  No.

Q.    2015?

A.    No.

Q.    2016?

A.    No.

Q.    2017?

MS. TAIT:  Objection.  Relevance.

THE WITNESS:  No.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  How about in New York?

MS. TAIT:  I'm sorry.  I didn't hear the question, Your Honor.

Q.    (BY MR. AMINOFF:)  How about in New York?  In 2014?

UNITED STATES DISTRICT COURT

MS. TAIT:  Objection.  Relevance.

THE COURT:  Time to move on, Mr. Aminoff.

MR. AMINOFF:  I'm sorry, Your Honor?

THE COURT:  Time to move on.

MR. AMINOFF:  Yes, Your Honor.

THE COURT:  Thank you.

Q.    (BY MR. AMINOFF:)  So, sir, I think you testified that you sat in on a bunch of pitch meetings during your time. Is that right?

MS. TAIT:  Objection.

THE WITNESS:  On StarClub or in general?

Q.    (BY MR. AMINOFF:)  No.  In general.

MS. TAIT:  Vague as to -- thank you.

Q.    (BY MR. AMINOFF:)  Just generally speaking, sir, you have participated in a lot of pitch meetings in your time?

A.    Yes, sir.

Q.    You certainly participated in a lot of pitch meetings before the subject matter in this case; right?

A.    Yes.

Q.    Okay.  And you told the FBI that, in your experience, CEOs tend to embellish in these meetings; is that right?

A.    Um, look, I mean, you have to be optimistic about the future.  You're investing in the future.  Yes.

Q.    And you're obviously familiar with the term

"puffery"?

A.    Yes.

Q.    Okay.  And you don't believe everything you hear in an advertisement?

A.    No.

Q.    Of course.

Sir, this isn't the first time you've testified, is it?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, have you sat for depositions in the past?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

MS. TAIT:  403 as well, Your Honor.

Q.    (BY MR. AMINOFF:)  Sir, you're currently suing Mr. Fritsch in the Los Angeles Superior Court, aren't you?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

MR. AMINOFF:  Your Honor, can I be heard on that one?

(At sidebar:)

MR. AMINOFF:  This is Jon Aminoff for the defense.

Your Honor, the fact that he's suing Mr. Fritsch, I think that's certainly relevant to his bias.

UNITED STATES DISTRICT COURT

THE COURT:  Ms. Tait.

MS. TAIT:  Well, Your Honor, it didn't come out on the direct, we didn't bring it out that --

MR. AMINOFF:  Bias is always --

THE COURT:  Yes.  Bias is already --

MS. TAIT:  Yeah, as long as extrinsic evidence --

MS. LEE:  (Unintelligible.)

MS. TAIT:  Yeah.  Exactly.

THE REPORTER:  I'm sorry, counsel, I can't hear you.

THE COURT:  Nobody can hear you, including me.

MS. LEE:  Sorry.  This is Sarah Lee for the Government.

It doesn't go to bias because he's just trying to cover money for his investors --

MS. TAIT:  In the fund.

MS. LEE:  -- in the fund.  And there are several other people that are named in that lawsuit.  So he's -- he's acting as a manager of the company and he's named multiple defendants in the lawsuit as well.

MS. TAIT:  He's also not the only plaintiff --

THE COURT:  I'm going to overrule the objection but very narrow, please, so -- and then you can redirect.

MR. AMINOFF:  Your Honor, I -- I'd like to ask him some questions about this litigation and then, more specifically, his -- his -- the actions he has taken to avoid

cooperating in any way with the defense, barring us in any way serving subpoenas on him.  I think that's all relevant.

We are very limited in the information we've been able to obtain from this witness.  And I think that goes directly to bias, and I should be allowed to ask.  And I'm assuming Ms. Tait is going to object, so I figure may as well bring it up now.

MS. TAIT:  Your Honor, the person is a foreign person.  He does not live in this country.  And the -- the Government doesn't think that that's appropriate.  He doesn't -- he's not subject to the Court's process that the defense is trying to serve --

MR. AMINOFF:  Your Honor --

THE COURT:  You can ask a very simple question of whether you've tried to get ahold of him or something like that, but that's it, really narrow.

MR. AMINOFF:  Could I just -- for the record, Your Honor, you have issued subpoenas in this case.

THE COURT:  Yes.

MR. AMINOFF:  Subpoenas all over the United States. I have contacted every single one of them trying to serve these subpoenas.  He forwards my e-mails to Ms. Tait and calls my actions illegal.  I think the fact that he is doing that is sort of extreme -- and then he's just nitpicking certain e-mails and providing them to the Government.  He hasn't

provided a full download.  The information you're seeing is incredibly limited, and I think the jury is entitled to know that.

MS. TAIT:  Your Honor, no objection has been made to the e-mails on the grounds that they are inauthentic or anything like that.  Mr. Guy is not required to accept service or his corporation is not required as a foreign company to accept service of process in the United States.

MR. AMINOFF:  I don't see what the problem is.

THE COURT:  It's not required to, but it's relevant that he didn't.  So just a few questions and then move on.

MR. AMINOFF:  Understood.

(In the presence of the jury:)

Q.    (BY MR. AMINOFF:)  Mr. Guy, we were talking about your civil suit against Mr. Fritsch.  Do you recall?

A.    Yes.

Q.    So you filed suit against Mr. Fritsch; correct?

A.    Yes, with two other plaintiffs.  Yeah.

Q.    And you also filed suit against several of his coworkers at StarClub?

MS. TAIT:  Objection.  Relevance.

THE WITNESS:  I don't recall.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  Including the CFO, Jim Polsen?

A.    I don't recall pleadings but --

Q.   Would it refresh your recollection to look at the pleadings?

THE COURT:  Doesn't matter.

MS. TAIT:  Objection.  Relevancy.

THE COURT:  Just move on.

Q.   (BY MR. AMINOFF:)  Okay.  Mr. Guy, you previously met with the Government in this case; is that right?

A.   Yes.

Q.   You -- you met with the FBI agents?

A.   Yes.

Q.   You've met with the prosecutors?

A.   Yes.

Q.   The three people sitting at this table right here?

A.   Yes.

Q.   Okay.  You've met with them at least ten times?

A.   No.  Not that much.

Q.   Okay.  Would it refresh your recollection to kind of flip through the FBI --

THE COURT:  He didn't say he doesn't remember.

And please speak into the microphone.  You can pull it closer to you.

THE WITNESS:  Yes, ma'am.

Q.   (BY MR. AMINOFF:)  Would you agree that you met with them more than five times?

A.   The people at the table?

**UNITED STATES DISTRICT COURT**

Q.    No.  Sorry.  Excuse me, sir.  Let me ask that a little bit better.

I'm asking if you've met with the FBI and the Government attorneys at least five times?

A.    Yes.

Q.    Okay.  Would you say ten times?

A.    No.

Q.    Okay.  So somewhere between five and ten times.

You provided them copies of some of your e-mails?

A.    Yes.  We gave them all those, yes.

Q.    Sir, you didn't give the Government all of your e-mails, did you?

A.    Whatever was pulled off the servers, yes.

Q.    So was it a select set of e-mails or was it all of your e-mails?

A.    Well, my understanding --

MS. TAIT:  Your Honor, vague as to time.  Objection.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Okay.  So, Mr. Guy, with respect to your involvement with Mr. Fritsch, is it your testimony that you gave the Government all of your e-mails?

A.    Yes.

MS. TAIT:  Objection.  Irrelevant and 403 and vague as to time.

THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

Q.    (BY MR. AMINOFF:)  And the Government asked you to provide other specific materials?

MS. TAIT:  Objection.  Vague as to time again.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I don't understand what you mean.

Q.    (BY MR. AMINOFF:)  Do you remember getting e-mails from Ms. Tait asking you for specific documents?

A.    Oh, yes.  To clarify, yes.  Yes.

Q.    And you provided those specific documents?

A.    Yes.

Q.    Just recently, the Government asked you for copies of transcripts of your depositions?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  Was that --

A.    Yes.  Yes.

Q.    And you provided some of those; is that right?

A.    Yes.  My understanding, yes.

Q.    You provided them with a deposition transcript from the Northern District of California?

MS. TAIT:  Objection.  Relevance as to the specifics.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Isn't it true that you only

UNITED STATES DISTRICT COURT

provided them with a portion of your deposition transcript --

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, are you aware that I tried to subpoena records from you?

A.    Um, yes.

Q.    You are.

Did you instruct your attorneys not to accept subpoenas?

MS. TAIT:  Objection as to counsel -- statements to counsel.

THE COURT:  Sustained.

MS. TAIT:  Privileged.

THE COURT:  Sustained.

You don't have to answer.

Q.    (BY MR. AMINOFF:)  Did you, in fact, forward my e-mails to the FBI?

A.    I forwarded my law firm's e-mails to the FBI, I think so, yeah.

Q.    Which included my e-mails?

A.    I think so.  Who are you, by the way?

Q.    My last name is Aminoff, sir.

A.    Oh, yes.  Yeah.

Q.    You remember my e-mails?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    And you forwarded them to the Government attorneys?

A.    Yes, I did.

Q.    You described my actions as highly inappropriate?

MS. TAIT:  Objection.  Relevance.

THE WITNESS:  Yeah.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  So in your opinion, a criminal defendant shouldn't conduct an independent investigation; is that right?

MS. TAIT:  Objection.  Argumentative.  403.

THE COURT:  Sustained.

THE WITNESS:  What relevance does it have?

THE COURT:  Don't answer.  Sustained.

Q.    (BY MR. AMINOFF:)  Did you understand that this Court had issued a subpoena for your records?

A.    Which I sent to my lawyers, yes.

Q.    And those were not provided to me?

A.    I, you know -- and?

Q.    You understood that I was trying to serve a subpoena from this Court on you; is that right?

MS. TAIT:  Objection as to the -- the legal implication, Your Honor.

THE COURT:  Sustained.

THE WITNESS:  Yes.  And my lawyer --

THE COURT:  Don't answer that.

THE WITNESS:  Okay.  Sorry.

Q.    (BY MR. AMINOFF:)  So essentially, in this case, if you've chosen to provide something, we can see it; is that right?

MS. TAIT:  Objection.  Argumentative.  Vague.  Misstates the testimony.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Is one of the advantages of living in Bermuda being beyond the subpoena power of this Court?

MS. TAIT:  Objection.  403.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, did you ever ask these three prosecutors if it was illegal for me to serve a subpoena on you?

MS. TAIT:  Objection.  Relevance.  403.

MR. AMINOFF:  Your Honor, I understood that we could get into some of this.  So far, I don't feel like I've really --

THE COURT:  Sustained.  Ask another question.

Q.    (BY MR. AMINOFF:)  Did these three attorneys ever tell you that it was perfectly appropriate for me to serve a subpoena on your attorneys?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

Q.    (BY MR. AMINOFF:)  It was overruled, sir.

A.    I don't recall.

Q.    You don't remember?

Sir, I notice that with -- I would say a vast majority of Ms. Tait's questions, you did not say "I don't remember."  Is that right?

A.    Depends what she's asking.

Q.    Did you and Ms. Tait prepare a lot for your testimony today?

A.    No.

Q.    You didn't prepare?

A.    A little bit.

Q.    A little bit.

So you just -- you have a remarkable recall for memory; is that right?

THE COURT:  No comments.

MR. AMINOFF:  I apologize, Your Honor.

THE WITNESS:  Well, sir --

Q.    (BY MR. AMINOFF:)  There no pending question.

A.    You know, when someone --

THE COURT:  Don't answer.  Hey.  Stop.

Q.    (BY MR. AMINOFF:)  All right.  Let's talk about your January 30, 2015, investment in StarClub.  Shall we?

A.    Okay.

Q.    So on January 30, 2015, you caused a wire to be sent

UNITED STATES DISTRICT COURT

from Harrington to StarClub?

A.    Yes.

Q.    And that was for $7 million?

A.    You want to refresh me, yes.  But yes, I think so.

Q.    Fair enough.

So by this time, you'd known Mr. Fritsch for a little over a year?

A.    Sure.  Yeah.

Q.    On direct examination, you discussed statements Mr. Fritsch had made about a company called Universal.  Do you remember that?

A.    I do.

Q.    And you understand this to be NBC Universal?

A.    Yes.

Q.    And you testified that Mr. Fritsch was optimistic about a deal closing with -- with NBC Universal; is that right?

MS. TAIT:  Objection.  Misstates testimony, as I recollect it.

THE COURT:  Well, then, he can say no.

MS. TAIT:  Okay.

THE COURT:  Go ahead and answer.

THE WITNESS:  As the e-mails lay out, yes.

Q.    (BY MR. AMINOFF:)  And I believe you -- you -- I believe you testified to an e-mail where Mr. Fritsch said he thought the deal with Universal would close between August 22nd

and 28th, 2014; is that right?

A.    I think that's what that e-mail said, yes.

Q.    Now, you also discussed a company called Yucaipa?

A.    Yes.  In his e-mails, yes.

Q.    And you know someone named Ron Burkle to be the managing partner of Yucaipa?

A.    I didn't know him at the time.  I knew of him, yes.

Q.    And, again, I believe we looked at an e-mail where Mr. Fritsch said he expected the deal to close between August 22nd and August 28th, 2014?

A.    Yeah.  If that's what the e-mail said, yes.

Q.    And then you also talked about a company called Access.  Do you remember that?

A.    I do.

Q.    And, again, Mr. Fritsch spoke optimistically about a deal with Access?

A.    He did.

Q.    And Mr. Fritsch stated that he thought the deal would close with Access around January 15th, 2015?

A.    Again, if it's in the e-mails, yes.

Q.    Okay.  Do you want to see the e-mail?

A.    No.  I'm good.

Q.    So, then, in January 2015, you made this large $7 million investment in StarClub; correct?

A.    Correct.

Q.    Now, prior to making that investment, you requested some information from the StarClub CEO, James Polsen?

A.    Yes.  Most likely.

Q.    Could you turn to Tab 1160, please.

(Exhibit No. 1160 for identification.)

Q.    (BY MR. AMINOFF:)  Just let me know when you get there, please.

A.    Yeah.  I'm there.

Q.    Do you recognize that document?

MS. TAIT:  Your Honor, I would be objecting to this document as hearsay.

MR. AMINOFF:  Your Honor, it's offered for the effect on the listener.

MS. TAIT:  Your Honor, I think the only effect is whether --

THE COURT:  Stop --

MS. TAIT:  Sorry, Your Honor.

THE COURT:  -- arguing in front of the jury.

THE WITNESS:  1160; correct?

Q.    (BY MR. AMINOFF:)  Just a second, sir.

(At sidebar:)

THE COURT:  Okay.  What's this?

MR. AMINOFF:  So, Your Honor, this is an e-mail from the CEO to Mr. Guy containing cap giving.  And I'm proffering it purely based on the actions Mr. Guy took after receiving

this.

THE COURT: Not for its truth.

MR. AMINOFF: Not for its truth.

MS. TAIT: Well, Your Honor, it's prejudicial. It's 403. This is feeding into narrative. The jury is going to see these references to Euro-Dutch Trust and other things that the defendant would want to say are his investments in StarClub. So I believe that this is a disguised offer as for truth.

MR. AMINOFF: Your Honor, if I might respond. The Government already offered a -- a statement showing deposits to Euro-Dutch Trust. If that's what they were worried about, that's all been --

THE COURT: That's admitted.

MR. AMINOFF: Thank you.

(In the presence of the jury:)

Q.   (BY MR. AMINOFF:) So, sir, we were looking at Tab 1160. Are you there?

A.   Yeah. Can you put it on the screen?

Q.   Not yet, not until the Court tells me I can.

THE COURT: Yes, you can. It's admitted not for the truth of the matter asserted.

(Exhibit No. 1160 received into evidence.)

MR. AMINOFF: Thank you.

Q.   (BY MR. AMINOFF:) That's an e-mail from James Polsen to you, sir?

UNITED STATES DISTRICT COURT

A.    It is.

Q.    And he's sending along some financial documents; right?

A.    He is.

Q.    And you received that around January 21st, 2015?

A.    Yes.

Q.    Okay.  Could you turn to the second page, please?

And there's the capitalization table you requested; is that right?

MS. TAIT:  Objection.  Misstates -- misstates the -- page 1.

THE COURT:  Well, just yes or no.

Q.    (BY MR. AMINOFF:)  The page numbers are at the bottom of the page.  It says --

A.    I see it, yeah.

Q.    -- the exhibit number and then page 2 of 3.

A.    What are you asking?

Q.    That's the capitalization table; correct?

A.    For converting the convertible debt on page 2 --

Q.    Sir, if you see at the top of page 3, does it not say "StarClub Capitalization Table"?

A.    Yeah.  It does on page 3, correct.

Q.    I'm looking at page 2.  Do you see at the bottom it says page 2 of 3?  Do you see that?

A.    I do.

**UNITED STATES DISTRICT COURT**

Q.    So let's look at that page.

Now, at the top of that page, I see -- the top left, it says, "StarClub."  Do you see that?

A.    I do.

Q.    And below that, it says, "StarClub Capitalization Table."  Do you see that?

A.    I do.

Q.    Excellent.

Now, referring to the fourth line below "Conversion of Debt," you see a reference to Salida?

A.    I do.

Q.    Okay.  Now, nowhere in that document does it --

MR. AMINOFF:  Oh, no, no.  Take it down.

Q.    (BY MR. AMINOFF:)  Nowhere in that document does it list Universal as a shareholder, does it?

A.    Well, this is the convertible debt --

Q.    Sir, if you could kindly answer my question, we can move this along.

A.    Well, you've got to know what you're talking about.

Q.    Yeah.  So my question is:  Do you see Universal listed on that document?

A.    Well, did Universal own the convertible debt?

Q.    Sir, I'm going to do the asking of the questions.

THE COURT:  I give the instructions to the witness.

MR. AMINOFF:  Apologies, Your Honor.

THE COURT:  Just answer the question and then move --

THE WITNESS:  I do not see --

THE COURT:  -- move on, Mr. Aminoff.

Go ahead.

THE WITNESS:  Yeah.  I do not see Universal on that page.

Q.    (BY MR. AMINOFF:)  Do you see Yucaipa on that page?

A.    I do not.

MS. TAIT:  Objection.  Relevance.

THE COURT:  What he sees on there isn't relevant. We all have it.

MR. AMINOFF:  Your Honor, the Government --

THE COURT:  Do you have a question to ask?

MR. AMINOFF:  I was going to ask if he saw Access on that page.  Can I ask him that?

MS. TAIT:  Your Honor, objection.  Relevance and unfairly characterizes the document.  403.

THE COURT:  It's not there.  Move on.

THE WITNESS:  Sir, this is a convertible debt analysis.

THE COURT:  Do not answer.

MR. AMINOFF:  Thank you.

THE COURT:  Just listen to the questions, please, Mr. Guy.

UNITED STATES DISTRICT COURT

THE WITNESS:  Yes, Your Honor.

THE COURT:  Ms. Tait will have another opportunity to ask you questions.

Q.    (BY MR. AMINOFF:)  Now, sir, we established that you received this document on January 20th; correct?

A.    Yes.

MS. TAIT:  Objection.  Misstates the date.

Q.    (BY MR. AMINOFF:)  Excuse me.  January 21st.  My mistake.

A.    Yes.

Q.    And then you made your $7 million investment on January 30th; correct?

A.    Yes.

MR. AMINOFF:  Okay.  You can bring that down.  Thank you.

Q.    (BY MR. AMINOFF:)  Mr. Guy, Ms. Tait covered with you in great detail some of the purchase agreements that you signed in this -- or your agent signed in this case.  Do you recall that?

A.    I do.

Q.    Okay.  I'd like to discuss those with you now.

You know a person named Ian Clark; right?

A.    I do.

Q.    And he used to work for you?

A.    Yeah, he worked in the Canadian office, yeah.

Q.    He performs trading functions for you?

A.    He did trading and back office functions, yes.  He had signing authority on the funds.

Q.    And just to expose my ignorance, what is back office functions?

A.    Settlement, settlement of the securities.

Q.    And you delegated authority to him to sign documents on behalf of Harrington; is that right?

A.    Yeah.  That's correct.

Q.    So I'd like to refer you to Tab 1161, which has already been admitted under the Government's exhibit number --

(Exhibit No. 1161 for identification.)

MR. AMINOFF:  Do we know what that is?

MS. TAIT:  Your Honor, to be clear, the attachment, I think, to 1161 may have been admitted.  Is that --

THE COURT:  All right.

MR. AMINOFF:  Could we work off of that document, Your Honor?

THE COURT:  Off 1161?

MR. AMINOFF:  Off 1161.

THE COURT:  Yes.

MR. AMINOFF:  Could we publish that, please?

MS. TAIT:  Your Honor, we just object to page 1, Your Honor.

MR. AMINOFF:  We won't use page 1, Your Honor.

**UNITED STATES DISTRICT COURT**

THE COURT:  All right.  1161, 2 through 14.

(Exhibit No. 1161, pages 2 - 14,

received into evidence.)

THE COURT:  You're showing page 1 now so --

MR. AMINOFF:  Oh, yeah.  Can you skip that.

Q.    (BY MR. AMINOFF:)  So this is the January 30, 2015, purchase agreement contract between Harrington and StarClub; is that right?

A.    It is.

MR. AMINOFF:  Maybe skip to the last page.

THE WITNESS:  Yes.

Q.    (BY MR. AMINOFF:)  Okay.  Now, you covered several provisions of this contract with Ms. Tait.  I wanted to focus on a couple that were not yet covered.

MR. AMINOFF:  If we could go to 1161 at page 4, paragraph 6.

Q.    (BY MR. AMINOFF:)  And if you could look at paragraph 6(b)?

A.    Yeah.  Can you blow it up?

Q.    And in this paragraph, Harrington certifies that it's received all the documents that it has requested; is that correct?

MS. TAIT:  Objection.  Relevance, Your Honor, in a criminal case.

THE COURT:  Overruled.

THE WITNESS:  It's just saying that the securities are exempt from the Securities Act.

Q.    (BY MR. AMINOFF:)  Sorry, sir.  6(b).

A.    Oh, prior -- sorry.

Q.    No problem.

A.    I'm not exactly sure what that's all referring to but yes.

Q.    Do you understand that that is referring to the purchaser acknowledging that they've received all the documents that they've requested?

A.    Pertaining to this subscription agreement?

Q.    Sure.

A.    Yes.

Q.    And carefully reviewed them?

A.    Yes.

Q.    And understand the information therein; is that right?

A.    Correct.

Q.    If we could go down to paragraph 6(d).  (d).

And in this paragraph, we're clarifying that StarClub has made all the documents, records, and books available to you for inspection?

A.    Okay.

Q.    Do you agree that's what that document says, sir?

A.    That's what the document says, yes.

Q.    Excellent.

And if we could go down to 6(f), please.

And here, it says that you did not rely on any representations made by StarClub?

A.    Okay.

Q.    It says that; right, sir?

A.    That's what it says, yeah.

Q.    And then if we go to -- staying on 6(f), it also says you did not rely on any information provided by StarClub; is that right?

MS. TAIT:  Objection, Your Honor, based on a criminal case.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  If we go to paragraph 6(i), this certifies that you relied on the advice of your own advisors; is that right?

MS. TAIT:  Same objection, Your Honor.

THE COURT:  Sustained.

THE WITNESS:  I guess that's what it says.

THE COURT:  Don't answer.

THE WITNESS:  Sorry.

Q.    (BY MR. AMINOFF:)  And also in 6(i), that you did not rely on the advice of any employee or agent of StarClub?

MS. TAIT:  Same objection, Your Honor.

THE COURT:  The objection is sustained.

UNITED STATES DISTRICT COURT

MR. AMINOFF:  I'll move on, Your Honor.

THE COURT:  It is not relevant.

Q.    (BY MR. AMINOFF:)  If we go to paragraph 6(l), here you acknowledge the substantial economic risks of this investment; correct?

A.    As in all investments, correct.

Q.    And if we go to 6(n), you were specifically warned that this was a high risk investment?  Oops.  Sorry.  Excuse me.

A.    That's what it says.

Q.    All right.  And 6(n) also notes very significant risks to this investment?

A.    It does.

Q.    That the company has a limited operating history?

A.    It does.

Q.    Limited assets?

A.    Sure.

Q.    Sorry.  I couldn't hear you.

A.    That's what it says, yeah.

Q.    And, also, that the company is -- the company being StarClub is engaged in a highly competitive business?

A.    Yes.

Q.    And if we go to paragraph 6(t).  And here, you acknowledge that no oral representations have been made --

MS. TAIT:  Objection.  Relevance in a criminal case.

**UNITED STATES DISTRICT COURT**

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  And then if we go to paragraph 18(a), that should be on page 12.

MS. TAIT:  Objection again.  Relevance in a criminal case.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Now, you understood that you could negotiate for additional clauses in the contract; correct?

A.    At certain times, yes.

Q.    I believe you testified on direct that you did, in fact, negotiate for a downward price?

A.    On pricing, yes.

Q.    Yeah?

So if something was particularly important to you, you could negotiate to have it included in the contract; is that right?

A.    Potentially.

Q.    Potentially or yes or no?

A.    You know, it's usually an agreement between the company --

MS. TAIT:  Objection.  Argumentative.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  Why don't I just re-ask the question.

You understood that if something was particularly important to you, you could negotiate to try to have it in the contract; is that right?

A.    Potentially, yes.

MR. AMINOFF:  We can bring that down.

Q.    (BY MR. AMINOFF:)  Mr. Guy, I'd like to talk to you a little bit about due diligence.  Is that a term you're familiar with?

MS. TAIT:  Objection, Your Honor.  Relevance. Motion in limine.

MR. AMINOFF:  I don't think that was covered by the motion in limine, Your Honor.

THE COURT:  Counsel approach.

(At sidebar:)

MS. TAIT:  Your Honor, Monica Tait.  I think the defense is going to get into -- going to get into blaming the victim for not doing certain things with respect to investigating StarClub and the allegations that Mr. Fritsch was making to him.

MR. AMINOFF:  I'm not going to do that, Your Honor.

THE COURT:  What are you going to do?

MR. AMINOFF:  Your Honor, my plan, first of all, is -- the Government actually elicited testimony on direct -- sorry.  Jon Aminoff for defense.

The Government elicited testimony on direct about

these contracts in very great detail.  Part of that included the due diligence that was in the first two, I believe.  The Government actually asked specifically about the people involved in that due diligence -- Byron Capital.

I think you did ask him that.

In addition, Your Honor, he testified multiple times that he had no way of getting any materials from this company aside from Mr. Fritsch and the due diligence process --

THE COURT:  I think you can ask him questions that relate to the truth of what his other options might have been, since he said there were none.

MR. AMINOFF:  Can I go into the detail of the process in the first two investments?  Because it's in the contract.  It's 7 percent to have due diligence done.

MS. TAIT:  The only purpose for showing that, Your Honor, is for the financial analysis, is to be able to tie the money that the person spent that came from Goodmans and that came from Byron.

MR. AMINOFF:  These are facts that are not in evidence.

MS. TAIT:  Well, they are, because he testified that not all of his money went in there so that when the jury sees the financial analysis, that they're not looking for a payment in the amount that he paid because it doesn't match that amount.  That's the commission.  That's the only part of the

**UNITED STATES DISTRICT COURT**

Government's questioning on that.

We didn't talk to him about due diligence in the sense that the company's lawyers, not Mr. Guy's lawyers, were doing investigations into the company. That was not the subject of direct at all.

MR. AMINOFF: Okay. But you touched on it and you put the entire document into evidence, so the jury is going to have it. I think I'm allowed to probe a little.

THE COURT: You think the jury is interested in any of these tons of documents?

MR. AMINOFF: It's fascinating, Your Honor.

MS. TAIT: Oh, I'm sure they were excited when I mentioned Goodmans and Salman, but it was solely for the financial analysis to be able to explain why the jury is not going to see an exact wire transfer in the amount of $2.5 million because they had to pay these commissions.

MR. AMINOFF: And that will be your argument.

MS. TAIT: That was the question.

MR. AMINOFF: You specifically brought it up. You brought up due diligence. You brought up the people involved. They're going to see the contracts.

THE COURT: Stop arguing.

MS. TAIT: I don't believe I said --

THE COURT: You can cross-examine on due diligence to the extent that he was saying that he only had Mr. Fritsch

to rely on.

MR. AMINOFF:  Can I ask him about it being in the contracts?

THE COURT:  About what being in the contracts?

MR. AMINOFF:  There was a due diligence clause in the first two contracts for which he made -- that's what we were just arguing about, that's what we were just discussing, the 7 percent.

MS. TAIT:  Your Honor, that was -- those firms worked for StarClub.  They did not work for this investor.

MR. AMINOFF:  That's not true.  I -- Byron Capital is his longtime accountant.

MS. TAIT:  But not in that contract.  That contract, Byron Capital represented StarClub.

MR. AMINOFF:  He brought Byron Capital in.

MS. TAIT:  That's a fact not in evidence.  That's not what the contract said.  The contract said that --

MR. AMINOFF:  Why --

MS. TAIT:  Well, because it's not relevant.  The contract said --

THE COURT:  Oh, go ahead and ask.

MR. AMINOFF:  Thank you, Your Honor.

(In the presence of the jury:)

Q.   (BY MR. AMINOFF:)  Thank you for your patience, Mr. Guy.

UNITED STATES DISTRICT COURT

So I was just starting to ask you about due diligence.  You are familiar with the term "due diligence," I'm assuming?

A.    I am.

Q.    Okay.  It's an investigation of sorts; is that right?

A.    It is.

Q.    Okay.  In the world of sort of venture capitalism, is it fair to say that it's a process by which an investor investigates a company before making an investment?

MS. TAIT:  Objection, Your Honor.  403.  Relevance.

THE COURT:  Sustained.

The specific items, Mr. Aminoff.

MR. AMINOFF:  Okay.  I was just trying to get a clear sense of -- okay.

Q.    (BY MR. AMINOFF:)  So going back to your -- the contracts, maybe we could look at Government 191, which I believe is already in evidence.  And if you could go to page 13, Article 8, Section 8.1.

So this section indicates that the agent is going to receive a 7 percent commission on this deal; is that right?

A.    That is correct, yes.

Q.    Okay.  And that's being paid out of StarClub's -- that's being paid out of the investment?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    Okay.  And the agent on this first deal was Byron Capital; is that right?

A.    Mr. Campbell Becher, yes.

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  And you have a fairly longstanding relationship with Mr. Becher; is that right?

A.    No.  We don't, actually.

Q.    You don't have a relationship with Byron Capital, sir?

A.    They were the broker that covered our funds, yes.

Q.    Okay.  If we could go to page 20.

MR. AMINOFF:  If you could zoom in on "Conditions Precedent."

Q.    (BY MR. AMINOFF:)  So as a condition precedent of this contract, the money would not be released until the agent was satisfied --

MS. TAIT:  Objection, Your Honor.  Relevance as to the -- the position of the agent who worked for StarClub.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  And these funds were ultimately released; correct?

A.    Yes.

Q.    Okay.

MS. TAIT:  Objection.  Calls for speculation.

**UNITED STATES DISTRICT COURT**

MR. AMINOFF:  I think he knows whether --

THE COURT:  Well, don't guess.  Do you know?  Do you know whether the funds were released?  Don't guess.

THE WITNESS:  I -- I only can assume, Your Honor.

Q.    (BY MR. AMINOFF:)  Okay.

MS. TAIT:  Your Honor, move to strike that response.

THE COURT:  That will be stricken.

MR. AMINOFF:  And then if we can go to Government 192, please.  And if we go to page 2.

Q.    (BY MR. AMINOFF:)  And we have the same agent, Byron Capital, again?

MS. TAIT:  Again, Your Honor.  Objection.  Relevance.

THE COURT:  Just yes or no.  Yes or no, sir?

THE WITNESS:  Yes, you do.  Yes.  Sorry.

Q.    (BY MR. AMINOFF:)  And page 20, please.

And, again, the due diligence --

MS. TAIT:  Again, Your Honor, same objections.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  And then after these first two contracts, the rest of your contracts do not include a due diligence provision, do they?

MS. TAIT:  Objection, Your Honor.  Relevance.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Okay.  Let's discuss

Goldman Sachs.

MR. AMINOFF:  You can bring that down.

Q.    (BY MR. AMINOFF:)  So I believe you testified on direct that you had connected Mr. Fritsch with some people at Goldman Sachs; is that right?

A.    That is correct.

Q.    Okay.  And you introduced him to someone named Mike -- is it Yaeger?

A.    Yes.  Mr. Yaeger.

Q.    And that was in June of 2014?

A.    Um --

Q.    Do you not recall?

A.    Roughly.  I mean -- yeah, roughly.

Q.    You have a working relationship with Mike Yaeger; is that right?

A.    I did, yes.

Q.    Would you describe yourself as friends?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.  Put time frames, counsel, for all these questions, please.

MR. AMINOFF:  Maybe another hour, Your Honor?

THE COURT:  Another -- I beg your pardon?

MR. AMINOFF:  Another hour maybe, Your Honor?

THE COURT:  Before a break?

MR. AMINOFF:  Oh, I'm sorry.  Are you asking --

THE COURT:  I said put time frames in your questions.

MR. AMINOFF:  Oh, I'm sorry.  I misunderstood you. I'm so sorry.  Sorry.

Q.   (BY MR. AMINOFF:)  So prior to 2014, would you have described yourself as friends with Mr. Yaeger?

A.   No.  I was a client of his, you know, but we became closer over time, sure.

Q.   If he described you as a good friend, would that not be accurate, in 2014?

A.   '14?

MS. TAIT:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

THE WITNESS:  I consider him a friend.

THE COURT:  If I say "sustained," don't answer the questions.

THE WITNESS:  Sorry, Your Honor.

MS. TAIT:  Move to strike, Your Honor.

THE COURT:  It will be stricken.

Q.   (BY MR. AMINOFF:)  Did you understand that after you introduced Mr. Fritsch to Mr. Yaeger in 2014, that he met with representatives of Goldman Sachs in 2014?

A.   It's my understanding, yes.

MS. TAIT:  Objection.  Relevance.

MR. AMINOFF:  Can I respond, Your Honor?

UNITED STATES DISTRICT COURT

THE COURT:  Overruled.  Just ask another question.

Q.    (BY MR. AMINOFF:)  And you understand that Mr. Yaeger introduced Mr. Fritsch to someone named Aaron Siegel?

A.    Yes.

Q.    And that was in August of 2014?

A.    Roughly.

Q.    And you were acquainted with Mr. Siegel; right?

A.    No.

Q.    You're not acquainted with Mr. Siegel?

A.    No.

Q.    Oh, okay.

And Mr. Fritsch informed you that he had a call scheduled with Mr. Siegel?

MS. TAIT:  Objection, Your Honor.  Hearsay.

MR. AMINOFF:  Your Honor, the Government brought in an e-mail showing this call, it's already in evidence.

THE COURT:  Well, refer to the e-mail, then.

MR. AMINOFF:  Sure.  Let's do it this way.

Q.    (BY MR. AMINOFF:)  Sir, can I refer you to Tab 1177, please.

(Exhibit No. 1177 for identification.)

Q.    (BY MR. AMINOFF:)  Do you recognize that document?

A.    I do.  Do you want to put it on the screen?

MR. AMINOFF:  Move to admit.

UNITED STATES DISTRICT COURT

MS. TAIT:  No objection, Your Honor.  We think it is the same as a Government exhibit, but I don't have the number on it.

THE COURT:  All right.  That's admitted.

(Exhibit No. 1177 received into evidence.)

Q.    (BY MR. AMINOFF:)  So Mr. Fritsch informed you that he had a call scheduled with Mr. Siegel; is that right?

A.    Yes.

Q.    And it was your opinion that Mr. Siegel would be an important contact with -- for Mr. Fritsch because StarClub was going to be bought out at this time?

MS. TAIT:  Objection.  This calls for speculation, as he does not know Mr. Siegel.

THE COURT:  Overruled.

If you have an opinion, you can answer.

THE WITNESS:  I introduced Mr. Fritsch, StarClub, to Mr. Yaeger.  Mr. Yaeger works within the group, and then he would show these projects to certain groups if they had an interest.  Mr. Siegel was the investment banker in one of the groups at -- at Goldman Sachs.  I've never met the man.  That's all I know.

Q.    (BY MR. AMINOFF:)  So you sent Mr. Fritsch this e-mail; correct?  That's your e-mail address at the top of the page?

A.    It is, yeah.

UNITED STATES DISTRICT COURT

Q.    And you say to Mr. Fritsch, "You need a banker because you will be bought"; right?

A.    From -- yeah.  With everything that he's saying is happening at his company, yes.

Q.    So your opinion was that it was important for Mr. Fritsch to have this contact with Mr. Siegel because he would be bought out; right?

A.    Yes, that's what he's telling me.

Q.    If you could just answer my question, please.

So that was your opinion at this time; is that right?

A.    Yes.  Typically when companies --

Q.    Thank you.

A.    -- are being sold, they need a banker.

MR. AMINOFF:  Your Honor, move to strike as nonresponsive.

THE COURT:  Everything after "Yes" will be stricken.

MR. AMINOFF:  Thank you.

Q.    (BY MR. AMINOFF:)  And your opinion was that StarClub needed an additional 30 million in capital; is that right?

A.    From what Mr. Fritsch was telling me.

Q.    So -- sir, I understand that you want to give a lot more information --

THE COURT:  Mr. Aminoff --

MR. AMINOFF:  Sorry, Your Honor.

THE COURT:  -- don't instruct the witness, please.

If it's a yes or no question, sir, just say yes or no.

THE WITNESS:  Yes, ma'am.

Q.   (BY MR. AMINOFF:)  So, sir, it was your opinion that StarClub needed an extra $30 million in capital; is that right?

A.   Again, sir, it's from what Mr. Fritsch told me.  Okay?  So, yes --

THE COURT:  There is that yes or no.

THE WITNESS:  Okay.  No.

Q.   (BY MR. AMINOFF:)  And you're speaking directly with Mr. Yaeger at this time; right?

A.   Yes.

Q.   And Mr. Yaeger's kind of reporting back to you on the Goldman Sachs -- Mr. Fritsch contacts at this time; is that right?

MS. TAIT:  Objection.  Hearsay and relevance.

MR. AMINOFF:  Goes to the witness's state of mind, Your Honor.  It's not offered for the truth.

THE COURT:  Sustained.

Q.   (BY MR. AMINOFF:)  Is that correct?

MS. TAIT:  I think the question's sustained.

THE COURT:  The objection is sustained.

MR. AMINOFF:  Oh, I'm sorry.  Sustained.  I'm so

UNITED STATES DISTRICT COURT

sorry.

THE COURT:  Ask a different question.

Q.    (BY MR. AMINOFF:)  So you understood that Mr. Fritsch would be having a call with Mr. Siegel on approximately August 12th; is that right?

A.    My understanding.

Q.    Okay.  Could you have a look at Tab Number 1172, please.

(Exhibit No. 1172 for identification.)

MS. TAIT:  The Government objects to this as hearsay.

MR. AMINOFF:  It's not offered for the truth, Your Honor.

MS. TAIT:  Your Honor, I suspect it is being offered for its truth.

MR. AMINOFF:  No, Your Honor.  It's being offered for the effect on the listener.

MS. TAIT:  Your Honor, I don't know how the effect on --

THE COURT:  Stop arguing in front of the jury.

MS. TAIT:  Sorry.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, if you could look at Tab 1178, please.

(Exhibit No. 1178 for identification.)

UNITED STATES DISTRICT COURT

Q.    (BY MR. AMINOFF:)  I believe you testified to this document on direct.

MR. AMINOFF:  Is that right, Ms. Tait?

THE WITNESS:  Looks familiar, yes.

MS. TAIT:  This is Exhibit 115, as far as I can tell.  The time stamps may be different, but I think the content --

THE COURT:  All right.

MR. AMINOFF:  Move to admit, Your Honor?

THE COURT:  Yes.

MR. AMINOFF:  Publish, please?

THE COURT:  Yes.

MR. AMINOFF:  Thank you.

(Exhibit No. 1178 received into evidence.)

Q.    (BY MR. AMINOFF:)  Sir, I believe you testified to this e-mail on direct examination.  Do you recall that?

A.    Yes.

Q.    And Mr. Fritsch is speaking rather optimistically about -- about Disney; is that right?

A.    Among others, yeah.

Q.    Yeah.

And he suggests involving Mr. Siegel; is that right? Bullet Point Number 3, paragraph Number 3.

A.    Yes.  Yes.

Q.    And you respond, "Let's get Aaron engaged"?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    And you are having an ongoing dialogue with Goldman Sachs at this time, are you not?

MS. TAIT:  Objection.  Relevance.  And hearsay.

MR. AMINOFF:  Your Honor, could we approach?

THE COURT:  Overruled.

MR. AMINOFF:  Thank you.

Q.    (BY MR. AMINOFF:)  It was overruled.

THE COURT:  Just yes or no.

THE WITNESS:  With Michael Yaeger, yes.

Q.    (BY MR. AMINOFF:)  With Michael Yaeger.  Okay.

And so after receiving this e-mail, did you contact Mr. Yaeger?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

Just yes or no.

THE WITNESS:  No.  I don't recall.

Q.    (BY MR. AMINOFF:)  If you could turn to Tab 1172, please.

Let me know if you -- when you get there.

(Pause in the proceedings.)

THE COURT:  Didn't I just look at that?

MR. AMINOFF:  I think I said 1172.  I meant 1179. Sorry.

(Exhibit No. 1179 for identification.)

**UNITED STATES DISTRICT COURT**

MS. TAIT:  Hearsay as to this document, Your Honor.

THE COURT:  Sustained.

THE WITNESS:  Okay.

MS. TAIT:  I believe the objection is sustained.
Correct, Your Honor?

THE COURT:  Yes.

MS. TAIT:  Thank you.

Q.    (BY MR. AMINOFF:)  Sir, are you denying that you were in regular contact with Goldman Sachs at this time?

A.    No.

Q.    Okay.  And, in fact -- in fact, you spoke with Aaron Siegel on August 20th of 2014; correct?

A.    I don't recall.

MS. TAIT:  Objection, Your Honor.  Irrelevant.

MR. AMINOFF:  Your Honor, could -- I hate to ask, but could we approach again?

(At sidebar:)

MR. AMINOFF:  Your Honor, I think the relationship with Goldman Sachs -- sorry.  This is Jon Aminoff from the defense.

I think the relationship with Goldman Sachs is highly relevant to everything that is going on here.  They are involved in all of this, and Mr. Guy is talking to them constantly.

So to the extent that Mr. Fritsch says anything

**UNITED STATES DISTRICT COURT**

about Goldman Sachs, Mr. Guy knows exactly what's happening. He knows if it's true or not.

The other thing is, for over a year, Goldman Sachs is saying to him this company needs more money and we have to build up the platform. It's not ready to be sold. It's happening constantly. That's -- that's what's going on in his subjective state of mind, and that's what I'm offering this evidence to show because he -- he -- he's not considering the statements that Mr. Fritsch is making. He knows the true status of the company.

MS. TAIT: Your Honor, it's interesting, with respect to the Goldman Sachs information, I don't have any separate information about what Goldman Sachs did or didn't know with respect to this at the time. But I believe he would be the appropriate witness to the contents of those conversations.

MR. AMINOFF: I disagree, Your Honor. It's in e-mails between Goldman Sachs and Mr. Guy that he then forwards to the client and he -- to Mr. Fritsch and he and Mr. Fritsch then talk about it.

Also, the Government introduced the relationship with Goldman Sachs. They brought in Goldman Sachs. They brought in some of these e-mails from Goldman Sachs.

MS. TAIT: Your Honor, this witness has no understanding of the relationship between the defendant and

Goldman Sachs and what the defendant may have been telling these facts the entire time.

And so whatever Goldman Sachs is saying to this witness is hearsay from the defendant, because as he did testify, he leaves these relationships alone. He lets the investor -- I'm sorry -- the company work with the investment bank, even though he did have this preexisting contact with Goldman.

MR. AMINOFF: Your Honor, that makes my exhibits all the more relevant because every time Mr. Fritsch has a contact with Goldman Sachs, Mr. Guy gets on the phone and talks to Aaron Siegel, the person he denied knowing, and he talks to Mike Yaeger. And then he sends an e-mail to the client and he says, Hey, I just talked to Mike Yaeger. Here is what he said.

MS. TAIT: While I agree that that did happen on occasion, it is hearsay. I mean, I've seen one e-mail like that.

THE COURT: Who said what to whom? You've lost me.

MR. AMINOFF: Your Honor, I don't believe it's hearsay because it's not being offered for the truth.

THE COURT: You didn't answer my question. Who are we talking about? Who said what to whom?

MR. AMINOFF: There's a group of people at Goldman Sachs. The main two are Mike Yaeger and Aaron Siegel. Okay? Then there's obviously Danny Guy and Bernhard Fritsch.

Guy introduces Fritsch to Aaron Siegel and Mike Yaeger.  They then have several conversations.  Fritsch reports some of those back to Guy.  Guy's saying some of those are false.  But the two Goldman people are involved in those conversations, and he's talking to them as well.  So he knows all of this.  He knows --

THE COURT:  Who knows what?

MR. AMINOFF:  Guy does.  I'm sorry.  Guy knows exactly what's going on at Goldman.  He also knows that Goldman is telling him for over a year that this company is not ready to be sold --

THE COURT:  Goldman is telling whom?

MR. AMINOFF:  I'm sorry.  Goldman is telling Guy for over a year that this company is not ready to be sold.  They need to raise $40 million.  They have to build up their platform.  It's not in the position to be sold.  He knows that.

The representations that Fritsch is making about being optimistic about a sale are just that.  Goldman Sachs is making the same representations to Mr. Fritsch.  They're excited about the company, they're --

THE COURT:  So to the extent that the Government argues reliance, which I allowed, then information provided by Goldman directly to Guy --

MR. AMINOFF:  Yes.

THE COURT:  -- is relevant.

**UNITED STATES DISTRICT COURT**

MS. TAIT:  In terms of, like, their opinions, not in terms of what -- the things that their opinions are based on, what Mr. Fritsch is telling them, though, Your Honor.  So it's hearsay.  That they're interfacing with Mr. Fritsch and getting information about the company and that's all coming from Mr. Fritsch.  And so it's a way of getting Mr. Fritsch's statements in through what Goldman tells Danny Guy.

MR. AMINOFF:  I think -- I don't think that's true.  They're doing their own investigation -- no, excuse me.  If they were just relying on Mr. Fritsch, they wouldn't be saying to Mr. Guy this company is not ready to be sold.  Like, you have to do it.  You have capital to raise.  You need to build up your infrastructure.  It's an idea.  It's not a business.

THE COURT:  I agree.

(In the presence of the jury:)

Q.   (BY MR. AMINOFF:)  Thank you for your patience, Mr. Guy.

So I believe where we were was -- I was asking you if you were in regular contact with Goldman Sachs in the 2014 period.

A.   We spoke, yes.

Q.   Okay.  If you could take a look at Tab 1180.

(Exhibit No. 1180 for identification.)

THE WITNESS:  1180?

Q.   (BY MR. AMINOFF:)  1180.

**UNITED STATES DISTRICT COURT**

A.    Okay.

Q.    What is that document, sir?

A.    That is an e-mail between myself and Bernhard Fritsch.

Q.    Okay.

MR. AMINOFF:  Move to admit, Your Honor.

MS. TAIT:  Your Honor, we object as hearsay.  403.

MR. AMINOFF:  It's not offered for the truth, Your Honor.

MS. TAIT:  Your Honor, I think, based on the sidebar, it is.

THE COURT:  Questions generally aren't hearsay, but the rest of it is.

MR. AMINOFF:  Your Honor, I'm not offering that for the truth.  It's just purely for the effect on the listener.  Maybe the jury can be instructed it's not being offered for the truth.

MS. TAIT:  Your Honor, the listener in this e-mail is Mr. Fritsch.  And I don't see how this is effect on the listener.  We continue to object.

MR. AMINOFF:  It's for the effect on both -- Mr. Guy.

THE COURT:  Sustained.

I'm sorry.  Let me look at that again.

I'll allow it for the effect on Mr. Guy.

**UNITED STATES DISTRICT COURT**

MR. AMINOFF:  Thank you.

Permission to publish?

THE COURT:  Yes.

(Exhibit No. 1180 received into evidence.)

MR. AMINOFF:  Thank you.

Q.    (BY MR. AMINOFF:)  All right.  So, Mr. Guy, you see at the top line that you just confirmed that you just spoke with Aaron at Goldman?

A.    Yes.

Q.    Presumably that is Aaron Siegel?

A.    I assume so.

Q.    Okay.  So I'm not accusing you of that, I'm just assuming you misspoke a few minutes ago when you said you didn't know Aaron Siegel.  Is that right?

A.    He was the banker that Mike introduced us to.  So I don't know him.  He was the banker in the group that Mike was trying to set StarClub up with.

Q.    So you've spoken to him?

A.    Yeah, I've spoken to him.  Yeah.

Q.    Okay.  I thought a few minutes ago you said you'd never spoke to him.  Did I mishear you?

MS. TAIT:  Your Honor, misstates testimony.  He said he never met the man.

THE COURT:  Move on, please.

MR. AMINOFF:  Okay.

UNITED STATES DISTRICT COURT

Q.    (BY MR. AMINOFF:)  So you recall -- well, in August of 2014, you reported to Mr. Fritsch that Goldman liked the -- loved the company; is that right?

MS. TAIT:  Objection.  Hearsay as to the Goldman Sachs opinion.

MR. AMINOFF:  It's purely for the effect on the listener.

THE COURT:  This is not being admitted for the truth of the statements in the e-mail but, rather, Mr. Guy's state of mind.

Q.    (BY MR. AMINOFF:)  That's what you reported, Mr. Guy?

A.    Yes.

Q.    Okay.  But you reported that the platform needs to be built out.

A.    I think that was to get to the scale that Goldman would have to be involved in, yeah.

Q.    By "the platform," presumably you meant the website; right?

A.    Well, the whole broadcast network.

Q.    The whole broadcast network with the various channels and whatnot?

A.    Correct.

Q.    Okay.  And that Goldman would represent StarClub if they were to be bought out?

UNITED STATES DISTRICT COURT

MS. TAIT:  Again, Your Honor, objection as to the hearsay.

THE COURT:  For the same reasons as before.

Q.  (BY MR. AMINOFF:)  And that Goldman would potentially be interested in an investment in StarClub?

A.  We were introducing it to Goldman for them to take a look at it to see if they would be involved in any way.

Q.  So you were reporting to Mr. Fritsch that Goldman would potentially be interested in an investment; is that right?

A.  No.  I never said that.

Q.  "If the company does receive an offer, they would love to represent StarClub."  Do you see that on the second to the third line of the e-mail, sir?

A.  I do.

Q.  Okay.  And so at this point, you believed the plan to be to raise money to build out the StarClub platform; is that right?

A.  Well, I think at this point in the -- in the game, there was -- Ron Burkle was there, Mr. Fritsch told --

Q.  Sir, I'm going to ask you if you could just please answer my question.

MR. AMINOFF:  Please, Your Honor, can we strike that?  And just re-ask my question.

THE COURT:  Just yes or no, sir.

UNITED STATES DISTRICT COURT

THE WITNESS:  Repeat your question, sir.

Q.    (BY MR. AMINOFF:)  The plan at this point was to raise money to build out the StarClub platform?

A.    Or sell the company.

Q.    And you report to Mr. Fritsch that we need to close financing to get the capital you need to build this out as quickly as possible; is that right?

A.    To grow the company, you need capital, yes.

Q.    You talk about Disney in this e-mail.  Do you see that?

A.    Yeah.

Q.    And you say it would be great if Disney works out but if not, we should build the company so we can sell it in the future; right?  I'm looking at -- let's see.  Third to the last line.

A.    You had multiple players at the table, yes.

Q.    But what you say specifically about Disney is it would be great if it worked out but, if not, let's make sure that they're there in the future; right?

A.    Yes.

Q.    Now, in May of -- we can take that down.  Thank you.

In May of 2015, you're still in regular contact with Mr. Yaeger; is that right?

A.    Um, yeah -- yeah.  Define "regular" but yes.

Q.    And you report to Mr. Fritsch that Mr. Yaeger says

UNITED STATES DISTRICT COURT

that Roc Nation appears to be interested in StarClub?

MS. TAIT:  Objection as to extrinsic and hearsay.

MR. AMINOFF:  Your Honor, it's not offered for the truth.

THE COURT:  Well, I'm not sure what it's offered for.

MR. AMINOFF:  Can I explain from here?

(At sidebar:)

THE COURT:  Not everybody needs to troop up here every time.

MS. TAIT:  We need the exercise.

MR. AMINOFF:  Jon Aminoff for the defense.

So what I'm trying to elicit with this is that people are expressing a lot of interest in this company.  And the Government is accusing Mr. Fritsch of lying about this stuff and pretending that people were coming to him with offers and interest and expressing a lot of interest.  And then he conveys that information to Mr. Guy, and they're calling him a fraud.  But it's not all coming from him.  People were legitimately interested in this company, and that's all I'm trying to get across here.

I'm not trying to prove that Roc Nation was actually interested but that Goldman was coming to Danny Guy and saying various interest in this company.

MS. TAIT:  Well, Your Honor, that's hearsay because

**UNITED STATES DISTRICT COURT**

the defendant also told the -- the defendant out of his own mouth told the witness that.  But, I mean, it's hearsay that he also told Goldman Sachs about it.

MR. AMINOFF:  No, no.

MS. TAIT:  It is also not relevant.

MR. AMINOFF:  No.  It comes directly from Roc Nation.  It comes from Jay Brown at Roc Nation.

MS. TAIT:  Well, that's hearsay.

MR. AMINOFF:  No, it's not because it's not offered for the truth.  It's offered for the effect on Guy.

MS. TAIT:  It is offered for the truth, that they were actually interested.

MR. AMINOFF:  It doesn't matter if they were actually interested.  What matters is that information was conveyed to Guy.  Whether Roc Nation is actually interested, I couldn't care less.

MS. TAIT:  Well, it does matter.

MR. AMINOFF:  No, it doesn't.  Because if -- if he's motivated to do anything by information coming from obvious third parties, then it's nothing to do with Mr. Fritsch.  It also expresses that, like, people are saying that they are interested in this company.

So when you say Mr. Fritsch is lying about that, there is interest coming from sources other than Mr. Fritsch.

MS. TAIT:  Well, but in order for you to prove that

point, it has to be true that Roc Nation is actually making offers.

MR. AMINOFF:  Just that it was conveyed.

MS. TAIT:  I don't -- I don't think so.  I think that you are trying to prove that Roc Nation actually was, in fact, interested, which is hearsay.

MR. AMINOFF:  I mean, you can think that.

THE COURT:  The objection is sustained.

(In the presence of the jury:)

Q.    (BY MR. AMINOFF:)  Mr. Guy, thank you for your patience again.

If you could turn to Tab 1182.

(Exhibit No. 1182 for identification.)

Q.    (BY MR. AMINOFF:)  Do you recognize that document?

A.    No.

Q.    Is that your e-mail address at the top of that document?

A.    It is, yeah.

Q.    Okay.  And then Mr. Fritsch's e-mail addressed next to the "To," where it says "To"?

A.    It is, yeah.  It's an e-mail between myself and him.

Q.    Okay.  Any reason to doubt its accuracy?

A.    No.

Q.    Okay.

MR. AMINOFF:  Your Honor, could I move to admit that

e-mail, please?

MS. TAIT:  No objection, Your Honor.

THE COURT:  It's admitted.

(Exhibit No. 1182 received into evidence.)

MR. AMINOFF:  Permission to publish?

THE COURT:  Yes.

Q.    (BY MR. AMINOFF:)  So on June 10th, you ask Mr. Fritsch how his meeting was --

MS. TAIT:  Your Honor, the year?

Q.    (BY MR. AMINOFF:)  On June 10th, 2015 -- sorry -- you ask Mr. Fritsch how his meeting was with GS; is that right?

A.    Yes.

Q.    And GS is Goldman Sachs?

A.    I assume so, yes.

Q.    All right.  If you could turn to the next tab, it's Tab 1183.

(Exhibit No. 1183 for identification.)

THE WITNESS:  Okay.

Q.    (BY MR. AMINOFF:)  Do you see at the bottom of that page that same e-mail, "How was the GS meeting?"

A.    I do.

Q.    And then do you see Mr. Fritsch's response and your reply above?

MS. TAIT:  Objection, Your Honor.  Hearsay to this one.  Also, relevance.

UNITED STATES DISTRICT COURT

MR. AMINOFF:  Your Honor, would now maybe be an appropriate time to take the second break?

THE COURT:  Yes.

MR. AMINOFF:  All right.  Thank you.

THE COURT:  Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

We'll take a 20-minute break.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  You can step down, sir.

THE WITNESS:  Thank you.

THE COURT:  Okay.  What exhibit are we on?

MR. AMINOFF:  We are on 1183, Your Honor.

THE COURT:  All right.  And at the bottom is the previous --

MR. AMINOFF:  Exactly.

THE COURT:  -- e-mail that was admitted.

Then we have Mr. Fritsch saying, "Nice, just another broker.  How are you doing?"

And then Mr. Guy, through his company e-mail, saying, "You're quite the poker player.  Do they have a buyer for this already?"

What's the problem, Ms. Tait?

MS. TAIT:  Well, Your Honor, it's just hearsay and

it's also irrelevant, as far as I understand.

THE COURT:  Well, I don't know what "just another broker" means.  The question, "How are you doing, Danny," is not hearsay.  "Do they have a buyer" is not hearsay.  It's a question.  I don't know that it matters that they were having lunch.

So what does this have to do with anything?

MR. AMINOFF:  Your Honor, so the point that I'm trying to get across here is that Goldman Sachs is saying all sorts of very optimistic things to Mr. Fritsch and Mr. Guy.  And at the same time, Goldman Sachs has done some -- it sounds like some due diligence on this company.  They have an opinion as to the company's status; that it's a very small company, it's very much in the developmental stage, it's not ready to be bought yet, and it needs a huge influx of capital to get it where it needs to be.  And Mr. Guy knows this throughout the entire period of his investment.

And I think this information is really critical to our defense because it does not make sense that Mr. Guy thinks that the company is about to be bought or -- or that, you know, a small -- you know, 6, $7 million investment every six months is going to make any difference to this company.  The company is in the exact same position for the entire time that he's investing in it.

And so his statements that he is relying on this,

he's relying on that, when he's got Goldman Sachs who he

referred to as the biggest and most respected investment banker

in the world?  It doesn't -- it doesn't make sense, Your Honor.

And so I think what we're getting at is --

THE COURT:  But I'm not -- how does that connect to

this particular e-mail?

MR. AMINOFF:  So in this e-mail, what we're seeing

is Guy has -- Guy has had a conversation with Goldman Sachs.

He asks Mr. Fritsch how the meeting was.  Mr. Fritsch says it

was fine.  And Guy says, No, no, no.  They told me all this

amazing stuff, like you're about to be bought out, all this

other stuff.  This isn't even coming from Mr. Fritsch.  These

are the exact sort of optimistic statements that people are

making about this company that Mr. Fritsch is solely being

blamed for.  All he's doing is reporting back what people are

telling him, and that's apparently fraud.

MS. TAIT:  Your Honor, if I could be heard on that.

Mr. Guy is not saying anything of the kind, for one thing, as

to -- he's asking questions of Mr. Fritsch.  But this is all --

this is all hearsay.  And this entire argument is bootstrapping

Goldman Sachs's alleged statements and to try to introduce them

as being some sort of a validation of the idea of StarClub in

the background.  And, you know, we object to that.

They could call Goldman Sachs to testify.  There's

no showing -- there's no showing any reason why not.  The

**UNITED STATES DISTRICT COURT**

defense has subpoena power.

There's no reason that these should come in through this -- in this manner.  And they're irrelevant.  This particular one is irrelevant.

THE COURT:  You're the one that raised reliance.  I allowed you to go into that over objection.  So the purpose makes sense.  This particular e-mail does not make sense to me in that connection.

What else were you planning to do with Mr. Guy?  What other e-mails?  Or --

MR. AMINOFF:  Could I revisit some of the ones we already talked about?  Is that --

THE COURT:  No.  I thought I let most of them in.

MR. AMINOFF:  My feeling was the opposite but --

THE COURT:  Not for their truth, obviously.

MR. AMINOFF:  I believe there were several that were excluded, Your Honor.

THE COURT:  We're going to move on.  So what else?

MR. AMINOFF:  So shortly -- time span-wise, Mr. Fritsch sends -- so after they're talking about this meeting, Mr. Fritsch sends Mr. Guy the presentation that Goldman Sachs did for him when he was at Goldman Sachs's office.  And that presentation includes a list of potential buyers.

THE COURT:  Presentation at Goldman Sachs made for

Mr. Fritsch.

MR. AMINOFF:  Exactly.

THE COURT:  And Mr. Fritsch is sending that to Mr. Guy.

MR. AMINOFF:  Exactly, your Honor.

MS. TAIT:  Your Honor, we object --

MR. AMINOFF:  So just -- just let me finish.

MS. TAIT:  I'm sorry.

MR. AMINOFF:  So Tab 1185, you're going to see portions of that presentation, which include all of the companies that we have been talking about.  And this was made by Goldman Sachs, not by Mr. Fritsch.

So he's forwarding it to Mr. Guy and saying, yeah, it was a great meeting.  They're excited about the company.

MS. TAIT:  Your Honor, this lacks foundation and there's no proof that it is what it says it is.  And it has Mr. Fritsch's handwritten notes all over it.  And I think it's his handwriting, anyway.  And it's -- it's not relevant, the contents of the -- the materials at 1185, pages 3 through 5.

MR. AMINOFF:  Your Honor, I don't see how it could possibly not be relevant.  These are the same companies that the Government is accusing Mr. Fritsch --

THE COURT:  The handwritten notes.

MR. AMINOFF:  The handwritten notes are Mr. Fritsch writing down contacts at these companies, the same people that

**UNITED STATES DISTRICT COURT**

the Government's been talking about.  So if we look at --

THE COURT:  Take out the handwritten notes.

MR. AMINOFF:  Take them out?  Okay.

MS. TAIT:  Your Honor, I mean, there's really no -- there's no indication that this is a draft or it's final. There's just no foundation for this document.  And it is, I believe, being introduced for the truth.

MR. AMINOFF:  It's being introduced for the fact that Goldman Sachs said this.

MS. TAIT:  Well, we actually don't know that Goldman Sachs said that, Your Honor.

MR. AMINOFF:  Well, it's a presentation that was clearly prepared by Goldman Sachs.  The front cover of it -- it's not in order, but this is the way it appeared over e-mail.

So on page 5 of the document, it says "Discussion Materials Prepared for StarClub" with a Goldman Sachs logo at the top.  And then this is literally days after Mr. Guy sends Mr. Fritsch this very excited e-mail about this great meeting that he had.  Like, Fritsch says, "Just another broker."  And Guy says, "You're quite the poker player," meaning he's not -- he's not, like, showing his enthusiasm.  Then do they have a buyer already, after he's had this potential buyer's meeting. It's days later, Your Honor.

MS. TAIT:  Your Honor, we continue to object.  This document, there's no foundation for it and they are trying to

introduce this as being from Goldman Sachs.  And there's no benefit -- there's no proof of that other than Mr. Fritsch's say-so, which is also hearsay, in addition to the lacking foundation.

MR. AMINOFF:  Your Honor, Mr. Guy can always say that he didn't receive this or deny it or whatever, but I think -- I think it's -- I mean, it's --

MS. TAIT:  We also don't know how -- if it is a true Goldman Sachs document, we don't know how it was couched, whether it was a draft.  We don't know anything.  We don't know what it was based on, whether it was based on information provided to Goldman Sachs by the defendant; hence, hearsay again.

THE COURT:  All right.  The objection is sustained. What else?

MR. AMINOFF:  Your Honor, 1186.

(Exhibit No. 1186 for identification.)

MR. AMINOFF:  There's an e-mail from Mr. Guy to Mr. Fritsch reporting on a conversation that he had with this Mike Yaeger person where he says that -- "I don't think you're ready for sale.  You got to build up" -- he says, "You've got to finish the build-out," meaning the platform, and that we need 40 million in.

And this is almost exactly the information that Goldman conveys to Mr. Guy a year earlier.  So almost for the

**UNITED STATES DISTRICT COURT**

entire portion that he is investing, Goldman is telling him this company is not going to be sold.  It's not ready.  It needs a significant capital raise.

THE COURT:  Ms. Tait.

MS. TAIT:  Your Honor, we don't object to 1186.

(Exhibit No. 1186 received into evidence.)

THE COURT:  All right.  What else?

MR. AMINOFF:  I think the rest of the things I want to get into are going to be significantly less controversial. I mean, there is -- I would like to ask him about an e-mail that was forwarded to him by Mr. Fritsch from Kevin Mayer at Disney.  And in that e-mail -- so Mr. Fritsch e-mails Kevin Mayer and references a possible M&A transaction -- oh, I'm sorry.

MS. TAIT:  What's the exhibit?

MR. AMINOFF:  Your Honor, I could bring you a copy. It was a late addition.  Thank you.

MS. TAIT:  Your Honor, we do have an objection, but we'll wait until the Court reads it.

MR. AMINOFF:  Objection to what, I'm sorry?

MS. TAIT:  To 1189.

(Exhibit No. 1189 for identification.)

THE COURT:  So what is it?

MS. TAIT:  What is the objection?

THE COURT:  No.  What is this?

MR. AMINOFF:  So, Your Honor, this is an e-mail chain between Mr. Fritsch and Mr. Mayer where Mr. Fritsch references a conversation that he's had with -- I'm sorry -- Mr. Mayer is, I believe, the president of Disney.  And Mr. Fritsch references a conversation that he's had with Mr. Mayer about an M&A acquisition and using this -- this broker Moelis, which the Government brought up on direct examination of Mr. Guy.

And here, Mr. Fritsch references all of this to Mr. Mayer.  And Mr. Mayer responds with not denying any of this and putting Mr. Fritsch in touch with his contact at Moelis.

MS. TAIT:  Your Honor, let me know, Your Honor, when you'd like to hear our objection.

THE COURT:  And this is sent to --

MR. AMINOFF:  Oh, I'm sorry.  And then Mr. Fritsch forwards this e-mail exchange to Mr. Guy back in 2015.

THE COURT:  And this is for what?  State of mind with Mr. Guy?

MR. AMINOFF:  Yes, Your Honor.  And -- I mean, to rebut the suggestion on direct that Mr. Fritsch was making all of this up.

MS. TAIT:  Your Honor, this is rank hearsay, as the defendant says, "Please see the e-mail chain below.  It happened."  And he's trying to say that he's having an M&A transaction, which is the label that the defendant put on this

e-mail, not Mr. Mayer.

Mr. Mayer has been interviewed by the Government and is one of the Government's witnesses, you know, depending on the scheduling. But Mr. Mayer has explained that there was a disconnect in connection with this e-mail and that he never would have -- he was not actually contemplating an M&A transaction because he would not have set up and referred Mr. Fritsch to -- to Moelis, which is an investment bank, if they had wanted to actually do an M&A transaction.

So this is -- yeah, this is hearsay, it is vague, it is 403 in light of Mr. Mayer's statements regarding the disconnect between what Mr. Fritsch is saying and Mr. Mayer's response, which I believe could be characterized as -- as being polite and -- in his words -- I'm looking at my colleague. That he's not actually interested in an M&A transaction is what he told us.

THE COURT: I'll admit it.

(Exhibit No. 1189 received into evidence.)

MR. AMINOFF: Your Honor, if I could address it. That's all very well and good --

THE COURT: You're still talking and I said I'll admit it.

MR. AMINOFF: Oh, I'm sorry.

THE COURT: Do you want to keep talking and change my mind or you want to just take "I'll admit it"?

MR. AMINOFF:  No.  I am going to shut up right now.
Thank you.

THE COURT:  Anything else?

MR. AMINOFF:  I assume no objection to -- well,
maybe -- there's an e-mail, Your Honor, at 1187.

MS. TAIT:  Your Honor, we object to that on
relevance grounds and also hearsay to the extent that it makes
representations.

MR. AMINOFF:  So, Your Honor, the reason I'd like to
offer that is -- the reason I'd like to offer that, Your Honor,
is about -- let me see -- one, two, three, four, five, six --
so one, two, three, four -- five lines down, the sentence
beginning, "Third," Mr. Guy talks about hiring an IP valuation.

And what I'm getting at with this is I think he
spells out pretty clearly that the value of this company is the
technology.  And that is what everyone is excited about with
this company, is the technology.  And that's why he keeps
investing, not, you know, optimistic statements and potential
deals and this and that.  It's the value of the technology.

And I think the Government has put at issue whether
this company is worth anything, whether it's all a farce,
whether Mr. Fritsch is very much, you know, full of it.  And I
think statements --

THE COURT:  I agree that some of it is relevant.
I'm not sure that it matters whether some of it or all of it

comes in, but you can discuss that with counsel.

And now our court reporter and I are going to take a break.

MR. AMINOFF:  Thank you, Your Honor.

(Break taken.)

(Out of the presence of the jury:)

MR. AMINOFF:  Your Honor, could I just bring up one other thing, please?

THE COURT:  Sure.

MR. AMINOFF:  Thank you.

We had -- had moved in limine -- yeah.  That's okay.

We had moved in limine to get into some of the civil litigation that Mr. Guy's involved in.

THE COURT:  And I issued an order.

MR. AMINOFF:  I thought you said I could ask about some of the allegations.

THE COURT:  Not allegations.  Wasn't that my ruling?  No allegations.

MR. AMINOFF:  I --

THE COURT:  Those are just what other people claim.

MS. TAIT:  That's what we understood, Your Honor.

MR. AMINOFF:  Sorry.  I -- I meant Mr. Guy's allegations.  I'm sorry, Your Honor, if that wasn't clear.  I meant the things that he's accusing other people of doing.  I thought we could get into some of that but --

THE COURT:  I think I said that was propensity and was not allowed.

MS. TAIT:  I think the Court referenced vendettas as not being allowed.

MR. AMINOFF:  I thought there were certain categories that we could get into.  Can I just pull up the order really fast?

MS. TAIT:  Your Honor, should we excuse the witness?

THE COURT:  I don't know what -- I don't want to take the time to do that.

MS. TAIT:  Thank you, Your Honor.  I just wanted to point it out.

THE COURT:  I said specifically that's not allowed.

MR. AMINOFF:  The Court said --

THE COURT:  Specifically that that is not allowed.

MR. AMINOFF:  Your Honor, do you mind if I ask you do you recall what we were allowed to speak about?

THE COURT:  What?

MR. AMINOFF:  Do you mind if I ask you what we were allowed to speak about?  Because maybe I misunderstood.

THE COURT:  I'm not going to tell you everything I allowed you to speak about.

MR. AMINOFF:  I think there was a limited category. I'm having a hard time finding the order.

THE COURT:  It's at 417 of the docket.

MR. AMINOFF:  Oh, thank you.

(Pause in the proceedings.)

MR. AMINOFF:  Thank you, Your Honor.

THE COURT:  All right.  And obviously any other spellings that our court reporter wants from you, you should provide.

MS. TAIT:  Yes, Your Honor.

(In the presence of the jury:)

THE COURT:  Sorry about the delay.  Everyone is back.  Our witness is still on the stand.

Sir, you are still under oath.

Mr. Aminoff, you may continue.

MR. AMINOFF:  Thank you, Your Honor.

Q.    (BY MR. AMINOFF:)  Mr. Guy, I think where we left off, we were talking about a meeting at Goldman Sachs between Mr. Fritsch and Goldman Sachs back in June of 2015.

A.    Okay.  Yeah.  What tab is it again?

Q.    It would have been June -- June 9th of 2015.  And I believe the exhibit you were looking at was 1183.  And I believe --

MS. TAIT:  That was not admitted, Your Honor, on our records.

MR. AMINOFF:  I thought we --

MS. TAIT:  Our notes indicate, Your Honor, that that was not admitted.

MR. AMINOFF:  Okay.  My apologies.  1182.

Q.    (BY MR. AMINOFF:)  Are you looking at 1182, Mr. Guy?

A.    I am.

MR. AMINOFF:  Okay.  Could we publish that, please?  That was admitted, I believe.

Q.    (BY MR. AMINOFF:)  Okay.  So on June 10th, you asked -- June 10th, 2015, you asked Mr. Fritsch about a meeting at Goldman Sachs; is that right?

A.    Correct.

Q.    Okay.  And then if I could refer you to Tab 1185.

(Exhibit No. 1185 for identification.)

MS. TAIT:  Your Honor, I think our objection to this was sustained as well.

MR. AMINOFF:  I thought this was --

THE COURT:  I sustained the objection.

MR. AMINOFF:  I'm sorry, Your Honor.  I thought you had admitted this one, just subject to removing the handwritten notes.

MS. TAIT:  No, Your Honor, I think -- ultimately, Your Honor, I think the Court sustained the objection.

THE COURT:  It's sustained.

(Off-the-record discussion.)

MR. AMINOFF:  Your Honor, could we approach very, very briefly?

(At sidebar:)

UNITED STATES DISTRICT COURT

THE COURT:  We have six people to take notes.  How can we not have an agreement?

MR. AMINOFF:  Your Honor, I thought this was the one you told me to stop talking because it was admitted.  This is the one with the presentation.

MS. TAIT:  Your Honor, I thought that after -- after it involved the hearsay claim -- hearsay, being lack of foundation and the fact that it's all coming in, you know, to prove the Goldman Sachs -- it is a Goldman Sachs document, it's all in the say-so of the defendant, I think the Court at this looming objection kept it out.

MR. AMINOFF:  That was all over- -- that was all overruled.  The last thing that you said was admitted, and I thought you said sustained and I asked to respond and you told me --

THE COURT:  No, I think -- I think that's right, but you can't show it at the moment because it still has those notations.

MR. AMINOFF:  Right.

MS. TAIT:  Your Honor, would it be all right to review the transcript?  Because I think the Court did sustain --

THE COURT:  Well, I've changed my mind if I decided otherwise before --

MR. AMINOFF:  Okay.  Maybe I can just ask him about

it now without showing it, without --

THE COURT:  Yes.

MR. AMINOFF:  Okay.  Okay.

MS. TAIT:  Thank you, Your Honor.

(In the presence of the jury:)

Q.    (BY MR. AMINOFF:)  Okay.  Mr. Guy, we're going to look at Tab 1185 but I'm not going to put it up on the screen.

MR. AMINOFF:  Cynthia, can you pull that one down? Thank you.

Q.    (BY MR. AMINOFF:)  So on -- on June 18th, Mr. Fritsch sends you an e-mail with an attachment; is that right -- June 18th, 2015.  Sorry.

A.    Yes.

Q.    And if you could just have a look at page 3, 4, and 5, which is that attachment; correct?

A.    Yes.

Q.    Okay.  And that is from a presentation that Goldman Sachs did for StarClub --

MS. TAIT:  Objection.  Hearsay, Your Honor.

THE COURT:  Well, I don't think you can ask him that question as phrased.

Q.    (BY MR. AMINOFF:)  Your understanding when you received that document is that Mr. Fritsch had a meeting with Goldman Sachs on June 9th, 2015; correct?

A.    My understanding, yes.

UNITED STATES DISTRICT COURT

Q.    Yes.

And your understanding was that the subject matter of that meeting was potential buyers for -- for StarClub; is that right?

A.    My understanding, it was to engage Goldman Sachs to help the company in any way, shape -- any way possible really.

Q.    And this was a presentation that Goldman Sachs made and presented to --

MS. TAIT:  Objection, Your Honor, with respect to foundation for the presentation, Your Honor.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Your understanding was this document contained a list of potential buyers for StarClub; is that right?

A.    Well, it says "reviewer or buyer universe."

THE COURT:  Don't read from it.

Just for the witness's state of mind.

Q.    (BY MR. AMINOFF:)  And that list includes --

MS. TAIT:  Objection for reading from the exhibit, Your Honor.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  That list includes several of the companies that we have been talking about; is that right?

THE COURT:  I just sustained the objection.

MR. AMINOFF:  Oh, I'm sorry.  I -- I didn't realize

**UNITED STATES DISTRICT COURT**

that.

MS. TAIT:  Your Honor, and I think I object to the words "several" as well, based on my review of the document.

THE COURT:  Rephrase your question.

Q.    (BY MR. AMINOFF:)  Mr. Guy, at that time, did you understand that Goldman Sachs had presented -- had presented Disney as a potential buyer?

MS. TAIT:  Objection, Your Honor.  Hearsay.  Foundation.  Calls for speculation.

THE COURT:  Only for his state of mind.

You can answer that.

MS. TAIT:  Objection.  Vague, Your Honor, as to what "presentation" means as well in the question.

Q.    (BY MR. AMINOFF:)  The presentation --

THE COURT:  Rephrase your question.

Q.    (BY MR. AMINOFF:)  The presentation attached to the document -- to the e-mail.

THE COURT:  You can answer.

THE WITNESS:  Well, assuming this came from Goldman, there's a list of potential companies that they would -- that StarClub could theoretically have a fit with, what's on there, yes.

Q.    (BY MR. AMINOFF:)  Okay.  And Disney's on there?

A.    Yes.

Q.    And Access is on there, page 4?

UNITED STATES DISTRICT COURT

A.    Page where?

Q.    Page 4, please.

A.    Access?

MS. TAIT:  Again, objection.  Hearsay, Your Honor.
Also, mischaracterizes what this is in light of the witness's
testimony just now as to what he thinks it is.

THE COURT:  Let's move on.

Q.    (BY MR. AMINOFF:)  On July 29th, 2015, you spoke to
Mike Yaeger again; is that right?

A.    Refresh my memory.

Q.    Sure.  If you could turn to Tab 1186, please.

A.    Okay.  Yes.

Q.    Do you recognize that document?

A.    It's my -- between me and Mr. Fritsch.

MR. AMINOFF:  Move to admit, Your Honor.

MS. TAIT:  I think we already agreed it could be
admitted.

THE COURT:  Yes.

MR. AMINOFF:  Thank you.

Publish, please.

Q.    (BY MR. AMINOFF:)  So in this e-mail, you're
reporting on a conversation that you had with Mike Yaeger; is
that right?

A.    Yes.

Q.    Okay.  And your understanding of Goldman Sachs's

evaluation of StarClub at this point in time is that they're not ready for sale; is that right?

A.    Um, I think they thought that it was -- they needed more capital to build it out.

Q.    Yes.

So they were not ready for sale; correct?

A.    I had a valuation that would be appropriate for Goldman to represent them.

Q.    So they were not ready for sale; correct?

A.    Well, any company's ready for sale.  Just the price.

MS. TAIT:  Objection.

THE COURT:  Listen to the question, please.

Q.    (BY MR. AMINOFF:)  At this point in time, you reported that Goldman Sachs had reported to Mr. -- that Goldman Sachs viewed StarClub as not being ready for sale; is that correct?

MS. TAIT:  Objection.  Hearsay.

THE WITNESS:  No.  Goldman -- it was not ready for Goldman Sachs to represent them with the size of the company they were.

Q.    (BY MR. AMINOFF:)  Goldman Sachs thought they were not ready for sale; is that correct?

A.    You'd have to talk to Goldman, sir.

Q.    Isn't that what your e-mail says, sir?

A.    No.

MS. TAIT:  Objection.  Badgering.

THE COURT:  It's for the state of mind of the witness.

Answer the question, please.

Q.    (BY MR. AMINOFF:)  I'll just -- let me make it simple.  Does your e-mail say that?

A.    "They don't think you're ready for sale, you need to finish the build-out.  We need that 40 million in."  Right.

Q.    Okay.

A.    "If they don't send it in, we need it from others."

Q.    And this is the exact same feedback you had received from Aaron Siegel back in August of 2014; correct?

MS. TAIT:  Objection.  Hearsay.

THE COURT:  Overruled.

THE WITNESS:  Refresh my memory.

Q.    (BY MR. AMINOFF:)  Sure.  Could you turn to Tab 1180, please.

MR. AMINOFF:  Your Honor, I believe 1180 has been admitted.  Can we publish?

MS. TAIT:  Agreed, Your Honor.  It's admitted.

THE COURT:  All right.

Q.    (BY MR. AMINOFF:)  Do you agree it's the same feedback?

A.    Oh, yes.  Yes.  Same e-mail, yes.

Q.    The same feedback.  This e-mail was sent a year

earlier.

A.    Um, you know, again, Goldman Sachs represents the biggest companies in the world.  So --

Q.    Sure.

A.    Yeah.  So was StarClub ready for Goldman Sachs?  No.

Q.    So the answer to my question, sir, is yes?

A.    What is your question?

Q.    My question was:  Did you receive the exact same feedback from Goldman Sachs a year earlier on August 20th, 2014?

A.    Um --

THE COURT:  Let's say not "exact same."  Could you --

MR. AMINOFF:  Very close.  Sorry, Your Honor.

MS. TAIT:  Objection, Your Honor.  Misstates --

THE WITNESS:  It wasn't -- it wasn't ready for Goldman Sachs, that's the feedback.  It's not big enough.

Q.    (BY MR. AMINOFF:)  Mr. Guy, did someone tell you not to answer my question?

A.    No.  I just don't think you ask direct questions, sir.

MS. TAIT:  Objection, Your Honor.

Q.    (BY MR. AMINOFF:)  Very well.

A.    The whole purpose for --

THE COURT:  There's no question, sir.  Wait for a

**UNITED STATES DISTRICT COURT**

question.

Q.    (BY MR. AMINOFF:)  Mr. Guy, were you an avid user of the StarClub website?

A.    No.

MR. AMINOFF:  You can take that down.  Thank you.

Q.    (BY MR. AMINOFF:)  Did you use the app?

A.    No.

Q.    Did you subscribe to any of the celebrity channels?

A.    Not that I recall, no.

Q.    So, Mr. Guy, you made five separate investments into StarClub; is that right?

A.    That is correct.

MR. AMINOFF:  And could we just pull up Government Exhibit 206, please.  I believe it was -- I believe that was admitted.

THE COURT:  Yes.  Well, it wasn't admitted, actually.  It's just for demonstrative.

MR. AMINOFF:  Just for demonstrative.  Excuse me.

Q.    (BY MR. AMINOFF:)  The Government is positing this as a summary of your transactions with StarClub; correct?

A.    Correct.

Q.    Okay.  So over the course of these five investments, there wasn't a single deal signed; right?

A.    Not to my knowledge, no.

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

Q.    (BY MR. AMINOFF:)  There's no commercial deal signed?

A.    Not to my knowledge.

Q.    No equity deal signed?

A.    Other than what we put in with others, no.

Q.    But you kept investing into StarClub; correct?

MS. TAIT:  Objection, Your Honor.  Relevance.  403.

THE COURT:  Sustained.

MS. TAIT:  Jury instruction.

THE COURT:  Move on.

Q.    (BY MR. AMINOFF:)  Mr. Guy, isn't it true that, in your view, what made StarClub valuable was its technology?

A.    Well, the patents, yeah, the component of that valuation, yes.

Q.    So you viewed that an accurate valuation of the company was essentially -- sorry.  Please -- motion to strike.

So to adequate -- to accurately evaluate the value of this company required an IP evaluation of the technology; is that right?

A.    Um, yeah, you could get a patent group to look at the patents, yeah, you could have done that.

Q.    And your view in January of 2016 was that StarClub was really more of an idea than a business; is that right?

A.    No.  That's not true at all.

**UNITED STATES DISTRICT COURT**

Q.    That's not true at all?

A.    No.

Q.    They didn't have a strong business plan?

A.    They needed capital to build out their platform. But with what we were shown and what we were told by Mr. Fritsch, that that was very well on its way with multiple people at the table wanting to invest, both in commercial and in equity deals.

Q.    And you found Mr. Fritsch to be a poor salesman; is that right?

A.    It was good enough for me, I guess.

Q.    But you wrote to him in January of 2016 that he was a poor salesman; is that correct?

MS. TAIT:  Objection.  Extrinsic evidence -- reference.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Let's talk a little bit about the revenue.

So you testified on direct examination that Mr. Fritsch told you that StarClub had generated $15 million in revenue in 2015?

A.    Yes, sir.

Q.    Okay.  And I think you testified on direct that that statement was made during a presentation; is that right?

A.    Correct.

Q.    And that was made in 2016?

A.    Yes.

Q.    In January of 2016?

A.    Yes.

Q.    Okay.  Do you recall being interviewed by FBI agent -- FBI Special Agent Greg Austin in 2016?

A.    Vaguely.

Q.    Okay.  Do you recall telling Agent Austin during that meeting that in 2015 --

MS. TAIT:  Objection.  Improper refreshing.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Did you tell Greg Austin in 2015 that Mr. Fritsch projected 15 million in revenue?

A.    I don't -- I don't recall.

Q.    Would having a look at Mr. Austin's 302 of your interview perhaps refresh your recollection?

A.    Absolutely.

Q.    If you could turn to Tab 1142.

(Exhibit No. 1142 for identification.)

Q.    (BY MR. AMINOFF:)  And I'm going to refer you to the fourth paragraph on page 1, please.

A.    Bear with me.  Let me get there.

Q.    Yep.

(Pause in the proceedings.)

THE WITNESS:  Okay.  Direct me again, sir.

UNITED STATES DISTRICT COURT

Q.    (BY MR. AMINOFF:)  So if you could turn to Exhibit 1142 at page 1 and the fourth paragraph down.

THE COURT:  The question is whether you now remember, not what you see there.

THE WITNESS:  I don't remember this interview.

Q.    (BY MR. AMINOFF:)  So your testimony is that you do not recall telling Agent Austin that Mr. Fritsch said 15 million --

MS. TAIT:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

THE WITNESS:  No.  I don't recall, no.

THE COURT:  Don't answer when I say "sustained."

THE WITNESS:  Sorry, ma'am.

MS. TAIT:  Move to strike, Your Honor.

THE COURT:  That will be stricken.

Q.    (BY MR. AMINOFF:)  Did you also say that Mr. Fritsch --

MS. TAIT:  Objection.  Hearsay.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Did you, um -- did you tell the prosecutors here on January 14th, 2025, that you probably got --

MR. AMINOFF:  Can I finish the question?

THE COURT:  Well, no, because -- approach.

(At sidebar:)

UNITED STATES DISTRICT COURT

THE COURT: It's kind of problematic for you to basically introduce the statement.

MR. AMINOFF: Your Honor, this is -- I believe it's valid impeachment. He's previously made these statements, and I'm allowed to confront him with the statements.

MS. LEE: Only if he denies it, Your Honor. This is Sarah Lee, sorry.

THE COURT: Well -- but then he has to be able to ask, Didn't you tell?

MS. LEE: I think -- Your Honor, I think it's proper impeachment if Mr. Aminoff elicits the fact of what he told prosecutors. And if Mr. Guy testifies contrary to that, then Mr. Aminoff can say, well, would it refresh your -- didn't you tell the prosecutors X? And that's contrary to what you're testifying to today. But he hasn't done that first step, Your Honor.

THE COURT: That's what he was trying to do, isn't it?

MR. AMINOFF: Kind of --

MS. LEE: No, Your Honor.

MS. TAIT: The words came out of Mr. Aminoff's mouth, Didn't you tell the FBI? Didn't you tell the prosecutors? That's not the way to do it.

THE COURT: What's the way to do it?

MS. TAIT: Well, isn't it true that StarClub was a

tech company?  And, oh, no, it's not.  And then, well, wouldn't you -- isn't it true that you --

MR. AMINOFF:  Isn't it true that he told you that -- that's what you want me to ask him?

MS. TAIT:  In other words, insert the fact as opposed to you told the FBI, isn't it true you told the FBI?  Isn't it true --

MR. AMINOFF:  I thought it was sufficient that he's told this story about the January --

THE COURT:  Do it her way.

MR. AMINOFF:  No problem.

         (In the presence of the jury:)

Q.    (BY MR. AMINOFF:)  So, Mr. Guy, you told --

MR. AMINOFF:  Is that right?  What do you want me to say?

THE COURT:  Go and tell him.

MR. AMINOFF:  How do you want me to say it?

         (Off-the-record discussion.)

Q.    (BY MR. AMINOFF:)  Mr. Guy, isn't it true that you told the prosecutors --

MS. TAIT:  That's improper.

MR. AMINOFF:  It's literally what you just said.

Q.    (BY MR. AMINOFF:)  Mr. Guy, you told the prosecutors here that on January 14th, 2015 *[sic]*, of this year, that you probably heard this reference to the 15 million in the StarClub

presentation but you really weren't sure; isn't that right?

MS. TAIT:  Objection, Your Honor.  But -- and also vague to the date.

MR. AMINOFF:  The date was January 14th, 2015 -- I mean 2025.  Should I ask it again?

THE COURT:  Are you referring to the date he spoke to you or --

MS. TAIT:  Well, I'm objecting to the introduction of the date he spoke to anyone as being improper.  But I -- if the witness can understand the question, perhaps the witness could answer.

THE COURT:  Okay.  If you understand the question, you can answer.

THE WITNESS:  I don't recall.

Q.    (BY MR. AMINOFF:)  You don't -- you don't recall when this alleged statement about the $15 million revenue was made?

A.    Yeah.  I don't -- what are you talking about?

Q.    Okay.  So I understood that you had testified that Mr. Fritsch made some statement about StarClub generating $15 million in revenue for the year 2015 --

A.    Correct.

Q.    -- correct?

A.    Yes.

Q.    Okay.  I also understand that you were interviewed

by these prosecutors on January 14th, 2025; correct?

A.    Yes.  Yeah.

Q.    And during that interview, you told them that this statement about the revenue was probably made in a StarClub presentation; right?

A.    I don't recall.

Q.    Okay.  Would having a look at the --

MS. TAIT:  A document, Your Honor.

Q.    (BY MR. AMINOFF:) -- having a look at a document perhaps refresh your recollection?

A.    Definitely help.

Q.    Let's look at Tab 1151.

(Exhibit No. 1151 for identification.)

Q.    (BY MR. AMINOFF:)  If we turn to page 6 of that document, please, sir.

A.    Okay.

Q.    And then if you look at -- there's a bullet point and it says the number 158.  Do you see that?

A.    158?  Yes.

Q.    If you could just read those first couple of lines to yourself.

(Pause in the proceedings.)

THE WITNESS:  Okay.

Q.    (BY MR. AMINOFF:)  Is your recollection now refreshed as to what you told the prosecutors on January 14th,

2025?

A.    Um, yeah.  That's what it says here, yes.

Q.    Do you remember that you told the prosecutors that the statement was probably made in a StarClub presentation?

MS. TAIT:  Your Honor, would the witness close the book?

THE COURT:  Yes.

The question is:  Does -- did that refresh your recollection?  The question is not what does it say there.

THE WITNESS:  Yeah, look -- sure.  The 15 million revenue was in the January presentation that we went to.

Q.    (BY MR. AMINOFF:)  So that's not what you told the prosecutors on January --

MS. TAIT:  Objection, Your Honor.  Improper 608.

MR. AMINOFF:  Your Honor, I believe that's valid impeachment now.

THE COURT:  Go ahead and ask a different question, though.

MR. AMINOFF:  So you want me to move on, Your Honor?

THE COURT:  Yeah.  Just rephrase your question.

MR. AMINOFF:  Oh, I'm sorry.

Q.    (BY MR. AMINOFF:)  Isn't it true that you told the prosecutors on January 14th, 2025, that the statement was probably made in a presentation?

A.    Well, I knew I saw the number, yeah.  Absolutely.

**UNITED STATES DISTRICT COURT**

Q.   Okay.  So you're sounding much more definite today than you were on January 14th, 2025.  Is that fair to say?

A.   Well, you've got to remember, it's nine years ago.

Q.   Yes.  That's -- that's my point.

A.   Do I remember that number?

Q.   There's no question.

THE COURT:  There's no question.

Q.   (BY MR. AMINOFF:)  You can close the book.  Thank you, Mr. Guy.

Mr. Guy, you testified on direct that Mr. Fritsch never corrected the statement about the 15 million, if it was made.  Is that -- is that accurate?

A.   Not that I recall.

Q.   Okay.  Did you ever receive a telephone call from CFO Polsen clarifying that there was no $15 million revenue --

MS. TAIT:  Objection.  Hearsay.

MR. AMINOFF:  State of mind, Your Honor.

THE COURT:  Well, it depends on timing.

Q.   (BY MR. AMINOFF:)  Shortly after that presentation.

MS. TAIT:  Your Honor, objection.  Hearsay.

MR. AMINOFF:  Your Honor, it's --

THE COURT:  I don't -- I don't think it's being used for the truth.

What's the purpose?

MR. AMINOFF:  To the extent that he's saying he was

**UNITED STATES DISTRICT COURT**

relying on this statement, it was disavowed very shortly thereafter.

MS. TAIT:  Objection, Your Honor.  Referencing extrinsic evidence not before the case.

THE COURT:  I'll allow it.

You can answer.

Q.    (BY MR. AMINOFF:)  Do you want me to ask the question again?

A.    Yes, please.

Q.    Did you receive a phone call from CFO Polsen clarifying that there was no $15 million revenue in 2015?

A.    No.

Q.    Do you know of anyone else who perhaps received a phone call from CFO Polsen saying that there was no revenue in 2015?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Sir, isn't it true that November 2016 you and Mr. Fritsch communicated about the company having, quote, "minimal revenue"?

A.    What time frame?

Q.    Well, let me show you the Government's exhibit because I think it was admitted.

MR. AMINOFF:  Is it 186?

Could you pull up Exhibit 186 with redactions?

UNITED STATES DISTRICT COURT

MS. LEE:  It's redacted.

MR. AMINOFF:  Yeah.  That's why I was asking if you --

MS. TAIT:  He doesn't have the right version.

MR. AMINOFF:  Oh.  Sorry.

Q.    (BY MR. AMINOFF:)  Okay.  So do you recognize this document?

A.    It's an e-mail from me to Ian Mann.

Q.    Okay.  And you testified to this on direct examination.  Yeah?

A.    Okay.  Yeah.

Q.    Okay.  I want to show you the second page of your e-mail.

And if you could look at the paragraph beginning --

MR. AMINOFF:  Oh, he can't see what I'm pointing at.

Q.    (BY MR. AMINOFF:) -- the paragraph beginning with "no audited financials."

A.    Okay.  Yes.

Q.    Isn't it true that you acknowledge in that paragraph that StarClub has minimal revenues?

A.    Well, for a social media company, 15 million is pretty minimal.

Q.    So it's your testimony today that $15 million is -- is minimal revenue for a seed start-up company?  That's your testimony?

A.    No.  For the scale of what he presented, it was minimal.

Q.    Okay.  So your testimony today is $15 million is minimal revenue for a company like StarClub?

A.    For a social media company.

Q.    Okay.  Okay.  And you sent that e-mail in 2016, November of 2016?

A.    Look, November 2016, we knew this was --

MS. TAIT:  Objection.  Move to strike, Your Honor.

Q.    (BY MR. AMINOFF:)  My question was:  You sent that e-mail in November 2016?

A.    Yeah.  Absolutely.

Q.    So 11 months after the statement was allegedly made.

THE COURT:  The Government's motion is granted to strike that statement.

Q.    (BY MR. AMINOFF:)  Mr. Guy, could you take a look at Tab 1166.

(Exhibit No. 1166 for identification.)

THE WITNESS:  Yep.

Q.    (BY MR. AMINOFF:)  Do you recognize that document?

A.    It was an e-mail from myself to Mr. Fritsch.

MR. AMINOFF:  Permission to publish, Your Honor?

MS. TAIT:  Your Honor, we do object.  It's hearsay.

MR. AMINOFF:  Your Honor, it's being offered for Mr. Guy's state of mind, not for the truth.

**UNITED STATES DISTRICT COURT**

MS. TAIT:  It's relevant -- relevance, Your Honor.

MR. AMINOFF:  Your Honor, I really just want --

THE COURT:  Really just want what?

MR. AMINOFF:  I was waiting for you to finish reading.  Do you want me to address it from here?

THE COURT:  Because I only want to read what --

MR. AMINOFF:  Sure, sure.  It's just the last couple of lines, Your Honor.  The sentence beginning, "The potential investors..."  I believe it's the third line from the bottom -- fourth line from the bottom.

THE COURT:  Of 186?

MR. AMINOFF:  1166.

THE COURT:  Okay.  1166, which --

MS. TAIT:  Your Honor, if the focus is on the last three lines, then we don't object.

MR. AMINOFF:  Okay.

THE COURT:  Okay.  So you can have the last three lines.

MR. AMINOFF:  Yes.  Thank you, Your Honor.

If we can publish and maybe zoom in on the last three lines.

Q.    (BY MR. AMINOFF:)  Okay.  So, Mr. Guy, in this e-mail you were talking with Mr. Fritsch about bringing in other possible investors; is that right?

A.    Yes.  Looks that way.

**UNITED STATES DISTRICT COURT**

Q.   Okay.  And you were referring to these investors as people who were interested in companies that are close to the revenue inflection point; right?

A.   Yes.

Q.   Okay.  Nothing further with that.

MR. AMINOFF:  Your Honor, if I could just have a moment?

THE COURT:  Sure.

(Off-the-record discussion.)

Q.   (BY MR. AMINOFF:)  Mr. Guy, do you know if Ian Mann received a call from Jim Polsen after the 2015 revenue statement was allegedly made?

MS. TAIT:  Objection.  Hearsay.

THE COURT:  Not to that question.

THE WITNESS:  Not to my knowledge.

Q.   (BY MR. AMINOFF:)  Not to your knowledge.

Sir, you testified on direct about, um, Mr. Fritsch's statements about a possible deal with Disney.  Do you remember that?

A.   I do, yeah.

Q.   Okay.  And there was talk of a possible merger?

A.   Yep.

Q.   And a company called Moelis.  Do you remember that?

A.   Yes.  Investment bank, yeah.

Q.   Could you take a look at Tab 1189, please.

**UNITED STATES DISTRICT COURT**

A.    1189.

THE COURT:  Did you add that to his book?

Q.    (BY MR. AMINOFF:)  I'm sorry, sir.  It's in the pocket in the back of your book.

A.    Oh, okay.

Okay.

Q.    Do you recognize that document, sir?

A.    I don't recall it.

Q.    You don't remember that.

Does it appear to be an e-mail from Bernhard Fritsch to you?

A.    It does.

Q.    Okay.  And that's your e-mail address next to your name on the "To" line?

A.    It is.

MR. AMINOFF:  Okay.  Move to admit, Your Honor.

MS. TAIT:  Your Honor, I believe this was admitted over the Government's objection -- objection.

MR. AMINOFF:  I believe so.

MS. TAIT:  Yes.

MR. AMINOFF:  Thank you, Your Honor.

Could we publish?

Q.    (BY MR. AMINOFF:)  So, sir, if you turn to page -- and I apologize.  It's not numbered.  But if you turn to page 2.  The bottom of page 2, you see the start of an e-mail

from Bernhard Fritsch to Kevin Mayer?

A.    Yep, I do.

Q.    Do you know Kevin Mayer to be high up in Disney?

MS. TAIT:  Objection.  Calls for speculation.

MR. AMINOFF:  Asked if he knew.

THE COURT:  Yeah.  Don't speculate.

THE WITNESS:  My understanding.

Q.    (BY MR. AMINOFF:)  You understand he's a higher up at Disney?

A.    Yes.

Q.    Okay.  If you could turn to the next page.  And you see this e-mail from Mr. Fritsch to Kevin Mayer?

A.    Yes.

Q.    And it references an M&A transaction?

A.    It does.

Q.    And it references Moelis?

A.    It does.

Q.    Okay.  And then if you turn back to page 2, and you see Mr. Mayer's response to Mr. Fritsch?

A.    I do.

Q.    And nowhere does Mr. Mayer say, You got it wrong, there's no M&A transaction?

MS. TAIT:  Objection.  Calls for speculation.  Again, for the -- this is not for the truth of the matter asserted, Your Honor, my understanding.

UNITED STATES DISTRICT COURT

MR. AMINOFF:  No, it's not.  It doesn't call for speculation, Your Honor.  I asked him if it says that.

THE COURT:  Well, we don't need him to read from a document that's in evidence.

MR. AMINOFF:  Your Honor --

THE COURT:  Ask a different question.

MR. AMINOFF:  All right.

Q.    (BY MR. AMINOFF:)  Mr. Mayer does not deny the existence of a possible M&A transaction in this e-mail, does he?

A.    Doesn't look like it, no.

Q.    And he actually refers Mr. Fritsch to someone who works at Moelis; right?

A.    Yes.  Yes, he does.

Q.    In fact, the co-founder of Moelis?

MS. TAIT:  Objection.  Calls for speculation.

THE COURT:  If you know.

Q.    (BY MR. AMINOFF:)  If you know.

THE COURT:  Do you know?

Q.    (BY MR. AMINOFF:)  Do you know?

A.    Yeah, I don't know.

Q.    Okay.  Mr. Guy, you met with the FBI several times in this case, didn't you?

A.    Yes.

Q.    You met with the FBI on December 14th, 2016; is that

accurate?

A.    Refresh my memory.

Q.    Sure.  If you can take a look at Tab 1142.

THE COURT:  Do you have that, sir?

Q.    (BY MR. AMINOFF:)  Sir, do you now recall that you met with the FBI in December of 2016?

A.    Yes.

Q.    And that meeting was at the Fairmont Hotel?

A.    I don't recall the hotel but, yes, at a hotel.

Q.    If you read just to yourself that first paragraph.

A.    Okay.  Yep.

Q.    Do you now recall that the meeting was at the Fairmont Hotel?

A.    Fairmont, yeah.

Q.    And you met with the FBI again in May of 2017?

A.    Again, refresh me on these timelines.

Q.    Sure.  If you could look at Tab 1143, please.

(Exhibit No. 1143 for identification.)

THE WITNESS:  Okay.

Q.    (BY MR. AMINOFF:)  And excuse me, you -- do you recall that you had a phone call with the FBI in May of 2017?

A.    Yes.

Q.    And then another meeting with the FBI later in May of 2017?

A.    Again, refresh me.

**UNITED STATES DISTRICT COURT**

Q.    Sure.

Can you go to -- it should be 1144.

(Exhibit No. 1144 for identification.)

THE WITNESS:  Okay.

Q.    (BY MR. AMINOFF:)  Do you now recall that you met with the FBI in --

A.    I don't remember timelines but, yes, I understand.

Q.    Was that meeting at Shutters on the Beach in Santa Monica?

A.    I think so, yes.  Yes.

Q.    And you met with the FBI again in June of 2017?

A.    Again, refresh me.

Q.    Sure.  If you could go to Tab 1145.

(Exhibit No. 1145 for identification.)

MS. TAIT:  Your Honor, just to be clear, this is a telephonic meeting.

Q.    (BY MR. AMINOFF:)  You met with the FBI by phone in June of 2017?

A.    Yes.

Q.    And you had another telephonic interview with the FBI in July of 2017?

A.    Again, refresh me but --

Q.    Yeah.  Could you go to Tab 1147, please -- or sorry.  1146.

(Exhibit No. 1146 for identification.)

THE WITNESS:  Okay.  Yep.

Q.    (BY MR. AMINOFF:)  And then you met with the FBI again in August of 2017, it was a telephonic meeting?

A.    I assume that's 1147.

Q.    That would be 1147, yes, sir.

A.    I would say yes.

Q.    All right.  And then again in September of 2024. And this was via Teams?

A.    Okay.  Yep.

Q.    And this time, the prosecutors were also present?

A.    Yes.

Q.    And then again in October of 2024?  You know what? Yes, October of 2024.  Excuse me.

A.    Okay.  Yep.

Q.    And again, the prosecutors here were present for that meeting?

A.    Yes.

Q.    And then again in December of 2024?

A.    I assume that's 150?

Q.    Yes, sir.  150 -- 1150.

        (Exhibit No. 1150 for identification.)

        MS. TAIT:  By Teams again, counsel?

        MR. AMINOFF:  Yes.

        THE WITNESS:  Okay.  Yep.

Q.    (BY MR. AMINOFF:)  And, again, the prosecutors were

UNITED STATES DISTRICT COURT

present for that one?

A.    Yes.  Yep.

Q.    And then you were interviewed again January of 2025? That's Tab 1151.

A.    1151.  Date -- okay.  Yep.

Q.    And the prosecutors were present again for that one?

A.    Yes.

MR. AMINOFF:  All right.  Could we pull up Government Exhibit 126?

Q.    (BY MR. AMINOFF:)  Mr. Guy, I believe this exhibit was admitted on direct examination.  Do you recall going over this exhibit with the Government?

A.    Can you blow it up, please?

Q.    Sure.  I want to address -- actually, you know what? That's not blowing it up.

MR. AMINOFF:  Could you focus -- go down.  There you go.  Is there a way to get rid of that yellow line?

THE WITNESS:  Yes.

Q.    (BY MR. AMINOFF:)  Do you recall going over this e-mail from Mr. Fritsch to you dated January 23rd, 2015?

A.    Yes.

Q.    I notice when you went over it on direct, you skipped the part after the word "However."

MS. TAIT:  Objection to the extent it was -- not the witness's decision to do so.

UNITED STATES DISTRICT COURT

MR. AMINOFF:  I wasn't trying to suggest it was.

THE COURT:  Well, now we know it wasn't.

Ask another question.

Q.    (BY MR. AMINOFF:)  Sir, you were aware that Mr. Fritsch offered to make the paperwork available to Mr. Cohen; is that right?

A.    Yeah.  He said that in this e-mail.

Q.    Do you know if Mr. Cohen took him up on that?

A.    I do not.

Q.    Did you ask Mr. Cohen to take him up on that?

A.    I don't recall but, you know -- I can't guess, so I don't recall.

Q.    Okay.  I just wanted to clarify.  You are currently suing Mr. Fritsch in Los Angeles Superior Court for the issues related to this case; is that right?

A.    I'm one of three plaintiffs, yes.

Q.    Okay.  And lastly, you first met Mr. Fritsch in approximately January -- December of 2013; is that right?

A.    I think that's the correct time frame, yes.

Q.    Okay.  And at that time, he -- he told you about his company; is that right?

A.    Um, I -- yes.

Q.    Did he show you any sizzle reels?

A.    Sizzle reels?

Q.    Like videos, video trailers.

A.    I think he did.

Q.    Did he show you video trailers other than that?

MS. TAIT:  Objection.  Vague.

THE COURT:  Sustained.

Q.    (BY MR. AMINOFF:)  Between 2013 and 2017, did you see other video reels about StarClub?

A.    As in -- define "video reels," as in sports stars, video postings --

Q.    Like trailers, promotional materials, things like that.

A.    Yeah.  Neymar.

Q.    Okay.

A.    There's a few celebrities, yeah.

Q.    Okay.  And ultimately in 2013, you thought Mr. Fritsch had a good idea; is that right?

A.    Yeah.  I did.

Q.    Okay.  And you thought this idea was potentially worth millions of dollars; is that right?

A.    Had the potential to be, yes, as he laid it out.

MR. AMINOFF:  One moment.

(Off-the-record discussion.)

MR. AMINOFF:  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Redirect.

MS. TAIT:  Yes, Your Honor.  Thank you.

UNITED STATES DISTRICT COURT

**REDIRECT EXAMINATION**

BY MS. TAIT:

Q.    Could you please -- thanks, Mr. Guy.

MS. TAIT:  Would you please display Exhibit 127?

THE WITNESS:  Are we talking --

Q.    (BY MS. TAIT:)  What's going to be on the screen, Mr. Guy.

A.    Okay.  Sure.

Q.    It's already in evidence.

So showing you Exhibit 127, down in the e-mail from Mr. Fritsch, after he tells you he wants to complete a $10 million fundraise, that's directed at you -- right? -- asking you for more money?

A.    Yes.

MR. AMINOFF:  Objection, Your Honor.  The document speaks for itself.

THE COURT:  Overruled.

Q.    (BY MS. TAIT:)  So what does he say here about the meeting with Disney?

A.    "The meeting with Disney was better than expected. We decided to engage an investment banker whom we both know and trust from Moelis & Company."

MR. AMINOFF:  Your Honor, objection.  We've already covered this.  It's cumulative.

MS. TAIT:  Your Honor, if I could have a little --

THE COURT:  Overruled.

Q.    (BY MS. TAIT:)  Mr. Guy, could you continue after the parenthetical, "And start"?

A.    Oh, sorry.  "And start the process of an M&A transaction with Disney."

Q.    So you understood to be talking about Disney, an M&A transaction with Disney; right?

A.    Yes.

Q.    So I'm going to switch to the defense Exhibit 1189.

Thank you.

And in this exhibit, we're looking here at pages 2 to 3, Mr. Fritsch sending a -- an e-mail to Kevin Mayer entitled "Confidential M&A Transaction - Moelis."  Do you see that?

A.    Yes.

Q.    And this is about a week after the -- the e-mail that we just saw from you where Mr. Fritsch told you that we, he and Disney, were engaging in a -- a banker; right?

A.    Yes.

Q.    So here, what is Mr. -- Mr. Fritsch says he would like the idea -- he likes the idea of engaging with a trusted banker and is looking forward to connect with the banker from Moelis and work -- elaborate with him, the banker, on various options to proceed; right?

A.    Yes.

MR. AMINOFF:  Your Honor, I think Ms. Tait is testifying.  That's -- if Mr. Guy wants to --

THE COURT:  Overruled.  But --

MS. TAIT:  I'll move very quickly, Your Honor.

Q.    (BY MS. TAIT:)  So on page 2, Mr. Mayer's response.  Does Mr. Mayer in that response say anything about Disney merging with StarClub?

A.    It does not.

Q.    Does Mr. Mayer instead simply introduce Mr. Fritsch to an investment banker he happens to know that's his good friend at Moelis?

A.    He does.

Q.    Isn't there a disconnect between Mr. Mayer handing off --

MR. AMINOFF:  Objection, Your Honor.

Q.    (BY MS. TAIT:)  -- Mr. Fritsch --

THE COURT:  Let me hear the question.

Q.    (BY MS. TAIT:)  Is there a disconnect between Mr. Fritsch *[sic]* handing off Mr. Fritsch to an investment banker, go in peace, and actually saying we're in a deal with you, Mr. Fritsch?

MR. AMINOFF:  Objection, Your Honor.

THE COURT:  Sustained.

Q.    (BY MS. TAIT:)  So let's talk about some of the investors.

UNITED STATES DISTRICT COURT

Looking at Exhibit 201, please, already in evidence, page 3.

So up here at the top, where Mr. Fritsch says that current investors include Access Industries --

MR. AMINOFF:  Your Honor, objection.  Asked and answered.  It's all cumulative.

MS. TAIT:  Well, Your Honor, I do have a question.

THE COURT:  Then ask it, please.

Q.    (BY MS. TAIT:)  Here where Mr. Fritsch identifies specific investors, is that optimism?

MR. AMINOFF:  Your Honor, same objection.

THE COURT:  Sustained.

Q.    (BY MS. TAIT:)  Did Mr. Fritsch ever indicate to you that these companies were -- let me just withdraw that.

Exhibit -- defense Exhibit 1177.

MS. TAIT:  Do we have that?  Instead, we can do -- we'll do the Government's version.  Just a moment.  It could be Government's 111 too.

Q.    (BY MS. TAIT:)  Okay.  We're looking at Exhibit 1177.  So I think when it was -- oops.  Sorry.

MS. TAIT:  What just happened?  We can put up ours.

Q.    (BY MS. TAIT:)  Okay.  There it is.  1177.

So you say to Mr. Fritsch, "Ton Burkle at the table" -- but I think you testified on direct you meant "Ron Burkle is at the table"?

A.    Yes.

Q.    And Ron Burkle is important because Goldman Sachs would care about Ron Burkle?

MR. AMINOFF:  Your Honor, objection.

THE COURT:  Sustained.

Q.    (BY MS. TAIT:)  And when you say you need 30 million additional capital, that's just what Mr. Fritsch told you that was needed; right?

MR. AMINOFF:  Your Honor, same objection.

THE COURT:  Sustained.

Q.    (BY MS. TAIT:)  You were having calls with Mr. Fritsch very frequently during the time period of -- of your active investment?

A.    Yes.

Q.    And e-mails with him very frequently; right?

A.    Yes.

Q.    And so did you put more weight into whatever Goldman Sachs might have told you or what Mr. Fritsch was telling you?

A.    Mr. Fritsch, as he runs the company.

Q.    And as far as you knew, Mr. Fritsch -- you don't know what he was telling Goldman Sachs?

A.    No idea.  I was not in those meetings.

Q.    Okay.  So you -- you were asked about pitch meetings that you took as a fund manager of just generically, generally.

Would you distinguish the -- a pitch meeting from the kind of relationship you developed with Mr. Fritsch once you were post investment?

A.      Oh, absolutely.

Q.      How is it different?

A.      Well, we have -- we have a -- we have a large investment in the company.  It's -- we were monitoring those -- those companies daily.  We're talking to the CEOs daily.  And you develop a rapport with them.  I mean, you're -- you're hand in hand with them helping grow the company.

Q.      And so you're not expecting to be receiving puffery at these conversations with the CEO?

A.      No.  No.

Q.      Let's look at --

MS. TAIT:  Can we put up defense Exhibit 1160, please?  And let's look at page 2.

Q.      (BY MS. TAIT:)  And so, Mr. Guy, I think you were trying to explain something about convertible debt analysis, the subtitle of this page.  What were you trying to explain?

A.      That this wasn't a -- a shareholder list.  This was the convertible debt analysis; if it was converted, who owned what.

Q.      So, in other words, this is a projection of what people might own if they converted their shares, their debt that they owned to shares?

A.    Yeah.  And only -- only the companies that own the debt.

Q.    So it didn't list all of the companies in the -- in the -- all the investors in the company?

A.    It did not.

Q.    Okay.  We reviewed a sum- --

MS. TAIT:  You can take that down.  Thank you.

Q.    (BY MS. TAIT:)  We reviewed some contracts, you reviewed with the -- with the defense.  How many of those contracts said that Mr. Fritsch could use the money he was raising however he wanted?

A.    None.

Q.    How many of those contracts said that Mr. Fritsch could tell you lies?

MR. AMINOFF:  Objection, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  None.

Q.    (BY MS. TAIT:)  You were asked about whether you used the StarClub app.  Did -- did you -- I mean, you didn't really use it.  So what were you relying on to understand what it's about?

A.    Mr. Fritsch.

Q.    So you had the ear of the CEO, so he could tell you what the app was all about; right?

**UNITED STATES DISTRICT COURT**

A.    Yes.

Q.    And at least he could -- okay.

So technology was part of the value of the company?

A.    Yes.

Q.    But revenue was also part of the value of the company; right?

A.    100 percent.

Q.    And how about the deals that Mr. Fritsch described that were on the table?  Was that part of the value of the company?

A.    Yes.  Yes.  To solicit the additional capital, yes.

Q.    And how about the identity of big investors like Credit Suisse being actual investors in StarClub?  Wasn't that also part of the allure of investing?

A.    It gives validity to what he's saying.

Q.    And also, the $200 million commercial deal with Access that he predicted for you, was that also important to investment decisions?

A.    Absolutely.

Q.    So as compared to, like, getting a valuation of the technology, um, does that -- let me see how to phrase this.

If the CEO isn't telling you the truth, how much does it matter whether the app works?

A.    It doesn't.

Q.    But you thought the app worked; right?

UNITED STATES DISTRICT COURT

A.    Yes.

Q.    Based on what Mr. Fritsch told you?

A.    And that he had signed up celebrities and sports stars, yes.

Q.    Okay.  So you're not denying -- let me rephrase -- let me move on.

Let's talk about revenue.  Let's look at Exhibit 171, page 1.

So do you remember this document -- we reviewed this on direct -- in April of 2016?

A.    Yes.

Q.    And it had an attachment which was a slide deck; right?

A.    Yes.

Q.    So let's look at this slide page -- I think it's page 19.

MR. AMINOFF:  Objection.  Same objections.  It's cumulative.  We already covered it.

THE COURT:  Is this something new?

MS. TAIT:  It's a different question, Your Honor.

THE COURT:  Okay.

MS. TAIT:  No, I'm sorry.  I guess it's 18.  17? Oh, my gosh.

Your Honor, let me just have one moment to find the right page.

THE COURT:  Okay.

MS. TAIT:  It's page 16.

Q.    (BY MS. TAIT:)  So this was -- this is a slide where there was historical and forecast results.  Do you see that?

A.    Yes.

Q.    So would you agree that the $15 million historical number was relatively minimal compared to the forecast results for the future?

A.    Yes.

Q.    So is that what you meant by minimal revenue?

A.    Yes.

Q.    And then defense Exhibit 1166 --

MS. TAIT:  Oh, sorry.  Could you display that?  Would you mind?  Thank you.

Q.    (BY MS. TAIT:)  So you were asked about your statement here about close to the revenue inflection point.  What's the revenue inflection point?

A.    That's when the sales go vertical.

Q.    Can you put that in laymen's terms?

A.    It's sort of like the hockey stick point.  It's where everybody wants to invest, where the heavy lifting is done and then the revenue -- the company just needs growth capital and then the revenues explode and the valuation explodes.

Q.    So you weren't saying that StarClub didn't have

UNITED STATES DISTRICT COURT

15 million in revenue?

A.    No.

Q.    You were just saying it's at the point where --

MR. AMINOFF:  Objection, Your Honor.  Leading.

MS. TAIT:  I'll just withdraw it.

Q.    (BY MS. TAIT:)  You believed Mr. Fritsch when you heard -- in the January 2016 meeting, you believed what you heard, that the revenue was $15 million; right?

A.    Yes.

Q.    Regarding any statements that you might have heard about on the cross relating to Goldman Sachs, you don't know if any of those statements that you might have been asked about that -- the contents of, you don't know if any of them were true or not; right?

A.    I do not.

Q.    Did anything that Goldman Sachs tell you at the points in time you were questioned about on cross, did anything they said to you cause you to believe that Mr. Fritsch was telling you false -- telling you something false in the other things that we reviewed?

A.    No.

Q.    They didn't tell you anything to make it seem false that Ron Burkle was really at the table?

A.    No.

Q.    Or that Disney was in an M&A transaction?

UNITED STATES DISTRICT COURT

A.    No.

Q.    Or that Maker Studios was about to enter a commercial deal?

A.    No.

Q.    Or that Access was going to write a big check and --

A.    No.

Q.    -- imminently?

A.    No.

Q.    Or that Credit Suisse was or was not an -- was not an investor?

A.    No.

Q.    So none of those things were denied -- were exposed when you spoke to Gold- -- in whatever conversations you might have had with Goldman Sachs?

A.    Correct.

Q.    So you didn't all of a sudden disbelieve the facts that Mr. Fritsch told you based on the specific e-mails that we've reviewed?

MR. AMINOFF:  Objection, Your Honor.  Asked and answered.

THE COURT:  One more time.  You can answer, sir.

THE WITNESS:  No.

Q.    (BY MS. TAIT:)  And counsel questioned you about a document that has attached to it a presentation by Goldman Sachs, which I understand is being -- allegedly by

**UNITED STATES DISTRICT COURT**

Goldman Sachs, which I understand may be omitted.  Do you remember that?

A.    I do.

Q.    Do you remember looking at it yourself in the binder?  I think it's Exhibit 1185 if you want to look at it.  We're not going to publish it.

A.    I do, yes.

Q.    Do you want to have a look at it right now?

A.    Sure.

Q.    I think it's the last couple pages, last three pages.

A.    Okay.

Q.    I think you were interrupted when you were asked about it.  But it sounded like you were saying this was a wish list of people to pitch the company to?

MR. AMINOFF:  Objection.  Leading, Your Honor.

THE COURT:  Please rephrase your question, Ms. Tait.

Q.    (BY MS. TAIT:)  Okay.  Considering -- concerning the list of companies, what was your understanding of what was being conveyed here?

A.    This was a list of companies that theoretically could be interested in what StarClub had to offer.

Q.    Okay.  You were asked about a lot of interviews that you had with the FBI.  Do you remember that?

A.    Yes.

Q.   In any of those times, did any Government representative tell you how to testify today?

A.   No.

Q.   And I know we've reviewed many specific statements in the direct that Mr. Fritsch, you know, made to you.  With all those specific statements about share prices, who's an investor, deals that are in the offing, would you regard those as being just optimism?

A.   No.  It's far more advanced than that.  These are transactions that were on the burner and close to closing.

Q.   Okay.

MS. TAIT:  Just a moment, Your Honor.

THE COURT:  All right.

MS. TAIT:  No further questions.

THE COURT:  Recross?

MR. AMINOFF:  Yes, Your Honor.  Thank you, Your Honor.

**RECROSS-EXAMINATION**

BY MR. AMINOFF:

Q.   Mr. Guy, you spoke about the meetings that you had with Mr. Fritsch and how those were not -- were not pitch meetings at that point; right?

A.   Well, other than the beginning.

Q.   Other than the beginning.  Fair enough.

So in those meetings, I believe you told Ms. Tait

that you didn't expect sort of puffery and stuff like that; is that right?

A.    Yeah.  You want the facts.  Once you're invested, you want the facts of where the company is.

Q.    Sure.

And when you're considering an investment in that period of time, isn't that when the due diligence period would ordinarily go?

MS. TAIT:  Objection, Your Honor.  Jury instruction.  403.

THE COURT:  Sustained.

MR. AMINOFF:  Your Honor, I believe the Government opened the door to that line of questioning.

THE COURT:  No.

MR. AMINOFF:  No.

MS. TAIT:  Your Honor, I don't see how.

THE COURT:  I just said no.

MS. TAIT:  I'm sorry, Your Honor.

Q.    (BY MR. AMINOFF:)  Mr. Fritsch, the Government asked you about the contracts that were signed in the case.  Do you remember that, done on redirect examination just now?

A.    Yes.

Q.    Ms. Tait asked you if Mr. Fritsch could lie based on these contracts; is that right?

A.    What are you talking about?  Subscription

UNITED STATES DISTRICT COURT

agreements?

Q.    Yes, sir.

A.    Oh, yeah.  Absolutely.

Q.    Okay.  I'd like to go back through those subscription agreements with you and just highlight a couple of points.

MS. TAIT:  Objection, Your Honor.  Cumulative.

MR. AMINOFF:  Your Honor, I wasn't --

THE COURT:  Overruled.

MR. AMINOFF:  Thank you, Your Honor.

Could we pull up 1161?  And let's go to -- go to page 4, paragraph 6(f).  6(f).  Yeah.  (f).

Q.    (BY MR. AMINOFF:)  So this is a subscription agreement that you signed --

MS. TAIT:  Your Honor, I believe this was excluded.

THE COURT:  Yes.

MR. AMINOFF:  Your Honor, I think the Government opened the door to it with its line of questioning just now.

THE COURT:  No.

MR. AMINOFF:  No?  Okay.

THE COURT:  Take that off the screen.

MR. AMINOFF:  Oh, sorry.  Let's take it down. Excuse me.

If I can have a moment, Your Honor?  Thank you.

(Off-the-record discussion.)

UNITED STATES DISTRICT COURT

MR. AMINOFF:  Your Honor, could we approach very briefly?

(At sidebar:)

MR. AMINOFF:  Your Honor, I just wanted to say for the record that I think the Government opened the door with respect to the contracts.  Ms. Tait asked the witness if there was no portion of the contract that allows Mr. Fritsch to do whatever he wants.

And I think the portions of the contract that I'm trying to highlight make very clear that the statements of the person are -- that Mr. Guy is not relying on statements made by Mr. Fritsch.

I think it's directly responsive to what the Government just asked.

MS. TAIT:  Your Honor, Monica Tait.

The Court did allow the defense to go over certain paragraphs of the contracts and, um, the Court sustained the objections because there is case authority indicating that contracts like these are not controlling on criminal cases and that you still have an intent to defraud and it's not relevant.

And so to the extent that -- I don't think we opened any doors there to be able to go and explore that particular provision.

MR. AMINOFF:  Your Honor, respectfully, I don't think that Ms. Tait is correct when she says it's not relevant.

I think it is relevant.  It's just not dispositive.

THE COURT:  No.

MR. AMINOFF:  No?  Okay.

THE COURT:  No.

MS. TAIT:  Thank you, Your Honor.

(In the presence of the jury:)

MR. AMINOFF:  Mr. Guy, thank you very much.

No further questions.

THE WITNESS:  Thank you.

THE COURT:  May the witness be excused?

MS. TAIT:  The Government is fine.

THE COURT:  Wait a minute.  Sir, I didn't excuse you.

THE WITNESS:  Sorry.

MR. AMINOFF:  He can be excused.

THE COURT:  All right.  Thank you very much, sir. You're excused.

Does the Government have another witness?

MS. TAIT:  We do.

MR. DE LEON:  Yes, Your Honor.  At this time, the Government would call Richard d'Abo.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

Please state and spell your full name for the record.

THE WITNESS:  It's Richard d'Abo, d, apostrophe, A-b-o.

THE COURT:  Common spelling for Richard?

You may proceed.

RICHARD D'ABO,

called as a witness by the plaintiff, was sworn and testified as follows:

**DIRECT EXAMINATION**

BY MR. DE LEON:

Q.    Good afternoon, Mr. d'Abo.

A.    Hi.

Q.    Can you tell the jury where you work?

A.    Yeah.  I'm a partner at the Yucaipa companies.

Q.    And what is Yucaipa?

A.    It's a private equity firm.

Q.    How long have you been a partner with Yucaipa, Mr. d'Abo?

A.    My last round is about 21 years.

Q.    And as a partner at Yucaipa -- Yucaipa, what are your roles and responsibilities?

A.    Um, that basically to -- to find good deals to do for us and at the same time look after the portfolio of deals that -- that we have.

Q.    Mr. d'Abo, during your time at Yucaipa, are you aware of people reaching out to Yucaipa to get Yucaipa to invest into their company?

A.    Yes.

Q.    And based on your personal experience, what is the benefit to a small company of getting an investment from Yucaipa?

MR. THREATT:  Objection, Your Honor.  Speculation.  Opinion.

THE COURT:  Overruled.

Q.    (BY MR. DE LEON:)  You can answer, Mr. d'Abo.

A.    Sorry.  Could you repeat the question again?

Q.    Of course.

Based on your personal experience, what is the benefit to a small company of getting an investment from Yucaipa?

A.    It's probably very good because of our reputation and size, it adds credibility.

Q.    Mr. d'Abo, I want to direct your attention to in or around 2014.  Do you recall meeting -- do you recall meeting Mr. Fritsch?

A.    Yes.

UNITED STATES DISTRICT COURT

Q.    What do you recall from that meeting?

A.    Um, yeah, not -- I mean, I don't recall a lot because it was a long time ago.  Um, and I think we had a very cordial meeting.  And I -- but I don't remember many details.

Q.    Do you -- did you hear about a company called StarClub during that meeting?

A.    Yes.

Q.    And what do you recall the discussion was about regarding StarClub?

A.    I think he had a very successful -- I can't remember the name of the actor.  But he had a very, um -- he was doing, um, a lot of online, um, publicity and other things or taking care of that actor's overall Internet presence.  And I think that that was fairly extensive, what he was doing.

Q.    During that interaction with Mr. Fritsch, did you leave him with an impression that Yucaipa was going to invest into StarClub?

MR. THREATT:  Objection, Your Honor.  Speculation.

THE COURT:  Sustained.

Q.    (BY MR. DE LEON:)  During that meeting, did you ever tell Mr. Fritsch that Yucaipa was going to invest into --

MR. THREATT:  Objection.  Hearsay, Your Honor.

Q.    (BY MR. DE LEON:) -- StarClub?

THE COURT:  Overruled.

THE WITNESS:  No.

UNITED STATES DISTRICT COURT

Q.    (BY MR. DE LEON:)  Mr. d'Abo, as a partner at Yucaipa, do you look for investments for Yucaipa to make?

A.    Yes.

Q.    Is there a process that you follow when you find an attractive investment opportunity?

THE COURT:  Could you put this in an appropriate time frame, please?

Q.    (BY MR. DE LEON:)  From 2014 to 2017, if you found a company that was an attractive investment opportunity, what would that process look like?

A.    Um, you know, we would do extensive due diligence and we would come up with a write-up to then present to the investment committee.

Q.    Did any of that happen with StarClub?

A.    No.

Q.    Mr. d'Abo, I want to show you a couple of e-mails that have already been admitted into evidence.

MR. DE LEON:  Mr. Flores, if you would publish Government Exhibit 108.  And if you could blow up the July 18th e-mail, Mr. Flores.

Q.    (BY MR. DE LEON:)  Mr. d'Abo, I want to direct your attention to the sentence beginning with "Richard d'Abo."

(Telephonic interruption.)

THE WITNESS:  Sorry.  I'm sorry.  Sorry.

Q.    (BY MR. DE LEON:)  Mr. d'Abo, directing your

UNITED STATES DISTRICT COURT

attention to the sentence beginning with "Richard d'Abo." This is an e-mail from Bernhard Fritsch to Danny. And it writes, "Richard d'Abo, Ron Burkle, CFO, is putting the deal together."

Is that -- is that an accurate statement, to your knowledge, Mr. d'Abo?

MR. THREATT: Objection, Your Honor.

THE COURT: Overruled.

THE WITNESS: No.

Q. (BY MR. DE LEON:) Was Mr. -- can you tell us who Ron Burkle is, Mr. d'Abo?

A. Yeah. He is -- he is our managing partner and he's my boss.

Q. At Yucaipa?

A. Yes.

Q. And it notes Ron Burkle, CFO.

Have you ever been CFO at Yucaipa?

A. No.

Q. What has been your position at Yucaipa?

A. I'm a partner at Yucaipa.

Q. Mr. d'Abo, were you ever putting a deal together between Yucaipa and StarClub?

A. No. I was looking at the company, but I did not put a deal together.

Q. And to your knowledge, did Yucaipa ever provide a commitment to invest into StarClub?

A.    No.

MR. DE LEON:  Mr. Flores, would you please publish what's been previously admitted as Government Exhibit 111.  If you could blow it up, please.

Q.    (BY MR. DE LEON:)  I want to direct your attention to the sentence beginning with "Yes."  "Yes, according to Ron B., we have a deal for $9 per share.  Plus get the talent of his management firm for SC.

"He cannot get pinned down to the final dollar amount.

"I will see him again on Wednesday.  I also" picked him -- "I also asked him to come to Toronto.  He liked the idea but it's not confirmed yet.

"Paperwork will get done by his CFO, Richard d'Abo, who called me and asked" what we have -- "asked that we have to work with their speed but he will get it done.  Whatever this means at the end.  Let's stay tuned."

MR. THREATT:  Objection, Your Honor.  I think counsel's just reading the e-mail into the record.

MR. DE LEON:  I'm about to ask him questions about the e-mail.

THE COURT:  Go ahead.

Q.    (BY MR. DE LEON:)  At this time, Mr. d'Abo, were you CFO?

A.    No.

Q.    Did you ever tell Mr. Fritsch that Yucaipa had a deal with StarClub for $9 per share?

MR. THREATT:  Hearsay, Your Honor.

MR. DE LEON:  Effect on the listener, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  No.

Q.    (BY MR. DE LEON:)  Did you ever tell Mr. Fritsch that you would get the paperwork done for a deal between StarClub and Yucaipa?

A.    No.

Q.    Did you ever call Mr. Fritsch and tell him that StarClub had to work at Yucaipa's speed to get the deal done?

A.    I don't recall that.

Q.    Would you recall if that did happen?

MR. THREATT:  Objection, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I -- it's so long ago.

Q.    (BY MR. DE LEON:)  One final e-mail.

MR. DE LEON:  Mr. Flores, if you would publish Government Exhibit 113, please.

Q.    (BY MR. DE LEON:)  Referring you to the August 10th, 2014, e-mail.  Starting with the sentence "The deals."

MR. DE LEON:  Mr. Flores, if you could highlight that sentence.

Q.    (BY MR. DE LEON:)  On August 10th, 2014, at 3:15 PM,

UNITED STATES DISTRICT COURT

this is Mr. Fritsch writing, "The deals Universal and Yucaipa will realistically close at the end of this month between August 22 and 28."

Mr. d'Abo, was there a deal closing between Yucaipa and StarClub in August 2014?

A.    Not to my knowledge.

Q.    Mr. d'Abo, to your knowledge, was there ever a deal closing -- sorry -- let me rephrase the question.

To your knowledge, was there ever a deal to be closed between Yucaipa and StarClub?

A.    Not to my knowledge.

MR. DE LEON:  One second, Your Honor.

No further questions from the Government.

THE COURT:  Cross-examination.

MR. THREATT:  Your Honor, I don't expect to be able to finish my cross-examination in the ten minutes we have remaining.  Would it possible be able to take this up tomorrow --

THE COURT:  You have 13 minutes so --

MR. THREATT:  Okay.  Yes, Your Honor.

Your Honor, may I approach?  I have a binder for the Court and one for the witness.

THE COURT:  Yes.

///

///

**CROSS-EXAMINATION**

BY MR. THREATT:

Q.    Now, Mr. d'Abo, good afternoon.

As I think you made clear on direct, the events you just spoke about all happened over a decade ago; right?

A.    Correct.

Q.    And I think you agree, that makes it very difficult to remember what exactly happened?

A.    Correct.

Q.    And you were trying to recall this information with the prosecutor without the benefit of any documents or your own e-mails; right?

A.    Correct.

Q.    I --

MR. THREATT:  Motion to withdraw that, Your Honor.

Q.    (BY MR. THREATT:)  As a partner at Yucaipa, you used an e-mail address presumably for work; right?

A.    Can you repeat the question?

Q.    As a partner at Yucaipa companies, you regularly communicate with people by e-mail to conduct business?

A.    Correct.

Q.    What was your e-mail address during this time frame, which would be the summer of 2014?

A.    Probably Richardd'Abo@YucaipaCo.com.

Q.    Would you have any others?

A.    Not -- not on my work side, no.  I don't believe so.

Q.    What about Richardd'Abo@mac.com?

A.    Yes.

Q.    And that's another one you used for business; correct?

A.    No.  That's my personal e-mail.

Q.    So you never used it to conduct business?

A.    Sometimes.

Q.    Okay.  Now, despite the -- these interactions with Mr. Fritsch having happened over a decade ago, you do recall that he had found success online for one star; correct?

A.    Correct.

Q.    You just can't remember exactly which star?

A.    It's a big name star.

Q.    Was it Enrique Iglesias?

A.    I think, yeah, maybe it was him.  Yep.

Q.    And in your role looking for attractive investments for Yucaipa, you felt like StarClub was doing something interesting for that star; correct?

A.    Correct.

Q.    Okay.  And that, I believe, was the point of entry for Yucaipa; right?

A.    Yes.

Q.    Okay.  And at this time, again, in 2014, there was less star presence on the Internet as compared to today; right?

A.    Correct.

Q.    Okay.  Do you recall how you met Mr. Fritsch?

A.    Um, yes.  I met him with -- through a friend of mine, David Rich.

Q.    David Rich.

Do you recall if that was in April of 2014?

A.    I -- that, I couldn't tell you.

Q.    You don't remember?

A.    No.  I mean, probably -- if -- probably around that time, I just don't -- I don't remember.

Q.    You don't recall?

A.    Whether it was April or what the date was.

Q.    Would it refresh your recollection to look at an e-mail involving you and Mr. Rich and Mr. Fritsch?

A.    Yes.

Q.    Please look in the binder I just handed you.  And please turn to Tab 1510.

(Exhibit No. 1510 for identification.)

Q.    (BY MR. THREATT:)  And please read it to yourself, Mr. d'Abo.  I should have said that.

(Pause in the proceedings.)

Q.    (BY MR. THREATT:)  And just let me know when you're finished, sir.

(Pause in the proceedings.)

Q.    (BY MR. THREATT:)  I think the pertinent

information, Mr. d'Abo, is more towards the top.  I don't think it's necessary for you to read the entire thing.

A.    Okay.

Q.    Does that refresh your recollection that you met with Mr. Fritsch and David Rich in April of 2014?

A.    Yes.

Q.    Okay.  Now, a couple of months later, you and Mr. Fritsch agreed to speak again, this time by phone.  Do you recall that?

A.    Probably.

Q.    Okay.  Actually, Mr. d'Abo, why don't you do me a favor.  Please turn to Document 1514 in the binder so just a few tabs after.

(Exhibit No. 1514 for identification.)

Q.    (BY MR. THREATT:)  And you recognize this e-mail; right?  That's your e-mail address, Richardd'Abo@mac.com?

A.    What -- sorry.

Q.    Oh, I'm sorry.  Tab 1514, Mr. d'Abo.  It's the same binder, the one I handed you a moment ago, just a few tabs after the document we were just looking at.

A.    Yeah.

Q.    It's an e-mail from Mr. Fritsch; right?

A.    Yep.

Q.    Sunday, June 15th, 2014?

A.    Excuse me?

**UNITED STATES DISTRICT COURT**

Q.    It's sent on June 15th, 2014; right?

MR. DE LEON:  Objection, Your Honor.

THE WITNESS:  June 16th.  Right?

Q.    (BY MR. THREATT:)  I'm looking at Tab 1514 --

THE COURT:  Stop talking.

What's your objection?

MR. DE LEON:  Improper refreshing, Your Honor.

MR. THREATT:  Your Honor, I was about to move to admit.  I wasn't trying to refresh.

MR. DE LEON:  Then it would be hearsay, Your Honor.

THE COURT:  Sustained.

MR. THREATT:  Your Honor, may I be heard briefly?  I can do it from the lectern or if we could approach.  I think there is a valid hearsay exception for this.

THE COURT:  All right.  We'll recess for today.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

You're ordered to return no later than 8:00 o'clock tomorrow, and you're ordered to have a good evening.

THE COURTROOM DEPUTY:  All rise.

(Out of the presence of the jury:)

THE COURT:  Sir, you may step down.

You are ordered to return here tomorrow no later than 7:45 AM.  Thank you.

**UNITED STATES DISTRICT COURT**

THE WITNESS:  Okay.

MR. THREATT:  And, Your Honor, if the Court would be willing just to remind that the witness and the Government and obviously defense counsel should not be communicating with him until tomorrow morning.

THE COURT:  Sir, don't have any -- Mr. d'Abo, sir?

THE WITNESS:  Yeah.

THE COURT:  Don't have any communications with the Government about this case, unless it has something to do with transportation to the court or something like that.  All right?

THE WITNESS:  All right.

THE COURT:  And the same, of course, for the Government.

You may sit.

Oh.  Sir, you need to leave the courtroom, please.

Mr. Threatt.

MR. THREATT:  Yes, Your Honor, I was just going to -- looking at the e-mail, this is a then existing state of mind.  I think it's clear that Mr. Fritsch -- this is early on in the parties' discussions, which the Court probably appreciates by this point in this case is something that we are very interested in as the defense.  And Mr. Fritsch is saying clearly -- this is at 9:23 AM.  He's saying, "I will call you between 10:00 and 10:30 AM if this is still good with you."

That is Mr. Fritsch's then existing state of mind

and intent to call Mr. d'Abo.  So I think it's clearly admissible because it's not hearsay -- or there's a hearsay exception, I should say.

THE COURT:  All right.  Well, we're done here.  You can talk about that -- now that you have the exhibit binder, you can talk about all the other exhibits and provide me with your objections and responses this evening so I can look at them first thing tomorrow.  So --

MR. THREATT:  Yes, Your Honor.  And to be clear, I'm not seeking to admit all of the documents in the binder.  And I'll discuss that with the Government.  But I'm not -- I'm not seeking to admit all of them.

THE COURT:  Good news.  Thank you.

Do try to come to some agreement.

Anything else we need to discuss?

MS. LEE:  Your Honor, very briefly, the Government filed a second amended witness list last night.  We added one witness.  We are planning to have him fly out tomorrow evening.

And I've asked the defense if they object to us calling the witness, and they were uncertain about it.  So we ask that the Court order them to provide their position tonight so that we can raise it before the Court, if necessary, before the witness flies out.

THE COURT:  That seems fair.

MR. THREATT:  I'm --

MR. AMINOFF:  Yeah.  That's fine, Your Honor.  The Government told us about this person, I believe it was yesterday.  And we got an offer of proof from them yesterday and just haven't had a chance to get back to them yet.  We will get back to them tonight.

MR. THREATT:  It's not somebody who's been interviewed previously in this case.  It's a fairly recent interview, so he's new to -- at least to the defense, Your Honor.

THE COURT:  Okay.

MS. LEE:  Thank you, Your Honor.

THE COURT:  Anything else?

MR. AMINOFF:  Your Honor, can I raise one thing?

THE COURT:  Yes.

MR. AMINOFF:  Obviously we've been doing a lot of objections over e-mail.  Does the Court have a way of making those part of the record or would you like us to file those?

THE COURT:  Yeah.  You can file them.

MR. AMINOFF:  Okay.  So maybe with respect to Mr. Fritsch's pro se motions the week before trial started and then these exhibits, can we just file them all in sort of one batch as just an exhibit?  Or how would you like us to do that?

THE COURT:  I don't understand the pro se motions.

MR. AMINOFF:  The e-mails --

THE COURT:  You mean the e-mails about them.

MR. AMINOFF:  Yeah, yeah.  Mr. Fritsch had e-mailed the Court a couple of times.

THE COURT:  Right.  I just wanted to make sure you weren't referring to the motion itself, which is already on the docket.

MR. AMINOFF:  No.  I think the motion -- I think you're right, Your Honor.  So --

THE COURT:  Okay.  So yes.

MR. AMINOFF:  We'll just kind of batch them all up and file them as a general sort of --

THE COURT:  Yes.

Anything else?

MS. LEE:  Moving forward, would you still like us to e-mail the Court with the objections, or do you want us to just file them on the docket?

THE COURT:  No.  Go ahead and e-mail them.  That's helpful.

MS. LEE:  Okay.  Thank you, Your Honor.

THE COURT:  Anything else?

MR. THREATT:  I don't believe so, Your Honor; though, I see my colleagues conferring.  If we can have one moment.

THE COURT:  Yes.

(Off-the-record discussion between counsel.)

MR. AMINOFF:  One more thing.

MS. ABEL:  Sorry, Your Honor.  Your Honor, based on the testimony today as well as developments in the case, we believe that there's a motion to renew our designated expert, the ones -- the two that were excluded.

In particular, Mr. Guy specifically testified today to the importance of patents, intellectual property, and valuation.  And that was the subject of one of our two.

THE COURT:  Ms. Burguiere.

MS. ABEL:  Correct.  I do believe that his testimony, which was undisputed, made that relevant and speaks to the worth of the company which he -- he discussed.

THE COURT:  That reminds me, I -- you had represented -- the defense had represented to me that there would be actual statements from the witnesses as opposed to the lawyers' interpretation of what he thinks they might testify to.  Do we have those?

MS. ABEL:  Your Honor, I think you're talking about a representation that the Government subsequently dismissed.  But I -- I may not be following you, but there was a representation --

THE COURT:  You told me you were going to submit statements from the actual expert witnesses.

MS. ABEL:  I'm sorry, Your Honor.  No, I'm not following.  Statements regarding --

THE COURT:  What they were going to testify to.

MS. ABEL:  In addition to the Rule 16 notices?  Sorry, Your Honor.  I'm just not following but --

THE COURT:  I have letters from the Public Defender's Office saying this is what the witness may testify to.  I understood and you, I believe, represented, that statements from the actual witnesses would be provided.  I don't recall getting those.

MS. ABEL:  So I think -- those letters constitute the defense's Rule 16 --

THE COURT:  That's not the point.  The point is you represented something to me and I don't think I have it.

MS. ABEL:  I don't recall that representation, so I think we should --

THE COURT:  Well, it was in writing.  So look at your latest motion or reply, I forget which.

MR. THREATT:  Your Honor, in the original motion practice, I believe we did represent that we intended to supplement the first batch of notices and then we did not do that.  I think we supplemented the substance in our reply brief.  The Court excluded the experts.  We then renoticed the experts.

I just didn't know if maybe that was what the Court was referring to because in our additional -- I guess it was our first opposition --

THE COURT:  I don't think so, but I've looked at

these things so many times I don't know.  So -- yes.

MS. LEE:  Your Honor, we would request an offer of proof if the defense is going to renew their motion.  These expert disclosures are very vague.  With respect to Izumo, Your Honor has excluded a vast majority of it and has permitted him only as to reliance.  So we would request a more specific offer of proof at this point.

THE COURT:  Well, the offer -- the testimony now is, as I believe it always was, although you were -- I'm not going to use that -- not going to describe it.  You were characterizing it as materiality.  It was not materiality.  It was reliance.

And so now that we've had all this reliance evidence, now the expert may testify as to reliance.

MS. LEE:  But to clarify, Your Honor, the expert cannot testify as to any particular victims' reliance; correct?  For example, I would have expected Danny Guy, based on him being a sophisticated investor, to do X, Y, Z.  And he wouldn't have relied on X, Y, Z representations.

THE COURT:  Well, the whole issue was specifically characterizing the victim or characterizing Mann and Guy is something nobody has raised before.  So you need to talk about that and whether it's appropriate for the expert to say that.  But I think they got Mr. Guy to admit it, so that's a whole different thing.

MS. LEE:  It has been the subject of prior litigation, Your Honor.  And in your order, you said that he -- the expert should not be allowed to opine whether Danny Guy was a sophisticated investor or not.

MR. AMINOFF:  Your Honor, we've read your order.  I don't think we have a problem.

Like, Mr. Izumo will testify, as Your Honor, I believe, allowed, about the practice of capital -- the capital raising process and sort of what the industry practice is surrounding sophisticated investors.

I think the Court does not want us to say sophisticated investors -- Danny Guy is a sophisticated investor.  I believe that's the Court's ruling so he will not do that.

THE COURT:  All right.

MR. AMINOFF:  I don't think any offer of proof is required.  I think your order was pretty clear.

MS. ABEL:  With respect to Ms. Burguiere -- so that's a separate -- separate expert that -- the defenses are just re-raising that I believe that Danny Guy's testimony today regarding intellectual property, patents, and its importance allows us to prove up that there was such a thing, that the -- that the company was itself valuable, independent of what his view may have been today.  And that that is the purpose of Ms. Burguiere's testimony.

I do believe that the Government has sufficiently called into question that the company was real, that it had value, that it -- it existed even on paper.

So her job was to conduct the valuation, which he said was a standard practice, for the jury, to let them see that there was a value to this company and that it was real.

THE COURT:  There is certainly grounds now for some portion of the testimony, it's probably a little narrower and it doesn't need to be as long and a whole tutorial on the patent issue.

MS. LEE:  Your Honor?

THE COURT:  Yes.

MS. LEE:  We would object to that.  Based on the disclosure, Ms. Burguiere is expected to testify at length about all these different purported patents that the company had and what a patent means and what a trademark means and what IP means.

Mr. Guy only testified to a very narrow -- narrow fact, which is that he believed that the technology was part of that value of the company but all these other things that the defendant provided misrepresentations about also had value to him.

And so this whole testimony that, frankly, relates to a patent damages civil lawsuit is completely irrelevant here.  It's going to waste time for the jury.  It's going to

confuse them.

THE COURT:  Talking about wasting time coming from this side is --

MS. LEE:  I understand.

THE COURT:  -- problematic so --

MS. LEE:  But it's --

THE COURT:  Stop.

Some amount of that testimony is going to come in. It's not going to be as broad as the statement from Mr. Threatt that we have because we don't have any statement from the expert witness.

Get together and talk about it and see if you can come to some agreement.  And whatever you can agree on, I will rule on.  But I don't even have those well in mind at the moment except I knew, once I granted your motion about reliance, that Mr. Izumo's testimony or portions of it are relevant.

Anything else?

Oh.  What are we going to do about Mr. Austin?  No, I'm sorry.  Bouchard, I think, whoever -- we need to have a hearing on some of those.

MR. DE LEON:  That's correct, Your Honor, the summary charts, the 900 series and the exhibits.  I think Mr. Threatt referenced that there should be a hearing on some of those.

**UNITED STATES DISTRICT COURT**

I'm happy to do that now, if that works for Mr. Threatt.

MR. THREATT:  Your Honor, we can do it now.  It may be more fruitful for the Court if we do it tomorrow morning because I think the Court's order --

THE COURT:  I'm not going to do it tomorrow morning.  We have 15 minutes before the jury comes in.

MS. ABEL:  After -- after -- perhaps after so we can confer about the -- the specific nature of what might be presented more --

THE COURT:  There is only -- we'll be dealing with other things tomorrow morning, I'm sure.  So unless he's not going to testify until the next day, we need to resolve it.

MS. ABEL:  I don't believe he'll testify tomorrow.

MR. THREATT:  I don't think it's possible for him to testify tomorrow based on what I understand the Government's witness order is, but they would know certainly better than I do.

MS. LEE:  I think -- one moment, Your Honor.

It's not possible, Your Honor, I think.  But I will note that if we're going to be making revisions to these charts, we need to know more than an evening before.  It's very time-consuming to make revisions.

THE COURT:  You need to take out the categories.

MR. DE LEON:  Yes, Your Honor.  And the Government

has already done that and we'll provide those revised exhibits to the defense tonight.

There's a couple of other charts, though, that the Government wanted to raise. I think this morning we discussed Exhibit 900, which was the revenue. And there was some confusion about potential revenue.

And perhaps the Government would propose changing the name of that chart to all deposits other than investor money transferred from and then list the -- the intercompany transfer accounts and also interest rebates and what it's excluding from that to make it less --

THE COURT: Well, that's one aspect.

So why don't you figure out what we need testimony on and maybe we can do it tomorrow after this hearing.

MR. THREATT: Yes, Your Honor. We'll be meeting and conferring because I think the Court's order is very clear as to many of the exhibits. There's a few issues like this that we may be able to reach agreement on and maybe the hearing won't even be necessary, at least it won't have to be that substantive.

THE COURT: That would be nice.

Anything else?

MS. LEE: No, Your Honor.

MR. DE LEON: No, Your Honor, thank you.

MR. THREATT: No, Your Honor, thank you.

THE COURT:  Have a good evening.

THE COURTROOM DEPUTY:  All rise.  Court is adjourned.

(Proceedings adjourned at 2:40 PM.)

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


               I, MYRA L. PONCE, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


                         DATED THIS 24TH DAY OF DECEMBER, 2025.



                         /S/ MYRA L. PONCE
                    _____
                         MYRA L. PONCE, CSR NO. 11544, CRR, RDR
                           FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**