**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

-oOo-

**HONORABLE DALE S. FISCHER, UNITED STATES DISTRICT JUDGE**

UNITED STATES OF AMERICA,

                    Plaintiff,

     v.                                    No. 2:17-cr-00520-DSF-1

BERNHARD EUGEN FRITSCH,

                    Defendant.


**REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS**

**TRIAL DAY 7**

**LOS ANGELES, CALIFORNIA**

**APRIL 1, 2025**

_____

SUZANNE M. MCKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

APPEARANCES:


On Behalf of the Government:

    MONICA E. TAIT, Assistant United States Attorney
        United States Attorney's Office
        Major Frauds Section
        312 N Spring Street, Suite 1100
        Los Angeles, California 90012


    JOSEPH DE LEON, Attorney at Law
        Latham and Watkins, LLP
        10250 Constellation Boulevard, 11th Floor
        Los Angeles, California 90067


    SARAH SUN LEE
        Jenner and Block LLP
        515 South Flower Street, Suite 3300
        Los Angeles, California 90071-2246


On Behalf of the Defendant:

    JAMES S. THREATT, Deputy Federal Public Defender
    JONATHAN C. AMINOFF, Deputy Federal Public Defender
    REBECCA M. ABEL, Deputy Federal Public Defender
        Federal Public Defenders Office
        321 East 2nd Street
        Los Angeles, California 90012

# INDEX

GOVERNMENT RESTED . . . . . . . . . . . . . . . . . . . . p. 154

## WITNESSES

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **FOR THE GOVERNMENT:** | | | | |
| **KEVIN MAYER** | | | | |
| By Mr. De Leon | 9 | | 47 | |
| By Mr. Threatt | | 21 | | |
| **TRAVIS BOUCHARD** | | | | |
| By Mr. De Leon | 50 | | 150 | |
| By Ms. Abel | | 111 | | 153 |
| **FOR THE DEFENSE:** | | | | |
| **BENJAMIN McALLISTER** | | | | |
| By Ms. Abel | 155 | | | |
| By Ms. Tait | | 188 | | |
| **SYDNEY HUY** | | | | |
| By Mr. Threatt | 206 | | | |
| **ANNABELLE BURGUIERE** | | | | |
| By Ms. Abel | 213 | | 247 | |
| By Ms. Tait | | 234 | | 250 |

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov      (213) 894-3913

**INDEX**


**EXHIBITS**


|  | RECEIVED | MARKED |
|---|---|---|
| Exhibit 300 | 50 | |
| Exhibit 304 | 50 | |
| Exhibit 308 | 50 | |
| Exhibit 309E | 50 | |
| Exhibit 312 | 50 | |
| Exhibit 319E | 50 | |
| Exhibit 340E | 50 | |
| Exhibit 348 | 50 | |
| Exhibit 349E | 50 | |
| Exhibit 352E | 50 | |
| Exhibit 353 | 50 | |
| Exhibit 366, pages 55 to 63 | 50 | |
| Exhibit 505 | 50 | |
| Exhibit 901 | 58 | |
| Exhibit 903 | 58 | |
| Exhibit 905 | 58 | |
| Exhibit 907 | 58 | |
| Exhibit 909 | | 83 |
| Exhibit 910 | 59 | |
| Exhibit 912 | 59 | |
| Exhibit 914 | 59 | |
| Exhibit 916 | 59 | |
| Exhibit 918 | 59 | |
| Exhibit 920 | 59 | |
| Exhibit 922 | 59 | |
| Exhibit 924 | 59 | |
| Exhibit 926 | 59 | |
| Exhibit 927 | 59 | |
| Exhibit 928 | 59 | |
| Exhibit 931 | 59 | |
| Exhibit 933 | 59 | |
| Exhibit 935 | | 107 |
| Exhibit 936 | | 109 |
| Exhibit 955 | 58 | |
| Exhibit 956 | 58 | |
| Exhibit 957 | 58 | |
| Exhibit 958 | 58 | |
| Exhibit 959 | 59 | |
| Exhibit 960 | 59 | |

**INDEX**


**EXHIBITS (Continued)**


|                   | RECEIVED | MARKED |
|-------------------|----------|--------|
| Exhibit 961       | 59       |        |
| Exhibit 962       | 59       |        |
| Exhibit 963       | 59       |        |
| Exhibit 964       | 59       |        |
| Exhibit 965       | 59       |        |
| Exhibit 966       | 59       |        |
| Exhibit 967       | 59       |        |
| Exhibit 968       | 59       |        |
| Exhibit 969       | 59       |        |
| Exhibit 1411      | 167      |        |

(Proceedings commenced on April 1, 2025, at 7:55 a.m.)

THE COURT:  Good morning.  The original message you didn't mean was April Fool's.

What can I do for you?

MS. ABEL:  Good morning, Your Honor.

THE COURT:  You can have a seat.

MS. ABEL:  Maybe the whole day is April Fool's but not quite yet.

So we just wanted to address your yesterday afternoon's order regarding Annabelle Burguiere, and just make sure we could comply.

So I understood the Court's order to be that we could opine as to the fact that the company owned intellectual property but not as to what it is, and I am not sure how to offer that testimony without violating --

THE COURT:  Not as to what it is?

MS. ABEL:  I'm sorry.  I wasn't --

THE COURT:  There was a lengthy discussion which sounded like the history of IP from beginning to end.

MS. ABEL:  Certainly not, Your Honor.  I just want to be able to describe that there is such a thing as a patent in, like, three sentences, and show what the patents that underline her opinion, the bases --

THE COURT:  That's about as much as I would allow.

MS. ABEL:  That is exactly it.  I don't expect the

entire exam to take more than 30, 40, max.

Is that permissible within the Court's --

THE COURT:  I don't know.  It depends on what you're asking.

MS. ABEL:  And the reason I'm asking is because I am trying to modify my outline to comply with the Court's order. I was struggling to not extract all the bases and reasoning for her opinion.  Certainly, I understood the Court to permit her opinion that the intellectual property has value and that that value is relevant to investors.  But in order to explain what that value is, we just need to describe two things -- what is it that she's valuing, which in this case is the intellectual property, patents, tech trademarks.  And then, how does she value it?  What is the basic methodology?

Are both of those things permissible?

THE COURT:  Yes.

MS. ABEL:  Fantastic.  Thank you.  That's all I needed to know.

MS. TAIT:  Your Honor, just to clarify.  In other words, expert is going to be able to put a dollar number on the value?  I didn't understand the Court's order to be saying that, but --

THE COURT:  Yes.  It isn't relevant without value.

MS. TAIT:  So the dollar amount is going to --

THE COURT:  Yes.

MS. TAIT:  Thank you.

MS. ABEL:  Thank you, Your Honor.  Nothing further. That was all.

THE COURT:  If it was really worth that much, they would have been able to do something with it, but that's not my area.

(Jury entered.)

THE COURT:  Everyone is back.

Ladies and gentlemen, have any you heard, seen, or read anything about this case since last we spoke?

I don't see any hands.

Does the government have another witness?

MR. DE LEON:  Yes, Your Honor.  At this time, the government calls Kevin Mayer to the stand.

THE COURTROOM DEPUTY:  Good morning.  Have you stand right here.  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.  And please state and spell your full name for the record.

THE WITNESS:  Kevin Andrew Mayer, K-E-V-I-N, A-N-D-R-E-W, M-A-Y-E-R.

THE COURT:  You may proceed.

**KEVIN MAYER,**

**called as a witness, by the Government, testified as follows:**

DIRECT EXAMINATION

BY MR. DE LEON:

Q.    Good morning, Mr. Mayer.

A.    Hello.

Q.    Can you tell the jury where you work?

A.    Where I work?

Q.    Yeah.

A.    That is a bit complicated, actually.  I'm self-employed in a couple of areas.  I'm CEO of Candle Media, which is a Blackstone-backed studio.  And I'm the founder and managing partner of Smash Capital, which is a venture fund that I raised.

Q.    Mr. Mayer, what did you do before that?

A.    Before that, I was CEO of TikTok and chairman of -- chief operating officer of ByteDance, the parent company of TikTok. It's a Chinese company.

       Before that, I was the Chairman of Direct-to-consumer and International at the Walt Disney Company.

Q.    How long were you at the Walt Disney Company?

A.    About 25 years.

Q.    Starting, roughly, about what time?

A.    A couple of times -- 1993 to 2000, and then 2005 to 2020.

Q.   And in your most recent time at the Disney Company, what was your jobs and responsibilities?

A.   Started off as executive vice president of corporate development.  I was in charge of mergers, acquisitions and strategy for the company.  I became chief strategy officer and then chairman of Direct-to-consumer, which is -- I launched Disney+ -- I became chairman of Direct-to-consumer and International, which is a division of Disney, and that housed Disney+ and Hulu and ESPN+.  I ran those.

Q.   Mr. Mayer, while you were at Disney, are you aware of whether Disney got inquiries from companies about entering into potential deals?

A.   Yes, we sure did.

Q.   And based on your personal experience, what would be the benefit to a small company to have a deal with Disney?

          MR. THREATT:  Objection.  Improper opinion, Your Honor.

          THE COURT:  Overruled.

     You can answer.

BY MR. DE LEON:

Q.   You can answer.

A.   What would be the benefit?

Q.   Yeah.

A.   Well, Disney is a big company.  It's a powerful set of brands, and small companies could benefit from being associated

with that, from the audiences that Disney speaks to, from the promotion Disney could give, to connection to creative artists, and things of that nature.

Q.   Mr. Mayer, when you were working at Disney, do you recall meeting someone by the name of Bernhard Fritsch?

A.   I do.

Q.   What do you recall from that meeting?

A.   I had several meetings with him at Disney.  I was introduced by a gentleman named Ruben Mamann, who was working with Bernhard, and Bernhard was working on some ideas with respect to fan sites and some Internet businesses.  And I met with him in my office a couple of times.  And I think I had dinner with him once, also.

Q.   Mr. Mayer, you hear about the company StarClub?

A.   Yep.

Q.   What do you recall learning about StarClub?

A.   As I recall, it was a series -- it was a platform by which celebrities could create their own sites and their own businesses, their own subscription sort of services, and attract audiences to pay them and to buy products from them. basically be their fans, and that was a connection to that community.

Q.   Mr. Mayer, in or about February 2015, did you introduce Mr. Fritsch to anybody at Maker Studios?

A.   I believe I introduced him to Courtney Holt.

Q.    Who is Courtney Holt?

A.    Courtney Holt is an executive -- he actually works for me right now at Candle Media, one of the companies that I founded. He came to Disney through an acquisition on something called Maker Studios, which was a YouTube, what's called a multi-channel network, which ran YouTube sites for a bunch of YouTube talent.  That's what he did.  He came to Disney and started working for me doing various tasks, as I was chief strategy officer.

Q.    And you had introduced Mr. Fritsch to Mr. Holt?

A.    Yes.

Q.    And do you recall why you would have introduced Mr. Fritsch to Mr. Holt?

A.    Well, Mr. Holt's background is similar -- he did a YouTube that had some similarities to what Mr. Fritsch was doing -- or intended to do on his fan sites.  And I often, when people come in with ideas and I hear it, I have to hand them off to members of my team to handle things -- I can't do that myself.  I would have too much to do it if I tried to take that all on personally.

Q.    Mr. Mayer, based on your personal experience in working with Mr. Holt in 2015, what would have happened after Mr. Holt's meeting with Mr. Fritsch if Mr. Holt was interested in doing a deal with StarClub?

        MR. THREATT:  Objection, Your Honor.  Speculation.

Foundation.  Vague.

THE COURT:  Don't speculate.  If you can answer with more confidence, go ahead.

THE WITNESS:  Would you repeat that, please?

BY MR. DE LEON:

Q.    Of course, Mr. Mayer.

Based on your personal experience in working Mr. Holt in 2015, what would have happened after Mr. Holt's meeting with Mr. Fritsch if Mr. Holt was interested in doing a deal with StarClub?

A.    He would have either gotten back to me and he would have recommended that we start a diligence process and a negotiation for price, and go through all the different steps that you have to go through, which are many, before we would conclude a deal to buy a company.

Q.    Mr. Mayer, do you recall if any of that happened?

A.    I don't recall exactly what he came back to me with.  I know the processes -- most of the processes that you have to go through to buy a company did not happen.

Q.    Mr. Mayer, when you were at Disney, were you involved in any M&A transactions?

A.    I was involved with M&A transactions, yes.

Q.    For the jury's benefit, can you tell us what an M&A transaction is?

A.    M&A stands for mergers and acquisitions.  That's when one

company combines with another either through -- is the technical difference between a merger and an acquisition, but it's the combination of two companies.  At Disney, we did a lot of that.  We had many deals that made a big difference for Disney, actually.

Q.   And what would the M&A process have normally looked like at Disney around 2014 to 2017?

A.   Well, my group ran all the M&A for Disney, so the process would look like either an idea would originate with myself and my team or someone else at Disney and be your pursuant company. Like Marvel, when we bought Marvel, that's how that happened. Or someone might come in with an idea and ask us to consider buying the company.

Either way, it would go -- it would go -- your would enter into a process of triage and understanding whether or not that company was a good fit and a good value for Disney, whether or not it made sense that the prices that were being -- if the price that was being asked by the seller of the company, and all the other strategic considerations that go into finalizing a deal.  That was all handled by my group.  And other groups within Disney like legal and accounting and the treasury function and the CFO function.  When we deals got down to really close to being done, you would have to have all of those groups involved.

Q.   Would the board get involved?

A.    For deals of a certain size.  Over -- I think the threshold was 250 million.

Q.    What about the CEO and CFO?

A.    Yes, always.

Q.    Mr. Mayer, did you ever introduce StarClub to Disney's CEO or CFO?

A.    No.

Q.    Mr. Mayer, did you ever introduce StarClub to Disney's board of directors?

A.    No.

Q.    Mr. Mayer, I'm going to now publish what has been previously admitted into evidence as the Government's Exhibit 127.  It should show up on your screen shortly.

      I'm going to direct you to the bottom of the first page, the e-mail that starts on January 27, 2015 at 3:56 a.m?

A.    Okay.

Q.    And beginning with the line, "The meeting," it states, "The meeting with Disney was better than expected.  We decided to engage in investment banker whom we both know and trust from Moelis & Company, not Goldman Sachs, and start the process of an M&A transaction."

      MR. THREATT:  Objection, Your Honor.  The document speaks for itself on the reading of the document.

      THE COURT:  Overruled.

BY MR. DE LEON:

Q.   Mr. Mayer, putting aside everything in that sentence except for Moelis & Company for now, can you tell us what Moelis & Company is?

A.   It's an investment bank.

Q.   Mr. Mayer, I now want to publish what has been previously admitted into evidence as Defense Exhibit 1189.  And referring you to the bottom of the page, it says from Kevin Mayer to Bernhard Fritsch, copying Navid.

Can you tell us who Navid is?

A.   It's Navid Mahmoodzadegan.  He is the president and co-founder of Moelis & Company.

THE COURT:  I'm going to ask you to spell that for our court reporter, please.

THE WITNESS:  The name or the company?

THE COURT:  Mahmoodzadegan.

THE WITNESS:  Navid is N-A-V-I-D, and Mahmoodzadegan, M-A-H-M-O-O-D-Z-A-D-E-G-A-N.

THE COURT:  Thank you.

BY MR. DE LEON:

Q.   And, Mr. Mayer, this looks like it's February 6, so it's a little over a week past the last e-mail that we looked at.

MR. DE LEON:  And if you go to the next page, Mr. Flores, you see the contents of that e-mail.  If you could zoom in, please.

Q.   And here, Mr. Mayer, it says that you write, "Please meet

my good friend and co-founder of Moelis, Navid"; copied.

And then go on to say, "Navid, as I do for all companies that have promise and are considering strategic alternatives, I am sending Bernhard to you."

Mr. Mayer, what did you mean by sending Mr. Fritsch to Moelis to consider strategic alternatives.

A.    I thought that Mr. Fritsch had an interesting concept for a company and didn't know if it would be right for Disney or not, and I felt that he would be better served by entering a process where he could look at other alternatives as well.  And that's what these bankers are good at; that's what they do, typically.

Q.    Mr. Mayer, if Disney were planning to enter into an M&A transaction with StarClub, would you have been introducing StarClub to Moelis to consider strategic alternatives?

MR. THREATT:  Objection, Your Honor.

MR. DE LEON:  I'll repeat the question.

Q.    Mr. Mayer, if Disney were planning to enter into an M&A transaction with StarClub, would you have been introducing StarClub to Moelis to consider strategic alternatives?

MR. THREATT:  Objection.  Speculation, Your Honor.

THE COURT:  Overruled.

Don't speculate.  If you have a non-speculative response, you can answer.

THE WITNESS:  Unlikely.  If we have a real desire to

get a deal done, the last thing we would want is for that company to start looking elsewhere for other potential, competing deals. So that would be unusual.

I have introduced companies that we're considering to buy to investment banks so that they're represented, but not to consider strategic alternative. That would be unusual.

MR. DE LEON: Mr. Flores, if you could publish what has been previously admitted as Government Exhibit 127 on the left side. And then put other one on the right side.

Q. Mr. Mayer, going back to the sentence in that e-mail from Mr. Fritsch to Danny Guy on January 27, 2015, which is on the left side, which is over a week before the e-mail that we just looked at, do you think it would have been accurate to say that Disney and StarClub decided to engage Moelis & Company and start the process of an M&A transaction?

MR. THREATT: Objection, Your Honor. Speculation.

THE COURT: Don't speculate. If you have a different answer based on your experience or the facts, you can go ahead and answer that.

THE WITNESS: Would you repeat the question?

MR. DE LEON: Of course.

Q. Looking at the document in front of here, Mr. Mayer, it says, "We decided to engage in investment banker whom we both know and trust from Moelis & Company, not Goldman Sachs, and start the process of the M&A transaction."

MR. THREATT:  Same objection.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I'm not sure -- you read the sentence. What is the question?

BY MR. DE LEON:

Q.   Would that have been accurate to say at that time?

A.   In part.  I did introduce him to Moelis & Company.  That would be -- we were considering an M&A transaction.  I did meet with him several times.  He met with my team.  I wouldn't find a problem with that sentence.

Q.   Would you says there's a disconnect between this e-mail and the last e-mail we looked at?

MR. THREATT:  Objection.  Speculation.  Foundation, Your Honor.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Well, it depends on how you read this. The process of an M&A transaction right.  Before I do an M&A transaction with Disney, without Disney, it's really in how you read the sentence.  I would say that we certainly weren't very seriously considering buying it at the time.

BY MR. DE LEON:

Q.   You were not?

A.   We weren't seriously considering buying the company at the

time.  We were looking at it in what we would call "kicking the tires."  We look at a lot of companies.  I mean, the amount of companies we look at at Disney and meet with, to consider an M&A transaction, is quite substantial, and we do very few.

Q.   So, Mr. Mayer, at the time of this e-mail, would StarClub and Disney have agreed to start the process of an M&A transaction?

MR. THREATT:  Same objections, Your Honor.

THE COURT:  Again, don't speculate, but if there's a non-speculative --

MR. THREATT:  Asked and answered, Your Honor.

THE COURT:  Overruled.

Go ahead.

THE WITNESS:  Could you reasonably say the process of an M&A was started?  I guess you could.  I don't really know what was in the mind of the writer of this sentence, exactly.

BY MR. DE LEON:

Q.   Understood.

Mr. Mayer, during all of your interactions with Mr. Fritsch, do you recall ever telling Mr. Fritsch that Disney was ready to start the start process of an M&A transaction?

MR. THREATT:  Objection.  Hearsay, Your Honor.

THE COURT:  Overruled.

Just yes or no.

THE WITNESS:  I would say, "No."

MR. DE LEON:  One second, Mr. Mayer.

THE WITNESS:  Yes.

MR. DE LEON:  No further questions, Your Honor.

THE COURT:  Cross-examination?

MR. THREATT:  Yes, Your Honor.  Thank you.

And, Your Honor, may I approach with a copy for the Court and witness?

THE COURT:  Please.

CROSS-EXAMINATION

BY MR. THREATT:

Q.   Good morning, Mr. Mayer.

A.   Good morning.

Q.   Sir, I just handed you a binder of documents that I may -- I'll be asking you to refer to throughout my questioning.

You spoke with the government quite a bit about some meetings and communications that occurred in February 2015.  I want to go back in time a little bit and talk about an earlier referral.

Do you recall introducing Mr. Fritsch to ESPN and ABC in August of 2013?

A.   Not really, no.

Q.   Would you do me a favor and please turn to Tab 1672.

Mr. Mayer, you recognize this, I assume; right?

A.   Yeah.

Q.   It's an e-mail from Mr. Fritsch.  And then we see in the

"To" line, "Kevin Mayer"; right?

    Do you see that?

A.    I do.

Q.    And Kevin.Mayer@Disney.com, that was your e-mail address at the time?

A.    It was.

Q.    And "Subject" line, "Next steps."

A.    Yes.

Q.    And it's dated August 21, 2013; right?

A.    It is.

        MR. THREATT:  Your Honor, at this time, I move to admit what has been marked as Exhibit 1672.

        MR. DE LEON:  One second, Your Honor.

    No objection, Your Honor, so long as it comes in for state of mind and not for the truth.

        THE COURT:  Mr. Threatt?

        MR. THREATT:  Yes, Your Honor.  There are multiple messages.  I believe some of them go to the effect.  On this one, in this case, Mr. Fritsch.  The message is from Mr. Mayer.  Others, I believe, are present sense impressions in terms of the future intentions of Mr. Fritsch.  I believe, in this case, just Mr. Fritsch.

        THE COURT:  The statements, of course, by Mr. Fritsch are admissible for their truth.  With that limiting instruction, I'll allow it.

MR. THREATT:  Thank you, Your Honor.

Ms. Su, could we please publish Exhibit 1672 to the jury. And if you could please turn to the second page.

Q.   These e-mails are reverse chronological order, Mr. Mayer, and they're now on the screen for you.  So the second page contains what is the first e-mail.  And this is -- Mr. Fritsch, at first, is thanking you for a meeting that you all just had at, I believe, Disney corporate offices; right?

A.   I don't remember where the meeting was.

Q.   I'm sorry?

A.   I don't remember where the meeting was or it's referring to a meeting.  I guess it is.  I'm seeing this for the first time in 12 years.

Q.   It's well understood.  I realize it's been --

A.   I don't recall.

Q.   I realize it's been some time.

That tells us, "Great to see you again."  So, obviously, you all had just seen each other; right?

A.   It would seem so, yes.

MR. THREATT:   And then, let's go back to first page, Ms. Su.

Q.   And if we can look at the bottom of first page, Mr. Mayer, we're going to highlight it for you, Mr. Mayer.

So this is your response to Mr. Fritsch; right?

A.   Yes.

Q.    I want to direct your attention to the middle where you say, "I was impressed with your technology and vision and would very much like you to meet with those copied below"; right?

A.    It does say that.

Q.    And then, below you've listed three people who, I believe, are senior executives at different positions of the Disney Company; right?

A.    Yes.

Q.    Albert Cheng, head of ABC.com?

A.    Yes.

Q.    John Kosner, head of digital ESPN as well?

A.    Yes.

Q.    And Mark Walker who heads up Disney.com, in your words; is that right?

A.    Right.

Q.    As so you're introducing these people to Mr. Fritsch following this meeting?

A.    I am.

Q.    And at the top of the e-mail, Mr. Fritsch responds, and he's specifically addressing "John."  I take it John Kosner; right?

A.    I don't know.  It looks that way.

Q.    Who is John Kosner?

A.    He ran ESPN.com.

Q.    In August of 2013?

A.   As I recall, that's what his job was then, yes.

Q.   Now, Mr. Mayer, if you can do me a favor and go back to the binder.  And this time turn to Tab 1681.

Just let me know when you've found that location in the binder?

A.   I found it.

Q.   This is another e-mail.  This time October 2013; right?

A.   Yes.

Q.   Again, it's between you and Mr. Fritsch.

A.   Yes.

Q.   And we see John Kosner as well?

A.   Yep.

Q.   And in this one, do you recall becoming aware that Mr. Fritsch and Mr. Kosner held a meeting?  Did you ever learn that fact?

A.   I'm looking at -- it looks like they were planning a meeting.  I don't recall this happening, but earlier in the e-mail, it says they're planning a meeting.

Q.   It was 12 years ago; right?

A.   Yes.

Q.   So it's possible it happened.  You just forgot?

A.   Definitely.

Q.   Now, Mr. Mayer, you also introduced Mr. Fritsch to people at Marvel; right?

A.   I don't recall doing that.

Q.    I believe you mentioned on Direct that Disney acquired
Marvel during your second stint with the company; is that
correct?

A.    Right.

Q.    Would that have been 2009?

A.    Yes.

Q.    Would you do me a favor, Mr. Mayer, turn to tab 1674,
please.  This is another e-mail between you and Mr. Fritsch and
Ruben Mamann, I believe?

A.    Mamann, yes.

Q.    Dated June 19, 2014?

      Do you see that?

A.    I do.

Q.    The other person in this is a, I believe, a Peter
Phillips, who worked at Marvel.com; right?

A.    He did, yes.

          MR. THREATT:  Your Honor, at this time I would move
to admit what's been marked at Exhibit 1674.

          THE COURT:  For the purpose of?

          MR. THREATT:  Your Honor, I believe it's present
sense impressions.  I'm happy to address -- I know the Court
has the substance of the e-mail, but it is a discussion of
future plans between the parties to this e-mail, so I believe
there's a valid hearsay exception on that basis.

          MR. DE LEON:  The government would object hearsay.

THE COURT: That doesn't sound like a present sense impression.

MR. THREATT: Okay. Understood, Your Honor.

Q. So taking a step back, Mr. Mayer, you indicated that you did not recall necessarily making the introduction. Having read this e-mail, does that refresh your recollection that you did introduce Mr. Fritsch to Marvel?

A. It doesn't, but I may have. I really don't remember.

Q. Okay. Now, you also discussed with Mr. Fritsch his aspirations for taking StarClub public; correct? Do you remember that?

A. Vaguely. I don't actually recall the discussion, but we may have had one.

Q. Could you do me a favor and turn to Tab 1670 in the binder?

A. Okay.

THE COURT: Number again, please, Mr. Threatt.

MR. THREATT: Yes, Your Honor. 1-6-7-0, 1670.

THE COURT: Thank you.

MR. THREATT: My apologies.

Q. Mr. Mayer, this is another e-mail thread. This time it's involving you and Mr. Fritsch; right?

A. Yes.

Q. And from August of 2014. So we've gone forward in time a number of months?

A.    Correct.

MR. THREATT:  Your Honor, at this time I move to admit this document, in particular, for the effect on listener of the statements made by Mr. Mayer to Mr. Fritsch.

MR. DE LEON:  The government objects on hearsay,

THE COURT:  Based on limiting instruction, I'll allow it.

MR. THREATT:  Thank you, Your Honor.

Ms. Su, if we could please publish that to the jury. 1670. And could we please go to the second page.  And if we could blow that up, please, Ms. Su, that e-mail.

Q.   Mr. Mayer, this is from you and Mr. Fritsch, and it seems like you all met again on the prior evening.  Does that sound right?

A.    I think what I'm looking at is Mr. Fritsch sending me an e-mail.

Q.    Yes.  My apologies, if I misspoke.  Yes, Mr. Fritsch is thanking you for the prior evening; right?

A.    Correct.

MR. THREATT:  If we can back to the first page, please, Ms. Su.

Q.   And in the e-mail we just looked at, he also mentioned going public.

Did you see that?

A.    I did.

Q.    Now, going back to the subsequent e-mails in the thread --

MR. THREATT:  Can we go to the bottom, Ms. Su, if we can pull up that.

Q.    And you are thanking Mr. Fritsch for dinner.  Do you see that?

A.    Yes.

Q.    Do you recall that didn't happen at his residence in Malibu?

A.    It definitely was not at his residence in Malibu.

Q.    Do you recall where it happened?

A.    A restaurant called BOA.

Q.    Okay.  And Mr. Fritsch responds that he might delay going public but he's interested in knowing your opinion; right?

A.    Yes.

MR. THREATT:  If we could go up a little bit, Ms. Su.

Q.    And you say that it seems early for StarClub to be going public; right?

A.    Yeah.

Q.    But you acknowledge his bankers probably have a better sense of whether it's an appropriate time than you do?

A.    Yes.

Q.    And you reference Goldman?

A.    I do.

Q.    To be clear, that is Goldman Sachs, the investment bank;

right?  Okay.

MR. THREATT:  And we can go to the top, Ms. Su.

Q.   And Mr. Fritsch responds that Goldman is in agreement that it might be a bit early for StarClub to be going public, at least at this time; right?

A.   He does.

MR. THREATT:  We can take that down, Ms. Su.

Q.   Now, Mr. Mayer, do you recall introducing Mr. Fritsch to a gentlemen named Ray Lee?

A.   No.

Q.   If you will do me a favor, please turn to Tab 1673 in your binder.  And please read that to yourself, Mr. Mayer, and let me know when you're finished.

A.   Yep.

Q.   Does that refresh your recollection about e-mailing Mr. Fritsch about Ray Lee?

A.   It does.

Q.   Do you recall who Ray Lee is or was?

A.   I vaguely remember.  I think I met her on an airplane.  I sat next to a woman named Abigail, who happened to be married to, I believe, Mr. Fritsch's CTO or something like that, Chief Technology Officer.

Q.   And that would be Ray Lee?

A.   Ray Lee.

Q.   So you were on a plane with Ms. Lee, at this point?

A.    As I recall, vaguely.

Q.    Were you aware that StarClub had acquired Mr. Lee's company called Upfront Media?

A.    No.  No.

Q.    Now, let's go forward, back to the time period you were discussing with the prosecutor, early 2015.

Please do me a favor, Mr. Mayer, and turn to Tab 1667. And on the -- do you recognize this e-mail, Mr. Mayer?

A.    Let me look at it.

I don't remember having received it, but I see that I did.

Q.    Right.  And it's an e-mail between you, and Mr. Fritsch, and Mr. Mamann again; right?

A.    Correct.

Q.    Dated January 26, 2015?

A.    Yes.

MR. THREATT:  Your Honor, at this time I would move to admit 1667.  Again, under present sense impression.

MR. DE LEON:  Objection.  Hearsay, Your Honor.

THE COURT:  I don't think that's a present sense impression.

Mr. THREATT:  Or state of mind, Your Honor.  My apologies.

THE COURT:  Or state of mind.

MR. THREATT:  Okay.  Thank you.

Could we publish that to the jury, Ms. Su.

Your Honor, to be clear, were you allowing the document to be admitted?  I think there was some confusion.

THE COURT:  For state of mind, yes.

MR. THREATT:  That's what I understood.  Thank you, Your Honor.

Thank you, Ms. Su.

Q.   This is the e-mail on the screen, Mr. Mayer; right?  Mr. Mamann is the one actually writing the e-mail in this instance.  He says, "Thank you for taking the time to meet with us today"; right?

A.   He does.

Q.   So this is another meeting between you and Mr. Fritsch?

A.   Presumably.

Q.   Do you recall if this one was at the Disney corporate offices or --

A.   I do not.

Q.   And you ultimately did make the introductions that seem to have been discussed at the meeting that day; right?

A.   In the other e-mails we looked at, it seems like I did, yeah.

Q.   Even in this e-mail, Mr. Mamann says that he'll be following up on introductions that the three of you had discussed; right?

A.   He does say that.

Q.   And I know that we discussed -- Mr. Mayer, do you remember

your testimony with the prosecutor about the referral to Courtney Holt who had worked at Maker Studios?

A.   I do.

Q.   You made a number of other referrals at the same time, though; right?

A.   Looks like I did, yeah.

MR. THREATT:  Actually, can we please pull up Defense Exhibit 1189, which has previously been admitted through Danny Guy.  If you can go to the last page -- actually, the second page.  Actually, one more page, Ms. Su.  My apologies.

Q.   This is the e-mail Mr. Fritsch writes to you, Mr. Mayer, shortly after this meeting in January 2015.  And he says, "In light of the possible M&A transaction, I like the idea to engage with a trusted banker analyst"; right?

A.   Yes.

Q.   And I assume you do recall specifically that discussion at this meeting?

A.   No.

Q.   But you know StarClub was interested in an M&A transaction?

A.   Yes.

Q.   And you're referring him to Moelis; right?

A.   Right.

Q.   And I believe you were close friends with the co-founder, a gentleman name Navid?

A.    (Inaudible response.)

Q.    Okay.  And Mr. Fritsch was also specifically interested, as he says in this e-mail, to get a detailed understanding of the evaluation of our business; right?

A.    That's what it he says, yes.

Q.    I think you said on Direct with the prosecutor that Disney was kicking the tires on StarClub; right?

A.    Right.

Q.    And Mr. Fritsch was clearly looking at options for a corporate acquisition of some kind?

A.    That's what it looks like, yeah.

Q.    And do you recall learning that Mr. Fritsch had, in fact, met with Navid and another person named James from Moelis at the StarClub offices?

        MR. DE LEON:  Objection.  Lacks foundation, Your Honor.

        THE COURT:  Rephrase your question.

        MR. THREATT:  We can take that down, Ms. Su.

Q.    Do you recall any further discussions you had with Mr. Fritsch about Moelis?

A.    No.

Q.    If you would do me a favor, Mr. Mayer, please turn to Tab 1676.  And please just read it to yourself, Mr. Mayer, and let me know when you're finished.

A.    Finished.

Q.    Does this refresh your recollection that Mr. Fritsch had a meeting with Navid at the StarClub offices shortly after you made the introduction?

A.    Yes.

Q.    Thank you.

Now, another referral you made, Mr. Mayer, was specifically to the Disney Theme Parks division.  Do you recall that?

A.    No.

Q.    Do me a favor, please turn to Tab 1679.  And so, Mr. Mayer, this is another e-mail thread involving you and Mr. Fritsch and a number of other people both at Disney and at StarClub; right?

A.    Yeah, a number of people, yep.

Q.    Do you see the name Charlie Simms there in the "CC" field?

A.    Yes.

Q.    Do you recall who that is?

A.    I do not.

MR. THREATT:  Your Honor, at this time I would move to admit 1679 into evidence, subject to the same limitation we've been discussing, state of mind as to Mr. Fritsch, and also effect on listener as to Mr. Fritsch for the statement made by others.

MR. DE LEON:  No objections as long as it's for state of mind, Your Honor.

THE COURT:  All right.  That's the limitation.  You may show it.

MR. THREATT:  Thank you, Your Honor.

If we could publish that, please, Ms. Su.

Q.   So using the e-mail we just looked at, Mr. Mayer, who is Leslie Ferraro, and what position did that person work in February 2015?

A.   Leslie Ferraro was a Disney Theme Park executive.  I believe she's head of marketing, but I'm not positive.

Q.   Head of marketing, specifically for those theme parks?

A.   Correct.

Q.   The Disney Theme Parks, we're talking about; right?

A.   Yes.

MR. THREATT:  Okay.  If we turn to page 2, please, Ms. Su.  And if we could blow up the top middle portion.

Q.   And so this is an e-mail you wrote to Mr. Fritsch, Mr. Mayer.  I want to direct your attention to the middle part that begins, "Leslie," with an em dash.  You say, "Bernhard has created a product and company to get celebrities in front of their fans via high-quality apps."

Do you see that?

A.   Yes, I do.

Q.   Immediately beneath it, you also write, "I've seen a demo, and I think it can be of interest to you with respect to targeted audiences it could reach"; right?

A.   Correct.

MR. THREATT:  If we go to back to page 1, please, Ms. Su, and zoom in on the very top third or half of the e-mail.

Q.   And so you're still copied on the message, Mr. Mayer, but this is just Mr. Fritsch and people at StarClub scheduling a meeting with Leslie Ferraro; right?

A.   Looks that way, yeah.

Q.   Following up on your referral?

MR. THREATT:  We can take that down, Ms. Su.

Q.   Mr. Mayer, you also referred Mr. Fritsch and StarClub, specifically, to digital marketing at Disney.  Do you recall that?

A.   No.

Q.   I know it's been a long time.  If you could please turn to Tab 1675 for me.

Have you found that document, Mr. Mayer?

A.   Yes.

Q.   So this is another e-mail, again, between you and Mr. Fritsch and various people at both Disney and StarClub; right?

A.   Yes.

MR. THREATT:  Your Honor, I would also move to admit this document into evidence, subject to the same limits we've been discussing.

MR. DE LEON:  No objection, Your Honor.

THE COURT: All right. That's admitted with that limitation.

MR. THREATT: Thank you, Your Honor.

And Ms. Su, if we can publish that, please.

Q.    Mr. Mayer, why don't we start here? Who was Ricky Strauss?

A.    Ricky Strauss was the head of marketing for the Walt Disney Studios.

Q.    Okay. So for the studios, specifically?

A.    Correct.

Q.    So this is a separate division from the parks division?

A.    It is.

Q.    And from Maker Studios?

A.    Yes.

Q.    And from ESPN?

A.    Yes.

Q.    And from ABC?

A.    Yes.

Q.    I also see Ray Lee on this e-mail. And that's the same Ray Lee we discussed a minute ago.

Do you recall ever meeting with Ray Lee?

A.    I do not.

Q.    Do recall communicating with him at all via e-mail or any other means?

A.    Not really.

MR. THREATT:  Ms. Su, if you could blow up the e-mail that starts halfway down the bottom of page 1, please.

Q.   And I just want to direct your attention, Mr. Mayer, to the second paragraph where you write, "Ricky" -- and, again, with an n or an em dash -- and you write, "I'm fairly impressed with Bernhard's series of apps which connect audiences with their favorite celebrities.  I think they're really onto something here for our digital marketing efforts"; right?

A.   Correct.

Q.   And then just like the other e-mails we've been looking at, Mr. Fritsch and Mr. Strauss sort of take from there and start scheduling a meeting.  I don't know if you see that at the very top of this e-mail.

Do you see that?

A.   I do see that.

Q.   Okay.  Thank you.  And, again, I wouldn't rehash what you went through with the prosecutor, but you also referred Mr. Fritsch to Maker Studios; right?

A.   Yes.

Q.   And Courtney Holt, specifically?

A.   Yes.

Q.   And Disney had recently acquired Maker Studios, I believe; is that right?

A.   Yes.

MR. THREATT:  We can take that down, Ms. Su.

Q.    Now, Mr. Mayer, we've been talking about early 2015, most recently.  You also meet with Mr. Fritsch again in late 2016.

Do you recall that?

A.    No.

Q.    Do me a favor and please turn to Tab 1671.  And this is another e-mail with, this time, you, Mr. Fritsch, Ruben Mamann, and Kim Fredricks.

Do you see that?

A.    Yes.

Q.    And the date is December 12, 2016; right?

A.    Right.

MR. THREATT:  Your Honor, at this time I move to admit 1671, again, subject to the same limitations.

MR. DE LEON:  Subject to the same limitations, Your Honor.

THE COURT:  All right.  That is admitted with that limitation.

MR. THREATT:  And if we could publish this, please, Ms. Su.  And if we can zoom in on the very bottom half of the e-mail, Ms. Su.  I think that should do it.  Thank you.

Q.    Again, these are in reverse chronological order, Mr. Mayer, but at the very bottom, this is the first e-mail in the chain.

A.    I do.

Q.    This is coming from Ruben Mamann.  And he says, "Bernhard,

I want to thank you for taking the time to meet today"; right?

A.    Yes.

Q.    So this another in-person meeting?

A.    Looks that way, yes.

Q.    Do you recall this one was at Disney corporate offices in --

A.    I don't recall.

Q.    And you respond, "Enjoyed it.  You guys are on to something!"

    Do you see that?

A.    I do.

        MR. THREATT:  And then, if we go to the top, please, Ms. Su.

Q.    And Mr. Fritsch is now following up.  I believe it was all kind of the same day.  He's trying to arrange a meeting for all of you in New York City.

    Do you see that?

A.    I do.

Q.    Do you recall, was there some sort of industry event in New York City in late December 2016?

A.    No recollection.

Q.    And then, you and Mr. Fritsch eventually have a phone call to follow up on this in-person meeting?

    Do you recall that?

A.    I do not.

Q.   Can you please turn to Tab 1684, Mr. Mayer.

And, again, this is another e-mail between you, Mr. Fritsch, and Liz Morin.

Do you see that?

A.   I see that.

Q.   Who is Liz Morin, please?

A.   My assistant at Disney.

MR. THREATT:  Your Honor, I would move to admit this document as well.  Again, subject to the same limitations.

MR. DE LEON:  Subject to the same limitations, Your Honor.

THE COURT:  All right.  That is admitted with that limitation.

MR. THREATT:  We could publish that, please, Ms. Su.

Q.   So Mr. Mayer, this is December 21st.  We're talking nine days after the most recent in-person meeting with Mr. Fritsch; right?

A.   It looks that way, yes.

Q.   And it's asking Ms. Morin to schedule a meeting for you and -- I'm sorry, a phone call for you and Mr. Fritsch to discuss; right?

A.   Yes.

Q.   Presumably, StarClub and Disney, in some capacity?

A.   Presumably, yeah.

Q.   Okay.  Thank you.

MR. THREATT: And we can take that down, Ms. Su.

Q. Mr. Mayer, please turn to 1685 in the binder. This is another series of e-mails between you and Mr. Fritsch. Again, various people of both Disney and StarClub; right?

A. Yes.

Q. Now, we're talking about January 10, 2017?

A. Yes.

Q. So there's a couple of weeks from the most recent communication; right?

A. Yes.

MR. THREATT: Your Honor, at this time I move to admit Document 1685. Again, subject to the same limitations.

MR. DE LEON: Subject to the same limitations, Your Honor.

THE COURT: That's admitted.

MR. THREATT: Thank you, Your Honor.

Ms. Su, if we could publish that, please.

Q. On this e-mail, Mr. Mayer, we also see a gentleman named James Polsen copied.

Do you see that?

A. I do, yes.

Q. Do you recall who Jim Polsen was?

A. No, I do not.

Q. We also see an Andrew Hopkins at Disney.com.

Do you see that name?

A.   Yes.

Q.   Who was Andrew Hopkins, and what position did he hold, I guess I should say, at this point in time, early 2017?

A.   Andy Hopkins was a senior member of my M&A team and, probably, a senior vice president at that time, or vice president.  I don't know which.

Q.   So you say a senior member of your M&A team.  Is that what his position was?

A.   Correct.

Q.   Are what exactly did that entail, if you don't mind?

A.   When we looked at, evaluated, and executed deals, he was a senior team member to help me do it.

        MR. THREATT:  And Ms. Su, if we could please go to the second page, and blow up the top half of the document.

Q.   So, Mr. Mayer, do you see this on the screen?

A.   I do.

Q.   So this is the original e-mail in this thread, and it's from Mr. Fritsch.

     Do you see that?

     I know it's a little awkward, because I think the very top of the e-mail is actually the bottom of the first page.  But we see down at the bottom, "All the best, Bernhard"; right?

A.   I do see that, yeah.

Q.   And he's attaching a number of documents that he's sending to you.

The company overview, do you see that?

A.    I do.

Q.    Evaluation analysis?

A.    Yes.

Q.    Okay.  And he invites you to follow up when you've had time to review everything; right?

I'm sorry.  That's closer to the bottom where it says, "Feel free to give me a ring."

A.    Yes.

MR. THREATT:  Ms. Su, if we can go back to the first page, please -- actually, my apologies, Ms. Su.  Can we go back to the second page, just briefly.

Q.    Mr. Mayer, do you see in the middle paragraph, right below Number 3, where there is two or three sentences there.  And we can blow that up.  I just want to direct your attention to the last sentence there.  It says, "Please send a mutual NDA when you have chance.  Thanks."

Do you see that?

A.    I do.

Q.    What does NDA stand for in this context?

A.    A non-disclosure agreement.

Q.    That is a fairly common document when someone is pursuing a merger and acquisition deal; right?

A.    It is.

MR. THREATT:  Thank you.

If we can go to page 1 now, Ms. Su.  And if we can blow up the -- or zoom in on the bottom half of the document, please.

Q.    Here are the responses to Mr. Fritsch's original e-mail.

Do see this, Mr. Mayer?

A.    I do.

Q.    And we see -- again, it's a little awkward with the way the page is cut off, but at the very bottom, we see the top part of Mr. Fritsch's initial e-mail -- right? -- where he had attached the documents.

A.    Yes.

Q.    And then you write back, "Thanks.  Getting through e-mails.  Copy Andy and my team for handling."

Do you see that?

A.    Yep.

Q.    And by "Andy," we're talking about Andy Hopkins; right?

A.    Right.

Q.    The senior member of your M&A team?

MR. THREATT:  My apologies, Madam Court Reporter.

Q.    Just to be clear, Andy Hopkins, the senior member of your M&A team; right?

A.    Yes.

MR. THREATT:  And if we can, please zoom in on the top part of the document, Ms. Su.

Q.    Again, as we've seen in other instances, Mr. Fritsch is now taking the ball from you and scheduling something with

Andy; right?

MR. DE LEON:  Objection.  Calls for speculation, Your Honor.

THE COURT:  Don't speculate.

BY MR. THREATT:

Q.  Let me rephrase.

He's asking to schedule a call after you referred him to Andy; right?

A.  That's what it seems to be saying; yeah.

MR. THREATT:  Can I have one moment Your Honor?

THE COURT:  Yes.

(A discussion was held off the record between Counsel.)

MR. THREATT:  No further questions.

Thank you, Mr. Mayer.

THE COURT:  Redirect?

MR. DE LEON:  Yes, Your Honor.  Just shortly.

REDIRECT EXAMINATION

BY MR. DE LEON:

Q.  Mr. Mayer, was it common for you to introduce companies to other people at Disney?

A.  Yes.

Q.  Why do you do that?

A.  I had kind of a personal policy of being helpful, whenever I could be helpful, unless there was a reason not to be.  And I did like -- I liked what I saw.  I thought it was a good idea

that Mr. Fritsch had come up with, and I thought it very well might be useful on a commercial basis with other parts within Disney.  So --

Q.   And when you connect Mr. Fritsch with other people at Disney, does that mean you're ready to proceed on a deal?

A.   It does not.

Q.   Mr. Mayer, were you connected with Mr. Fritsch through -- I think you mentioned on Direct -- through someone by the name of Mr. Mamann?

A.   Mamann.  Ruben Mamann.

Q.   Mamann.  Apologies.

And what is your relationship with Mr. Mamann?

A.   Personal friends for a long time.

Q.   And were you connecting Mr. Fritsch to other people at Disney out of your friendship?

A.   Partly.  I mean, had it not been a good friend of mine who made the introduction, I might not have taken all those actions; but it was, so I did.

Q.   And, Mr. Mayer, the defense just went through several e-mails between 2013 and 2017.  In what we've seen, were there any serious discussions about an M&A deal?

MR.THREATT:  Objection, Your Honor.  Vague. Documents speak for themselves.

THE COURT:  If you have opinion, you can answer.

THE WITNESS:  We had incipient, the very beginnings

of a discussion, but it never got very serious, I would say.

BY MR. DE LEON:

Q.    Never got pretty serious, you said?

A.    It did not get very serious.

Q.    Just one final question, Mr. Mayer.  Did you ever tell Mr. Fritsch that Disney was going to acquire StarClub?

MR. THREATT:  Objection.  Hearsay, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I did not.

MR. DE LEON:  No further questions, Your Honor.

THE COURT:  Recross?

MR. THREATT:  No, Your Honor.  Thank you.

THE COURT:  May the witness be excused?

MR. THREATT:  Yes, Your Honor.

MR. DE LEON:  Yes, Your Honor.

THE COURT:  Thank you very much, sir.  You are excused.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Does the government have another witness?

MR. DE LEON:  Yes, Your Honor.  At this time the government calls Travis Bouchard.

THE COURTROOM DEPUTY:  Can you stand for me, please.

Do you solemnly swear that the testimony you shall give in the cause now before this court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.  Please state and spell your name for the record.

THE WITNESS:  Travis Bouchard, T-R-A-V-I-S, B-O-U-C-H-A-R-D.

THE COURT:  You may proceed.

**TRAVIS BOUCHARD,**

**called as a witness, by the Government, testified as follows:**

DIRECT EXAMINATION

BY MR. DE LEON:

Q.   Good morning, Mr. Bouchard.  Can you tell the jury where you work?

A.   I'm a forensic accountant for the FBI.

Q.   How long have you been with the FBI, Mr. Bouchard?

A.   Just under eight years.

MR. DE LEON:  Apologies, Your Honor.  Before we begin, I would like to admit some exhibits that the parties have agreed to.

THE COURT:  All right.

MR. DE LEON:  At this time the government moves to admit by stipulation the following exhibits:  300, 304, 312, 308, 319E, 353, 366 pages 55 through 63, 348, 352E, 309E, 340E, 349E, and 505 as certified business records, Your Honor.

THE COURT:  All right.  Those are admitted.

(Exhibits 300, 304, 312, 308, 319E, 353, 366 pages 55

through 63, 348, 352E, 309E, 340E, 349E, and 505 were received into evidence.)

BY MR. DE LEON:

Q.    Sorry, Mr. Bouchard.  You were saying that you have been with the FBI for how long?

A.    Just under eight years.

Q.    What do you do there?

A.    I'm a forensic accountant.

Q.    What does a forensic accountant do?

A.    Essentially, we follow the sources and uses of funds.  So we follow money in, money out, and review records, and make reports on those.

        THE COURT:  Would you pull the microphone closer?

        MR. DE LEON:  So a little closer, Mr. Bouchard.

Q.    What were you doing before joining the FBI?

A.    I was a corporate accountant at a publicly-traded company called IDEXX Laboratories.

Q.    Do you have any academic degrees?

A.    Yes.  A bachelor's in accounting and a master's in business.

Q.    Now, Mr. Bouchard, I would like to ask you a bit about how you're familiar with this case.  Have you been present during trial to observe testimony from certain witnesses?

A.    I have.

Q.    Which ones?

A.    Ricky Flammang, George Mederos, Greg Austin, Danny Guy, Dylan Ris, Lisa Short, Miraflor Stemmann, and Kim Fredricks.

Q.    Mr. Bouchard, were you assigned to review summary charts based on records in an investigation into Bernhard Fritsch?

A.    Yes, I was.

Q.    Who originally prepared the summary charts?

A.    Another forensic accountant, Connie De La Santos.

Q.    And she works with the FBI?

A.    Yes, she does.

Q.    And did you work with Ms. De La Santos in finalizing these summary charts?

A.    Yes, I did.

Q.    Mr. Bouchard, did you personally review the available bank records that these summary charts are based on?

A.    I did.

Q.    At a high level, what do these summary charts generated capture?

A.    It shows the transactional data and all the money coming in and coming out of the accounts that it closed at.

Q.    Are these the kind of summary charts that you regularly prepare as a forensic accountant?

A.    Yes.

Q.    In your experience, about how many similar charts have you done since being a forensic accountant?

A.    Hundreds, thousands.  I mean, some I do almost weekly.

Q.   As a forensic accountant?

A.   As a forensic accountant, yes.

Q.   Mr. Bouchard, can you walk us through, at a general level, the steps you take to create summary charts, based on your review of the bank records?

A.   Sure.  We get the records from the bank, and then we put the data into Excel.  We have checks built in to make sure all data is complete and captured.  And then we show certain fields or -- like debits and credits and payee/payor, for example.  We just -- we use certain fields to show the summary reports.

Q.   Are you familiar with selecting different fields in Excel?

A.   Yes, absolutely.

Q.   And are you selecting specific aspects of data to put in the summary charts?

A.   I am.

Q.   Mr. Bouchard, was that standard process applied in this case?

A.   Yes, it was.

Q.   Mr. Bouchard, now that we've discussed your typical process, let's discuss what records you reviewed in this case.

A.   Sure.

Q.   Mr. Bouchard, did your analysis in this case require you to review a lot of bank records?

A.   Yes, it did.

Q.   And what did those records consist of?

A.   Bank statements, wire records, copies of checks, signature cards.  Much of those items.

Q.   And did you review all available bank records pertaining to a number of different bank accounts?

A.   Yes, I did.

Q.   And did you review an overview chart reflecting all the different bank accounts that you reviewed?

A.   I did.

Q.   I want to direct you to the binder of your left side, there.  Volume great 8, Government Exhibit 900.  If you could take a look at that.  That's Exhibit 900.

A.   All right.

Q.   Can you tell me what is that?

A.   A listing of the accounts I analyzed.

Q.   How many accounts are included in this chart?

A.   Twenty-three.

Q.   What is the source of information for this chart?

A.   Bank records.

Q.   And did you review every line in this chart for accuracy?

A.   I did.

Q.   Mr. Bouchard, are you confident that each line accurately captures the bank records -- sorry -- bank the accounts included in your analysis?

A.   Yes.

          MR. DE LEON:  Your Honor, at this time, the

government offers Government Exhibit 900, pursuant to Rule 1006.

MS. ABEL:  No objection.

THE COURT:  That's admitted.  Thank you.

MR. DE LEON:  Mr. Flores, would you please publish Government Exhibit 900, please.

Q.    Mr. Bouchard, can you walk us through each column heading?

A.    Sure.  So first is the "Account name," so that's the actual name listed on the account of the record.

Then "Financial institution" is the bank that the record came from.

"Type" is the type of account check, whether it's checking or savings or credit card.

"Account" is the account number listed on the record.

"Signers and users" are who the signers and users are of the record -- or of the account.  Sorry.

"EIN" is the employer identification number, or the tax ID.

"Open" is the date the account was opened.

"Earlier transaction" analyzes the date of the first transaction of the record I analyzed.

And then "Bank declaration" reference is the statement that the bank sends to certify the records are complete and accurate.  That's just the location where it's stored at.

The "Bank reference" is all the underlying that support

this document.

         MR. DE LEON:  Mr. Flores, if you would zoom out, please.

Q.   Mr. Bouchard, I noticed there are some asterisks in some of these rows.  Can you explain what the asterisk indicates?

A.   Sure.  In these cases, we did not receive that supporting documentation from the bank with the bank records.  So we just left it as an asterisk.

Q.   Mr. Bouchard, I want to start with talking about your analysis into the first four bank accounts listed on this exhibit, which is the StarClub, Inc., bank records.

     Mr. Bouchard, did you review available bank records for the four Chase accounts held in the name of StarClub, Inc., That ended in 7995, 6339, 9717, and 8398?

A.   Yes, I did.

Q.   Did you review summary charts for each one of these accounts that capture the information from the available bank records for each of these Chase accounts from January 2014 to July 2017?

A.   Yes, I did.

Q.   In reviewing the summary charts, Mr. Bouchard, did you analyze every available bank record from January 2014 to July 2017 for each of these four accounts?

A.   I did.

Q.   And were there a lot of pages to review for each account?

A.    Yes, there were.

Q.    I want to direct your attention to what has been previously marked as -- in the binder next to you -- Government Exhibits 901, 903, 905, 907, 955, 956, 957, and 958.

Let me know when you're ready.

Mr. Bouchard, can you tell us what these are?

A.    So for every account we had two charts, essentially.  So the first one will show the transactional data, so everything from the statements that we input in there.  Essentially, the statements are in Excel, as I stated.

The second chart will just show the same data, just summed by payee/payor.

Q.    Mr. Bouchard, what's the source of the information in these charts?

A.    The bank records.

Q.    Did you check every line for accuracy in reviewing these summary charts?

A.    Yes, I did.

Q.    And are you confident that these charts accurately summarize the transactions for these four accounts?

A.    Yes, I am.

MR. DE LEON:  Your Honor, at this time the government offers Government Exhibits 901, 903, 905, 907, 955, 956, 957, and 958, pursuant to Rule 1006.

MS. ABEL:  No objection.

THE COURT:  Those are admitted.  Thank you.

(Exhibits 901, 903, 905, 907, 955, 956, 957, and 958 were received into evidence.)

BY MR. DE LEON:

Q.   Mr. Bouchard, did you also follow this same process for the other accounts that are summarized in Government Exhibits 910, 912, 914, 916, 918, 920, 922, 924, 926, 927, 928, 931, 933, 959, 960, 961, 962, 963, 964, 965, 966, 967, 968, and 969?

A.   I did.

Q.   What is the source of the information for all these charts?

A.   The bank records.

Q.   Did you also check every line for accuracy in reviewing these summary charts?

A.   I did.

Q.   Are you confident that these charts accurately summarize the transactions for all these accounts?

A.   I am.

MR. DE LEON:  Your Honor, the government offers Government Exhibits 910, 912, 914, 916, 918, 920, 922, 924, 926, 927, 928, 931, 933, 959, 960, 961, 962, 963, 964, 965, 966, 967, 968, and 969, pursuant to Rule 1006.

MS. ABEL:  No objection.

THE COURT:  All right.  These are admitted.  Thank you.

(Exhibits 910, 912, 914, 916, 918, 920, 922, 924, 926, 927, 928, 931, 933, 959, 960, 961, 962, 963, 964, 965, 966, 967, 968, and 969 were received into evidence.)

BY MR. DE LEON:

Q.   Mr. Bouchard, of the four StarClub, Inc., Chase accounts that you reviewed, was there one account that most of the money came into?

A.   Yes, the 7995 account.

Q.   Let's talk about that account.

     MR. DE LEON:  At this time the government publishes what has been previously admitted as Government Exhibit 300.

     If you could just pull it up.

Q.   Mr. Bouchard, what is this?

A.   This is a signature card for the Chase 7995 account for StarClub.

Q.   What's the business address listed on the top left?

A.   228 Santa Monica Boulevard.

Q.   What date was the account opened?

A.   May 8, 2013.

Q.   Directing your attention to the middle of the page, whose name is printed there?

A.   Bernhard Fritsch.

Q.   And what does it mean?

A.   It means he's the signer on the account.

     MR. DE LEON:  Now publishing page 1 of what has been

previously admitted as Government Exhibit 301E, Exhibit 301.

You can blow it up.  Thank you.

Q.    Mr. Bouchard, directing your attention to the screen in front of you, can you tell us what this is?

A.    This is a bank statement for the same account, the 7995 account, for StarClub for January 1, 2014, through January 31, 2014.

MR. DE LEON:  If you could turn to page 2, Mr. Flores.

Q.    Mr. Bouchard, using this bank record as an example, can you tell us what information from this document would be reflected in your summary charts?

A.    Yes.  So all the additions -- the deposit, additions, the electronic withdrawals, the date and the amounts, those would all be pulled into my records.

Q.    What are deposits?

A.    Any incoming funds into the account.

Q.    What are electronic withdrawals?

A.    Electronic withdrawals are withdrawals or outgoing money of the account that had initiated electronically.

MR. DE LEON:  Mr. Flores, now publishing what's been previously admitted as Government Exhibit 901.

Q.    Mr. Bouchard, can you tell us what this is?

A.    Yeah.  This is a summary chart for the account 7995, that we just looked at, for the activities from January 2014 through

July 2017.

Q.    I notice that there's parentheses at the top left.  What do those indicate?

A.    That indicates who a signer on the account is.

Q.    Is that the case for all your summary charts.

A.    Yes.

Q.    Let's talk about how this chart is organized, beginning with the "Post Date" column.  Can you tell us what that column is?

A.    Sure.  So that column represents the date of the transaction.

And then what transaction type would be whether it's incoming or outgoing, so whether it's a credit or debit to the account.

"Check number" would be if there's an actual -- if it was a check and what the check number was.

"Payee/payor" is who the money came from or went to.

And the "Additional info from source docs" would be if it were a check or wire note that would be put in there.

"Credit" is the total amount of the incoming money from the transaction.

"Debit" is the total amount of the outgoing money from the transaction.

And "Balance" is the balance in the account as of that day.

Q.   Mr. Bouchard, does this chart capture every transaction from January 2014 to July 2017?

A.   It does.

Q.   And that's regardless of the amount?

A.   Correct.

Q.   Let's talk about some of the money that came into this account.

A.   Yes.

Q.   Starting with line 1, can you tell us what that is?

A.   That's the balance carried forward.  So as of January 1, 2014, that was the balance in the account.

Q.   Directing your attention to page 14, line 157, can you tell us what that is?

A.   Yes.  That's incoming money from Salida Strategic Growth for $2,797,504.

Q.   Directing your attention to page 16, line 180, can you tell us what that is?

A.   Also a wire from Salida Strategic Growth Fund for $7 million.

Q.   Directing your attention to page 20, line 227, can you tell us what that is?

A.   A wire from Jorg Mohaupt for $500,004.

Q.   Directing your attention to page 26, line 301.

A.   It's a wire from Ian Mann for $1,000,000.

Q.   Mr. Bouchard, let's talk about the rest of the money that

came in to Chase 795 account.

MR. DE LEON:  Mr. Flores, if you could publish what has been previously admitted as Government Exhibit 955, please.

Q.    Mr. Bouchard, can you tell us what this is?

A.    This is a summary chart, based on the prior one we just looked at.  This one just summed by "Payee/Payor."

Q.    Can we go through each column?

A.    Sure.  So the first column will be the Payee/Payor.

The second column will be the total incoming money from that Payee/Payor.

The third column would be the total outgoing money for that Payee/Payor.

And then, the net total would be the difference between the two.

Q.    Mr. Bouchard, based on your review of the incoming funds into this account and records you reviewed, were you able to draw a conclusion about the purpose of the incoming money coming into this -- StarClub Chase 7995 account.

MS. ABEL:  Objection, Your Honor.  Calls for expert opinion; based on hearsay.

THE COURT:  Sustained.

BY MR. DE LEON:

Q.    Mr. Bouchard, based on your review of the incoming funds into this account and records you reviewed, where did most of the incoming funds come from?

MS. ABEL:  Same objections, Your Honor.

THE COURT:  Counsel, approach.

(Sidebar commenced.)

THE COURT:  Well, I can't even tell what it is you're asking, so I can't evaluate the objection.

What do you mean, where do they come from?

MR. DE LEON:  I'm trying to establish that the majority of the funds came from investors.  And so, if it's easier, maybe I can say, "Based on the admitted records that you were dealing with, where did the majority of the funds come from?"

MS. ABEL:  That would still be based on hearsay.

THE COURT:  They'll have the documents; right?

They will have the summary?

MR. DE LEON:  They will have the summary, Judge, yes.

THE COURT:  So what if he were to draw a conclusion we've heard from the investors already?

MS. ABEL:  I think it's 702.

THE COURT:  I know that.  I'm not asking for you to tell me that.

MS. ABEL:  I'm sorry.

MS. LEE:  Your Honor, Sarah Lee.  The issue is that we've heard about Danny Guy's, but there are references to other investors in other documents that have been admitted at trial, and so there's a concern when this is summarizing --

THE COURT:  You can point that out in closing.  He's drawing conclusions now.

MS. LEE:  I think we're offering him as a summary witness to explain these voluminous records and to summarize the voluminous records, he understands that this chart is a summary of investors.

MS. ABEL:  Your Honor, the defense has no objection insofar as it relates to bank records.  But I understand the government now to be relying on records that are not the bank records, to draw a conclusion.  I would be very interested in what documents he says he's specifically relying on to draw this ultimate conclusion, which, ultimately, is an expert opinion.

MR. DE LEON:  Your Honor, to be clear, at some point during his testimony as well we'll be discussing the demonstrative, which was previously admitted as a potential chart.  It has since been revised.

I also intend to elicit what he excluded of the deposits coming into these five StarClub accounts.  And one of the exclusions was investors.  And he knows that based on his review of the admitted exhibits as to who is an investor.  So he was able to exclude that.

THE COURT:  Do you know who they are?  I am not joking.  Do you know who they are?

MR. DE LEON:  Absolutely.

THE COURT:  Well, then ask him if there was money coming in from ABC.

MR. DE LEON:  Okay.  It might take a bit, but I could do that exercise.  Yeah.

THE COURT:  Otherwise he's drawing conclusions about who are the investors.

MR. DE LEON:  Understood, Your Honor.

THE COURT:  There might have been money coming in from people who aren't investors.

MS. ABEL:  Among other problems we will get to.

MR. DE LEON:  Thank you, Your Honor.

(Sidebar concluded.)

BY MR. DE LEON:

MR. DE LEON:  Mr. Flores, if you could please publish what has been previously admitted as Government Exhibit 146. And if you could turn to page 4, please.

Q.   Mr. Bouchard, looking at this document in front of you, referring you to the bottom two lines, can you read what that says?

A.   "Salida Strategic Growth Funds" file.

Q.   And did you see Salida Strategic Growth Funds in your summary chart for 7995?

A.   I did.

Q.   Go to the next page, referring your attention to the Fidelity Clearing Canada, did you are see incoming funds from

Fidelity --

A.   I did.

Q.   -- in the chart?  Okay.

Moving down, about five rows down, you see it says, "BHP International Markets Limited"?

A.   Yep.

Q.   Did you see any incoming funds in the 7995 account from BHP International Markets Limited?

A.   I did.

Q.   Referring you to Clarence AG, did you see any funds coming in from Clarence AG?

A.   I did.

Q.   And moving down to Francis Scotland.

A.   I did.

Q.   Did you see -- let me finish the question, Mr. Bouchard.

A.   Sorry.

Q.   Did you see funds coming in from Francis Scotland?

A.   I did.

Q.   How about Stephen Buckley right below that?

A.   Yes, I did.

Q.   And then going three down to Jorg Mohaupt?

A.   I did.

Q.   Okay.  And going down to Paradigm Talent Agency LLC, did you see funds coming in from Paradigm Talent Agency in 7995?

A.   Yes, I did.

Q.    Directing your attention to the third row from the bottom, Brian O'Hea, did you see funds coming into the 7995 account from Brian O'Hea?

A.    Yes, I did.

        MR. DE LEON:  One second, Your Honor.

        THE COURT:  All right.

    (A discussion was held off the record between Counsel.)

        MR. DE LEON:  If you could scroll up, please.

Q.    Mr. Bouchard, do you see that first line that says, "Trident Financial Corporation"?

A.    Yes.

Q.    Based on this document, who did you determine Trident Financial Corporation was?

        MS. ABEL:  Your Honor, lacks foundation.

        THE COURT:  Overruled.

        MS. ABEL:  Speculation.

        THE COURT:  Overruled.

    Don't speculate.  You have an answer that is not speculation?

        THE WITNESS:  Yeah.  An investor.

BY MR. DE LEON:

Q.    Mr. Bouchard --

        MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 901, please.

Q.    Mr. Bouchard, the names we just went through in the other

document --

A.    Uh-huh.

Q.    -- what did you conclude those names were?

A.    Investors.

Q.    And you saw those investors in this document we're looking at here at 901?

A.    Yes.

Q.    For incoming wire transfers?

A.    I did.

Q.    Based on that, did you conclude that the StarClub Chase 7995 account was where the investor funds came in?

A.    Yes.

         MR. DE LEON:  If you could publish Government Exhibit 955.

Q.    All right, Mr. Bouchard, let's move on to the debit side of this.

A.    Good.

Q.    Notice that some of the numbers are in parentheses.  Why is that?

A.    That's the outgoing money, so it's negative money.  It's going out of the account.

Q.    And what was the top use of funds going out of the account from this account, 7995?

A.    It was payments to StarClub -- or transfers to StarClub Chase 6339 account for 14,237,000.

Q.   And then, What was after that?

A.   Transfers to StarClub Chase 9717 account for $13 million.

Q.   And how about US Mastertec LLC?

A.   The 3199 received $5,281,500.

Q.   And the one above that?

A.   The Greenwich Music, Inc., Chase account 4865 for $4,360,000.

Q.   And then, are the rest of those, the four after that, are they all 3229 Rambla Pacifico, Inc., outgoing funds to those accounts?

A.   Yes.

Q.   And all these accounts that we reviewed, did you also review the available bank records for all these accounts?

A.   Yes, I did.

Q.   Let's move on to the next StarClub Chase account ending in 6339.

         MR. DE LEON:  Now publishing page 1 of what has been previously admitted as Government Exhibit 304.

Q.   Mr. Bouchard, do you recognize this?

A.   Yes.  It's a signature card for that 6339 StarClub Chase account.

Q.   Who's names are listed in the middle?

A.   Bernhard Fritsch, Henry Wesniac, and Margaret Gonzales.

Q.   And does this page show when the account was opened?

A.   Yes.  May 28, 2013.

MR. DE LEON:  Moving to page 3, Mr. Flores, if you can.

Q.   Whose name is listed as a signer to add?

A.   Kim Fredricks.

Q.   Did you review this entire signature card, Mr. Bouchard?

A.   I did.

Q.   Was Mr. Fritsch ever removed as a signatory from this account?

A.   He was not.

MR. DE LEON:  Now publishing what's been previously admitted as Government Exhibit 903.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  It's a summary chart for the account we just looked at, 6339, for the activities from January 2014 through July 2017.

Q.   And are these transactions organized like the last chart that we looked at?

A.    Yes.

Q.   Referring you to line 1, what is the balance carried forward here?

A.   It is $36,255.57.

Q.   And does that mean that that amount was in the account as of January 1, 2014?

A.   Yes, that's correct.

Q.   Referring you to page 122, line 2253, can you tell us what

that is?

A.    Yes.  It's a payment to Rusnak Arcadia for $42,154.

MR. DE LEON:  Mr. Flores, if you could publish what has been previously admitted as Government Exhibit 956.

Q.    Mr. Bouchard, what is this?

A.    This is a summary chart for the same account over the same period.  It's just summarized -- or totaled by payee/payor.

Q.    What's the largest source of money coming in?

A.    The StarClub Chase 7995 account.

Q.    And what is the second largest?

A.    The StarClub Chase 9717 account.

MR. DE LEON:  Mr. Flores, if you could move to page 8, please.

Q.    Mr. Bouchard, can you tell us what the top use of funds from this account was?

A.    Yes.  It was payments to StarClub Amex account, 61000 for $3,760,758.

Q.    Moving up to the StarClub Limited Amex 62008, how much was used there?

A.    $1,118,045.80.

MR. DE LEON:  Moving up to page 7, Mr. Flores.  If you can go down.  Please go down.

Q.    Referring you to the StarClub Limited Amex 63006, how much was spent there?

A.    175,718.42.

Q.   Mr. Bouchard, did you review the available bank records for these StarClub Limited Amex accounts?

A.   Yes, I did.

Q.   And are all these three Amex accounts related?

A.   Yes, they are.

Q.   How so?

A.   They are all StarClub accounts.

Q.   And in reviewing the available records for these three accounts, did you come across any credit card charges made by Lisa Stalvey and George Mederos?

A.   Yes, I did.

Q.   Did you review summary charts summarizing Ms. Stalvey and George Mederos's credit card charges?

A.   Yes, I did.

        MR. DE LEON:  Mr. Flores, let's start with Ms. Stalvey's credit card charges.  Mr. Flores, if you could publish --

        THE COURT:  I think we'll hold off on that until we take our first break.

    Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

    We'll take a 20-minute break.

        MR. DE LEON:  Thank you, Your Honor.

        THE COURTROOM DEPUTY:  All rise.

(Jury exited.)

THE COURT:  You can step down, sir.

Anything we need to discuss?

MR. DE LEON:  Nothing from government, Your Honor.

MS. ABEL:  Not from the defense, Your Honor.  Thank you.

THE COURT:  All right.

(A brief recess was taken.)

THE COURTROOM DEPUTY:  All rise.  This Court is now in session.

THE COURT:  Let's get our jury.

(Jury entered.)

THE COURT:  You may be seated.  Everyone is back. Our witness is back on the stand.

Sir, you're still under oath.

Counsel, you may continue.

BY MR. DE LEON:

Q.  Mr. Bouchard, I believe we left off with Ms. Stalvey's credit card charges.

MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 927.

Q.  Mr. Bouchard, looking at the screen in front of you, can you tell us what this is?

A.   Yes.  A summary of the credit card charges, totaled by vendor, from Ms. Stalvey's cards from September 22, 2013,

through to February 19, 2017.

Q.    What Amex Express accounts?

A.    The account 61000, the account 62008, and the account 63006.

MR. DE LEON:  Mr. Flores, if you could please scroll down a little bit.

Q.    Mr. Bouchard, can you tell us how much was spent here at Erewhon?

A.    $89,220.40.

Q.    Going up to Albertson's?

A.    $70,711.66.

MR. DE LEON:  Mr. Flores, if you could go to page 2, please.

Q.    Towards the bottom, Mr. Bouchard, how much was spent over at Wade's Wines?

A.    $9,257.50.

Q.    And the grand total of how much was spent on this chart? How much is listed?

A.    $299,009.53.

Q.    Mr. Bouchard, let's move on to Mr. Mederos's credit card charges.

MR. DE LEON:  Mr. Flores, if you could please publish what has been previously admitted as Government Exhibit 928. And zoom in at the top left.

Q.    Mr. Bouchard, can you tell us what this is?

A.    Yeah.    These are the credit card charges by Mr. Mederos on the Amex accounts 61000, 62008, and 63006 for the period from December 22, 2013, through February 19, 2017.

Q.    Can you please walk us through the columns and what they indicate?

A.    The first column is the actual number of the physical card and whose card it is.

The second column is the account, the Amex account, that that card rolls up to.

The third column, Transaction Type, is for what it is, whether it's a credit card charge or a return or a credit of some sort or a payment.

Next is a statement period, so that is the statement closing period date.

The Date Posted is the actual date of the transaction.

The Payor or Payee column is the vendor payor or payee.

Payment/Credits is any credits or payments against that account in this line item.

And the Charges is the total amount charged for that payee/payor.

Q.    And the red number in the top left or the chart --

MR. DE LEON:    If you could just zoom out of that, Alex, please.

Q.    What does that indicate?

A.    Top right, you mean?

Q.    The top right.  Sorry.

A.    So that's the total number of charges on the cards.  In this case, it was $1,088,769.02.

Q.    Mr. Bouchard, directing your attention to page 21.

        MR. DE LEON:  If you could zoom in on line 1482.

Q.    Mr. Bouchard, can you tell us what that line is, 1482?

A.    It's a payment to McLaren Scottsdale for $1,000.

Q.    And do you know what that was for?

A.    It was towards the purchase of a McLaren.

        MS. ABEL:  Objection, Your Honor.  Lacks foundation.

        THE COURT:  Please lay a foundation, Counsel.

        MR. DE LEON:  Based on review of the records, do you know what that was for?

A.    Yes.  It was for the purchase of a McLaren.

Q.    Directing you to page 56, line 3974, can you tell us what that transaction was?

A.    It's a payment to Armani for $44,384.80.

Q.    How about line 3978?

A.    A payment to Tom Ford for $7,030.50.

Q.    Mr. Bouchard, let's move on to the next StarClub account ending in 9717.

        MR. DE LEON:  Mr. Flores, now publishing Government Exhibit 312.

Q.    Mr. Bouchard, can you tell us what this is?

A.    It's a signature card for the StarClub Chase account

ending in 9717.

Q.   And does it show when the account was opened?

A.   Yes.  October 21, 2013.

Q.   whose name is listed there in the middle?

A.   Bernhard Fritsch.

Q.   And is that as a signatory?

A.   Yes.

MR. DE LEON:  Now publishing what has been previously admitted as Government Exhibit 957.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  This is a summary chart for the account ending 9717 for the activities from January 2014 through July 2017, and this is totaled by payee/payor.

Q.   Starting with the credits, can you tell us the top credit for this account?

A.   Yes.  It was from the StarClub Chase 7995 account for $13 million.

Q.   And this 7995 account is the one we already went over?

A.   Yes, correct.

Q.   What was the balance carried forward listed here?

A.   $882,320.90.

Q.   And that was the balance as of January 1, 2014?

A.   That is correct.

Q.   How about the interest payment?

A.   $6,082.52.

Q.   Moving to the debits, Mr. Bouchard, how much was sent to the StarClub Chase 6339 account?

A.   $10,643,000.

Q.   This is another account that we discussed; right?

A.   Yes, that's correct.

Q.   How much was sent to US Mastertec?

A.   To the 3199 account, it was $545,000.

Q.   How about Greenwich Music, Inc.

A.   Yes.  To the Chase 4865 account, it was $340,000.

Q.   And then the 3229 Rambla Pacifico, Inc.?

A.   So to the Wells Fargo 7568 account is $130,000.  And then to the Wells Fargo 6377 account, it was $40,000.

Q.   Mr. Bouchard, let's move on to the last StarClub, Inc., Chase account ending in 8398.

        MR. DE LEON:  Now publishing what has been previously admitted as Government Exhibit 308.

Q.   Mr. Bouchard, what is this?

A.   This is a signature card for the 8398 StarClub Chase account.

Q.   And whose name is listed here?

A.   Bernhard Fritsch.

Q.   When was the account opened?

A.   November 26, 2013.

        MR. DE LEON:  Mr. Flores, could you please publish Government Exhibit 309E.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  It's a bank statement for the 8398 Chase StarClub account for period January 1, 2014, to January 31, 2014.

Q.   Moving down on that same page, can you tell us what the beginning balance was listed here?

A.   Zero.

      MR. DE LEON:  Mr. Flores, can you please publish Government Exhibit 958.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  It's a summary chart for that JPMorganChase account ending in 8398 for StarClub, showing the activities from January 2014 through July 2017, and it's summed by payee/payor.

Q.   And directing you to the credits into this account, can you tell us what those credits are?

A.   So the total of $25,130.09 from Google; and then $11,500 from PayPal; $55.99 from Apple; and a penny from HiLetgo.

Q.   And then moving to the debits, what was top debit here?

A.   It's the StarClub Chase 6339 account for $45,000.

Q.   And the one after that?

A.   The StarClub Chase 7995 and $16,641.29.

      MR. DE LEON:  You can take that down, Mr. Flores.

Q.   Mr. Bouchard, I want to move on to talking about the incoming funds into all of the StarClub's bank accounts that you reviewed from January 2014 to July 2017.

      In reviewing StarClub's bank accounts, did you review a

summary of incoming funds going into StarClub's accounts from January 2014 to July 2017?

A.    Yes, I did.

Q.    If you could look at the binder in front of you and please turn to Government Exhibit 909.

A.    All right.

Q.    Can you tell us what this is?

A.    Yeah.  This is a summary chart of all incoming funds, excluding intercompany transfers, the funds from investors, interest income, cash deposits, and refunds and rebates from the January 2014 to July 2017 period.

Q.    So this chart excluded the investor money listed on the StarClub Chase 7995 account?

        MS. ABEL:  Objection.  Lacks foundation.

        THE COURT:  Lay a foundation, please.

BY MR. DE LEON:

Q.    Going back to the 7995 account that we discussed and going through the investors that we discussed, are those excluded in this chart?

A.    Yes, they are.

Q.    And what else does it exclude?

A.    What else is excluded?

Q.    Yes.

A.    It also excluded intercompany transfers, so that would be --

Q.   You were about to explain --

A.   Yeah.

Q.   What is intercompany transfers?

A.   So that would be any account that Mr. Fritsch was the signing authority on, or any account that the majority of the incoming funds originated from a StarClub account.

Q.   And then what else is excluded on this chart?

A.   Interest income.

Q.   What is that?

A.   That was sort of the savings account that earned interest, which excluded the interest income on that.

Q.   And cash deposits?

A.   Any cash deposits that came into the account.

Q.   And what is the last?

A.   Refunds or rebates.  That was refunds or rebates from vendors that came in.  Those were a few in there, actually.

Q.   And did you review -- I'm sorry.  What is the source of information for this chart?

A.   The bank records.

Q.   And also admitted exhibits?

A.   Oh, yes.  Of course.

Q.   And what StarClub bank accounts did you review in reviewing this chart?

A.   So the Chase 7995 account, the Chase 8398 account, the Chase 9717 account, the Chase 6339 account, and the City

National's 8533 account.

Q.   And what months did those bank records cover?

A.   January 2014 through July 2017.

Q.   Mr. Bouchard, do you think it accurately summarizes all the incoming funds without the exclusions you discussed?

A.   Yes.

        MR. DE LEON:  Your Honor, the government offers Government Exhibit 909 as an demonstrative.

        MS. ABEL:  The defense objects as inaccurate, improper foundation, expert conclusions, and improper lay opinion.

        THE COURT:  Overruled.  That can be shown.

     (Exhibit 909 was marked for identification.)

        MR. DE LEON:  Mr. Flores, would you please publish Government Exhibit 909.

BY MR. DE LEON:

Q.   Mr. Bouchard, starting with the left side of the chart, can you tell us what this is?

A.   Yes.  This is a summary of the -- all other incoming funds by year, excluding the exclusions previously mentioned.

Q.   Moving over to the right, what does that table show?

A.   It shows the entity and the amount of other income from that entity over the four-year period.

Q.   Let's go year by year, starting with 2014.  What was the grand total that came in there?

A.   $107,443.64.

Q.   And moving over to 2015.

A.   $46,763.58.

Q.   And for that year, what were the incoming funds listed here?

A.   Google payments of $21,777.25; payments from Barge Entertainment LLC for $24,974; $12.32 from Apple; and a penny from HiLetgo.

Q.   And then how about for 2016?

A.   The total was $386,926.20.

Q.   How about 2017?

A.   $143,012.43.

Q.   Mr. Bouchard, based on your review of the records for these five StarClub bank accounts, from January 2014 to July 2017, what was the total amount of all the other incoming funds without the exclusions we discussed?

A.   $683,145.85.

Q.   Mr. Bouchard, let's move on to the bank accounts held in the name of US Mastertec.

     Did you review every single bank -- available bank record from January 2014 to July 2017 of US Mastertec LLC, Chase account ending in 6339?

A.   I did.

Q.   Did you also review every single available bank record from August 2014 to March 2017 of US Mastertec, Inc.'s Comerica

account ending in 9358?

A.   I did.

Q.   And did you review similar charts for each of these accounts?

A.   I did.

MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 316.  Let's start with the US Mastertec LLC Chase account.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  It's a signature card for the US Mastertec account ending 3199.

Q.   Okay.  And whose names are listed in the middle?

A.   Michael Ravin and Kaydee Kesterson.

Q.   What is the date listed?

A.   September 9, 2011.

MR. DE LEON:  Mr. Flores, if you could please go to page 4.

Q.   Under "signers to Add" here, who is being added?

A.   George Mederos and Miraflor Stemmann, both on February 19, 2014.

MR. DE LEON:  Mr. Flores, if we could please publish Government Exhibit 959.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  It's a summary chart for the US Mastertec account ending 3199 for activities from January 2014 through July 2017,

and it's totaled by Payee/Payor.

Q.    What were the top three credits that came into this account?  Starting with the top?

A.    Sure.  It was from the Chase 7995 account for $5,281,500; and it was the Chase 9717 account for $545,000; and then from the Chase 6339 account for $150,000.

Q.    How much was the balance carried forward on January 1, 2014 for this account?

A.    $4,055.30.

        MR. DE LEON:  Mr. Flores, if you could please go to page 3.  Let's move over to debits.

Q.    Mr. Bouchard, can you tell us how much was paid out to George Mederos?

A.    $131,652.

Q.    And how about Trouble Stunts LLC?

A.    $105,097.58.

Q.    How about Der Hut LLC?

A.    $96,750.

Q.    Going up to Rick Flammang?

A.    $72,500.

Q.    And Lisa Short, towards the bottom?  After George Mederos.

A.    $150,012.

Q.    Finally, how much to US Mastertec, Inc., Comerica 9358?

A.    $585,000.

Q.    Let's move over and talk about that account.

MR. DE LEON:  Now publishing what has been previously admitted as Government Exhibit 319E.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  It's a signature card for the US Mastertec, Inc., 9358 account.

Q.   And does it show when it was opened?

A.   Yes.  It was opened on August 4, 2014.

Q.   Directing your attention to the bottom of the page.

MR. DE LEON:  Mr. Flores.

Q.   Whose names are listed?

A.   Michael Ravin and Bernhard Fritsch.

MR. DE LEON:  Moving to page 3, Mr. Flores.

Q.   Going down, can you tell us what the beginning balance on August 4, 2014 was?

A.   Zero.

MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 960.

Q.   Mr. Bouchard, what is this?

A.   It's a summary chart for the Comerica Bank 9358 account for the activities from August 2014 through February 2017, summed by payee/payor.

Q.   And what was the top credit coming in?

A.   US Mastertec LLC, Chase account ending 3199 for $585,000.

Q.   Moving to the top debit, what was that?

A.   LBG Enterprises, Inc., Chase account 4865 for a total of

$372,000.

Q.    Let's move on and talk about LBG.  Did you also review available bank records for LBG Enterprise?

A.    I did.

MR. DE LEON:  Now publishing what has been previously admitted as Government Exhibit 353.

Q.    Can you tell us what this is, Mr. Bouchard?

A.    Yes.  It's a signature card for the LBG Enterprises, Inc., account ending 4865.

Q.    And does it show when it was opened?

A.    Yes.  March 30, 2006.

Q.    Whose names are listed here?

A.    Bernhard Fritsch and Lisa Marie Short.

Q.    Based on your review of the signatory card, does Mr. Fritsch ever get removed as a signatory?

A.    No.

Q.    Let's move on to the Chase account held in the name of Greenwich Music, Inc., ending in 4865.

Mr. Bouchard, did some of the money from the StarClub Chase 7995 account go into this account?

A.    Yes.

Q.    Did you review every single available bank record from January 2014 to May 2017 of Greenwich Music, Inc., Chase account ending in 4865?

A.    Yes, I did.

Q.   And did you also review similar summary charts for this account?

A.   I did.

MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 320, page 3.

Q.   Mr. Bouchard, what is this?

A.   It's a signature card for the Greenwich Music, Inc., account ending 4865.

Q.   And directing your attention to the signature boxes, whose names are listed?

A.   Bernhard Fritsch and Raymond Short.

MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 914.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yep.  It's a summary chart for the JPMorganChase 4865 account for Greenwich Music, Inc., for the activities from January 2014 through May 2017.

Q.   And starting with line 1, can you tell us what that is?

A.   Yes.  That's the balance carried forward that's at the beginning of the period for $14,360.68.

Q.   And how about page 3?

MR. DE LEON:  Mr. Flores.

Q.   Line 66.

A.   That's a payment to New Roads School for $15,197.85.  The check memo saying, "David Stalker January payment."

Q.   And moving to page 9.

        MR. DE LEON:  Mr. Flores.

Q.   Line 199.

A.   It's a payment to Dylan Ris for $1,800, with a check memo saying, "David Fritsch Tutor."

Q.   How about the transaction right above that?

A.   Payment to Princeton Review for $350, with a check memo saying, "David Stalker Fritsch, June SAT Prep Class."

        MR. DE LEON:  Mr. Flores, if you could go to page 13.

Q.   Line 291.

A.   A payment to New Roads School for $17,577, with a check memo stating, "David Stalker 2014-2015 tuition."

Q.   Directing your attention to page 23, line 524.

A.   Yes.  A payment to Beverly Hills Institute and Dental for $30,000.

Q.   Moving to page 31.

        MR. DE LEON:  Mr. Flores.

Q.   Line 710.

A.   Yes.  A payment to Menlo College for $18,940, with the memo stating, "Tuition, David Stalker."

        MR. DE LEON:  Mr. Flores, if you could go to page 24, line 50.

Q.   Can you tell us what that is, Mr. Bouchard?

A.   It's a payment to Mercedes Benz Financial Services for $73,495.12, with a memo saying, "Account 700367-6697."

MR. DE LEON:  Going to page 53, Mr. Flores.

Q.  Line 1201.

A.  It's a payment to Rusnak Pasadena for $200,000.

Q.  Based on your review of the records, do you know what this was for?

MS. ABEL:  Lacks foundation.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  It was towards the purchase of a Rolls Royce.

BY MR. DE LEON:

Q.  Directing your attention to page 22, line 499.

A.  It's a payment to Bennett Law Office for $138,035.

Q.  Based on your review of the records, do you know what this was for?

A.  Yes.  This was towards the purchase of a McLaren.

Q.  Have you reviewed records from First Interstate Bank regarding this wire to Bennett Law?

A.  I have.

MR. DE LEON:  Now publishing Government Exhibit 505.

Q.  Mr. Bouchard, can you tell us what this is?

A.  Yes.  It's an excerpt from the First Interstate Bank checking account ending 0588 for Bennett Law.

Q.  Directing you to line 22, Columns B and E, can you tell us what that is?

A.   Yes.  B is the amount, so it was $138,035 sent to Bennett Law Office, because E is the beneficiary.  So that's who received the money in the transaction.

            MR. DE LEON:  Moving down to Column Y, Mr. Flores.

Q.   Mr. Bouchard, line 22, Column Y, can you tell us what that is?

A.    Sure.  Column Y is the originator of the funds, who sent the money, and for the first row, 22, it was Greenwich Music, Inc.

Q.   How about column AI?

A.   Column -- what was it?

Q.   Apologies.

     Let's move over to line 23.  Can you tell us what line 23 is for Columns B and E?

A.   Yep.  It was $135,000 sent to Bennett Law Office.

Q.   And then, for line 23, Column Y?

A.   It came from the 3229 Rambla Pacifico account.

Q.   And did you also review available bank records from the Rambla account?

A.   I have.

Q.   We'll get to that later on.

     Moving to the next line, line 24, can you tell us what Columns B and E say?

A.   That was $271,510 sent to McLaren Scottsdale from this account.

MR. DE LEON:  You can take that down, Mr. Flores.

Now, publishing Government Exhibit 961.

Q.   Mr. Bouchard, can you tell us what this is?

A.   Yes.  It's a summary account for the Greenwich Music, Inc., 4865 account for activities from January 2014 through May 2017, summed by payee/payor.

MR. DE LEON:  Moving to page 4, Mr. Flores.  Going down.

Q.   Can you tell you us how much came to into this account from the StarClub, Inc., Chase 7995 account?

A.   $4,360,000.

MR. DE LEON:  Moving back to page 1, Mr. Flores.

Q.   How much went to Der Hut LLC from this account?

A.   $202,960.

Q.   And referring you to the top line here, GMI Amex 32005, how much went to that?

A.   $1,109,529.16.

Q.   Mr. Bouchard, did you review available bank records for this account?

A.   I did.

Q.   Based on your review of available bank records for this account, did Rick Flammang have credit cards issued to him under this account?

A.   Yes, he did.

Q.   And did you review summary charts reflecting

Mr. Flammang's credit card charges?

A.    I did.

MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 968.

Q.    Mr. Bouchard, can you tell us what this is?

A.    Yes.  It's a summary of the charges on Rick Flammang's cards for the American Express accounts 32005 and 33003 for the period December 30, 2013, through February 2017.

Q.    And how much was charged to Harbor Town Mariner?

A.    $40,516.89.

Q.    How about Yacht Management Group?

A.    $11,317.11.

Q.    Yacht Design?

A.    $10,564.30.

Q.    How about Car Rental Yacht Services?

A.    $5,471,83.

MR. DE LEON:  Moving down to the bottom of page 7, Mr. Flores.

Q.    What is the total amount of the credit card charges for this?

A.    $219,692.08.

MR. DE LEON:  Mr. Flores, if you can go back to Government Exhibit 961, page 1.

Q.    Now, directing your attention to the third row from the top, the GMI Chase credit card 6575, did you also review

available bank records for that account?

A.    Yes, I did.

Q.    And did you review summary charts of Kaydee Cox's credit card expenses?

A.    I did.

MR. DE LEON:   Now publishing Government Exhibit 969.

Q.    Mr. Bouchard, referring to this chart, can you tell us what it is?

A.    Yes.   It's a summary of the credit card charges on Kaydee Cox's cards for the accounts ending 6575 for Chase and 32005 for American Express.

Q.    Let's go through a few of these charges.

How much spent over at Swann's Furniture?

A.    12,337.47.

Q.    How about Neiman Marcus?

A.    $7,026.31.

Q.    How about Boot Star?

A.    $3,130.

MR. DE LEON:   Moving to page 13, Mr. Flores.

Q.    Mr. Bouchard, how much did Kaydee Cox spend on credit card charges for these accounts?

A.    $248,106.66.

Q.    Okay.

MR. DE LEON:   Turning back to Government Exhibit 961, Mr. Flores.

Q.    And about five rows down, the GMI Amex 61004, how much was spent from the GMI account here?

A.    $312,572.51.

Q.    Did you also review available bank records for that account?

A.    Yes, I did.

        MR. DE LEON:  Mr. Flores, if you please publish Government Exhibit 366, page 57.

Q.    Mr. Bouchard, can you tell us what this is?

A.    Yes.  It's a credit card statement for the 61004 account.

Q.    Whose name is listed here?

A.    Bernhard Fritsch.

        MR. DE LEON:  And going to next page, Mr. Flores.

Q.    Directing your attention to August 18, 2016, what are those two transactions?

A.    They are two payments to Rolls Royce Pasadena for $90,000 and $85,973.07.

Q.    And based on your review of the records, do you know what this was for?

        MS. ABEL:  Objection.  Lacks foundation.  Based on hearsay.

        THE COURT:  Overruled.

        THE WITNESS:  It is for the purchase of a Rolls Royce.

        MR. DE LEON:  Mr. Flores, you can remove that

exhibit, please.

Q.   Okay.  Mr. Bouchard, let's move on to the analysis into the 3229 Rambla Pacifico, Inc., bank accounts.

Did you review available bank records for the three Wells Fargo banks accounts held in the name of 3229 Rambla?

A.   I did.

Q.   Did you also review available bank records for the Chase account held in the name of 3229 Rambla?

A.   I did.

Q.   Did you review summary charts for each of these accounts?

A.   Yes, I did.

Q.   Let's start with the Wells Fargo account ending in 7568.

MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 916.

Q.   Can you tell us what this is, Mr. Bouchard?

A.   Yes.  It's a summary chart for the Wells Fargo 6568 account for the 3229 Rambla Pacifico, Inc., and it's for the period January 1, 2014, through July 2017.

Q.   And at the top left, Mr. Bouchard, I notice there's an asterisk.  Can you explain what that is?

A.   Yes.  For this account, we were not provided the signature cards from the banks, so we had to review copies of the cancelled checks to see who actually signed off on them, who the signees were on these checks.

Q.   And based on that review, who did you determine?

A.    It was, looks like, Lisa Short and George Mederos and Michael Ravin were signers for this account.

Q.    Is that the same for any time there's an asterisk on the Rambla Wells Fargo accounts?

A.     Yes, that's correct.

Q.    Starting with line 1, what was the balance carried forward here?

A.    $3,368.55.

          MR. DE LEON:    And moving to page 13, Mr. Flores.

Q.    Line 172.

A.    Yeah.    It's a payment to Miracle Cleaning for $2,635, with a check memo stating, "Rambla housecleaning and laundry."

Q.    Going to page 18, line 248.

A.    It was a payment to PM Construction for $36,000, with a check memo stating, "First deposit, retaining wall."

Q.    Page 19, line 267?

A.    It was another payment to PM Construction for the same amount, $36,000, with a memo stating, "Second installment."

Q.    How about page 20, line 283?

A.    Another payment PM Construction, totaling $52,000, with a memo saying, "Final payment."

Q.    And going to page 54, line 645?

A.    There's a payment to Mario Ruiz for $10,470, with a memo stating, "Painting."

Q.    Going to page 60, line 702?

A.    A payment to McLaren Scottsdale for $20,000, with the VIN number there listed.

Q.    Based on your review of the records, do you know what this was for?

MS. ABEL:  Objection.  Lacks foundation.  Based on hearsay.

THE COURT:  Overruled.

THE WITNESS:  It was for purchasing a McLaren.

MR. DE LEON:  Moving to page 94, Mr. Flores.

Q.    Line 1093.

A.    It's a payment to Judy Purcell for "Housekeeping, Massage" as memo, totaling $1,875.

MR. DE LEON:  Now publishing Government Exhibit 962.

Q.    Can you tell us what this is, Mr. Bouchard?

A.    Yes.  It's a summary chart for the Wells Fargo 7568 account for activities from January 2014 through July 2017.

Q.    This is the account we've just been going over?

A.    Yes, absolutely.

Q.    Directing you, first, to the credits coming in, what's the top credit coming in here?

A.    A total of $1,784,500 from the StarClub Chase 7995 account.

MR. DE LEON:  Switching gears, going to page 9, Mr. Flores.

Q.    Can you tell us how much was spent on PM Construction?

A.    $306,500.

Q.    How much went to Judy Purcell?

A.    $97,535.40.

Q.    How about 877 East Broadway LLC?

A.    $79,173.

MR. DE LEON:  Going to page 8, Mr. Flores, towards the bottom.

Q.    How much went to Lisa Short?

A.    $55,173.

Q.    Mr. Bouchard, let's move on to the other Wells Fargo account ending in 6377.

MR. DE LEON:  Now publishing Government Exhibit 340E, page 1.

Q.    Can you tell us what this is?

A.    Yes.  A bank statement for the 6377 Rambla Pacifico, Inc., Wells Fargo account for February 24, 2014.

MR. DE LEON:  Going down, Mr. Flores.

Q.    That beginning balance on February 24, what does it say?

A.    Zero dollars.

MR. DE LEON:  Mr. Flores, if you can please publish Government Exhibit 963.

Q.    Can you tell us what this is?

A.    It's a summary chart for the Wells Fargo 6377 account for the activities from February 2014 through July 2017.

Q.    Moving to the credits, what was the top credit coming into

this account?

A.    From StarClub Chase 7995, totaling $675,000.

Q.    Going to the bottom, what was the top credit for this account?

A.    It was $298,574.29 to Deutsche Bank.

Q.    And based on your review of the records, do you know what this was for?

         MS. ABEL:  Objection.  Lacks foundation.  Based on hearsay.

         THE COURT:  You have some foundation, Counsel?

         MR. DE LEON:  It's okay, Your Honor.  I'll move on.

         THE COURT:  All right.

BY MR. DE LEON:

Q.    How about the transaction right above it?

A.    It was $203,588.66 to the Los Angeles County Tax Collector.

Q.    All right.  Let's move on to the other Wells Fargo account held -- sorry -- ending in 6313.

         MR. DE LEON:  Mr. Flores, if you can please publish Government Exhibit 964.

Q.    Can you tell us what this is, Mr. Bouchard?

A.    Yes.  It's a summary chart for the Wells Fargo 6313 account for the activities January 2014 through April 2014.

Q.    What was the source of funds, the top source of funds coming into this account?

A.    It was from the Chase 7995 account, totaling $100,000.

Q.    What was the balance carried forward in this account on January 1, 2014?

A.    $5,732.75.

Q.    Moving down to the top use of the funds, can you tell us what that was?

A.    It was Rambla Pacifico, Inc., Wells Fargo 6377 account for a total of $49,156.84.

Q.    And then, right above that?

A.    $20,013.32 to Deutsche Bank.

Q.    Let's move on to the final Rambla account, the Chase account ending in 6803.

        MR. DE LEON:  Mr. Flores, if you can please publish Government Exhibit 348.

Q.    Mr. Bouchard, can you tell us what this is?

A.    Yes, it's a signature card for the 6803 Rambla Pacifico, Inc., Chase account.

Q.    And who's name is listed there?

A.    George Mederos.

Q.    Does it show when the account was opened?

A.    Yes.  May 18, 2014.

        MR. DE LEON:  Mr. Flores, if you could please go to page 3.

Q.    Mr. Bouchard, whose name is listed as a signer to add?

A.    Bernhard Fritsch?

Q.    And on what date?

A.    May 27, 2014.

        MR. DE LEON:  Mr. Flores, if you could please publish Government Exhibit 349E.

Q.    Mr. Bouchard, what is this?

A.    This is a bank statement for the 6803 Rambla Pacifico, Inc., Chase account for May 19, 2014, through May 30, 2014.

Q.    What was beginning balance here?

A.    Zero.

        MR. DE LEON:  Mr. Flores, can you please publish Government Exhibit 922.

Q.    Mr. Bouchard, can you tell us what that is?

A.    Yes.  It's a summary chart for the same JPMorganChase bank account ending 6803 for the activities from September 2014 through July 2017.

Q.    And directing you to line 8, can you tell us what that is?

A.    It's a payment to Bennett Law Office for $135,000.

Q.    Based on review of the records, do you know what this was for?

A.    Yeah.  It was the purchase of a McLaren.

        MR. DE LEON:  Going to page 3, Mr. Flores.

Q.    Line 48.

A.    It was a payment to Rusnak Pasadena for $30,000.

Q.    Based on your review of the records, do you know what this was for?

A.    It was for the purchase of a Rolls Royce.

MR. DE LEON:    Now publishing Government Exhibit 965.

Q.    Mr. Bouchard, can you tell us what this is?

A.    It's a summary chart for the same account, just totaled for payee/payor.

Q.    And what was the main credit coming into this account?

A.    StarClub Chase 7995 account, totaling $1,020,000.

MR. DE LEON:    You can take that down, Mr. Flores.

Q.    Mr. Bouchard, let's move on to the Chase account held in the name of Der Hut LLC.  Did you review every single, available bank record from January 2014 to May 2017 of Der Hut LLC's Chase account ending in 6241?

A.    I did.

Q.    Did you also review summary charts for that account?

A.    I did.

MR. DE LEON:    Mr. Flores, if you could please publish Government Exhibit 352E.

Q.    Mr. Bouchard, can you tell us what this is?

A.    Yes.  It's a signature card for Der Hut 6241 account.

Q.    And whose name is listed?

A.    Kaydee Kesterson.

Q.    When was the account opened?

A.    It was opened on November 19, 2010.

MR. DE LEON:    Mr. Flores, if you could please publish Government Exhibit 966.

Q.    Mr. Bouchard, what were the top two credits coming into this account?

A.    Greenwich Music, Inc., Chase account 4865, for a total of $202,960 and the US Mastertec LLC Chase account ending 3199 for a total of $96,750.

Q.    How much was the balance carried forward for this?

A.    $12.88.

        MR. DE LEON:  Now switching gears to page 3, Mr. Flores.

Q.    What was the top debit for this account?

A.    There were ATM withdrawals from the Bahamas for $121,539.68.

Q.    And how much was spent on Broward Shipyard, Inc.?

A.    $43,088.96.

Q.    Going up to page 2 and directing your attention to the bottom, how much was paid out to Ricky Flammang?

A.    $15,265.00.

Q.    How about Bradford Marine?

A.    $9,987.45.

Q.    Inflatable Services, Inc.?

A.    $5,510.94.

Q.    And the Marina at Atlantis?

A.    $5,268.62.

        MR. DE LEON:  You can take that down, Mr. Flores.

Q.    Mr. Bouchard, did you also review available bank records

from two bank accounts in the name of StarSite, Inc., from October 2016 to July 2017?

A.    Yes, I did.

Q.    And based on your review of the bank records, what was the source of funds that came into this account?

A.    It was from Trident.

Q.    And based on the records that you reviewed, who is Trident?

A.    An investor.

Q.    Mr. Bouchard, I want to focus on the McLaren that we discussed during your testimony.

      Did you prepare an overall summary of the sources of the funds to purchase the McLaren based on what you saw in the available records?

A.    Yes, I did.

Q.    In the binder next to you, please turn to Government Exhibit 935.

A.    I'm good.

Q.    Can you tell us what that is?

A.    It shows a flow of the funds originating from the StarClub Chase 7995 account, ultimately ending up to purchase the McLaren.

Q.    And what is the source of information for this chart?

A.    The records.

Q.    And is that across multiple bank accounts?

A.   Yes, it is.

Q.   Do you think it accurately summarizes the payments relating to the McLaren purchase?

A.   I do.

MR. DE LEON:  Your Honor, the government offers Government Exhibit 935 as a demonstrative.

MS. ABEL:  No objection.

THE COURT:  All right.

(Exhibit 935 was marked for identification.)

BY MR. DE LEON:

Q.   Mr. Bouchard, can you tell what we're looking at here?

A.   It's the funds -- the flow of the funds originating from the StarClub Chase 7995 account that went towards the purchase of the McLaren.

Q.   Can you walk us through this chart here, starting with the left side?

A.   Sure.  So on January 28, 2015, there was a transfer from the StarClub Chase 7995 account to the Greenwich Music, Inc., Chase 4865 account for $135,000.  And then two days later, there's a wire from the Greenwich Music, Inc., account to Bennett Law Office for $138,035.

Q.   Now over to the right side.

A.   On the right side, on January 20, 2015, there's $150,000 transfer from StarClub 7995 account to the Rambla Pacifico 6803 account.  And then, from there, on January 30, same day as the

GMI wire, there's $135,000 wired to Bennett Law Office from the Rambla Pacifico 6803 account.  So Bennett Law Office received a total $273,035 from money originating from the Chase 7995 account.

MR. DE LEON:  Let's move to page 2, Mr. Flores.

Q.    Can you walk us through this, starting with the middle column?

A.    Yep.  So the middle is the balance is from the slide above, so it's $273,035 received in total to Bennett Law Office.  And on that same day they received the funds, on January 30, Bennett Law Office then wired $271,510 directly to McLaren Scottsdale.

Q.    Let's go to the left side.

A.    On January 21, 2015, we saw a payment of $20,000 to McLaren Scottsdale from the Rambla Pacifico 7568 account.  And then --

Q.    On the right side?

A.    Sure.  On the right side, there's a $1,000 credit card charge on January 21, 2015, on George Mederos's Amex card for StarClub paid to McLaren Scottsdale.

So McLaren Scottsdale received a total of $292,510 from all of these accounts.

MR. DE LEON:  You can take that down, Mr. Flores.

Q.    Mr. Bouchard, now I want to direct your attention to Rolls Royce we've discussed during your testimony.

Did you also prepare an overall summary chart for the purchase of the Rolls Royce, based on your review of the bank records?

A.    Yes, I did.

Q.    You can turn to Government Exhibit 936 in the binder in front of you.

A.    Okay.

Q.    Can you tell us what it is?

A.    Yeah.  It's a similar chart.  This one is a flow of funds originated from the Chase 7995 account, that went towards the purchase of the Rolls Royce?

Q.    What's the source of information?

A.    The records.

Q.    And is that across multiple accounts?

A.    Yes, it is.

Q.    Do you think this flow chart accurately summarizes payments relating to the Rolls Royce purchase?

A.    I do.

MR. DE LEON:  Your Honor, at this time, the government offers Government Exhibit 936 as a demonstrative.

MS. ABEL:  No objection.

THE COURT:  All right.  You may show that.

(Exhibit 936 was marked for identification.)

BY MR. DE LEON:

Q.    All right, Mr. Bouchard.  Can you walk us through this

flow chart, starting with the left side?

A.   Sure.   So between August and September 2016, there are a total of $580,000 in transfers from the StarClub Chase 7995 account to the Greenwich Music, Inc., Chase 4865 account.

And then, from there -- so on August 19, 2016, we saw a $200,000 transfer from the Greenwich Chase 4865 account to Rusnak Pasadena.

Additionally, there were $90,000 and $85,973.07 charged on an Amex card for GMI on August 18, 2016.  And the Greenwich Music, Inc., Chase account actually paid that balance in that credit card for when those transactions hit.  So we have it here.

So that means a total of $375,972.07 was sent from the Greenwich Music, Inc., Chase -- or Greenwich Music, Inc., accounts to Rusnak Pasadena.

Q.   Okay.  And moving to the right --

MR. DE LEON:  You can take that off, Mr. Flores.

Q.   Moving to the right side of the chart.

A.   Yep.  On August 1, 2016, there was a transfer of $50,000 from the Chase 7995 account to the Rambla 6803 account.  And then, from there, a week later is a $30,000 transfer from that Rambla account to Rusnak Pasadena.

So Rusnak Pasadena received a total of $405,973.07 of funds that originated from the Chase 7995 account.

MR. DE LEON:  Just one second, Your Honor.

THE COURT:  Yes.

(A discussion was held off the record between Counsel.)

MR. DE LEON:  No further questions from the government, Your Honor.

THE COURT:  Cross-examination?

CROSS-EXAMINATION

BY MS. ABEL:

Q.  Hi, Mr. Bouchard.

A.  Hi.

Q.  How do you feel about spreadsheets?

A.  I made a career out of it, so.

Q.  Fair enough.  I am less excited.  I'll warn you.

I want to -- we're going to have to get into it.  So I want to talk a little about numbers.  Let's start with work creating the spreadsheets.

A.  Sure.

Q.  So I understand you didn't, in fact, create the spreadsheets; is that right?

A.  Not all of them.

Q.  Okay.

A.  Some of them, yes.

Q.  Okay.  Then, some of the spreadsheets.

And some of them were created by a Ms. de los Santos?

A.  Yes.

Q.  Do you recall which ones you created?

A.   Every pivot table, I created.

Q.   A pivot table.  Okay.

And for the sake of the jury --

A.   That would be second chart of the two charts of each account.

Q.   And just for an explanation, is that the chart where you grouped all of the payee/payors into a list?

A.   Yes.

Q.   So it's not the transaction details?

A.   I mean, I didn't create them.  I didn't review those -- detail review them for every line item, but, yes.

Q.   So you didn't input the data into transaction detail spreadsheets?

A.   I did not.

Q.   Ms. de los Santos did that?

A.   She procured that process, yes.

Q.   But I understand you to say that you ensured -- you checked every line for accuracy?

A.   Yes.

Q.   Okay.  Are you sure about that?

A.   Yes.

Q.   And it's important that they're 100 percent accurate?

A.   Yeah.

Q.   I want to talk a little bit about the scope of the review. Let's look at Government Exhibit 900, please.

So this is the list of all the accounts that were reviewed for this case; is that right?

A.   It's all the ones that I analyzed, yes.

Q.   And if an account is not on this list, you did not review it?

A.   We received additional accounts that we had -- like, for example, we had some of Mr. Fritsch's personal accounts, but we didn't fully analyze those on here.

Q.   So they weren't -- the review, as we described before, was not conducted for, for example, Mr. Fritsch's personal accounts?

A.   Not to the level that other ones were, correct.

Q.   So, for example, StarClub Wells Fargo account 8303590551 --

        MS. ABEL:  Why don't we zoom in on the StarClub accounts.  That would be Line 1 through 7.

Q.   Do any of those end in 0551?

A.   No.

Q.   So fair to say you didn't review that account?

A.   Correct.

Q.   Also, again, looking at that same StarClub list, you didn't review any statements from StarClub business checking account ending in 7477?

A.   Nope.

Q.   And then, I want to talk a little bit about the dates.  In

all of the many tables that we reviewed, your review was focused on the period beginning on January 1, 2014; is that right?

A.    That is correct.

Q.    And so --

MS. ABEL:  Can we zoom out?

Q.    If we look here -- so looking at the highlighted part --

MS. ABEL:  And maybe we could blow it up, too, if it's at all possible, so we can all see, with the tiny screen.

Q.    So on the left-most column, it has an opened column line; is that right?

A.    Correct.

Q.    And I understand you to say that that's the date that the account was opened?

A.    Yes.

Q.    And in some situations, we don't know the date of the opening account because the bank just didn't give you that record?

A.    That is correct.

Q.    And then next to that, it says, "Earliest transaction analyzed."

Do you see that?

A.    Yes.

Q.    So in every instance, those dates are on or after 12-10-2013?

A.    That is -- there is one for 2012, though.

Q.    Excuse me.  Thank you.  5/25/2012.

A.    Yes, correct.

Q.    But none of the spreadsheets we looked at included anything even in the 2012 or 2013 period; is that right?

A.    For the spreadsheets, they are mostly for accounts, for the other accounts, but, yes.

Q.    I'm just clarifying the time period.

A.    Yeah.

Q.    All those spreadsheets we've just been through --

A.    Correct.

Q.    -- January 2014 through July 2017?

A.    Correct.

Q.    So if there was account activity that predates January 2014, it was not captured in the spreadsheets?

A.    For the most part, that's correct.

Q.    So you may have analyzed, the transactions, for example, of that one that has 2012, but it's not captured on the spreadsheet?

A.    Which --

Q.    And we can look at it?

A.    Which account is that?

Q.    Sure.  It's impossible to capture it all on one page.
      So that looks like the StarClub American Express account.

A.    Right.

Q.   So we looked at several American Express spreadsheets?

A.   We did.

Q.   None of them captured data before January 2014?

A.   Correct.

Q.   And I want to look specifically at --

        MS. ABEL:  You can remove that highlighting.

At line 8.  Can we zoom in on line 8.

Q.   So that's the Greenwich Music ending in 0865?

A.   4865.

Q.   Excuse me. 4865.  Thank you.

Is that correct?

A.   Yes.

Q.   And I see that that one does have an opening date.

A.   Yes.

Q.   And what was date that account was opened?

A.   September 10, 2004.

Q.   So a full ten years before your analysis?

A.   Sure.

Q.   Based on your experience with many, many bank statements, presumably, there would be account statements covering that decade-long period?

A.   There should be.

Q.   And there would be incoming and out -- presumably, incoming and outgoing transfers during that decade-long period.

A.   I don't know what would be in that account in that period.

Q.    Sure.  But it was opened in September 2004?

A.    Yes.

Q.    So you don't know what money went through that account for the ten years prior?

A.    I don't know if anything was in that account prior.

Q.    Based on all the testimony you sat through, do you know when StarClub approximately began operating?

A.    I do not.

Q.    You sat through eight witnesses; is that right?

A.    That's correct.

Q.    Didn't hear when StarClub began operating?

A.    I don't remember the date it was.

Q.    Let's look at row 12, which I believe is -- I'm sorry. It's 17, on page 2.  Yes, 17.

      So that's a Mastertec account ending in 3199?

A.    That's correct.

Q.    And that one shows an opening date of September 2011?

A.    Correct.

Q.    But, again, according to your review, the first transaction you looked at was January 2013?

A.    Yes.

Q.    But the first transaction captured on your spreadsheet was January 2014?

A.    Correct.

Q.    I want to talk a bit about how the government obtained the

bank statements that you reviewed.

If you know, did the government issue a subpoena to the bank?

A.    Yes.

Q.    And what is a subpoena?

A.    A subpoena is a document that we send to the banks or financial institutions to elicit response to their records.

Q.    And in many of those subpoenas, did the government ask for records predating 2014?

A.    I'm not 100 percent positive, to be honest.

Q.    Did you review records predating 2014?

A.    Prior to when?

Q.    2014?

A.    I saw a few of them.

Q.    So if you reviewed them, is there any other way you would have reviewed them but for obtaining them via the subpoena?

A.    No.

Q.    So, presumable, therefore -- not even presumably. Therefore, the government obtained records prior to 2014.

A.    As far as I know, yes.

Q.    Let's talk a little about your assumptions regarding investments into StarClub.  I am going to bring up two documents side by side that are already in evidence -- 146, page 5 and then 955, at 1.

Okay.  So due to the magic, we have two documents.  On the

right side is one of the financial statements you reviewed for StarClub account ending in 7995?

A.   Correct.

Q.   And based on the testimony you listened to, do you understand this to be the wire account?

A.   That's -- I assume this to be the account where the investor funds are sent.

Q.   Okay.  On the left side, I heard you testify on Direct that all of the entities on this list were investors into StarClub?

        MR. DE LEON:  Objection, Your Honor.  Misstates testimony.

        THE COURT:  Rephrase your question, please.

BY MS. ABEL:

Q.   Do you recall looking at the document on the left side?

A.   I do remember seeing this document, yes.

Q.   And it's titled, Security Holder Information for StarClub?

A.   It is.

Q.   And you relied on it in coming to the conclusions you came to; is that right?

A.   I used it to determine who -- if it falls under investor or not, yes.

Q.   So the people, entities, et cetera, on that list, you concluded were investors?

A.   Yes.

Q.    And, therefore, let's talk a little bit about those investors.  So I want to point you to -- you've been through some of these.  Do you recall looking at individual line items with the government?

A.    Yes.

Q.    And you were matching them up to the right side; right?  To try and identify investor funds that came into the StarClub account; is that right?

A.    Yes.

Q.    I want to look at, on the right side, Shale Management Corporation.

        MS. ABEL:  Can you highlight that for him, on the right?

Q.    Do you see that?

A.    I do.

Q.    And that's a $2 million credit to the StarClub account; right?

A.    Yes.

Q.    Do you see that on the left side?

A.    I do not.

Q.    I'm happy to go to the next page for you if -- actually, no.  I'm not happy.  I will ask my colleague to assist you with trying to find it on the next page.

A.    I can explain that one, if you want.

Q.    I'm just asking if you see it.

A.    The word "Shale" is not listed there.

Q.    Okay.  So it's not in any of those listings.

A.    That's not actually true.  The investment that makes up the $2 million isn't on this sheet.

Q.    Just to clarify, are you speaking about what you heard in court or the admitted exhibits in this case?

A.    No.  I used --

Q.    That is beyond the scope of your testimony?

A.    I used this document.  The dates on that document is description dates, not actually the date that that Shale wire posted.

Q.    So you're basing it on a date, not the words?

A.    Well, Shale is a broker.  It's not --

        MS. ABEL:  Can we go back on the left side, back one page.

Q.    So you are not testifying that the entities on the left side are the same?  You're just matching up dates?

A.    It's both, the name of the entity, if they're listed.  And then, the majority of these dates match up to the actual wires in the detailed transactions as well.

Q.    And I hear you say, "majority."  Therefore, many of the dates don't match up?

A.    Well, there's more dates on here than covers our period.

Q.    Okay.  But even the ones that are there, many of the dates don't match up?

A.   The majority of them match up.

Q.   Can we review some that don't?

Okay.  Let's take a look at Clarence AG.

Do you see that on the right side?

A.   I do.

Q.   And do you see it on the left side?

A.   Yes.

Q.   And where do you see that listed?

A.   Clarence AG?

Q.   Yep.

A.   On the left side?

Q.   Yes.

A.   There's one listed at the bottom, January 30, 2015.

Q.   January 30, 2015.  Okay.

And that's the only one you see; is that right?

A.   There is one on the next page, I believe.

Q.   Okay.  Can we turn to the next page?

A.   I don't see anything on here.  Never mind.  Oh, okay.

Q.   We can go back.

A.   No, that's fine.

        MS. ABEL:  You can go back, anyway.

Q.   So January 30, 2016 [sic].  I hear you to be talking about the dates of the individual transactions; is that right?

A.   I mentioned, yes.

        MS. ABEL:  Okay.  So let's take these down, and let's

bring up 901. And let's go to January 30, 2015. Can you -- sorry -- scroll down to January 30. You know what? I don't think I wrote that exact page down. My apologies. I might have. Just keep going. We'll get to January 30th. Almost there. One more.

Q. So looking at January 30th, do see Clarence AG?

A. I do not.

Q. Thanks.

MS. ABEL: Let's take that down.

Q. So we talked before about Shale Management Corporation.

MS. ABEL: And let's bring up just 995, please.

Q. Do you recall talking about Shale Management Corporation?

A. I do.

Q. Do you know whose funds those are, based on the testimony you heard and the documents received into evidence?

A. Based on the investor list we just looked at, it appears to be Clarence AG's investments.

Q. But we just looked for Clarence AG and they didn't match up.

A. On January 30th, we saw Shale on there; and then on January 30th, on the inventory we had a payment from Clarence AG.

Q. So Clarence AG and Shale are the same thing?

A. No. Shale is a broker, or a financial institution.

Q. Again, is that based on the documents or evidence that you

heard in this case?

A.   Well, that's the conclusion I made based on it being the investor account --

Q.   Based on you being an expert?

A.   I don't consider myself an expert, no.

Q.   More importantly, do you know who sent those funds?

A.   Do I know 100 percent?  No.

Q.   So you don't know if that money came from Mr. Fritsch?

A.   It appears to have come from Clarence AG, based on the records.

Q.   Did you just testify that Clarence AG is a transfer entity?

A.   I didn't say that.

Q.   What did you testify that Clarence --

A.   I said Shale is a broker for --

Q.   Thank you clarifying.  And you're right, you did.  I misstated.

     Shale is a broker; right?

A.   Yes.

Q.   So do you know who the source of those funds is?

A.   Based on documents, it appears to be Clarence AG.

Q.   Do you know who the source of the Clarence AG funds is?

A.   I do not.

Q.   Do you know if that money came from Bernhard Fritsch?

A.   I do not.

Q.   What about Goodman's LLP?  Do you see that as the second one on the list there?

A.   I do.

Q.   And that's $9.5 million --

A.   Yes.

Q.   Do you know who was the source of all those funds?

A.   There were multiple investments on the same date as that, on the investors' list.  There's four or five lines on the investment list that we just looked at.

Q.   So that Goodman's LLP encompasses investments from many people?

A.   Yes.

Q.   Do you know if one of those people was Bernhard Fritsch?

A.   I do not.

        MS. ABEL:  Let's bring up 146 one more time.  And at page 4, please.

Q.   So we're back at the document that you described as the investor list.

        MS. ABEL:  Can you just blow up the list.  Thank you.

Q.   We're back at the investor list.  I just want to point out -- the second one, is that Mr. Fritsch?

A.   Yes, it is.

Q.   And the seventh one down.

        MS. ABEL:  We'll count out here.  I'm sorry.  On Page 5.  Excuse me.  Next page.

Q.   The seventh one down on page 5, is that GMI, General Music Industries, Inc.?

A.   Yes, it is.

Q.   And do you see below, down toward the bottom of what is currently on the screen, do you see Your Dutch Trust Company, dated January 23, 2015?

A.   Yes, I do.

Q.   489,186 shares?

A.   Yes.

Q.   At 2.66 per share?

A.   Yes.

Q.   So that would be -- quick math.  Brought my calculator, just to be safe -- 1.3 million?

A.   Sounds about right.

Q.   Going back to page 4 one more time, scrolling down a little, do you see in the middle-ish there, BEF Enterprises, Inc.?

A.   I do.

Q.   Dated August 1, 2009?

A.   Yes.

Q.   550,000 shares?

A.   Yep.

        MS. ABEL:  You can take that down.

Q.   I want to go back to something you testified on Direct about StarSite.

Do you recall that?

A.    Yes.

Q.    So you looked at some account statement for StarSite but did not prepare a spreadsheet for them; is that right?

A.    Correct.

MS. ABEL:  Let's bring up 955 one more time.

Q.    This, again, is the -- what you described as the investor account; is that right?

A.    Yes.

MS. ABEL:  Can we zoom in on the top half, please.

Q.    Underneath Shell, do you see StarSite, Inc.

A.    Yes.

Q.    Is that a transfer from the StarSite account to the StarClub account ending in 7995?

A.    Yes, it is.

Q.    For a total of $1.7 million?

A.    Yes.

MS. ABEL:  Can we bring up 956?  And zoom in on the top half again.  Thank you.

Q.    So this is another StarClub account, this one ending in 6399?

A.    Uh-huh.

Q.    Do you see -- third one down -- a StarSite deposit of $400,000?

A.    I do.

Q.   So that is a transfer from the StarSite account to the StarClub account for $400,000?

A.   That is correct.

Q.   So adding those together -- in case we need it -- $2.2 million from StarSite into StarClub?

A.   That's correct.

Q.   I think you also testified that Trident Financial Corporation was the source of those, based on your review of the StarSite records?

A.   Yes, that's correct.

Q.   And I think this came up on Direct, but we'll just make sure.

        MS. ABEL:  146, page 4 -- maybe it's page 5.  Excuse me.  Page 5.  Thank you.  And zoom in on the top half.

Q.   First line there, is that Trident Financial Corp?

A.   Yes, it is.

Q.   January 31, 2014?

A.   Yep.

Q.   At 315,657 shares at $3.96 per share?

A.   Correct.

Q.   So that's a total of about $1.25 million?

A.   Sure.

Q.   And then halfway down on that page, another entry for Trident Financial Corp?

A.   Yes.

Q.    January 23, 2015; is that right?

A.    Yes.

Q.    And we see 611,396 shares?

A.    Yes.

Q.    At $2.66 per share?

A.    Uh-huh.

Q.    And that's, if we multiply out, $1.6 million?

A.    Sure.  Around there.

Q.    Do you know who controlled the funds in the Trident --
from Trident Financial Corporation?

A.    I do not.

Q.    Do you know if that money came from Bernhard Fritsch?

A.    I do not.

        MS. ABEL:  We can take that down.

Q.    I want to talk a little bit about the purpose of your
testimony in this case.  I think we've clarified, but just to
be sure, you are not testifying as an expert?

A.    I am not.

Q.    You're not forming any opinions about the documents you
reviewed?

A.    (Inaudible response.)

Q.    You're not drawing any conclusions about the evidence in
this case?

A.    No.

Q.    You're not testifying that any particular expense is a

personal expense, for example?

A.    I'm not.

Q.    And you're not testifying that any particular expense is a corporate expense, for example?

A.    I am not.

Q.    With that in mind, let's look at some of the expenses.

        MS. ABEL:  Can we bring up 956.

Q.    So this is the StarClub account ending in 6399 [sic]; is that correct?

A.    6339, yes.

Q.    I can't do the numbers today.

        6339; is that correct?

A.    Yes.

Q.    And fair to say, based on your review or the records, that this account is where many of the transactions StarClub occurred?  It has the greatest number of transactions.  Is that a fair statement?

A.    I can't remember a number of transactions.

Q.    Okay.  Does it have the greatest number of payee/payors?

A.    I didn't count, so honestly, I can't --

Q.    Okay.

A.    If I could count, I would tell you.

Q.    That's all right.

        I'm going to go through some expenses, and for tracking purposes, I am going to keep track of it.

Let's go to all the way down to page 8, which is the last page of this document. And I understand them to be in order -- the charges in order from smallest amount to largest amount.

A. Yes.

Q. So the bottom of this is the largest charges?

A. Largest charges, correct.

Q. And the second to last line there, it says, "ADP"?

A. Yes.

Q. And based on your general understanding of your experience in reviewing -- excuse me. Based on your experience reviewing financial records in your job, you understand that ADP is payroll processing service?

A. I do.

Q. And that amount there from ADP is $3,336,732; is that right?

A. Yes.

Q. And for the sake of simplicity, I will be leaving off the cents. Is that all right with you?

A. That's fine.

Q. Okay. Let's go right above that.

Do you see a payment made to Grushko & Mittman?

A. Yes.

Q. And it says, "Grushko & Mittman IOLA Trust."

Do you see that?

A. I do.

Q.    And based on your experience reviewing financial records in your job, what -- do you know what an IOLA Trust is?

A.    I assume it's a law firm of some sort; that's it.  That's all I know.

Q.    Okay.  That's sufficient.

So that, then, presumably, would be, based on your understanding, a payment to a law firm?

MR. DE LEON:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    So we have ADP, and then we have payment to the IOLA Trust.  So I'm going to add in thee IOLA Trust, which is about 2.7 million; is that right?

A.    Yeah.

Q.    Next, above that, we have EI Productions.

Do you see that?

A.    I do.

Q.    And based on the witnesses and the evidence you have heard today in this case, do you understand, as it relates to StarClub, EI stands for Enrique Iglesias?

A.    I don't know in this case, honestly.

Q.    Did you hear evidence that EI is commonly referred to by StarClub for Enrique Iglesias?

A.    I heard reference of that in the trial, yes.

Q.    And the total amount paid to EI Productions, about 1.2 million; is that right?

A.    Yep.

Q.    And then above that, payments made to 1402 3rd Street Promenade LP.

        Do you see that?

A.    I do.

Q.    And based on the evidence and witnesses you've heard and listened to in this case, do you understand that the StarClub Santa Monica offices were located on the 3rd Street Promenade?

A.    Yes.

Q.    So we have payment there of about 1.1 million -- 1.14; is that right?

A.    Yep.

Q.    Let's go up a couple of lines there, Valor Ventures, Ltd.

        Do you see that?

A.    Yes.

Q.    And there's a total amount there for $972,248.

        Do you see that?

A.    I do.

Q.    And based on -- and you may not recall, and that's fine, but if you do recall, do you recall that amount came from several transfers or one transfer?

A.    I do not recall at all.

Q.    Well, let's look at that.

MS. ABEL:  Can you bring up Exhibit 903, at page 21. Looking at line 413.

Q.    Do you see that at the bottom an entry there for Valor Ventures, with an amount of $314,832?

A.    I do.

Q.    And that wasn't the total amount we saw on the other screen, which was -- on the other exhibit, which was over --

A.    About a third, yeah.

Q.    So is it therefore reasonable to conclude that the amount on the payee/payor list included multiple transfers?

A.    Included multiple, yes.

Q.    And I know you didn't create this, but you told me you reviewed every single line.

How do you know that amount was transferred to Valor Ventures?

A.    That's what is listed on the bank record.

Q.    It was listed on the account statement?

A.    Yes.

Q.    Let's take a look at that account statement.

MS. ABEL:  And for this, I will need the Elmo.

No, we will distribute an exhibit.

THE COURT:  Why don't we go ahead and take our break, first.

Ladies and gentlemen, don't talk about the case or form or

express any opinions about the case until it's finally submitted to you.  We'll take a 20-minute break.

(Jury exited.)

THE COURT:  You can step down, sir.

Is there anything we need to discuss?

MS. ABEL:  Your Honor, we only request that the witness not review any documents during the break.

THE COURT:  All right.  Don't review any documents.

And both of you need to speak more slowly, especially with the numbers.

MS. ABEL:  Understood, Your Honor.  The faster I say them, the faster they're over.

THE COURT:  Not if you have to say them twice.

MS. ABEL:  Fair point, Your Honor.

THE COURT:  Did you want something?

MS. TAIT:  I want to just raise one issue that may come up in the defense case.  It doesn't have to be dealt with now, if we think we have time before the end of the day, before the defense case starts.  We don't have to address it this instant, but it regards the potential testimony of Sturges, the accountant, --

MS. ABEL:  He won't testify today, Your Honor.

THE COURT:  Okay.  Thank you.

All right.  We should be ready to go.

(Jury entered.)

THE COURT:  You may be seated.  The witness is back on the stand.

Sir, you're still under oath.

Ms. Abel, you may continue.

BY MS. ABEL:

Q.   Mr. Bouchard, before we took our break, we were talking about Valor Ventures.

Do you recall that?

A.   Yes.

Q.   There was an entry on the StarClub spreadsheet for 972,000, approximately?

A.   Yes.

Q.   And we were trying to backtrack how that line item was populated?

A.   Yes.

Q.   And we were going to look at an account statement that substantiated that; so we were talking about specifically an entry -- actually, let's --

MS. ABEL:  I'm going to have you bring it up before we -- 903.

Q.   Okay.  903, there.  We were looking at page 21, and then it was line 413 at the bottom there.

A.   Yes.

Q.   We were trying to determine how that Valor Ventures, Ltd. was populated, as the payee; is that correct?

A.   Yes.

Q.   So just to put us back where we were, so we're going to look at the account statement that reflected that date.  So it's July 15, 2014.

Do you see that?

A.   I do.

Q.   So we would look at the July 2014 statement.

And do you see, there, the July 2014 statement for the account ending 6339?

A.   Yes.

MR. DE LEON:  Ms. Abel, what exhibit is that?

MS. ABEL:  My apologies.

Your Honor, with permission, can I provide them?  One for the Court, too.

Q.   And do you have that statement in front of you?

A.   I do.

MS. ABEL:  We'll label this 1764.

Q.   Is that business record you reviewed in preparing the Excel spreadsheets we've discussed today?

A.   Yes.

MS. ABEL:  I would like to move into evidence 1764.

Any objection?

MR. DE LEON:  No objection.

THE COURT:  Thank you, Ms. Abel.

MS. ABEL:  Sorry.  I wasn't sure if he --

THE COURT:  He was thinking about it.

BY MS. ABEL:

Q.    So 1764.  So we're looking at the July statement, and we were looking specifically at a date that -- it came from July 15th.  So I'm going to turn the page to look for July 15th. I'm going hope we can see it.

Okay.  Perfect, actually.

So at the bottom there, do you see electronic withdrawals -- I'm sorry.  I'm on page 8929.

A.    Correct.

Q.    Are you on the same page?

A.    Yes.

Q.    And at the bottom, "Electronic withdrawals."  I think, on Direct, you testified those are wire transfers; is that right?

A.    They can be, but yes.

Q.    And do you see an entry there for 7 -- on July 15th?

A.    Yes.

Q.    And the amount that we were looking for was $314,832.

Do you see an amount matching that?

A.    That is correct.

Q.    And then, there is a description there; is that right?

A.    Yes.

Q.    It's, to me, gibberish, but can you read that description?

A.    Yes.  It's "Corporate Advisory Services and Commission, StarClub."

Q.    And do you see anywhere in that description the word "Valor Ventures"?

A.    Not on this record, but the date does provide us additional records for withdrawals and transfers, which does show additional -- like, who the actual money is coming from for wire transfers.

Q.    And are you aware that you reviewed that in this case?

A.    Yeah.

Q.    For this transaction?

A.    I reviewed all the wire documentation -- the supporting wire documentation from the banks, yes.

Q.    Okay.  As have I.

      Are you aware that there is supporting wire documentation substantiating that that is Valor Ventures?

A.    To be honest, I can't recall at this time.

Q.    Okay.  Let's turn the page to page 4, the next page -- oh, it's not page 4.  I guess it would be 8930.

      And on 7/18, do you see there an entry, Canadian Imperial Bank of -- and then it seems to be C-O-M-M-T-O-R-O-N-T-O?

A.    Yes.

Q.    And then, one right below it, 7/25, similar or almost identical description?

A.    Yes.

Q.    Do you see that?

      Okay.  So the 7/18 description and the 7/25 description

are -- for all intents and purposes, actually, I think, are nearly identical?

A.   For description, yes.

Q.   And there's -- so those two entries -- let's go back to your spreadsheet.

MS. ABEL:  And I'll turn this off.

903 at page 23, please.

Q.   So we were looking at 7/18 line and a 7/25 line, and I see there, "7/18, Canadian Imperial Bank of Comm."

Do you see that, line 427?

A.   I do.

Q.   And then, there's also one -- remember the descriptions were identical for 7/25, line 436?

A.   Yep.

Q.   But that one is listed as Valor Ventures?

A.   Right.

Q.   Let's go back to 956.  And this is, again, the list of expenses from the 6399 account.

MS. ABEL:  We'll go to page -- that last page, 8?

Q.   So we were going through -- I think we had just left off with Valor Ventures, and we see they are at $972,248; right?

A.   Yes.

Q.   And then, up two lines, a $600,000 transfer from Sabre Graphite Corp?

A.   Yep.

Q.    Are you aware that that payment was made to an entity controlled by Danny Guy?

A.    I was not, actually.

Q.    Above that is an entry for Young Basile PC?

Do you see that?

A.    Yep.

Q.    Are you aware that this payment was related to StarClub's merger with another company, Upfront Media Group?

A.    I did not know this.

        MS. ABEL:  Can we bring 903, at page 48, line 916?

Q.    Do you see there, line 916, Young Basile?

A.    Yes.

Q.    And you see the escrow deposit on UMGSC merger?

A.    Yes.

Q.    Does that inform that perhaps that payment is related to a UMGSC merger?

A.    I mean, that's what the note says.

Q.    And you relied on the notes in coming to the conclusion that you --

A.    I wouldn't say I relied on those notes at all, actually. I relied more so on the statements.  But the notes were there. I just put them because they were on the records.

Q.    But the notes don't tell us anything about what the payment is for?

A.    They may or may not.  It depends on the case.

Q.    Let's go back to 956, page 8.

So Young Basile, we have 500,000; and then Charles Sanders.

Do you see that?

A.    I do.

Q.    Based on the testimony and evidence that you heard in this case, do you know Charles Sanders was an attorney who worked for StarClub?

A.    I do not recall hearing that.

Q.    You don't recall hearing that testimony?  Okay.

A.    Sorry.

Q.    And that is $427,372?

A.    Yes.

Q.    So it seems like we took a long time, but we really only looked at eight entries on this spreadsheet.  We're still on page 8 of the spreadsheet; is that right?

A.    Yes.

Q.    There are seven others?

A.    Right.

Q.    But these are some of the largest amounts?

A.    Yes.

Q.    So based on my running tally, I have about $10.9 million so far.

Does that sound approximately right, based on the entries we've reviewed?

A.   Sure.

Q.   Let's take a quick look at the Mastertec account.

          MS. ABEL:  969, please.  Nope.  I've written it down wrong.  My apologies.

     May I have one moment, Your Honor?

          THE COURT:  Yes.

          MS. ABEL:  Thank you.

     Here we go.  "959" is what I meant to say.

          THE WITNESS:  Okay.

BY MS. ABEL:

Q.   And this is the spreadsheet for the payees and payors for Mastertec checking account ending 3199?

A.   Yes.

Q.   And, let's go to the very last page, page 3.

          MS. ABEL:  Can we zoom in, just the bottom half?

Q.   And the very last entry there for Paychex.

     Do you see that?

A.   I do.

Q.   Based on your experience handling bank account statements in your job, do you understand "Paychex" is a payroll processing company?

A.   I do.

Q.   Similar to ADP?

A.   Yes.

Q.   And the total amount there is $1,430,648; is that right?

A.    Yep.

Q.    I am going to add that in.

And then, going up a few lines, do you see the name Ian Paul Cartwright?

A.    I do.

Q.    And based on the evidence you've heard in this case and the exhibits you reviewed, do you understand Ian Paul Cartwright to be the chief technology officer?

A.    I did hear that, yes.

Q.    And so we see there, $274,148.

Do we see that?

A.    I do.

Q.    Then we have some entries for Day Pitney, $160,000.

Are you familiar with what Day Pitney is?

A.    I am not.

Q.    Okay.  Would you -- do you have any reason to doubt that it is a law firm?

MR. DE LEON:  Objection.  Calls for speculation.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    Based on your training and experience dealing with account statements and the understanding of the entities ending in LLP, would it be reasonable to conclude that Day Pitney is a law firm?

MR. DE LEON:  Same objection.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    What about Robinson & Cole?  Do you know what that is?

A.    I have no idea.

Q.    A couple of lines above that is Ben McAllister.

Do you see that?

A.    I do.

Q.    And based on the evidence you've heard in this case and the exhibits you reviewed, are you aware that Ben McAllister was the creative director at StarClub?

A.    I remember the title, but  -- I did hear the name, yes.

Q.    You heard that he was an employee?

A.    (Inaudible response.)

Q.    Okay.  And I see there that that is $136,468.

Do you see that?

A.    Yes.

Q.    So with just those entries and not including the Day Pitney and Robinson & Cole, we are at just about $13 million.

Does that sound approximately right?

A.    Sure.

        MS. ABEL:  You can take that down.

I want to turn, very briefly, to GMI.

Can we bring up 961?  Just the very top half there.

Thanks.

Q.    And the second line there on GMI account -- I believe

there is only one GMI account.  Is that your recollection?

A.    For a bank account?

Q.    Yep.  Only one -- feel free to take a look at Exhibit 900.

A.    I can't remember, to be honest.

Q.    I believe there's just one GMI bank account, but please let me know if you disagree.

A.    I can't remember without looking.  Sorry about that.
There's two Greenwich Music accounts -- oh, no.  You're right.  One checking.  One is a credit card.

Q.    Yeah, setting aside credit cards.  Fair clarification.
There is only one checking accounts?

A.    Yes.

Q.    So this is that checking account; is that right?

A.    Yes.

Q.    And the second line there, we see an entry for Paychex; is that right?

A.    Yes.

Q.    And that is $606,770?

A.    Correct.

Q.    And that -- again, that spreadsheet covers all withdrawals from January 2014 to August 2017?

A.    To May 2017.

Q.    Excuse me.  May.  Is that correct?

A.    Yes.

Q.    So that would be, presumably, many withdrawals related to

Paychex over that period?

A.    I've had to take a look, but -- I'm made aware, but this is not one number.

Q.    It's not one.  More than one?

A.    Yes.

Q.    Thank you.

Look at the credit card.  I want to transition, briefly, to talking about credit cards.  One of the credit cards you discussed was an Amex used by Lisa Stalvey.

Do you recall that?

A.    Yes.

MS. ABEL:  927, please.

Q.    Based on the evidence and testimony, you understand Lisa Stalvey was a chef, someone who cooked food?

A.    Yes.

Q.    And there was evidence at trial that she cooked for StarClub meetings and events?

A.    I did hear mention of this.

Q.    And scanning through the charges -- I believe you did so with the government -- the vast majority appeared to relate to food and drink purchases?

A.    I don't remember.

Q.    Feel free to look through 927.

MS. ABEL:  Can you scroll for us?

THE WITNESS:  Of the ones I recognize, many of them

are food and drink related, yes.

Q.    I think you also talked about Mr. Mederos's card?

A.    Yes.

Q.    And this is --

        MS. ABEL:  Can we zoom in on the top?

Q.    This is Mr. Mederos's credit card.  These are all charges that Mr. Mederos -- these are charges made with Mr. Mederos's credit card; is that correct?

A.    Correct.

Q.    And you focused on one -- a couple with the government. Page 56, line 3974.

        Do you recall discussing that charge, Armani?

A.    Yes.

Q.    And Mr. Mederos made that purchase with that card?

A.    His card made that purchase.

Q.    His card made that purchase?

A.    Yes.

Q.    Mr. Mederos's card?

A.    Yes.

Q.    Thank you.

        I want to, last, just talk about Der Hut.

        MS. ABEL:  Can we bring up 900?

        THE WITNESS:  That is, again, the list of all of the accounts.

        MS. ABEL:  Can we go to page 2, line 20.  If we can,

make it bigger.

Q.   So that there is the Der Hut account.  Do you recall that one?

A.   I do.

Q.   And according to your spreadsheet, the only person who had the right to use that account was Kaydee Kesterson?

A.   She was a signer on the account, yes.

Q.   She's the only one?

A.   From the records I -- from the signature card that I saw, she was on it, yes.

        MS. ABEL:  Can we go to 966, page 3?

Q.   The government focused on some ATM withdrawals, the last line from that account, $121,000 and change.

    Do you see that?

A.   Yes, I do.

Q.   You don't know who made those withdrawals?

A.   I do not.

Q.   But based on the records you reviewed, the only person with authority to withdraw is Kaydee Kesterson?

A.   Well, with the ATM, if you have the card and the PIN, you don't know who made those withdrawals.

Q.   The only person with authority to use the card was Kaydee Kesterson?

A.   Per the signing authority, yes.

Q.   For the documents you reviewed?

A.    Yes.

MS. ABEL:  May I have just a moment, Your Honor?

THE COURT:  Sure.

(A discussion was held off the record between Counsel.)

MS. ABEL:  Nothing further, Your Honor.

THE COURT:  Redirect?

MR. DE LEON:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. DE LEON:

Q.    Mr. Bouchard, you remember discussing Shale Management with the defense, do you?

A.    I do.

MR. DE LEON:  Mr. Flores, if you would please publish Government Exhibit 146, page 1.

Q.    We have here an e-mail from Mr. Fritsch to Danny; is that right?

A.    Correct.

MR. DE LEON:  Moving to page 5, Mr. Flores.

Q.    And directing you to the middle of this page, there are two entries on January 30, 2015; isn't that right?

A.    That's correct.

Q.    And what are those two entries?

A.    It says, for Hairdo Mobile Opportunities Fund SAB; and for Clarence AG.

MR. DE LEON:  And, Mr. Flores, if you could not put

up Government Exhibit 901, please.  And if you could go to page 15.  Go down.  And go down another page.  One more page down.

Q.   Mr. Bouchard, I would like to direct your attention to lines 180 and 181.  Can you tell me what those two transactions are and on the date?

A.   Yes.  So on January 30th, there were two wires in -- one from the Salida Strategic Growth Fund and Shale Management Corp.  One for 7 million and one for 2 million.

Q.   And that is the date we just saw on the other document; isn't that right?

A.   Yes, that's correct.

        MR. DE LEON:  And if you could zoom out, Mr. Flores.  And scrolling up slowly for Mr. Bouchard's benefit.

Q.   Mr. Bouchard, do you see any other credits coming into this account in January of 2015?

A.   I do not.  Nope.

        MR. DE LEON:  One more.

        THE WITNESS:  No, I do not.

BY MR. DE LEON:

Q.   And based on that, did you conclude that these two transactions were investor money?

A.   I did.

        MR. DE LEON:  You can take that down, Mr. Flores.

Q.   Mr. Bouchard, the summary charts we've been discussing,

did they capture every transaction coming in from the time period stated on the top left of the summary chart?

A.    Yes.

Q.    Regardless of amount?

A.    Yes.

Q.    Mr. Bouchard, if you were unclear as to the payor or payee for a particular transaction, would you look at other records?

A.    I would, yes.

        MR. DE LEON:  Mr. Flores, could you please publish Government Exhibit 959.

Q.    If you could tell us what this is again, Mr. Bouchard?

A.    It's a summary of the US Mastertec LLC 3199 account for activities from January 2014 through July 2017.

        MR. DE LEON:  And if you could go down to page 3, Mr. Flores.

Q.    I believe the defense asked you about particular debits on this account; isn't that right?

A.    Correct.

Q.    And think they tabulated 13 million for some of the debits?

A.    That sounds about right, yeah.

Q.    But if you look here, what is the sum of debit total for this account?

        MS. ABEL:  Objection.  Misstates testimony on Direct.

        THE COURT:  Just ask what is the total.  Don't state

anything.

BY MR. DE LEON:

Q.    What is the total?

A.    On this account?  $6,141,568.

Q.    So that's not 13 million?

A.    It's not.

MR. DE LEON:  One second, Your Honor.

No further questions, Your Honor.

THE COURT:  Recross?

RECROSS-EXAMINATION

BY MS. ABEL:

Q.    Previously, we went through a series of transactions from the StarClub account and the Mastertec account.

Do you recall that?

A.    I do recall.

Q.    And as you were going, I was calculating?

A.    Yeah.

Q.    And I believe that we clarified that the approximate total of both was in the $13 million range?

A.    That is correct.

Q.    Is that fair?

A.    Yes.

MS. ABEL:  Thank you.

THE COURT:  May the witness be excused?

MR. DE LEON:  Yes, Your Honor.

THE COURT:  Ms. Abel?

MS. ABEL:  Yes, Your Honor.

THE COURT:  You're excused, sir.  Thank you.

Does the government have another witness?

MR. DE LEON:  At this time, Your Honor, the government has no more witnesses, and the government rests.

THE COURT:  Thank you.

From the defense?

MS. ABEL:  Yes, we do intend to call witnesses.

THE COURT:  Why don't you call your first one.

MS. ABEL:  The first witness is Ben McAllister, Your Honor.

THE COURTROOM DEPUTY:  I'll have you stand right here.  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

THE WITNESS:  Here?

THE COURTROOM DEPUTY:  Yeah.

MS. ABEL:  Your Honor, with permission, may I distribute the exhibit binders?

THE COURT:  Please.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

MS. ABEL:  Thank you.

THE COURTROOM DEPUTY:  Please state and spell your full name for the record.

THE WITNESS:  Benjamin McAllister, B-E-N-J-A-M-I-N, M-C-A-L-L-I-S-T-E-R.

THE COURT:  Why don't somebody bring them up and put them on a shelf.

You may proceed.

MS. ABEL:  Thank you, Your Honor.

**BENJAMIN MCALLISTER,**

**called as a witness, by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MS. ABEL:

Q.   Good afternoon, Mr. McAllister.  Thanks for coming.

I'm going to start by asking how you met Mr. Fritsch?

A.   I met Mr. Fritsch through an acquaintance named Andres Newman.

Q.   And what kind of work did Andres Newman do?

A.   Content production.  Mostly design creative work.

Q.   And approximately when did you begin working with StarClub?

A.   Probably, 2009 or '10.

Q.   And who else do you recall working for StarClub at that time?

A.   I remember, I think, Jim Polsen; James Singleton; Margaret

Gonzales, I think was her name.

Q.   And at that point, back when you started in 2009-ish, what kind of work did you do for StarClub?

A.   We worked with artists that were on the StarClub, like, music label at the time, building websites and doing branding and photography, and those kind of things.

Q.   When you first started working with StarClub, where was the StarClub office?

A.   It was in Malibu.

Q.   Can you describe what it looked like, what it was?

A.   I think it was a section of the house in Malibu, Bernhard's home.

Q.   Do you recall the address?  The street?  How about the street?

A.   It was Rambla Pacifico or something.

Q.   And you said a section.  Where in the house did you work?

A.   Downstairs in kind of a -- I think it was turned into a studio, like a music studio or something like that.

Q.   And did you use any of the other parts of the home?

A.   We would have meetings in Bernhard's office as well, I think, on one floor up.  Yep.

Q.   And at that early stage in the 2009-ish time frame, what was StarClub's business model?

A.   At that time, it was more of a music label.  It was kind of like a digital focus, I would say.

Q.   And I think you testified to something about a recording studio.  Can you say a bit more about that?

A.   I don't remember the specifics, but I know there was some recording going on with some artist down there, yeah.

Q.   And when you say "down there," where are you talking about?

A.   In the lower level of the house.

Q.   In the Rambla Pacifico property?

A.   Yes.

Q.   Did Mr. Fritsch also live in the home at that time?

A.   Yes.

Q.   Let's jump ahead a few years later to 2012-ish.  At some point, did StarClub open other offices?

A.   Yes.  There was an office on the Santa Monica Promenade.

Q.   And about when do you recall that opening up?

A.   I couldn't say the year, but maybe 2012 or '13, something like that.

Q.   And did you work from that office every day?

A.   I did a lot, yeah.

Q.   And at that point in 2012-ish, when the office is open in Santa Monica, what kind of work did you do for StarClub?

A.   I did product design and graphic design, things like that, for the apps that we were making for celebrities.

Q.   Did you have a title at StarClub?

A.   Creative director.

Q.   And after the Santa Monica offices opened, did you ever go to the Rambla Pacifico property again?

A.   I did.

Q.   Why did you go there?

A.   We would have off-site meetings still at the house.

Q.   Was food provided at some of those meetings?

A.   Yes.

Q.   If I know, was talent ever invited to the Rambla Pacifico property?

A.   Yes, they were.

          MS. TAIT:  Vague as to time, Your Honor.

          THE COURT:  Huh?

          MS. TAIT:  Sorry, Your Honor.  I was just indicating "vague" as to time.

          THE COURT:  Let's just get the time frame, Counsel.

BY MS. ABEL:

Q.   Sure.  If you know, after 2012, was talent ever invited to the 3229 Rambla Pacifico property?

A.   I believe so, yes.

Q.   And if you know, why was talent invited to that property?

A.   For, like I said, off-site meetings or those kind of things.

Q.   Do you recall the name US Mastertec?

A.   Yes.

Q.   Have you also heard it referred to as USMT?

A.   Yes.

Q.   Is it all right if I just call it Mastertec?

A.   Sure.

Q.   What relationship, if any, as far as you understand, did Mastertec have to StarClub?

A.   US Mastertec was kind of a software development partner, I would say.

Q.   Partner of?

A.   Of StarClub.

Q.   And did the two companies' work together?

A.   Yes.

Q.   Did you do work with Mastertec and StarClub?

A.   I did, yes.

Q.   Did you work with employees from both entities?

A.   Yes.

Q.   Who at Mastertec did you work with?

A.   I worked with Ian Cartwright as well as, I think, some other developers that worked for US Mastertec as well.

Q.   And when you say side developers, what does that mean?

A.   People that were working on web development or app development.

Q.   Is there another -- is coding another word for developing?

A.   Yes.

Q.   So making the source code?

A.   Yes.

Q.    Who at StarClub did you work with?

A.    I worked with various people over the years.  Later -- you know, more recently, Aahmek Richards and Hazel Steward, Dionne Clarke.  Anyone who worked -- who was there at different times.

Q.    Did you work with Mr. Fritsch?

A.    I did, yes.

Q.    And you mentioned that -- I think you mentioned that Mastertec had coders, developers; is that right?

A.    Yes.

Q.    And where did those developers work out of?

A.    There were developers in the office.  They worked there. And there were, as well, outsourced developers over the years. We had some in Belgium, in China, and other places.  Canada.

Q.    And When you say "in the office," where are you referring to?

A.    In the office in Santa Monica?

Q.    So some in Santa Monica, and others kind of all over the world?

A.    Yes.

Q.    To the extent you know, what kind of projects did the Mastertec developers work on?

A.    Building celebrity apps and back-end database-driven, software, things like that.

Q.    How did you interact with those developers?

A.    Primarily by providing them, like, designs and kind of

functionality that we were looking to create.

Q.    So just for common understanding, is it fair to say you draw up the design and they would make it work?

A.    Yes.

Q.    Is that a common understanding, if you will?

A.    Yeah.

Q.    Do you recall what entity paid you?

A.    I worked for StarClub and I think, as well, US Mastertec at a certain point as well.

Q.    So it changed over time?

A.    Yes.

Q.    Let's talk a little bit about StarClub's products?

A.    Uh-huh.

Q.    Thinking back to 2014, can you describe the idea that StarClub was developing?

A.    What was time frame, you said?

Q.    Sure, yeah.  2014.

A.    2014, I think we were primarily doing, like, vertical channels, we call them, which were celebrity apps and websites for them to engage with their audience online, basically.

Q.    And "vertical," what do you mean by "vertical" in that -- in that --

A.    Just that they owned the channel.  Like, it wasn't Facebook or Instagram or something.  It was a dedicated just for them.

Q.    Okay.  So the celebrity had their own app --

A.    Yep.

Q.    -- is that what you're saying?

A.    Yep.

Q.    Okay.  What were some of the early apps in 2014, around that time period, developed by StarClub for celebrities?

A.    I think the first one was Dwight Howard, the basketball player; Jessica Simpson; Enrique Iglesias.  Yeah.  The ones I can think of.

Q.    Did you work on all of those?

A.    Yes.

Q.    And are you familiar with concept of influencer marketing?

A.    Yes.

Q.    What does that term mean?

A.    It's basically a way of kind of monetizing your audience online.

Q.    And when say "your," who is "your" in that sentence?

A.    Like an influencer, a celebrity.  Like a well-known person who has a lot of social following.

Q.    So I understand, you're saying, making money off of your postings --

A.    Right.

Q.    -- is that right?

A.    Yep.

Q.    Based on your experience in this industry, what was the

state of influencer marketing in 2014?

A.    Yeah.  I mean, platforms like Instagram were still pretty new.  I mean, there were YouTubers that were, you know, getting paid to make videos, but it was definitely not a developed industry the way it is now, I would say.

Q.    And based on your understanding, was StarClub engaging in influencer marketing in 2014?

A.    Yes.  Yeah, I could say that.

Q.    So I think you talked about Jessica Simpson, and you Said -- I think you testified you were involved in designing Jessica Simpson's app?

A.    Yes.

Q.    And for the sake of everyone, who is Jessica Simpson?

A.    She's a singer and fashion mogul.  Yeah.

Q.    And was that app a big project for StarClub?

A.    It was, yeah.

Q.    Can you describe what that entailed?  What kind of work was done?

          MS. TAIT:  Objection.  Vague as to time.

BY MS. ABEL:

Q.    At the time that Jessica Simpson's app was being developed, can you describe what work was being done?

          MS. TAIT:  Vague as to time in terms of years, Your Honor.

BY MS. ABEL:

Q.    In approximately what year was, if you recall, the Jessica Simpson app being developed?

A.    I couldn't say, but maybe in 2012 or '13, maybe.

Q.    And was it an ongoing -- was it ongoing, or was it once and done?

A.    It was ongoing, yeah.

Q.    And so what kind of work did StarClub do on the Jessica Simpson app?

A.    Development to release the app on the IOS app store, Android, and on the web.

Q.    So when you say "IOS," what do you mean by that?

A.    Like an iPhone app.

Q.    Okay.  So developing the iPhone app?

A.    Yeah.

Q.    And what were some of the features of the app, if you recall?

A.    It was like a social media app, primarily.  Like a lifestyle kind of thing.  She posted pictures of herself and her baby.  People could comment and like them and stuff like that.

Q.    You also mentioned Enrique Iglesias.  Did you work on that app?

A.    Yes.

Q.    And, again, for everyone, who is Enrique Iglesias?

A.    He's a singer, I guess.  Yeah.

Q.   In your opinion, is he well known?

A.   Yes.

Q.   Do you recall the name of Enrique Iglesias's app?

A.   Yeah.  It had, like, a name, "Enrique Freakout," or
something like that.

Q.   Did you work with Enrique Iglesias's team?

A.   Yes.

Q.   When I say "team," what did you understand that to mean?

A.   He had a social medial manager, I think, that we worked
with primarily.

Q.   Based on your understanding, did Enrique Iglesias have a
relationship with StarClub?

A.   Yes.

Q.   And based on your recollection, do you recall him creating
content, video, posts, et cetera for StarClub?

A.   Yes.

Q.   If you recall, did you work on an app for Tyrese Gibson?

A.   Yes.

Q.   And, again, who is Tyrese Gibson?

A.   And actor, musician.

Q.   What, in your opinion, is he most well known for?

A.   Probably the *Fast and Furious* movies, I would say.

Q.   And he had what role -- was he an actor in those movies?

A.   Yes, he was an actor.

Q.   Based on your understanding, did StarClub have a business

relationship with Tyrese Gibson?

A.   Yes.

Q.   If you recall -- do you recall Tyrese Gibson posting content to the StarClub app?

A.   Yes.

Q.   If you recall, did you ever meet Tyrese Gibson related to your role at StarClub?

A.   I think I did, yeah.

Q.   Can I ask you to open what I hope is Volume I -- yes, Volume I of the binder in front of you and turn to 1411?

A.   Yes.

Q.   Do you recognize that?

A.   Yes.

Q.   What is it?

A.   It's a photo, I think, probably at a party that we had, like a launch party of some kind or a promotional event.

Q.   Do you see yourself in that photo?

A.   I do, yep.

Q.   And where, if you recall, was it taken?

A.   This is at the office in Santa Monica, it looks like.

Q.   And approximately when was it taken?

A.   That, I couldn't tell you very easily.

Q.   Okay.  And you just don't recall?

A.   You mean the year that it was --

Q.   Yeah, year.

A.   Yeah, I don't.

Q.   Okay.  Would it refresh your recollection to look at a document?

A.   Sure.  Uh-huh.

Q.   Turn to the next page.

A.   Uh-huh.

Q.   Take a look at that.  Don't read it aloud.  Just take a look and let me know when you're done.

     For the record, we're looking at 1412?

A.   Uh-huh.  Okay.

Q.   Does that refresh your recollection as to when the photo in 1411 might have been taken, just generally?

A.   Yes.  So 2014, possibly, yeah.

     MS. ABEL:  Move to admit 1411.

     THE WITNESS:  Back to 1411?

     MS. ABEL:  Sorry.  For the Court's purposes, I'm just asking to admit the exhibit.

     THE COURT:  Any objection?

     MS. TAIT:  Not to the photo 1411.

     THE COURT:  It's admitted.

     (Exhibit 1411 was received into evidence.)

     MS. ABEL:  Can we publish 1411?

     Okay.  If you could just make that a bit bigger.

BY MS. ABEL:

Q.   Is that the photo you were seeing in your binder there?

A.    Yes.

Q.    Where do you see yourself in that photo?

A.    On the right, second to -- on the right.

Q.    Second from the right?

A.    Yeah.

Q.    And this is some ten years ago.  Is that fair?

A.    Yeah.

Q.    Do you recognize anyone else in that photo?

A.    Yeah.  I recognize Ruben is on the far right.

Q.    And so I'm just going to slow you down so we know what you're talking about.

All the way to the right, you recognize someone named Ruben.  Do you know what that person's last name is?

A.    Ruben Mamann.

Q.    And what role did he have, if you recall?

A.    I don't remember his title, but he -- maybe business development or something.

Q.    Okay.  Anyone else you recognize?

A.    Yes.  Hazel Stewart is there next to me.

Q.    The third from the right?

A.    Uh-huh.

Q.    Okay.

A.    And then, obviously, Bernhard.

Q.    You say "obviously", but why don't you identify --

A.    Yeah.  Bernhard Fritsch there, standing with Tyrese Gibson

in the middle.

Q.   Okay.  And Tyrese Gibson is wearing what in the picture?

A.   A pink tie.

Q.   And anyone else in that photo you recognize?

A.   I recognize Dionne Clarke on the far left.

Q.   So is it fair to say these are employees of StarClub taking a picture with Tyrese Gibson?

A.   Yes.

Q.   In the Santa Monica offices?

A.   Yes.

Q.   Thanks.

     Do you recall any StarClub event featuring Tyrese Gibson?

A.   This could have been that -- an event.  I do remember we had kind of a promotional launch event, at some point, and I believe Tyrese was there, but I don't know if this was that or not.

Q.   Setting aside the photo --

          MS. ABEL:  We can take it down.

          THE WITNESS:  Okay.

BY MS. ABEL:

Q.   Do you recall -- I hear you describing an event that, perhaps, featured Tyrese.  What's your recall about that?

A.   It was kind of a launch party, kind of a promotional event.

Q.   And who -- what kind of -- who attended it?

A.    The StarClub team and Tyrese.  I don't remember who else, honestly, beside that.

Q.    Was it a large gathering?

A.    It was fairly large, I think, yeah.

Q.    So we've talked now about, sort of, the 2014-ish time period and a little earlier, where there were the creation of separate apps for each celebrity.

A.    Uh-huh.

Q.    At some point, did StarClub transition to a new model?

A.    Yes.

Q.    Can you describe the new model?

A.    The new model was of a -- more of like -- kind of a -- what do you call like a DI -- like a do-it-yourself kind of app, that didn't require the resource of building entire apps for everybody, if it wasn't, like, a huge star kind of thing.  Right?  But you could still use the app to post to your social media and take advantage of the same -- some of the same functionality.

        MS. ABEL:  Can we bring up previously admitted Exhibit 48, at 4.

BY MS. ABEL:

Q.    Okay.  Does this page look generally familiar to you?

A.    Yes.

Q.    And does this demonstrate generally the product you were just describing?

A.    Yes.

Q.    Let's just walk through it, very briefly.

On the left side, I see there's a number "1," where it says "original content."

Do you see that?

A.    Yes.

Q.    And when it says that, whose content are we potentially -- who are we talking about?

A.    Influencer, talent, celebrity, whatever you want to call them.

Q.    And then, number 2, it says "branded content."

What do you understand that to be?

A.    Content, pre-made content that you could post to monetize.

Q.    And whose would that be?  Content from --

A.    From a brand partner.

Q.    So based on this photo, it seems to be mixing the original content with the branded content?

A.    Right.

Q.    In the middle there, there's a picture, words in a square that stays, "StarSite Syndicator."

Do you see that?

A.    Yes.

Q.    What do you understand that to be?

A.    That is kind of the process of distributing this content to a platform where an audience is.

Q.    And was StarSite Syndicator the app that StarClub was developing?

A.    Yes.

Q.    And then, on the right side, there's arrows going out. Number 4 says, "Campaign advertising served."

      What do you understand that to generally describe?

A.    Advertising to monetize the content.

Q.    In number 4, you see those pictures in the square?

A.    Yeah.

Q.    What do you understand those pictures -- those symbols, I guess --

A.    Platforms that it would be posted to.

Q.    For example?

A.    Facebook or Tumblr, like that.

Q.    Are those the icons for those --

A.    Yeah.

Q.    -- those entities?

A.    Yeah, yeah.

Q.    And so would the StarSite Syndicator post to those platforms?

A.    Yes.

Q.    So based on everything you just said, do I understand you to say that this Syndicator app will take talent content, branded content, mix them together and post them to third-party social media websites?

A.   That's right.

Q.   Is that a fair description of the application?

A.   Yes.

Q.   And this in approx -- we talked about how there was a transition.  When, approximately, did this transition occur, roughly?

A.   I wouldn't be able to tell you date.

Q.   Okay.  In your opinion, why did the product change over time?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Lay some foundation.

MS. ABEL:  Sure.

BY MS. ABEL:

Q.   So we talked before about how it was previously individual apps for each celebrity.

Do you recall that?

A.   Yes.

Q.   And then we talked about how it transitioned to this Syndicator platform?

A.   Yes.

Q.   And you worked on both versions; is that right?

A.   Yes.

Q.   And based on your understanding of StarClub's business model and your work on it, why did that change come in?

MS. TAIT:  Calls for speculation.

THE COURT:  Unless you know.  Don't guess.

BY MS. ABEL:

Q.  Do you know why they changed from individual apps to the Syndicator?

A.  I mean, I didn't necessarily make the decision myself to do that, so I -- I mean, it would obviously be --

THE COURT:  Don't guess.  Move on.

BY MS. ABEL:

Q.  Were there also independent features being developed at StarClub for the applications?

MS. TAIT:  Objection.  Vague as to the word "feature."

THE COURT:  If you understand the question, you can answer it.

THE WITNESS:  I need clarification, I think.

BY MS. ABEL:

Q.  Sure.

If you recall, was there an analytics feature being developed?

A.  Yes.

Q.  And what was that called?

A.  I don't remember the name.

Q.  Okay.  Actually, we don't need to bring this up.  Oh, it's a different binder.

Do you have government binder -- a black one, I believe --

119?

A. This one that won't close here?

Q. Perhaps, perhaps. I don't know what numbers are on the side there.

Are there 100-level numbers in there?

THE WITNESS: 500 -- no.

MS. ABEL: Okay. With the Court's permission, can I approach with the government binder?

THE COURT: Which binder is that?

MS. ABEL: II.

BY MS. ABEL:

Q. And I was just asking you to take a look at 119, at page 4, and see if that refreshes your recollection as to the name of the analytics feature.

A. 119, page 4?

MS. ABEL: I think this has been admitted, so we can just bring it up. My apologies. 119, at 4.

Q. Okay. My bad. Never mind. I'm directing you to the wrong place, unless we have the wrong number.

Never mind. We'll come back to this. I'm sorry about that. I just have an incorrect number in my listing here.

You can set that aside. We'll come back.

Do you recall a video chat feature being developed?

A. Yes.

Q. Do you remember what that was called?

A.    Star Chat.

Q.    What did that feature do?

A.    It was like -- kind of like a Zoom-type application, where you could chat with fans that kind of could be queued in to talk directly with the talent.

Q.    And this is certainly pre-COVID; right?

A.    Yes.

Q.    Approximately, in what -- pre or post -- was it post 2014 that this feature was being developed?  Excuse me.

A.    It's so tough with the dates to say for sure, but --

Q.    Okay.

A.    -- possible.

Q.    Aside from the main Syndicator app and its features, did StarClub also work on other products?

A.    Yes.

Q.    Did you work on an educational product?

A.    Yes.

Q.    Do you remember what that project was called?

A.    It was called "Class Time."

Q.    And what was Class Time designed to do?

A.    It was basically the same as Star Chat, except it was for a virtual classroom.

Q.    A classroom.  Teachers and students, in that way?

A.    Yes.  Or anything like educational-basis thing.

Q.    Okay.  And as part of your role at StarClub, did you have

any responsibility for the company's website?

A.    Yes.

Q.    Was that a regular part of your job, to update it?

A.    I would say, yes.  Yeah.

Q.    Do you recall the web address?

A.    StarClub -- maybe starclubltd.com, or something.

Q.    And what was the purpose of the website?

A.    It was a company website that we posted the latest, you know, kind of sales pitch, kind of, for the company on.

Q.    And did you have any responsibilities for uploading promotional content to the website?

A.    Probably, yes.

Q.    And that promotional content, did it include videos?

A.    It could have, yeah.

Q.    Do you recall something described as a "sizzle reel"?

A.    Yes.

Q.    What was that?

A.    A video kind of showing what the company -- what the products did or what they were going to do kind of thing.

Q.    Do you recall uploading that to the website?

A.    It's possible, yes.

Q.    And was it updated over time, the sizzle reel?

A.    Yes.

Q.    And you would upload it as needed -- as new versions became available?

A.    Yes.

Q.    Was there also a video like a tutorial-type video?

A.    I believe so, yes.

Q.    And what was the general purpose of that video?

A.    I think there was one for the Syndicator that was kind of like a how-to kind of one.  We may have had earlier ones for the other apps as well, for the celebrities.  I am not sure.

Q.    Why were the videos uploaded to the website?

A.    To present them to potential partners, I would say.

Q.    So you could send the link around?

A.    Yes.

        MS. ABEL:  Your Honor, may I briefly confer with the government regarding a potential exhibit?

        THE COURT:  Yes.

    (A discussion was held off the record between Counsel.)

BY MS. ABEL:

Q.    For the sake of time, we'll come back to the video.

A.    Okay.

Q.    Let's transition to what you were talking a bit about -- meetings, partner meetings, I think you mentioned.

    As part of your job, did you attend meetings with potential StarClub business partners?

A.    Yes.

Q.    I'm speaking only about business partners.  What are some examples of partners you recall meeting with?

MS. TAIT:  Objection as to the form of the question. Is it partners, or is it potential partners?

THE COURT:  You need to clarify the question, Ms. Abel.

MS. ABEL:  Sure.

BY MS. ABEL:

Q.   As part of your job, what were some examples of potential or actual business partners that you recall meeting with?

MS. TAIT:  Objection.  Compound.

THE COURT:  Overruled.

THE WITNESS:  Companies as well as talent and their management.

BY MS. ABEL:

Q.   What are some examples of the companies you're thinking of?

A.   Meetings that I actually attended, personally?

Q.   Yes.

A.   I think we had meetings with Disney; maybe Universal.  And then, all the talent partners like Tyrese and Enrique Iglesias and Jessica Simpson and the various teams of all those.

Q.   Thinking back on all your time at StarClub, from 2014 to 2017, thinking back on your time between those years, if you had to give an estimate for how many of types of meetings attended, what would you say?

A.   I wouldn't be able to say a lot.

Q.    More than 10?

A.    Yes.

Q.    More than 20?

A.    Probably.

Q.    More than 30?

A.    Yeah, probably -- I honestly don't know.  It could be a thousand; it could be --

Q.    Did you sometimes present at those meetings?

A.    I did, yes.

Q.    Let's walk through what generally occurred at a meeting with a potential business partner.  And I'm going to think specifically about an entity like a Universal or a Disney.

      What, if anything, would be shown to the potential business partner?

A.    Probably a custom presentation with their branding on it, and then maybe like a screen-sharing of the products that we had, like the app or something, those kinds of things.

Q.    And you say "presentation."  Do you mean like PowerPoint slides?

A.    Yeah.

      MS. ABEL:  And can we show previously admitted Government 48, and to page 2.

Q.    Does this look generally like an example of a slide deck that could be shown at a business partner meeting?

A.    Yes.

Q.    In fact, it says in the top right corner, "Prepared for WME."

      Do you see that?

A.    Yes.

Q.    What do you understand WME to be, if anything?

A.    It's a talent agency.

Q.    And what role would you have in creating presentations for entity business partners?

A.    Like I said, customizing the graphics to match, put their relevance for their company.  Like, if it was talent for WME, we would show what it would look like if we had some of their clients in there.

            MS. ABEL:  Can we go to the next page.

Q.    So is this an example of the example of talent you might highlight?

A.    Yes.

Q.    Speaking, I assume, about the left side of the page?

A.    Yeah.

Q.    And then, on the right side of the page, would you assist with creating that?

A.    Yes.

Q.    And what do you understand that to represent?

A.    The left?

Q.    The right.  Excuse me.  The right side.

A.    The right would be potential brand partners, I guess.

Q.    And I think you mentioned that during meetings, you might do a screen-share.  Can you describe a little bit more about what that would look like?

A.    We would show, like, the app, kind of the functionality of it, like, on a screen, like, kind of remotely controlled, being almost like air play or something like that.

Q.    Okay.  The app on -- did you do this?

A.    I think I did do that sometimes, yeah.

Q.    And you have the app on your phone?

A.    Uh-huh.

Q.    And then you'd air play it, which means mirror.  Is that fair?

A.    Yeah, yeah.

Q.    To a big screen?

A.    Yes.

Q.    That everyone could see?

A.    Yes.

Q.    And then, what would you show?

A.    We would just click through it and show, like, what it did and how it worked.

Q.    The different functionality?

A.    Yep.

Q.    Given how many meetings you were describing before, would you create a different presentation for each meeting?

A.    Maybe not every meeting but a lot of meetings, yeah.

Q.    So there would be numerous Versions of a presentation?

A.    Yes.

Q.    Do you recall working on a presentation for Spotify?

A.    Yes.

Q.    Do you recall working on a presentation for Disney?

A.    Yes.

Q.    Do you recall presenting to Universal in 2014?

A.    I don't remember.

Q.    Can I ask you to look at 1427.  Just take a look at that and let me know when you're done.

A.    Uh-huh.  Yep.

Q.    Does that refresh your recollection that you presented to Universal in 2014?

A.    I'm not sure if I actually was at the meeting, but it says I was going to go to the meeting, I think.

Q.    I'm just asking if you --

A.    Yeah.  That doesn't refresh my memory about the actual events of the meeting or anything, no.

Q.    Okay.  I want to transition to talking very briefly about patents.

      While at StarClub, did you work with someone named Ted Sabety?

A.    Yes.

Q.    Who was Ted Sabety?

A.    He was a patent attorney.

Q.   And based on your understanding, did Mr. Sabety work with StarClub?

A.   Yes.

Q.   Did you work with Mr. Sabety on anything in particular.

A.   I did.  Yep.

Q.   What was that?

A.   I think on some video chat technology patents.

Q.   Can you just explain, generally, what Mr. Sabety would assist you with?

A.   On just creating diagrams and looking at prior art of patents that already existed and things like that about it.

Q.   What was the goal of your interactions with Mr. Sabety?

A.   To develop new patents.

Q.   Were those patents based on the work you did at StarClub?

A.   Yes.

Q.   Did Mr. Sabety assist you with applying for a patent, based on the work you did at StarClub?

A.   I believe so, yes.

Q.   When did you stop working for StarClub, approximately?

A.   I was kind of transitioning out towards the end of 2016-17.

Q.   Okay.  So you worked with the company for close to eight years, approximately?

A.   Yep.  In one way or another, yep.

Q.   And you have since worked for other tech companies; is

that right?

A.    Yep.

Q.    Would you tell us a little bit about companies that you've worked for since 2017?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    Would you describe the companies you've worked for since 2017 as startups?

A.    Yes.  Some of them have been, yep.

Q.    And what kinds of startups were they?

A.    I worked with a financial tech startup; a block chain music rights platform; and VR and AR company.

Q.    And when you say "VR," are you referring to virtual reality?

A.    Uh-huh, yeah.

MS. TAIT:  Objection.  Relevance, Your Honor.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    During the 2014 to 2017 period, would you describe StarClub as being a startup?

A.    Yes.

Q.    Based on your experience working at StarClub, during that three-year period, 2014 to 2017, did StarClub appear to you to be making a huge amount of revenue?

A.    No.

Q.    Do you recall when was the first time you were interviewed by the FBI about this case?

A.    Maybe 2016, '17.  Around that time.

Q.    At the time you were interviewed, were you still working for StarClub?

A.    Yes.

Q.    So at that time when you were interviewed, StarClub was still operating?

A.    Yes.

        MS. ABEL:  May I have a moment, Your Honor?

        THE COURT:  Yes, discuss.

    (A discussion was held off the record between Counsel.)

BY MS. ABEL:

Q.    I just want to clarify, because I may have asked a poor question.

    When I asked before that it didn't appear to you that StarClub was making a huge amount of profit --

        THE COURT:  You didn't say that.

        MS. TAIT:  Objection.

BY MS. ABEL:

Q.    Let's just ask a separate question.

    Based on your experience at StarClub from 2014 to 2017, did it appear to you that StarClub was profitable?

        MS. TAIT:  Lacks foundation.

THE COURT:  Sustained.

By MS. ABEL:

Q.   Based on your experience -- you worked at StarClub for nine years?

A.   Uh-huh.

Q.   You saw many of the business partner meetings?

A.   Yes.

Q.   You interacted with talent?

MS. TAIT:  Objection to the form.

BY MS. ABEL:

Q.   Did you interact with the talent?

A.   Yes.

Q.   And you were able to witness the app itself in action. You worked on the application?

A.   Yes.

Q.   And you attended many potential business partner meetings?

MS. TAIT:  Objection.  Leading.

BY MS. ABEL:

Q.   Did you attend many potential business partner meetings?

A.   Yes.

Q.   Based on all of that experience, did it appear to you that StarClub was profitable?

A.   No.

MS. TAIT:  Move to strike, Your Honor.

THE COURT:  Sustained.

MS. TAIT:  The objection is foundation.

MS. ABEL:  Thank you, Your Honor.  Nothing further.

THE COURT:  Cross-examination?

MS. TAIT:  Yes.  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. TAIT:

Q.   Good morning, Mr. McAllister.

So you were asked some questions about the house in Malibu; right?

A.   Yes.

Q.   Do you recall that?

So after 2014, when StarClub had its offices in Santa Monica, did you go to the Malibu residence very often for StarClub events?

A.   Less often, but I did go to off-site meetings there, yeah.

Q.   And about how many per month would you estimate, beginning in 2014, going forward?

A.   I wouldn't be able to say that.

Q.   About how many per year would you estimate 2014, going forward?

A.   I don't know that.

Q.   Is it something on the order of more than 20 a year?

A.   Umm --

Q.   From 2014, forward.

MS. ABEL:  Your Honor, asked and answered.

THE COURT:  Overruled.

You can answer it.

THE WITNESS:  I don't remember, unfortunately, with a number, like, how often it was.

BY MS. TAIT:

Q.  So you're not able to even put a -- like, you're not able to say if it's more than 20 a year or less than 20 a year?

A.  Maybe less than 20.  I can't answer.  Unfortunately, I don't remember.

Q.  Who was in control of StarClub?

A.  Bernhard.

Q.  And Mr. Fritsch was also in control of Mastertec; right?

A.  As far as I know.

Q.  So he was the one who told you what to do in your job; right?

A.  Yes.

Q.  And that's including when you were getting paid by Mastertec?

A.  Yes.

Q.  Mr. Fritsch, also, was in charge of Mr. Cartwright; isn't that right?

A.  Yes.

Q.  Was there anybody else who was more senior to Mr. Fritsch at US Mastertec, that you know of?

A.  No.

Q.    You were asked a couple of questions about StarSite.  It was on a slide that we were looking at.  And I just wanted to ask:  StarSite is part of the StarClub system; right?

A.    Yes.

Q.    It's not like some separate deal?

A.    No.

Q.    So at US Mastertec, did you ever work with Lisa Short?

A.    No.

Q.    And did you ever work with George Mederos?

A.    No.  No.

Q.    And looking at --

        MS. TAIT:  Can we pull up the defense photo -- would you mind?  Exhibit 1411.

Q.    So we're looking at the photo.

      Do you see that?

A.    Yes.

Q.    Is George Mederos in this photo?

A.    I don't think so.  I don't really remember exactly what George Mederos looks like.

Q.    Do you know what Lisa Short looks like?

A.    No.

Q.    Do you know what are Ricky Fleming looks like?

A.    Doesn't sound familiar to me, Ricky Fleming, no.

Q.    Did you work for Ricky Fleming -- with Ricky Fleming at US Mastertec?

A.    I do think so.  I don't recognize that name.

Q.    Did you work with a developer called Der Hut LLC when you were at US Mastertec?

A.    The name sounds familiar, but I don't know -- no, I can't think of any employees of that company that I worked with there.

Q.    Or any developer with that name?

A.    No.

Q.    So what was your salary?  Sticking to those last three years, what was your salary at US Mastertec?

A.    I was a contractor at one point, I think; and then an actual employee of StarClub toward the end, if I remember correctly.

       Anywhere, probably, from ninety to one hundred twenty thousand, or something, if I remember.

Q.    Per year?

A.    Yeah.

Q.    And do you know what Mr. Fritsch's salary was?

A.    No.

Q.    Do you know the salaries of any of the other employees -- I'm sorry -- any other executives that you testified about?

A.    No.

Q.    Where did Mr. Polsen work?

A.    He would come in for meetings in the office, but not -- I don't think he was in the office 9:00 to 5:00 kind of thing.

Q.   So he wasn't regularly in the StarClub offices; right?

A.   He would be regularly there for meetings, but not for -- not, like, sitting in a desk.

Q.   Not day to day; right?

A.   Right.

Q.   Did there come a time when it became known that there were issues with StarClub technology not be able to post to Facebook with its advertising?

MS. ABEL:  Vague, Your Honor.  Objection.

THE COURT:  If you understand it, you can answer.

THE WITNESS:  I don't remember Facebook being a problem for us.

BY MS. TAIT:

Q.   Do remember there being any other social media provider being a problem for getting StarClub's post and advertising onto those platforms?

A.   Instagram was -- you couldn't link to another place to run ads on, for example.

Q.   You could not?

A.   You could not, no.

Q.   Okay.  Any other examples?

A.   That's the main one that I can think of.

Q.   So the entire time you were there -- which is, like, eight years, right, --

A.   Yes.

Q.   -- there was a good amount of time where there was a functioning app, I think you're saying?  Right?

A.   Yes.

Q.   But the entire time you were there, this was a pre-revenue company; is that right?

A.   As far as I know.  There might have been revenue, but I wasn't really privy to that part of it, really.

Q.   So it wasn't just a startup company in 2014 to 2017; right?

        MS. ABEL:  Objection.  Lacks foundation.

        THE COURT:  Lay some foundation.

BY MS. TAIT:

Q.   Well, you worked there for eight years; right?

A.   Yes.

Q.   So it was a startup for eight years, wasn't it?

        MS. ABEL:  Objection.  Lacks foundation.

        THE COURT:  If you know.

        THE WITNESS:  I don't know how to -- a startup company is kind of a -- like a term that can mean different things, I suppose, to different people.

BY MS. TAIT:

Q.   It can mean different things to different people; right?

A.   Yeah.

Q.   How transparent was Mr. Fritsch with the financials of the company?

MS. ABEL:  Objection.  Vague.  Lacks foundation.

MS. TAIT:  I can rephrase it.

THE COURT:  Thank you.

BY MS. TAIT:

Q.    How transparent was Mr. Fritsch about how much money the company was making?

MS. ABEL:  Objection.  Vague.

THE COURT:  Overruled.

Rephrase your question, Ms. Tait.

BY MS. TAIT:

Q.    For the period 2014 to 2017, how transparent was Mr. Fritsch with information about how much money the company was making?

MS. ABEL:  Objection.  Lacks foundation.

THE COURT:  Sustained as to any other witness.

MS. TAIT:  Can he answer just as to him?

THE COURT:  Yes.

BY MS. TAIT:

Q.    How transparent was he with you?

A.    I wasn't aware of anything, like numbers or financials of any kind or revenue.

Q.    Did you sometimes attend investor meetings?

MS. ABEL:  Objection.  Beyond the scope.

THE COURT:  It does seem beyond the scope, Ms. Tait.

BY MS. TAIT:

Q.    What involvement did you have with presentations to investors?

                MS. ABEL:  Objection.  Beyond the scope.

                MS. TAIT:  May I try, Your Honor?

Q.    You made lots of presentations; right?  You are a graphic designer?

A.    Yes.

Q.    And you made presentations for the partners?

A.    Yes.

Q.    Potential partners, I should say; right?

A.    Yes.

Q.    And you made presentations for the potential celebrity; right?

A.    Yes.

Q.    Did you can make presentations for the investors?

                MS. ABEL:  Objection.  Beyond the scope.

                THE COURT:  Overruled.  I'll allow it.

                THE WITNESS:  Yes.

BY MS. TAIT:

Q.    And when you made presentations for the investors, were there sometimes financial information in that presentation?

                MS. ABEL:  Objection.  Beyond the scope.

                THE COURT:  Sustained.

BY MS. TAIT:

Q.    My question was --

A.    Do I answer?

Q.    You can't, no.  Don't answer.

When you made financial presentations to potential investors, who was the author of the financial portions?  Any financial portion of those presentations?

MS. ABEL:  Objection.  Beyond the scope.

THE COURT:  Sustained.

BY MS. TAIT:

Q.    So you talked a bit about Jessica Simpson.

A.    Yes.

Q.    At some point, she cut off her relationship with StarClub; right?

MS. ABEL:  Objection.  Lacks foundation.

THE COURT:  If you know.

THE WITNESS:  We stopped working with her, yes.

BY MS. TAIT:

Q.    And that was by 2014, wasn't it?

A.    I couldn't tell you the year.  I don't remember, but it sounds possible.

Q.    And you recall she was paid a termination fee?

MS. ABEL:  Objection.  Lacks foundation.

THE WITNESS:  I'm --

THE COURT:  Don't answer that.

You need to lay some foundation, Ms. Tait.

BY MS. TAIT:

Q.    What do you know about Ms. Simpson ending her relationship with StarClub?

A.    Nothing about the business aspect of it, just that we didn't work with her after a certain point.

Q.    Who told you that?

          MS. ABEL:  Objection.  Hearsay.

          THE COURT:  Overruled.

          THE WITNESS:  I guess it would have been Bernhard.

BY MS. TAIT:

Q.    Would you have gotten that from any other person?

A.    To stop working with them?  No.

Q.    Do you know one way or another -- you talked about patents.  Do you know one way or another if any patents were issued while you were working at StarClub?

A.    I think there were, yes.

Q.    And how many do you know of?

A.    I think there was one that -- had my name on it, as well as some other coworkers, that we worked on.

Q.    And any others that you know of?

A.    I was aware of others that were related to kind of video chat functionality and those kind of things.

Q.    How were you aware of that?

A.    Just I heard about that they existed.

Q.    Who did you hear that from?

A.    Probably from Bernhard.

Q.   What do you know about whether any of those patents yielded any money?

A.   I'm not aware of whether they did or not.

Q.   We talked about some meetings and presentations with companies like Disney, Spotify, Universal?

A.   Yes.

Q.   As far as you know, was there any commercial deal with Disney reached by StarClub while you were there?

A.   Not that I'm aware of one way or another, no.

Q.   As far as you know, was there any commercial deal with -- let me rephrase.  Let me withdraw that.

     Were you ever excluded from meetings about financials with the investors?

         MS. ABEL:  Objection.  Lacks foundation.  Beyond the scope.

         THE COURT:  Sustained.

BY MS. TAIT:

Q.   So you talked about developing various features, I think it was called by the defense Counsel.  Right?

A.   Yes.

Q.   And different aspects of the potential StarClub product; right?

A.   Yes.

Q.   Now, were you frustrated by the inability to get any of those things to actually be completed?

MS. ABEL:  Objection.  Lacks foundation.

THE COURT:  I'll sustain on that and other grounds.

BY MS. TAIT:

Q.   Were you frustrated by your job at StarClub?

MS. ABEL:  Objection.  401.  403.  Lacks foundation.

THE COURT:  Overruled.

THE WITNESS:  At times, yes.

BY MS. TAIT:

Q.   Why?

A.   Why was I frustrated?  Maybe because I would have, you know, led the company differently, in different directions if it was my decision on certain things.

Q.   Was there opportunities that were presented to Mr. Fritsch that were not pursued?

MS. ABEL:  Objection.  Lacks foundation.

THE COURT:  Sustained.

MS. TAIT:  May I rephrase it?

THE COURT:  Well, I'm sustaining the objection, so you can try again.

BY MS. TAIT:

Q.   Are you aware that there were opportunities that Mr. Fritsch decided not to take that were proposed by employees?

MS. ABEL:  Objection.  Speculation.  Lacks foundation.  403.

THE COURT:  And other --

MS. ABEL:  Also hearsay, yes.

BY MS. TAIT:

Q.   So you're a graphic designer; right?

A.   Yes.

Q.   And so you create a lot of these presentations; correct?

A.   (Inaudible response.)

Q.   And did there come a time where Mr. Fritsch asked you to Photoshop a picture of him with Steve Jobs?

MS. ABEL:  Objection.  Beyond the scope.  403.

THE COURT:  They are all sustained -- well, you can ask that question.

You can answer, sir.

THE WITNESS:  I don't really remember that, no.

BY MS. TAIT:

Q.   You don't remember talking to the FBI about being requested to Photoshop a photo?

MS. ABEL:  Objection.  Hearsay.  Improper impeachment.

THE COURT:  Sustained.

BY MS. TAIT:

Q.   So as far as you know, did StarClub make any revenues from all the technology you were working on for eight years?

A.   There probably was some revenue from advertising.

Q.   And how much?

A.    I wouldn't be able to say.

Q.    So you didn't have access to that info?

A.    No.

Q.    Who did?

        MS. ABEL:  Objection.  Lacks foundation.

        MS. TAIT:  I'll withdraw it.

BY MS. TAIT:

Q.    Ultimately, are you aware of whether any of StarClub's technology was sold after the company no longer existed?

        MS. ABEL:  Objection.  Lacks foundation. Speculation.

        THE COURT:  Well, she's asking whether he was aware. So he either was or he wasn't.

    You can answer that.

        THE WITNESS:  Not aware of that.

BY MS. TAIT:

Q.    And one more thing about this chef, Ms. Stalvey.  Do you remember her?

A.    Yes.

Q.    Was she there every day at StarClub in Santa Monica?

A.    No?

Q.    How often was she there 2014 to 2017, your last three years?

A.    She would come to cater kind of, like, things sometimes for the staff there.

Q.    So it was kind of occasional?

MS. ABEL:  Objection.  Misstates the testimony.

THE COURT:  Overruled.

THE WITNESS:  It wasn't, like, every day, no.

MS. TAIT:  Okay.  No further questions, Your Honor.

THE COURT:  Redirect?

MS. ABEL:  Nothing further, Your Honor.

THE COURT:  May the witness be excused?

MS. ABEL:  Yes, from the defense.

MS. TAIT:  Yes, from the government.

THE COURT:  Thank you very much.  You are excused.

Does the defense have another witness?

MR. THREATT:  Yes, Your Honor.  Can the parties approach for a brief sidebar before we call our next witness, Your Honor?

(Sidebar commenced.)

MR. THREATT:  James Threatt for the record.  Our next witness is Sydney Huy, is an assistant investigator in our office.  We're going to introduce through her a number of patents that were issued by USPTO to StarClub.  They are certified copies.  I didn't know if the government might object.  I want to preview for the Court, I think, especially given the testimony that just occurred on Cross of Mr. McAllister.  It's, obviously, highly relevant.  I just wanted to alert the Court that that's what we'll be doing next.

MS. TAIT:  We do object that it's irrelevant.  Which patents are being introduced?

MR. THREATT:  There are four.

MS. TAIT:  Are they actual patents or applications?

MR. THREATT:  Four actual patents.  I think four are actually patents.

MS. TAIT:  Let me rephrase.  Hold on a second.  Can I confirm?

(The court reporter interrupted.)

MS. TAIT:  Are these the ones that were obtained from the patent office?

MR. THREATT:  They are certified copies.

MS. TAIT:  We haven't seen them.

Can we have a few moments?

THE COURT:  Okay.  I'm going give you a few minutes.  We're going to take a break.

(Sidebar concluded.)

THE COURT:  Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it is finally submitted to you.  We'll take our last break.  See you in 20 minutes.

(Jury exited.)

THE COURT:  Breaks are for staff too, so we're going to take a break.  And when our CRD returns, if you need me to come out earlier, fine.  Otherwise, if you can work it out, see

you in 20 minutes.

MR. THREATT:  Yes, Your Honor.

THE COURT:  Thank you.

(A brief recess was taken.)

MR. THREATT:  Your Honor, I believe there was an issue the government wanted to raise.

MS. TAIT:  There is an issue, Your Honor.

Your Honor, the defense has provided copies of patents, patent applications, and quite a large number of trademark applications.  And the government contends that these are simply not relevant to the case.  These are highly technical documents on the patent side.

The expert is going to be able to talk generally about the patents that the company had, but the Court has already said that we're not going into a dissertation over the contents and meaning of patents.  And there does not seem to be any reason to do that by reference to these patent documents.  It's not -- it's just not at issue in the case.  She can say --

THE COURT:  We're not going into trademarks.

What is the issue right now?

MS. TAIT:  Of the patents as well, Your Honor.  The certified copies of patents and patent applications.

THE COURT:  With whom?  Do you have somebody that's going to talk --

MR. THREATT:  Yes, Your Honor.  There's an assistant

investigator.  This will take 10 minutes.  She obtained the documents.  We're going to admit them.

The government just completed a line of Cross-examination, clearly suggesting to the jury that StarClub had no patents. Even at sidebar they were asking whether or not these were real documents.

THE COURT:  Don't get me started on that.

MR. THREATT:  Yes, Your Honor.

THE COURT:  Why can't you just stipulate that these are patents they had?

MS. TAIT:  Your Honor, we just don't believe that the actual documents should come in, because they are not relevant.

THE COURT:  Why can't you just --

MS. TAIT:  We can stipulate, perhaps, to some of the things in the slides in terms of, you know, this patent number or this patent application existed.  We can consider that.

THE COURT:  Just do what you want to do, Mr. Threatt. I will stop you if I don't like it anymore.

MR. THREATT:  I will keep it brief, Your Honor.

THE COURT:  Thank you.

MR. THREATT:  I'm not going to waste the Court's time.

THE COURT:  Go ahead.  Thank you.

(Jury entered.)

THE COURT:  You may be seated.  Everyone is back.

Does the defense have another witness?

MR. THREATT:  Yes, Your Honor.  The defense calls Sydney Huy to the stand.

THE COURTROOM DEPUTY:  Please raise your right hand.

Do you solemnly swear that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

Please state and spell your full name for the record.

THE WITNESS:  First name is Sydney, S-Y-D-N-E-Y. Last name Huy, H-U-Y.

THE COURT:  You may proceed.

**SYDNEY HUY,**

**called as a witness, by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MR. THREATT:

Q.   Good afternoon, Ms. Huy.  Where do you work?

A.   I work at the Federal Public Defender's Office.

Q.   And what is your title?

A.   I'm an assistant investigator.

Q.   And how long have you been employed as an assistant investigator for the Federal Public Defender's Office?

A.   Eight months.

Q.   And what are your duties as an assistant investigator?

A.   My duties include, mostly, requesting, collecting, and organizing records from various agencies; serving subpoenas; conducting research; and assisting investigators and attorneys in ongoing projects.

Q.   And at some point, were you assigned to work on the Bernhard Fritsch matter?

A.   Yes.

Q.   And as part of the assignment, was one of your tasks to obtain records of patents and trademarks?

A.   Yes.

Q.   And at a high level, what efforts did you undertake to complete that search?

A.   I requested certified patents and trademarks from the United States Trademark and Patent Office's website.

Q.   Okay.  There should be two binders on your left-hand side. I'm sorry it looks like the witness box is in a state of upheaval, but on the shelf to your left is where the binder is. You'll need Volume II and Volume III for the defense exhibits.

When you can do me a favor, Ms. Huy, please turn to tab 1705, which is in Volume II.

Please let me know when you've found it.

A.   I have it.

Q.   Do you recognize that document?

A.   Yes.

Q.   Does it appear substantially the same as the document that you received from the USPTO?

A.   Yes.

          MR. THREATT:  Your Honor, at this time I'd move to admit Document 1705 into evidence.

          THE COURT:  I'll take it under submission.

          MR. THREATT:  Thank you, Your Honor.

     Does that mean I am not permitted to publish to the jury at this time?

          THE COURT:  You can show it to them.

          MR. THREATT:  Can we publish that, please, Ms. Su.

Q.   And just to confirm, Ms. Huy, this is the document that we were just discussing; right?

A.   Yes.

          MR. THREATT:  And, s. Sue, can we please turn the page?

Q.   You see in the upper left-hand corner, you see where it says, "Applicant," Ms. Huy?

A.   Yes.

Q.   And what does it say there?

A.   StarClub, Incorporated.

Q.   And you see where it says, "Inventors," right underneath that?

A.   Yes.

Q.   And what's the name there, if you don't mind?

A.    Ben McAllister and Max Kline.

Q.    Now, going back to the binder, if you could do me a favor and please review Documents 1702 through 1704, and let me know whether or not those are also documents you obtained from the United States Patent and Trademark Office.

MS. TAIT:  We don't have a copy of 17.

THE WITNESS:  Yes.

BY MR. THREATT:

Q.    Have you had a chance to look at those, Ms. Huy?

A.    Yes.

Q.    And are each of those documents also documents you obtained from the United States Patent and Trademark Office?

A.    Yes.

MR. THREATT:  Your Honor, I would also move to admit Documents 1702, 1703, and 1704 into evidence as well.

MS. TAIT:  Your Honor, objection, in particular as to 1702, regarding the names on the patent -- the applicant and the inventor, and with respect to the other ones and all of the relevance in 403.

THE COURT:  Counsel, approach.

(Sidebar commenced.)

THE COURT:  This is just a waste of time.  Are you not willing to stipulate that these are documents and there's also four patents?

MS. TAIT:  With respect to 1702, StarClub is not the

inventor.  It's someone else.  And there is no evidence in the case that relates to StarClub.  It's another company.  It's Upfront Media.  We haven't heard testimony from anyone establishing that that company and StarClub share patents.

THE COURT:  I am going to take them under submission. Have her testify about them.

MR. THREATT:  Understood.  You mean Ms. Huy, your Honor.

THE COURT:  Yes.

MR. THREATT:  Very good.

(Sidebar concluded.)

BY MR. THREATT:

Q.    Ms. Huy, do me a favor, please turn to tab 1706.  And, actually, while you're there, please look at Documents 1706 through 1710, if you don't mind.

A.    Yeah.

Q.    And are those documents United States Patent Application Publication documents, Ms. Huy?

A.    Yes.

Q.    Are those also documents you that received from the United States Patent and Trademark Office?

A.    Yes.

MR. THREATT:  Your Honor, I would move to admit Exhibit 1706 through 1710 into evidence as well.

THE COURT:  I'll take that under submission.

MR. THREATT:  Yes, Your Honor.

BY MR. THREATT:

Q.    Now, Ms. Huy, please do me one last favor and turn to tab 1714 in the binder that you have.  And please review that document as well.

And is this trademark registration also a document that you received from the United States Patent and Trademark Office?

A.    Yes.

MR. THREATT:  Your Honor, at this time, I would ask to move a number of -- this and similar documents into evidence, starting with tab 1714.  I believe that's 1714 through 16 -- actually, it's through 20, I should say, through 1720.  And then 1722, 1724, and then all the way from 1725 to 1746.

MS. TAIT:  Objected to as relevance and 403 regarding trademark.

THE COURT:  I am going to take this under submission. I thought I had indicated for these.  But move on, Mr. Threatt.

MR. THREATT:  No further questions, Your Honor.

THE COURT:  Any Cross-examination?

MS. TAIT:  No, Your Honor.

THE COURT:  Thank you very much.  You can step down.

THE WITNESS:  Thank you.

THE COURT:  Does the defense have another witness?

MS. ABEL:  Yes, Your Honor.  The defense calls Annabelle Burguiere.

MS. TAIT:  Your Honor, may we be heard at sidebar regarding part of the presentation to come?

(Sidebar commenced.)

THE COURT:  Okay.  So I had said no trademark.

MS. TAIT:  That's what I'm objecting to, Your Honor.  There's trademarks --

THE COURT:  Did I just not say that?

MS. TAIT:  Yeah.

THE COURT:  Stop talking.

MS. ABEL:  Given response to that, that was part of the bases of our opinion to establish the value of the actual property.  It's one slide.

MS. TAIT:  I think there are two slides, Your Honor.  You skipped one.

THE COURT:  Did you say something about tech.  Trademarks aren't tech.  She can talk about patents.

MS. ABEL:  That's fine.  Her testimony is the actual in general.

THE COURT:  She can testify to things that are relevant.  It's not relevant.

Anything else we need to discuss about this?

MS. ABEL:  No.

THE COURT:  All right.

MS. TAIT:  No.

(Sidebar concluded.)

THE COURTROOM DEPUTY:  You can stand right here for me.  Sorry.

Please raise right hand.

Do you solemnly swear to that the testimony you shall give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURTROOM DEPUTY:  Thank you.  Please have a seat.

Please state and spell your full name for the record.

THE WITNESS:  My full name is Annabelle Burguiere.

THE COURT:  You may proceed -- I'm sorry.  You need to spell your name, please.

THE WITNESS:  A-N-N-A-B-E-L-L-E.  And my last name is Burguiere, B-U-R-G-U-I-E-R-E.

THE COURT:  You may proceed.

MS. ABEL:  Thank you.

**ANNABELLE BURGUIERE,**

**called as a witness, by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MS. ABEL:

Q.   Good afternoon.

A.   Good afternoon.

Q.    Can you please describe, briefly, your academic background.

A.    Sure.  I have master in finance from a French business school, and I also have a degree in law from a French university.

Q.    Can you tell us what you do for a living?

A.    I'm a corporate training consultant, and I'm specialized in intellectual property valuation.

Q.    What is intellectual property valuation?

A.    So intellectual property, first, is any creation of the mind.  It can be an invention; it can be literature; it can be art.  So any creation of the mind.  And when you do intellectual property valuation, you're trying to determine the economic benefit of this asset.

Q.    What experience do you have with valuing intellectual property?

A.    I have been doing valuations for 16 years, and I have been focused on intellectual property for the past of 12 years.  And that's 100 percent of what I do in my position as a consultant.

Q.    What types of -- what experience do you have with valuing intellectual property for a startup organization?

A.    So, in the course of my position, I work with corporations.  But I also work with startups that are trying to determine the value of their IP, intellectual property -- a way also shortened by "IP" -- the IP assets, and that's very useful

for the course of the business but also to raise fund.

THE COURT:  You need to slow down, please, Ms. Burguiere.

THE WITNESS:  Okay.

BY MS. ABEL:

Q.   Are you a member of any organizations relevant to your expertise?

A.   Yes.  I am a member of an organization called HIPLA, the Houston IP Lawyer Association.  I am also a member of LES, which is Licensing Executive Society.  And I am also a member of CHIP, which is an organization that foster cooperation and networking in policy, technology, and law.

Q.   Have you taken any courses related to your expertise in this case?

A.   Yes.  These three organizations that provide classes and courses, and so I attend regularly classes to upgrade my knowledge on these topics.

MS. ABEL:  I would at this time move to qualify Ms. Burguiere as an expert in the field of intellectual property valuation for a startup organization.

THE COURT:  Any objection?

MS. TAIT:  No, Your Honor.

THE COURT:  All right.  She's an expert.

BY MS. ABEL:

Q.   So I just want to, just briefly, get an understanding of

intellectual property.

What are generally the components of intellectual property?

A.   Sure.   I've mentioned before it's defined generally as any creation of the mind, and can be something related to technology or something related more to art.

So what I focus on in my work is closely related to technology.  So it can be a patent.  It can be, also, related to brand, trade secret, trademark, know-how, software code.

Q.   And you mentioned patents.  What is a patent?

A.   So a patent is an exclusive right granted to an individual for his invention.  And it's very useful because it gives you the right to exclude other companies or individuals from using this invention.

Q.   Generally, why is intellectual property valuable?

A.   So, generally, for a corporation or for a startup, intellectual property is very useful because it's a community of assets.  So as I mentioned, it can prevent other entities from using your invention.  But you can also monetize it by licensings, or you can use it as an asset to raise funds if you need to finance your project in the development.

Q.   You said "raise funds."  What do you mean by that?

A.   So more specifically to your startup, you usually want to raise funds at different stages.  So we have pre-seed, seed, Series A, and you're using this money to develop and grow.  And

so showing the investors that you have intangible assets, a technology that work, a proof of concept will help the investors get a better understanding of what they are investing in.

Q.   And why is intellectual property important -- why is intellectual property specifically important to investors and startups?

MS. TAIT:  Objection, Your Honor.  It seems to be beyond the scope of what the Court has permitted.

THE COURT:  It is.  Move on.

BY MS. ABEL:

Q.   In your experience, do investors and startups take any steps to determine the value of intellectual property?

MS. TAIT:  Your Honor, beyond the scope.

THE COURT:  Sustained.

BY MS. ABEL:

Q.   As part of your work in this case, did you learn, generally, about StarClub's business model?

A.   Yes.

Q.   Based on your review of the records, would you describe StarClub as a startup during development period from 2014 to 2017?

A.   Yes.

MS. TAIT:  Objection, again, Your Honor.  Beyond the scope.

THE COURT:  I'll allow that for foundation.

BY MS. ABEL:

Q.   So I understand that your opinion is that StarClub was a startup.  What, therefore, would be the primary indicators of value for a company like StarClub?

A.   So, typically, if you're an investor in a startup, you're going to look at what the technology and the concept of the startup is.

MS. TAIT:  Your Honor, again, beyond the scope, I believe, of what the Court has permitted.

THE COURT:  Sustained.

MS. TAIT:  Move to strike, Your Honor.

THE COURT:  That will be stricken.

BY MS. ABEL:

Q.   Did you conduct a search to determine if StarClub had any intellectual property?

A.   Yes, I did.

Q.   What did you find?

A.   So I found that StarClub had five patents.  I also found that --

THE COURT:  Limiting it to patents.

MS. ABEL:  Thank you, Your Honor.  I didn't have a moment to --

BY MS. ABEL:

Q.   We'll just speak about the patents for today.

So I think you just said that there were five patents, and I brought up, to help us along, a slide.

Do you see the slide?

A.    Uh-huh.

Q.    Did you prepare this slide?

A.    Yes.

Q.    So as of January 16, I think you said there were five patents controlled by StarClub?

A.    Correct.

Q.    And does each patent get a number?

A.    Yes.

Q.    And is that what's found in the leftmost column?

A.    Yes.

Q.    And then the next column to the right, what does that reference?

A.    This is the title of the patents, and this generally describes what the patent is about and what is covered by the patent.

Q.    And then the column next to that, it says, "Inventor/Author."

What does that refer to?

A.    So that refers to the person that created this patent.

Q.    And then there is a filing date.

What does that refer to?

A.    So the filing date is when your patent is ready.  You have

had discussion with the organization that manages patents in the U.S., called the USPTO.

MS. TAIT:  Your Honor, beyond the scope.

THE WITNESS:  And so the filing date is --

THE COURT:  When she objects, you don't talk until I tell you to.

MS. TAIT:  I'm sorry, Your Honor.  I just objected on beyond the scope.

THE COURT:  We need just a little bit of background, so go ahead.

THE WITNESS:  So the filing date is when your patent is ready and has been approved by the USPTO.

BY MS. ABEL:

Q.   And then the next column, "Assignee."  What does that refer to?

A.   Assignee is the person that owns the patent.

Q.   Then there is a description.  What does that indicate?

A.   In this column "Description," we ID what the patent generally refers to.  So in this case, most of the patents are about video-conferencing and communication.

Q.   Just to ground us in all in some reality, why don't we just take a very quick look so we can see where some of this information is found on the documents --

MS. ABEL:  Actually, Your Honor, can Ms. Burguiere rely on the document, just for identification of what we see on

the screen?

THE COURT:  I don't know why we're going there.

MS. ABEL:  Okay.

Q.   How long does a patent last?

A.   Usually, 20 years.

Q.   And I see here in the Inventor List.  I see Mr. Fritsch as to the -- is it common to refer to the patent by the last three digits?

A.   Yes.

Q.   So, if I say "the '810 patent," do you understand me to be referring to the first one there?

A.   Yes.

Q.   So as I understand it, based on your slide here, the '810 and '927 slides were -- at least one of the inventors was Mr. Fritsch; is that right?

A.   That's correct.

Q.   And then, down at the bottom, the last patent, '307, there is the name "Ben McAllister"?

A.   Uh-huh.

Q.   Do you have a general understanding of who that is?

A.   I understand it's an employee -- he was an employee of StarClub.

Q.   And let's talk about the two in the middle -- the '075 and the '031.  I see that the assignee there is Upfront Media Group.

Do you see that?

A.    Yes.

Q.    Did you become familiar with Upfront Media Group in your review of the records in this case?

A.    Yes.

Q.    And based on your review of the records in this case, how does Upfront Media relate to StarClub?

        MS. TAIT:  Objection, Your Honor.  703 basis. Reliability.

        THE COURT:  Overruled.

        THE WITNESS:  I understand that Upfront Media Group was acquired by StarClub.

BY MS. ABEL:

Q.    What does that acquisition mean for Upfront's patents?

A.    So that means that the patents that belong to Upfront Media are controlled by StarClub during the period -- during this period.

Q.    And did StarClub also have some patent applications during the 2014 to 2016 time period?

A.    Yes.  They had three patent applications.

Q.    And why are patent applications important to the valuation analysis?

A.    So the patents are granted to you, so they are already accepted.  Patent applications are in the process, and they show the future technology that you're going to development.

Q.    Would an investor be interested in the patent applications of a startup --

MS. TAIT:  Objection, Your Honor.  Beyond the scope.

THE COURT:  I need to hear the question.

MS. ABEL:  I'll repeat the question.

Q.    Would an investor be interested in the patent applications filed by a startup company?

MS. TAIT:  Objection, Your Honor.  Beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  Yes, they would, because that would show the future opportunities of the startup.

BY MS. ABEL:

Q.    So all totaled, I think we had five granted patents and three patent applications; is that right?

A.    Correct.

Q.    So can you describe, generally, the generally accepted approaches to valuing a company's intellectual property?

A.    Sure.  So we -- as a financial expert, I usually and the industry usually rely on three approaches.  The first one is the cost approach.  So you're trying to understand how much money you have to invest to generate an asset and, most specifically, an intellectual property asset or a patent.

The second approach is looking at how much incremental revenue you can derive from this patent.  So because you own that technology, you're going to be able to generate premium

pricing or bigger gross profits or cost-saving.  So that is the income approach.

And the third approach is looking at what other people in this industry think about this kind of technology.  You're looking at similar transactions.  And that's called the market approach.

Q.   In the context of a startup like StarClub, in your opinion, is the cost of creating intellectual property a good marker of its value?

A.   The cost approach for a startup is usually not the best approach because it isn't captured in the opportunity and upside from the technology.  He only captures what he has constituted of this technology.

Q.   When considering the value of a company's intellectual property, what is the valuation date that we look at?

A.   We usually look at the time when a willing buyer and a willing seller would exchange the goods, so the time of the transaction.

Q.   Okay.  So as you understand it, as related to this case, that date would be, for example, when Danny Guy made his investment?

A.   That's correct.

MS. TAIT:  Objection.  Again, beyond the scope.

THE COURT:  Overruled.

BY MS. ABEL:

Q.   Here, one of those dates -- the relevant date would be January 30, 2015?

MS. TAIT:  Objection.  Misstates the facts and the testimony in this case.

THE COURT:  Sustained.

BY MS. ABEL:

Q.   Based on your review of the records and the charge in this case, do you understand the date that Danny Guy made the charged investment?

MS. TAIT:  Objection, Your Honor.  Misstates --

THE COURT:  We already have that evidence, and the jury has the information.

BY MS. ABEL:

Q.   So we're looking at the date of the transaction.  And so, as I understand your testimony, is that the date the investment was made?

A.   That's correct.

Q.   So for our purposes, we're looking generally at the date in the 2015, 2016 time period, and we'll be more precise?

A.   Uh-huh, correct.

Q.   So applying the valuation methodology you just described, how much do you think a willing investor would have estimated the StarClub intellectual property to be at the time of the transaction?

MS. TAIT:  Objection.  Beyond the scope in the

principal testimony.

THE COURT:  Overruled.

THE WITNESS:  So at the time the evidence available in this case, an investor would have been able to look at the indication of value through the methodology I described earlier, and those benchmark value indicates that the value of the IP would be somewhere between low-digit to middle-digit million.

BY MS. ABEL:

Q.   You said low-digit to mid --

A.   Mid-double-digit million dollars.

Q.   Okay.  So 10 to 15 million, is that a rough estimate?

A.   Yeah, correct.

Q.   At a high level, what are things you looked at to reach that opinion?

A.   I looked, first, at the ODT accounts that were available at the time of the transaction in this case.  I also looked at the intellectual property asset that was able to be identified, so the patent, the patent application.  We're also going to talk about the trademarks later.

THE COURT:  We're not.

BY MS. ABEL:

Q.   We're not going to talk about the trademarks.

A.   I looked at transactions in the market for comparable technology.  And I also looked at other companies that cited

the patent in their own patent.

Q.    Let's just briefly go through those -- those things.

So you mentioned audited financials.  And what part of the approach directs you to look at those documents?

MS. TAIT:  Objection, Your Honor.  Vague.  The audited financials are prior to the time in question.

MS. ABEL:  I can clarify, Your Honor.

THE COURT:  All right.

BY MS. ABLE:

Q.    You looked at audited financials covering what years?

A.    2012 to 2014.

Q.    And you looked at those -- why did you look at audited financials?

MS. TAIT:  Your Honor, may I have a word with defense Counsel?

THE COURT:  Yes.

(A discussion was held off the record between Counsel.)

BY MS. ABEL:

Q.    Just kind of go back for a second.  You mentioned the audited financials.  What years did those cover?

A.    From 2012 to 2014.

Q.    Are you certain that those are the dates?

A.    That is my recollection.

Q.    Is it possible your recollection is incorrect?

A.    It's possible.

THE COURT:  Why don't you just tell us what the dates are.

BY MS. ABEL:

Q.   Is it possible that the audited financials cover the periods 2011, 2012, and 2013?

A.   That's possible.

Q.   Why do you look at -- as part of which approach did you look at the audited financials of the ones you described?

A.   As part of the cost approach.  So in the audited accounts that were certified by the third party, they described some assets.

MS. TAIT:  703 basis.

THE COURT:  Overruled.

BY MS. ABEL:

Q.   What in the audited financials did you rely on in valuing StarClub's intellectual property?

A.   The audited financial accounts mentioned some technology transfer agreement in which stock had been vested.

MS. TAIT:  Objection, Your Honor.  Hearsay.  703. Limiting instruction requested.

THE COURT:  Ask another question, please.

BY MS. ABEL:

Q.   You mentioned one of the things you also relied on is that other companies' patents cited to StarClub's patents?

A.   Correct.

Q.   Can you generally describe what that means?

A.   Sure.  When you want to file a patent, you have to do a search for what prior technology exist that relates to the novel invention that you want to file as a patent.  So by doing so, you're going to identify all the prior patents that exist. And so this is called looking for prior art.  And so what we see here is that the StarClub patent was cited by several technology companies when they were finding their own patent.

Q.   So just to break that down a little bit, StarClub patent is issued?

A.   Uh-huh.

Q.   And then, after that, later patents cited the StarClub patents; is that right?

        MS. TAIT:  Objection, Your Honor.  Misstates the slide, as I think it includes applications as well as patents.

        THE COURT:  Does it misstate the slide?

        MS. ABEL:  Your Honor, I've only gotten through half the slide, so no.

        THE COURT:  Go ahead.

BY MS. ABEL:

Q.   We'll say that again.

     As to the issued patents, you can look at later patents -- I understand you to describe looking at later patents by other entities that cited earlier patents.  Is that what I understand you described?

A.    That's correct.

Q.    And when you look at those later patents, they are issued by -- are they issued by other entities?

A.    Right.  They are issued by other entities.

Q.    And I understand your slide on the right side --

THE COURT:  Counsel, approach.

(Sidebar commenced.)

THE COURT:  I don't understand this.  How could she find the value of a patent in whatever based on other patents that came after the representation to Mr. Guy or whoever?

MS. ABEL:  We were just getting there.  The next question which is, were those patents in January 2016 and prior?

THE COURT:  January 2016 and --

MS. ABEL:  And prior.  The citations or the later patents all occurred before January 2016.  That was going to be the next question to clarify that none of those occurred after January 2016.

MS. TAIT:  None of the citations.

MS. ABEL:  None of the citations occurred after -- if Lehman had done due diligence, he would have found the five patents and three applications as well as all of the patents.

THE COURT:  All right.

(Sidebar concluded.)

BY MS. ABEL:

Q.   So I think we were describing the citations by these companies -- Google, Thompson, QuickPlay, et cetera.  And those are later patents that cite back to the StarClub patents and patent applications; is that right?

A.   That's correct.

Q.   And all of those citations occurred on or before January 2016?

A.   All the companies that we see on the slide cited to the StarClub patent before the valuation date of 2016.

Q.   And I see, in that number of forward citations, there are some numbers in there.  Can you just describe what that number represents?

A.   Yes.  The numbers that we see in the third column represent the total number of forward citation as of today, which means that, even after the date of the valuation --

Q.   I'm sorry.  I'm just going to stop you.  As of today or as of -- on the slide that we're looking at right now, as of today or as of the valuation date?

A.   As of today.  The number, the third column is of today.

        MS. TAIT:  Your Honor, objection as a result of the sidebar.

        MS. ABEL:  I misunderstood.  Can I clarify?

        THE COURT:  Well, she's answered.  Those numbers aren't relevant.  Move on.

BY MS. ABEL:

Q.    Okay.  I just want to clarify.  The company cited on the right-hand side, those were all cited to the patents as of January 2016; correct?

A.    Correct.

Q.    You also mentioned market transactions for similar technologies in the things you relied on; is that correct?

A.    Yes.

Q.    What does that mean?  What is a market transaction?

A.    We, in the valuation approach, in the market approach -- we typically look at transactions such as acquisition of an asset or licensing of an asset.

Q.    And acquisition of patents, therefore, are a company that had patents?

A.    Correct.

Q.    And can you describe what the slide, therefore, demonstrates?

A.    Yes.  So in this slide, we see that between 2010 and 2014, I selected four transactions -- actually, I selected four transactions that are similar in technology to the technology described by StarClub.  So what we see is that four companies in the fourth column acquired those companies for the amounts in the third column.

Q.    And why do you look at those market transactions?

A.    Market transactions show the interest of other parties in the industry for similar technology.  So this is an indication

of the interest of the marketplace for similar technology and intellectual property.

Q.   So after considering all of this evidence, does it remain your opinion that the intellectual property value available at the time of the transaction indicated a value in the low to mid double digits for StarClub?

A.   Yes.  It is my opinion that an investor would have looked at his benchmark value and concluded to that.

Q.   I probably missed it.  Low- to mid-double-digit millions of dollars?

A.   Correct.

Q.   If an investor conducted an intellectual property valuation, would he have uncovered that StarClub had a value in that range?

         MS. TAIT:  Objection.  Relevance.

         THE COURT:  Sustained.

BY MS. ABEL:

Q.   Is it your opinion that this low- to mid-double-digit-million-dollar value of the intellectual property of StarClub would have been important to an investor?

         MS. TAIT:  Objection.  Relevance.

         THE COURT:  Sustained.

         MS. TAIT:  Move to strike both of those, Your Honor.

         THE COURT:  Those will stricken.

MS. ABEL:  May I have just a moment, Your Honor?

THE COURT:  Yes.

(A discussion was held off the record between Counsel.)

MS. ABEL:  Nothing further, Your Honor.

THE COURT:  Cross-examination?

MS. TAIT:  Yes, Your Honor.

Mr. Flores, will you kindly pull up Exhibit 206?

Which is a demonstrative, Your Honor.

THE COURT:  All right.

CROSS-EXAMINATION

BY MS. TAIT:

Q.    Good afternoon, Ms. Burguiere.  I'm sorry if I
mispronounced your name.

A.    Good afternoon.

Q.    Looking at the screen in front of you, Exhibit 206, you
conducted no valuation going back to January 16, 2014; right?

A.    Can you rephrase the question?

Q.    You did not conduct a valuation dating back to January 16,
2014; correct?

MS. ABEL:  Objection.  Relevance.  Beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  No, I didn't.  It is out of the scope
that was required to look at.

BY MS. TAIT:

Q.    The scope that the defense attorneys asked you to look at;

right?

A.    Uh-huh.

Q.    And you did not see any audited financials for the year 2014?

A.    Correct.

Q.    2015?

A.    Uh-huh.

Q.    Nor 2016?

A.    Correct.

Q.    Nor 2017; right?

A.    I don't think they were available in this case.

Q.    Okay.  Patent applications aren't patents; correct?

A.    Correct.

Q.    And a patent is also not a proof of concept, is it?

A.    What do you mean by "proof of concept"?  Can you clarify?

Q.    What do you mean by "proof of concept"?  You're the one who used it in your testimony.

A.    A proof of concept is an idea of a business or a method in which you're going to do a technology.

Q.    Isn't a proof of concept the proof that your concept works?

        MS. ABEL:  Objection.  Argumentative.

        THE COURT:  Overruled.

    Go ahead and answer.

        THE WITNESS:  Sorry.  Can you repeat what you said?

BY MS. TAIT:

Q.    Isn't proof of concept proof that your concept works?

A.    Yes.

Q.    So that is not the concept.  The concept is an idea.  The proof of concept is proof that your idea works?

A.    That's correct.

Q.    And those are two different things?  Yes?

A.    Uh-huh.

Q.    So a patent is not proof that your idea works; right?

A.    A patent describes a method or a system to implement in technology.

Q.    And it doesn't prove that the method or system works; right?

A.    What do you mean by "work"?

Q.    I mean functions; is real.

A.    I guess that would depend if your patent was granted by the patent examiner.  The patent examiner said that this patent works.

Q.    Is that what a patent examination is?  It says that your patent -- your technology actually, physically works in the real world?

A.    A patent is an exclusive right to an invention that is novel compared to the prior art.

Q.    Right.  So it doesn't mean that it actually works, or that is actually exists in the real world --

MS. ABEL:  Objection, Your Honor.  Badgering.  Asked and answered.

THE COURT:  Overruled.

BY MS. TAIT:

Q.    In the real world, walking around.  It's an idea, and it's unique idea, and someone said it's unique; right?

MS. ABEL:  Vague.  Compound.

THE COURT:  One thought at a time, Ms. Tait.

BY MS. TAIT:

Q.    The patent is your idea; right?

A.    A patent is an idea that can cover many applications, and so you can use it -- a startup can use it for very different applications.  Some that may work, some that may not work.

Q.    Exactly.  Some that may not work; right?

A.    Yeah.

Q.    You referenced some patents by a company that was not StarClub -- Upfront Media?

A.    Yes.

Q.    And StarClub did not invent those patents; right?

A.    They did not.  They acquired Upfront Media.

THE COURT:  Just answer the question you've been asked, please.

BY MS. TAIT:

Q.    How many StarClub former employees did you interview in making your valuation?

A.    I didn't interview any employees.

Q.    How many interview reports from the Government's investigation did you read of StarClub employees before you made your valuation?

A.    My analysis focused on the intellectual property and not on the interview of --

         MS. TAIT:  Your Honor, may I ask the witness to answer the question, which is:  How may interview reports of employees from the investigation did the witness read?

         THE WITNESS:  I did not review them.

BY MS. TAIT:

Q.    So you didn't learn what the employees said worked and did not work at StarClub; right?

A.    Correct.

Q.    And these interview reports were available, but you didn't read them; right?

A.    Correct.

Q.    And you didn't review the e-mails that the defendant sent to outside investors to understand what defendant said about the technology?

A.    I reviewed some of those e-mails from investors.

Q.    And you didn't investigate, though, whether the statements and the e-mails were true or false, did you?

A.    No.  My analysis focused on the intellectual property, the patent, and the patent applications.

Q.    So you really have no idea whether StarClub actually ever worked, do you?

A.    I've seen screenshots of Enrique Iglesias and other celebrities communicating with their audience.

Q.    Those were prepared by a graphic artist; right?

A.    No.  They were obtained independently by public research.

Q.    Did you also review PowerPoint slides?

A.    I did.

Q.    Did you actually see a demonstration of the product with -- an actual live product?

A.    The company doesn't exist anymore, so I didn't see any of that.

Q.    Okay.  In order to come up with your valuation, how much money have you been paid for your work for the defense team up to today?

A.    Up to today, I've been paid $20,000.

Q.    How much money are you charging right now, per hour, for sitting in that chair?

A.    $500.

Q.    And how much do you charge per hour for waiting out in the hallway?

A.    Depends if I'm working something else or if I'm working this case.

Q.    Okay.  So how much -- well --

A.    It's the same rate.

Q.    Same rate, $500 an hour.  Okay.

So most patented inventions never make it to market; isn't that right?

MS. ABEL:  Objection.  Beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  Can you rephrase the question?

BY MS. TAIT:

Q.    Isn't it true that most patented inventions, they just don't make it to market; isn't that true?

MS. ABEL:  Objection.  Speculation.

THE COURT:  Overruled.

THE WITNESS:  What do you mean by "most"?

BY MS. TAIT:

Q.    I mean, more than 50 percent.

A.    I actually don't know that.  A lot of patents --

THE COURT:  Don't speculate.  If you don't know, you don't know.

THE WITNESS:  I don't know the answer to these questions.

BY MS. TAIT:

Q.    Is it true that most patented inventions fail to make their owners any money?

MS. ABEL:  Objection.  Speculation.  Lacks foundation.  Beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  I also don't know the answer to this question.  It depends.

BY MS. TAIT:

Q.   So you are a patent expert, but you don't know the answer to those two questions?

A.   My work focuses on patents that are granted and patent application.  Whether those work or not -- I usually work with companies that already have their business established.  So if they don't have a product, I usually am not contacted by those companies.

Q.   So you usually work with companies that already have something that is functioning and working out in the real world?

A.   I work with companies that have an IP that is already established and patent granted, or the patent application is in the process of being granted.

Q.   And the technology is actually working?

A.   They can be in the process of working.

Q.   So, again, is it the case that you really don't know that most patented inventions fail to make their owners any money? Let me just rephrase.

     Isn't that something the Patent and Trademark Office says on their website?

          MS. ABEL:  Objection.  Asked and answered.  Leading.

          THE COURT:  Overruled.

THE WITNESS:  It might be on the USPTO website.  I haven't looked at it.

BY MS. TAIT:

Q.   So let me just rephrase.  Are you sure that you can't answer the question whether most patented inventions fail to make their owners any money?

MS. ABEL:  Objection.  Asked and answered for the third time.

THE COURT:  Overruled.

THE WITNESS:  I think that "most" is a broad statement.  It's true that a lot of startups don't make money, but there are a lot of startups that do make money; so the answer is, it depends.  So "most" is a broad statement.

BY MS. TAIT:

Q.   I did not ask about startups, though.  I asked about patents.

A.   Yeah.  It depends.  Same answer.  Some patents fail to make money; some patents do make money.

Q.   And most fail; isn't that right?

A.   Can I ask you again what do you mean by "most"?

Q.   I mean 51 percent, at least.

A.   I don't know the exact number.  I would say a fair amount do not make money, and a fair amount also make money.

Q.   Just because you have a patent, it doesn't mean that your invention actually does what you say it does in the patent.

Would you agree?

A.    Can you rephrase the question?

Q.    Just because you have a patent issued, it doesn't mean that your actual invention really does what you say it does; right?

          MS. ABEL:  Objection.  Cumulative.

          THE COURT:  Overruled.

          THE WITNESS:  If your invention practices your patent, then it means that your patent is using this invention. Maybe your invention has all the technology included.

BY MS. TAIT:

Q.    Maybe --

A.    Or may be using one claim of the patent, so --

Q.    So just because you have a patent, it doesn't mean that your invention actually works in the real world; right?

A.    There are a lot of different factors that --

          THE COURT:  Please listen to the question and answer that question.

          THE WITNESS:  Sure.  Can you please rephrase your question one more time.

BY MS. TAIT:

Q.    Just because you have a patent doesn't mean your invention does what you say it does?

A.    I guess I have no opinion on that question.

Q.    You would agree that obtaining a patent on something that

doesn't make any money probably means the patent isn't worth much either; right?

A.   So patent is contextual.  It will depend on real use.

MS. TAIT:  Your Honor, I would like a "yes" or "no" answer, if that's possible.

THE WITNESS:  So what was your question?

BY MS. TAIT:

Q.   You would agree that, if you get a patent on something that doesn't make any money, then that probably means the patent isn't worth any money either?

A.   No.  I disagree.

Q.   Okay.  If you have a patent, that is not a ticket to success, is it?

MS. ABEL:  Objection.  Vague.

THE COURT:  Rephrase your question.

BY MS. TAIT:

Q.   Having a patent isn't a ticket to having a successful company, is it?

MS. ABEL:  Objection.  Vague.

THE COURT:  I don't know what "a ticket" means. Rephrase.

BY MS. TAIT:

Q.   Even though a company has patents, if the CEO sucks enough money out of that company --

MS. ABEL:  Objection.  403.

THE COURT:  Don't interrupt the question, please.

MS. TAIT:  Sorry, Your Honor.

THE COURT:  Go ahead.

BY MS. TAIT:

Q.    If a company has patents, if the company doesn't have any money to build out the patent technology, is it going to succeed?

A.    It depends; but it's difficult.

Q.    It would be difficult, won't it?

A.    Probably.

Q.    So you used the market approach, I think you said, to come up with your valuation?

A.    Yes.

Q.    And that depends on what happens in the market, as you understand it, based on your valuation; right?

A.    Correct.

Q.    So StarClub shut down in August 2017.  Do you know that?

A.    Yes.

Q.    Who bought the intellectual property that you valued so highly at that time?

A.    So part of the intellectual property was reassigned to employees of Upfront Media.

THE COURT:  Who?  Excuse me.

THE WITNESS:  The companies that we mentioned in here.

BY MS. TAIT:

Q.    Upfront Media.

A.    UMG, that we had on the slides earlier.

Q.    So who bought it, is my question?  Who paid money for it?

A.    As far as I know, no one purchased the patent.

Q.    And if nobody purchased that intellectual property in 2017, did that figure into your market valuation?

A.    No, because this is after the fact of my valuation.  In valuation, you're only looking to find what happened before or at the time of the valuation.

Q.    So in the real world, when the company shut down and it had patents and they sold them, that didn't -- excuse me.  They didn't sell them.  Let me rephrase it.  It was bad.

In the real world, when the company shut down and nobody paid for the patents, that didn't make it into your valuation?

A.    In the methodology evaluation, based on my experience and the commonly accepted practice of valuation, you only look at the facts that were known or knowable at the time of the valuation.

So what goes into my valuation is only the facts that were known as of January 2016.

Q.    So you ignored the fact that the company had patents when it shut down?

MS. ABEL:  Objection, Your Honor.

BY MS. TAIT:

Q.    And how much money it was able to sell it for, or not?

A.    This is after the valuation date.

Q.    It's after the valuation date, so you ignored it?

A.    Because this is how you --

THE COURT:  Yes or no, please.

THE WITNESS:  Yes.

MS. TAIT:  Can I have a word with my colleague?

THE COURT:  Yes.

MS. TAIT:  Thank you, Your Honor.  No further questions.

THE COURT:  Ms. Abel?

REDIRECT EXAMINATION

BY MS. ABEL:

Q.    So to clarify, even if you have no functional technology, the patent can be sold?

A.    Yes.

Q.    The patent independent has value?

A.    Yes.

Q.    It is an asset that you can sell like a house?

A.    Yes.

Q.    Okay.  And why don't we look at things that happened after the valuation date?  You were saying that you only looked at things that occurred on January 2016 and earlier.  Why don't we look at things after that?

A.    Because the general principles of valuation relies on the

assumption of I prefer to call negotiation.  So you only look at the fact that a willing buyer and a willing seller, under no pressure, would have known at the time of the transaction, and the price that they would be willing to pay under no pressure.

Q.    So you put yourself in the shoes of the investor at the time they're ready to make --

            MS. TAIT:  Objection, Your Honor, as to scope and the question.

            THE COURT:  Sustained.

BY MS. ABEL:

Q.    One other question that I don't know if I understood. There was discussion about proof of concept.  What is your understanding of that term?

A.    So a proof of concept is something that's usually discussed with invention and technology and patent and is a concept -- is how you would implement a process to -- how technology works.

Q.    In order to apply for a patent, you can include -- what do you include in the contents of the application?

            MS. TAIT:  Objection, Your Honor.  Beyond the scope.

            THE COURT:  Other reasons to sustain.  The objection is sustained.

BY MS. ABEL:

Q.    When applying for a patent, would one generally have to rely on the existing technology that they are patenting?

MS. TAIT:  Objection again, Your Honor.  Beyond the scope of the Cross and for any other --

THE COURT:  Any other reasons, sustained.

MS. TAIT:  Any other reason you may be thinking.

BY MS. ABEL:

Q.   You've looked at the underlying patents that we discussed in this case, the ones that StarClub had; is that right?

A.   Correct.

Q.   In those patents, was there any figures or images?  Were there images in those patents?

MS. TAIT:  Again, Your Honor, relevance and beyond the scope.

THE COURT:  I'll allow that question.

BY MS. ABEL:

Q.   Were there images?

A.   Yes.

Q.   What were those images of?

A.   So, for instance, in the first patent that was in the table, the '810, there was a screenshot of the interface a user would see of StarClub.  So it describes the celebrity in the middle, and then other functions on that screen.

MS. ABEL:  Can I just have one moment, Your Honor?

THE COURT:  Yes.

(A discussion was held off the record between Counsel.)

MS. ABEL:  Nothing further.

THE COURT:  Two minutes, Ms. Tait.

MS. TAIT:  I'll try to do it quicker than that, Your Honor.

RECROSS-EXAMINATION

BY MS. TAIT:

Q.   The drawings in the patent applications that you just talked about, that does not mean that the invention actually works; right?

A.   No.

Q.   Okay.  As far as you know, none of the patents that you looked at were ever sold for actual cash money after the company had them; right?

A.   Yes.

Q.   I'm correct?

A.   Yeah.

MS. TAIT:  Thank you, Your Honor.

THE COURT:  May the witness be excused?

MS. ABEL:  Yes, from the defense.

MS. TAIT:  Yes, Your Honor.

THE COURT:  Thank you, very much.  You're excused.

Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.  You are ordered to return tomorrow no later than 8:00 a.m.  You are ordered to have a good evening.

(Jury exited.)

THE COURT:  You may be seated.

What do we have coming up tomorrow from the defense?

MS. ABEL:  We have, I believe, at least four witnesses.  Three fact witnesses and one expert.  We expect we will be able to be done tomorrow.

THE COURT:  Who are the fact witnesses?

MS. ABEL:  We expect -- and this is not necessarily in this order because I can't recall the order, but Hazel Steward.  We expect Aahmek Richards.  We expect Tom Gruenbeck.  We expect Eugene Izumo.  And that's the expert, the last of the --

THE COURT:  All right.  I would like to have the exhibits and any objections, and I cannot waste time while the jury is staring at me.

You had an issue that you needed to discuss, I think, not about Mr. -- is it Welborn?  Shall we deal with that now?

MS. TAIT:  Yes, Your Honor, if we could.  So this relates to the accounting expert.  The Court has allowed some narrow testimony from them.  They were allowed testify about expenses associated with properties used for business purposes. And this concerns Item 2, "Fees paid for StarClub's management."

It's our understanding that the accounting expert, that the defense's intent is to bring in through that expert hearsay documents that were seized from StarClub and/or perhaps from

the documents of the premises or on people's computers for the purpose of claiming that these are actual contracts of the company that establish the management agreements or the amounts that Mr. Fritsch or his companies were supposed to earn.  \

And we believe that the expert -- that that's just a way of the expert bringing in unfounded and hearsay information. And so we do object to the jury hearing the contents of these said management agreements, because they should come in with a witness.  For example, they could come in with Mr. Polsen, who probably signed them, if they are real.  And we don't think that it's appropriate for the expert to bring in through the back door these things that we don't even know are real contracts of the company, even though they were seized there.

I will recall that during the government's presentation, there were many objections to documents seized from the business premises as to whether they were or were not legitimate or hearsay or authentic, et cetera, and so we would apply the same analysis here, even though I know experts can rely on hearsay, but I don't think that these are reliable.

THE COURT:  So before you were arguing they were reliable, and now you're arguing they're not?

MS. ABEL:  Thank you for making that point for me.

MS. TAIT:  If I said that, that didn't come out right.  I will argue they were reliable when Kim Fredricks testified that it's a real thing.  This is with her system, and

she kept these documents, and it had her handwriting on it. It's different, Your Honor.

Mr. Polsen comes in and testifies, these are the real agreements, that would be different, Your Honor.

THE COURT:  I haven't seen them, so I don't know how they were created, where they were found.  I don't know.  You can ask him if he relies on hearsay that he's not sure is accurate or valid.

MS. ABEL:  I think that will be a proper basis for Cross, Your Honor.  These are agreements that were seized from the very same files that Kim Fredricks kept and in the same course of business, but they were also seized by the government on August 2, 2017, so they could not have been created after that date.

To the extent the government would like to Cross on the reliability or the accuracy of the document --

THE COURT:  I really don't know what they are.  I would like to see what they are, but --

MS. ABEL:  They are in our --

THE COURT:  I don't know that I agree with your position.

MS. ABEL:  We'll point you to the relevant --

THE COURT:  The documents don't necessarily come in.

MS. ABEL:  Certainly, Your Honor.  Only insofar as he relies on them in forming his opinion.

THE COURT:  That doesn't mean they come in.

MS. ABEL:  I mean, he intends to refer to them in what he relied on to form his opinion, not that they are exhibits, per se.  I think we can have a fight over whether under 703 they are more probative than prejudicial, but I think that fight should be done after his testimony and not before.

THE COURT:  There will not be any fights in my courtroom.

MS. ABEL:  Bad characterization.  We can have a pleasant discussion.

THE COURT:  Professional discussion.

MS. ABEL:  Professional discussions as to whether or not, under 703, they are more probative than prejudicial, as the rule requires.

MS. TAIT:  Your Honor, if you do decide that any of it gets to be referenced in terms of, like, the content, what I expect them to say -- just my wild guess -- is they'll say, well, Mr. Fritsch had a contract that let him pay a million dollars a year, let's say, to a company for management fees. Then I would like the Court, pursuant to Rule 703 and also Turner versus Burlington, which was cited in our pleading over the weekend, that the jury should be told -- actually, it's not that case.  It's another case I cited.

THE COURT:  You are talking too fast.

MS. TAIT:  Excuse me, Your Honor.

THE COURT:  It's the end of the day --

MS. TAIT:  You're right.

THE COURT:  -- and my poor court reporter has really been hanging in there.

MS. TAIT:  She really has.

Well, the 59 -- .59 acres of land case, Your Honor.  The government, if these facts do get mentioned, we would request a limiting instruction that it should be considered solely as a basis for the opinion and not as substantive evidence.

THE COURT:  That is certainly true.

MS. ABEL:  Your Honor, I just think we should defer this conversation until after we have heard the expert as to whether they are admissible substantively and, if so, whether there's -- or counter whether there's a limiting instruction necessary.  But I just don't think -- even after looking at the documents, I'm not sure the Court could evaluate whether or not they are more probative than prejudicial, as required under 703.

THE COURT:  We'll see what happens.

MS. ABEL:  Thank you, Your Honor.

THE COURT:  So those four are for tomorrow?

MS. ABEL:  That witness we expect to be called Thursday, the one we're discussing.

THE COURT:  Okay.  And who else for Thursday?

MS. ABEL:  I think we're working that out, Your

Honor.  I don't know that we have a firm list for Thursday yet.

THE COURT:  Do you have an estimate of when the case will be finished?

MS. ABEL:  God willing, Thursday, Your Honor.

THE COURT:  Does that mean we're doing jury instructions and closing on Friday?

MS. ABEL:  Fingers crossed.

THE COURT:  Fingers crossed, I get the jury instructions, then, by then.

So if there is anything else that you intend to present for jury instructions, I need that first thing tomorrow.

MS. ABEL:  Yes, Your Honor.

MS. TAIT:  Yes, Your Honor.

That's it, Your Honor.  Thank you.

THE COURT:  Thank you.

MR. DE LEON:  Thank you, Your Honor.

THE COURT:  Have a good evening.

(Adjourned at 2:35 p.m.)

-oOo-

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov      (213) 894-3913

REPORTER'S CERTIFICATE


    I certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.


/s/ Suzanne M. McKennon, CSR, CRR, RMR
_____          Date:  12/30/2025
United States Court Reporter