UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-oOo-

HONORABLE DALE S. FISCHER, UNITED STATES DISTRICT JUDGE

UNITED STATES OF AMERICA,

                Plaintiff,

  v.                             No. 2:17-cr-00520-DSF-1

BERNHARD EUGEN FRITSCH,

                Defendant.

REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS

TRIAL DAY 8

LOS ANGELES, CALIFORNIA

APRIL 2, 2025

_____

SUZANNE M. McKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

APPEARANCES:


On Behalf of the Government:

    MONICA E. TAIT, Assistant United States Attorney
        United States Attorney's Office
        Major Frauds Section
        312 N Spring Street, Suite 1100
        Los Angeles, California 90012


    JOSEPH DE LEON, Attorney at Law
        Latham and Watkins, LLP
        10250 Constellation Boulevard, 11th Floor
        Los Angeles, California 90067


    SARAH SUN LEE
        Jenner and Block LLP
        515 South Flower Street, Suite 3300
        Los Angeles, California 90071-2246


On Behalf of the Defendant:

    JAMES S. THREATT, Deputy Federal Public Defender
    JONATHAN C. AMINOFF, Deputy Federal Public Defender
    REBECCA M. ABEL, Deputy Federal Public Defender
        Federal Public Defenders Office
        321 East 2nd Street
        Los Angeles, California 90012

**INDEX**


**DEFENSE RESTED** . . . . . . . . . . . . . . . . . . . . .   p. 181

**JURY INSTRUCTION CONFERENCE**. . . . . . . . . . . . . . .   p. 183


**WITNESSES**


**Direct | Cross | Redirect | Recross**

**FOR THE DEFENSE:**

**THOMAS GRUENBECK - Voir Dire**
    By Mr. Threatt          16


**HAZEL STEWARD**
    By Mr. Aminoff          25
    By Ms. Tait                      35


**THOMAS GRUENBECK**
    By Mr. Threatt          39                   45
    By Ms. Tait                      41                   47


**AAHMEK RICHARDS**
    By Mr. Threatt          49                             82
    By Ms. Tait                      69


**EUGENE IZUMO**
    By Mr. Aminoff          91              111
    By Ms. Lee                       99                   113


**TREVOR STURGES**
    By Ms. Abel            115              165
    By Ms. Tait                     145                   179

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov     (213) 894-3913

INDEX


EXHIBITS


|  | RECEIVED | MARKED |
|---|---|---|
| Exhibit 1702 | 232 | |
| Exhibit 1703 | 232 | |
| Exhibit 1704 | 232 | |
| Exhibit 1705 | 232 | |
| Exhibit 1706 | 232 | |
| Exhibit 1707 | 232 | |
| Exhibit 1708 | 232 | |
| Exhibit 1709 | 232 | |
| Exhibit 1710 | 232 | |
| Exhibit 1752 | 149 | |
| Exhibit 1753 | 149 | |
| Exhibit 1756 | 137 | |
| Exhibit 1757 | 139 | |
| Exhibit 1759 | 144 | |
| Exhibit 1760 | 144 | |
| Exhibit 1761 | 144 | |
| Exhibit 1762 | 144 | |

(Proceedings commenced on April 2, 2025, at 7:48 a.m.)

THE COURTROOM DEPUTY:  Calling Item Number 1, CR 17-520 United States of America versus Bernard Fritsch.

Counsel, please state your appearance, starting with government.

MS. TAIT:  Good morning, Your Honor.  Monica Tait, Sarah Lee, and Joseph De Leon for the United States.

MR. AMINOFF:  Good morning, Your Honor.  Deputy Federal Public Defender Jonathan Aminoff, Jimmy Threatt, and our client, Mr. Fritsch.  He's present on bound this morning. Also, present at Counsel table is FPD paralegal Susan Su.  And we are missing Ms. Abel at the moment.  She unfortunately had a child care issue this morning, but we expect her shortly.

THE COURT:  Okay.  I've received -- you can have a seat.  I received several e-mails relating to jury instructions, so I am looking at those.  I received the objections to exhibits.  That's for Mr. Sturges.  I guess he is the one who --

MR. THREATT:  I think that's right, Your Honor.  I think he is the one from whom there are the most disputes, and we expect he will not be testifying until probably later in the day.  I believe we gave five names yesterday.  He should be the fifth of those five witnesses.  So we do have a little bit more time.  Ms. Abel is unfortunately the one dealing with that exam.  So if it's possible to delay any substantive arguments

as to the exhibits, we would appreciate that, certainly from the defense.

THE COURT:  The responses refer to Exhibit 1769, which says, "This page is intentionally left blank."  And you also indicated that Exhibit 1770 was forthcoming.  When will it be coming forth?

MR. THREATT:  Your Honor, I hope very, very soon.  I believe that a legal assistant from our office is working with Ms. Abel, who hopefully will be here very soon, or Ms. Abel will have them herself.  I apologize for the inconvenience.  I may be able to e-mail an electronic copy right now to the Chamber e-mail address.

THE COURT:  Yeah.  That would be great, 69 and 70.

MS. TAIT:  Would Mr. Threatt please e-mail to the government as well, 70?

THE COURT:  Yes.

MR. THREATT:  Absolutely.

MS. TAIT:  Thank you.

THE COURT:  I am not sure how much argument we need so we can wait for Ms. Abel, but who is Gruenbeck?

MR. THREATT:  Your Honor, he is the current Trustee of the Rich Mountain Trust, which is the Trust that was mentioned some Bohemian documents that I believe were the subject of some dispute recently between the parties, but we expect his testimony would be exceptionally limited.  I think

Case 2:17-cr-00520-DSF    Document 629   Filed 12/30/25   Page 7 of 233   Page ID #:9141

7

the Direct exam would be something in the world of five minutes, if that.  It will be a very, very quick witness.

MR. DE LEON:  Yes, Your Honor.  And there is one exhibit, as I understand, that the defense intends to admit through a set of witness, and that is Exhibit 1763.

THE COURT:  Correct.

MR. DE LEON:  I believe the hearsay exception reference was 80315.

THE COURT:  It was.

MR. DE LEON:  However, the government still objects as to how this document would be authenticated and deemed Trustworthy.  Perhaps, the defense can proffer if Mr. Gruenbeck does intend to provide such indication and how he would go about doing that giving that this is a Trust from -- or this document, sorry, Exhibit 1763 goes back to 2000, I believe, and his involvement is unclear to the government in this document.

MS. TAIT:  And also not relevant.

MR. DE LEON:  Also not relevant.

THE COURT:  Well, it's 42 pages.  I haven't read it all.  So until someone points out to me what part or parts of it are relevant, it's certainly not coming into evidence.  I assume the -- oh,  I shouldn't assume things.  I don't know what this gentleman is going to testify to, but if he's the present Trustee, I think he can at least authenticate the document.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

So is this another Ms. Abel issue?

MR. THREATT:  No, Your Honor.  And I believe Mr. Gruenbeck certainly can authenticate the document given that he is the current Trustee.  You know, he was not the person who drafted the document or the Trustee when the Trust was initially set up, but is certainly the document that continues to govern the Trust, including in Mr. Gruenbeck's current capacity as the Trustee for the Trust.

But I also was not planning to, you know, walk through the document at length, though I understand the Court's concern about the length of the document itself.

THE COURT:  Oh, no, I wanted to hear him explain how the rule against perpetuity applies to this.  Apparently, there's a --

MR. THREATT:  We all would, Your Honor.  I never fully understood it myself from law school, so.

THE COURT:  I don't think whoever made it up understood it either.  But anyway, there's reference to some king, I think, in here.

MS. TAIT:  Your Honor, one more thing, if we could?

THE COURT:  Yes.

MS. TAIT:  We do have a relevance objection to that document because we know it's from 2000, and as we know from the Bohemian episode over the weekend that the only apparent alleged relevance is that money was sent to this Trust long,

long ago, at a time, I suspect, Mr. Gruenbeck was not the Trustee and the defense wants to argue that that money was somehow Mr. Fritsch's money.  Although the underlying documents which are excluded suggests that they were really somebody else's money being loaned to Mr. Fritsch.

So I don't see the relevance of the Rich Mountain Trust standing alone here in the evidence, based on the exclusion of the Bohemian information.  I would request a proffer of relevance as to the Trust.

MR. THREATT:  I'm happy to do that, Your Honor.  And I just -- and this is not really a live issue -- I don't think -- anymore, but we certainly don't agree with Ms. Tait's description of the Bohemian court records.  But I think a more important point for today is that there are transfers from a company called Euro-Dutch to StarClub and various StarClub entities.

Euro-Dutch for a long time was the Trustee of the Trust, and I think it became clear in Ms. Abel's Cross-examination yesterday of Mr. Bouchard that, the government has very little idea as to what a lot of the money coming into and out of these accounts was.

And so our position is certainly that it's highly relevant.  And, again, Mr. Gruenbeck's testimony, putting aside the document, Your Honor, will be very brief.  I don't plan to have him on the stand for longer than a few minutes.  Although

we certainly think it's relevant to the case given --

THE COURT:  What is he going to testify to?

MR. THREATT:  Sorry, Your Honor?

THE COURT:  What is he going to testify?  What's he going to say?

MR. THREATT:  He's going to testify to some basic facts about the Trust itself in his capacity as the Trustee of the Trust.

THE COURT:  What facts?

MR. THREATT:  He's going to, you know, confirm that there is such a Trust.  That the purpose of the Trust is to hold Mr. Fritsch's family money.  He is going to testify about taking over as Trustee of the Trust from prior Trustee, including Euro-Dutch.  That is really, I think, the vast majority of it.

My apology.  One moment, Your Honor.

(A discussion was held off the record.)

MR. THREATT:  And Your Honor, my apologies if I didn't make this clear enough, but I mean certainly the relevance is that with Euro-Dutch transfers coming into the StarClub entity and related entities, I believe there is a very credible argument that transfers from Euro-Dutch specifically included money that was Mr. Fritsch's money.

MS. TAIT:  That's like saying --

THE COURT:  How do you get to -- there is nothing

telling me -- I haven't read all 42 pages that it ought to be Mr. Fritsch's money?  That's the issue.

MR. THREATT:  Your Honor, and this is less -- to be clear, this is less dependent on the document.  This is more with respect to Mr. Gruenbeck's oral testimony, what I would expect him to testify to in front of the jury.

THE COURT:  What would you expect him to say?  I'm not going to ask it again.

MR. THREATT:  Yes, Your Honor.  I mean, I think I just walked through most of it that --

THE COURT:  You did not.  You did not tell me what the relevant -- the answer to the relevant question is.

MR. THREATT:  I think it is relevant establishing the existence of the Trust, establishing that Euro-Dutch for a long time was the manager of the Trust, and he is obviously not going to testify about transfers of money into StarClub entities.  He doesn't not -- is not going to speak to that, but we think the limited testimony about the Trust itself, the relationship of the Trust to the Euro-Dutch company that is transferring money into StarClub -- we think all of that is highly relevant.  Again, the testimony we expect him to offer is a few minutes.

THE COURT:  You have not explained to me why this is relevant.  I've asked you several times.  What is he going to say that is going to be relevant?  All of that is not helpful.

You keep saying Mr. Fritsch's family money.  I don't know whether it's Mr. Fritsch's family's money or Mr. Fritsch's money.

MR. THREATT:  Your Honor, the Trust was set up by Mr. Fritsch's mother, but then he became the sole beneficiary of the Trust.

THE COURT:  Okay.  So I know it's the first time anyone has ever said that.

MR. THREATT:  My apologies, Your Honor.

THE COURT:  Where is that in the Trust?

MR. THREATT:  And again, Your Honor, this is -- we're frankly not as interested in the document itself.  It's more about Mr. Gruenbeck's oral testimony, which I do think is more relevant to the issues that the jury will consider.

Your Honor, one other point of relevance is the original -- I mean the document does confirm that the original Trustee of the Trust was Anthony Inder Reiden, who is figure that's come up a fair number of times at trial, at the time through a company called Providence Trust Limited.  That's on the very last page of 1763.

THE COURT:  I saw that, but that doesn't say anything about why this document should come into evidence.

MR. THREATT:  And I understand the Court's position, Your Honor.  Again, we're not -- we certainly obviously marked the document.  We proposed introducing it through

Mr. Gruenbeck, but the defense is less concerned with the document itself, which is now, you know, a number of years old. We're more interested in Mr. Gruenbeck's knowledge about more recent events with the Trust.

We get very limited testimony.  And I do think I walked through what I would consider the salient points with the Court.  It is not going to be a very long time on the stand at all.

MS. LEE:  Your Honor, the fact that Mr. Inder Reiden and Euro-Dutch may have managed this Trust does not prove that money from Euro-Dutch or money from Anthony Inder Reiden was Mr. Fritsch's money.  He may have had other money that he was transferring and loaning to StarClub and actually the documents that we have seen and the information we have shows that it was other money.

MR. THREATT:  I mean, Your Honor, I think it's certainly relevant, and I think it provides a valid basis for us to making an argument to the jury that, as things become increasingly clear, there's going to be a significant point of dispute between the parties and their respective closing arguments.

The government's position, we obviously understand it. They're entitled to argue that position, but I don't think it's a basis for excluding the anticipated testimony Mr. Gruenbeck on the basis that it's not relevant.

THE COURT:  Again, I haven't heard the testimony.  I think we may have to do this outside the presence of the jury and get him in to find out what he has to say that I think is relevant.  I know what the government thinks.  I know what you think.  But without the testimony, I can't tell, and I don't want to start down that road until I'm sure.

So is he your first witness today?

MR. THREATT:  Can I have one moment, Your Honor?

(A discussion was held off the record.)

MR. AMINOFF:  Your Honor, he wasn't going to be our first witness.  We actually have someone else, and so we would propose to do her first and then Mr. Gruenbeck.  But I know that creates a problem with the Court's scheduling in terms of our breaks.

THE COURT:  Yes.

MR. AMINOFF:  But if you would indulge us, that would be our plan.  I suppose we could do -- in the alternative, if you just wanted to hear from him and make your determination of relevance just have him appear right now, and the Court could hear from him and then just ask the jury to be patient with us for a few minutes.

THE COURT:  Is he out in the hall?

MR. AMINOFF:  Yeah, he's here.

THE COURT:  Well, let's get him in.

MR. AMINOFF:  Your Honor, could I raise one other

issue?

THE COURT:  The jurors are here.

MR. AMINOFF:  I know.

THE COURT:  You don't care about that as much as I do.

MR. AMINOFF:  I will be quick.  I had intended, at the close of the government's case yesterday, to make a motion under Rule 29 for a judgment of acquittal on both counts with respect to all issues.

THE COURT:  I was wondering about that.

MR. AMINOFF:  In the excitement, I forgot.

THE COURT:  You found something exciting about this?

MR. AMINOFF:  Yeah, yeah, yeah.  The defense would like to make a motion for judgment on acquittal based on both counts with respect to all issues.

THE COURT:  All right.  The motion is under submission, as of the time of the close of the government's case.

THE COURT:  T.J., can you just let the jurors know that I'll be with them as soon as I can?

He's going to be under the penalty of perjury if I let him testify.  So do you want him to be sworn in?  Ms. Tait? Ms. Lee?  Somebody?

MS. TAIT:  Yes, Your Honor.

THE COURT:  All right.  Raise your right hand.

Sir, do you solemnly swear that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  Yes, I do.

THE COURT:  All right.  So Mr. Threatt.  Cut to the chase.  I don't want to authenticate the document.  I just want to know what he's going to say that's going to make me allow his testimony.

MR. THREATT:  Yes, Your Honor, understood.  Would you like me to walk through the questions I plan to question him with?

THE COURT:  Yes.

MR. THREATT:  Okay.  Mr. Gruenbeck, why don't you use one of these microphones here?

THE WITNESS:  Yes.

MR. THREATT:  It's going to be short, Your Honor.

**THOMAS GRUENBECK,**

**called as a witness, by the Defense, testified as follows:**

VOIR DIRE EXAMINATION

BY MR. THREATT:

Q.   Mr. Gruenbeck, are you familiar with something called a Rich Mountain Trust?

A.   Yes, I am.

Q.   What is it?

A.   It's a family Trust.

Q.    For whose family?

A.    For Mr. Fritsch's family.

Q.    Does it contain Mr. Fritsch's personal money?

A.    Yes.

Q.    When was the Trust established?

A.    Approximately 25 years ago.

Q.    Who was the original Trustee?

A.    I believe it was Providence Trust and Anthony Inder Reiden.

        MS. TAIT:  I'm not objecting because we're not before the jury, but I would object on this personal knowledge to these facts.

        THE COURT:  Yes.  Go ahead.

BY MR. THREATT:

Q.    And did there come a point in time when Mr. Inder Reiden served as a Trustee through a different corporation?

      Mr. Inder Reiden, that's I-N-D-E-R, I believe, R-I-E-D-E-N, served as Trustee through a different corporation?

A.    I believe so.

Q.    What was the name of that corporation?

A.    I believe it was Providence Trust.

Q.    Are you sure about that?

A.    Of the Trust, it's either Providence or Euro-Dutch Trust.

Q.    Okay.  And, to your knowledge, does the original Trust presently have any assets?

A.    It does not.

MR. THREATT:  That was really the short of it, Your Honor.  It wasn't going to be much at all.

THE COURT:  That's what he's going to testify to?

MR. THREATT:  That was our plan, Your Honor.

THE COURT:  How is that relevant?

MR. THREATT:  Again, Your Honor, for the reason we laid out before.  There are transfers from Euro-Dutch. Euro-Dutch is -- has a long history of being in control of the money that's contained in the Rich Mountain Trust.  And again, in one of the defense's arguments that it intends to make to the jury is that Mr. Fritsch had his own personal money intertwined in these companies and one source --

THE COURT:  He doesn't know that?

MR. THREATT:  Well, and Mr. Gruenbeck would not be the only one whose testimony we would offer on this issue, Your Honor.  We do have, as you know, an accountant who is going to testify later today.  There is support in the accounting records the transfers from the Euro-Dutch corporation that was managing the Trust containing Mr. Fritsch's family money to StarClub and other related entities.  So it's not an argument we'd be making based solely on Mr. Gruenbeck's testimony, but his testimony is one part of that.

THE COURT:  I don't see how he can testify it was Mr. Fritsch's money coming into the Trust.

MR. THREATT:  Can I have one moment, Your Honor?

THE COURT:  Yes.

(A discussion was held off the record between Counsel.)

MR. THREATT:  And, again, Your Honor, this would be brief testimony, but the key point --

THE COURT:  Stop saying that.  That's not a grounds for me to admit it.

MR. THREATT:  Then the key point is establishing a relationship between the family Trust and Euro-Dutch, which that's really the reason we want to offer this testimony.

THE COURT:  Well, he can't testify that Mr. Fritsch's personal money went into it?

MR. THREATT:  Into StarClub or?

THE COURT:  Went into the Trust.

MR. THREATT:  Okay.  Okay, Your Honor.  Understood, Your Honor.

MS. TAIT:  Your Honor, just as Fidelity can be a Trustee, for example, of someone's family Trust, when Fidelity sends wire transfers to Mr. De Leon's account, that does not mean that Mr. De Leon's -- that is my money if I also have a Trust that Fidelity is the Trustee for.  Euro-Dutch Trust is a company that is not the defendant, and there is no reason to connect the fact that Euro-Dutch sends wires to Tom, Dick, or Harry with Mr. Fritsch.

That is 403, not reliable, and not relevant.  The fact

that the name of this company happened to manage one Trust and sends wire transfers elsewhere.

MR. THREATT:  Your Honor, I think it's a little more nuanced than that, which is I don't think -- I don't think there is any evidence that Euro-Dutch would have been sending money on any other person's behalf.  I think it is highly relevant that it's Mr. Fritsch's company, and the company that manages Mr. Fritsch's Trust is sending money to StarClub.

I think it'd be an incredible coincidence if this company that manages Mr. Fritsch's Trust is sending money on someone else's behalf to the company that Mr. Fritsch is the founder and CEO of.

MS. TAIT:  Your Honor, no coincidence.  As we filed over the weekend, the interview report of Mr. Inder Reiden indicates that it was Mr. Inder Reiden's money.  He was the director of the Euro-Dutch Trust, and he loaned funds to Mr. Fritsch via that -- invested in StarClub, actually, through that vehicle.  And so that is not evidence in this trial.

Mr. Inder Reiden is not here to testify.  The Bohemian records don't come in, but there is certainly no evidence in the trial to indicate that Euro-Dutch Trust is Mr. Fritsch, and I think that this evidence that is proposed here doesn't indicate it either.

MR. THREATT:  Your Honor, Mr. Inder Reiden -- I mean I understand the government's position with respect to him, and

unfortunately, he can't be a witness at this trial, as with many others.

But, you know, there are a lot of disputes between Mr. Reiden and Mr. Fritsch right now.  We're not trying to get into any of that, but I certainly don't think that Mr. Reiden's self-serving account to the government should be a basis for excluding this, you know, very limited testimony from Mr. Gruenbeck.

I understand that may be what Mr. Inder Reiden said, but, you know, I still believe that it would be a pretty amazing coincidence.  I don't think there's any evidence that Euro-Dutch itself was a bona fide investor the way we discussed other people in this case.

I don't think -- I know that, you know, at a certain point, the government did not consider Mr. Inder Reiden's money to be that of an investor.  I think their position has changed on that based on more recent financial charts that have been produced.

And so, you know, again, we think that the evidence is highly relevant, the testimony would be limited, and when compared with the expected testimony of Mr. Sturges, it would provide a good faith basis for the defense to make a very credible argument to the jury in closing.

MS. LEE:  First, Your Honor, Your Honor has excluded that aspect of Mr. Sturges's testimony.  So this testimony

would be in a vacuum.  And our understanding is that the testimony from Mr. Sturges about Euro-Dutch and the Bohemian records is out.

Secondly, it's not just Mr. Inder Reiden's self-serving statements, as Counsel described.  We have evidence in this trial that Trident, which was Mr. Inder Reiden's company, was an investor, and we admitted an audio file of the defendant himself staying that Trident is an investor.  So we know from evidence in this trial that Mr. Inder Reiden's company, Trident, was an investor.

MR. THREATT:  But I think that also just means that the money is coming from Euro-Dutch, not Mr. Inder Reiden's money if he is indeed an investor, and he's sending his money via this other entity, Trident.  I mean, it's highly probative of the fact that any money coming from Euro-Dutch is not Mr. Inder Reiden's personal money.

I also know that, while the Bohemian court records are out, there are transfers from Euro-Dutch in the government's own discovery that I expect will be discussed when Mr. Sturges is on the stand.  To the extent the Court is going to let Mr. Gruenbeck testify, his testimony would be paired with testimony we expect to come in through Mr. Sturges this afternoon.

THE COURT:  All right.  I'll allow him to testify briefly just to the legal issues of how things got from

Euro-Dutch Trust.

MS. TAIT:  Your Honor, can we get a proffer of personal knowledge based on that, because he's not testifying as an expert.  He's testifying as personal knowledge.

THE COURT:  How do you know whatever you're going to say?

THE WITNESS:  What questions do you want me to answer?

MR. THREATT:  Well, the ones we went through.

THE COURT:  Whatever I ask is what you'll answer. What is the basis for your knowledge?

THE WITNESS:  I was appointed as the new Trustee for the Rich Mountain Family Trust to try to administer the Trust. That's how I know.  I've reviewed records regarding the original Trust document.  I'm familiar with who the prior Trustees were and who --

THE COURT:  When did you do that?

THE WITNESS:  When did I take over as Trustee?

THE COURT:  No.  When did you go over those records? When you became the Trustee, or when you were contacted by the defense?

THE WITNESS:  When I was appointed as the Trustee about a year and a half ago.

THE COURT:  And was there a reason that you need to do that?

THE WITNESS:  So I knew -- yes.  Because as part of the process of taking over Trustee, I needed to send a letter to the prior Trustees.  I ascertained who the Trustees were because I had to send a letter to them telling them that I am taking over the Trust.

THE COURT:  All right.  I will allow that very limited testimony.  You are not to ask about any funds going anywhere and who they belong to.

MR. THREATT:  Understood, Your Honor.

THE COURT:  All right.  Ms. Jackson, would you get the jury?

MR. THREATT:  And, Your Honor, if it's okay with the Court, we would still prefer to call Ms. Steward first and follow-up with Mr. Gruenbeck.

THE COURT:  Fine with me.

Let's get her into the courtroom so she is at least sitting there.

MR. THREATT:  Yes, Your Honor.

(Jury entered.)

THE COURT:  Just have a seat please until we call you.

You may be seated.  Everyone is back.  I'm sorry for the delay.  We had some things we had to work out.

Has anyone heard, seen, or read anything about the case since yesterday?  Don't see any hands.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov     (213) 894-3913

Mr. Aminoff?

MR. AMINOFF:  Thank you, Your Honor.  The defense calls Hazel Steward.

THE COURTROOM DEPUTY:  Stand right here.  Raise your right hand.

Do you solemnly swear that the testimony that you're about to give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  If you can just watch your step going up.

Ma'am, if I could just have you state your name and spell your last name for the record.

THE WITNESS:  My name is Hazel Steward, S-T-E-W-A-R-D for Delta.

THE COURT:  You may proceed.

MR. AMINOFF:  Thank you, Your Honor.

**HAZEL STEWARD,**

**called as a witness by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MR. AMINOFF:

Q.   Good morning, Ms. Steward.

A.   Good morning.

Q.   Ms. Steward, are you employed?

A.   I am.

Q.   How are you employed?

A.   I am self-employed.  I have my own company.

Q.   And what is your company?

A.   My company is Binj, B-I-N-J.  It's an AI audience intelligence platform.

Q.   Were you previously employed at a company called StarClub?

A.   I was.

Q.   When was that?

A.   I was employed at StarClub early, probably March 2014 through to, I believe, June 2015.

Q.   What was title there?

A.   Senior vice president of channel operations.

Q.   How was it that you came to work at StarClub?

A.   Through a friend of mine who I just launched another platform with.  She was friends with somebody called Ruben Mamann who wanted me to be introduced to meet Bernhard, who was looking for somebody to launch his platform StarClub.

Q.   When you said Bernhard, do you mean Bernhard Fritsch?

A.   Bernhard Fritsch.

Q.   Do you see him in the courtroom today?

A.   I do.

Q.   Could you just briefly identify him?

A.   Yeah.

     MR. AMINOFF:  Identifying for the record that gentleman sitting at Counsel table who's not Mr. Threatt.

THE COURT:  Okay.

BY MR. AMINOFF:

Q.   Ms. Steward, could you just very briefly describe your professional experience before starting your employment at StarClub?

A.   Yes, certainly.  I've been in media entertainment for the past 25-plus years, I would say.  I started off at Sky Television in the UK and launched Sky One Entertainment with Liz Murdock and the Murdock Brothers and worked with them for ten years as an executive, a producer, and on the buying team. I then moved to L.A. early 2006, and ran a large development departments, Merv Griffin Entertainment, The Going Company, et cetera, creating and selling shows to NBC, ABC, CBS, and the likes, the large broadcasters.

I then, when there was a shift in the market and digital sort of came to light, I was headhunted to go launch original programming on the largest fashion star and beauty network on YouTube, which was Style Hold, that went on to sell at RTL for upwards of $100 million.  And then after that, I launched various people's platforms, StarClub which is one of them.

And the two platforms that I've launched were Rich TV, which is in 100 of the leading airports, a million hotel rooms, up in the air, the cruiseliners, the entertainment network on the go, and Golf Nation and Spirits Network, which was the first shopper entertainment networks, which was content-driving

commerce.

And then I set up -- five years ago, we set up AI learning, and we launched --

THE COURT:  I think we're done, Mr. Aminoff.

MR. AMINOFF:  Thank you, Your Honor.

Q.   And thank you for the explanation, Ms. Steward.

So I believe you testified that you began working in StarClub in 2014; is that right?

A.   Yeah.

Q.   Okay.  What did StarClub do when you started working there in 2014?

A.   StarClub was monetizing on celebrity social media.

Q.   Monetizing celebrity social media?

A.   Social platform, yeah.

Q.   Understood.  Where were the offices at that time?

A.   In Santa Monica, Third Street, I think.  Right down there by the ocean.

Q.   And that's where your office was when you started?

A.   Yeah.

Q.   How many people would you estimate worked at StarClub at the time?

A.   One, two, three, around ten.

Q.   Ten.

A.   Maybe a few less, around about ten.

Q.   Okay.  Around ten.

A.    Uh-huh.

Q.    Now, I believe you mentioned that your title was senior vice president for channel operations; is that right?

A.    Uh-huh.

Q.    And as senior vice president for channel operations, what were your responsibilities?

A.    Was to -- front of house.  It was to keep the platform live, work with talent, ensure that they were posting content so their feeds were refreshed, to make sure that the tech team were keeping the platform going and enabling everything that we needed to happen on a day-to-day basis.

Q.    You used the term "front of house."  What is that?

A.    Oh, sorry.  Front of house meaning anybody that can see our platform.

Q.    Anyone that can see your platform?

A.    Ability to the outside world, yeah.

Q.    Okay.

A.    Show that we were live.

Q.    Did you have a role in acquiring new talent as well?

A.    Yes.  I mean that was part of new business to see who we could get on board, because the idea was to bring as much to scale to the platform to bring as much talent as we possibly could to get as many big names onto the platform.  So, yes.

Q.    Could you describe a little bit how you did that?  How you attempted to acquire new talent?

A.    Yes.  Because I've been in media for years, I had other relationships with the agents, Willie Morris, and the CIA, and what have you.  So it would be an actual reach out to talk to them and introduce what the platform was and where we wanted to go with that, as well as I would have to go and attend meetings or attend talent meetings to try onboard them.

Q.    So when you see "attend talent meetings," were those pitch meetings, or what type of meetings were those?

A.    Pitch meetings to talk about it.  I had various.  They were either pitch meetings that were in the office, or I had to fly and see if we could onboard the bigger talent.

Q.    Do you recall any specific examples of some of the bigger talent that you just referred to?

A.    Yes.  Having to, for example, fly to Brazil around the World Cup to try and onboard Neymar, Jr., who is one of the most famous footballers in the world at the time.  So we had to spend a day in his offices to pitch to all of the team management as to why StarClub was a great idea to jump on board.

Q.    Do you recall if you ultimately did any kind of work with Neymar, Jr.?

A.    We did.  We onboarded him to do a very high profile challenge for us, which was called the Super Bowl challenge, which we had shot in Barcelona, I believe.

Q.    And could you describe what that -- oh, I'm sorry.  I

didn't mean to cut you off.

A.   Oh, no.  That's okay.

Q.   Could you describe for us what that challenge was?

A.   It was to see -- because obviously everybody knows he's a soccer player.

MS. TAIT:  Please, objection.  Relevance, Your Honor.

THE COURT:  Please speak more slowly.

THE WITNESS:  Sorry, I forget because it's my English accent.

THE COURT:  Well, you have to remember.

THE WITNESS:  So it was because he's a soccer player, and it was around Super Bowl Sunday.  The challenge was to see if he could make a goal through a Super Bowl post by kicking a Super Bowl -- by kicking, you know, an American football as opposed to a soccer, a soccer ball to see how far he could kick.

BY MR. AMINOFF:

Q.   And was this a video that you were creating?

A.   It was shot as a --

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

MR. AMINOFF:  Your Honor, if I could briefly respond to the objection?

THE COURT:  Are you going to make this much shorter after that?

MR. AMINOFF:  I only have a few more questions, Your Honor.

THE COURT:  Okay.

MR. AMINOFF:  Thank you.

Q.   Did you create a video surrounding this challenge?

A.   Yeah.

Q.   And what did you do with that video?

A.   It was posted on his social media, on YouTube, and across other talent that was on our platform at the time they posted the video as well.

Q.   So the video --

A.   To maximize views.

Q.   So the video was actually posted to StarClub; is that correct?

A.   Yeah.

Q.   Okay.  And what does StarClub do with that content?  I think you said, but I didn't quite understand.

A.   Content is -- the idea of a big stunt like that, is content drives commerce, if you like.  So the idea is to get as many eyeballs around that content as possible to appeal to brands so that brands will come on board and advertise for gaining such content.

Q.   On the StarClub platform?

A.   Uh-huh.

Q.   Okay.  Do you recall -- without going into a whole lot of

detail, but just do you recall any other sort of high level talent that you worked with while you were at StarClub?

A.   I do.  We worked with Tyrese Gibson, who's a movie star, as we all know, who was posting lots of videos on a day-to-day basis and working with him.

Q.   Any others, just names?

A.   Mary J. Blige.

Q.   Did you ever work with Enrique Iglesias while you were with StarClub?

A.   Of course.  Sorry.  Yes.  Enrique Iglesias was one of the first ones that we launched the platform with, and I had to spend time with him and fly to New York and launch the platform, yeah.

Q.   Did you ever -- I'm sorry, I didn't mean to cut you off.

A.   No.  That's good.

Q.   Did you ever work with Kevin Hart?

A.   I didn't work with him.  I was in a meeting with him when we were looking to onboard him onto the platform.

Q.   Okay.  So Kevin Hart ultimately did not sign with StarClub?

          MS. TAIT:  Objection.  Foundation.

          THE COURT:  Sustained.

          MR. AMINOFF:  I'll move on, Your Honor.

          THE COURT:  Thank you.

BY MR. AMINOFF:

Q.    Now, I believe you also said part of your duties at StarClub involved not just acquiring new talent but working with them to establish their content; is that right?

A.    Yes.

Q.    Okay.  Do you recall any -- being involved in any film projects?

MS. TAIT:  Objection.  Cumulative and relevance.

MR. AMINOFF:  Your Honor, I was transitioning from talking about to working with talent to working with movie studios.

THE COURT:  I got that part.

MR. AMINOFF:  Oh, I'm sorry.

THE COURT:  Overruled.

MR. AMINOFF:  Thank you, Your Honor.

Q.    Ms. Steward, do you recall working on any film projects while you were at StarClub?

A.    Yes.

Q.    Could you detail just one for us, perhaps?

A.    Working with Universal, for example.  We were looking to be the marketing and PR partner for one of their new movies that they were releasing at the time, which was "We Joke Too."

So we set out to execute on a proof of concept for them to show how many that we could drive eyeballs to their movie trailer which ultimately drives -- their idea is they want bums on seats in the cinemarts.  So at the end of the movie trailer

period, we showed them exactly the figures that we had been able to achieve.  And they were to much success.

Q.    And I believe you testified that you left StarClub in 2015; is that correct?

A.    I did.

Q.    Can I ask you why you left?

A.    I moved to New York to set up production with Lawrence Spencer from Good Morning America.

MR. AMINOFF:  Your Honor, if I could just have one moment, please?

THE COURT:  Yes.

(A discussion was held off the record between Counsel.)

MR. AMINOFF:  Thank you very much, Ms. Steward.  I have no further questions.

THE COURT:  Cross-examination?

CROSS-EXAMINATION

BY MS. TAIT:

Q.    Hi, Ms. Steward.

A.    Hi.

Q.    So you worked at StarClub for a little more than a year; is that about right?

A.    Yes.

Q.    Okay.  And during that time did you attend any meetings with investors?

MR. AMINOFF:  Objection, Your Honor.  Beyond the

scope.

THE COURT:  Sustained.

BY MS. TAIT:

Q.   Were you aware of what investors were told about StarClub?

MR. AMINOFF:  Objection, Your Honor.  Beyond the scope again.

THE COURT:  Well, you already asked her what she did so I think it's relevant to flesh that out.

Go ahead, Ms. Tait.

THE WITNESS:  I wasn't part of the investor meetings.

BY MS. TAIT:

Q.   You weren't part of investor meetings, no.

And so it sounds like the entire period you were there, when you were launching channels, there was something that worked; right?

A.   Absolutely.

Q.   Okay.  And you were part of negotiating with talent to bring them on; right?

A.   Discussing with talent, yeah.

Q.   Discussing.  Who was responsible for actually signing those deals?

A.   I was not.

Q.   You were not.  Okay.  And who was in charge of StarClub?

A.   Mr. Fritsch.

Q.   Are you familiar with US Mastertec in part of your work?

A.    No.

Q.    Okay.  You didn't ever hear of that company?

A.    No.

Q.    Okay.  Were you part of -- I think you said you were part of developing the -- overseeing, I can't remember how you put it, the technology to make sure that what you were developing with the Channels to make sure that it actually, you know, technically worked; right?

A.    I would check in with them because there were features that we had to have to keep us ahead of the curve kind of thing, yeah, absolutely.

Q.    But you never heard of US Mastertec in that context?

A.    No.

Q.    Okay.  Let's see.  I assume you were paid for your work?

A.    I was.

Q.    And the talent, they were paid regardless of whether there was any revenue to the channels; isn't that right?

        MR. AMINOFF:  Objection.  Foundation, Your Honor.

        THE COURT:  If she knows.

        THE WITNESS:  I wasn't to do with anything to do with the financials or the payment of the talent.

BY MS. TAIT:

Q.    So you don't know how much the talent was paid?

A.    No.

Q.    And you don't how much revenue the company had?

A.    No.

Q.    Okay.  Meaning I'm correct?

A.    Sorry, you're correct.  Yes, yes, sorry.

Q.    So again, going back to your payment, did you pay for the stock options that you received from the company?

MR. AMINOFF:  Objection.  Beyond the scope.

THE COURT:  Sustained.

THE WITNESS:  I didn't have stock options.

MS. TAIT:  You can't answer.

THE COURT:  Well, she did.  So move on.

MS. TAIT:  Okay.  Thank you.

One moment, Your Honor?

THE COURT:  Yes.

MS. TAIT:  No further questions.  Thank you, Your Honor.

THE COURT:  Redirect?

MR. AMINOFF:  We have no further questions, Your Honor.

THE COURT:  May the witness be excused?

MR. AMINOFF:  As far as the defense is concerned, yes.

THE COURT:  Ms. Tait?

MS. TAIT:  Yes, Your Honor.

THE COURT:  All right.  Thank you very much.  You're excused.

Does the defense have another witness?

MR. THREATT:  Yes, Your Honor.  The defense is going to call Thomas Gruenbeck.

THE COURT:  Step forward, sir.

THE COURTROOM DEPUTY:  If I can have you stand here, I'll swear you in.  Can you raise your right hand for me?

Do you solemnly swear that your testimony that you're about to give in this cause now before the Court will be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Thank you.  And, sir, if you could just watch your step going up?

Sir, I'm going to have you state your name and spell your last name for the record.

THE WITNESS:  Okay.  Thomas Gruenbeck, G-R-U-E-N-B-E-C-K.

THE COURT:  You may proceed.

MR. THREATT:  Thank you, Your Honor.

**THOMAS GRUENBECK,**

 **called as a witness, by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MR. THREATT:

Q.   Good morning, Mr. Gruenbeck.

A.   Good morning.

Q.    Are you familiar with something called the Rich Mountain Trust?

A.    Yes, I am.

Q.    What is it?

A.    It's a family Trust.

Q.    For whose family?

A.    For the Fritsch family.

Q.    And when was the Trust established?

A.    It was established in approximately the year 2000.

Q.    And are you the current Trustee?

A.    Yes.

Q.    Who was the original Trustee?

        MS. TAIT:  Objection.  Lack personal knowledge.

        THE COURT:  Lay the foundation, please, Mr. Threatt.

BY MR. THREATT:

Q.    Do you know who the original Trustee is?

A.    Yes, I do.

Q.    Who was it?

A.    It was Providence and Euro-Dutch.

Q.    And do you know acted as Trustee by exercising control over those corporations?

A.    Yes, I do.

Q.    Who was that?

        MS. TAIT:  Objection, Your Honor.

        THE COURT:  Sustained.

BY MR. THREATT:

Q.   Mr. Gruenbeck, to your knowledge, does the Trust presently have any assets?

A.   It does not.

          MR. THREATT:  Can I have one moment, Your Honor?

          THE COURT:  Yes.

     (A discussion was held off the record between Counsel.)

          MR. THREATT:  No further questions, Your Honor.

          THE COURT:  Ms. Tait?

                         CROSS-EXAMINATION

BY MS. TAIT:

Q.   Good morning, Mr. Gruenbeck.

A.   Good morning.

Q.   You are also an attorney for Mr. Fritsch, aren't you?

A.   Yes, I am.

Q.   And you've been representing him in various matters for several years; is that right?

          MR. THREATT:  Beyond the scope, Your Honor. Objection.

          THE COURT:  Not beyond the scope.

     Go ahead.

BY MS. TAIT:

Q.   You've been representing him personally for several matters -- several years, haven't you?

A.   Yes.

Q.    And you've represented him in various court proceedings; correct?

A.    Yes.

Q.    Okay.  And you are under oath right now.  Do you realize that?

A.    Yes.

Q.    I think you misspoke when you said who the original Trustee of this Trust was.  Do you recall?  I think you said two companies, but there is only one original Trustee; am I right?

A.    Well, the original -- well, when -- the documents that I reviewed to determine --

MS. TAIT:  Motion to strike, Your Honor.

THE COURT:  That will be stricken.

Please listen to the question and answer that question.

BY MS. TAIT:

Q.    You were asked under oath who the original Trustee of this Trust in 2000 was?

A.    Yes.

Q.    Who was that?

A.    I recall it was Providence and Euro-Dutch Trust.

THE COURT:  Are you saying Providence and Euro-Dutch?

THE WITNESS:  Yes.

BY MS. TAIT:

Q.    Are you certain of that answer, Mr. Gruenbeck?  Would

looking at a document, perhaps -- are you certain -- is it possible your memory is fading and it was only the Providence Trust was the original Trustee, the original Trustee from 2000? Providence Trust Limited?

A.   I am not sure which document you are talking about.

Q.   The original Trust that you're testifying about.

A.   I am sorry.  Do you want to show me a document?  I'm not sure which document you're talking about.

Q.   Okay.  So maybe your memory is not so good?

MR. THREATT:  Objection, Your Honor.  At this point I believe is badgering.

THE COURT:  No.  Just --

BY MS. TAIT:

Q.   Mr. Gruenbeck, isn't it true that the only Trustee listed in the original 2000 document is Providence Trust Limited?

A.   The --

THE COURT:  "Yes," "No" or "I don't know."

THE WITNESS:  I don't know.

BY MS. TAIT:

Q.   Isn't it true that at the time of the establishment, the Trust had over $10,000 in it?

A.   I'm not aware of that.

Q.   But you're the Trustee?

A.   Correct.

Q.   Isn't it true that right now the Trust has no dollars in

it?

A.    Correct.

Q.    So sitting here right now, you don't know for sure that Euro-Dutch Trust was the original Trustee or not?

A.    Based on the documents I reviewed, I saw them --

Q.    I am asking about the original Trust.

A.    As far as I know, it was Providence and Euro-Dutch Trust.

        MS. TAIT:   Your Honor, may I confer with my colleagues?

        THE COURT:    Yes.

    (A discussion was held off the record between Counsel.)

BY MS. TAIT:

Q.    So a while ago, just earlier in the questioning, you weren't sure if it was Euro-Dutch Trust as the original Trustee; am I right?

        MR. THREATT:  Objection.  Misstates testimony, I believe, Your Honor.

        THE COURT:  Well, she's asking if she's right.  So if she's not, he'll tell her.

        THE WITNESS:  My recollection was it was Providence and Euro-Dutch.

BY MS. TAIT:

Q.    But I think you testified to the contrary earlier in my questioning.

A.    Which question was that?

Q.    The question, when I asked you, isn't it the case that there's only one Trustee listed in the original Trust document and that's Providence Trust Limited?

A.    I don't have that document in front of me so I can't tell you what's in that document.

Q.    Okay.  And you don't remember the entire document?

A.    No, I did not memorize it.

Q.    It's long, isn't it?

A.    It's pretty long.

Q.    Right.  But the -- we do know that there was only $10,000 in the Trust at inception?

A.    I don't know that.  You might know that.  I don't.

Q.    All right.  I think your testimony stands.

        MS. TAIT:  Just moment, Your Honor?

    (A discussion was held off the record between Counsel.)

        MS. TAIT:  No further questions.

        MR. THREATT:  Just one question, Your Honor, on Redirect.

                    REDIRECT EXAMINATION

BY MR. THREATT:

Q.    Mr. Gruenbeck, setting aside who the original Trustee was, was Euro-Dutch ever a Trustee on the Trust?

        MS. TAIT:  Objection, Your Honor.

    (Interrupted by the court reporter.)

BY MR. THREATT:

Q.    So putting aside who the original Trustee was, do you know whether Euro-Dutch was ever the Trustee of the Rich Mountain Family Trust?

MS. TAIT:  Objection, Your Honor.  Previous colloquies.

MR. THREATT:  I'm trying to clarify, Your Honor.  I think there was --

THE COURT:  I understand, but you need to lay some foundation because we seem to have an issue, so.

MR. THREATT:  One moment, Your Honor.

MS. TAIT:  Hearsay, Your Honor, as well.  Lack of personal knowledge, as well, Your Honor.

THE COURT:  Sustained.

Do you have another question?

MR. THREATT:  Yes, Your Honor, if I could try to lay some foundation.

BY MR. THREATT:

Q.    So, Mr. Gruenbeck, when did you become the Trustee of the Rich Mountain Family Trust?

A.    Approximately a year and a half ago.

Q.    In that capacity, what did you do to familiarize yourself with the structure of the Trust?

A.    I reviewed some of the Trust documents, and I had to determine who the prior Trustees were because, if I was taking over as Trustee, I had to know who to give notice to.

Q.   And in conducting that review, did you learn whether Euro-Dutch Trust was ever a Trustee of the Trust?

MS. TAIT:  Objection.  Hearsay.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  I did learn that.

BY MR. THREATT:

Q.   And was Euro-Dutch Trust ever a Trustee of the Trust?

A.   Yes, it was.

MR. THREATT:  No further questions, Your Honor.

THE COURT:  Ms. Tait?

RECROSS-EXAMINATION

BY MS. TAIT:

Q.   When you took over the Trust prior to that, you had represented Mr. Fritsch in personal litigation; right?

MR. THREATT:  Objection, Your Honor.  Beyond the scope of Redirect.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry, could you repeat the question again?

BY MS. TAIT:

Q.   So you took over Trust about 18 months ago?

A.   I believe it was in February of 2024.  So about a year and two months.

Q.   For several years prior to that, you were Mr. Fritsch's

attorney in personal matters; correct?

A.    Yes.

Q.    Okay.  Thank you.

MS. TAIT:  No further questions.

MR. THREATT:  Nothing further, Your Honor.

THE COURT:  May the witness be excused?

MR. THREATT:  Yes, Your Honor.

MS. TAIT:  Yes, Your Honor.

THE COURT:  Thank you very much, sir.  You're excused.

Does the defense have another witness?

MR. THREATT:  Yes, Your Honor.  The defense calls Aahmek Richards.

THE COURTROOM DEPUTY:  Sir, if I can have you just stand right here?  I'm going to swear you in.  Please raise your right hand.

Do you solemnly swear that the testimony you're about to give in the cause now before the Court shall be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  So help you God?

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Watch your step going up, sir. I'm going to have you state your name and spell your last name for the record.

THE COURT:  I think we need to have both names spelled.

THE WITNESS:  Okay.  My name is Aahmek Richards, and you spell it A-A-H-M-E-K, and last name Richards, R-I-C-H-A-R-D-S.

THE COURT:  Thank you.  You may proceed.

MR. THREATT:  Thank you, Your Honor.

**AAHMEK RICHARDS,**

**called as a witness, by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MR. THREATT:

Q.   Good morning, Mr. Richards.

A.   Good morning.  Good morning.

Q.   Where do you presently work?

A.   I work at Binj.

Q.   And just tell us briefly, what is Binj?

A.   Binj is an AI marketing platform.

Q.   Okay.  And do you know someone named Bernhard Fritsch?

A.   Yes, I do.

Q.   Could you point him out for us, please?

A.   Right there.

MR. THREATT:  Let the record reflect that it's the gentleman who's not Mr. Aminoff.

Q.   How did you meet Mr. Fritsch?

A.   I met Bernhard, I was working for Tyrese Gibson, the music

artist and actor, and he had recently signed a deal with StarClub to do a fan club app.  And while I was working with Tyrese, he asked me to, you know, work on the fan club app.  So I met Bernhard at the -- we did a launch party for his app.  That was the first time we met.

Q.    Before joining StarClub, what kind of work did you do with Mr. Gibson?

A.    I actually ran his record label, and I was his manager.

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. THREATT:

Q.    Sorry, Mr. Richards, if there is an objection and the Court sustains it, it mean you can't answer the question.

A.    Okay.  Sorry.

Q.    Just to clarify, you were working with Tyrese Gibson, and then you went from there to working with StarClub; is that correct?

A.    Yeah.  So I was working with Tyrese.  I started managing him fan club app for StarClub.

Q.    What was the fan club app?

A.    So basically, we built this -- it was, in essence, a social media app but specifically for the artist.  So the artist has their own app.  When they would post consent somewhat like Instagram, but it was an app that you would go into the App Store and download to your phone, and then you

could sign up, and then you could get like, you know, exclusive content from Tyrese.  You could chat --

(Interrupted by the Court Reporter.)

THE WITNESS:  Yes.  You could download the app from the App Store, and there was exclusive content from Tyrese, and then you could actually like do a live chat with him, and you got concert dates, and things like that.  So specifically for Tyrese.

BY MR. THREATT:

Q.   When you were working with Mr. Gibson, were you excited about the prospect of his partnering with StarClub?

A.   Yes, I was extremely excited.

Q.   Why was that?

A.   Because I've been working in the entertainment business for about 28 years, and predominantly on the digital marketing and Internet side in the music business, and I thought it was just a really cool idea, something I thought was, you know, extremely cool.  And so that's what I'm into.  I love technology, music.

Q.   When did you go from working with Tyrese to being an employee of StarClub?

A.   So initially, Bernhard asked me to do some consulting.  We had a couple meetings about the project.  And, you know, I have a lot of ideas in the space, so he saw that, and he was like, "Man, you'd be a great asset for the company."

THE COURT:  If you can slow down, please.

BY MR. THREATT:

Q.    Sorry, Mr. Richards, we have a court reporter who's trying to type down everything you say.

A.    I'll try to talk slower, I'm sorry.  I talk fast.

Initially, I started as a consultant.  Bernhard had a meeting with me, and he asked me if I had any other ideas in the space or if I knew any other artists that would be interested in doing fan sites.  I said, yes.  So I did some consulting for several months.  And then he asked me if I would be interested in joining the company full-time.

Q.    Do you remember when you started consulting?

A.    It's so long ago, honestly.  I think it was maybe early 2015, I want to say.  I think.

Q.    Do you recall when you stopped working for StarClub?

A.    I was there for two years, so '16, '17.  It was somewhere around the end of 2017, I believe.

Q.    Could it have been the beginning of 2017?

A.    Maybe.  Yeah.  I think, yeah.

Q.    We talked a little bit about Tyrese Gibson.  Do you recall any other celebrity partners that were working with StarClub during the time that you were employed there?

A.    Yeah.  Actually, I brought Ludacris.  He was one.  Mary J. Blige; the soccer player, Neymar; Dwight Howard; Enrique Iglesias was one of the projects I worked on.  Who else?

Jessica Simpson.

I'm trying to think.  We had so many artists.  Oh, Steven Tyler from Aerosmith was one of the projects.

Q.    What was your title when you were at StarClub?

A.    I became the vice president of Channel Management.

Q.    Can you tell me what does that mean?

A.    So by this time we had probably, I think, about 30 different celebrity apps going, and I was in charge of managing the day-to-day.  These apps needed to be updated weekly and frequently with content whether it was like tour dates or exclusive photos.  So I was responsible for dealing with the agents, the managers, and artists to make sure that they were posting every week.  And we all set -- always we scheduled like live chats, as well.  So I was managing that aspect of it.

Q.    Is it fair to say that you were a liaison between StarClub and the celebrity partners?

A.    Yes.  Yes, definitely.

Q.    When you first started working with StarClub, did it have an office in Santa Monica?

A.    Yes, our office was in Santa Monica.

Q.    Did you also do work in a residence in Malibu?

A.    Yes.  We had several meetings at Malibu, yep.

Q.    Can you give us a ballpark of how often you would physically be present at the residence in Malibu for work?

A.    I think we did, I'll say like, three or four times a

month.

Q.   Okay.

A.   We closed several deals in Malibu with the managers and artists.

Q.   When you say "close deals," what do you mean by that?

A.   Well, we would pitch the manager or the agent the idea of doing a fan club, and a lot of times we had the actual kind of like, you know, final meeting in Malibu at Bernhard's house.

Q.   Why would you do that?

A.   You know, working with entertainers and music artists, they like flashy things, and I think they get excited when they see people that are successful, and they're more interested in doing deals with them.  I think it's just a great environment because Bernhard's house was like a music studio, and it was very, like, artist-friendly and fun.  So I think it was just a great environment to like, you know, get the artists and the managers feeling comfortable working with us and seeing that we were serious.

Q.   Can you give us some examples of celebrities with whom you closed deals at the Malibu residence?

A.   The last one we did that was really big was Wesley Snipes, but Kindu was Mary J. Blige's manager, Ludacris's manager.  I trying to remember who else.  Yeah, but the most recent one I can remember and last one was Wesley Snipes.

Q.   Can you tell us more about the deal with Wesley Snipes?

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

BY MR. THREATT:

Q.   You mentioned that the house was like a recording studio. Just to be clear, Mr. Richards, did the house actually have a recording studio?

A.   I believe so.  In the living room, I remember we had a drum set, and there were a lot of instruments, and we had a really cool presentation screen where we showed a lot of the presentations of the projects that we were going to do with the artists.  It was a -- you know, it felt like a -- I think it had a recording studio, I'm not sure, but it definitely had a screening room, which was cool because I remember we did a lot of presentations in there.  And then there was the -- like the living room was like a studio.  It had a drum set, guitars, you know, bass, a bunch of instruments and stuff.

Q.   When you say "presentations," are you referring specifically to presentations with talent?

A.   Yeah, you know, when you're presenting --

THE COURT:  Just listen to the question, please, so we can move along.

BY MR. THREATT:

Q.   I think the Court would like a "Yes" or "No" answer to my question, Mr. Richards.

A.   Yes.

Q.    Could you tell us very briefly what those meetings were like with the StarClub talent?

        MS. TAIT:  Objection.  Cumulative.  Relevance.

        THE COURT:  Very briefly.

        THE WITNESS:  Okay.  We would present what the StarClub App and Syndicator did, so we would show them the actual tools that they would have at their disposal for their fan club site.

BY MR. THREATT:

Q.    Did you feel that having these meetings at the house was useful in closing the deals?

A.    Definitely.

Q.    To be clear, was Mr. Fritsch also living at the house during this time?

A.    I believe so.

Q.    Now, Mr. Richards, taking a step back in time, when you started in 2015, I think it's clear but I'm just going to confirm, did the company already have a product?

A.    Yes, they did.  Uh-huh.

Q.    And what was the product at that time?

A.    It was StarSite and the FanClub Apps.

Q.    And can you just describe briefly how those worked for us?

        MS. TAIT:  Objection.  Cumulative.

        THE COURT:  Overruled.

    You can answer.

THE WITNESS:  Yeah.  The app was a social media platform for the artist.  So it was their own Instagram.  And it was an IOS App and a Google Play App, so you could use it on Android phones as well.  And it was -- gave them the ability to communicate with their fans directly and post original content that we would then syndicate to their other socials like Instagram and Facebook and things like that.

BY MR. THREATT:

Q.    Were these apps available in the Apple store and the Android store?

A.    Yes, they were.  Yes.

Q.    And did the product evolve over time?

A.    Yes, it did evolve.

Q.    Can you explain a little bit how it evolved?

A.    I'm sorry.  So we had technology that we built called a "Syndicator."  And the Syndicator was a tool that allowed you to post on your FanClub App, but then you were able to connect the app with Facebook, Twitter, Instagram at the time, and what it would do is, as you post it on your FanClub site, it would automatically post to these other social networks.

       And it allowed us to stitch and add in front of your content, so we were able to basically run ads on these other networks via our Syndicator.

Q.    Thank you, Mr. Richards.

       Are you also familiar with a StarClub product called Oflo?

A.    Yes.  Oflo was a product that I developed.

Q.    Can you please tell us a little bit about that one?

A.    So Oflo is basically TikTok before TikTok started.  The idea came about because short form video content was becoming really popular, and there was this platform called Vine that got bought by Twitter and then shutdown.  And when that happened there were a lot of creators.  These people had, you know, millions of followers that were creating short-form content, and they didn't have a platform at the time, so I thought we should create an app.

      (Interrupted by the court reporter.)

         THE WITNESS:  So I had an idea to basically take these content creators, which are influencers now, and I offer them a deal to create exclusive content for our platform called Oflo.  And Oflo was an original video social media platform that we created.  And we used the Syndicator to help monetize their content, as well.

BY MR. THREATT:

Q.    Did you consider Oflo a form of influence for marketing?

A.    Yes, it was an influencer market before it was a thing.  Yeah.

Q.    Can you -- what do you mean when you use the phrase "influencer marketing"?

A.    Well, so now there's a genre called influencers and content creators and YouTubers, and these are people that, you

know, make short form content for social media and have become like the new celebrities in the world.  So they're -- yeah.

Q.    Was Mr. Fritsch enthusiastic about Oflo?

A.    Extremely.

Q.    Did you encounter any obstacles with anyone else at StarClub?

A.    Yeah.  I mean, the main issue I had was there was a CFO by the name of Jim Polsen.  And he, you know, wasn't very excited about the fact that we were doing this project with a bunch of young African-American, you know --

MS. TAIT:  Objection.  Relevance.  403.

THE COURT:  Sustained.

MS. TAIT:  Move to strike, Your Honor.

THE COURT:  That will be stricken.

MR. THREATT:  Your Honor, could we limit the portion that's stricken to just, I think, the last part, which is the basis for the objection.  I believe there was an answer before that that was not objected to.

THE COURT:  Yes.

MR. THREATT:  Thank you, Your Honor.

Q.    So, Mr. Richards, changing topics a little bit, do you know who Danny Guy is?

A.    Yes, I do.

Q.    Who is he?

A.    He was an investor in StarClub.

Q.   And is that how you got to know him?

A.   Yes.  That is how I was introduced to him.

Q.   Did you ever meet with Mr. Guy without Mr. Fritsch present?

A.   Yes, I did.

Q.   How many times do you think?

A.   I would say three times.  Two or three times, yes.

Q.   Do you remember approximately when?

A.   I can't.  I'm sorry, I can't remember the dates.

Q.   Do you recall if it was before this case was charged?

A.   Yes, it was.

Q.   Okay.  Why did you meet with Danny Guy?

A.   Danny asked to meet with me because he wanted to get information from me about what was going on in the company.

Q.   Okay.  When you met with Mr. Guy was he ever accompanied by other individuals?

A.   Yes.  He --

          THE COURT:  Stop.  Just listen to the question and answer that question.  "Yes" was the answer.  We don't need you to elaborate.

          THE WITNESS:  Okay.

BY MR. THREATT:

Q.   Could you tell us who those other -- that other person or those other people were?

          MS. TAIT:  Objection.  Relevance, Your Honor.  403.

THE COURT:  Sustained.

BY MR. THREATT:

Q.    Did Mr. Guy make you any promises about your future at StarClub?

A.    Yes, he did.

MS. TAIT:  Objection.  Hearsay.

THE COURT:  Not to that question.

MR. THREATT:  And, Your Honor, if we get the objection we expected, could I be heard briefly at sidebar or we could just speak very briefly now?

(Sidebar commenced.)

MR. THREATT:  James Threatt for the record.  Your Honor, I was just asking him briefly about some of his interactions with Danny Guy because, as with Mr. Guy himself, as with Greg Austin, we think this goes to the credibility of the government's investigation itself, in speaking with those things about his intersections with Mr. Guy and what we think substantially goes to the defense theory of their case.

I'm not trying to get into a prolonged discussion on this. I will keep it brief.  That was my intention to ask about --

THE COURT:  What is he going to say that's not for the truth of the matter asserted?

MR. THREATT:  It goes to Mr. Richards's motivations in terms of some of his own actions.  He was feeding information to Danny Guy and Gavin O'Reilly when Mr. Fritsch

was charged.  I expect him to testify that he was doing that. Because while he was frustrated with the company, generally, he was not frustrated with Mr. Fritsch.

And Mr. Guy had promised that he, Mr. Richards, would be made the CEO if he helped Mr. Guy push Mr. Fritsch out of the company.  And so we think it goes -- and again, Mr. Richards was a main person who was actively employed at the company who was providing information that was then picked up by Gary Austin, the FBI, and other people, and became part of the investigation.

So I also don't -- I don't think it was true that Mr. Guy was going to make him CEO, but I think it's highly relevant that Mr. Richards was told it and Mr. Richards believed it and that Mr. Richards then took actions on that basis.

THE COURT:  Took what actions?

MR. THREATT:  He explained that he was sending information to Danny Guy.  But also informed some of the things that he told the FBI agent in early stages of the investigation.  Mr. Richards was one of the employees who knew Greg Austin in December 2016.  Danny Guy came to L.A., orchestrated a whole series of meetings with Greg Austin.

Mr. Richards is the only active employee who met with him at that time, and it will go to why he agreed to meet with Greg Austin.  It will go potentially to some of the things he told Greg Austin.

So we do think it's highly relevant.  This is very much a core part of how this case began.  We think it goes, you know, in the same way that we're allowed to explore this with the case agent, and we think it's appropriate here as well.

THE COURT:  So I'm sorry, but I'm not really getting what you're saying.

MS. LEE:  Your Honor, Sarah Lee.  Regardless of what --

THE COURT:  One minute.

MS. LEE:  Okay.

THE COURT:  I need to know what he's trying to tell me first.  What is the end game here?

MR. THREATT:  The end game is to challenge the credibility and genuineness of the investigation from beginning.  Mr. Richards --

THE COURT:  Okay.  And how are you going to do that with this witness?

MR. THREATT:  This witness is, again, someone who was providing information from the company to law enforcement. He's someone who was meeting with law enforcement very actively early on.  I think it's somewhat telling that he was not called as a government witness at trial, and he will explain that he did those things and took those action because --

THE COURT:  He did what things and took what action?

MR. THREATT:  He was e-mailing -- this came out while

in a deposition, but he was sending e-mails, providing information to Danny Guy, who was forwarding them to Greg Austin.  He was meeting with Danny Guy.  He was really part of -- I think there was somewhat conspiracy to take Mr. Fritsch out of the company, and that's a large part of how this case began.

And Mr. Richards will talk about that, how Danny Guy promised him he would be made CEO if Mr. Richards helped Mr. Fritsch get pushed out of the company.  I mean that's what I expect him to testify to.

MS. TAIT:  Your Honor, if I can say -- this is Ms. Tait.

Mr. Richards was interviewed by Greg Austin.  Since that time Mr. Richards has been interviewed three times by the current prosecution team.  A lot of these statements are quite contrary to what we heard from Mr. Richards, including as recently as June of 2024, in which he was still having different nuances --

THE COURT:  He makes inconsistent statements --

MS. LEE:  Your Honor, this is Sarah Lee.

Just because -- regardless of what Danny Guy may have promised Mr. Richards, that does not show what Mr. Richards was telling the FBI was false in any way.  It's not relevant.

MR. AMINOFF:  Jonathan Aminoff for defense.

Your Honor, it goes to bias.

MS. TAIT:  Mr. Richards's bias?

MR. AMINOFF:  Maybe we should talk one at a time for the court reporter.

But the issue here, Your Honor, is this person was promised specific things by Danny Guy and then relied on those promises in statement that he made.  So the idea is that he expressed a bias that had begun at the time based on what Mr. Guy told him.  And certainly it informed his actions.  It informed his conduct.

The government elicited testimony from other witnesses about receiving information from this person in that context.

THE COURT:  I don't know you put it -- say "context" and restore his credibility.  So far he hasn't said anything negative about your client.

MR. AMINOFF:  I expect based on what the government is saying -- I suspect that's where we're going on Cross, Your Honor.  I think we're allowed just to probe that a little bit to kind of get the full story out, so to speak.  I think Mr. Threatt is only going to ask a couple of questions.

MR. THREATT:  I --

THE COURT:  He is standing right next to you.

MR.THREATT:  Yes, Your Honor.  I was going -- I think the question was:  Did Mr. Guy make any promises?  I was going to ask Mr. Richards what those were.  Mr. Richards has also told me that there is an implicative threat from Danny Guy, as

well, in the vein of the company was going to be taken down because he was having it investigated by the FBI.

MS. TAIT:  That is hearsay.

MR. THREATT:  Goes to Mr. Richards and his motivations on why he acted the way he did.

THE COURT:  Not that part.

MR. THREATT:  Okay.

THE COURT:  This is 403.

MS. TAIT:  Yes.

THE COURT:  That's a textbook example.  So you can ask one or two questions, but then you're done.

MR. THREATT:  Yes, Your Honor.

(Sidebar ended.)

BY MR. THREATT:

Q.   Just to go back to where we left off, Mr. Richards, I believe I asked you if Mr. Guy had made you any promises about your future at StarClub?

A.   Yes.

Q.   And what --

THE COURT:  Listen to the question.  If it's a "Yes" or "No" question, just answer "Yes" or "No."

THE WITNESS:  Yes.

THE COURT:  Or "I don't know."

BY MR. THREATT:

Q.   And what was the promise, Mr. Richards?

A.    If he took the company over, he would make me -- he would basically put me in charge of the company.

Q.    He would make you the CEO of StarClub?

A.    Yeah.

Q.    Okay.  Now, Mr. Richards, you've met with law enforcement a number of times, I believe; right?

A.    Yes.

Q.    Do you recall off the top of your head how many times?

A.    I did four interviews.

Q.    Okay.  Was the first one in December of 2016?  Do you recall?

A.    I believe so.

Q.    And when was the last one, if you remember?

A.    I believe it was last year, 2023.  No, maybe '24.  I think it was maybe the end of '23 or early '24.

Q.    Could there have been one in 2023 and one in 2024?

A.    Yes, I believe so.

Q.    Were any of those meetings in person?

A.    Yes, they were all in person.

Q.    Were any of those meetings with any of the prosecutors sitting to your left?

A.    Yes.

Q.    Were there any FBI agents at these meetings?

A.    Yes, at all of the meetings there were FBI agents.

Q.    Were the FBI agents taking notes?

A.    Yes.

Q.    Do you recognize any of the FBI agents that were at the meetings?

A.    Yes.

Q.    Were they --

        MS. TAIT:  Objection, Your Honor.  Relevance.

        THE COURT:  Overruled.

BY MR. THREATT:

Q.    Do you see them in the gallery?

A.    Yes.

Q.    Did you write down any of the notes that were taken in these meetings?

A.    I did not.

Q.    Let's focus on the most recent in-person meeting.  How many people were physically present other than you?

A.    I believe three.

Q.    Okay.  And where was the meeting held, if you remember?

A.    Downtown on Hill Street, at the other building around here.

Q.    Was it -- could it have been the U.S. Attorney's Office?

A.    I believe so, yes.

Q.    So they didn't come to your residence to interview you?

A.    No.

Q.    Just so we know, where do you live, Mr. Richards?

A.    I live in Porter Ranch.

Q.    Okay.  And did you have a lawyer present at these meetings?

A.    I did not.

Q.    Under those circumstances, did you feel intimidated?

A.    Yes.

          MS. TAIT:  Objection Your Honor.  Relevance.

          THE COURT:  Overruled.

BY MR. THREATT:

Q.    Did you feel intimidated, Mr. Richards?

A.    I mean, I, you know, going to the FBI building and being interviewed by FBI agents is a bit intimidating.

Q.    Understood.

          MR. THREATT:  Can I have one moment, Your Honor?

          THE COURT:  Yes.

BY MR. THREATT:

Q.    No further questions.  Thank you, Mr. Richards.

A.    Uh-huh.

          THE COURT:  Cross-examination?

                    CROSS-EXAMINATION

BY MS. TAIT:

Q.    Good morning, Mr. Richards.

A.    Good morning.

Q.    So you introduced a lot of people to StarClub, it seems like; right?

A.    Yes.

Q.    You had a lot of connections with the stars?

A.    Yes.

Q.    Okay.  But you were frustrated with how things were going on with the app, weren't you?

A.    I was frustrated with dealing with Jim Polsen.

Q.    And you were frustrated that the app didn't work?

A.    No, the apps actually worked.

Q.    You were frustrated -- you told -- do you remember meeting with the FBI after -- when Greg Lawson was no longer in the case?

A.    Yes, I've had four meetings with the FBI.

Q.    Right.  And do you remember saying isn't it true --

        MR. THREATT:  Objection.  Improper impeachment, Your Honor.

BY MS. TAIT:

Q.    Okay.  Well, let me just do it this way.

        Isn't it true that StarClub --

        MR. THREATT:  Same objection, Your Honor.

        THE COURT:  Overruled.

BY MS. TAIT:

Q.    Isn't it true that StarClub had to --

        MR. THREATT:  Objection.  Counsel is testifying, Your Honor.

        MS. TAIT:  Your Honor, I'm sorry, I thought it was a leading question that's okay.

THE COURT:  Yes, and it is.  Go ahead.

MS. TAIT:  Thank you, Your Honor.

THE COURT:  I haven't heard it yet.  It may not be, but I can't rule before I hear it.  Go ahead.

BY MS. TAIT:

Q.    Isn't it true that, to keep entertainers associated with StarClub, StarClub had to pay them --

(Interrupted by the court reporter.)

BY MS. TAIT:

Q.    Isn't it true that, to keep the celebrities on the StarClub App, StarClub had to pay them far more than the revenue that they generated?

A.    I don't know that to be true.

Q.    You don't know that to be true?  Didn't you tell that to the FBI before?

A.    I don't remember telling the FBI that.

Q.    Okay.  Isn't it true that Facebook blocked StarClub's ads?

MR. THREATT:  Objection.  Improper impeachment, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  Yes, after several months of us running ads, we did get a block.

BY MS. TAIT:

Q.    And it ruined the FanClub App?

A.    It didn't ruin the app.

Q.    That's not your words, "It ruined the FanClub App"?

A.    I don't believe I said that.

Q.    Okay.  And Facebook also blocked the Syndicator; right?

        MR. THREATT:  Objection, Your Honor.  Improper impeachment.  I believe Counsel's reading from a 302.

        THE COURT:  Overruled.

        THE WITNESS:  That's what happened.

BY MS. TAIT:

Q.    It did happen; right?

A.    It got blocked, yes.

Q.    And Oflo was your idea; right?

A.    Yes, it was.

Q.    And it was real, and it was working; right?

A.    Yes, it was.

Q.    And Mr. Fritsch shut it down, didn't he?

A.    No.  Jim Polsen told me that he was unhappy with the app and the content that was being created and he was refusing to pay some of my invoices.

Q.    And Mr. Fritsch was in control of the company, wasn't he?

A.    Mr. Fritsch was the CEO.

Q.    And he was Mr. Polsen's boss; right?

A.    I believe so.

Q.    And you pitched Oflo to Danny Guy, didn't you?

A.    Yes, I did.

Q.    And Danny Guy thought it was a good idea, too?

A.    Yes, he did.

Q.    But it was shut down by Mr. Fritsch, not Mr. Polsen?

A.    I don't know.

MS. TAIT:    Okay.    And let's pull up Exhibit 58, please, page 3.

Thank you, Mr. Florence.

Q.    Do you remember a man named Gavin O'Reilly?

A.    Yes, I know him.

Q.    And he was a mentor to you; right?

A.    Yes, he's a friend of mine.

Q.    And he's a friend; right?

I am showing you -- let me start with -- let's start with page 1.

This is an e-mail from Gavin O'Reilly.   Do you see that?

A.    Yes, I do.

Q.    I'm going to scroll down to the bottom half of page 1.   Do you recall seeing a lengthy e-mail from Mr. O'Reilly in or about late 2016 regarding StarClub?

A.    I can't say I remember the e-mail.   I'm looking at this now.   So long ago.

Q.    Okay.   Next page, page 3, please, at the top.

So Mr. O'Reilly writes, "The next product was Oflo, which was driven" -- I'm going to summarize -- "by Aahmek, and it was a genuine project.   And then, however, although it was successfully built and launched in Quarter 1 of '16, it was

effectively killed off before the summer because Bernhard Fritsch said that his investors and shareholders did not want to pay for content.  The total cost" -- and I'm skipping ahead -- "of the tech was certainly less than $150,000."

Is that true?

A.    No, we spent more than $150,000 on Oflo.

Q.    Mr. Richards, isn't it true that you sent an e-mail endorsing the content of this e-mail by Mr. O'Reilly?

A.    I don't know.  I don't remember that.

Q.    You don't remember doing that?

A.    I don't.

Q.    You don't remember saying this is exactly right or some words to those effects with respect to Mr. O'Reilly's e-mail?

A.    It was so long ago so I don't remember the e-mails.

Q.    Okay.  When you met with the FBI the very first time did you lie to them?

A.    No, I didn't.

Q.    Okay.  And when you met with the FBI the other times that you've done so, did you lie to them?

A.    No, I didn't.

Q.    So whatever you said was the truth; right?

A.    I don't know what you're referring to.

Q.    Well, you know that you didn't lie; right?

A.    Yes.

Q.    Okay.  Sometimes you were part of investor meetings;

right?

MR. THREATT:  Objection.  Beyond the scope, Your Honor.

THE COURT:  Overruled.

THE WITNESS:  I was in one investor meeting, yes.

BY MS. TAIT:

Q.   Okay.  And usually -- only one investor meeting?

A.   Yes.

Q.   Okay.  When financial presentations happen during the meeting, you were asked to leave the room; right?

A.   In that meeting in particular, I was done with what I was doing, which was presenting the product, and we were told that we could leave if we wanted to.

Q.   And you were asked to leave the room for the financial presentation?

A.   I was basically told that my part was to present the creative.

Q.   And then you were done?

A.   And then I could leave, because I had to go up and do other work, yes.

Q.   So do you know a company called US Mastertec?

A.   Yes, I'm familiar.

Q.   And Mr. Fritsch was in control of that company, too; right?

A.   Ian Cartwright ran US Mastertec, and that's who I dealt

with.  I don't know intricacies of who owned it or who was in charge of it, but Ian was the person that I know that ran US Mastertec.

Q.    And Mr. Fritsch would be able to give Mr. Cartwright direction on what he did; isn't that right?

A.    Yeah, he worked there.  He was at the office.

Q.    And Mr. Fritsch had the last say-so at StarClub; right?

        MR. THREATT:  Objection.  Foundation, Your Honor.

        THE COURT:  If you know.

BY MS. TAIT:

Q.    As far as you knew?

A.    I don't know.

Q.    You did slide decks and presentations while you were there; right?

A.    Yes.

Q.    And Mr. Fritsch had the last say-so on the slide decks and presentations; right?

A.    There were other people that had say-so.

Q.    But the last say-so, is the question.

A.    I don't know.

Q.    He had the final say.

        (Interrupted by the court reporter.)

BY MS. TAIT:

Q.    Mr. Fritsch told you, didn't he, that he always wanted to be in development of new projects?

A.    NO.  We had a conservative about R and D, research and development, and he was explaining to me that the company, like most tech companies, you're in a development stage until you get it right.

Q.    And he told you he didn't want to finish the projects.  He just wanted to keep developing; right?

A.    NO.

Q.    He told you that -- he did not encourage you to finish any product line; isn't that true?

A.    No, I don't believe that's true.

Q.    And he said that, if StarClub finished a product, then investors would expect StarClub to go to market then; right?

MR. THREATT:  Objection.  Improper impeachment, Your Honor.  I believe Counsel is reading from a document.

THE COURT:  Overruled.

THE WITNESS:  You're referring to a conversation that we had, and the conversation was about how the company was in research and development, and we were still trying to figure things out.  So I was asking him about projects.

And he was explaining to me, "Look, until we get it right we're going to pivot several times because this is what technology companies do.  Sometimes you have an idea that doesn't quite work out and you maybe need to pivot and move in a different direction."

So the conversation that you're referring to was him

explaining to me that, hey, don't get too attached to an idea because that might not be the final idea.  We may need to keep developing it more or trying moving to a different angle.  So that was what that conversation was about that you're referring to.

BY MS. TAIT:

Q.   Mr. Richards, when you met with the FBI in 2024, or early 2023, in both of those times, didn't you say that Mr. Fritsch pulled you aside and said, "If you finish any project, we cannot raise more money."

     Didn't he say that?

A.   We had a conversation --

     MS. TAIT:  I'm sorry, Your Honor, it's a "Yes" or "No" question.

     THE WITNESS:  I don't remember saying that, no.

BY MS. TAIT:

Q.   You remember saying that?  And you don't remember him saying that?

A.   Not in those words that you just said.  I remember having a conversation with him about this, but not those particular words.  I don't believe I said it like that.

Q.   You don't believe you said that Mr. Fritsch -- how about this:  Mr. Fritsch was a perpetual fundraiser.

     Do you remember saying that?

A.   No, I don't remember saying that.

Q.   Do you remember saying that he wanted to constantly new ideas so that there was always a need for investment?

A.   No, I don't remember that.

Q.   So you don't remember saying that when you spoke to the FBI?

A.   No, I don't.

Q.   But whatever you said to the FBI in your prior interviews, that was true at the time?  Yes?

A.   Yes.

Q.   Okay.  And isn't it true that you heard Mr. Guy [sic] say that Danny Guy was stupid?

THE COURT:  What?

THE WITNESS:  Yes.

MR. THREATT:  Your Honor, I am not sure.

BY MS. TAIT:

Q.   And he was stupid --

THE COURT:  Wait -- whoa.

MS. TAIT:  Oh, I'm sorry, Your Honor.  I thought it was allowed.  I apologize.

MR. THREATT:  Your Honor, I think I maybe just misheard the question.  I thought it was about Mr. Guy calling himself something.

THE COURT:  That was the question.  That's why I --

MS. TAIT:  I'm sorry, did I --

Q.   Did you hear Mr. Fritsch say Danny Guy was stupid?

MR. THREATT:  Objection, Your Honor.  Improper impeachment.

THE WITNESS:  I don't remember.

THE COURT:  Sustained.

BY MS. TAIT:

Q.   Did you hear Mr. Fritsch say Danny Guy would be happy to give Mr. Fritsch more money?

MR. THREATT:  Same objection, Your Honor.

THE WITNESS:  I don't remember.

THE COURT:  I think it's time to move on, Ms. Tait.

MS. TAIT:  Okay.

Q.   Mr. Fritsch stiffed vendors; isn't that right?

A.   I don't remember.

MR. THREATT:  Objection.  Outside the scope. Improper impeachment, Your Honor.

THE COURT:  Sustained.

MS. TAIT:  Okay.

Q.   Do you know where Mr. Fritsch got all the money to build out the Malibu house?

MR. THREATT:  Objection.  Beyond the scope, Your Honor.  Foundation.

THE COURT:  Sustained.

THE WITNESS:  I don't know.

MS. TAIT:  No, you can't answer.

THE COURT:  Don't answer.

THE WITNESS:  Oh, okay.  Sorry.

THE COURT:  Are you almost done, or should we take a break?

MS. TAIT:  We are almost done.  Just a moment, Your Honor.

THE COURT:  All right.

BY MS. TAIT:

Q.   So you testified on Direct that there were meetings, I can't remember the number you used, four or fives times a month, at the Malibu House?

A.   I didn't say four or five times a month.  I said two to three times.

Q.   Oh.  Two to three times a month.  I'm sorry, I misheard you.  So two to three times a month; is that right?

A.   I mean, there were months when we had more meetings than that, but I'm --

Q.   As an average; is that right?

A.   Average, yeah.

Q.   Two or threes times a month.

Do you know who paid for the Malibu house?

A.   I don't know.

MR. THREATT:  Objection.  Outside the scope. Foundation, Your Honor.

THE COURT:  Sustained.

THE WITNESS:  I don't know anything --

THE COURT:  Don't answer.

MS. TAIT:  Okay.  Thank you.

MR. THREATT:  Your Honor, just very briefly.

And, Your Honor, I would like to note an objection for the record that I believe Counsel was reading from 302, and I believe that would be improper impeachment.

THE COURT:  Don't make those kinds of comments --

MR. THREATT:  My apologies, Your Honor.

THE COURT:  -- on the lectern.

REDIRECT EXAMINATION

BY MR. THREATT:

Q.   Mr. Richards, just briefly.  Did you ever take notes during the meetings with the FBI?

A.   No, I didn't.

Q.   So to the extent that you were being asked about things that were contained in a document, they would not be things that you yourself wrote?

A.   No, they weren't.

Q.   Would they be someone else's recollection or a perception or interpretation of what you said?

A.   I believe so.

MR. THREATT:  No further questions, Your Honor.

MS. TAIT:  No further questions.  Thank you, Your Honor.

THE COURT:  May the witness be excused?

MR. THREATT:  Yes, Your Honor.

MS. TAIT:  Yes, Your Honor.

THE COURT:  Sir, you're excused.  Thank you very much.

We'll take a 20-minute break.  Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it's finally submitted to you.

THE COURTROOM DEPUTY:  All rise.

(Jury exited.)

THE COURT:  Have a seat.  Some of you, and you know who are, need to take a piece of paper to write on it slow down and bring it with you to the lectern when you get there.

How's Ms. Abel doing?

MR. AMINOFF:  She's all ready, Your Honor.  She's here.

THE COURT:  Okay.  So she's the one who needs to deal with this?

MR. AMINOFF:  Yes.  Should I ask her to come up and --

THE COURT:  Yeah.  I take it we're getting to this today?

MR. AMINOFF:  Yes, Your Honor.

THE COURT:  All right.  So we need to --

MR. AMINOFF:  Okay.  I'll tell her to get here.

And, Your Honor, I wanted to explain the objection that we

were made -- making to the attempted impeachment.

THE COURT:  I understand.  I understood the objection.

MR. AMINOFF:  Okay.  I just, Your Honor, I would request a limiting instruction that Counsel is reading statements that are not the witness's statements into the record.  The proper way to do that impeachment is to have the agent testify as to what he said, not physically read the document into the record.  So I would ask the Court to instruct the jury that whatever Counsel is saying is not evidence. Thank you.

THE COURT:  I've already said that, and I say it at the end in the instructions as well.

MR. AMINOFF:  Thank you, Your Honor.

THE COURT:  All right.  What?

MS. LEE:  A different topic, Your Honor, while we wait for Ms. Abel.  Given the pace we're going at, I'm hopeful that two witnesses that the defense has identified may finish before 2:30 today.  So to the extent there are additional witnesses we would appreciate knowing that, or if not, if the Court wants to hear argument on jury instructions.

MR. AMINOFF:  We need to confer.  We have two witnesses for today.  I suspect they will both finish today and then we need a minute to confer.

THE COURT:  All right.  So when is Ms. Abel getting

here?

MR. AMINOFF:  She is on her way right now.  I expect her to walk into the courtroom at any moment, Your Honor.

THE COURT:  She is not walking in, and as I mentioned before, my staff and I need a break, too.

MR. AMINOFF:  Would it make sense to go ahead and take the break, and then we can take --

THE COURT:  We are taking a break.  That's why the jury isn't here.

MR. AMINOFF:  I mean a break for the court reporter.

THE COURT:  I'm not sure why these documents, which with one exception, appear to be fully executed documents are not independently admissible.

MR. THREATT:  I think that is certainly our view, Your Honor.

THE COURT:  You didn't say that.

MR. THREATT:  Well, I believe Ms. Abel is the one who responded to the government's objections.  This is my last point.  I think she'll be here any second to maybe walk through her precise thinking in more detail for the Court.

THE COURT:  I guess I need to hear from the government.  They're contracts.

MS. TAIT:  They purport to be contracts.

THE COURT:  They really pretty clearly purport to be contracts.  Yes, otherwise known as "contracts."

MS. TAIT:  So, Your Honor, I mean, if anything from the premises that was signed by someone, it could have been admissible for that purpose that looked like a contract, I think this trial could have looked a little different.

THE COURT:  Don't get me started on how this trial should have looked.

MS. TAIT:  Okay.  Fair enough, Your Honor.

THE COURT:  These documents were found in the same place as the documents that you've been introducing on the grounds that they were business records.

MS. TAIT:  We had a witness who said that.

THE COURT:  Yes.

MS. TAIT:  Right.

THE COURT:  How she kept the files.  What she put in the files.

MS. TAIT:  Right.  Yes, she did, but she is not talking about these documents.

So, Your Honor, I mean there's documents Between Mr. Fritsch and a dead person -- in most cases, and no one is testifying that those are the actual records of StarClub.  Some of them -- and I think all of these ones that are trying to be admitted right now are -- do mention StarClub or mention its predecessor.

THE COURT:  Well, there's two different issues, whether the witness can testify and appropriately rely on them.

I assume that he's going to say that this is the kind of thing that experts in his field rely on, and that doesn't really come in, so.

MS. TAIT:  Right.  But that is what we're objecting is whether they come in.  You know what, Your Honor?  I do have some issues with this particular expert.  I noticed that his background is calculating economic damages.  His background is not reviewing company records for contracts.  So I don't know if he --

THE COURT:  You need to discuss this.  We're taking a break --

MS. TAIT:  All right.

THE COURT:  -- and it's a little late to be making that objection.  Although, if you want to Voir Dire him, of course, you can.

THE COURTROOM DEPUTY:  Court is in recess.

(A brief recess was taken.)

THE COURT:  Is there something we need to discuss? The jurors are ready to come in.

MS. TAIT:  Your Honor, I think there are some issues with respect to the Sturges's testimony.  So the Court has allowed Mr. Sturges to testify to three things as an expert -- expenses with property use for business purposes, fees paid for management, and expenses associated with travel for business, so -- and the Bohemian stuff is out.

We looked at the slides from the defense, and it looks like the financial activity -- there are a bunch of slides about pre-2014 financial activity, which is not expert testimony.  It's more in the line of what Mr. Bouchard did with respect to review of bank records.  It seems like he's just totaling things up and saying what was received from Euro-Dutch Trust and basing that on the bank records.  So that is not expert testimony.

So we'd like to have a -- if that comes in, we would like to have a dual role.  Of course, we're -- you know, we know where defense is going with Euro-Dutch.  A dual role instruction, excuse me.

With respect to the management agreements.  They are presented in the slides.  They're actually photo -- you know, pictured in the slides.  There's a lease agreement starting with --

THE COURT:  Okay.  He is not going to show those.

MS. TAIT:  Okay.  So the lease agreements have it and also the management agreements.

THE COURT:  Not going to show any agreements.  I haven't allowed them in.

MS. TAIT:  Okay.  And then --

THE COURT:  I may allow them eventually, but we're not going to decide that in the next five minutes.

MS. ABEL:  I can take them off the slides.  It was

just a -- you can't --

THE COURT:  Just take them off.

MS. TAIT:  Also, Your Honor, the proposed expert regarding management agreements, et cetera, he is a bachelor's degree person in business administration from Cal State Northridge, not an accountant.  And so, you know, I question what his expertise is to be able to opine that -- I don't know what he's going to say about the management agreements, whether he's just going to say, "I saw them and here's what they said," which is hearsay, as we've discussed or whether he's going to say anything more about whether they're legitimate.

MS. ABEL:  May I respond?

THE COURT:  Yes.

MS. ABEL:  Thank you, Your Honor.  I believe that the time to challenge Mr. Sturges's qualifications was at least three months ago when we gave initial notice regarding these experts, and certainly a month ago when we litigated this at least three times.  They've had his CV.  They could have at any moment challenged it.

The Court has already granted the limited scope of his testimony with the understanding of his qualifications.  The government has had an opportunity to raise 702 challenges, and the morning of his testimony was not it.  So the defense's position is that that argument has been waived.

In any event, of course, we will establish his expertise

and experience as relevant to his relatively limited testimony which beyond just his educational background includes his experience as a chief financial officer for several entities as well as his long 15-plus-year experience as a forensic accountant.

The defense -- separately, the defense has no objection to a limited role instruction.  We agree that his review of financial statements, just like Mr. Bouchard, is non-expert testimony and a dual role instruction makes sense.  And I will be very clear in the Direct that he is testifying as an expert only on two of his three points.

THE COURT:  All right.

MS. TAIT:  Your Honor, I mean, I think I've said my piece, Your Honor.  I leave it up to you.

THE COURT:  Right.  Have a seat.

THE COURTROOM DEPUTY:  All rise.

(Jury enters.)

THE COURT:  You may be seated.  Everyone is back. Does the defense have another witness?

MR. AMINOFF:  Yes, thank you, Your Honor.  The defense calls Eugene Izumo.

THE COURTROOM DEPUTY:  Sir, I'll have you stand right here and raise your right hand.

Do you solemnly swear that the testimony that you're about to give in the cause now before this Court shall be the truth,

the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Just watch your step, sir.

If I can have you state your name and spell your last name for the record?

THE WITNESS:  Eugene Izumo, I-Z-U-M-O.

THE COURT:  You may proceed.

MR. AMINOFF:  Thank you, Your Honor.

**EUGENE IZUMO,**

**called as a witness, by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MR. AMINOFF:

Q.   Good morning, Mr. Izumo.

A.   Good morning.

Q.   How are you employed, sir?

A.   I have an advisory firm called Acorn Advisors.  We perform investment banking services.

Q.   Let's talk a little bit about your education and experience that brought you to this point.

What is your formal education?

A.   I have an undergraduate degree in neuroscience, a master's in education, and an MBA.

Q.   Do you have any professional licenses?

A.   Yes, Series 63 and 79, which are FINRA exams for

investment banking.

Q.    And what is FINRA?

A.    FINRA's the regulatory body for investment banking.

Q.    So after you completed your MBA -- and when did you complete your MBA?

A.    2012.

Q.    After you completed it, what did you do next?

A.    I joined an investment bank in San Francisco called GCA Savvian.  This is a technology-focused investment bank.  It's now part of Houlihan Lokey, which people mainly know.

Q.    And what is your title there?

A.    I was hired as an associate, and I was promoted to VP while there.

Q.    And were you vice president of a particular division?

A.    Investment banking.

Q.    What did you do there?  What were your responsibilities?

A.    Primarily serving technology companies, but healthcare as well.  And we did capital raising and mergers and acquisition transactions.

Q.    How long were you there?

A.    I was there for four years.

Q.    And what did you do next?

A.    I went on -- since I left continued to do investment banking and capital raising in a variety capacities.  I was part of Rise Venture Consulting, where we were doing similar

work and more recently at Focal Point Partners, which is now part of B. Riley, prior to starting my own firm.

Q.   And you mentioned your own firm is called Akos Advisors?

A.   Correct.

Q.   And what do you do there?

(Interrupted by the court reporter.)

BY MR. AMINOFF:

Q.   The name of your company?

A.   Akos Advisors.

Q.   Would you mind spelling that?

A.   A-K-O-S.

Q.   Thank you.  And what do you do there?

A.   We do the same work, capitalizing and M&A.

MR. AMINOFF:  Your Honor, I would like to offer Mr. Izumo as an expert on the capital raising process.

MS. TAIT:  No objection.

THE COURT:  All right.  He's an expert in that field.

BY MR. AMINOFF:

Q.   Mr. Izumo, do you know Mr. Fritsch?

A.   No.

Q.   Have you reviewed any audited financial statements from his company?

A.   I have not.

Q.   Okay.  So we are going to just speak generally about the capital raising process today.

All right.  Just at a very high level, could you define what capital raising is?

A.    Capital raising is raising money.

Q.    Raising money, okay.

Now, does the capital raising process generally include a due diligence process?

A.    Yes.

Q.    Okay.  Could you walk us through the stages of a standard due diligence process?

A.    So the due diligence process can vary.  Dependent on --

Q.    I'm sorry, maybe let me ask you in more bite-sized pieces, perhaps.

Are there stages, generally, in a due diligence process?

A.    Yes.  Due diligence can be very time consuming and costly for investors.  So typically, it's staged out such that, there's initial business due diligence and then deeper and deeper dives, ultimately, ending in confirmatory diligence, which typically involves outside advisors, including accountants, lawyers, and industry experts.

Q.    Okay.  So then starting at the very beginning of the process, how might the due diligence process begin?

A.    So initially in any capital raise, you expect the company or its management team to be sharing, offering memorandum, or perhaps even before that, teasers, to prospective investors.

Q.    What is a "teaser"?

A.    A teaser is a very short form overview of the business. It's typically one to five pages, and it gives very high-level snapshot of what the company does, the problems its solving, the industry it's serving, as well as the market size.

Q.    So it sounds like the process begins with some sort of level of marketing by the companies; is that right?

A.    Yeah.  So it is going to be the companies' marketing itself, reaching out to perspective investors to try to garner some initial interest.

Q.    And if there is, in fact, some interest from a potential investor, what might you expect to see next?

A.    Typically, that leads into a diligence, or learning phase. It can often start with a meeting between the investors and the company management team.  So you typically see a meeting. These days, it's over video where they go through information memorandum, which might be a 15- to 20-page PowerPoint presentation, walking through the various aspects of the business and highlighting the investment opportunity.

Q.    And then what else, if anything, might you expect to happen at that initial meeting?

A.    The investors are going to usually have done a little bit of their homework prior to that meeting.  So they would have learned what they could from publicly available information about the company and thus be able to ask some questions to the management team to try to determine whether they want to spend

more resources on learning about the business.

Q.   So at the conclusion of that meeting, what would be the next expected step in the diligence process?

A.   So, as I mentioned, the investors are typically thinking about it in stages.  It's a matter of much -- they're looking at a lot of different investment opportunities.  So how much resources do you want to invest in it.  And following that meeting, assuming that they decide to move forward, they're going to want to do a much deeper dive into the company which would involve requests for various pieces of information including financial performance, financial projections, customer information, contract information, things like that.

Q.   So it sounds like it's a lot of document gathering and investigation?

A.   Yeah.  It's them doing their homework to figure out whether the investment opportunity is as strong as the marketing materials might suggest.

Q.   And after that, if the investor is interested, what might you expect to happen next?

A.   There would usually be at least a few more conversations between management team and the investors, again, to further ensure that they fully understand the investment opportunity and get to know the team as well.  And at some point, assuming this is a competitive process and there are a number of investors that are interested, the company would set a bid date

for investors to submit a term sheet.

Q.   And then -- so they set a date for potential investors to submit their bids, and then what might happen after that? Assuming some bids are submitted, what might happen after that?

A.   Yeah.  So this is what I would consider the negotiation phase.  During this time, there may be additional information gathering, what we call sharpening the pencils.  That would occur by the investors.  The company is obviously trying to get the best terms with their ideal investor.  So there's some back and forth, and ultimately, one party would be selected, and they would sign a letter of intent with the investor.

Q.   So after the letter of intent is signed, is the money just sent to the company?  Is that the end of the process?

A.   Typically, no.  At this stage, there's going to be additional confirmatory diligence.  So there is -- this is the next phase of spending by the investor, where you want to make sure that all the numbers are exactly as they say they are. All the contracts, you know, there's no gotchas in there.  So you bring in outside lawyers, accountants, due diligence professionals who the investors paying to do further analysis to the company and to verify that all the information that has been previously provided in the memos are accurate?

Q.   And then at that point, once the deals are signed and everything's verified, then the money is typically sent to the company?

A.   During that time, there's also documentation that's going on so the transaction lawyers get involved.  So there's back and forth on the detail terms around the deal.  And that phase of confirmatory diligence as well as documentation typically is going to last between 30 to 60 days.  At which point the deal is closed, and funds will be transferred.

          MR. AMINOFF:  If I could just have a movement, Your Honor?

          THE COURT:    Yes.

     (A discussion was held off the record between Counsel.)

BY MR. AMINOFF:

Q.   Thank you for your patience.  Just one more question.  I'm Going to ask you this as sort of a hypothetical.

A.   Uh-huh.

Q.   So if it was a capital raise being done for a small private company that was not yet profitable operating in the tech space and the capital raise was seeking approximately $10,000,000, would you expect the sort of due diligence that you have described today?

          MS. LEE:  Objection, Your Honor.  Relevance.

          THE COURT:  Overruled.

     You can answer.

          THE WITNESS:  Yes, $10,000,000 is a significant amount of capital, and so I would expect an investor to do a significant amount of diligence of the company before agreeing

to invest that amount of money.

BY MR. AMINOFF:

Q.    Would you expect the same amount of due diligence for a $5,000,000 capital raise?

A.    The amount of diligence is really going to depend on the investor.  They get to decide when they're willing to invest.  So it's really up to them how much diligence they're going to do.  So for some smaller venture capital firms, I think at the $5,000,000 level, they would still do a very significant amount of diligence?

Q.    Would it depend on the amount of capital controlled by the firm?

A.    It may in terms of -- if for the investor $5,000,000 is not a significant amount of capital, then you would still expect them to have a team that is doing a base level of diligence to ensure that their money is being well invested.

Q.    Is it ultimately a question of risk tolerance by the investor?

        MS. LEE:  Objection, Your Honor.  Relevance.

        THE COURT:  Sustained.

        MR. AMINOFF:  Nothing further, Your Honor.

        THE COURT:  Cross-examination?

        MS. LEE:  Yes, Your Honor.

                    CROSS-EXAMINATION

BY MS. LEE:

Q.   Hi, Mr. Izumo.

A.   Hi.

Q.   You don't know me; right?

A.   No.

Q.   You know Mr. Aminoff; right?

A.   No.

Q.   Your wife is friends with Mr. Aminoff?

A.   I'm not.

Q.   Your wife is long-term friends with Mr. Aminoff; correct?

A.   They are friends, yes.

Q.   Okay.  Since at least 2008; is that right?

A.   I am not sure when.

Q.   Is that how you came to work on this case?

A.   Their relationship -- yes, I was referred through my wife.

Q.   And your wife is also a defense Counsel; correct?

A.   Yes, she is.

Q.   And she has litigated cases against my office; right?

A.   Which office would yours be?

Q.   I am at the U.S. Attorney's Office?

A.   I am not sure of that question.

Q.   Okay.  She's litigated cases against prosecutors?

A.   Yes.

Q.   Okay.  So typically when a company hires you, what kind of investors do you work with?

A.   Venture capital firms, family offices, private equity

firms.

Q.    So is it fair to say you don't work with people investing in their personal capacity for, let's say, $500,000?

A.    Our clients are not typically individual investors, no.

Q.    And for individual investors, the due diligence process can differ from what you just testified about; right?

A.    Sure.

Q.    There is a lot of different ways to raise capital; correct?

A.    Yes.

Q.    So one of the ways that you testified about is just one of many ways; correct?

A.    Yeah.

        MS. LEE:  Mr. Flores, would you please publish Exhibit 21.  It's already in evidence.  Please go to page 3.

Q.    Mr. Izumo, do you recognize this document?

A.    I do not.

        MS. LEE:  Mr. Flores, would it be possible to scroll through page 1 and then page 2 or put them up side by side. I'm not sure how the technology.

    Page 3 and page 4, I'm sorry.

BY MS. LEE:

Q.    Mr. Izumo, just to be clear, have you ever seen this document?

A.    I don't think so.

Q.    Okay.  Just taking a quick look at it, would this be the type of teaser document that you testified about on Direct examination?

A.    This would qualify as a teaser.

Q.    Because you said a teaser is a one- to five-page introduction to a company; correct?

A.    Yes.

Q.    And this appears to be a teaser for StarClub; correct?

A.    Yes.

Q.    And a teaser is a way that a company gets potential investors; correct?

A.    I would say it's how they initiate conversations with potential investors.

Q.    And companies who are to initiate conversations with potential investors to get money from those potential investors; correct?

A.    Yes.

Q.    Do you always advise companies that you serve to tell the truth; right?

A.    Yes.

Q.    And if a company is creating a teaser, you tell companies to be truthful in these documents; right?

A.    Yes, always.

Q.    Because it's important to be truthful to investors; correct?

A.   Of course.

Q.   You testified that you are certified Series 63.  Do I have that right?

A.   63 and 79, uh-huh.

Q.   So let's focus on 63 because I don't really know what 79 is.

But 63 is an exam that financial advisors, like yourself, have to take -- or can take; right?

A.   To be an investment banker in marketing investment opportunities, it is one of the tests that you have to take, yes.

Q.   And it involved -- it covers federal and state regulations on how to be honest and ethical to investors; right?

A.   Yes.

Q.   Because being honest and ethical to investors is a federal regulation; correct?

A.   Yes.

Q.   Your experience is advising companies in capital raising; right?

A.   Yes, among other things.

Q.   And one thing you've done to gain expertise in that field is you review articles written by people in that field?

A.   Yes.

Q.   And you've also written some articles yourself; right?

A.   Yes.

Q.   So your expertise is not in advising investors; is that right?

A.   That is an interesting question.  In order to consummate a transaction, you need to advise both sides.  I mean --

Q.   Are you being paid by companies generally or by investors, generally?

A.   We also advise companies on the buy side or investment side, so both.  Majority of my experience is on what we call the sale side.  So on the company side.

Q.   So in this case, you would be advising StarClub and Mr. Fritsch and not investors; correct?

A.   Yes.

Q.   What documents have you reviewed for your testimony today?

A.   There was one investment memo, like a PowerPoint deck that I recall seeing a while back.  That's the one that I recall.

Q.   That's the only document you reviewed?

A.   That's the one that I recall.

Q.   Okay.  Have you seen any e-mails?

A.   I don't think so.

Q.   Have you talked to any witnesses in this case?

A.   No.  Well, I met somebody out in the room back there.

Q.   For purposes of your testimony?

A.   No.

Q.   Was your conversation with whoever was there part of preparing for your testimony?

A.    No.

Q.    So the only person you talked to in this case was -- to prepare for this case is Mr. Aminoff; is that right?

A.    His team, yes.

Q.    Okay.  Who on his team?

A.    Jimmy as well.

Q.    Mr. Threatt?

A.    I hadn't met them, like, in person.  So I don't actually know them.

Q.    Okay.  But you haven't talked to the defendant; correct?

A.    No.

Q.    And you never advised him; right?

A.    No.

Q.    And if you had advised him, you would have told him to tell the truth to investors; right?

A.    Yes.

Q.    Have you watched any of the trial in this case?

A.    No.

Q.    Up to today, how much have you been paid to be an expert in this case?

A.    I think my rate is $300 and hour, and maybe four hours.

Q.    Are you getting paid to testify today?

A.    Yes, I am.

Q.    The due diligence process for investing in a Canadian company can differ from the due diligence process for investing

in a Santa Monica start-up; right?

A.    The due diligence process can vary widely.

Q.    The due diligence process for investing in an oil and gas company can differ from the due diligence process for investing in a technology start-up; right?

A.    Sure.

Q.    For example, a start-up company might have a shorter history of financials than an oil and gas company?

A.    Sure.

Q.    And someone who is investing who is a friend might have a different due diligence process from someone who's investing who's a complete stranger to the founder of a company; right?

A.    It's always up to the investor.

Q.    So I'm correct that the due diligence process may vary; correct?

A.    Yes.

Q.    That is fine; right?

A.    Yeah.  It's whatever the investor wants.

Q.    The only thing that actually matters is that the founder can't lie in investments; correct?

A.    Investors should not be lying.

Q.    Investors should not be lying, and founders should not be lying.

A.    Founders should not be lying.

Q.    No one should be lying in this process?

A.    Nobody should be lying.

Q.    Okay.  So someone who's investing in a company and is e-mailing and calling the founder on a weekly basis might have a different due diligence process from someone who's investing for the first time in a company; right?

A.    Sure.

Q.    And it's reasonable for the investor to rely on the conversations between the investor and the founder; right?

A.    Sure.  Yes.

Q.    And one thing that investors appreciate is transparency; correct?

A.    Of course.

Q.    And incomplete information or documentation during due diligence can signal risk to investors; right?

A.    Sure.

Q.    And one thing that you advise founders is to manage the process with transparency and professionalism; right?

A.    Of course.

Q.    It's important for companies involved in a capital raising process to have accurate financials; correct?

A.    Yes.

Q.    And it's important for them to present accurate financials to investors; right?

A.    Yes.

Q.    In fact, one of the top ten pitfalls to avoid when selling

a business -- out of those top ten pitfalls, number 1, is having unorganized financial records; right?

A.    Sure.

Q.    That is what you wrote on your website; right?

A.    Yes.  If that was number 1, then that's number one.

Q.    Number one is having unorganized financial records; right? That's number 1 on the top ten pitfalls to avoid for your clients?

A.    Yes.

Q.    And that's important because investors rely on figures like revenue to increase their confidence in a company; correct?

A.    Definitely.

Q.    Definitely?

A.    Definitely.

Q.    And declining financial performance, like low revenues, could be concerning to investors; right?

A.    Of course.

        MS. LEE:  So Mr. Flores, would you please publish Exhibit 4?

    And if you could zoom in on the middle e-mail that starts "Hi, Danny"?

Q.    Mr. Izumo, you have not read this e-mail; correct?

A.    I have not.

Q.    This is the first time you're reviewing this e-mail?

A.   Yes.

MR. AMINOFF:  Objection, Your Honor.  I think we're getting a bit beyond the scope at this point.

MS. LEE:  I'm asking about the importance of diligence.

THE COURT:  All right.

BY MS. LEE:

Q.   Okay.  Mr. Izumo, I'm just going to read a part of this to you, beginning on the third line down, beginning, "It does not change."

This is an e-mail from Mr. Fritsch to Danny Guy.  "It does not change the fact that we need cash now to produce revenues, which is highly important, as revenues will drive up the share price tremendously."

Did I read that correctly?

A.   Yes.  And is -- Danny is the investor?

Q.   That doesn't matter.  I'm just going to ask you:  Do you agree in some cases that revenues can drive up a share price tremendously?

A.   Sure.

Q.   And do you agree that revenue can be highly important?

A.   Yes.

Q.   Okay.  Thank you.

And when a founder lies about a company's revenues, that is not optimism; right?

A.   Lying is not optimism, no.

MR. AMINOFF:  I'm going to object again as beyond the scope.

THE COURT:  Yes, I think you're getting beyond the scope of testimony.

BY MS. LEE:

Q.   You don't advise your companies --

THE COURT:  Take this off the screen, please.

BY MS. LEE:

Q.   -- to lie about revenues; correct?

MR. AMINOFF:  Objection, Your Honor.  I think it's cumulative at this point.  We've covered all of this.

THE COURT:  Move on please.

MS. LEE:  Okay.

Q.   You also do not advise your companies to lie about potential M&A transactions; right?

MR. AMINOFF:  Objection again, Your Honor.  Same objection.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  Can you repeat question, please?

BY MS. LEE:

Q.   Yes.  You do not advise companies to lie about potential M&A transactions; correct?

A.   We never advise our clients to lie.

Q.    And, in fact, one thing that you advise companies and founders to do is to highlight potential strategic M&A opportunities; right?

A.    Sure.

Q.    Because a potential M&A transaction is attractive to potential investors; right?

A.    Generally, yes.

        MR. AMINOFF:  I think this goes beyond the scope.  We didn't cover M&A's.  Actually, I think it should be excluded.

        MS. LEE:  It's part of the diligence process.

        THE COURT:  Move on.

BY MS. LEE:

Q.    Final question.  You do not advise founders to lie about the current investors in their company; right?

        MR. AMINOFF:  Objection, again, Your Honor.

        THE COURT:  Overruled.

    You can answer.

        THE WITNESS:  We do not advise our clients to lie.

        MS. LEE:  Okay.  No further questions.

        THE COURT:  Redirect?

        MR. AMINOFF:  Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. AMINOFF:

Q.    Just a couple of quick questions, please.

    Mr. Izumo, when was the first time you and I met in

person?

A.    This morning.

Q.    Shortly before you took the stand?

A.    Yesterday.

Q.    Your wife works for the County; is that right?

A.    That's right.

Q.    She does not work for the Federal Public Defenders Office?

        THE COURT:  You need to answer.

        THE WITNESS:  She works for the County.

BY MR. AMINOFF:

Q.    She does not work for the Federal Public --

A.    She does not work for the Federal Public Defenders Office, no.

        MR. AMINOFF:  Would you mind doing that side-by-side thing?

        MR. FLORES:  Sure.

        MR. AMINOFF:  Thank you.

Q.    Mr. Izumo, I believe you testified on Cross-examination that this document appears like a teaser?

A.    Yes.

Q.    And I think you said on Direct Examination that a teaser is a type of document that you might expect to begin a capital raising process?

A.    Yes.

Q.    You would never expect someone to invest based on a teaser

alone, would you?

A.    Generally, not, but it's up to the investor.

Q.    Ultimately, if the investor wants to gamble, that's up to the investor?

A.    It's always up to the investor.

Q.    But as an industry standard, would you ever expect someone to invest based on a teaser alone?

A.    No.  I would not expect them to invest on a teaser alone.

MR. AMINOFF:  If I can have a moment, Your Honor?

THE COURT:  Yes.

MR. AMINOFF:  Thank you, Your Honor.  Nothing further.

Thank you, Mr. Izumo.

MS. LEE:  I have two questions, Your Honor.

THE COURT:  All right.

RECROSS-EXAMINATION

BY MS. LEE:

Q.    You can keep it up.

Mr. Izumo, a teaser is intended to initiate a potential investment; correct?

A.    Uh-huh.

Q.    Is that "Yes"?

A.    Yes.

Q.    For the court reporter.

A.    Yes.

Q.    And you do not advise founders to lie on teasers; right?

You do not advise founders that; right?

A.    I never advise founders to lie.

Q.    Thank you.

THE COURT:  May the witness be excused?

MR. AMINOFF:  Yes, Your Honor.

MS. LEE:  Yes, Your Honor.

THE COURT:  Thank you very much, sir.  You're excused.

Does the defense have another witness?

MS. ABEL:  Yes, Your Honor.  Call Trevor Sturges.

THE COURTROOM DEPUTY:  Sir, please step up and stand right here so I can swear you in.

Do you solemnly swear that the testimony that you're about to give in the cause now before this Court shall be the truth, the whole truth, and nothing but the truth so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE COURTROOM DEPUTY:  If you can watch your step going.  Sir, if I could have you state your name and spell your last name for the record?

THE WITNESS:  Absolutely.  Trevor Sturges, S-T-U-R-G-E-S.

**TREVOR STURGES,**

**called as a witness, by the Defense, testified as follows:**

DIRECT EXAMINATION

BY MS. ABEL:

Q.    Thank you.  Good morning.

A.    Good morning.

Q.    Can you please start by describing your academic background?  And for the assistance of everyone and the jurors, I'll be bringing up slides to guide our morning.  But can you describe your academic background?

A.    Certainly.  I have a bachelors in business administration from California State University Northridge.

Q.    And can you explain your experience -- can you tell us what you do for a living?

A.    Sure.  Currently, I'm a director at Resolution Economics where I focus on litigation consulting.  That entails expert witness testimony like I'm here today doing.

         (Interruption by the court reporter.)

             THE WITNESS:  Yeah, sorry about that.  I do tend to speak too fast.

    Where I focus on investigations, economic damages.  That type of work.

BY MS. ABEL:

Q.    Can you please describe your experience with corporate finance and accounting?

A.    Certainly.  I've been with Resolution Economics for 11 years.  Five of those years was actually as the chief financial

officer, or CFO.  I was involved or responsible for all financial reporting in all accounting aspects in multiple LLCs that fell under the Resolution Economics umbrella.

Q.    And can you just generally describe what financial accounting experience you have aside from the CFO roles?

A.    Yeah, certainly.  I've been -- let's see.  I joined PricewaterhouseCoopers.  It's one of the world's largest accounting firms back in 1997, and I did what's called financial advisory services, which was again, investigations, economic damages.  Those entailed us looking at audited financial statements, manage reports, all sorts of corporate records.

Q.    And what were the tasks you were asked to complete as part of your role in this case?

A.    Sure.  I believe I do have a slide that kind of summarizes my scope of work.  But first, I was asked to review and analyze bank records prior to 2014.

Second, I was asked to review the lease agreement between StarClub, or its predecessor, at 3229 Rambla Pacifico, Inc.  Or LLC, sorry.  Oh, it is an Inc.  And I was also asked to review and analyze a management agreement between StarClub and GMI.

Q.    And which one of those -- which of those tasks required your expertise and experience as a forensic accountant and CFO?

A.    I put on my expert cap, if you will, for items 2 and 3, which was the lease agreement and management agreement.

Q.    And your review of the bank statements, was that done as a non-expert, based on your review of the books?

A.    Certainly.

        MS. ABEL:  I would move now to admit -- to qualify Mr. Sturges as an expert in the field of forensic accounting as to items 2 and 3 related to 3329 and GMI.

        MS. TAIT:  No objection.

        THE COURT:  All right.  He's so certified -- qualified.

        MS. ABEL:  Thank you, Your Honor.

Q.    Let's start with the relevant financial activity that occurred prior to 2014.

    So as part of your review here, did you review bank statements?

A.    Exactly what I reviewed, yes, amongst other documents.

Q.    And you were provided bank statements pertaining to accounts associated with several different entities?

A.    Yes.  There was StarClub.  There was GMI.  There was 3229, StarSite.  There was some other ones, as well.

Q.    Based on your understanding, who obtained these bank statements?

A.    The government.

Q.    Have you reviewed financial spreadsheets prepared by the government in this case?

A.    I sure have.

Q.    Based on your understanding, what years do the government's spreadsheets cover?

A.    I believe it was January 1, 2014, to approximately July 2017.

Q.    Did you review any analysis of bank statements done by the government covering years prior to 2014?

A.    I don't believe they existed.

Q.    Did you conduct an analysis of bank statements obtained by the government for the years prior to 2014.

A.    I certainly reviewed those, yes, and that is my summary, my findings.

Q.    Okay.  Stop.

        THE COURT:  You really need to slow down.

        THE WITNESS:  Thank you.  Sorry, ma'am.

BY MS. ABEL:

Q.    Have you reviewed bank activity for StarClub bank accounts prior to and post-2014?

A.    I have

Q.    And I'm speaking specifically about StarClub now.

A.    Thank you.

Q.    How many approximately StarClub bank accounts did you review?

A.    Half a dozen.  Yeah, probably six.

Q.    Are you familiar with the type of transactions in those accounts pre- and post-2014?

A.    Yes, by review -- by me reviewing the bank statements, I'm familiar.

Q.    Did you see any substantial differences in the type of transactions in the StarClub accounts prior to and post-2014?

          MS. TAIT:  Objection.  Vague as to what post extends to.

          THE COURT:  Sustained.

BY MS. ABEL:

Q.    Did you see any substantial differences in the type of transactions in the StarClub accounts prior to 2014 and post-2014 through 2017?

A.    No.  I think the wire activity was very similar in terms of entities coming in and going out of those accounts.

Q.    Same questions related to the GMI accounts.  Did you review the GMI accounts prior to and post-2014?

A.    I did.

Q.    If you will recall, when was the GMI account opened?

A.    I think it goes all the way back to 2004, if memory serves me correct.

Q.    Looking at the activity prior to and post-2014 through 2017 for the GMI account, did you see any substantial differences in the type of transactions that flowed through that account?

A.    Just like similar to the StarClub account we were just talking about, there were similar amounts coming in and amounts

going out both pre- and post-2014.

Q.    Last, we'll talk about the 3229 account.  You have reviewed account activity prior to and post-2014 for the accounts associated with 3229 Rambla?

A.    I have.

Q.    And you are familiar with the type of transactions in those accounts?

A.    I am.

Q.    Did you see any substantial differences in the types of transactions in the 3229 Rambla account prior to and post-2014 through 2017?

A.    Just like the other two accounts we just spoke of, similar amounts -- similar wire coming in, similar wires going out both pre- and post-2014.

Q.    I want to drill down a little bit on your work reviewing the account statements prior to 2014.  Did you review monthly statements for those accounts?

A.    For any monthly bank statements, yes.

Q.    Did you review all of the statements that the government obtained that were available for those years?

A.    For the pre-2014 --

        MS. TAIT:  Objection.  Foundation.

BY MS. ABEL:

Q.    Did you review all of the statements that the government obtained that were available for the pre-2014 years?

MS. TAIT:  Objection.  Foundation as to how this witness knew what was obtained.

MS. ABEL:  I think it could be rephrased, Your Honor, For example, all the statements the defense provided.

THE COURT:  Okay.  I'm up here so stop talking to each other.  Why don't you lay a little bit more foundation, please, Ms. Abel.

MS. ABEL:  Certainly.

Q.    Earlier, we talked about your understanding regarding what the government obtained in terms of financial accounts; is that right?

A.    That's right.

Q.    You discussed that there were bank statements that the government obtained; is that your understanding?

A.    That is my understanding, yes.

Q.    And is it your understanding that the defense provided you with the bank statements for those accounts prior to 2014?

A.    That is my understanding.

Q.    Have you reviewed all the statements that were provided?

A.    I did.

Q.    And to the extent you recall, were those bank account statements numbered, Bates numbered in the bottom right-hand corner?

A.    They sure were.

Q.    In your review of those pre-2014 bank statements provided

from the government, then to the defense, and then to you, did you find that certain accounts were missing?

A.    Certain accounts were missing from the government's list of accounts they reviewed post-2014, yes.

Q.    Okay.  Did you see any statements for the StarClub business checking account ending in 7477?

A.    I did not for 74 -- yes.

Q.    Sorry.  We're talking -- I'll let you finish.  Repeat that.

A.    I did not see any statements for that account.

Q.    How do you know that the 7477 exists?

A.    There were wires going out to that account, and I believe also coming in from that account from another StarClub account.

Q.    Okay.

A.    And the def. D description was StarClub business checking.

Q.    Are there some account statements bank activity that you reviewed that the government did not analyze?

A.    I believe there was one StarClub account that ended in 0551, testing my memory here, that I did see in the analysis from the government.

Q.    Okay.  Let's take a look at that.

        MS. ABEL:  Government Exhibit 900, please.

Q.    Have you see this document before?

A.    I have.

Q.    What do you understand it to be?

A.   A list of accounting included in the government's analysis.

Q.   Do you see the StarClub business checking account ending 7477?

A.   I do not.  But if you could click to the second page, that would be great.  I do not see it there.

Q.   I'm going back to the first page.  Do you see the StarClub Wells Fargo account ending in 0551?

A.   I do not.

     MS. ABEL:  You can take that down.

Q.   In reviewing the pre-2014 statements, did you see any amounts from an entity Euro-Dutch?

A.   I did.

     MS. TAIT:  Objection.  Relevance, Your Honor.

     THE COURT:  Sustained.

     MS. TAIT:  Move to strike, Your Honor.

     THE COURT:  It will be stricken.

     MS. TAIT:  Can you put the slide down, Your Honor?

     THE COURT:  Yes.

     MS. ABEL:  Your Honor, may I have just one moment?

     THE COURT:  Yes.

     MS. ABEL:  Thank you.

   (A discussion was held off the record between Counsel.)

     MS. ABEL:  Thank you, Your Honor.  May we have a brief sidebar?

(Sidebar commenced.)

MS. ABEL:  My understanding, confirmed with my colleague -- this is Rebecca Abel for defense -- is that it was prior testimony regarding the Euro-Dutch entity and Mr. Fritsch's relationship to the entity, and that was the evidence that is relevant of Mr. Sturges's testimony on this particular point.

MS. TAIT:  Ms. Abel, I believe there is no testimony available of Mr. Fritsch's relationship to the entity in terms of relevance to prove that it is Mr. Fritsch's money.  I believe that the testimony was not coming in that way we continue to believe this is not relevant to this document?

MR. THREATT:  Your Honor, I thought it was clear from Mr. Gruenbeck that Euro-Dutch managed the Trust that contains Mr. Fritsch's family money.  Whether the evidence that Mr. Gruenbeck was raising has similar transactions, I feel like we established the relationship between the Euro-Dutch entity and the Fritsch Family Trust, which is the original family trust. And as Ms. Abel saw, this was the follow-up to that point that we got in through Mr. Gruenbeck.

MS. TAIT:  This is Ms. Tait.  The fact that the Trust company is a Trustee interest is not new.  That the Trust company is the original Trust.  The Trustee is a separate entity from beneficiary and that does not prove that at all.

MS. ABEL:  Your Honor, that is obviously up to the

jury.  We met relevance.

THE COURT:  One more question.

MS. ABEL:  We believe the transactions as well as Euro-Dutch to satisfy the connection to Euro-Dutch.

THE COURT:  It doesn't tell this whole thing.

MS. ABEL:  I'm sorry?

THE COURT:  We just went through this whole thing, didn't we?

MS. ABEL:  Right.  Your Honor, I established that the Trust is who controls the money.  At this point the jury has no idea what kind of money we're talking about.  It could be $1. We have established that it is not handled by Mr. Fritsch.

MS. TAIT:  There is no evidence that Mr. Fritsch controls the money at all.

THE COURT:  There is no evidence to that.

MS. ABEL:  Understood.

MR. AMINOFF:  Jonathan Aminoff for defense.  I found one of the issues this morning that we talked with the relevance of Mr. Gruenbeck's testimony.  And I think one of the important things about it was the fact that Euro-Dutch controlled Mr. Fritsch's Trust, I think it at least creates some inference for analysis that it is fully possible that it is Mr. Fritsch's money that was coming through Euro-Dutch.  It is a profound coincidence that this Trust management company in the Bahamas was investing in Mr. Fritsch's company at the same

time controlling his Family Trust.  So I think that it at least makes it relevant and allows us to argue that this is Mr. Fritsch's money.

The evidence also introduce that Euro-Dutch is an investor in StarClub.  That point seems to be beyond dispute at this point.

MS. TAIT:  The government did not introduce a document that Mr. Fritsch sent to Mr. Guy which was, in part, fabricated and, in part, true and admitted that a certain entity who were or were not investors.

MR. AMINOFF:  This is Jonathan Aminoff again.  I think the government's expert, non-expert, was testifying as a free agent accountant.

THE COURT:  All right.  Go ahead.

MR. AMINOFF:  Thank you, ma'am.

(Sidebar concluded.)

BY MS. ABEL:

Q.   Sorry for that, Mr. Sturges.  We'll just very briefly look at a few transfers here.  So I think we were talking about your review of monthly statements prior to 2014, and then I asked you, in reviewing the pre-2014 statements, did you see any amounts from Euro-Dutch?

MS. TAIT:  Same objection, Your Honor.

BY MS. ABEL:

Q.   Sir, can you just lean forward, because I don't think

it's --

A.   Yes, I did see amounts coming into --

THE COURT:  Overruled.  When there's an objection, you need to wait for me to rule, sir.

THE WITNESS:  Sorry, ma'am.

THE COURT:  Go ahead.

BY MS. ABEL:

Q.   Can you -- and I brought them up for reference.  Can you explain the amounts you saw coming into the StarClub account from Euro-Dutch?

A.   Yeah.  I've highlighted on the screen here a couple of examples.  There is a $500,000 amount coming in April 2012.  And I believe there is another $500,000 coming in from Euro-Dutch in February of 2012.

Q.   Okay.  And I'm going to take these slightly out of order.  My apologies.

Taking a look at this slide, were there other amounts coming into the Mastertec account from Euro-Dutch?

A.   Yeah.  As you'll see here, there's a $100,000 in March 2012 coming in from Euro-Dutch.

Q.   Okay.  Did you see any amounts coming in from Trident?

A.   I did.

MS. TAIT:  Objection.  Relevance, Your Honor.

THE COURT:  Overruled.

BY MS. ABEL:

Q.   I am going to go back, for ease of use, while looking at the same thing -- sorry for that.  There we go.  Can you tell us about the amounts you saw coming in from Trident?

A.   I sure can.  There was $7.5 million in May 2012 going into a StarClub Ltd account.

     (Interrupted by the court reporter.)

BY ABEL:

Q.   Can you just repeat that?

A.   $7.5 million.

Q.   Coming in from?

A.   Coming in from Trident to StarClub in May 2012.  There was $4.5 million from Trident going into StarClub account in June 2012.

Q.   So just on this slide alone, amounts coming in from Euro-Dutch and Trident totaled $13 million?

A.   Approximately, yes.

Q.   Okay.  And again, this is a statement that's pre-2014.  So these are statements the government did not analyze; is that right?

A.   I did not see any analysis from the government.

Q.   Okay.  In reviewing the pre-2014 statements, did you see amounts transferred between StarClub accounts?

A.   I did.

Q.   Let's go over some examples.  Can you describe what this transfer concerned?

A.    Yeah.  This is account number 9717, $1.5 million was coming from StarClub account 7995.  In other words, what transferred from one StarClub account to another.

Q.    Okay.  And let's look at just another example.  I believe I'm on 8.  Yep, slide 8.

Can you describe the transfer you see there?

A.    Yeah.  This is from account number 6339.  Received $183,000 from StarClub account 7995.

Q.    And did you also see money pre-2014 being transferred between the entities that you reviewed GMI, StarClub, Mastertec, 3229 Rambla?

A.    I did.

Q.    Okay.  Why don't we take a look at one of those examples. Can you describe the transfers you see on this slide?

A.    Sure.  We're looking at a GMI bank statement for September 2012.  And you can see $100,000 came in from StarClub, and $470,100 came in from US Mastertec.

Q.    And similar here, can you describe the transfers on slide 10, please?

A.    Sure.  The account listed here is for 3229 Rambla.  The account number is 6313.  The date is October 2012, and this account received 50,000 from StarClub account 7477, and 125,000 from StarClub account 0551.

Q.    Are these transfers consistent with the way the StarClub accounts were used post-2014 through 2017?

A.    Based on my review, yes, it is.

Q.    We talked earlier about the transfers that came in from Trident and Euro-Dutch.  Did you also see money transferred out of the accounts during this period pre-2014?

A.    Of course.

Q.    Let's transition to your expert opinion related to contracts and agreements that you reviewed.  I want to start with money paid -- this is money that was paid from StarClub to 3229 Rambla or GMI; is that right?

A.    That's right.

Q.    And I understand you reviewed bank activity related to the 3229 Rambla and GMI accounts?

A.    I did.

Q.    Did you review any other documents related to money paid to 3229 Rambla and GMI accounts from StarClub?

A.    I did.  I reviewed a lease agreement and a management agreement.

Q.    And why did you review those documents?

A.    I was looking to see if there was reason for amounts to be paid from StarClub to 3229 or StarClub to GMI.

Q.    And let's talk a little bit about those agreements.

        MS. TAIT:  Your Honor, objection.  Request a limiting instruction 703.

        THE COURT:  What do you want the instruction to be?

        MS. TAIT:  The substance of the agreements do not

come in for their truth.

THE COURT:  Well, they're not coming in at all yet, so.

MS. ABEL:  Your Honor, may I continue to lay foundation?

THE COURT:  Yes.

MS. ABEL:  Thank you.

Q.   Let's talk about those agreements you were just talking about.  Who produced those contracts, to the extent you know?

A.   Government.

Q.   Okay.

MS. TAIT:  Actually, Your Honor, misstates the facts.  Vague as to the word "produced," Your Honor.

THE COURT:  He doesn't know.  So that answer will be stricken.  Ask a different question.

BY MS. ABEL:

Q.   Based on your understanding of the evidence, where were these contracts located?

A.   StarClub offices in Santa Monica.

Q.   Based on your understanding of the evidence, where were they stored?

MS. TAIT:  Objection, Your Honor.  Lacks foundation.

THE COURT:  Sustained.

MS. ABEL:  Can I --

THE COURT:  You can, just --

MS. ABEL:  Okay.

Q.    Based on your understanding, did these contracts appear to be stored during the ordinary course of StarClub's business?

MS. TAIT:  Objection.

THE COURT:  Stop that.

MS. ABEL:  Okay.

Q.    Did you review any audited financial accounts?

MS. TAIT:  Objection.  Relevance.  Beyond the scope of the testimony.

THE COURT:  Sustained.

MS. ABEL:  Your Honor, it's relevant to establishing the value -- the importance of the contracts.  It lays foundation for the contracts themselves.

THE COURT:  Ask a different question.

MS. ABEL:  Certainly, Your Honor.

Q.    As part of your expertise, do you rely on audited financials?

A.    All the time.

Q.    Okay.  And why do you rely on audited financials?

A.    They are actually audited by an independent third-party, and they are signed.  They are the third-party's opinion as to whether or not they are accurate.

Q.    Did you review any audited financials for StarClub?

MS. TAIT:  Objection.  Relevance.  And hearsay with respect to the underlying documents.

THE COURT:  Overruled.

BY MS. ABEL:

Q.   Did you?

A.   I did.

Q.   Okay.  When you reviewed those audited financials, did those statements -- audited financials discuss the contracts that we're talking about?

MS. TAIT:  Objection.  Hearsay.

THE COURT:  Sustained.

BY MS. ABEL:

Q.   In the audited financials, was there reference to the contracts we were just discussing?

MS. TAIT:  Same objection.

THE COURT:  Overruled.

THE WITNESS:  Yes, there was.

BY MS. ABEL:

Q.   And based on your understanding of the audit process, do you understand that those contracts would have reviewed by the auditor?

A.   It would have.

MS. TAIT:  Objection.  Foundation.  It's hearsay as well.

THE COURT:  Overruled.

BY MS. ABEL:

Q.   I'm sorry, can you just repeat your answer?

A.    They would have, yes.

Q.    Thank you.  Do you regularly rely on evidence cited in audited financials?

A.    Yes.

Q.    Would that include contracts like the ones you reviewed here?

A.    Yes.

Q.    Based on your training and experience as a forensic accountant and chief financial officer, would you reasonably rely on contracts like the ones for 3229 and GMI in your analysis?

A.    Yes.

Q.    Why do you rely on them?

A.    One, as we just spoke, they were reviewed by an auditor and mentioned in the audited financial statements.

      And, two, you know, based on my experience, these are not out of the ordinary.

Q.    Based on your expertise in conducting an analysis of corporate expenses in this case, did you consider these contracts in reaching your conclusions?

A.    I did.

        MS. ABEL:  Your Honor, based on that foundation, the defense would move to admit 1756, 1757, 1759, 1760, 1761, and 1762 under Rule 703.

        THE COURT:  I am not admitting them at this time.

MS. ABEL: Okay. For purposes of Mr. Sturges's testimony, does the defense have permission to discuss them without showing them?

THE COURT: Limited discussion.

MS. ABEL: Certainly, Your Honor.

Q. Let's start with 3229 Rambla. Based on your review of the contracts, who were the parties to -- based on your -- excuse me. Retract that.

Let's talk about 3229 Rambla. What was the contract that you reviewed relevant to 3229 Rambla?

A. It was a lease agreement.

Q. Who were the parties to the agreement?

A. The tenant was 877 Media, Inc., which is, in essence, StarClub. And the landlord was 3229 Rambla Pacifico.

Q. And when was the contract executed?

A. Began in January 2009.

Q. Generally, what was the purposes of the contract?

A. It was for rental payments --

MS. TAIT: Objection. Hearsay, Your Honor.

THE WITNESS: -- between StarClub --

MS. ABEL: Stop. Sorry.

THE COURT: Sustained.

BY MS. ABEL:

Q. The lease agreement that you described, what was the subject of the lease agreement? The property?

MS. TAIT: Objection. Hearsay, Your Honor. 703.

(Sidebar commenced.)

THE COURT: So nobody answered my question when I asked it before. Why are these documents just admissible as -- I forget the verbiage. They've changed the term since I left law school -- verbal acts or documents that have indicated certain terms.

What do you call them now?

MS. TAIT: There is no condition -- there is no foundation that these are real documents. The signature on this line is Mr. Fritsch, and the other signator is dead.

THE COURT: Didn't we have the signature authenticated in this case? It doesn't matter if the other person is dead. There's one document that doesn't have signatures on any page.

MS. ABEL: I didn't move this in. That was not one I did not include my list.

MS. LEE: Your Honor, Sarah Lee. While legally operative documents are admissible, you need someone to authenticate it. Someone with personal knowledge who can say, "I know what this contract is, and this is how I know about it."

Here, we just have some expert who just was handed this. I can write a contract, forge my signature on it, and have my sister --

THE COURT:  Stop.  Go ahead.

MS. ABEL:  So they're admitted, Your Honor?

THE COURT:  Yes.

(Sidebar concluded.)

BY MS. ABEL:

Q.   All right.  Why don't we start again just briefly.  So we were talking about the lease agreement between 3229 Rambla and StarClub.  And generally, what was the purpose of that contract?

A.   It was for rental payments for a facility where they had offices.

Q.   What was the address?

A.   3229 Rambla Pacifico.

Q.   Initially, what was the amount of that lease agreement?

A.   Do you mind putting the slides back up?

Q.   No, no.  Thank you.

A.   It was $60,000 per month.

Q.   Again, this is a contract you relied on in forming your opinion?

A.   That's correct.

MS. ABEL:  And I would again move to admit 1756.

THE COURT:  That's admitted.

(Exhibit 1756 was received into evidence.)

BY MS. ABEL:

Q.   Were there any amendments to that agreement?

A.    There were.

Q.    Did the amendment modify the terms?

A.    It did, yes.

Q.    How did it modify them?

A.    It reduced that rental amount for a short period of time and then increased the rental amount per year for a short period -- per month for a short period of time.

Q.    When did those changes take effect?  If you don't recall, please let me know.

A.    I believe -- God, I think it was either -- I don't recall actually to tell you the truth.

Q.    Okay.  Would it refresh your recollection to look at the contracts?

A.    Yeah, it would.

Q.    Can you open the binder -- I hope it's in front of you -- to 1757?

A.    Actually, it is not 1740.  It ends.

Q.    Are there other white binders up there, or have we --

A.    There's white binders here.

Q.    Okay.

          THE COURT:  Volume 3 of 3.

          MS. ABEL:  Thank you.

          THE WITNESS:  Volume 1, Volume 3.

     Can you repeat the number?

BY MS. ABEL:

Q.   Yes, of course, 1757.

A.   Here it is.

Q.   Is that the amendment to the lease agreement we were just discussing?

A.   It is.

Q.   Okay.  Did you rely on that document when forming your opinion?

A.   I did.

        MS. ABEL:  Move to admit 1757.

        THE COURT:  That's admitted.

     (Exhibit 1757 was received into evidence.)

BY MS. ABEL:

Q.   Again, we were talking about how that modified the terms. Does that refresh your recollection as to when those modified terms took effect?

A.   Yeah.  The rental payments changed from -- beginning in January 1, 2013.

Q.   And then -- and what did they change to?

A.   Sorry, to 25,000 per month, and then they went up to 80,000 per month.

Q.   Okay.  Based on your expertise in forensic accounting and as a CFO, are corporate leases like this common?

A.   Yeah.

Q.   Based on the terms of the lease agreements, the original and the amendment, how much was 3229 Rambla entitled to

received from StarClub during the period from 2014 to 2017?

A.    I believe it's -- yeah, it is $2,681,773.

Q.    I see that there is some sort of reverse engineering.  How did you come up with the amounts for 2014, 2015, and 2016?

A.    Based on the agreements we just spoke about.  And, you know, some of the rental payments were for the first six months of the year, and it changed for the second six months.  So I did a calculation to come up with the annual amount.

(Interrupted by the court reporter.)

THE WITNESS:  I'm sorry, once again.

I did some calculations to come up with the amount per year for simplicity's sake.

BY MS. ABEL:

Q.    Underneath you have a note regarding payments that pre-date 2014.  Do you see that?

A.    I do.  As we just spoke, the lease actually became effective in 2009.  I summarized the total of those lease payments from 2010 to 2016, and those are approximately $5.5 million.

Q.    And is it -- based on your review of the documents in this case, including these lease agreements and your expertise as a forensic accountant and CFO, is it your opinion that the amounts that StarClub paid to 3229 Rambla pursuant to these agreements were corporate expenses?

A.    Yes, they were.

Q.    Aside from the documents we were just talking about, in general, in determining whether the amounts paid to 3229 were corporate expenses, are there general principles you apply?

A.    You look at the expenses, the expenses, you look at the industry in which the company is in, and based on your own experiences running a business, yeah, you can determine whether an expense is corporate or personal.

Q.    When you talk about whether an expense is corporate, does it help to look at what the business does?

A.    Absolutely.

Q.    What is your understanding of StarClub's business?

A.    I understand they were in the business of attracting celebrities and other influencers to help them promote their online presence, or their social media presence.

Q.    Does that inform your understanding of whether the payments that StarClub made to 3229 Rambla were for corporate expenses?

A.    Certainly helps.

Q.    In what way does it inform your understanding?

A.    It tells me what industry they're in.

Q.    How does it inform your opinion that the expenses from StarClub to 3229 Rambla were for corporate purposes?

A.    Well, I understand from Jim Polsen's interview that that --

        MS. TAIT:  Objection.  Hearsay, Your Honor.

THE COURT:  Sustained.

BY MS. ABEL:

Q.   Without discussing any specific evidence that you're thinking of, what do you understand about why 3229 Rambla property -- the payments to the 3229 Rambla property were for corporate expenses?

A.   Oh, yes, certainly.  It was used for work purpose, i.e., entertaining perspective clients.

Q.   So let's transition now to talking about GMI.  There were a separate set of agreements between StarClub and GMI.  And when I say "GMI," we're referring to Greenwich Music, Inc.; is that right?

A.   That's right.

Q.   Okay.  And were there a separate set of agreements between StarClub and GMI?

A.   There was a management agreement, yes.

Q.   Who were those contracts between?

A.   877 Media, or StarClub, and GMI.

Q.   When was the first of the management agreements executed?

A.   It began in January of 2009.

Q.   And again that was five years --

(Interrupted by the court reporter.)

THE WITNESS:  Yes.

BY MS. ABEL:

Q.   That was five years before the events charged in this

case?

A.    That's five years before 2014, yes.

Q.    And what did the management agreement provide for?

A.    For services between GMI and StarClub, for certain executives that were already employed or working with GMI.

Q.    And what was the term of the initial agreement?

A.    I think it was five years.

Q.    In the initial agreement, what was the amount of compensation paid to GMI for the management services under the contract?

A.    Initially, it was 300,00 per year.

Q.    Was the management agreement ultimately extended?

A.    It was.

Q.    If you recall, through what date?

A.    2018.

Q.    Okay.  And did the amount of the compensation change in the amendments?

A.     It did.  It went from 300,000 per year, 1.720,000 per year, and then up to 1 million per year.

Q.    At what point did we get to the 1 million per year to GMI?

A.    January 2014.

Q.    Would the management agreement and its amendment contracts you relied on in forming your opinion?

A.    Yes, they were.

          MS. ABEL:  At this point I would move to admit 1759,

1760, 1761, and 1762.

MS. TAIT: Same objections, Your Honor.

THE COURT: Those are admitted.

(Exhibits 1759, 1760, 1761, and 1762 were received into evidence.)

BY MS. ABEL:

Q. Based on your expertise in forensic accounting and as a CFO, are management agreements like this common?

A. Yes, they are.

Q. And based on the terms of the management agreement and its amendments, how much was GMI entitled to receive from StarClub during the period from 2014 through 2017?

A. $3,000,000 even.

Q. Is that slide a representation of the amount that was due under those contracts?

A. Yes. Thank you for putting that up.

Q. Of course.

And finally, based on your review of the documents in this case, including these agreements and your expertise as a forensic accountant and CFO, is it your opinion that the amounts StarClub paid to GMI pursuant to the management agreement and amendments were corporate expenses?

A. Yes.

MS. ABEL: May I have just a moment, Your Honor?

THE COURT: Yes.

(A discussion was held off the record between Counsel.)

MS. ABEL:  Thank you, Mr. Sturges.

THE WITNESS:  Thank you.

THE COURT:  Cross-examination?

CROSS-EXAMINATION

BY MS. TAIT:

Q.  Hi, Mr. Sturges.

A.  Hello.

Q.  Mr. Sturges, we don't know each other; right?

A.  We do not.

Q.  Okay.  We never met before or talked before; is that right?

A.  As far as I know.  I don't know if that was a trick question.

Q.  No, it wasn't.

A.  Okay.

Q.  Okay.  So you don't know who or what Euro-Dutch Trust is; right?

A.  Not as a fact, no, I don't.

Q.  Okay.  You don't know who or what Trident is; right?

A.  Not as a fact, no.

Q.  Is it the case, based on your long experience, Trustees of Trusts sometimes work for other people as well; right?  In other words, let me rephrase that.

If you're the Trustee of my Family Trust, you could also

be the Trustee of someone else's Family Trust?  Yes?

MS. ABEL:  Objection. Beyond the scope.

THE COURT:  Overruled.

You can answer.

THE WITNESS:  My understanding is that you can be both.  It's not exclusive.

BY MS. TAIT:

Q.   Right.  And you can have all sorts of other businesses; right?

A.   Sure.

Q.   If you're a corporation with a Trustee, you could have other corporate business; right?

A.   I am not an expert in this, but I would imagine so, yes.

Q.   Okay.  We spoke about some bank accounts.  Pardon me while I get my book.  Just a moment.

A.   No problem.

Q.   On Direct, you spoke about a bank account ending 0551.  Do you remember that?

A.   I do.

Q.   As of July 1, 2013, the balance in that account was $2,006 approximately; is that right?

A.   I don't have the records in front of me.  And I certainly would not remember that.

Q.   But you remember that the count by the end of 2013, there was not very much money left in the account; right?

A.   I don't actually remember the exact ending balance.  No.

Q.   Okay.  Well, would it refresh your memory to look at a document?

A.   Sure.  I mean, I'll take your word for it, if it had a low balance at that period of time.  It may have been in the process of closing that account.

Q.   Yeah.  Because you said you reviewed the whole time Period --

A.   Yeah.

Q.   -- between 2014 to 2017?

A.   Okay.

Q.   Right.  And so, by the end of 2014, there wasn't much left in that account; am I right?

A.   They may have transferred it to another account.

Q.   Right.  But there wasn't much left in that account; right?

A.   Yeah.  But it may not be their operating account.  They may have changed.

Q.   It's "Yes" or "No."

A.   Oh, sorry, ma'am.  If there was only $2,000 --

         THE COURT:  You need to speak --

         THE WITNESS:  Yeah, sorry.

         THE COURT:  You both need to speak slower.

         THE WITNESS:  If there was under $2,000, yeah, I was say there's not much in that account.

BY MS. TAIT:

Q.    And so would you -- so you don't remember how much there was?

A.    I do not remember the ending balance on a specific date. no.

Q.    Okay.  So would you have a look at the binder to see if it refreshes your memory, Exhibit 1752?  Do you have the defense binder?  Page 26.

A.    1752?

Q.    Yeah.

A.    Okay.  I see the ending balance is $2,635.00.  Yes, I see that.

Q.    And that was after those transfers you talked about, those incoming transfers?

A.    Yes.

Q.    Okay.  Thank you.

    How about the account ending 6313?  You talked about that one too.

    Do you remember what the ending balance was in that one in the 2013 time frame?

A.    I do not.

Q.    Do you remember that it was very minimal?

A.    I do not.

Q.    Would it refresh your memory to look at a document?

A.    Sure.

Q.    Could you look at Exhibit 1753?

A.    I am there, ma'am.

Q.    Okay.  So you talked about transfers into this account through 2013, I think, and maybe before; right?

A.    Yes, ma'am.

Q.    Does this refresh your memory about how low the balance was in this account at December 31, 2013?

A.    Yes, but that doesn't speak to the activity.

THE COURT:  Sir, could you listen to the question and answer the question?

THE WITNESS:  Sorry.

BY MS. TAIT:

Q.    The balance was less than $6,000; right?

A.    Yes.

Q.    Okay.

MS. TAIT:  Your Honor, we move to admit Exhibits 1752 and 1753.

MS. ABEL:  No objection.

THE COURT:  All right.  Those are admitted.

(Exhibits 1752 and 1753 were received into evidence.)

BY MS. TAIT:

Q.    So isn't it the case that to extent, you know, you reviewed all the bank records that you had, right, and that the account -- the transfers in that you talked about from Euro-Dutch and other parties, those dollar amounts were dissipated from those accounts by -- largely dissipated by

January 1, 2014; right?

A.    I could -- if I -- I would interpret dissipated as used for company reasons.

Q.    No.  I mean dissipated as not there anymore.

A.    Understood, but they would go for a purpose; correct?

Q.    I don't know.

            THE COURT:  Rephrase your question.

            MS. ABEL:  Objection --

BY MS. TAIT:

Q.    In items of balances in the accounts, money in -- the money was out of those accounts by the end of 2013.

      Do you agree?

A.    I agree, but you got to look at --

            THE COURT:  There is no just -- you answered the question.

            MS. TAIT:  Thank you.

      So I'm going to ask Mr. Flores to display already admitted 513.  Page 2, please.  And if you could blow these paragraphs up, please?

Q.    Mr. Sturges, have you ever seen this before?

A.    Can you put some context on this?  I'm just looking at paragraphs.

Q.    Paragraph 2 -- how about paragraph 3, from November 24, 2008, through at least August 2, 2017, 3229 Rambla Pacifico, Inc., was a title holder to the Rambla property.  And during

that time, Bernhard Eugen Fritsch has also been the sole shareholder and 100 percent owner of 3229 Rambla Pacifico, Inc.

Have you ever seen that before?

A.   I believe I'm aware of that, yes.

Q.   Okay.  And so would you agree that an arm's length business deal is one where one party of the deal doesn't control the other party to a deal?

A.   That is kind of the definition of arm's length.

Q.   Yeah, I thought so.

THE COURT:  No comments.

BY MS. TAIT:

Q.   Did you consider --

MS. TAIT:  Sorry, Your Honor.

Q.   The lease agreements that you've testified about, the ones that are in evidence, I think, are -- let me see.

There's leases between 3229 Rambla Pacifico and StarClub or a predecessor; right?

A.   Correct.

Q.   And I think it's Exhibit 1756 and 1757; right?

A.   Correct.

MS. TAIT:  Okay.  And let's put up page 7 of Exhibit 1756 on the screen, if we could.

Q.   And so on the tenant is StarClub; right?

A.   That's right.

Q.   And Mr. Fritsch signs for the tenant; right?

A.    That's right.

Q.    And the landlord is 3229 Rambla Pacifico, Inc.; right?

A.    Yes.

Q.    And Mr. Fritsch at all times controlled that company; right, during this period of time, July 1, 2009, based on the stipulation of the parties that we just reviewed; right?

A.    Can you define "controlled"?

Q.    Oh.  Well, let's put up the stipulation again, Exhibit 513.

        MR. FLORES:  Page 2?

        MS. TAIT:  Page 2.

Q.    So it says, "During that time, 2008 through 2017, Bernhard Fritsch has always been the sole shareholder and 100 percent owner of 3229 Rambla Pacifico, Inc."

      So that is what I meant by "control."  Agreed?

A.    Yeah, there's just -- yes.

Q.    Okay.  Thank you.

      And then back to Exhibit 1756, page 7.  And so again, under landlord that is 3229 Rambla Pacifico, Inc.; right?

A.    Yes

Q.    And Mr. Fritsch didn't sign there, did he?

A.    No, he did not.

Q.    Someone else signed it; right?

A.    Yes.

Q.    And do you know who Michael J. Reagan is?

A.    I believe he was the president of either --

Q.    Do you know what he is?  It is simply "Yes" or "No."

A.    I may know his title.  I don't know him personally.

Q.    Okay.  Do you know that he's dead?

A.    I have heard that, yes, in conversations.

Q.    Okay.  So Mr. Fritsch was essentially both the landlord and the tenant of this agreement; right?

A.    Entities he was involved with or controlled was, yes, --

Q.    Yes.

A.    -- the landlord and the tenant.

Q.    Okay.  So as the same is true Exhibit 1757, I think is also in evidence.  That's the lease amendment.

        MR. FLORES:  You want this?

        MS. TAIT:  Yeah, let's look at that, page 2.

Q.    So again, we have the tenant for StarClub; right?
Mr. Fritsch?  Yes?

A.    Yes.

Q.    And the landlord for 3229 Rambla Pacifico, Inc., wholly owned by Mr. Fritsch; right?

A.    Yes.

Q.    And the landlord is not signed by Mr. Fritsch; right?

A.    Correct.

Q.    But again, Mr. Fritsch is on both sides of this transaction; yes?

A.    Yes.

Q.    Okay.

THE COURT:  Ms. Tait, this a good time for a break?

MS. TAIT:  That would be great, Your Honor.

THE COURT:  Ladies and gentlemen, don't talk about the case or form or express any opinions about the case until it is finally submitted to you.  We'll take a 20-minute break.

THE COURTROOM DEPUTY:  All rise.

(Jury exited.)

THE COURT:  You can step down, sir.

Anything we need to discuss?

. LEE:  Just the issue of the schedule, Your Honor.  I am not sure what we have up, but if --

THE COURT:  I was just about to ask.

MR. AMINOFF:  Could we report back at the end of the break?  The defense just needs to confirm a couple of things.

THE COURT:  All right.

MR. AMINOFF:  Thank you, Your Honor.

MS. LEE:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Court is in recess.

(A brief recess was taken.)

THE COURT:  Let's get our witness back.

MR. AMINOFF:  Your Honor, did you want to address scheduling now or?

THE COURT:  If there's a short version of it.

MR. AMINOFF:  Yes.  It's the defense's intention to

rest after this witness.

THE COURT:  Okay.  So I will release the jury and have them come back tomorrow.  I may have the come back a little bit later, and you will all stay here until I am comfortable the jury instructions are close to being done.

MR. AMINOFF:  Sounds like a plan.

THE COURT:  I take it the government does not have a rebuttal case?

MS. TAIT:  No, Your Honor, not -- I don't think so.

MS. LEE:  We don't expect one.

MS. TAIT:  We don't expect one.

THE COURTROOM DEPUTY:  All rise.

(Jury enters.)

THE COURT:  You may be seated.  Everyone is back. The witness is back on the stand.

Sir, you're still under oath.

Ms. Tait, you may continue.

MS. TAIT:  Thank you, Your Honor.

Q.  So just to pick up where we left off, sir, I'm going to display again Exhibits 157, page 2, and 156, page 7, the signature pages.

I'm sorry.  Excuse me.  1757, page 2, 1756, page 7.  Too many 7's in my sentence.

So again, sir, we talked about what an arm's length agreement is; right?

A.   Yes.

Q.   And it's one where one party to deal does not control the other party to a deal; right?

A.   In summary, yes.

Q.   In summary.

So if one party has control of both sides to a contract, then you could agree that they would dictate the terms of the contract; right?

A.   They could.  That does not deem it inappropriate.

Q.   But they could dictate the terms?  Yes?

A.   Yes.

Q.   And they could decide what amounts that things will be charged?  Yes?

A.   They could.  Doesn't mean they --

Q.   That's my question.  That's my question, sir.

You know how this works.  I ask these questions and then --

THE COURT:  Ms. Tait, I'll give the instructions.

MS. TAIT:  Sorry.  Sorry, Your Honor.

Q.   So they could collude with themselves to pick a price; isn't that right?  They could?

A.   They could negotiate, yes.

Q.   Or they could not negotiate?  Yes?

A.   Correct, if it's appropriate terms.

Q.   Or if it's inappropriate terms; right?

A.   I suppose if you control both parties and you're sitting on both sides and you're negotiating with yourself, in theory, you control both sides.

Q.   That's right.

A.   I believe that happens quite often.

Q.   Okay.  So they could choose a price regardless of market price?

A.   Yeah, this was subject to the auditor's review.

Q.   Answer my question.  I'll get to the auditors.

But they could, in a contract, choose the price that was not based on fair market value; right?

A.   If they're only dealing with themselves, they can pick the price.

Q.   Right.  Okay.

And so let's look at other agreements that I think are now in evidence.  And these are the GMI agreements.

Let's look at Exhibit 1759, page 10.  I think that's in evidence.

Do you see that?

A.   Yes.

Q.   Who signs for 877 Media, that is, StarClub?

A.   Bernhard Fritsch.

Q.   And who signs for Greenwich Music, Inc.?

A.   Michael Ravin.

Q.   That's the dead man; right?

A.    Yes, ma'am.

Q.    Okay.  Let's look at Exhibit 1760, page 2.  I think this is another GMI agreement; right?  You have it in your book.

A.    Yes.  It's in front of me.

Q.    Yeah.  This is another GMI agreement with StarClub?  Yes?

A.    Yes.

Q.    And on page 2, who signs for StarClub?

A.    Mr. Fritsch.

Q.    And who signs for GMI?

A.    Ravin.

Q.    Same person, Mr. Ravin?  Yeah?

A.    Yes.

Q.    And let's look at another GMI agreement.  I think, if you agree, Exhibit 1761 is another one; right?  Sorry, page 1.

A.    Looks to be, yes, second amendment.

Q.    Right.  And who is signing for StarClub?

A.    Mr. Fritsch.

Q.    And I can't really see a signature.  It seems like there's writing, but Greenwich Music is a third-party; correct?

A.    Correct.

Q.    Hubertus von Hesse; right?

A.    Looks like it, yes.

Q.    Okay.  And then Exhibit 1762.  This is another GMI management agreement; right?

A.    Looks to be; yes.

Q.   On page 1 -- let's go to page 2, first.

A.   Yes.

Q.   StarClub is a party, and who signs?

A.   Mr. Fritsch.

Q.   And on page 2, Mr. Hesse again signs for Greenwich Music; right?

A.   It reads that way, yes.

Q.   And so if Mr. Fritsch was also in control of GMI, again, these would not be arm's length agreements; am I right?

A.   They may or may not be arm's length, that's correct.

Q.   But if he's controlling both parties, then it would not be an arm's length agreement because one party would be in control of both sides; right?

A.   Could be, yes, that's correct.

Q.   So do you know -- as far as you know, the auditors -- that audit ended in -- as of December 31, 2013; right?

A.   Yeah, but they do work --

Q.   No, no, just question.

A.   The actual audited financials, yes, for the period ending. The work takes place after the fact.

Q.   Of course.  But the period that's being audited ended December 31, 2013?

A.   Correct.

Q.   Okay.  And are you aware that that pre-dates the investment activity that is the heart of this case?

A.    Yes.

Q.    Okay.  And are you aware that, beginning in 2014, StarClub started raising multimillion dollars of money from investors?

A.    Yes.

Q.    And the company, though, had no audited third-party financials for you to review for the period ending December 31, 2014; right?

A.    I did not see those, no.

Q.    And the company had no audited financials for the period ending December 31, 2015; right?

A.    Right.

Q.    And none for the period ending December 31, 2016; right?

A.    Right.

Q.    And like no quarterly audit for the periods of the first two quarters of 2017; right?

A.    I would refer to it as a quarterly review rather than an audit.

Q.    Okay.

A.    But, no, I did not see those.

Q.    You did not see those either?

A.    No.

Q.    Okay.  So you relied on an audit from before the investors, that are the heart of this case, invested; right?

A.    Were my opinions related to the lease agreement and management agreement?

Q.   Right.  And you don't -- and so you don't know whether the auditors had access to that stipulation I read to you, do you?

A.   They would -- it's pretty easy --

Q.   No.  Do you --

A.   I do not know what the auditors had access to.

Q.   You don't know what they were told; right?

A.   Correct.

Q.   Because you weren't there; right?

A.   Yeah.

Q.   And isn't it the case that the management is responsible for the preparation and fair presentation and financial information in audits?

    Let me rephrase it.  Isn't it true that the management is responsible for preparation and fair representation of financial info that's given to auditors?  Right?

A.   Absolutely.

Q.   And the management here is Mr. Fritsch, among others; right?

A.   Among others, yes.

Q.   Okay.  And so if Mr. Fritsch was not telling the truth to those auditors, that would affect the credibility of the audit reports that your reviewed?  Yes?

A.   There are cases where auditors do not find the convoluted fraud, yes.

Q.   If Mr. Fritsch was not telling the truth to auditors that

would effect the credibility of the audit?  "Yes" or "No"?

A.    It depends on -- I need to see the auditor's work papers and see what steps they actually contemplated and questions asked and answers provided.

Q.    So you won't agree with me that, if Mr. Fritsch lied to the auditors, that that would affect the credibility of the audit?  You won't agree with that?

A.    No.  I'm saying, yes, a lying client does affect the outcome.

Q.    Yeah, okay.

And you don't have any way of knowing what was said to those auditors; right?

A.    I have no idea whether there was lies or no lies.

Q.    Right.  Exactly.

So you relied on an old audit which was based on what StarClub's management told the auditors; yes?

            MS. ABEL:  Objection.  Misstates the testimony.

            THE COURT:  Overruled.

You may answer.

            THE WITNESS:  I relied on the audit that ended in 2013, yes.

BY MS. TAIT:

Q.    Okay.  So I think you -- part of your qualifications you said that you'd been a CFO.

A.    Correct.

Q.    The companies that you've been a CFO for, had you been a CFO for a company that had like more than ten shareholders?

A.    Yes, absolutely.

Q.    Yes, yes.  And I'm just going to move on.  Thank you.

      Would you agree, based on your long years of experience, that it's kind of a classic way to hide money to claim it's a business expense?

A.    A classic way to hide money?

Q.    Yeah, hide your own money.

      It's a classic way to hide money is to claim that something is a business expense instead of a personal expense?

A.    I don't know how that would hide money.

Q.    Because if -- would it hide money if you make payments out of your corporation to other corporations to make it look like it wasn't being paid to you?  Would you agree that could be used to hide money?

A.    There's multiple ways to hide money, yeah.

Q.    And that's one of them, isn't it?

A.    To pay an entity that you control, yeah.  There's lots and lots of ways.

Q.    Yeah.  And that's one of those ways?  Yes?  Right?

A.    Yes.

Q.    And it's actually not legal to use corporations to pay your own personal expenses, is it?

            MS. ABEL:  Objection.  Beyond the scope.  Calls for a

legal conclusion.

THE COURT: Sustained.

BY MS. TAIT:

Q.   So speaking of business expenses, how much have you been paid for your work from the defense team up until today?

MS. ABEL:  Objection on the commentary, Your Honor.

MS. TAIT:  I'm sorry, Your Honor.

Q.   How much have you been paid --

MS. TAIT:  I'll phrase, Your Honor.  Apologies.

Q.   How much have you been paid for your work for the defense team up until today?

A.   Actual cash received, I'm not 100 percent sure.  I think an invoice -- one invoice has been sent out.  There's probably more in the works, so.

Q.   Okay.  Well, what is the amount of the one invoice that's been sent out?

A.   I think about $8,000.

Q.   And is that just for you, or is that for another person at your firm, as well?

A.   Myself and a colleague.  Mostly myself.

Q.   Okay.  And after the $8,000 so far, and has there been any more work to do?

A.   There's been more work, yes.

Q.   And about how much more do you believe would be owed?

A.   That's hard for me to say at this point in time.  I mean,

I have to put my hours in, as you know.

Q.   And so you're the accountant.  How much would you estimate that it would be?

A.   Let's say another week and a half to two weeks of my time over a span of six weeks.  So I don't know what my hourly rate.  So let's say another $15,000, perhaps.

Q.   Another $15,000.

Do you know your hourly rate, sir?

A.   My hourly rate varies on each matter.  I think we have a flat rate on this at maybe 400 and hour.  Maybe 450.

Q.   Right now, you're earning $450 an hour for sitting there; is that right?

A.   That's right.

Q.   Okay.  And for waiting out in the hallway, too; correct?

A.   That's my discounted rate.

Q.   That's your discounted rate?  Okay.

MS. TAIT:  Just a moment, Your Honor.

Okay.  No further questions.

THE WITNESS:  Thank you.

REDIRECT EXAMINATION

BY MS. ABEL:

Q.   Not afternoon yet.  Good morning.

A.   Good morning.

Q.   I want to just quickly touch on a few things.  The government started by asking you about the ending balance on a

variety of accounts.

Do you recall that?

A.   I do.

Q.   Does the ending balance tell you anything about what the money was used for?

A.   No.

Q.   Does the ending balance tell you anything about the money that came into and went out of the account?

A.   No.

Q.   I am going to talk a bit about the contracts and the parties to those contracts.  I want to start with a little bit more basic premise.

Are you familiar with the concept of a shareholder?

A.   Of course.

MS. TAIT:  Objection.  Beyond the scope.

THE COURT:  Not for that question, but probably coming up.

BY MS. ABEL:

Q.   Are you familiar with the concept of an officer or director?

A.   Yes.

Q.   Are you aware that -- are those the same thing?

A.   They can be -- no, they're not.

Q.   Okay.  So can you clarify as to the difference -- The differences between a shareholder and an officer and director?

MS. TAIT:  Objection, Your Honor.  Relevance and beyond the scope.

MS. ABEL:  Your Honor, I'm laying foundation.

THE COURT:  Do it quickly.

MS. ABEL:  This is it.  Yep.

THE WITNESS:  Shareholder can be an individual who owns a share of the company.  A director could be someone who actually sits on the board and not involved in day-to-day operations.  And an executive is usually someone who's actually at the office, perhaps, actually fulfilling the task of that role on a day-to-day basis for that entity.

BY MS. ABEL:

Q.   And each of those descriptions -- a shareholder, director, and officer -- have different roles in a corporation; is that right?

A.   Yes.

MS. TAIT:  Objection.  Relevance.

MS. ABEL:  Can we -- the government's stipulation I don't think I actually have that.

MS. LEE:  513?

MS. ABEL:  513.

MS. TAIT:  It's your stipulation, I think, too.

BY MS. ABEL:

Q.   And looking at the paragraph that the government directed you to, last sentence, "Mr. Fritsch was the sole shareholder

and owner of 3229 Rambla Pacifico," do you see that?

A.   I do.

Q.   Does that state anything as to whether Mr. Fritsch was an officer or director of that company?

A.   No.

        MS. ABEL:  Okay.  Can you take that down?

        Can you bring up 1756?  And the last page, please.  And can we just zoom in on that a little bit?  Okay.

BY MS. ABEL:

Q.   And do you see the landlord there, and I believe the government clarified with you that the landlord there was 3229 Rambla; is that right?

A.   Right.

Q.   And do you see the person who signed it, Michael J. Ravin, and he has a title?  What was that title?

A.   President.

Q.   And of those three descriptions, which one is that?

A.   Officer.

Q.   Okay.  So Michael Ravin was an officer of 3229 Rambla?

A.   Yes.

        MS. TAIT:  Objection.  Foundation.

        THE COURT:  Sustained.

BY MS. ABEL:

Q.   To the extent that --

        MS. TAIT:  Move to strike, Your Honor.

THE COURT:  It will be stricken.

BY MS. ABEL:

Q.    Do you understand that a -- do you understand the role of a president of a company?

A.    Yes, I do.

Q.    Can you --

MS. TAIT:  Objection.  Relevance.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    Does a shareholder control the day-to-day actions of an entity?

MS. TAIT:  Objection.  Relevance.  Foundation.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    We've talked before, when looking at the stipulation, that Mr. Fritsch was a shareholder of the 3229 Rambla entity; is that right?

A.    Right.

Q.    What is your understanding of whether a shareholder of an entity makes corporate decisions?

MS. TAIT:  Objection.  Relevance.  Foundation.

THE COURT:  Sustained.

MS. ABEL:  Your Honor, can I have a brief sidebar on that issue?

(Sidebar commenced.)

THE COURT:  It's much too broad a question, the functions of a president of an entity.  Probably various widely as the number of presidents of entities.  The same for shareholders.

MS. ABEL:  Yes, Your Honor.  I'm just clarifying that shareholders are not corporate decision-makers, and officers and presidents are.

THE COURT:  That is not always true at all?

MS. ABEL:  That's fine.  And we certainly can redirect on that, but I do think that is often the case.  We can clarify that we're talking about often.  But it's directly responsive to the one question.

THE COURT:  I understand that, but the questions you're asking are not appropriate.

MS. ABEL:  Okay.  I can be more -- I can be more general in is it your understanding that?

THE COURT:  No.  That's going the other direction.

MS. ABEL:  Okay.  They made vague assertions that Mr. Fritsch didn't because he was a shareholder.

THE COURT:  Vague assertions?

MS. ABEL:  They made assertions on Cross that Mr. Fritsch made decisions because he was the shareholder. They don't have any foundation for that either.  Obviously, it was Cross.  So I would like to clarify that shareholders are not people who make corporate decisions.

THE COURT: That is not necessarily true. So you can't clarify it.

MS. ABEL: In his expert opinion as of --

THE COURT: That is not necessarily true. And if you were to say it was necessarily true, I wouldn't find him as an expert anymore.

MR. AMINOFF: Can he say "generally"?

THE COURT: No.

MR. AMINOFF: Can he say he doesn't know the structure of this particular company and he knows --

THE COURT: Yes, you can ask if he knows the structure of those two entities.

MR. AMINOFF: Is that going to do it?

MS. ABEL: I'll try.

(Sidebar concluded.)

BY MS. ABEL:

Q. Mr. Sturges, in your experience as a CFO of an entity, were you an officer?

A. I was.

Q. And in your experience as a CFO of an entity, of any entities, there were other officers of those entities?

MS. TAIT: Objection. Relevance, Your Honor.

THE COURT: Sustained.

BY MS. ABEL:

Q. On Cross-examination, the government reminded us that

Mr. Ravin has passed away.

Do you recall the specific date of his death?

A.    I don't, no.

MS. ABEL:  Can you bring up Exhibit 514?

Q.    Looking at this

MS. ABEL:  Can we just zoom in a bit.

THE WITNESS:  I got it.

BY MS. ABEL:

Q.    Okay.  Sorry, I don't.

Looking at this death certificate, that has already been admitted into evidence, it appears Mr. Ravin died in 2019; correct?

A.    I see that on this --

MS. TAIT:  Objection.  Relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes, I do see that date listed.

BY MS. ABEL:

Q.    And going back to 1756.

MS. ABEL:  The last page, again, please.

Q.    And the date of his signature on this document was what?

A.    This is 2009.

Q.    So ten years before his death.

A.    Correct.

Q.    Okay.  Just want to make it clear.

On Cross-examination, the government asked you about

contracts where a party controls both sides.  And you were trying to explain the frequency of how often you see that in your experience and expertise as a CFO and a financial accountant.

Can you explain that?

MS. TAIT:  Objection.  Relevance.  403.  Beyond the scope.

THE COURT:  Overruled.

THE WITNESS:  Absolutely.  So we can refer -- there is a lot of different examples I could provide, but the most easiest one is called a "sale lease back," where a company will own a building, and the company is actually operating in that business, they'll sale it to an entity they control, and they'll get a good chunk of cash, million dollars in cash to sell that business.

But then they also say we're going to lease that facility to the company that's operating there.  We're going to recover a lease payment every month, as well.

And they're control both parties.  It happens all the time.  And it's more for liability reasons, not necessarily I'm cheating.  It's I'm going to protect myself.  I'm going to value the cash flows over there for this business, and I'm going to value my company but for the real estate over here.

So it's really more complicated than I'm just, you know, paying myself.  It's not that easy.

BY MS. ABEL:

Q.    Understood.  Thank you for that explanation.

The government also asked you about the fair market value of the property and whether you believe that -- whether there is a basis to believe the property was a fair market value.

Do you recall that?

MS. TAIT:  Objection.  Misstates testimony.

THE COURT:  Don't misstate the testimony.

BY MS. ABEL:

Q.    Do you recall the line of questioning concerning fair market value?

A.    I do.

Q.    And what do you -- in terms of -- and as I recall it, but please correct me if I'm wrong -- the questions regarding fair market value were whether the amounts paid for 3229 Rambla were, in fact, a fair market value.

Is that your recollection of the questioning?

MS. TAIT:  Objection, Your Honor.  Misstates the testimony.

THE COURT:  If it's not his recollection, he'll say, "No."

You can answer.

THE WITNESS:  She asked me about was, you know, was not asking about fair market value.  She was saying, if they're negotiating with each other, it may not be fair market value.

That's what I recollect.

BY MS. ABEL:

Q.   Okay.  Does that affect the validity of the corporate expense analysis?

        MS. TAIT:  Objection.  Beyond the scope.

        THE COURT:  Overruled.

BY MS. ABEL:

Q.   Does that fair market discussion affect whether or not you would find the amounts paid under the agreement to be corporate expenses?

A.   A contract is a contract.  It calls for a certain payment per month.

Q.   Thank you.

     I want to talk about the audited financials.  So I understand you have described on Cross -- and please correct me if I'm wrong -- that there were audited financials for 2011, 2012, and 2013; is that correct?

A.   Yes.

Q.   And based on your review of that document, they were provided in one single document?

A.   That's correct.

Q.   Meaning -- and again, correct me if I'm wrong -- that the auditor audited all three years at one time?

A.   That can be insinuated, yes.  It's not uncommon.

Q.   Was the document -- was it one single document?

A.    One single document.

Q.    Issued in, I think you were trying to explain on Cross, issue in what year?

A.    In 2014.

Q.    Okay.  So after-the-fact, they issue back financials?

A.    It's after the large write-up on subsequent events.  So they look at everything that's posted 12/31/2000 --

MS. TAIT:  Objection.

THE COURT:  Sustained.  Stop talking.

BY MS. ABEL:

Q.    We'll just move on.  All right.  I think you answered my question.

So the government then proceeded to ask you whether there were audited financials for 2014, 2015, and 2016, the next three-year period; is that correct?

A.    Correct.

Q.    And you said, "No"?

A.    I have not seen it.

Q.    Based on your understanding of the facts of this case, the company shut down in 2017?

A.    That is my understanding, yeah.

Q.    Okay.  So looking back at the prior three-year period, we could've -- there could still be audited financials that could have been made during -- for that three-year period?

MS. TAIT:  Objection.  Lacks foundation, Your Honor.

THE COURT:  Sustained.

BY MS. ABEL:

Q.    The government asked you about lies that may or may not have been told to the auditors.

Do you recall that?

A.    I do.

Q.    Do you have any evidence one way or another that Mr. Fritsch lied to the auditors?

A.    I do not.

Q.    Do you have any evidence one way or the other that any officer or director of StarClub lied to the auditors?

A.    I do not.

Q.    You were going to describe a bit about the audited financial process.  I think just high level, what -- who conducts an audited financial?

A.    Auditors or accountants will either come on site and review the books and records.  And once they're on-site, they'll usually take some records back and put it into their system, and they test certain transactions.  I'll tell you one thing, they would've looked at bank statements.  That is the most basic of an audit function is to go through the bank statements and see the money-in, the money-out.

It is usually done by the first year in review by someone with more experience because that is such a basic function of an audit.

Q.    You said they come in.  The audit is not conducted by anyone at StarClub?

A.    No.  You mean at, like an employee?  No.  These are third-party independent auditors who work for an audit firm that are paid by StarClub to actually come in an audit them.

Q.    And you reviewed the audit for 2011, 2012, '13, that document; correct?

A.    I did, yes.

Q.    And was that conducted by a third-party audit entity?

A.    Yes.

Q.    Are you familiar with the entity?

A.    I did look them up early on in this engagement.  They're community and audit firm that is quite large.

Q.    And one of the things that the auditors do consider is contracts entered into by the company; is that right?

        MS. TAIT:  Objection.  Beyond the scope.  Cumulative.

        THE COURT:  Overruled.

        THE WITNESS:  Of course, they do.

BY MS. ABEL:

Q.    Okay.  And based on your review of that audit, they did consider the contracts you reviewed?

A.    They absolutely make note of it in the notes to the financial statements.

Q.    Okay.  The government then spent some time asking you about how much you got paid.

Do you recall that?

A.    Yes.

Q.    And who paid you?

        MS. TAIT:  Objection.  Relevance, Your Honor.

        THE COURT:  Overruled.

        THE WITNESS:  I believe the Federal Public Defenders Office.

BY MS. ABEL:

Q.    Is that my office?

A.    Yes.

Q.    You mentioned a discounted rate.  Why did you have a discounted rate in this case?

A.    You know, I'm not sure in full negotiations that went into it, but we usually -- for billing at a discounted rate.

Q.    Okay.

        MS. ABEL:  Can I have just one moment?

        THE COURT:  Yes.

    (A discussion was held off the record between Counsel.)

        MS. ABEL:  Nothing further, Your Honor.

        THE COURT:  Recross?

        MS. TAIT:  Just a couple questions, Your Honor.

                    RECROSS-EXAMINATION

BY MS. TAIT:

Q.    Mr. Sturges, have you sat through this trial up to now?

A.    I have not.

Q.    Okay.  So you had no idea -- you don't know in what depth the auditors went through in their audit; right?

A.    I know the audit process.

Q.    Yeah.  You know generally, right, the process?

A.    Of course, yes.

Q.    But in this case, you don't know what they did; right?

A.    No, not without reviewing their work papers.

Q.    And you don't know what management told them specifically about all the expenses of the company; right?

A.    I did not see what is called a management representation letter.  I've not seen that executed.

Q.    Right.  Okay.  And you don't know if the auditors interviewed all the people who were paid money from the company during that time, or any of them; right?

A.    People who were paid?

Q.    Yeah, people who received large payments from the company. You don't know if the auditors interviewed them; right?

A.    Interviewed them, no.  They probably would not have interviewed them.  They would have --

Q.    Right.

A.    -- looked at the records.

Q.    And the records would have been provided by the management; right?

A.    Management does provide the records.

Q.    Okay.

MS. TAIT:  No further questions.

MS. ABEL:  Nothing from the --

THE COURT:  May the witness be excused?

MS. ABEL:  Yes, from the defense.

MS. TAIT:  Yes.

THE COURT:  Thank you very much, sir.  You're excused.

Does the defense have another witness?

MR. AMINOFF:  No, Your Honor.  The defense rests.

THE COURT:  Does the government have any rebuttal?

MS. TAIT:  No, Your Honor.

THE COURT:  All right.  Ladies and gentlemen, you've now heard all the evidence in the case.  The lawyers and I have quite a bit of work to do to prepare for tomorrow.  And tomorrow we'll be hearing -- I'll give you the jury instructions, and then you'll be hearing from both sides in what we call closing argument, and then you will be deliberating.

I never try to predict how long deliberations may take, but if you're still deliberating next week, then we would come in on Monday.  I think I mentioned that to you, that if you didn't leave me anymore.

ALTERNATE NUMBER ONE:  Yes, Your Honor, I had scheduled some time off.  I'll be out of state from Friday night until Monday night.

THE COURT:  All right.  Have a seat.  You are Alternate Number One, I believe.

ALTERNATE NUMBER ONE:  Yes.

THE COURT:  All right.  Well, we'll see.  Maybe we're done before that.  I can't understand --

JUROR NUMBER SEVEN:  I have a medical procedure on Monday which I did address.

THE COURT:  Okay.  Right.  So we'll see where we are on Friday and what we might have to adjust.  So I'm going to -- I keep forgetting what day it is.  Today is Wednesday.  I'm going to order you to return no later than 9:00 a.m. tomorrow.  But please, please get here on time so we can get our jury instructions and arguments to you tomorrow, and then you can begin deliberating beginning tomorrow.

I will ask you what schedule you want to use.  If you want to keep the 8:00 a.m. to 2:30 schedule during your deliberations, then you should just let me know that.  We'll give you a note.  You can tell us about it.

If you want to stay longer, a more normal day where you come in and then you deliberate, you have lunch, and stay later in the day, in other words, past 2:30, then the Court would provide lunch for you.  You could stay until, let's say, 5:00 o'clock.  Or if you've reached a decision earlier, you wouldn't obviously have to stay after you've reached a decision.  So I really think about that.

I need a unanimous response though.  So if somebody doesn't want to stay longer and takes that lunch break, then all of you will have to stay, obviously.  So, otherwise, the default will be the schedule that we have right now.

So don't talk about the case or form or express any opinions about the case until it's finally submitted to you. You're ordered to return by 9:00 a.m. tomorrow, and you're ordered to have a good evening.

THE COURTROOM DEPUTY:  All rise.

(Jury exited.)

THE COURT:  Have a seat.  So I don't think we need to decide that now.  So we'll see how the deliberations go.  I think there's a lot of work to do on the instructions.  Yes?

MR. AMINOFF:  One thing, Your Honor.  I didn't mean to interrupt you.

Just now that all the evidence is closed, the defense would again move for a judgment of acquittal based on Rule 29 for all counts and all issues.

THE COURT:  And I assume you would like to brief that.

MR. AMINOFF:  Maybe briefly, Your Honor, but I --

THE COURT:  Not now.

MR. AMINOFF:  Not now.  I think we can just orally make the motion.

THE COURT:  Right.  I understand.  I'll take that

under submission.

All right.  So maybe you should just go take a lunch hour and come back at 1:15.  And I hope the instructions obviously shorten things up for me.  So I hope the instructions are in good enough form for us at least to start talking about them.  So we'll see you at 1:15.

MS. TAIT:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  The Court is in recess.

(A lunch recess was taken.)

THE COURT:  All right.  Just for the record, a little belatedly, Mr. Aminoff, I assume that you consulted with your client before announcing you were resting.

MR. AMINOFF:  I did, Your Honor.

THE COURT:  All right.  And he did not want to testify?

MR. AMINOFF:  No, Your Honor.  We did discuss it.

THE COURT:  Excellent.  Thank you.

All right.  This is going to be a little choppy.  Hard to get a handle on the wire fraud because there are so many issues.  I don't think the law is necessarily consistent.  So just a few comments before we get to that.

I will use the government's reasonable doubt instruction. When the Circuit changes its; I will change mine.  That's what you've got as number 10.

I think the corporate position instruction is not

necessary.  That's 17, the set you gave me.

Charts and summaries, I don't have a revised set for me yet, but I put those both in the same instruction just so I don't have to change page numbers too many times.

Are both of those relevant or just one?

MS. ABEL:  To clarify, are you talking about proposed instruction number 20?

THE COURT:  19 and 20.  In my version, I put them together.

MS. ABEL:  Okay.

THE COURT:  Are they both relevant?

MS. TAIT:  Yes, Your Honor, they both are, because we had demonstrable charges.

MS. ABEL:  I do believe we're in agreement.  Can you just give me one moment to look at them again?

THE COURT:  Sure.  One says they go into evidence, and one says they don't.

MS. ABEL:  Yeah, yeah.  We definitely have both.  And there's actually some that are still outstanding from the Court in determining which category they belong in.

THE COURT:  Okay.  Sooner or later I'll have to do that.

28, in your version, good faith, I'm not giving that.

23, I don't think there are any other crimes.  So I don't need to give that instruction; correct?

MS. TAIT:  Agreed, Your Honor.

THE COURT:  All right.  We'll be working backward because I just got an instruction proposed by the defense.  I assume the government has seen that.

MS. TAIT:  We just got it, Your Honor.  Yes, we've seen it now.

THE COURT:  All right.  So I'm sure you want to think about it, but the concept is putting in the specific alleged false representations for Danny Guy and different one for Ian Mann.

MS. TAIT:  Yes, Your Honor, we object.  That's not wire fraud, in our opinion.  That's just not how wire fraud works.

Could I be heard on that?

THE COURT:  Well, I think I probably need some authority on that.  I was looking back at -- I can't remember how many wire fraud cases I've done, but another one that I did, and we definitely did put in the specific representations. I think the problem with this case is there's so much going on that it's not entirely clear to me what the government is contending.

MS. TAIT:  Well, if I could address one thing about this current one, the one that we just got that is off, setting aside the issue of whether or not to put in the specific representations, the idea that a particular execution of a wire

fraud scheme is tied to a particular representation is wrong, because a wire fraud execution doesn't have to be tied in any way to a particular false statement. Wire fraud executions just execute a scheme to defraud that involves misrepresentations.

In fact, a wire can be a check that represents nothing or like for example here, a wire that represents nothing. It's just that that's the jurisdictional hook that, if the government proves it was essential to the scheme, which here the two wires get the scheme money. And that's why they are essential.

So going -- so, in other words, to split up that Count 2 is tied to statements X, Y, and Z, and Count 1 is tied to different statements, that's not the law. So that's to split them up that way, that's just not wire fraud.

Now, the issue, the other issue, which is the jury instruction from last night, I think, which is where the defense wants to have specifically which are the false statements, we do object to that. And we would recommend just using the language in the indictment. And one would also need to grab the language about the missing -- the misuse of funds which is absent from last night's or maybe it was this morning's proposed defense instruction, because that is part of the indictment. It is part of the scheme to defraud.

MS. ABEL: Your Honor, I just want to clarify. I

think the government is confusing two elements and using the phrase "wire fraud" to refer to all of them. And the defense's instructions are quite intentional. The instruction proposed last night defines the scheme to defraud and therefore includes all of the alleged misrepresentations that are charged in the indictment and on which the government is proceeding. And that is relevant to the instruction proposed last night.

The instruction proposed, this just briefly before refers only to the intent element, and that is what it references. And as to the intent element -- and Your Honor fairly points out that we did not include our citations at the bottom, and that was just due to haste. But I believe the cases, the Ninth Circuit cases, Lui and Miller, both establish that a convergence element is required as to the intent, which means that there needs to be causation. There needs to be a statement on which there was a causation to the wire. And that's relevant only to intent. To be very clear, that's why the instruction is defining intent and not to scheme in which all of the representations are relevant.

But I do think, to the Court's point, it is important in this case to establish on which statements there could be convergence. And there are only a few due to the timing, due to the absence of Ian Mann, and the limited amount of evidence that came in regarding anything Ian Mann could theoretically have relied on in making his investment.

So for that reason, we proposed to break them out.  And I don't think with any intent to confuse the jury that all of the things the government wants to raise are relevant to scheme, but only a select number are relevant to intent.

THE COURT:  We have to know what the government contends is material as well.

MS. ABEL:  Yes, Your Honor, and I believe materiality -- and there's a separate instruction, obviously, on materiality, but materiality is relevant.  It's the same thing, meaning they have to -- he has to know that they occurred, the investor, in order to -- for them to be material.  Whether they are reasonably capable of causing a person in that person's shoes to cause the investment means that they necessarily heard the statement.

THE COURT:  All right.  Well, now we're even further back than I thought we were.  All right.  Let's jump into -- before I forget, do I have a Verdict Form?

MS. LEE:  Yes, Your Honor.

MS. TAIT:  Yes, Your Honor.

THE COURT:  I know I have a verdict instruction that mentions specific counts.  So I've put the language that the defense requested in the position that the government requested, although I think it's sort of redundant.

MS. TAIT:  Is that in the instructions, Your Honor, or in the Court's version of a Verdict Form?

THE COURT:  I'm not looking at the Verdict Form.

MS. TAIT:  Okay.

THE COURT:  I'm looking at the instruction that explains the Verdict Form.  We need that one, as I said.  Anyway, we've described this twice, so I don't know if that's necessary, but it's not a big issue either.

All right.  So we now have the most salient disputed instructions.  We just culled them out.  So I'm not printing out 70 pages every time.  So on your page 2 of the small section that Ms. Wardlaw just gave you, I have taken out from these instructions what I always take out, and that is the reference to the specific United States Code section.  No good can come of telling the jury what section to look up.  So I'm not going to do that.

Do we have a deceive and cheat?

MS. TAIT:  Yes, we should, Your Honor.

MS. ABEL:  Yes.

MS. LEE:  Element three.

THE COURT:  Pardon?

MS. LEE:  Element three.

THE COURT:  Oh, I know, but do we have a definition of it?  Did somebody do a search?

MS. TAIT:  It's in --

MR. AMINOFF:  I think it's on the e-filed version, Your Honor, I believe it's page 56 or the ECF page 66.

MS. TAIT:  Are you on -- is Counsel on document 446?

MR. AMINOFF:  446.  Is that the right one?

THE COURT:  I don't even know what document I have.

MS. LEE:  I'm on Docket 446.

THE COURT:  There it is.  Okay.

MS. LEE:  56.  Page 56.

MS. TAIT:  Yeah.

THE COURT:  Oh, I see.  I don't know.  Maybe that needs to go up earlier.  I added some language in that relates to the discussion we had earlier when Mr. Guy testified about reliance.  Using it as a basis the government's proposal, although, as I said, I added in the defense requested language, but I put it in the fourth element.  I don't think it's necessary, for the reasons I stated, but it's fine in there.

And then the defense asked to add what you referred to as bracketed material.  I think in the Ninth Circuit instruction, whether misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue.

Is there any objection to adding that from the government?

MS. TAIT:  Your Honor, which page of the Court's document are you referring to?  Or is it the --

THE COURT:  It's not there.

MS. TAIT:  Oh, it's not there.  It's in the proposal?

THE COURT:  No, it's not in my document.  It's in your document.  It's in your second amended.  I should have had

that printed out.

MS. TAIT:  We have a copy, but you don't have it handy.  Your Honor, it's -- I guess it's -- if the defense can point us to it, we can find it that way.

MS. ABEL:  Yeah.  What are we looking for exactly?

MS. TAIT:  In document 446, something regarding --

MS. ABEL:  Is it --

THE COURT:  It's the wire fraud instruction.

MS. ABEL:  Oh, okay.

MS. TAIT:  Oh, okay.

MS. ABEL:  The defense's proposed wire fraud instruction, and ours is at page 34, which included the bracketed language.

MS. TAIT:  Okay.  Thank you.  Hold on.

MS. ABEL:  Which I believe is --

MS. LEE:  Oh, I see.  It's the second to last paragraph.

MS. ABEL:  That's right.  Whether a misrepresentation goes to the nature of the bargain may depend on the specific transaction.

THE COURT:  Somebody's trying to write this down in a different language.

MS. ABEL:  Thank you.  Thank you, Your Honor.

The last sentence of the second paragraph on page 40 -- 45 of the ECF, 35 of the actual document.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov     (213) 894-3913

THE COURT:  Just use the page numbers because, once you put a blue back on this thing, I can't see.

MS. ABEL:  Fair enough.  35 at the bottom, the last sentence, whether a misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue.  And I do believe in the version the Court just gave us, it's in there on page 2 -- 3.  Three.

THE COURT:  Yes, I added it.

MS. ABEL:  Okay.

THE COURT:  In other words, I addressed those two issues.

MS. TAIT:  Thank you, Your Honor.  We understand. We're not going to object any further on that.

THE COURT:  Okay.  All right.  So let's talk about negligence, gullibility, carelessness, or even foolishness. Why is this instruction necessary?

MS. TAIT:  Well, Your Honor, and particularly today, we heard the expert testify about the due diligence process. And I believe that the defense is going to argue that Mr. Guy was careless and didn't take appropriate steps and that --

MS. LEE:  Mr. Mann.

MS. TAIT:  Mr. Mann as well, and that they essentially -- you know, they're responsible for what happened. They should have known better.  They should not have believed the defendant.  They should not have taken him at his word.

And so we do believe this instruction is necessary based on the arguments that we anticipate that are going to come from the defense side.

THE COURT:  I think the defense suggested it wasn't going to say that.

MR. AMINOFF:  No.  Thank you, Your Honor.  The defense was not planning to do that.  But I think one issue that I'm having, Your Honor, is I think the instruction before with your underlined language would cover this because the underlined language goes to the objective standard and specifically says that a victim's subjective motivation.  So it would seem -- it seems to me improper to define the objective standard in the instruction before and then have a separate on negligence.  That just seems to weigh too heavily in the government's favor.

THE COURT:  What are you going to say about due diligence?  That's the whole problem.  What is the point of it? He didn't do something he should have done or -- this whole area of the law is sooner or later maybe going to get clarified, but it's not now.

MR. AMINOFF:  Agreed.  Agreed.  I mean, I think what we are allowed to say is what would Mr. Fritsch have expected in response to his statement.

THE COURT:  So you're going to say that Mr. Fritsch should have expected Mr. Guy to go check, call Disney and say,

"HOW close?"

MR. AMINOFF:  Well, maybe not, Your Honor.  But for example, you know, Ms. Lee wanted to show the expert today the one pager.  I don't think anyone in his right mind would expect to send out a one pager and get $7 million in return.  I just don't.  I think that's materiality.  So it's not a question of what happened with Mr. Guy.  It's Mr. Fritsch's intention when sending out that document whether the statement in those documents are material.  I think that's where it fits.

THE COURT:  Yeah.  I mean, but the problem with that is I don't know whether -- I'm not making a legal argument.  I'm making what I think is a common sense argument.  Is it okay for him to lie?  I'm not saying he did, but this is the government's position, and I have to figure out what instruction to give.  Is it okay for him to lie because he says to himself, well, anybody I'm telling this lie to, will check it out.  So it's okay for me to lie?

MR. AMINOFF:  I think that's the materiality standard, Your Honor; right?  Like, I mean, I think that the point is, like, is this something that someone would rely on, a reasonable person in this person's position?  I don't think it's ever, you know, a good thing to lie.  But if that lie is purely I want to get in the door with these investors and then sell them on my company and whatever, whatever, I don't intend anyone to put money in based on this initial first step, I

don't think that's fraud.

You know, I think there's a big difference between that initial statement and then what comes further down the line. So I'm not saying it's a great thing to lie, but the fact of the matter is I think it all goes to materiality. And if materiality is truly an objective standard, then I don't think it matters.

THE COURT: A great deal with -- the problem with the whole concept of it's okay for me to lie because he should check it out.

MR. AMINOFF: I'm not saying he should necessarily check it out, Your Honor, but I mean --

THE COURT: That's what the witness testified to.

MR. AMINOFF: Well, but I think what the witness testified to is there are certain levels; right? I mean, you know, we all watch advertisements. I don't think any of us expect that everything we see in an advertisement is 100% accurate; right?

And I think there's some wiggle room there. And then as you get further into the process or if the two people are meeting face to face and having a conversation about the company, then maybe the standards start to change. And so I think that is the issue that the jury needs to take into consideration.

I mean, maybe the one pager, there's a bit more wiggle

room on it.  Maybe the e-mails, there's less wiggle room on. And so I think that's where the intent requirement and the materiality come into play.

MS. TAIT:  Well, Your Honor, you can't expect -- I think that the way that we proposed it, with the adjustment that the Court has just made to the jury instruction with the underlining, gets the materiality issue across.  I think it is true when it is Ninth Circuit authority with respect to wire fraud cases, this is a Ninth Circuit instruction, that the victim cannot be blamed for the defendant's -- for falling for a defendant's lie.

And it is also true -- and the jury can keep this in mind -- that the statement has to be important.  In other words, if the defendant lies and says, "StarClub is located in Venice, California," the materiality instruction will tell the jury to be able to evaluate that false statement.

Would the government be silly enough to charge that?  And the jury would be able to most likely handily conclude it was not material and that the victim -- whether he -- you'd still need the victim foolishness instruction, I think potentially. But these things can all be handled by adults like the jury.  I don't think that they're not capable of keeping these things separate.

But it is the case that it's not about the victim's mind. And so you can't blame the victim for what happened.  And you

can't say, well, they were dumb.  You can say, as the Court has now ruled with materiality, that certain statements are important and material, and certain are not.  But you can't blame the victim because it's about the intent of the defendant and the falsity or not of the statements and then the materiality.

MR. AMINOFF:  Your Honor, can I make a suggestion?

THE COURT:  Yes.

MR. AMINOFF:  What if we took -- so on page 2, on the instruction on page 2, if we took the last four lines out, 25 to 28, and then the next two lines on the next page and combined that with the negligence instruction?  So the instruction just sort of read -- and I can type up a draft, but something along the lines of, you know, Mr. Guy testified regarding his reliance on alleged statements made by the defendant.  The victim, subjective --

MS. ABEL:  No.

MR. AMINOFF:  I'm sorry.

MS. ABEL:  Just terms of combining.

MR. AMINOFF:  Yeah.  A victim's subjective motivation is not dispositive on the question of materiality.  A statement can be material even if no one, in fact, relied on it, so long as the statement objectively had the tendency to influence or was capable of influencing a person to part with money or property.  An individual's negligence or intentional disregard

is not a defense of the charge of wire fraud.  However, alleged false or fraudulent pretenses, representations, or statements may be shown not to be material by other general evidence, such as evidence of industry practice.

THE COURT:  I think that has to be written out so everybody can look at it.  But it sounds like closer to addressing the issues.

MS. TAIT:  I agree that it's closer.  I'd like to see it written out.

MR. AMINOFF:  What I just read, just so we're all on the same page, is what the Court has on the bottom of the printed out version on page 2, the underlined portion on the bottom of page 2 and the top of page 3.

MS. TAIT:  Yes, I'm with you there.

MR. AMINOFF:  And then the defense proposed instruction on Docket 446.  And it's the page number on the bottom of the page is 40.

MS. ABEL:  40?

MR. AMINOFF:  I think it's 40.

MS. ABEL:  Excuse me.  Yep.  40.

MS. TAIT:  Your Honor, based on what you've just said, I do -- what Counsel's said, I think we think we'd be in agreement with that, if the Court finds that acceptable.

MS. ABEL:  We'd just submit it in writing as a proposed instruction since we seem to be in agreement.

THE COURT:  Well, we're going to type it out right now.

MS. ABEL:  Would you like -- I can e-mail it.

THE COURT:  Yes.

MS. ABEL:  I'll e-mail it right now.

THE COURT:  Somebody e-mail it to Ms. Jackson.

And you can then print it out; right, T.J.?

Okay.  Great.

MS. ABEL:  And just for the sake of our conversation, maybe we call that the negligence instruction.  That seems to solve our negligence, our reliance, our various problems in a couple of ways.

THE COURT:  All right.

MS. TAIT:  To be clear, the government would propose that it -- well, we'll see it in writing.  But we propose that it's the government sentence followed by the defense, "however."

THE COURT:  All right.  We'll see how that looks.

MR. AMINOFF:  And you want to add -- Your Honor, just since we're talking about it, I think the defense would generally object to the use of the word "victim" throughout the instructions.  So maybe we could either refer to -- I mean, perhaps an alleged victim or Mr. Guy.  We haven't heard from Mr. Mann, so there's not going to be any accusation that --

MS. TAIT:  Your Honor, we have a proposed "alleged

victim."

THE COURT:  All right.

MR. AMINOFF:  I think we might need to take it on a case by case, but I think that would be okay here.

THE COURT:  Okay.  I might interrupt Ms. Abel's train of thought if we move on.

MS. ABEL:  No, Your Honor.  Thank you.

THE COURT:  Okay.  I think that takes us through these comments, too.

Okay.  Now, on page 10 of the little packet I gave you, which starts off "To establish a scheme or plan to defraud," where did that underlined language come from?  Is that one of yours?  Did we stick that in?

MR. AMINOFF:  I believe I stuck it in here.

THE COURT:  That's yours.  Okay.  So it's basically the concept that you're trying to get through the one page that you just sent.

MR. AMINOFF:  The one page that we just sent goes to the intent.  This portion goes to materiality.  That's the difference.  That was what Ms. Abel was talking about to start.

MS. TAIT:  Is just a good time for me to address what's on your page 10?  I don't want to interrupt your thoughts.  So on page 10, so, again, this is again missing the part of the indictment that alleges that there were -- there was a misuse of funds.  And that, you know, the investors were

promised X, Y and Z about the use of funds.  And that, in fact, it was used for other things.  So we would like that to be put in there.  But specifically, with respect to the underlined information, like there's a desire to specify in this manner.

And item two, beginning in 17 to 18, we think that we would say, "Disney and Yucaipa" and cross out "Warner," based on the evidence this was admitted at trial.

THE COURT:  In both places or just one?

MS. TAIT:  Just on line 18.

THE COURT:  Okay.

MS. TAIT:  It's definitely correct as to line 20.

THE COURT:  Well, I guess the defense doesn't object to removing a grounds.

MR. AMINOFF:  Can we add a couple more to that?  No, that's great.  Thank you.

MS. ABEL:  All right.

THE COURT:  So with that change --

MR. AMINOFF:  I'm sorry, Your Honor.

THE COURT:  I'm trying to figure out, with that change, is it now undisputed or not?

MS. TAIT:  No, Your Honor, we still need to add from the indictment, page 4-ish.  Let me see if I can just pull it out.

MS. LEE:  Paragraph D.

MS. TAIT:  Paragraph D of the indictment.  Your

Honor, do you just -- does the Court have a copy?

THE COURT:  I do.

MS. TAIT:  It's on page --

MS. LEE:  Page 4, paragraph D.

MS. TAIT:  Yes, on page 4.  It goes on to the top of page 5.  With the exception of the 7.9 million.

Ms. Abel's e-mail, Your Honor.

THE COURT:  Yes.

MR. AMINOFF:  Oh, wait.  I'm sorry.  Just I think we were a little confused as to exactly what we were adding to page 10.  So there's the underlined portion for me.  We're removing the word "Warner" from line 18.  And then you wanted to add a section from the indictment about the funds.  And could you just give me the line numbers from the indictment that we're adding?

MS. LEE:  Page 4.

MR. AMINOFF:  Yep.

MS. LEE:  Starting at lines 18 through 24.  I have a copy of it.

MR. AMINOFF:  Yeah, no, I'm looking at it.  Your Honor, my only objection to that is that comes from, my understanding, is the contracts that Mr. Guy signed with StarClub.  And respecting the Court's ruling, I wasn't allowed to cross-examine based on the portions of those contracts because the government said it was irrelevant.  But those

contracts are in evidence.  So if that's all going to be in the jury instructions, I feel like it be should be fair game for me to argue the entirety of those contracts to the jury in closing.

MS. LEE:  Your Honor, the evidence comes from the contract, but it also comes from other documents that were admitted in evidence, like pitch documents and presentations. And there's also testimony from Mr. Jorg Mohaupt where he said that he invested and he understood from conversations with Mr. Fritsch that his proceeds would be used for corporate expenses.  So it's not just the contracts.

MR. AMINOFF:  Respectfully, Your Honor, I disagree because I think the slide decks that were presented that included use of funds were about specific capital raises that Mr. Guy and Mr. Mann were not actually involved in.  They're about potential pitches to different companies, like for example, Rock Nation, that had nothing to do with Mr. Guy.  So I think the evidence with respect to Mr. Guy and Mr. Mann are purely those contracts.

THE COURT:  Well, take your choice.  Which do you prefer?  You can refer to the documents, or we're not adding this.

MS. TAIT:  We're okay with defense Counsel being able to argue the contracts, but we think that the language from the indictment in page 4, line 14 through 24 -- sorry, line 18 to

24 -- gotta wear the glasses -- should come in in this section. So if Counsel wants to argue that, then we're okay with that.

THE COURT:  Okay.  Are you making changes as we're talking?  I don't -- I'm not sure what you're doing.

THE LAW CLERK:  Yeah, I can also --

THE COURT:  You're doing your best.

THE LAW CLERK:  Yeah, I can make changes on the fly.

THE COURT:  Okay.  But so let me just --

MS. ABEL:  I think we were referring to page 10, line 21, adding a number four and putting that contract language.

Is everyone in agreement with that proposal?  I think that's what I understand everyone to be suggesting.

MS. LEE:  Adding a four.

MS. ABEL:  Adding a four.  Yeah, yeah.  Is that consistent with what you're proposing.

MS. LEE:  I think what I was envisioning, but is just after number three period, we can just add the language from the indictment, starting with "When soliciting funds."

MS. ABEL:  I just want it to be what we're defining then.

MS. LEE:  Oh, so and number four?

MS. ABEL:  Yeah, yeah.

MS. LEE:  Okay.  That's fine.

MS. ABEL:  Semicolon and number four, I think.

MS. LEE:  Okay.

MS. ABEL:  Yeah.  Ms. Tait, I think we're saying the same thing.

MS. TAIT:  Yeah.

MS. ABEL:  But we were all talking about one set of things.  Perfect.

THE COURT:  All right.  Then we're going back to our first discussion.  And we have the e-mail from Ms. Abel with the proposed instruction.

MS. TAIT:  With respect to the e-mail from Ms. Abel, we are agreeable.

THE COURT:  Where is that going now?

MS. ABEL:  I believe that replaces the 446 proposed instruction at pages 38 and 40 that were originally disputed. It replaces that as well as the lines at the bottom of the Court's printout at page 2-3, the red line there.  So I think that can come out --

MS. LEE:  No.  And this is going in Docket 446, page 31.  This is the language we're adding; right?

MR. AMINOFF:  Yes.  We're at the Court's instructions on the bottom of page 2.  We're taking out the underlining.

MS. LEE:  Yes.  Which is docket 446 at page 31.

MS. TAIT:  Page 31.  Oh, yeah, hold on.

MR. AMINOFF:  That might be right.

MS. ABEL:  That's our wire fraud instruction; right?

MS. LEE:  Yes.

MS. ABEL:  And then so we're adopting the Court's wire fraud instruction at pages 2 to 3, minus the red line.

MS. TAIT:  Let's just double check.  Hold on a moment, please.

MS. ABEL:  Yeah, of course.  No, I -- we all got seven documents.

MS. LEE:  So basically, the underlined portion of the Court's instruction beginning at page 2, the underline is coming out.  And we're adding this e-mail, the statements in this e-mail.

MS. TAIT:  Removing it essentially.

MS. ABEL:  Right.  The statements in that e-mail, my understanding is resolve the party's disputes identified at 446, pages 38 or pages 38 through 42.

MR. AMINOFF:  So that replaces the Court's page 5.

MS. LEE:  Agree.

MS. ABEL:  Replaces the Court's instruction on page 5.  Please tell us if we make no sense.

MR. AMINOFF:  Been a long three weeks.

THE COURT:  It's been a longer trial that I'd been doing.

MS. LEE:  I don't think we have a problem.

MS. TAIT:  Right.

MS. LEE:  Okay.  No issues with that.

MS. ABEL:  Okay.  So then we've got scheme, which we just dealt with.  And then we've got materiality.  Scheme?  We've done a scheme which is at pages 10 to 11.  And then we've got materiality, which is this one.

(A discussion was had sotto voce.)

THE COURT:  I think we're at 16 now with my short.

MS. ABEL:  Yes.  Your Honor, can we just have a moment?  Based on the changes that were already made, maybe we can eliminate some objection.

THE COURT:  That would be great.

MS. ABEL:  Thank you, Your Honor.

MS. TAIT:  I'm sorry.  With the cross talk, I couldn't hear.  Which one are we on?

THE COURT:  Page 14.

MS. TAIT:  I'm sorry.  16.

THE COURT:  Okay.

(A discussion was had sotto voce.)

THE COURT:  I address that basically by adding a part of that red line that starts on page 2.

MS. LEE:  Your Honor, the additional proposed language in Ms. Abel's e-mail removes the part of the instruction that says the materiality is evaluated under an objective test.  So maybe one thing we can do --

THE COURT:  Why don't you go ahead and talk about it.

MS. LEE:  Add those two sentences to your e-mail.

MS. ABEL:  Which?  I think I know what we're hearing -- can you tell us exactly which two sentences we're talking about?

MS. LEE:  The element of materiality is evaluated under an objective test that examines the intrinsic capabilities of the false statement itself.

MS. ABEL:  Okay.  I think we would also propose that the -- and give me one second.

MS. LEE:  And then this is already --

MS. ABEL:  And maybe we put that at the top of the revised proposed, because it -- now we're in the land of materiality.  So we ground the jury in which element we're talking about.  Is that -- does that make sense?

MS. LEE:  Your Honor, may I have a moment to confirm with Ms. Abel.  If we look at the same document, maybe it's easier.  Okay.

(A discussion was had sotto voce.)

MS. LEE:  What I was envisioning was different from what everyone else was envisioning.  But in the Court's mini version, page 2, I understand that we're just removing the currently underlying portion, and then we're creating a new instruction in addition to this wire fraud instruction that has the language from Ms. Abel's e-mail in addition to additional language which is currently on page 16 of the Court's mini version.

The only dispute, I believe, that the parties have right now is whether we should include the sentence that starts on line 6, beginning "What is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose.  And the government requests that language, and the defense objects.

THE COURT:  And where does the language come from?

MS. TAIT:  Your Honor, it comes from Lindsey in their discussion of what is material.  It's part of the Lindsey decision, and it's part of the discussion of, you know, what -- how the objectivity and how it doesn't matter what's inside the mind of the victim, essentially.

THE COURT:  Well, that's a correct statement of the law.

MS. ABEL:  Your Honor, can we just have just a moment?

THE COURT:  Sure.

MS. ABEL:  Your Honor, as you have reread and reread Lindsey, that case concerns the admissibility of lender carelessness evidence.  And we've certainly addressed the lender carelessness issue, but it does not frame a jury instruction.

THE COURT:  It doesn't have to frame a jury instruction.  The issue is whether this statement is the law, not whether it's in Lindsey or somewhere else.

MS. ABEL:  Yes, Your Honor, I don't think it defines the relevant -- I think it confuses the issue of materiality and intent.  I don't think it is a misstatement.  I think it's in the wrong place, because here we're just --

THE COURT:  Where do you want to put it?

MS. ABEL:  In intent?  Right.  Because I think that that is a statement regarding intent, and I think right now we're having a conversation about materiality and the definition of that term as it relates to Mr. Guy, reliance, negligence, et cetera.  And I think confusion of those issues will confuse what is already a confusing issue.  And certainly, --

THE COURT:  As long as it's in the instructions, just put it somewhere in the instructions.

MS. ABEL:  Yes, Your Honor.  I think the goal is to keep intent defined, materiality defined, scheme to defraud defined, and try and -- that way the jury can kind of follow along.  There's a main instruction, and then a definition of each element would be the hope.  And I just worry that that one would blend the elements together.

THE COURT:  All right.  Well, write something out.  Tell me where you want to put it.  And then Ms. Lee can write something out and tell me where she wants to put it.

(A discussion was had sotto voce.)

MS. TAIT:  In either Galecki or Lindsey.  And so I

guess we're going to just have to withdraw that sentence.  Not having that, I do think it's a correct statement of law, but I just cannot find it at this moment.

THE COURT:  Okay.

MS. TAIT:  And this is with respect to the sentence: What is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose.

THE COURT:  All right.  So I'm not sure where we are. I think I'm -- are you sure where we are?

MS. ABEL:  Oh.

MS. TAIT:  Okay.

THE LAW CLERK:  I made the change in the document.

THE COURT:  Okay.  So what -- tell us what you have changed so we can figure out whether there's more.  I don't know whether you were listening to all of this or working on what we gave you before.

THE LAW CLERK:  I think I'll use the defense version. The last e-mail.

MS. ABEL:  I think that's right.

THE COURT:  Right.

MS. ABEL:  I think you're agreeing to withdraw the one additional sentence.

MS. TAIT:  The sentence that I just read.  Yes.

MS. ABEL:  Right.  That is exactly what you, Sarah, just sent.  But without that sentence is what the defense said.

So I think we're in agreement.

MS. TAIT:  Okay.

MS. ABEL:  And then I think that just leaves two things, which is the falsity instruction, which I understand the government opposes.  And maybe we could turn to that next if everyone is ready.

MS. LEE:  You handed page 19.

MS. ABEL:  Yeah, exactly.

MS. LEE:  Of the mini instructions.

(A discussion was had sotto voce.)

MS. TAIT:  Your Honor, would you like our position on the defense falsity instruction, which is the one that begins on the Court's page 20?

THE COURT:  Yes

MS. TAIT:  Okay.  So we do continue to object to this.  We think that it's already adequately covered in the main wire fraud instruction.  And we think that it looks like, you know, the defense made this proposal when it thought that we were going to be talking in the case that the trial would be about forward looking statements.  But that's not what happened.

It wasn't the sort of thing where defendant was making, you know, generalized sort of statements of future profits.  He was making specific statements about what's happening next week with Ron Buckle.  So we don't think that this is an appropriate

instruction.

THE COURT:  Slow down.

MS. TAIT:  Sorry.

We think it's adequately covered already by the Ninth Circuit jury instruction as modified.

MR. AMINOFF:  Thank you.  Your Honor, I respectfully disagree.  I think we've outlined in the earlier instruction on page 10 various false statements that Mr. Fritsch has allegedly made.  I think during the course of the trial, we've shown that those aren't, in fact, false.  And I think instruction on what is false is more than appropriate.  I think I can leave it there because it seems to me that the government spent a lot of time trying to present statements that they're claiming is false.  So it would only seem fair to me to define what that means.

THE COURT:  What?

MR. AMINOFF:  Sorry.

THE COURT:  What?

MR. AMINOFF:  Sorry.  The government's claimed Mr. Fritsch has made various false statements.  They spent a lot of time talking about those.  I think we should have an instruction on what is false so we can argue that point.  I mean, I think it's kind of central to the case.  I don't know why we wouldn't have an instruction on that.

(A discussion was had sotto voce.)

THE COURT: It's only the last sentence that the evidence --

MS. LEE: Yes, we were just about to propose that. Your Honor, we're fine with everything except for the last sentence.

MS. ABEL: Beginning with expressions of opinion.

THE COURT: Yes, and Counsel is, of course, to argue that the alleged statements or misrepresentations were, in their view, just aspirations. But we don't think that's appropriate for an instruction.

MR. AMINOFF: You know, just a brief response.

THE COURT: Well, it's -- to some degree, it's legal talk because we talk in terms of aspirations, goals, etc.

What does general subjective claims mean?

(A discussion was had sotto voce.)

THE COURT: Mr. Aminoff?

MR. AMINOFF: You know, Your Honor, what that means. I mean, Mr. Fritsch described some of these meetings as being very good, having gone very well. And, you know, I think the government is going to try and point out that these e-mails are wholesale lies. And so I think it would go to something like that.

There's a lot of very general claims made in some of these e-mails, and I think it should be clear that that is not the basis for fraud. I mean, a lot of -- a lot of his e-mails, a

lot of the statements in his e-mails, I would say are expressions of opinion, aspirations or goals, or general subjective claims.

THE COURT: I don't think there's a better way to say it than this. So some of them clearly were not direct false --

MS. TAIT: Well, I think, Your Honor --

THE COURT: They were not lies.

MS. TAIT: I think Your Honor is correct though, that general subjective claims is confusing and should come out if the Court is inclined to give the rest of the sentence.

THE COURT: Well, are you going to claim or argue that he was reporting that a meeting went well, and that was a lie?

MS. LEE: The focus of those e-mails are specific representations about Disney, for example, about to enter into an M&A transaction. And so Counsel is free to argue that that was, you know, an aspirational statement. But general subjective claims, it's just vague. That's not the focus of our argument.

THE COURT: You didn't answer my question.

MS. ABEL: I believe that's a concession.

MS. LEE: Am I -- I mean, I think we are going to rely on the e-mails as part of what misrepresentations were made in the case. But I still don't know what general subjective claims means.

THE COURT: Well, I don't either. That's part of the problem.

MR. AMINOFF: I mean, without having all the e-mails in front of me, I think it was things along the lines of "This meeting went very well." I mean, there was one, as I recall, where Mr. --

THE COURT: The jury's not going to know that that's what a general subjective claim means because I don't know.

MR. AMINOFF: I understand that, Your Honor. I think the problem is, like, there have been a lot of e-mails that have been admitted, and I would hedge on the side of a slightly perhaps over-inclusive instruction, because, you know, --

THE COURT: You would.

MR. AMINOFF: No.

THE COURT: The question is whether I would.

MR. AMINOFF: Of course. Of course. Obviously, it's entirely up to the Court, but, you know, there's a lot of claims in there that are just sort of very flowery, hopeful language. And I do --

THE COURT: I tell you what, you can use this, but you have to come up with a better way to say general subjective claims.

MR. AMINOFF: Okay. Okay.

THE COURT: Good.

MR. AMINOFF: I'll look.

THE COURT:  It doesn't have any particular meaning to me, and I can't think it will to jurors.

MR. AMINOFF:  We'll have a look at the case law and make some suggestions.

THE COURT:  Okay.

Remembering that just because the case uses that language does not mean it goes in a jury instruction.

All right.  What about this most currently proposed one?  Did we deal with that?

MS. TAIT:  I have an additional objection that, you know, we just received it while we were sitting here that I didn't raise before, Your Honor.  And so I understand this to be directed towards intent.  I have not been received the site yet to Lou, unless it just came in by e-mail.  I assume I know which Miller case it is.

But in paragraph 2, this misstates what Mr. Fritsch's intent to defraud would have to be with respect to Mr. Guy because Mr. Guy invested $6 million after he got the one pager from Mr. Fritsch.  And this paragraph 2 suggests that he cannot be somehow -- that that's not actionable as to Mr. Guy, but it is.

The wire fraud scheme was ongoing at the time.  Mr. Guy was both investing himself and recruiting actively other investors for Mr. Fritsch.  And Mr. Guy received that one pager just like Mr. Mann, we believe, did.  Or in other words, he

received the one pager relating to the current investors.

And that third element is not present in the second paragraph.  To be clear, we don't think that these specifics belong here anyway.  But again, I haven't read Counsel's authority for their allegation that it does.

THE COURT:  All right.  So you need to do that.

MR. AMINOFF:  Thank you, Your Honor.  So it's clear what our position is, the reason that we left that third one out is because the subject matter of Count 1 is a January 2015 wire transfer.  And the one pager was sent in October of 2015.  So while it may be relevant to scheme to defraud, I don't think it's relevant to intent as to Count 1.

MS. TAIT:  Your Honor, that's not how I understand wire fraud to work.  I think the wire fraud -- the intent to defraud happens throughout the scheme to defraud, and the wire to execute the scheme to defraud or various wires happens when they happen.  The scheme is still ongoing, as I've explained with respect to Count 2, certainly, and actually just the behavior of the defendant after the charged Count 1.

And so therefore the intent to defraud with respect to specific -- if you're going to tie it to specifically specific false statements, the one pager with respect to Danny Guy is relevant if you're going to be tying it to specific false statements to the intent to defraud.

And I just got the case from Counsel, Your Honor, so I'll

be right --

THE COURT:  So Ms. Wardlaw and I are going to go back and work on these, and you can read the cases, and somebody send me the citations.

MR. AMINOFF:  I believe I actually did unintentionally, but I did.  It was Lee and Miller, Your Honor.

MS. TAIT:  Lou.

MR. AMINOFF:  Lou and Miller.  Excuse me.

THE COURT:  Okay.  We'll be back.

(A brief recess was taken.)

THE COURT:  All right.  So you now have a full set of instructions.  I haven't numbered the instructions.  As you can see, the first instruction on page 2 obviously goes somewhere else if we need to basically repeat what I had said before to remove that.  And the same for the instruction on page 3.  So those will go in there later.  Some gives you a few minutes to work through these specifically for the ones that we've been talking about.  We did not necessarily resolve the issue we were discussing last.

We are also in agreement that the government wanted to look at the case or cases.  So I'll give you a few minutes and then try to wrap this up as much as possible, unless you've resolved it while we were back there.

(A brief recess was taken.)

THE COURT:  What would you like you to discuss?

MS. TAIT:  Well, Your Honor, could we start with the defense?  I guess we're calling it the intent instruction.

THE COURT:  Just got a proposal.

MS. TAIT:  Oh, there we go.

THE COURT:  So where is that now?  And what page is that now?

MS. LEE:  Page 26 of the newest set.  Yeah.  The Court's proposal works for us.

MR. AMINOFF:  You know, the defense would object to the Court's proposal.  And, Your Honor, the problem is, given the way this case has been tried, I don't think it's going to be at all clear to the jury what we are -- what we're talking about, quite frankly.  And it's going to be extremely difficult to argue to the jury what it is that establishes Mr. Fritsch's intent.

THE COURT:  I know you'll figure it out.  You think it's right for me to tell them.

MR. AMINOFF:  Your Honor, I think one of the problems is I don't think the instruction, as it's written, makes clear that the false statement needs to come before the wire transfer.  And I think that is a correct statement of the law. I think if you could at least put that.  Because the problem is, Your Honor --

THE COURT:  It only needs to be a single wire transfer during the course of the scheme.  There has to be a

scheme.

MR. AMINOFF:  Yes, Your Honor.  There has to be a scheme.

THE COURT:  Do you have a case that says the wire transfer has to come in a particular order?

MR. AMINOFF:  Well, I think what has to come in the order, Your Honor, is the deception and then the depriving the victim of the money or the property.  I think those two things it has to work in that order, because otherwise it makes no sense that if Mr. Guy -- if Mr. Fritsch had never spoken to Mr. Guy, Mr. Guy transfers $7 million to him, and then a year later, Mr. Fritsch makes false statements, obviously, that's not wire fraud; right?  So there have -- sorry.

THE COURT:  It's a scheme.

MR. AMINOFF:  Yes, Your Honor.

THE COURT:  It's a process.

MR. AMINOFF:  Yes.

THE COURT:  He's doing lots of things, allegedly.

MR. AMINOFF:  Yes.

THE COURT:  And at some point, there was a wire.  There was lots of wires, actually.  They could have charged an endless number of wires.  They only need to try to charge one in the course of the scheme; right?

MR. AMINOFF:  Right.

They did charge one.  And I think what we're saying is,

under Miller, there has to be some convergence between the false representations by Mr. Fritsch and that, in this case, wire. Because the money transfer is via wire, that's what they're alleging, then the two have to come together in some way. And so that's why we've written the instruction, as we have, that there has to be the false statements inducing that wire transfer.

MS. TAIT: No, Your Honor, I disagree. I think that the Court has it right. It is a process. And I would direct the Court to -- we also have an issue, similar issue, with one of the Court's jury instructions here, too. But it is a process, and during the process, there are wires executed. And the Court is right. We could have and maybe should have charged many more wires that occurred during the course of the scheme. And they can occur at multiple times.

As long as it's part of the defendant's intent that the intent to defraud and intent to execute the scheme and the -- and so I think this is correct. What the Court has proposed is correct.

And I don't believe that Miller or Lou supports what the defendant is arguing. I think those cases talk about whether the false statement has to be made to the victim from whom the money's taken. And that's a different issue. It's not the execution of the wire count.

We do have a similar issue, Your Honor.

THE COURT:  All right.  So do you have some authority that you would like me to look at in addition to Lou and Miller?

MS. TAIT:  Yes, Your Honor, I would point to the Court to Schmuck, 705, 714 to 715, basically talking about innocent mailings.

And Jinian, 725 F.3rd 954, around 960 to 961.

THE COURT:  How do you spell the --

MS. TAIT:  J-I-N-I-A-N.

THE COURT:  What other issue do you have?

MS. TAIT:  So for the same reasons as on this issue that we were just addressing, the government would request that the Court excise, on page 21 of the Court's instructions, the paragraph beginning at line 28 continuing to page 22 of the Court's instructions to line 4.  Because again, that's confusing, we believe, because it again tries to tie a particular execution of the wire fraud scheme to particular false statements, which is not the way wire fraud works.

The scheme is a process.  It exists.  And the wire executes the scheme.

And when the Court's ready, we have one final recommendation.

THE COURT:  What's wrong with the sentence with --

MS. TAIT.  The paragraph -- sorry, pages 20 to 21.

THE COURT:  21 to 22.

MS. TAIT: Sorry. 21 to 22. Excuse me. So the sentence reads, for each count, the government must prove that one of the charge false statements was made to investors in furtherance of the alleged scheme to defraud, i.e., to obtain money and property.

THE COURT: What's wrong with that?

MS. TAIT: My concern is that that's going to bring in the same argument for the defense that you must -- that would be incorrect to say that, for Count 1, you must find these false statements, and, for Count 2, you must find those false statements when that's not the way wire fraud works.

(A discussion was had sotto voce.)

THE COURT: For each count, the government has to prove the charge material -- is that your problem? The charge materially false?

MS. TAIT: I would say -- let's see. I would say that to remove for each count, we would say, therefore, the government must prove that one of the charged materially false prefaces, representations, et cetera, was made, i.e, to obtain money and property from the alleged victims.

THE COURT: What's the difference?

MS. TAIT: Well, the difference is that --

THE COURT: I mean, say it again.

MS. LEE: We're just removing "for each count," those three words, from line 28.

THE COURT:  That's true, isn't it?  You have to prove the same thing for each count.  The elements are the same for each count.

MS. LEE:  I think the concern is that we're tying the specific charged executions to the materially false statements.

MS. TAIT:  I'm trying to think of a way we could put in the word "scheme" in there, Your Honor.

THE COURT:  But it says in furtherance of the alleged scheme to defraud.

(A discussion was had sotto voce.)

MS. TAIT:  Your Honor, we're struggling to come up with an alternative.  And so if that's the Court's instruction, then we're gonna drop that.

May I raise one, I hope not controversial, recommendation?

THE COURT:  Okay.

MS. TAIT:  The page 37 of the Court's instructions, the Verdict Form references.  So we proposed this, Your Honor, before the parties, I think, had a stipulation, I think.

And so in the current -- the form that we proposed, I think, the last jury instructions we had mentioned the wire transfer from London, et cetera.  But the evidence didn't come in that way.

What we recommend, Your Honor, is that, instead of the paragraphs beginning from line 7 through 12, that the Court simply say what's in the Verdict Form, which is correct and

matches the stipulation.  So, for example, for Count 1, a wire transfer -- reading from the Verdict Form -- of $7 million from D.G. to StarClub on or about January 30, 2015.

THE COURT:  No.  This certainly should track the Verdict Form.

MS. TAIT:  Right.  That's what we're asking.

THE COURT:  Yes.

MS. TAIT:  Yeah.

THE COURT:  Is there any objection?  Did you agree to the Verdict Form?

MS. ABEL:  I'm not sure that we're seeing what the government is referring to in the Verdict Form.  Can we just have a moment?

THE COURT:  Sure.

(A discussion was had sotto voce.)

MR. AMINOFF:  We have no objection to removing the locations in the Court's instruction on page 37.

THE COURT:  Okay.  So I'll make the instruction the same as the Verdict Form.

MR. AMINOFF:  Yes, please, Your Honor.

THE COURT:  And I haven't looked at it, but if it mentions the criminal code section, I will take that out of the Verdict Form.

MS. TAIT:  It does not.

THE COURT:  All right.  Any other issues with

anything that should be taken out or added to the instructions.

MS. TAIT: Not from the government?

MS. ABEL: Your Honor, I just want to briefly return to the intent instruction, and I just want to highlight the defense's position is that, as consistent with Miller, that there is a causation requirement and that that requirement falls under the intent element, not under the scheme element. And so that's -- the defense has been intentional in its requests.

And so the proposal that the parties are in agreement with on page 21 as to the scheme involves all of the alleged misrepresentations 1, 2, 3, and 4. No dispute. The argument that the defense is raising as to intent is that intent is separate and that certain evidence is relevant to scheme but is not relevant to intent. And I think Miller supports that, when it says that, wire fraud requires the intent to deceive and cheat, in other words, to deprive the victim of money or property by means of deception.

The phrase "by means of" which is in the 1343 statute, requires causation -- by means of. So the deception has to cause the intent to deprive the money or property. And that causation means it has to happen before, if it happens after the causation element is eliminated, and again, uniquely to the intent element.

And so it almost operates as a limiting instruction. You

can consider these things for the scheme, but as to intent, you can only consider the things that precede the wire charged. And to Your Honor's point, if they had charged four wires, we would not have such a limit.

But here we have a factual argument.  I agree it is factual, but if we talk about it in closing, it will sound like an instruction to the jury.  And we certainly do not want to be the ones instructing the jury.  And instead, what it really is is a limiting instruction, which is generally proper.  And that is why we have isolated the factually preceding false statements.  And I don't know that -- I don't understand the parties to have a dispute as to which ones preceded the statement.

THE COURT:  I was just going to ask that.

MS. ABEL:  Thank you.

THE COURT:  Assuming I were to agree with the defense, does the government agree that those specific items were the only ones that came before?

MS. TAIT:  No, Your Honor, we don't.

THE COURT:  Which ones do you think came before?

MS. TAIT:  Well, for example, looking at the -- what the Court lined out.  So the first lined out paragraph, number one, you know, the 50 million in revenue.

Number two, you need to take out Warner, as we did, with another dispute that we discussed.  But, number two, Disney,

Warner.  Yes.

Number three has to be added, which is the current investors being Credit Suisse, Access, and Warner.

And number four needs to be added, which would be, as we did with the other instruction, the part about the promises about the uses of funds.

MR. AMINOFF:  Your Honor, if I could clarify why we phrased it the way we did.

THE COURT:  Yes.

MR. AMINOFF:  So the one pager, Access, Warner, and Credit Suisse are current investors.  That was sent in October of 2015, so post-dating, obviously the January 30, 2015 wire transfer.  So for that reason, because it's after, we took it out.

The use of proceeds, the use of proceeds is found in three different contracts, none of which pertain to the January 30, 2015 wire transfer.  It appears at Exhibit 192 on page 19 with respect to the January 2014 wire transfer.  It appears in Exhibit 119 at page 5 of the December 10, 2014, wire transfer. And then it appears at Exhibit 143.

THE COURT:  I'm sorry, this isn't helpful.  I'm going to look at the cases, and instead of my trying to remember this, I want you both to e-mail me your positions with regard to the timing.  If I agree with the defense position and you need to explain the detail that you were just giving me --

MR. AMINOFF: So I'll put that in an e-mail and send it to you.

THE COURT: Yes.

MR. AMINOFF: Yes. Gotcha. Thank you, Your Honor.

THE COURT: Tonight, as soon as possible.

Okay. Anything else?

(A discussion was had sotto voce.)

MS. TAIT: Oh, yes, Your Honor, just one thing we discussed earlier the issue of the contracts and the issue of what could be commented on with respect to the contracts. I just wanted to say that, if the government feels that any kind of argument in closing is contrary to the jury instructions in some fashion, that the government would object.

We expect that -- for example, if they try to say that this contract absolves you of wire fraud, in other words, that's going to be objectionable because the Court's instructions will control. So I just wanted to raise that.

THE COURT: Correct. Okay. So the instruction that's here on page 2, which relates to depositions, do you want me to repeat that somewhere in these instructions or eliminate it?

MS. TAIT: I think it could stay on.

THE COURT: Okay. And the next one is you've heard a recording. Do you want that to stay, too?

MS. LEE: Yes, Your Honor.

THE COURT: Okay. All right.

MR. THREATT: All right. Your Honor, just one brief final point. When Sydney Huy, the assistant investigator, was on the stand, the defense moved to admit a number of documents from the USPTO. I understand the Court's ruling as to the trademarks, but there was a discussion at the sidebar where, I think, the defense, at least, was under the impression that we would be able to admit the patents and the patent applications. I believe there are up eight of them total. I can give the exhibit numbers.

But once we were back in front of the jury, the Court took them under submission. I don't believe the parties or the Court have addressed those exhibits since.

THE COURT: I take it the government objects.

MS. TAIT: You know, Your Honor, in light of the way the testimony came in, the government does not object to the patents and the patent applications.

THE COURT: Okay. Those are admitted.

MR. THREATT: Thank you, Your Honor. Just to be clear, those are numbers 702 through 1702 through 1710. Just to make sure that we're all talking about the same documents.

THE COURT: Thank you.

(Exhibits 1702, 1703, 1704, 1705, 1706, 1707, 1708, 1709, and 1710 were received into evidence.)

THE COURT: Anything else?

MS. LEE:  Not from the government, Your Honor.

MS. ABEL:  Not from the defense, Your Honor.

THE COURT:  All right.  Well, we'll work on these and send them to you sometime later this evening.  And 8:00 o'clock tomorrow.  All right.

MS. TAIT:  Thank you, Your Honor.

MS. LEE:  So we'll be here by 8:00 a.m. tomorrow?

THE COURT:  By 8:00 a.m.

MS. LEE:  Okay.  Thank you.

THE COURT:  And have a good evening.

MS. TAIT:  Thank you.

THE COURTROOM DEPUTY:  Court is adjourned.

(Adjourned at 4:13 p.m.)

-oOo-

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.


/s/ Suzanne M. McKennon, CSR, CRR, RMR
_____     Date:  12/30/2025
United States Court Reporter

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov     (213) 894-3913