UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

-oOo-

HONORABLE DALE S. FISCHER, UNITED STATES DISTRICT JUDGE

UNITED STATES OF AMERICA,

                    Plaintiff,

     v.                              No. 2:17-cr-00520-DSF-1

BERNHARD EUGEN FRITSCH,

                    Defendant.


REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL PROCEEDINGS

TRIAL DAY 9

LOS ANGELES, CALIFORNIA

APRIL 3, 2025

_____

SUZANNE M. MCKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

APPEARANCES:


On Behalf of the Government:

    MONICA E. TAIT, Assistant United States Attorney
        United States Attorney's Office
        Major Frauds Section
        312 N Spring Street, Suite 1100
        Los Angeles, California 90012


    JOSEPH DE LEON, Attorney at Law
        Latham and Watkins, LLP
        10250 Constellation Boulevard, 11th Floor
        Los Angeles, California 90067


    SARAH SUN LEE
        Jenner and Block LLP
        515 South Flower Street, Suite 3300
        Los Angeles, California 90071-2246


On Behalf of the Defendant:

    JAMES S. THREATT, Deputy Federal Public Defender
    JONATHAN C. AMINOFF, Deputy Federal Public Defender
    REBECCA M. ABEL, Deputy Federal Public Defender
        Federal Public Defenders Office
        321 East 2nd Street
        Los Angeles, California 90012

**INDEX**

CLOSING INSTRUCTIONS BY THE COURT. . . . . . . . . p.   15

CLOSING ARGUMENT BY MS. LEE. . . . . . . . . . . p.   32

CLOSING ARGUMENT BY MR. AMINOFF. . . . . . . . . p.   60

REBUTTAL CLOSING ARGUMENT BY MS. TAIT. . . . . . p.   87

FINAL CLOSING INSTRUCTIONS BY THE COURT. . . . . p. 117

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov     (213) 894-3913

(Proceedings commenced on April 3, 2025, at 8:07 a.m.)

THE COURT:  We're all conserving funds, so you're getting two for each side.

So do I have a Word version of the Verdict Form?

MS. LEE:  I believe we may have e-mailed it to chambers, but it seems like a long time ago.  So I can try to re-mail it.

THE COURT:  Why don't you check and make sure that the caption page reads the same as the caption page for the jury instructions and also that it doesn't refer to the code section.  And then we can all take a look at it.  These instructions are what I sent to you previously, except for the one that was marked "draft."

I have read everything you've submitted, read the cases which I find not at all helpful for either side because they don't seem to have anything to do with the issue that I need to decide.

I hope I haven't lost my voice before I have to start reading jury instructions.

So I don't know the answer.  But as we do down here in the District Court, we give it our best shot, and then the Ninth Circuit tells me if I was right or wrong, but only if the Defendant's found guilty.

So I have used the defense proposed instruction just correcting the same typo that was in one of the other

instructions changing "of" to "or."

I think the reason there was no help in the case law -- at least I didn't find any help in the case law -- is because this is a relatively unique situation.  I was looking back at a couple of wire fraud cases I've had and a number of others. And as I think the defense pointed out, it's because of the way the government pleaded it.  If the government had pleaded on such and such a date Mr. Fritsch sent the following wire, they could have had a whole bunch of counts, but they didn't.  They have the two, and that's the two we're addressing so.

MS. TAIT:  Well, Your Honor, may I just be heard regarding the defense instruction that the Court has adopted?

THE COURT:  Yes.

MS. TAIT:  So the Court has adopted the second two paragraphs of that defense instruction.  In other words, that, for Count 1, it's 15 million in revenue for 2015 Disney, Warner, Yucaipa.

Is that right, Your Honor?

THE COURT:  No, that was not.

MS. TAIT:  Oh, I'm sorry.

THE Court:  Did we put the wrong one in there?

MS. TAIT:  Pardon me.  Sorry.  I'm sorry, Your Honor. Let me review page 26.

THE COURT:  The defense stated that you had apparently convinced them that an additional item should be in

with regard to Count 1.  So that's what we have there.
Actually, there's some kind of --

MS. TAIT:  Your Honor, just with respect to Count 2, this is referring to page 26, lines 24 to 27.  Your Honor, Count 2 happened in January of 2016.  That just means that's when the scheme was executed a second time, in January 2016. But all of the events leading up to that were the scheme to defraud, and that includes all of the misreps because Mr. Guy testified he wouldn't have given the Defendant any money.  He wouldn't have referred his friends to the Defendant, his friends include Ian Mann.

And so it is relevant everything that came before and not just the things that came immediately before, because the scheme was an arc, and it was ongoing, and everything that the Defendant set up to that point was relevant and was part of the scheme of defraud.

So when you have Count 2 in isolation only with respect to the revenue claim, that assumes that only one victim exists, which is Ian Mann.  Mr. Fritsch was attempting to get more money from Danny Guy at that same time.  That's why Danny Guy went to the meeting in January 26, 2016.  He, as it turns out, Mr. Fritsch didn't get anymore meeting -- money from Danny Guy, but he was intending to get money, and that's the scheme to defraud.

THE COURT:  I understand what you're saying.

MS. TAIT:  Okay.

THE COURT:  Now, I'm not sure if some of them was before the date of the wire in Count 1.  I thought this was the language you had given.

MS. TAIT:  We had not.  But with respect to the way this is phrased, in other words, the intent to defraud -- I mean, I'm sorry if I didn't phrase it correctly, Your Honor.  I mean, I think we have two very different views of it but --

THE COURT:  Clearly.

MS. TAIT:  Yeah.

THE COURT:  I don't know which is right but --

MS. TAIT:  Right.  I think that what is right is that the intent to defraud element goes to scheme to defraud.  It doesn't go to making a wire, because there's no intent required with respect to wire.  You just have to know that a wire is going to happen.

THE COURT:  Okay.  Well, you've gone over this unnamable position.

MS. TAIT:  Right.  Thank you, Your Honor.

THE COURT:  My question is with regard to this particular instruction --

MS. TAIT:  Yes.

THE COURT:  -- which is the basic instruction I've decided to give, right or wrong.  Every day I come in here, I do my best to work correctly every single time.  I fail

miserably some days and only minimally on other days, but all I can do is try.  There's not a lot of help out there for this.

But if there were more misrepresentations that were made to Danny Guy than the ones that are in this paragraph before the wire, then they should go in here.  I believe I asked you to do that and tell me what they were, but you didn't.  You just decided you were going to stick with your position and not.

MS. TAIT:  I'm sorry, Your Honor.  And I will chalk it up to tiredness that I completely dropped that.  And as you say it, now, I do remember you saying that.  But I'm very sorry, Your Honor.

Every misrepresentation that Danny Guy heard up until January of 2016 is relevant to Count 2, because --

THE COURT:  Okay.  Relevant to Count 2?

MS. TAIT:  Yes.

THE COURT:  Danny Guy?

MS. TAIT:  Yes.  Because the scheme was still ongoing as to Mr. Guy in January of 2016 when a wire was executed, which happened to be Mr. Mann's payment of money.  But Mr. Fritsch was trying to get Mr. Guy to give more money as well as Mr. Mann.  That's the scheme to defraud.  He's lying to get more money.

THE COURT:  I understand what you allege he was doing.

MS. TAIT:  Right.

THE COURT:  What I'm asking you now relates to Count 1 --

MS. TAIT:  Okay.

THE COURT:  -- up to the date of the wire.

MS. TAIT:  I'm sorry, I thought we were talking about Count 2.

THE COURT:  No.

MS. TAIT:  I apologize.  Count 1.

THE COURT:  Count 1 is Mr. Guy.

MS. TAIT:  Right.

THE COURT:  Okay.

MS. TAIT:  Count 1.  You know, so our position is that it was a unitary scheme and that they -- all of the misreps should be there.  But with -- if the Court wants to divide things out for Count 1 -- let me just review this really quickly.

THE COURT:  I want to be done with this.

MS. TAIT:  Of course, Your Honor.

THE COURT:  I would like you to do what I asked you to do, and that is identify any specific misrepresentations such as appears here right now, false claim that Disney and Yucaipa were on the verge of acquiring, etc.

Are there other specific things that go in this paragraph that happened before the wire that you've charged?

MS. TAIT:  As Count 1?

MS. ABEL:  Yes.

THE COURT:  So I will now go back into chambers again, and you will identify those to the defense.

MS. ABEL:  Can I make a brief proposal?

THE COURT:  Yes.

MS. ABEL:  I'm sorry.  The defense outlined in a chart, on page 7 of its filing last night, the facts.  If the government has a disagreement, I would -- I think that would resolve the Court's question.

THE COURT:  Okay.  Well, two of you talk.  I'm sure she has your --

MS. TAIT:  All right.

THE COURT:  And somebody's sending me the Verdict Form after you fixed it.  And I need to figure out -- I should have done this yesterday.  We need to figure out what to do with Alternate Number 1.  I don't think we need to decide today about Juror 7, but I don't think it makes sense to have Alternate Number 1 come back tomorrow because, if we sub him in and they aren't done by the end of the day tomorrow, I have to sub in a different alternate.

MS. TAIT:  That Alternate Number 1, he's just away for the weekend, isn't he?  Friday.

THE COURT:  He's away Monday.

MS. TAIT:  He's away Monday as well.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

THE COURT:  And they'll be deliberating.  If they haven't come up with a verdict, they'll be deliberating Monday.

MS. TAIT:  Isn't it also the case that Juror Number 7, she's in the same boat, though, because she's away Monday?

THE COURT:  Yes.

MS. TAIT:  Okay.

THE COURT:  If they come up with a verdict before --

MS. TAIT:  She's a juror, not an alternate.  I understand, Your Honor.

MS. ABEL:  Defense has no objection to releasing juror number -- I can't.  I don't know.  Alternate Number 1.

THE COURT:  Alternate 1.  I think I'll entertain him with your closings before that, since he's probably on his way here already.

MS. ABEL:  He's on the edge of his seat.

MS. TAIT:  Your Honor, so with respect to the homework that we're going to accomplish in the next few minutes, we will also then address -- and again, I apologize, Your Honor.  Also trying to do our best and appreciate that the Court also is working so hard.  But we will also specify for Count 2 what we believe the misrepresentation should be in instruction number 21, beginning at lines 24, because we do have an issue with that as well.

THE COURT:  I'm sorry, what?

We are still on 21?

MS. TAIT:  Yes.  Just --

THE COURT:  And you said --

MS. TAIT:  We're going to get back to you with respect to Count 1, but we also will propose some additional language with respect to the paragraph on count -- about Count 2.

THE COURT:  Okay.  Well, you can try.

MS. TAIT:  Okay.  Thank you, Your Honor.

THE COURT:  That's it.

(A brief recess was taken.)

THE COURT:  You can have a seat.  With regard to the instruction the government just proposed, what is the defense position?

MS. ABEL:  We received no proposal, Your Honor.  But as to the Verdict Form, we are -- I didn't hear you ask about that perhaps.

THE COURT:  Not yet.

MS. ABEL:  Okay.  Sorry.  But as to the jury instruction, we received no proposal.

MS. TAIT:  Oh, you did not receive it?  I'm so sorry.

MS. ABEL:  Did you e-mail it?

MS. TAIT:  Yes, I did.

MS. ABEL:  Oh, oh, okay.  No, I wasn't.  I was looking at exhibits.

MS. TAIT:  Okay.  I'm sorry, Rebecca.  I'm sorry that

I didn't point it out to you.  Yeah, no, I just --

MS. ABEL:  Yeah, no, I just -- it's fine.

Your Honor, the government is just re-arguing the same position that --

THE COURT:  Exactly.  I'm going to --

MS. ABEL:  Thank you.  Appreciate it.

THE COURT:  -- do what I had proposed.

MS. TAIT:  Your Honor, just one more thing, Your Honor.  I'm so sorry to stand on this, but, you know, trying to advocate for the government.  In October of 2015, when Mr. Fritsch, as his scheme was ongoing, he sent this one pager to Mr. Guy, and Mr. Guy then sent him $6 million in November.  And it does not --

THE COURT:  I understand your point.

MS. TAIT:  Yes.

THE COURT:  I even agree that you might be right, but they might be right, too.  And I think they're more likely to be right based on the way you pled the indictment.

MS. TAIT:  Okay.  Well, --

THE COURT:  That's all I can do.

MS. TAIT:  I appreciate that, Your Honor.  I just wanted to make sure that I wasn't, you know, not explaining my position.  And thank you, Your Honor.  We do disagree, but I appreciate that.  Okay.

THE COURT:  And congratulations.  I hear you have a

new boss.

MS. TAIT:  I haven't met --

THE COURT:  The quickest ever in all the time I've been here.

MS. TAIT:  Yeah, I think it's -- it's not -- yeah, there's a way to do it.

THE COURT:  Oh, clearly.  The Attorney General apparently says, "You're the U.S. Attorney for the Central District."

It's a lot easier than what I went through, that's for sure.

All right.  So Verdict Form?

MS. ABEL:  No objection.

MS. TAIT:  No objection.

THE COURT:  All right.  Good.

All right.  Well, when one juror called and said she was going to be -- she's seven minutes away, but that still gets her on time, so.

All right.  Anything else we need to discuss?

MS. ABEL:  Okay.

MS. TAIT:  No, Your Honor.

MR. THREATT:  Not from the defense, Your Honor.

THE COURT:  See you soon.

(A brief recess was taken.)

THE COURT:  Okay.  You may be seated.  Everyone is

back.

Has anyone heard, seen, or read anything about the case since yesterday?

I don't see any hands.  Sit back and relax.

Members of the Jury, now that you have heard all the evidence, it is my duty to instruct you on the law that applies to this case.  A copy of these instructions will be available in the jury room for you to consult.

It is your duty to weigh and to evaluate all the evidence received in the case and in that process to decide the facts. It is also your duty to apply the law as I give it to you, to the facts as you find them, whether you agree with the law or not.  You must decide the case solely on the evidence and the law.  You will recall that you took an oath promising to do so at the beginning of the case.  You should also not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases. Unconscious biases or stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

You must follow all these instructions and not single out some and ignore others.  They are all important.  Please do not

read into these instructions or into anything I may have said or done as any suggestion as to what verdict you should return. That is a matter entirely up to you.

The indictment is not evidence.  The Defendant has pleaded not guilty to each of the charges.  The Defendant is presumed to be innocent unless and until the government proves the Defendant guilty beyond a reasonable doubt.  In addition, the Defendant does not have to testify or present any evidence to prove innocence.  The government has the burden of proving every element of the charges beyond a reasonable doubt.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the Defendant is guilty.  It is not required that the government prove guilt beyond all possible doubt.

A reasonable doubt is a doubt based upon reason and common sense and is not based purely on speculation.  It may arise from a careful and impartial consideration of all the evidence or from lack of evidence.

If after a careful and impartial consideration of all the evidence, you are not convinced beyond a reasonable doubt that the Defendant is guilty, it is your duty to find the Defendant not guilty.  On the other hand, if, after a careful and impartial consideration of all the evidence, you are convinced beyond a reasonable doubt that the Defendant is guilty, it is your duty to find the Defendant guilty.

The indictment charges that the offenses alleged were

committed on or about a certain date.

Although it's necessary for the government to prove beyond a reasonable doubt that the offenses were committed on a date reasonably near the date alleged in the indictment, it is not necessary for the government to prove that the offenses were committed precisely on the date charged.

The evidence you are to consider when deciding what the facts are consists of:

one, the sworn testimony of any witness;

two, the exhibits received in evidence; and,

three, any facts to which the parties have agreed.

In reaching your verdict, you may consider only the testimony and exhibits received in evidence. The following things are not evidence, and you may not consider them in deciding what the facts are:

One, questions, statements, objections, and arguments by the lawyers are not evidence. The lawyers are not witnesses. Although you must consider a lawyer's questions to understand the answers of a witness, the lawyer's questions are not evidence. Similarly, what the lawyers have said in their opening statements and at other times and will say in their closing arguments is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers state them, your memory of them controls.

Two, any testimony that I have excluded, stricken, or instructed you to disregard is not evidence. In addition, some evidence was received only for a limited purpose. When I have instructed you to consider certain evidence in a limited way, you must do so.

And, three, anything you may have seen or heard when the Court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Evidence may be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which you can find another fact.

You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give to any evidence.

By way of an example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night. However, other evidence, such as a garden hose that was left turned on may provide an explanation for the water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you

must consider all the evidence in the light of reason, experience, and common sense.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it, or none of it.

In considering the testimony of any witness, you may take into account the following:

First, the opportunity and ability of the witness to see or hear or know the things testified to;

Second, the witness's memory;

Third, the witness's manner while testifying;

Fourth, the witness's interest in the outcome of the case, if any;

Fifth, the witness's bias or prejudice, if any;

Sixth, whether other evidence contradicted the witness's testimony;

Seventh, the reasonableness of the witness's testimony in light of all the evidence; and

Eighth, any other factors that bear unbelievability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but

remember it differently.  You may consider these differences but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify. What is important is how believable the witnesses were and how much weight you think their testimony deserves.

When a person is unavailable to testify at trial, the deposition of that person may be used at the trial.  A deposition is the testimony of a witness taken before trial. The lawyers for each party may ask questions.  The questions and answers are recorded.  The deposition of Jorg Mohaupt and Gavin O'Reilly were presented to you.  You should consider deposition testimony in the same way that you consider the testimony of the witnesses who have appeared before you.

You have heard a recording that has been received in evidence.  A transcript of the recording is shown to you to help you identify speakers and as a guide to help you listen to the recording.  However, bear in mind that the recording is the evidence, not the transcript.  If you heard something different from what appeared in the transcript, what you heard is controlling.

You have heard testimony that Defendant made statements. It is for you to decide, one, whether the Defendant made the statements and, two, if so, how much weight to give to them. In making those decisions, you should consider all the evidence about the statements, including the circumstances under which the Defendant may have made them.

A Defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict, the law prohibits you from considering in any manner that the Defendant did not testify.

You have heard testimony from Eugene Izumo and Annabelle Burguiere who testified about their opinions and the reasons for those opinions.  This opinion testimony is allowed because of the specialized knowledge, skill, experience, training, or education of the witness.

Such opinion testimony should be judged like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's

knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

You have also heard Trevor Sturges testify about his opinions and the reasons for those opinions.  Some of the testimony you have heard from this witness is based on the specialized knowledge, skill, experience, training, or education of this witness.  This testimony is allowed because of the knowledge, skill, experience, training, or education of this witness.  It should be judged like any other testimony. You may accept all of it, part of it, or none of it.  You should give it as much weight as you think it deserves, considering the witness's knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.

Other opinion testimony you have heard from this witness is called "lay opinion testimony."  Lay opinion testimony is based on inferences drawn from the witness's direct perceptions and must be rationally based on those perceptions and not on speculation or what someone else has said.  You should judge lay opinion testimony like any other testimony.  You may accept all of it, part of it, or none of it.  You should give it as much weight as you think it deserves.  When considering lay opinion testimony, however, you should not give it any extra credence based on the specialized knowledge, skill, experience,

training, or education of this witness.

You should also consider whether the witness testified about a lay opinion based on the witness's perceptions or testifying to an opinion based on specialized knowledge, skill, experience, training, or education.  When a witness provides opinion testimony based on knowledge, skill, experience, training, or education, that person might rely on facts that are not based on his or her personal observations or involvement, but that opinion cannot serve as proof of the underlying facts.

You should also consider the factors discussed earlier in these instructions that were provided to assist you in weighing the credibility of witnesses.

Also, the fact that a witness is allowed to express opinions based on that person's specialized knowledge, skill, experience, training, or education should not cause you to give that witness undue deference for any aspect of that person's testimony or otherwise influence your assessment of the credibility of that witness.

During the trial, certain charts and summaries were shown to you to help explain the evidence in the case.  Some of the charts and summaries were not admitted into evidence and will not go into the jury room with you.  They are not themselves evidence or proof of any facts.  If they do not correctly reflect the facts or figures shown by the evidence in the case,

you should disregard these charts and summaries and determine the facts from the underlying evidence.

Certain other charts and summaries have been admitted into evidence.  Charts and summaries are only as good as the underlying supporting material.  You should, therefore, give them only such weight as you think the underlying material deserves.

You are here only to determine whether Defendant is guilty or not guilty of the charges in the indictment.  The Defendant is not on trial for any conduct or offense not charged in the indictment.

The Defendant is charged in Counts 1 and 2 of the indictment with wire fraud.  For the Defendant to be found guilty of that charge, the government must prove each of the following elements beyond a reasonable doubt.

First, the Defendant knowingly participated in or devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  Deceitful statements of half truths may constitute false or fraudulent representations;

Second, the statements made as part of the scheme were material, that is, they had a natural tendency to influence or were capable of influencing a person to part with money or property;

Third, the Defendant acted with the intent to defraud,

that is, the intent to deceive and cheat; and

Fourth, the Defendant used or caused to be used an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.  Count 1 alleges a wire transfer of $7 million from Mr. Guy to StarClub on or about January 30, 2015.  Count 2 alleges a wire transfer of $1 million from      Mr. Mann to StarClub on or about January 25, 2016.

In determining whether a scheme to defraud exists, you may consider not only the Defendant's words and statements but also the circumstances in which they are used as a whole.

A wire is caused when one knows that a wire will be used in the ordinary course of business or when one can reasonably foresee such use.

To convict Defendant of wire fraud, the false or fraudulent pretenses, representations, or promises must directly or indirectly deceive the alleged victim about the nature of the bargain.  A misrepresentation will go to the nature of the bargain if it goes to price or quality or otherwise to essential aspects of the transaction.  Whether a misrepresentation goes to the nature of the bargain may depend on the specific transaction at issue.

It need not have been reasonably foreseeable to the Defendant that the wire communication would be interstate or foreign in nature.  Rather, it must have been reasonably

foreseeable to the Defendant that some wire communication would occur in furtherance of the scheme.  And an interstate or foreign wire communication must have actually occurred in furtherance of the scheme.

To establish a scheme or plan to defraud, the government must prove beyond a reasonable doubt the Defendant had a plan to obtain the alleged victim's money by means of deceit. Obtaining that money must have been the object of not merely incidental to that plan.  It is not enough if Defendant both obtained the alleged victim's money and deceived the alleged victim.  The deceit must have been the mechanism by which the Defendant obtained the alleged victim's money.  Withholding potentially valuable economic information necessary to make discretionary economic decisions is not a scheme or plan to defraud.

In Counts 1 and 2, the government alleges that Defendant knowingly devised a scheme to defraud investors in StarClub. That scheme is alleged to have been carried out by making the materially false and fraudulent pretenses, representations, and promises charged in the indictment.  Specifically, that Defendant falsely claimed:

One, that StarClub generated $15 million in revenue in 2015; Two, Disney and Yucaipa were on the verge of acquiring part or all of StarClub or planning commercial partnerships with StarClub; Three, Access Industries, Credit Suisse, and

Warner were current StarClub investors; and, Four, when soliciting funds from potential investors, Defendant also represented that StarClub would use investor money for certain specified purposes, including, a, to launch what it described as vertically integrated and interactive social media platforms, the channels for talent partners, celebrities, and global brands; b, for technology enhancements related to such channels; and, c, for working capital and general corporate purposes.

Therefore, for each count, the government must prove that one of the charged materially false and fraudulent pretenses, representations, and promises was made to investors in furtherance of the alleged scheme to defraud, i.e., to obtain money and property from the alleged victims.

Unless the government proves beyond a reasonable doubt that Defendant knowingly devised a scheme to defraud, you must find Defendant not guilty as to the particular count you are considering.

The government alleges the existence of a single scheme to defraud.  Each of the jurors must find the Defendant guilty of participation in the same single scheme to defraud and that the scheme to defraud in which the Defendant is found to have participated is the same scheme as the overall fraudulent scheme charged by the government.

A pretense, representation, or promise is false if it is

untrue when made and was then known to be untrue by the persons making it or causing it to be made.  A pretense, representation, or promise is fraudulent if it was falsely made with the specific intention to deceive and cheat, that is, to obtain money and property from someone by deceiving or making false representations to that person.  Expressions of opinion, aspirations, goals, or puffery cannot be used as a basis to find that Defendant made false and fraudulent representations.

The element of materiality is evaluated under an objective test that examines the intrinsic capabilities of the false statement itself.  To be material, a statement need only have the propensity or capacity to influence or affect a decision. Materiality, while an objective assessment, is judged in relation to the persons to whom a statement is addressed.

Mr. Guy has testified regarding his reliance on alleged statements made by Defendant.  An alleged victim's subjective motivation is not dispositive on the question of materiality. A statement can be material even if no one, in fact, relied on it, so long as the statement objectively had the tendency to influence or was capable of influencing a person to part with money or property.

An individual's negligence or intentional disregard is not a defense to a charge of wire fraud.  However, alleged false or fraudulent pretenses, representations, or statements may be shown not to be material by other general evidence, such as

evidence of industry practice.

A separate element of wire fraud requires the government to prove beyond a reasonable doubt that the Defendant had the intent to defraud.  A Defendant does not have the intent to defraud unless he simultaneously has both the intent to deceive the victim and the intent to obtain that victim's meaning by means of that particular deceit.

To establish beyond a reasonable doubt that Defendant had the intent to defraud, you must determine as to each count that Defendant acted with the intent not only to make false statements or utilize other forms of deception, but also to deprive a victim of money or property by means of those deceptions.

To establish beyond a reasonable doubt the Defendant had the intent to defraud, you must determine, as to Count 1 pertaining to Mr. Guy, whether Defendant falsely claimed:

One, Disney and Yucaipa were on the verge of acquiring part or all of StarClub or planning commercial partnerships with StarClub; or, Two, StarClub would use investor money for certain specified purposes, including, a, to launch what it described as vertically integrated and interactive social media platforms, the channels for talent partners, celebrities, and global brands; b, for technology enhancements related to such channels; and, c, for working capital and general corporate purposes.

To establish beyond a reasonable doubt that the Defendant had the intent to defraud, you must determine, as to Count 2 pertaining to Mr. Mann, whether Defendant falsely claimed that StarClub generated $15 million in revenue in 2015.

An act is done willingly if the Defendant is aware of the act and does not act or fail to act through ignorance, mistake, or accident.  You may consider evidence of the Defendant's words, acts, or omissions along with all the other evidence in deciding whether the Defendant acted knowingly.

A separate crime is charged against the Defendant in each count.  You must decide each count separately.  Your verdict on one count should not control your verdict on the other count.

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room.  A computer will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment and how to locate and view the exhibits on the computer.  If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the Bailiff signed by your foreperson or one or more members of the jury. Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on

maintenance or instruction, a court technician may enter the jury room, with the Bailiff present, for the sole purpose of assuring that the only matter that is discussed is the technical problem.  When the court technician or any nonjuror is in the jury room, the jury shall not deliberate.  No juror may say anything to the court technician or any nonjuror other than to describe the technical problem or to seek information about operation of the equipment.  Do not discuss any exhibit or any aspect of the case.

The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case.  You may not use the computer for any other purpose.  At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any outside website, database, directory, game, or other material.  Do not attempt to alter the computer to obtain access to such materials.  If you discover that the computer provides or allows access to such materials, you must inform the Court immediately and refrain from viewing such materials.  Do not remove the computer or any electronic data from the jury room and do not copy any such data.

Those are the initial jury instructions.  And as I said yesterday, you've heard all the evidence.  It's now time to hear the arguments of Counsel.  I'll have just a few more instructions after Counsel has finished.

I'll remind you again that what the attorneys say during argument is not evidence.  Each attorney will outline for you his or her interpretation as to what the evidence shows.  If the attorneys state the evidence to you differently from your recollection of the evidence, you should rely on your own recollection of the evidence.

If the attorneys discuss the law and it is different from my instructions on the law, you must rely on the law as I have stated it to you.

First, the government will give an opening argument.  Then the defense will give an opening argument.  And then the government will give a closing argument.

Ms. Lee, it looks like you're up.  Are you ready to go?

MS. LEE:  I believe so, Your Honor.

THE COURT:  All right.

**CLOSING ARGUMENT BY THE GOVERNMENT**

MS. LEE:  Good morning, Members of the Jury.  At the beginning of this trial, we told you that this case is about the Defendant's lies.  It's about his stack of lies.  It's about the lies that he told investors to take money from them.  And it's about the lies that he told to hide the ways that he was using that money.

The Defendant ran a company called StarClub.  And you heard a lot about that company at this trial.  The Defendant ran the operations of the company, and the Defendant ran the

finances of that company.  And the Defendant also recruited investors to invest in the company and promised he would use their money for business purposes.  And Defendant told additional lies to keep the money coming in.

The Defendant claimed that StarClub made $15 million in revenue in 2015.  The Defendant also told lies about commercial deals and potential investments from companies like Disney and Yucaipa.  The Defendant also lied about current investors in StarClub, including Access Industries, Warner, and Credit Suisse.

These were lies, and the Defendant intended to lie.  And you know that he intended to lie because you saw the way that he used the investor's money -- to enrich himself; to buy exotic cars; to fix up his house; to fix up his yacht, the Madame Musique; to pay his ex-wife, his girlfriend, his children's camp expenses.  And that was a crime.  It was a crime for the Defendant to tell falsehoods, to take money from people and use it for a purpose that he didn't tell the investors he was using it for.

And for his crimes, Members of the Jury, the Defendant has been charged with wire fraud, two counts of wire fraud.  And the Court just instructed you on the elements or the requirements of wire fraud, but I'm going to briefly go over them again.

The first element is that the Defendant knowingly

participated in or devised a scheme or plan to defraud for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  All this means is that the Defendant participated in a scheme through lies.  He ran a scheme through lies.

Second, the statements made as part of the scheme were material, that is, they had a natural tendency to influence or were capable of influencing a person to part with money or property.  And the key word here is material, that the lies mattered, that they made a difference.

Third, the Defendant acted with the intent to defraud, that is, the intent to deceive and cheat.  And all this means is that the Defendant intended to lie.  He knew that he was lying when he was lying.

The fourth and final element is that the Defendant used or caused to be used an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.  This just means that the wires pass between different states or from a foreign country into the United States.

And at this point, I'm going to go through all the evidence that you saw at this trial and explain how each element is supported by the evidence.  And I'm going to start with the last element because the parties essentially agree on this one.

The parties have filed a stipulation, which was entered

into evidence, that the two counts charged against the Defendant involved a foreign or interstate wire.  That's Exhibit 512.  It was entered into evidence, and it's an agreement by the parties as to specific facts.  We read that stipulation to you at trial during Agent Greg Austin's testimony.  It's Exhibit 512.

It says that the $7 million wire that was sent on January 30, 2015, to the StarClub account, was an interstate or foreign wire communication.  And you heard testimony from Mr. Guy and Agent Austin that that wire was from Danny Guy's company, Salida.

Exhibit 301 has the bank account statement that shows this wire coming in.  And you can see that it was from Salida, Danny Guy's company.

The stipulation also refers to Count 2.  The parties have agreed that the $1 million wire sent on or about January 25, 2016, was also an interstate or foreign wire communication. And that deposit is in the same exhibit that we saw before, Exhibit 301-E.  And you can see the $1 million wire coming in from Mr. Ian Mann.

So the fourth element is easy.  And the parties agree that these wires were interstate or foreign wires.  And that element is met.

Now, I'm going to go back to the first two elements and discuss these together, whether Defendant had a plan to defraud

through lies and whether those lies were material.  Defendant had a plan to defraud his investors.  He convinced them to invest in StarClub.  He told investors that he would use their money to build out the technology of the company.  And you saw this in several documents during the trial.

Here's one of the documents that Danny Guy's company signed.  And it says that the money that Mr. Guy paid for will go for general corporate purposes, including technology enhancements.  This is Exhibit 196.

Here's another document.  It's Exhibit 203.  And this is part of a pitch document that the Defendant sent to Mr. Guy to get money from investors.  And it says that the money he's raising, the capital raised for StarClub, is going to go to certain purposes, including launching of channels, technology development, working capital and reserves, and investment banking fees.  This is Exhibit 203.

And you heard Mr. Guy testify that he believed his money was going to go to StarClub's business.  And you heard from Mr. Jorg Mohaupt, too.  He was one of the gentlemen who testified by video, deposition video.  He's from the Netherlands.  And he said he made a personal investment into StarClub and that, based on his conversations with the Defendant, he believed that his money was going to further develop the business and for general and working capital purposes.

So this was part of the Defendant's plan to bring investors in by promising that he would use their money for StarClub's business only.  Then he told three categories of lies to keep the money coming in.  And we told you about those lies at the beginning of trial, and you heard them again throughout the trial.

First, Defendant lied about StarClub's revenues.  He told investors that StarClub made $15 million in revenue in 2015.  And you heard testimony from Mr. Guy about a meeting in January 2016.  Mr. Guy and Mr. Ian Mann, both from Bermuda, traveled to StarClub's offices in Santa Monica.  And you saw e-mails from the Defendant setting up that meeting.

Here's one of them.  This is Exhibit 151.  The date of this e-mail is January 16, 2016.  It's an e-mail from Mr. Fritsch, the Defendant, to Danny Guy.  It says, "Hi, Danny, safe travels tomorrow.  I am looking forward to have you here this coming week.  We can pin down the following times at StarClub Monday with you and Ian Mann."  The Monday after this e-mail is January 18, 2016.

And Mr. Guy testified that, during that meeting in January 2016, Mr. Guy and Mr. Mann heard the Defendant claim that StarClub had made $15 million in revenue in 2015.  Then the day after that January 18th meeting, Mr. Guy sent a follow-up e-mail.  This is dated January 19th, 2016, to the Defendant and to the CFO, Mr. Polsen.  This is Exhibit 154.

And Mr. Guy says, "Guys, just a follow up from yesterday." And he lists a bunch of questions.  And one of them is:  "Can you provide a breakdown of where all the 2015 revenue came from specifically?"

And the Defendant never gives a straight response as to where the revenue came from.  Instead, about four months later, he sends over another document confirming what he said.  This is an e-mail dated April 25, 2016.  It's from the Defendant again to Mr. Guy.  It's Exhibit 171.

And he attaches what he calls an integration plan.  And in that document is this slide that claims StarClub made historically approximately $15 million in revenue in 2015.

So how do we know that this is material?  How do we know that this mattered?  Mr. Guy testified that the financials of a company matters when he makes investments and that positive revenues show positive growth.

And Mr. Izumo, who was one of Defendant's experts who testified, also told you that revenues are highly important to investors and potential investors and that, when you talk about historical revenues, that's not just optimism, but these are facts.  Those are representations.

In this case, Defendant claimed that StarClub made $15 million in revenue was a misrepresentation.  It was a lie.

When Mr. Guy asked about details, he was never given a straight answer.

When Mr. O'Reilly, who was the chief marketing officer who worked at StarClub, he also testified by video -- he was the English gentleman. He said that he came into StarClub, and he tried to do work there, and he needed the financials of the company in order to understand the company's position. But he said that, when he asked the Defendant for detailed financial information, that he was constantly fobbed off. I think that means that he was just brushed off.

So take a look, when you deliberate, at Exhibit 58. This is account -- this is an account of Mr. O'Reilly's time at StarClub. He said that he needed basic financial information to do his job. The Defendant was evasive. And Mr. O'Reilly never got any audited accounts.

When the FBI agent, Greg Austin, testified, he also said that he collected thousands of pages of documents and reviewed them, and he never saw any audited financials for 2015.

So what does that mean? It means the only way that someone could truly understand how much revenue StarClub made in 2015 was to look at the bank account statements.

And Mr. Bouchard, an accountant who testified at trial, did that. He reviewed all the bank records for StarClub between January 2014 and July 2017 and determined that the only possible revenue that StarClub made in 2015 was approximately $47,000. You saw this during the trial.

And to get to this number, Mr. Bouchard testified that he

added up all the incoming money into StarClub's accounts and then he subtracted money from investors, refunds, cash, interest, and other transfers from StarClub accounts or other accounts that the Defendant controlled.

So basically what he did was he added up all of the money that came from an external source that wasn't investor money, and he got to this number.  And that amount for 2015 was $46,763.58.  It was not anything close to $15 million.

So the Defendant was lying when he told Mr. Guy and Mr. Mann that.  And you know he was lying because he admitted this himself when he was interviewed by Agent Austin.

(Video excerpt played.)

MS. LEE:  The Defendant told Agent Austin -- this is Exhibit 518 -- that StarClub is just starting to generate revenue.  And this was in August 2017.

So when the Defendant told Danny Guy and Ian Mann that StarClub had made $15 million in revenue in 2015, that was a lie.

Now, let's talk about the next category of lies, the deals.  The Defendant lied over and over again that StarClub was super close to entering into a commercial transaction with companies like Disney and Yucaipa.  And you saw these lies in the many e-mails that the Defendant sent Mr. Guy.  Here's one about Yucaipa.  It's Exhibit 108.

The Defendant, Mr. Fritsch, on July 18, 2014, says, "Hi

Danny, what a day.  Just got back.  Richard d'Abo, Ron Burkle, CFO is putting the deal together."

You heard from Mr. d'Abo at trial.  He said that he works for Yucaipa, and that Ron Burkle is his boss.  So the Defendant is talking about Yucaipa here.  And the Defendant told lie after lie to Mr. Guy about how he was about to enter into a deal with Yucaipa.

Here's another one, Exhibit 110.  So Mr. Guy on July 27, 2014, asks, "Anything new on the deal?"

And two days later the Defendant responds, "Hi, Danny. Yes, we are moving along.  I will be meeting with Ron Burkle this week in NYC, Thursday, Friday to complete the discussions about the deal."  Again, the Defendant is saying StarClub is about to complete a deal with Yucaipa.

Here's another one, Exhibit 111.  Mr. Guy asks again, "So do we have a deal?  That's on the bottom August 1st. Same day, the Defendant responds, "Yes, according to Ron B. we have a deal for $9 a share."  A few lines down, "Paperwork will get done by his CFO, Richard d'Abo," who called me and asked that we have to work with their speed, but he will get it done. And the Defendant says, "This is a good one for us from a credibility point of view."  These were material statements.

Look at what the Defendant just says himself.  He says, "This is good for us.  Yucaipa partnering with StarClub will be good from a credibility point o view.  The investors will care

about that.  You should care about that.  That's going to impact your share price."

Mr. Guy -- you actually heard this word "credibility" over and over again.  That's how you know that these statements were material.  Mr. Guy testified that, if a high profile investor like Yucaipa came into the company, that that would provide credibility, and it would allow StarClub to grow faster.

Mr. d'Abo, the representative from Yucaipa, also said that he knows, from his experience at Yucaipa, that a partnership from Yucaipa provides credibility to other companies because Yucaipa is respected in that way.  So these statements that the Defendant was saying were material, and they were lies.

You heard straight from Mr. d'Abo.  He said he was never even the CFO of Yucaipa.  He said that he had a conversation with the Defendant but that Yucaipa never had a deal with StarClub and they were never even close to finalizing a deal with StarClub.

And Mr. d'Abo testified that he received an offer from Mr. Fritsch for $9 a share.  But that to him, the difference between an offer and a deal is night and day.  There was never a deal.  Mr. d'Abo said that he didn't like the structure of the offer and he thought it was not appropriate for Yucaipa.  So the Defendant's statement were lies.

It's the same story for Disney.  The Defendant told lies over and over again about Disney.  Here's Exhibit 115, the

e-mail.  And if you look at the second e-mail on this page, it's the e-mail from the Defendant.  He says, "Hi, Danny, I just got back from a long, intense, but very positive meeting with Disney.  They are willing to proceed on the deal."  And he talks about the deal, and he says, "We are on a perfect track." He kept up this lie about Disney for a while.

This is Exhibit 4, e-mail dated December 23, 2014.  And at the bottom of the e-mail, he says that Maker Studios/Disney is planning to enter into a commercial transaction with StarClub. And the Defendant knows that these statements are material because he's asking Mr. Guy above for more money.  He's saying, "We need cash now to produce revenues."  So he's making these statements about Disney to convince Mr. Guy to give him more cash.

About a month later, another e-mail about Disney, January 27, 2015.  He makes all these statements about Disney, "The meeting with Disney was better than expected.  And we're going to start the process of an M&A transaction.  We're starting that process, and it's going to be better than expected."

He also says, in the same breath, "I want to encourage us to complete a $10 million fundraise."

What does that mean?  I want more money.  I want $10 million more dollars.  I want you to give me more money. And don't worry, your money is gonna be worth it because all

this stuff with Disney is happening.  We're gonna be in an M&A transaction with Disney.

And you heard at trial that M&A means mergers and acquisitions, which means the Defendant is saying here that Disney is about to buyout StarClub.

Defendant's lies worked.  Three days later, Danny Guy sent $7 million to StarClub.  But the evidence in trial showed that Defendant's statements about Disney were lies.

You heard from two witnesses at trial about Disney and Maker Studios, which was bought out by Disney.  First, you heard from Mr. Courtney Holt.  He testified early on in the trial.  And he said that he initially worked at Maker Studios before Disney bought Maker Studios out.  So he understands that it's material to have a transaction with Disney, even if Disney is just considering you, because he went through it with Maker, and he knows that Disney -- a partnership with Disney is meaningful and validates the company.

And Mr. Holt testified that he met with Mr. Fritsch but never said Disney was interested in any deal with StarClub.  And he did not see the value of any commercial deal with StarClub.  And that it was not accurate for Mr. Fritsch to say a deal would close anytime soon.

You also heard testimony from Mr. Mayor.  Mr. Mayor testified that he worked at Disney for 25 years in this period, when the Defendant was making these statements about Disney,

before Mr. Mayor became the CEO of TikTok.  Mr. Mayor testified that, because Disney has a powerful set of brands, that small companies like StarClub would, of course, want to be in business with Disney.

And he did testify that he had meetings with the Defendant and he did run the Mergers and Acquisition Group, but that he never told the Defendant that an M&A transaction was going to be started, and he never started any diligence process with StarClub.

So Defendant's claim that Disney and Maker Studios was planning to enter into a commercial transaction with StarClub, by February 2015, that was a lie.  They were material.  They were Defendant's attempts to get money from investors, and they mattered.

Now, for the final category of lies.  Defendant also told potential investors that he had current investors in the company that were reputable companies like Credit Suisse, Access, and Warner.  Here's Exhibit 201.

It's a promotional one pager that the Defendant e-mailed to Danny Guy.  You can see the e-mail on other pages of Exhibit 201.  Defendant's expert, Mr. Izumo, testified that one pagers like this are sent to investors to induce them into investing.  It says right here that current investors include Access Industries, Credit Suisse, and Warner.

And throughout this trial, you heard testimony after

testimony from witness after witness that this was a lie. First, you heard from Mr. Michael Robinson. He also testified early on in this trial. He told you that Access Industries is a big investment firm. They're based in New York and London, and that the core function of Access is making investments in other companies.

And he said that investment from Access is material because they have a durable pool of money, and they've had success in investments. And he said that he searched all the spreadsheets and databases that would have a record of an investment into StarClub and that there was no record of any investment into StarClub.

You heard about Access from Jorg Mohaupt as well. He is, again, the gentleman who testified on the video. He said he personally invested $500,000 into StarClub, but that that was not an investment by Access. When Mr. Mohaupt was asked, if he ever proposed an investment to Access, the firm, Mr. Mohaupt said that would not have been appropriate, so there was no point in proposing.

And he also testified, if there was an investment by Access, he would have known about it because he was a partner at Access, and there was never an investment by Access.

Mr. Mohaupt was shown this exhibit, Exhibit 4. Again, it talks about Disney, but it also talks about Access. It says, "Access is nervous that our revenues are going to go up before

they can write a check.  And the share price would be possibly way over $20 a share."

The Defendant is saying Access is about to invest and they're nervous that the share price is going to go up.  And Mr. Mohaupt testified that these statements were untrue.  He testified that, if he had known about these false statements, he would not have invested into StarClub and that he did not want to be abused.  He didn't want his personal investment to be sold as an investment by Access.

Finally, Defendant admitted himself that Access was not an investor in StarClub.

(Video excerpt was played.)

MS. LEE:  Again, this is another audio clip from Agent Austin's interview with the Defendant in August 2017. And he's saying here that members of Access invest in StarClub, but that Access itself was never an investor in a StarClub. That was a lie.

Now, let's turn to Credit Suisse.  It's another lie.  You heard from Mr. Ryan Yanovich again early on in the trial, and he is a lawyer.  He's currently at UBS.  But Credit Suisse was bought out by UBS, and he also worked at Credit Suisse.  He testified that Credit Suisse is a global investment bank. Again, their job is to make investments.

And that when Agent Austin, back in 2017, reached out to Credit Suisse and said, "Hey, can you search your records and

see if there's any investment into StarClub?" his team did a search of all the records in the United States, and there were no hits, no record of any investment by Credit Suisse into StarClub.  That was another lie.

And it was the same story for Warner.  You heard from Mr. John Glass, another witness at trial.  He told you that Warner Music is one of the top three major record labels in the country.  So, of course, StarClub wanted them to be an investor.  They represent celebrities like Led Zeppelin, Pink Floyd, Bruno Mars, Ed Sheeran.

And Mr. Glass said that he's the head of digital legal affairs.  That means he was in charge of investments and deals into companies.  He also said that he had conversations with the Defendant, but again, a deal was never finalized, no investment was inked, and Warner never invested in StarClub.

Mr. Mohaupt, again, he also testified about Warner, and that's because Access, where Mr. Mohaupt was a partner, owned Warner Music Group.  And Mr. Mohaupt as a board member of Warner Music Group.  And he said that he would have known about an investment by Warner into StarClub.  And there was never any investment.  There never was.

When Agent Austin asked Defendant straight up if Credit Suisse or Warner was an investor in StarClub, the Defendant said "No."

(Video excerpt was played.)

MS. LEE:  This is another clip from the Defendant's interview.  It's Exhibit 532.  Again, the interview was August 2017.  And in this clip, Agent Austin asks, "Is Credit Suisse an investor?"

And Defendant tries to hedge.  He goes, "Well, management has invested."  But to the direct question, "Has Credit Suisse ever invested in StarClub?" he has no response.

And then Agent Austin asked, "Well, has Warner ever invested?"

And the Defendant again tries to hedge.  Again, he goes, "Well, you know, Jorg Mohaupt, he is affiliated with Warner."

But when Agent Austin asks, "Has Warner itself ever invested in StarClub?"

The Defendant says, "No, not that I'm aware of."

He said, "No, Credit Suisse is not an investor.  Access is not an investor."  This is another one of Defendant's lies.

The Defendant planned and participated in a scheme to defraud his investors through these lies.  And those lies were material.  They mattered.

And that brings us to our last element, intent.  Did the Defendant act with the intent of defraud?  Did he know that he was lying?  The evidence shows that he did.

We know that he intended to lie because he controlled all of the conversations with the investors.  And then he controlled how the money was spent.  And then he misused that

money.

First, Defendant knew exactly what he was saying to investors.  He controlled all the conversations with the investors.  Mr. Guy testified that he talked to Mr. Fritsch a hundred times more than anyone else at StarClub.  And you saw that in the e-mails, the vast majority of them are just between Mr. Guy and Mr. Fritsch.  There's no one else.  All those e-mails about Disney, Yucaipa, Credit Suisse, Warner Access -- it's just Mr. Fritsch sending them.  So he was aware of those lies.

And that matches what Mr. Mohaupt said, too.  He said, when he was investing into StarClub, his primary contact was Mr. Fritsch.

Defendant also controlled the money he got from the investors.  And you heard testimony from people at StarClub who not only said that Mr. Fritsch ran StarClub, he was the top dog, but that he also directed them on how to use the money that StarClub got from the investors.

Ms. Fredricks testified.  She was Defendant's assistant. She had been hired a few years out of college.  And part of her job was to help Defendant pay the bills.  And the Defendant told her how much to pay, who to pay, where to pay it from.  He had all the authority.  He was aware of the balances in the accounts.  And when the balance was low, he knew that he had to move money around.

May Stemmann Demon also testified.  She was another employee.  And you saw her on the witness stand.  And so she technically said that she worked for US Mastertec.  And you heard evidence at this trial about US Mastertec.  And US Mastertec had a different name from StarClub and, technically, was supposed to run the technology of the company, but they were basically the same company.  The Defendant controlled both of them.  They're both located in Santa Monica, and they were the same company.

And Mace Demon, she was the one who had control of a US Mastertec account, only because Mr. Fritsch gave her that control.  And anything that she did in that account had to be approved by Mr. Fritsch.  And Mr. Fritsch directed her on how to pay expenses out of the US Mastertec account and no one else.  And she couldn't do it on her own.

Finally, you heard a lot of evidence at this trial about how the money was misused, and that goes to intent.  I want to be clear on this point.  The government does not dispute that some of the investor money went for StarClub's business purposes.  The government does not dispute that.

You heard testimony from employees like Ms. Fredricks, Ms. Stemmann, Ms. Steward, Mr. O'Reilly, and Mr. Richards, who did work for StarClub, and they got paid.  But evidence of how some of the investor money, how a lot of it, went to enrich the Defendant himself and not for the purposes that he promised,

that is evidence of his intent to lie.  He didn't lie for no reason.  He lied because he wanted to enrich himself.

So let's discuss how he used that money on himself.  He did try to complicate things so he wouldn't get caught, but it's actually pretty simple.  He used other companies that he created and used them as a piggy bank.  He used the US Mastertec account.  Again, that's the account that Ms. Demon said that Mr. Fritsch directed her on what expenses to pay.

Another company he had, Greenwich Music, Inc.  You heard Ms. Fredricks testify that she helped write checks from the Greenwich Music, Inc., account.  And the Defendant always directed her on those payments.

Defendant used Der Hut LLC.  You heard from Ricky Flammang and Agent Austin that that account was used to pay expenses for Defendant's yacht, the Madame Musique.

And finally, Defendant had this other company, 3229 Rambla Pacifico, Inc.  It's the same as the address for his house, his Malibu mansion, where he used this account to pay for expenses like payments to Mr. Mederos to fix up the house and to pay his ex-wife, Lisa Short, an allowance.

By the way, yesterday you heard mention of some contracts that Mr. Fritsch had StarClub enter into with Greenwich Music and StarClub enter into with Rambla Pacifico Inc.  But you also heard evidence that Mr. Fritsch controlled all these companies.  So he was just entering into these contracts to paper over his

fraud.

But Agent Austin testified that, when you take a careful look at the bank records, you can uncover that fraud.  He testified that he carefully reviewed all the investor money coming into StarClub and that it went to one account, 7995. And then he saw money from that account going into other accounts that the Defendant controlled.

So take a look at Exhibit 955 when you deliberate.  This is a summary of all the money that came in from investors to account 7995 and all the money going out from January 2014 to July 2017, which is the time frame charged in this case.

For example, on this exhibit, you can see Danny Guy's money along with other investors.  Then at the bottom, that's the money coming out, all the numbers in red.  You see all the money going out to his Greenwich Music, 3229 Rambla, Greenwich Music again, US Mastertec.

And the Defendant also transfers some of that money to other StarClub bank accounts.  So let's look at those bank accounts.  Here's another StarClub bank account.  At the very top row, it got $13 million of investor money.  And then you see the money going out again -- 3229 Rambla, Greenwich Music, US Mastertec, and another StarClub account.

The other StarClub account ends in 6339, so let's look at that account.  The transactions for this account are summarized in Exhibit 956.  And again, the government does not dispute

that some of this money did go to StarClub's business expenses. But the evidence also shows that a lot of this money in this account also went for personal transactions, too.

They went to pay off his Amex cards. You see the entry for the Amex, where you saw purchases like $40,000 for his Armani clothes and thousands of dollars to Tom Ford. Take a look at those credit card transactions when you deliberate. They're in Exhibits 927 and 928. And to save time, I'm not going to go over all the credit card transactions here, but many of those were personal.

What else did he pay from this account? Miracle cleaning, over $300,000. And you can see from Exhibit 815 that some of this was purely personal. This is an invoice from Miracle Cleaning, just one of them, that StarClub paid. It includes cleaning for Mr. Fritsch's house, tidying his gym, changing and washing the sheets, remaking beds, changing cat litter, organizing the Defendant's closet.

Now, let's talk about the money that went from investors to US Mastertec. This is in Exhibit 959. The top rows, before the red, that's all money coming into US Mastertec. That's the only money coming into this account. And as you can see, the vast majority of that is StarClub investor money.

In the same exhibit, 959, it's a long exhibit. But on the other pages you can see the money coming out from US Mastertec. Take a look. Over $70,000 to Ricky Flammang, who testified

that he was hired to fix up the Defendant's yacht.

$90,000 to Der Hut, which again was set up to pay for the yacht.

Over $105,000 to Trouble Stunts LLC.  Mr. Mederos told you that that was Mr. Mederos's company that he had set up before when he used to work as a stuntman.  And the Defendant wanted to pay Mr. Mederos through an LLC.

Over $130,000 to Mr. Mederos himself, who testified he never worked at US Mastertec.  He never worked at StarClub.  He was just hired to do stuff around the house to be the driver.

$150,000 to Lisa Short, who testified at this trial, and she was the Defendant's ex-wife who was living with him.  Now, Ms. Short did testify that she did do some work for US Mastertec.  You heard that at this trial.  She said that she did part-time work from home.  She said approximately 20 hours a week for a short time period, about a year.  But that work was completely unrelated to StarClub.  She said she didn't work for StarClub.  She says she was doing some online work learning program for high school students.

So ask yourself why is she getting this money from StarClub investors?  It's because the Defendant wanted to pay his ex-wife more money.  And he used the investor's money to do so.

A few more expenses from US Mastertec.  Again, this is Exhibit 959.  $30,000 to Kennedy Kesterson.  $30,800 to Kaydee

Cox Kesterson.  And you heard over and over again at this trial that at this time Ms. Kaydee Kesterson was the Defendant's girlfriend and Kennedy Kesterson was her daughter who was a minor at that time.  There's no evidence that either of these individuals worked at US Mastertec.

The Defendant knew these were personal expenses.  There were improper purposes.  So he tried to hide it from investors by funneling it through another company that he controlled, US Mastertec.

And he did things like tell his employees, like Ms. Demon, that, oh, these are just for consulting purposes.  He told Maze Demon over and over again that the payments to Der Hut, which again was for his yacht, were for consulting.  Here's an e-mail.  Another e-mail.  Der Hut Consulting Firm.  Another e-mail.  "Please send from US M.T. today $19,500 to consulting firm Der Hut."

Another e-mail, "We need to transfer today $14,250 to the consulting firm Der Hut."

Again.  Again.  $15,000 to Der Hut for consulting services.

He knew all along that this was for his yacht. Exhibit 869.  Defendant knew all along that Der Hut was a company he set up to pay for his yacht.  And there's other evidence you saw at this trial that Der Hut was for his yacht. Here's just one example of an exhibit that shows that

Exhibit 822.  Der Hut LLC is paying for the yacht's insurance expenses.

It's the same story with his other accounts, 3229 Rambla Pacifico.  He set it up to pay for personal expenses including repairs to his house, housekeeping, his masseuse, and his ex-wife.

Take a look at Exhibit 328-E.  It's a compilation of checks that came from the Rambla Pacifico account, checks over and over again going to Lisa Short, the ex-wife.

Mr. Mederos told you that Mr. Fritsch said this was an allowance for Ms. Short.  This is in addition to the money that she was getting from US Mastertec.  Lisa Short, again.  Lisa Short, again.

This last one is to 877 East Broadway.  And Ms. Short testified at trial that that was her LLC that she had set up. So it's money for her.  By the way, you also heard that StarClub paid for her Mercedes.

And you also heard that StarClub paid for another Mercedes for David Stocker, who is Mr. Fritsch's son.  That's the check that went for his car, Exhibit 507.

And then StarClub paid for another Mercedes, Kaydee Kesterson.  That's the check for that Mercedes, Exhibit 501. Kaydee Kesterson again was the girlfriend.

Okay.  Back to the Rambla account, let's look at some more checks.  Judy Purcell.  This is an Exhibit 330.  Mr. Mederos

told you that he wrote these checks.  And the Defendant told him they were for housekeeping and for massages.  Another check.  Another check.  Another check.  So that's Rambla Pacifico, Inc.

Now, let's talk about Greenwich Music.  Same story, used as a piggy bank for Defendant to funnel his investor money through and pay himself.  So take a look at how the money was spent.  And this is in your summary chart.  It's Exhibit 961.

Money came into this account from StarClub investors.  And it's going out again.  Der Hut LLC, again, that yacht; Rusnak Pasadena, where the Defendant bought his Rolls Royce; Bennett Law Office, which was used by the Defendant to buy his McLaren and his Rolls Royce; Menlo College, where the Defendant's son was going to college; Dylan Ris, who testified at this trial that he provided tutoring services to the Defendant's high school son.  He never worked at StarClub.  He never worked at Greenwich Music.  You saw the checks from Greenwich Music to places like Camp Playland for the Defendant's eight-year-old son.  Checks to another camp towards the other son.

This is intent.  It's evidence that the Defendant knew that he was lying when he told investors that he was going to use money for business purposes.

Now let me be clear about this.  It's not a crime to want fancy cars.  It's not a crime to live in Malibu.  It's not a crime to pay for massages.  It's not a crime to want to get

tutoring for your kids.  But it is a crime to lie to your investors to tell them that you will use their money for one purpose when you intended all along to do this.  He intended all along to enrich himself.

And, Members of the Jury, when you're asked if the Defendant committed this crime with the intent to defraud, you know that he met -- that he did.  He fully intended -- this element is met.

Now, before I sit down -- and I will sit down, I want to remind you that the Court gave you the jury instructions.  And you'll have them again in your deliberation room.  And during jury selection, you took an oath to look at the evidence and follow the law.  And the evidence shows you that the Defendant lied again and again to get money from people who trusted in him.  And he knew what he was doing.  And that's why, when you get this Verdict Form on these counts, he's guilty of each one of them.  He's guilty on Count 1, and he's guilty on Count 2. Thank you.

THE COURT:  Thank you.

Ladies and gentlemen, we'll take a break.  Ms. Jackson will bring you menus so you can fill those out.  And let us know what you'll be wanting for lunch.  So we'll make that order.  So we'll take took a 20-minute break.

THE COURTROOM DEPUTY:  All rise.

THE COURT:  Obviously, don't talk about the case,

form or express any opinions about the case quite yet.

(Jury exited.)

THE COURT:  You may be seated.  As I'm sure you have now gathered, the jury has asked to stay later today and have lunch.  So we'll bring that for them.

So anything we need to discuss?

MS. TAIT:  What time should we be back from?  What time should we be back, Your Honor.

THE COURT:  20 minutes.

MS. TAIT:  Okay.  Thank you.

MR. THREATT:  Nothing from the defense, Your Honor.

THE COURT:  Okay.  I take it you'll be ready to go?

MR. THREATT:  Yes.

THE COURT:  All right.

(A brief recess was taken.)

THE COURT:  You may be seated.  Everyone is back.

Mr. Aminoff, you may proceed.

### CLOSING ARGUMENT BY THE DEFENSE

MR. AMINOFF:  Thank you, Your Honor.

If this is your first time serving on a jury, you really got your money's worth.  You didn't start your jury service with a simple DUI or a shoplifting case.  You started with wire fraud.

You've been sitting here for three weeks.  You've heard at least 20 witnesses testify.  You watched two riveting

international depositions.  You heard three experts testify. And you spent a lot of time listening to the prosecutors, the defense lawyers, and, of course, the Court.  You've heard a lot about a three-year period of Mr. Fritsch's life and that three-year period has given rise to the case before us.  And in a few moments, you're going to have the opportunity to decide whether the government has proven its case beyond a reasonable doubt.

But before we get to that, I get an opportunity to talk to you, and this is my last opportunity to talk to you.  So I want to make the most of that opportunity to talk to you.  And I'm going to use my time this morning to go over some issues with you that I think are very important.  I'm not going to overdo it.  I'm not going to go on for an hour.  But I do want to highlight some things with you that I really think are worth discussing.  And I want to be very orderly about this because we've covered a lot over the last three weeks.  So my plan is to break this up into some chapters and go over it piece by piece with you.

So Chapter 1, Chapter 1 is going to be the law.  Now, obviously, Judge Fisher has instructed you on the law.  You've heard her instructions.  You're going to follow those instructions.  And that is the instructions.  Those are the law.  I'm just going to highlight a few of those for you that I want you to particularly pay attention to.  So Chapter 1 is

going to be the law.

Chapter 2 -- Chapter 2, I'm going to break down the government's case and go through various issues that I see in the government's case.  The government's case is based on what StarClub investor Danny Guy told them, and Danny Guy sold the government a bag of goods.  The government's case is based on four areas that they're describing as misstatements.

And those four areas are statements about being on the verge of deals, statements about actual investors, statements about revenue, and statements about how Mr. Fritsch spent the investments.  We're going to break down each one of those.  And I think ultimately you're going to see that Danny Guy is just a rich guy who's mad that he lost money on an investment.  So we're going to call Chapter 2 "The Sore Loser."

In Chapter 3, we're going to talk about Bernhard Fritsch, Bernhard Fritsch, this man sitting right over here; Bernhard fritsch, the genius inventor who lives in his house on the hill in Malibu.  You've heard a lot about that house, seen a lot of pictures of that house.  We're going to talk about Bernhard Fritsch.

We're going to talk a lot about StarClub, and we're going to talk about how Bernhard Fritsch put everything into StarClub for years, all he had into StarClub and how he lost everything in StarClub.  So Chapter 3 is going to be called "the Founder."

And, lastly, Chapter 4, we're going to wrap it up.  I'm

going to try and tie it all together and point you to some key facts which I think is ultimately going to help you arrive to the correct decision in this case, which is a decision of not guilty on both counts.  Okay.  Here we go.

Chapter 2.  Chapter 2, the law.  That would be Chapter 1. Chapter 1 is the law.  Mr. Fritsch is charged with two counts of wire fraud stemming from Mr. Guy's July '15, July 2015, 7 million -- 7 million investment in StarClub.  Count 2 is Mr. Ian Mann's January 2016 $1 million investment in StarClub. Now, before we get into the law of fraud, I just want to cover a couple of basics.

As you've been instructed, Mr. Fritsch is presumed innocent.  And you've been instructed that government has the burden of proving each and every element of the counts.  This is the Court instruction on a wire fraud.  Ms. Lee summarized it, and I'm going to summarize it briefly as well.

Initially, you're looking for a scheme to defraud.  The government is claiming that Mr. Fritsch has knowingly made a plan to deceive and cheat the investors out of money.  So element one is scheme to defraud.  Element two is the materiality aspect.  So the misstatements that Mr. Fritsch is accused of making have to be material.

What does "material" mean?  Materiality looks at the statement itself and asks whether it has the capability of influencing a reasonable person in the investor's shoes.  So

element two is materiality.

Element three is the intent to defraud.  So when making those statements, the Defendant has to have had the intent to defraud.

What does that actually mean?  The government has to prove that Mr. Fritsch intended to deceive and trick the investors into giving him money.  So element three is intent to defraud.

And, finally, element four is the wires.  And as Ms. Lee said, no one is debating the wires.  We certainly agree that those two wire transfers were sent to StarClub.  So we have scheme to defraud, material false statements, intent to defraud, and the wires.

And here's the problem with the government's case. Mr. Fritsch never intended to defraud anyone.  Now, Mr. Fritsch has made a lot of statements.  Mr. Fritsch is a talker, no doubt about that.  But when he made those statements, he was not intending to defraud anyone.  And those statements are actually true.  And we'll break all those down in a minute. Mr. Fritsch is not guilty of Count 1 or Count 2.  Let's get to Chapter 2.  Oops.

I'm sorry.  Additional instruction I wanted to touch on. With respect to the intent to defraud, what you are looking at for intent to defraud with respect to Count 1 is these two accusations of the government.  Whether Disney and Yucaipa were on the verge of commercial partnerships and whether StarClub

would use investor money for corporate purposes.

Why are those the only two things that matter?  Because those are the only two things that happened before the wire transfer of January 30, 2015.  That establishes, in the government's view, the intent to defraud.  So I'm going to spend particular time focusing on those two facts.

With respect to Count 2, the only thing that happens before that January 25, 2016, wire transfer is the government's accusation that Mr. Fritsch claimed StarClub had $15 million in revenue.  That's jury instruction number 21.  Don't take it from me.  Please review it very carefully when you get back to the jury room.

Okay.  Let's talk about this scheme to defraud.  Here's the premise of the government's case.  Mr. Fritsch starts StarClub in 2009.  He spends the next five years working day and night building this company.  You heard his ex-wife testify.  He's always working.  Twenty-four hours a day, she said.  He works day and night to build up this company.

And by 2014, things are happening.  The business is starting to get going.  He's got employees.  He has office space.  He has a product.  And he has a client list that's starting to include A-list celebrities.  You heard the witnesses talk about them.  Enrique Iglesias is signed to StarClub; Jessica Simpson; Neymar Jr., Mary J. Blige.

His schedule is packed.  He's meeting with executives from

major companies all the time, traveling all over.  He's finally starting to make it.  But this is the time period where the government says the scheme to defraud begins, right here, when the company's actually starting to blossom.  The government wants you to believe that, after five years working day and night on this company, at this point, at this point when it's starting to take off, Mr. Fritsch starts the scheme to defraud.

Why?  Why would that be the starting point?  Who else comes on the scene at the beginning of 2014?  Danny Guy. Right?  Danny Guy makes his first investment in StarClub in January of 2014.  And when Mr. Guy eventually loses the money because StarClub fails, he cries fraud.

So let's break this down.  Remember your instructions.  A scheme to defraud's purpose is to obtain money through false claims.  And those false claims have to be material, meaning they were capable of influencing a reasonable person.  And that when Mr. Fritsch made these alleged false claims, he had the intent to defraud.

So with that in mind, let's look at the four pillars of the government's case.  Pillar one is revenue.  The government claims that Mr. Fritsch lied to Danny Guy and Ian Mann about StarClub's revenue.  I want you to think very carefully about the evidence you've heard over the last week.  What is the evidence of that?

We've got Danny Guy's testimony; right?  Danny Guy claims

that Mr. Fritsch told him and Mr. Mann, in a January 2016 in person presentation, that StarClub had generated $15 million in revenue.  I'm going to refer you to the jury instructions which gives you some direction as to how to look at a witness's credibility.  This is your instruction number eight.  And I'd like to refer you to some specific points here.  Let's start with the one marked "Second, the witness's memory."

When the government asked Mr. Guy questions, he seemed to remember everything crystal clear, no problems.  How many times did he tell me he didn't remember?  When I asked him about previous statements he had made about the revenue figures, he didn't remember.  When I asked him about previous interviews with FBI agents, he didn't remember.  He remembered that he had previously told the government that this statement was probably made in an investor meeting, but now he was certain of it.

Now let's talk about this presentation.  Where is this presentation?  How many pitch decks have you seen?  How many documents from StarClub?  How many e-mails?  There is no mention of this $15 million revenue, save for in one presentation that was allegedly sent to Spotify.  And what do we know about that presentation?  Not very much.  We don't know if that was an old presentation that someone just hadn't updated.  That if the 2015 marker was actually a projected revenue.  We don't know if it was ever sent to Spotify.  The government didn't bring in the person who created it.  Where's

the CFO?  Where's Jim Polsen, the person in charge of the numbers and the spreadsheets?  Why haven't you heard from him?

Let's keep working our way down the line.  Let's look at the third marker on jury instruction number eight, the witness's manner when testifying.  How would you describe Danny Guy's manner on Cross-examination?  Combative, entitled, avoidant.  We don't have to go on and on.  I think you remember his manner as well as I do, and I think his behavior speaks for itself.  You can apply that factor as you see fit, obviously.

What about Danny Guy's interest in the outcome of this case?  The fourth factor in jury instruction number eight. Danny Guy's a hedge fund manager.  As he told you, his business is dependent on his reputation.  And his reputation is that of someone who's going to make you money.

What do we know?  We know that Danny Guy made a lot of money in the early 2000's.  He told you that the first day he testified.  He talked about his success rate, how high his fund went to.  He didn't tell you that a few years later he lost a hell of a lot of money.  That fund went up fast, and it went down very fast.

MS. LEE:  Objection, Your Honor.

THE COURT:  Overruled.

MR. AMINOFF:  He lost a lot of money in 2008.  He lost a lot more money.  And then he lost the $22 million in StarClub.

So what's better for his reputation?  That he was defrauded or that maybe he made some bad investments?

Let's go to number five, the witness's bias or prejudice. Did anyone think Mr. Guy's not biased?  He told us he's got a lawsuit pending against Mr. Fritsch in Los Angeles County Superior Court.  That's still pending.  That certainly goes to bias.

But what else?  What else do we know about him?  He spent a year trying to get the FBI to bring this case.  He told Aahmek Richards, who came in here and testified, that, if Aahmek would act as a spy for him, he would make him CEO of StarClub when he took the company over.  So we know his interests here.

He was also conspiring with Gavin O'Reilly.  You know that Gavin O'Reilly was at the Fairmont Hotel the day Danny Guy first met with Austin, Agent Austin, the FBI agent who came in here and testified.

Do you think that was a coincidence?  Danny Guy had a grudge, and you've watched it play out in this courtroom.

Let's talk about other evidence that contradicts his testimony.  We talked about all the e-mails that we've seen. Remember how much Danny Guy said he was in touch with Mr. Fritsch?  I think Ms. Lee included in her presentation 100 times more than anyone else.  Not a single e-mail that says $15 million in revenue.  Not one.  There's a vague e-mail about

where did revenue go, but we don't know what that's referring to.

We do know that Jim Polsen was cc'd on that e-mail.    Ms. Lee showed it to you.  He could clarify that one.  But Jim Polsen's not here, is he?  It is awfully convenient that this major lie that the government is pointing to is not preserved anywhere.  It's the one thing that was uttered in an in-person meeting that does not seem to be documented.  Everything else is on paper, everything else you've been shown, but that one key statement is nowhere to be found.

And what about Danny Guy's later statements?  What about the e-mail that I showed him where he refers to the company as having insignificant revenue?  He tried to say that a company that had previously had no revenue and suddenly having 15 million in revenue was insignificant.  It just doesn't add up.

But let's take it a step further.  Even if you think that Mr. Fritsch had made this statement, in order for him to be guilty of wire fraud when he says it, he must have the intent to deprive Danny Guy of money.  The government showed you the five transactions between Guy and Fritsch, but they only charge the January 2015 $7 million wire.

So what's the point?  If Fritsch made this comment about $15 million in revenue in January 2016, it cannot possibly show his intent to defraud Danny Guy with respect to Count 1, and

that's as a matter of law.  And I would refer you back to that same instruction number 21.

Let's go to pillar two of the government's case.  So this is the category that Mr. De Leon, in his opening statement, referred to as sort of on the verge of deals.  Okay?  So it's not that Mr. Fritsch set claim that he had actual deals with these companies.  It was that things were going well.  He was on the verge of deals.  Things were moving forward.

Now, in opening, the government claimed that included in this category of companies was three companies -- Disney, Yucaipa, and Warner Music.  The government's now dropped Warner Music from this category.  The government now agrees that Warner Music does not fit in this category.  Now they're just claiming Disney and Yucaipa.  Okay?

So let's talk about Disney.  And I'm including Maker in this category because Maker, as we heard, was acquired by Disney.

Just as a preliminary matter, how often do you think two people have a meeting and walk away feeling differently about how it might have gone?  Let me give you an example.  Let's say two people go for coffee.  We'll call them John and Monica.  Okay?  Two people go for coffee.  They have coffee.  At the end of the coffee, Monica says to John, "That was really fun.  We should do it again sometime."  And John says, "Great."

And John goes back, and he tells his buddies, "Hey, we had

a great time.  We're doing it again sometime."

But Monica didn't really have that great a time.  She was just being nice.  She didn't want to hurt John's feelings.

Is John lying when John tells his friends, "It was great, we're going to do it again sometime"?  When that second coffee never happens, is John lying?

One thing that I've been really struck by, by the executives who've come in this courtroom, is they've all kind of said they weren't that serious about StarClub.  They thought it was a good idea.  They were interested; that they weren't going to do a deal.  They weren't that serious about it.

Do you remember that testimony?  And then we started showing them their e-mails.  And do you remember what their e-mail showed?  They met with Mr. Fritsch on multiple occasions.  They introduced him to multiple people.  And not just outside people, people in their companies, their executives.

Is the CEO of Disney gonna waste all his executives' time with Mr. Fritsch if he's not interested?

But even if you're on the verge of a deal, if you're Mr. Fritsch, you walk away from these interactions feeling positive because you haven't been told "No" and you've been introduced to someone else, there is genuine interest.

Okay.  Let's talk a little bit more about Disney.  So the government claims that Mr. Fritsch made false statements about

a possible mergers and acquisitions deal or a possible commercial partnership with Disney.

What have we learned?  We heard from Courtney Holt, and we heard from Kevin Mayer.  So recall that Courtney Holt was the head of Maker, I believe, and Kevin Mayer was very high up at Disney and the head of mergers and acquisitions.  And we spent a lot of time looking at one particular e-mail.

And hopefully I haven't screwed up the slide.  No.  Okay.  Here we go.

We spent a lot of time looking at this one e-mail, the kind of the famous Moelis e-mail which Mr. Fritsch forwards to Danny Guy.  And he's obviously expressing excitement.  Right?  You can see that.

We showed this e-mail to Mr. Mayor, and he recalled it.  This e-mail is in evidence.  You can look at it when you get back to the jury room.  It's Exhibit 1189.

What is the subject line of that e-mail?  Confidential merger and acquisition transaction - Moelis.

Okay.  So Mr. Fritsch is communicating with the head of mergers and acquisitions at Disney.  And this is the subject line of the e-mail that they are going back and forth on.  Now, I understand that Mr. Mayor came in here and said, "No, I was referring him to this other company.  Like he would maybe do a merger and acquisition with this other company."  Okay.  Maybe that was his understanding of it.

But can you see how Mr. Fritsch took it differently and his view of the conversation was different?  That does not make him a liar.  Read the jury instructions.  His lies have to be intentional.  Maybe he misunderstood or maybe he's right, and Mr. Mayor just doesn't remember.  But the e-mail speaks for itself.  A merger and acquisition subject line with the head of mergers and acquisitions for Disney.

As the founder of the startup that's just taking off, you would be ecstatic to get this e-mail.  And if you forward it to your investors and you're excited about it, that is not a lie. I would really encourage you to look at all of the e-mails with Disney and Maker.  And I believe this is all of the ones that are in the record.  I hope I haven't missed any, but please take a look at all of them.  This is, I believe, the complete list.  And you will have access, of course, to all of the exhibits once you're back in deliberations.

I think you will find, looking at these, that they express a lot of positivity and hope for future possible meetings.  And that is the perspective that Mr. Fritsch is coming from and why he is totally reasonable in all of the things that he says.  He is not lying.

Okay.  So the other company we have to talk about is Yucaipa.  And the government is claiming that Mr. Fritsch made false statements about Yucaipa.  All right.  So to begin with, there's a lot of statements about conversations and meetings

with a guy named Ron Burkle.  And Ron Burkle is apparently the head of Yucaipa.  Ron Burkle hasn't testified.  So we don't know exactly what Ron Burkle would have said about these meetings.

But Mr. Fritsch made some specific comments about a guy named d'Abo.

And during her closing, Ms. Lee showed you this e-mail. Now, this is Exhibit 111.  You can check it out for yourself when you go back to deliberation.  And the e-mail says that StarClub has a deal for $9 a share and the paper will get done by CFO Richard d'Abo.  Okay?  That's in that e-mail.  I encourage you to take a look.

Here is, from a week beforehand, the e-mail from Mr. Fritsch -- or from Mr. Fritsch to Mr. d'Abo.  Okay? Mr. d'Abo testified to this e-mail.  It's in evidence.  It's Exhibit 1517.

Now look, you can see that there's attachments to that e-mail.  What's attached?  A deal for $9 a share.  Mr. Fritsch is not lying.  A deal for $9 a share is with Richard d'Abo. Now, granted, I don't recall Mr. d'Abo's title, but I know he's not the CFO.  That came in.  That portion of the e-mail is not accurate.

Is that an honest mistake?  Is that material?  What is important about the e-mail that Mr. Fritsch sends to Mr. Guy? It's the fact of a deal.  It's what the government told you,

and I would agree with it.

Here is the deal.  It doesn't say, "We have a signed deal."  He said the deal is with Richard d'Abo, and they are working on it.

But there's more.  Look at the follow-up e-mail from Mr. d'Abo.  Mr. d'Abo doesn't say, "Oh, who are you, Mr. Fritsch?  Why are you sending me a deal?  We never had a conversation of a deal."  He sends him line edits.  Line edits to the deal.

What does that tell you?  They are actively talking about a deal.  This is all in evidence.  I encourage you to please review.  This is Exhibit 1519.

Okay.  Let's talk about the one pager.  So we spent a lot of time talking about the one pager.  Okay?  And I want to get into that with you.  This is the famous one pager.  And it's one page front and back.  So in front of us, it's two pages.

I've highlighted the portion about the companies.  So first paragraph, about five or six lines down, there is a single line that says that "The current investors include Access, Credit Suisse, Harrington, Warner, and others.  Harrington wasn't an investor by this point.  So that part is indisputably not true.

So you heard Mr. Fritsch's statement.  Okay.  And he explained to the agent -- when the agent asked him, he explained right away that one of the higher-ups at Access was

an investor, Mr. Jorg Mohaupt.  We know that.  He said Access itself wasn't.  Access owns Warner.  So that was the connection there.

And he had several -- I believe it was directors -- from Credit Suisse who were also investors.

The government hasn't disputed any of that.  But why are we talking about this?  So, remember, to support a fraud conviction, you have to have an intent to be -- to defraud. And the statements have to be material.  And material again means that the statement has the capacity to affect a decision.

These statements were not made in a pitch meeting.  They weren't made during active negotiations.  They're not in a pitch deck.  This is a one pager.  One pager is the most basic of ads, just a one pager.  So in considering materiality, you're allowed to look at general evidence, such as evidence of industry practice.  And this is in your jury instruction.  It's instruction number 20.

I think -- I'm thinking of Mr. Izumo's testimony from yesterday.  Mr. Izumo told us what the purpose of -- the purpose of a one pager is.  And I disagree with Ms. Lee's characterization in her closing argument that this is to induce an investment.  Of course, you're going to rely on your own recollection.  But as I recall, Mr. Izumo said this might be to get your foot in the door for an investment meeting.  No one is investing based upon a one pager.

But more importantly, look at the date at the top of the page.  When was that document sent to Danny Guy?  October 9, 2015.  That's 10 months after the investment.  This document is not even relevant to Count 1.  Well, okay, I won't go that far.  But it certainly does not prove intent to defraud with respect to Count 1.  It cannot, as a matter of law, improve and -- prove intent to defraud with respect to Count 1.

And this document never went to Ian Mann.  You've seen no evidence that Ian Mann saw this document.  So with respect to intent to defraud, this document does not come into play with either Count 1 or Count 2.

Let's get to the final pillar of the government's case.  So, in this section, I want to talk about the claims that Mr. Fritsch said he was going to use the money to fund the company, and then he used it for personal expenses.  And I want to spend a little bit of time talking about this, because there's kind of an easy answer to this and there's a more complicated answer to this.  Let's start with a simple one.

In some of the purchase agreements between Mr. Fritsch and Mr. Guy, there is what's called a "Use of funds clause."  A "Use of funds clause," just as it sounds, lays out what the company can use the funds for.  All of those contracts are in evidence.  You can check them out.

These are portions of the contracts.  It's not included in that January 2015 contract, the contract that they negotiated

for and signed.  There's no use of proceeds clause.

So with respect to intent to defraud, this, again, is not part of Count 1.  But I understand it's not a very satisfying answer.  Of course, like, if you receive a large investment from someone, you wouldn't expect someone just to spend it on personal items.  I understand that.  I think we need to talk about that a bit more because the answer does get kind of complicated.

Mr. Fritsch did not misuse funds.  Okay.  What do we know?  We know that Mr. Guy transferred about $22 million over an approximate two-year period to StarClub.  And we know that there were several other sources of money that went into StarClub.  But the government cannot explain what the other money is.

So what else have we learned?  We learned that the then Trustee of Mr. Fritsch's family Trust gave significant funds to StarClub.  We also heard Mr. Sturges come in, this was yesterday, and tell us about some contracts and how at least $5.6 million was transferred from the StarClub's accounts to the GMI and the 3229 Rambla accounts.  And those are legitimate business expenses.

Now, Ms. Lee described those as a vehicle for fraud.  Nope, that's not true.  These contracts predate this period of time by several years.  And Mr. Sturges told you that this is very common and does not necessarily indicate fraud.  It's very

normal.

So what else do we know about the money?  Do you remember when my co-Counsel, Ms. Abel, was cross-examining Agent Bouchard, just started going through the numbers.  Remember she took out a calculator?

Just in front of you, in a few minutes, she calculated $13 million in legitimate business expenses.  Those business expenses included things such as payroll, rent on the Santa Monica office, lawyer's fees, stuff like that.  That is all totally valid business expenses.

The government's told you that about $40 million went into StarClub between 2014 to 2017, but they haven't told you the source of that money, aside from Danny Guy and Ian Mann. That's 23 million.

You've seen the investor list.  There's a lot of names on there, a lot of entities.  It certainly includes Mr. Fritsch. It includes the Trustee of his family Trust multiple times. Bottom line is the government has not proven where this money comes from.  There are tens of millions of dollars of corporate expenses in here, and they want to distract you with flashy cars and personal expenses.

How many photos did you see of the McLaren?  How many photos have you seen of the house?  Where is their expert who analyzed the numbers and could actually tell you the source of this money?  The problem is you don't know.  And you don't know

because they haven't told you.

But there is certainly no evidence that the money Mr. Fritsch took out of those accounts was Mr. Mann's money or Mr. Guy's money.  My ultimate point is that Mr. Fritsch had plenty of business expenses, and those business expenses were paid.

You've heard from multiple StarClub employees, called by the defense, that told you that StarClub was thriving.  It's no secret that people with money use entities, and they do this sometimes to try and avoid paying taxes.  Some of them even move to Bermuda to try to avoid paying taxes.  Others might purchase a car out of state where the taxes are lower.  The fact that money went from StarClub's account to another account does not prove anything.

Okay?  Chapter 3, let's talk about Mr. Fritsch for a minute.  Mr. Fritsch had an idea.  He had an idea for monetizing celebrity social media.  His original idea was for celebrity-based channels and later for something called the StarSite Syndicator.  You've heard a lot about that over the last three weeks.  You know what?  These were good ideas.  They were ideas that were ahead of their time.

You've heard from Mr. Fritsch's ex-wife.  He works all the time.  He has an uncanny ability for coming up with what the next thing is in the technological market, what the tech market needs, and then trying to solve that issue.

Mr. Fritsch had five patents and several more pending patent applications. The intellectual property owned by StarClub was valued at between $10 and $50 million by the expert who came in this courtroom and told you.

The government spent a lot of time trying to convince you that Mr. Fritsch's company was just a fraud. They originally thought they had no patents. You heard the FBI agent submit a statement under penalty of perjury that the company had no patents. Then they tried to argue the company only had one patent. No, it's not true. That is not true. You've got the patents in evidence. You can look at them. The company had at least five patents and several more pending.

They tried to convince you the product didn't work. They asked the employees who came in this room and testified whether the product worked. They suggested that it didn't work. The employees told you it's not true. The company had a working product. It was a real company.

You heard from Hazel Steward. They did promotions. They did movie promotions for Universal.

You heard Aahmek Richards. He was proud of the technology. He was developing new Apps while he was there.

And you heard from Ben McAllister who detailed it all.

The government spent a lot of time talking about Mr. Fritsch's expenses and how he's lived his life. You've heard references to his family Trust and the money that he put

into the company.  He is entitled to spend his money however he wants.  If he wants to buy a fancy car, he can buy a fancy car. If he wants to pay for a tutor for his learning disabled son, he can do that, too.  That's up to him.  It's not a crime.

But those days are over.  That's how it goes.  Startups fail.  It doesn't mean that fraud has happened.  When a startup fails, it's not necessarily a fraud.

I'm now onto Chapter 4, and that's wrapping up.  So the government's asking you to do a lot of speculating in this case.  The fact of the matter is we have no idea what happened in all those meetings with various companies.  But fortunately, we have some of Mr. Fritsch's e-mails, and those have shown you his version of the facts is the truth.

The government's asking you to make assumptions about Mr. Fritsch's spending, but they haven't done the work to support those assumptions.  They could have hired an expert to analyze all of the numbers.  They could have done the audits that they called out Mr. Fritsch for not doing, but they didn't.  They just want you to see the money moving from one account to another.  They want you to see the fancy house, the sports car, and assume he must be guilty.  But that's not how it works.

It is the government that bears the burden of proof here. And Mr. Bernhard Fritsch is presumed innocent until the government proves him guilty beyond a reasonable doubt.

So what's reasonable doubt?  Again, Judge Fischer told you it's proof that leaves you firmly convinced that Mr. Fritsch is actually guilty.  If after you review all of the evidence and you're not convinced beyond a reasonable doubt, then you have to find him not guilty.

Beyond a reasonable doubt is literally the highest standard in our criminal -- in our legal system.  It's higher than civil court.  It's higher in the -- higher than in a family court where people can have their parental rights removed.  It's the highest standard we have.

And yet here we are with a whole bunch of questions.  No answers, just speculation and innuendo.

Okay.  Let's sum up.  So Mr. Fritsch is charged with defrauding Mr. Mann with respect to the January 2016 wire transfer of a million dollars.  You've heard almost no evidence about Mr. Mann.  We watched international depositions of Mr. Mohaupt and Mr. O'Reilly, but we didn't see Mr. Mann.

You've seen no evidence that Mr. Fritsch ever made any statements to Mr. Mann about deals, closing, or equity possibilities, and no evidence that he ever sent him that one pager that we've talked so much about.  Those two are out.

The government's entire case -- excuse me.  No evidence presented as to any promises made to Mr. Mann about how the money would be spent.  The government's entire case regarding Ian Mann hinges on Mr. Guy's testimony about that January 2016

meeting. That's it. And we know Mr. Guy's testimony about that January 2016 meeting is simply not credible. Absent that, there is no evidence to support Count 1. You have to acquit Mr. Fritsch of Count 2. Sorry, I said, "Count 1." Count 2. Mr. Fritsch did not defraud Ian Mann. Mr. Fritsch is not guilty of Count 2.

Talk about Count 1. So as you well know, Mr. Fritsch is charged with defrauding Danny Guy with respect to the January 2015 wire transfer of $7 million. You know that to find Mr. Fritsch guilty, you have to find a scheme to defraud and that Mr. Fritsch made material false statements with the intent to defraud. The government has identified four areas that they think fits that bill.

The one pager, it doesn't work with Danny Guy. It was sent 10 months after that investment. The Yucaipa and Disney deals, the argument that they were on the -- that Mr. Fritsch made a false statement when he said that he was on the verge of deals with Disney and Yucaipa.

But Mr. Fritsch's statements are 100% accurate. At worst, the statement about Disney was a misunderstanding. It was not a deliberate false misrepresentation, and there's no proof otherwise.

And then we have the spending issue. Well, there's no use of funds clause for that January 2015 contract. And there was -- Danny Guy did not testify that Mr. Fritsch promised him

that that was going to be the use of the money.  And I have all sorts of complaints about how the government's calculated the use of money.  And I think we've already done that to death. So that's out.

And all we're left with is -- we covered the Yucaipa.  So we got the Yucaipa and the Disney, which we know are true, and then we've got the personal spending, which is not in the contract, no promises were made, and, regardless, that money was not used for personal expenses.

This is the last time I get to talk to you.  The government's going to get back up here in a minute.  They get the last word because it's their burden.  And I hope they'll answer some of these questions for you because you deserve an answer.  And Mr. Fritsch deserves an answer.  He's the one sitting here being accused of all these things.

But you gotta ask yourself why?  Why are we here?  How do we get here?  It all starts and ends with Danny Guy.  Danny Guy had a grudge, and the millionaire hedge fund manager is used to getting his way.  But not here.  Here, he lost.  And Danny Guy's a sore loser.  So he whined and complained, and he got himself an FBI investigation, and then he got himself a prosecution.  He got himself a trial.

But he doesn't get you.  He doesn't get your integrity.

On StarClub, everyone lost.  And that's a shame.  It was a good idea, and it didn't work out, and that's too bad.  But

that's startups, and that's the business world.  But that doesn't make Bernhard Fritsch guilty of a crime.  Mr. Fritsch is not guilty of Count 1 or Count 2.  He did not defraud anyone.  Thank you for your time.

### REBUTTAL CLOSING ARGUMENT BY THE GOVERNMENT

MS. TAIT:  Good morning, ladies and gentlemen.  Thank you for your attention and your time during this trial.  The government does have the burden of proof, and we embrace it.  And that's why we get the last word.  We embrace that burden because the evidence here does show that the Defendant is guilty beyond a reasonable doubt of both the counts, Count 1 and Count 2.

Let me start with the accusation that this whole case is about Danny Guy being a sore loser.  The claim is that Danny Guy told the government what to do and directed this whole thing.  But you heard from Special Agent Austin, who gave you all the details of the 50-plus subpoenas that he issued, the numerous people that he interviewed, all of the shoe leather that he wore out in investigating this matter in an appropriate fashion, as he described it to you.  So you know that testimony.  You heard that testimony from the FBI.

And he didn't just stop with the allegations of this one person.  He investigated it thoroughly.  He looked at the e-mails, he obtained evidence, he went out, and the government found evidence regarding the various companies that were

represented about in the e-mails, and did a thorough investigation.

Defendant asks why all of a sudden in 2014 does Mr. Fritsch decide to engage in this fraud scheme when he had been in this company since 2009?  So I'm going to ask Mr. Flores if he could pull up some of the government's exhibits.  Let's start with -- can we start with Exhibit 905, which is one of the government's exhibits for financial information.  And just focusing on line 1.

So this top area right here.

So this is one of the StarClub accounts.  And in this particular account on January 1, 2014, this is how much money is in this account at StarClub.  $882,000.  Now, you can go to the rest of the StarClub accounts for the same time frame, and you'll see.  They're in Exhibits 901, 903, and this one is 905?  901, 903, 905, 907.  Let me show you a couple of them.

If we could put up Exhibit 901, first line.

$23,000 in the account in Exhibit 901.  Exhibit 903, $36,000 in this account.  This is another StarClub account.  Exhibit 907, this one starts in June of 2014 and starts with a balance of 90 cents.  So the -- he had no money.

The company was down to the wire, and he found a bunch of investors, among them Danny Guy, and he found a source of money, and he became addicted to getting that money.

And he knew that he needed to say things about StarClub

that weren't true in order to be able to get more and more money. And that was the motivation. Once he saw that it worked, he knew he needed to keep lying in order to have the money keep coming in. Because without that, he wouldn't be able to run StarClub, and he certainly wouldn't be able to live the lifestyle that he so enjoyed.

So let's talk about the Court's jury instructions for just a moment. I'm just going to put one on the presenter here, and I'm putting on the presenter instruction number 17.

And how do we get it on here? I've got my glasses on, and I can't see that. Oh, there we go.

Oh, sorry.

Mr. Flores fixed it, and I messed it up. There we go.

So Exhibit 17 defines the scheme to defraud. I'm sorry, instruction 17 defines the scheme to defraud. And as you can see, the Court has set out for you what it is that the government alleges is the scheme to defraud. And it is all these things. This is the scheme to defraud. All of these allegations are the scheme to defraud.

And so that is why we have been covering these issues -- that StarClub had 15 million in revenue; that Disney and Yucaipa were on the verge of acquiring part or all of them; that Access, Credit Suisse, and Warner were current investors; and that, when soliciting funds, StarClub made certain promises. Mr. Fritsch made promises about how certain funds

would be used.  I'll get that down.  Thank you.

So all of those lies, you heard about them during the trial.  They were all important.  They matter to a potential investor when considering whether or not to part with their money.  Whether something is material, -- you'll see this in the instructions, too -- is it goes to the nature of the bargain.

And here the nature of the bargain was what kind of company am I investing in?  What are my prospects for making money?  Is this a good investment, or is this a bad investment?  These things go to the heart of the bargain.  And that's why all these statements were material, the ones identified there in that jury instruction.

So you have to decide.  You have to decide.  This is a scheme to the fraud.  It's an arc.  It goes on for a long time.  And over the course of that time, he made various statements.  And as my colleague told you at the beginning, it was a stack of lies one on top of the other that went over the course of the lengthy relationship that the Defendant had with Danny Guy and others.

And you know that Mr. Fritsch was continuing to keep up that scheme even after Mr. Guy didn't even give him any more money because Mr. Guy testified that Mr. Fritsch continued to ask him for more investment money.  He continued to lie about StarClub during those requests.

And, for example, when they came -- when Mr. Mann and Mr. Guy came to California in January of 2016, they heard the revenue figure, Mr. Guy was enthused, he got into gear, and he was still, you know, impressed and wanted to continue to invest and find other people to invest in StarClub. And so that was Mr. Fritsch's intention. He knew that Mr. Guy had already found him so many investors.

Mr. Guy found Mr. Mann. He found Stephen Buckley. He found Brian O'Hea. He found Francis Scotland. All these people will appear here in the wire transfers -- I believe all my names do. He found a family with the named Pollock. And Mr. Guy had brought in all this money to StarClub because he believed what the Defendant had been telling him over the course of the arc of their relationship.

If he had known at any point the Defendant was telling him lies, the money would have stopped. Mr. Guy wouldn't have gotten any more of his friends to invest with Mr. Fritsch and he wouldn't have invested himself. It would have been over. The gravy train would have been over. And he would not have been able to get more money out of that very lucrative source.

And interestingly, maybe to you, Mr. Guy even essentially got Mr. Fritsch Mr. Mohaupt because Mr. Guy introduced Mr. Fritsch to Goldman Sachs. And Goldman Sachs was the best introduction they made was to Mr. Mohaupt. That was Mr. Fritsch's words in one of the e-mails that you saw. So

Mr. Guy even reached across the Atlantic Ocean and found that investor for Mr. Fritsch.

So all of that money came through as a result of the relationship with these two men.  And Mr. Fritsch didn't want to ruin that.  He wanted to keep it coming, and he wanted to keep going.  And that's why he had to continue to tell lies.

Let me talk to you about a pretty late version of one of the things that Mr. Fritsch said and why he continued to need to lie to Mr. Guy.

Now, I'm going to go to here.  Let's see.  No, I'm going to stop presenting first.  Hold on.  Okay.  From here.

All right.  So this is a set of slides regarding the use of proceeds allegation.  And as you saw in the scheme to defraud, we have alleged that StarClub, that Mr. Fritsch, you know, told lies about what he was going to use the money for.  And we all know why -- the McLaren, the Rolls.

So, again, it begins in January of 2014 with Mr. Guy's very first investment.  This was January of 2014.  And I'm going to show you at Exhibit 206 in a moment.  You're not going to have it with you in the jury room.  So if you want to take notes, you'll have a last opportunity to do that.  So here the use of proceeds that are promised with the investment offering.  And Mr. Guy testified that he wasn't getting all of the money that was requested from this offering.  This is an offering to investors.  He was one investor.

You will see in the bank records that around the time that Mr. Guy contributed money that it went through an agent.  It didn't come directly from Mr. Guy.  So you won't find a wire transfer from Salida in January of 2014 because it came through an agent, which we identified in the testimony.  I believe that that agent was either Goodman's or Fidelity, but Mr. Guy testified about it.

In any case, here is the promise.  The company is going to use the net proceeds of the offering to launch vertically integrated and interactive media platforms, the channels for technology enhancements, for working capital, and general corporate purchases.

Here it is again in November of 2014.  So Mr. Guy's already invested at this point.  He's already actually invested twice.  He's about to invest a third time.  He invested 2.5 million in January.  He invested about 4.1 million in July.  And now we're in November.  And Mr. Fritsch is soliciting more money.  So he sends this packet out to Mr. Guy, and he says -- it has a use of proceeds here.  This is Exhibit 119, page 5.

I'm sorry, I didn't call out the prior exhibit, which was Exhibits 191 and 192, page 19.

THE COURT:  Slow down, please.

MS. TAIT:  Sorry, Your Honor.

So back to this one, Exhibit 119, page 5.  Again, it's similar what the company intends to use the net proceeds for,

including channels, marketing, technology enhancements, and working capital.

November 2015, Mr. Fritsch sends another e-mail to Mr. Guy.  At this point, Mr. Guy has already invested round one, round two, round three, December of 2014, and then early January of 2015, which is Count 1.  So by this time, Mr. Guy is in by about $17 million, $16 million into StarClub.  And Mr. Fritsch again offers another potential investment.

At this time, particularly Mr. Guy, and through -- and also earlier in 2015, Mr. Guy is finding new investors for StarClub as well as himself because he's so enthused about the prospect.  Same general promise to use the funds for proper purposes is alleged in the jury instruction, Exhibit 143, page 26.

And then inside the same sheet -- or, sorry, inside the actual agreement from that point in time that followed, I think, Exhibit 196, page 2, there's another use of proceeds promise.

And then in an e-mail in August of 2015, Mr. Fritsch says here another financial presentation.  And Mr. Guy sends this to Mike Yaeger at Goldman Sachs.  Again, a money raising.  This is trying to raise more money.  And Mr. Fritsch is using Mr. Guy's cachet.

Who has the relationship with Goldman Sachs?  It's not Mr. Fritsch; it's Mr. Guy.  He brought Goldman Sachs, which is

a big investment bank, to Mr. Fritsch for the purpose of getting them to help them raise more money.

And again, in this slide, the use of proceeds again was represented.  What are we going to do with the money?  Well, we're going to do the same thing.  We're going to launch channels, tech, working capital, reserves, and maybe some hefty investment banking fees.

October 2015, here's another one.  This is an e-mail.  Mr. Fritsch tells Mr. Guy, "Hey, have a look at.  Here's what the capital is going to be getting us if people invest more money."

Again, Mr. Guy is finding investments for him and considering additional investments himself.  And Mr. Guy says, "Hey, can I send this to Yaeger?"  And that's Mike Yaeger at Goldman Sachs.  Another fundraiser; right?

And Mr. Fritsch says, "Yes, for sure," because this explains what am I going to do with your money?

And so that brings us to November of 2016.  By this point, Mr. Guy hasn't given him any more money, but Mr. Fritsch is still trying to get more money.  He's still engaging with Mr. Guy.  And at this angle, he's also engaging with Ian Mann.

And here Mr. Fritsch says -- he's defending because Mr. Guy of -- November 2, 2016, Exhibit 186, Mr. Guy says, "There's some things of concern.  There's no audited financials and puts us," because it's us, "at risk of not being able to raise money."  And then he asks, "Where did all the money go?"

And Mr. Fritsch responds -- he has to say this because, if he doesn't say this, if he tells the truth, if he doesn't say this, he's not going to be getting any more money through the Mr. -- to the Danny Guy pipeline.  He says 90% focusing funds are going towards tech development.

And so if you look at the facts, this one is exhibit -- yes, exhibit -- sorry, at the top.  It says, "Exhibit 186," the e-mail.  And at the bottom is Exhibit 955, one of the government's charts.  This shows you the 7995 account.

How do you know that's the investor account?  You know it because Mr. Austin told you that he reviewed things carefully, and that's where he saw all the investor money going into.  You know it because there's going to be e-mails in our evidence that have wiring instructions and they match this account number.

In other words, it's a pitch to investors.  Please send me money.  Where to send the money?  Send it to this account. Including there's an e-mail to Ian Mann that sends them wiring instructions.  And so you know that is the investor account.

So just highlighting here, and this is a summary of the outgoing money from that 7995 account during the period of analysis.  And in this case, this makes sense to start there because that's when Mr. Guy started investing and started bringing Mr. Fritsch all these other investors as well.

And just the highlights, you do your own math.  The

calculation here, 7.6 million of the money from this account went out to Greenwich Music, 3229 Rambla accounts.  7.6 million out of 40 million at the bottom there.  So right there it's more than 10%, almost 20% is going to not technology development.  So it's not true that 90% of funds are going to technology development because, you know, especially with the defense telling you here and essentially admitting to  you, --

MR. AMINOFF:  Your Honor, objection.

MS. TAIT:  I'm sorry, Your Honor.  In the defense argument -- may I continue?

THE COURT:  Yes.

MS. TAIT:  I heard the defense attorney say that everything at 3229 Rambla is Mr. Fritsch's own personal money. Maybe you didn't hear it that way, but I did.

THE COURT:  But, ladies and gentlemen, you be the judges of what the evidence is.

MS. TAIT:  You be the judges -- of course, Your Honor.

But if indeed 3229 Rambla is all Mr. Fritsch's money and if indeed Greenwich Music is all Mr. Fritsch's money, which we contend it is, then this is where the money's going to.  It's not tech development.  At least this amount of the money.

But this doesn't even include all of the money that you've seen in this case.  This doesn't include the US Mastertec money because money came from that 7995 account.  Who -- by the way,

who was in control of that account?  Only one person.  You'll see the account statement, the signature card is     Mr. Fritsch.

So this doesn't include the money that US Mastertec sent to the consultants Der Hut; Kennedy Kesterson, the child of his girlfriend; Mr. Fleming, who ran the boat; and Lisa Short and Kaydee Kesterson, the ex-wife and the girlfriend.  It also doesn't include the money that StarClub spent on the vehicle leases for David Stalker, Mr. Fritsch's son; Lisa Short, his ex-wife; Kaydee Kesterson.

It also doesn't include the more than $1 million that George Mederos, who is the estate manager for Mr. Fritsch's house, spent on the Amex for StarClub, not for any other entity.  Not an Amex for 3229 Rambla; an Amex for StarClub. And you heard his testimony.  You can evaluate it why he spent that money.

He said he did those charges at Mr. Fritsch's instruction because he was the estate manager and he was basically just buying everything.  And I think he agreed that -- your recollection controls.  He agreed that the sky was the limit on what he could charge on that credit card.

It also doesn't include whatever portion of Chef Lisa Stalvey was a personal portion.  We don't know.  Mr. Fritsch, we could not present records to you to divide it all out.  But we did have testimony that Ms. Stalvey was at the home very

regularly, making breakfast for the kids, and basically being a personal chef.  And the amount of time she was doing work for StarClub was not equivalent to -- even equivalent to the amount of time she was there for the family.

So, again, this is -- so when Mr. Fritsch said 90% was going to tech development, that was a complete lie.  And that was at the end, you know, towards the end of 2016.  He was still keeping up that facade.

Okay.  So let's discuss the revenue statement.  The defense argues that it's all based on Danny Guy.  And Mr. Guy says he was at this meeting in January of 2016 with Mr. Mann. They were there together, and they were told that the company had 15 million in revenue, which to a person who had just put in 22 million into the company, 15 million in revenue doesn't sound bad, even though it's not huge.  The projections that you've seen in the slides are certainly way more than that. But 15 million sounds pretty good.

So defense argues that there's no evidence that Mr. Fritsch actually said that.  But there is, because Mr. Fritsch continued to solicit Danny Guy throughout that year of 2016.  And in particular, in April of that year, he sent Mr. Guy a deck, a slide deck.  And that slide deck included historical figures.  Mr. Guy defined for you what historical means.  It means actual.  I believe Mr. Izumo also talked about historical, actual.

And so in this slide deck, Mr. Fritsch had to match what he had told Mr. Guy in January because, if the revenue figure in that slide deck was the truth, which I'll show you in a moment, which is, you know, less than $100,000 for 2015, Mr. Guy would have known something was off and very wrong, because that's not the number that he heard.

And so let me ask Mr. Flores if you can find Exhibit 171, please.  Wait to display it until I find the right page.  You can show this one.

So this is -- now we could show the first page.  Sorry, I hit the -- oh, sorry.  Okay.  Sorry for the technical difficulty.  Oh, there we go.

Okay.  So we're displaying Exhibit 171, page 1.  And this is an e-mail.  Here's the date.  Mr. Fritsch is sending this e-mail.

And also -- well, this e-mail says, "Confidential attached."  That's the title.  He says, "Please find the outline of the integration plan for your eyes only, not for distribution."

And so that's exciting; right?  You're another prospect.

And let's go on to -- I think it's page 19.  Let's look there.  It might be 16.  Could you check that?  16.

So here we go.  So on page 16, he includes in this presentation.  He's not sending this to Mr. Guy for no reason. He's sending this to Mr. Guy.  Mr. Guy is an investor.  He

finds more investors.  He's got the relationship with Goldman Sachs.  He's important to Mr. Fritsch.

And he gives him these historical figures in the left column under 2015.  And it says, as sales and other revenue more than $50 million.  And this is important because it had to match what he had told Mr. Guy in January.  Because if he had said the truth, which is something under $100,000, then again, Mr. Guy would have stopped everything and would have realized that he had been defrauded.  But that is not what happened because the Defendant continued to need to maintain what he had already told him.

And so to say that there's no evidence that Mr. Fritsch said that the revenue was $15 million is wrong.  This is the evidence.  He's saying it again.  He said it in January at the meeting, and he's saying it again in this presentation.

Okay.  We can take that down.  Thank you.

Okay.  Let's talk about Disney and Mr. Fritsch.  You saw the presentations they talk about.  He sent them out.  So he talks about his sophistication.  He talks about how long he's been in business.  He has been a person who's been around the block.  He knows what he's doing.  He's no country bumpkin who doesn't know the ins and outs of business.  He's no person that doesn't know what a deal is and what a conversation is or what a meeting is.  People take meetings in this town all the time. Mr. Fritsch knows the difference.

So looking at the Disney e-mails, I want to just pull up for you --

If we could, Mr. Flores, could we put up Exhibit 115?

All right.  So here again, this is early.  And when you look at the defense exhibits, Mr. Aminoff gave you a slide that listed the defense exhibits.  It didn't list the government's e-mails on this topic of Disney.  And the government's e-mails are Exhibits 115, Exhibit 4, and Exhibit 127.  And this is what Mr. Fritsch said to Danny Guy.

So you have Kevin Mayer and Courtney Holt in their testimony saying, basically, these meetings were just meetings, and there was nothing serious, according to Kevin, in terms of mergers and acquisitions.  But Mr. Fritsch is saying "Disney" confidential in all caps.  As an abuser of all caps myself, all caps mean something.

So, Mr. Fritsch, on August 15, 2014, says, "I just got back from a long and intense but very positive meeting with Disney.  They are willing to proceed on the deal."

Now, you look at the defense e-mails.  I invite you to. That's not what they said.  They said, "Let's hear some directions to a meeting.  Nice to meet you."  Not they are willing to proceed on the deal.  They are going back and running the numbers now.  They don't have a conflict with the investment banker at Goldman Sachs.  They want us to perfect the business model between all of these other companies.

Thumbs up.  Timing.  We are on a perfect track.

Mr. Fritsch, at this stage, has already received two tranches of money from Mr. Guy.  He's received the 2.5 million in January, and he received the 4.1 million in July.

And what did that tell Mr. Fritsch?  He told him that Danny Guy was loaded.  He had lots of money.  And this is the way to get Danny Guy excited and want to continue to invest himself and also to bring in his associates and his contacts at Goldman Sachs and elsewhere.

So let's look at Exhibit 4.  So this is August of 2014, December 2014, later the same date.  So at this point, Danny Guy had just invested in early December -- he told you about an investment he made of about $2.7 million.  So now he's thinking about investing even more money, and he does.

And so here Danny says, "Did you close early?"

And Mr. Fritsch responds with lots of facts here.  He says, "We need cash now to produce revenues, which is highly important as revenues will dry up the share -- drive up the share price tremendously."

"So we need cash now," that is directed to Danny Guy and to his network.  We need your cash.  We need it now.

In fact, Access in London -- and he tells Mr. Guy about Access, that they're nervous the revenues will go up and that the price will be way over $20 per share.  You can go back, and you can look at Mr. Guy's agreements.  They're in evidence.

Mr. Guy didn't pay anywhere near $20 a share.  This is a huge bump up in value for the company, allegedly.

But Mr. Mohaupt talked about this, and he said that this was not what was occurring.  Mr. Mohaupt was Mr. Fritsch's personal contact, the person he knew at Access.  And so you know that Mr. Mohaupt has no ax to grind.  And you can evaluate it for yourself.

But Mr. Mohaupt said that this statement, he was surprised at it.  He said that, if he had heard that this was going on, he was not going to be investing or doing business with Mr. Fritsch.

THE COURT:  Slow down.

MS. TAIT:  Sorry, Your Honor.

And then the next paragraph, here's some more news.  It's the new Instagram evaluation, and there's actually news that Maker Studios/Disney is planning to enter into a commercial transaction with StarClub by February.

So Maker Studios, that's Courtney Holt.  He testified, and that is not consistent with what he told you.  And so this statement again is directed Danny Guy to try to get him to give him more money.  And it's false.

Next, Exhibit 127.  And this is the last really major Disney e-mail that I invite you to review alongside the defense e-mails, of course.  And here, let's start at the very bottom.

Yeah, let's see.  Let's look at the top of page 2 for a

moment.  So Mr. -- no, page 2 is a continuation of page 1.  Can go back?  Thank you.

All right.  So here on January 27, 2015, this is just before Mr. Guy sends the next tranche of money, which is $7 million.  And that's Count 1.  Mr. Fritsch writes, starting -- yes, sorry, January 27.  He says, "Danny, I'd like to encourage us to complete the 10 million fundraise for the company this week."

Danny Guy testified that at this time, not only was Mr. Guy going to put in his 7 million, but there are e-mails that are in the evidence showing that right around this time, Mr. Guy was getting money from other potential investors to Mr. Fritsch as well.

And there's an e-mail that right after this in which Mr. Fritsch says, "I can't find their investment."

And Mr. Guy says, "Oh, these are the names."

And then eventually Mr. Fritsch agrees that he found those people's investments.  So this is the context.

He says, "Danny, we need to finish this fundraise.  You need to get this done.  And the meeting with Disney was better than expected.  We decided to engage.  We decided to engage an investment manager.  We're going to hire an investment manager who we both know and trust from Moelis."

Well, right then, I think we didn't both know that Navid was his name.  You could go back and look.  Kevin Mayer

introduced Mr. Fritsch to Navid.  Mr. Fritsch didn't know this banker at Moelis and Company.  So right there, that's off.  I'm not saying that's material, but just keep that in mind.

But we both know and trust this person from Moelis and Company, not Goldman Sachs, and start the process of an M&A transaction.

And then he keeps going with more specifics and says in the all caps, "This is going to be better than expected."  And the reason for sending this e-mail is to continue the scheme to defraud and to get Mr. Guy to fork over some more money and to get his friends to do the same.

So that -- the Disney is false.  And these deals were not true.  You heard from the two Disney executives, there was no interest at this level.  And the suggestion that Mr. Fritsch was so naive that he could come away from meetings and friendliness that is exhibited in those various e-mails at around this time and to think that there is a deal and a starting a process of an M&A transaction, the suggestion is unfounded.

So turning to Yucaipa, so let's have a look at exhibit -- the government's exhibits that are key here are Exhibits 108, 110, and 111.  And I'm just going to focus on 111.  Let's just do 111 because you've heard a lot about this.  But so -- in the defense argument, there was a suggestion here -- August 1, 2014.

Yes, "According to Ron B.," that's, Ron Burkle, "we have a deal for $9 per share, plus the talent of his management firm." And then a few lines down, "Paperwork will get done by his CFO, Richard d'Abo," et cetera.

So what was $9 a share is what Mr. Fritsch offered to them.  This is not an offer from them back to Mr. Fritsch.  He sent them an offer and said, "Hey, can you give me $9 a share?"

But that gets translated into, yes, according to Ron B., Burkle, we have a deal for $9 per share.  And Mr. d'Abo threw very cold water on that.  He said that the difference between an offer and a deal, especially the offer came from the other side.  Think about that.  The difference between an offer and a deal is night and day.

So this is Mr. Fritsch again trying to get Mr. Guy to be enthused to believe that things are on the right track and that there's outside interest, important parties in the company and he should continue to invest and continue to use his network to get more investors.

I want to say just a word on the -- turning to -- not the -- there's two jury instructions at issue that were -- I brought up the scheme to defraud one, and defense Counsel brought up the intent to defraud one.

And with respect to the intent to defraud on Count 2, the allegation is tied to the $15 million revenue figure here.  I hope that I've elaborated enough for you to be able to be

confident that that did happen, and it did occur.

Ian Mann was at that meeting.  He was invited there by Mr. Fritsch.  Excuse me.  He was welcomed there by Mr. Fritsch, according to the one e-mail.  And he came with Danny Guy.  Danny had introduced Ian Mann to the investment, as Danny had with all those other people whose names I listed just a few moments ago.

Danny also was listening to the presentation.

(The court reporter interrupted.)

MS. TAIT:  I'm sorry.

Danny also was listening.  Had either of those -- had Danny known that this was a false statement, he would have told Mr. Mann as well that he wasn't going to be investing anymore.  There's definitely intent to defraud as to this statement, because you know that Mr. Fritsch knows very well what is the balances in the account.  He knows whether the company's making money or not.  He knows that that's not a true statement.

And that is further shown by the Spotify slide that I showed you a few moments ago in which he has to make the statement again and put it into this presentation, because otherwise he can't tell Danny Guy the true numbers.  And as you know, the true numbers, which I'll show you in a moment, are very, very low.

So you don't have to take Danny Guy's word for it.  You can take Mr. Fritsch's slide for it.

We indeed have spoken a lot about the one pager.  I just want to go over just one aspect of the one pager that might not have been as clear because of the deposition setup with Mr. O'Reilly and having to look at it on a screen this big, so if I could just do that.  Hold on while I find the right place.

Okay.  So if we can display here -- okay.  So I'm just going to run through this very quickly.  Who wrote the one pager?  The point of my exercise here is that Mr. Fritsch is the one who made the edits to the one paper, the one pager that were false.  It starts out with Mr. O'Reilly.  He starts it on October 18, 2015.

Those are his Exhibits 43 and 44.  And he tells Mr. Fritsch, "Hey, look, here's this one pager I wrote."

And if you notice, right here, there's no mention of the investors.  There's no mention of Access.  There's no mention of Credit Suisse.  There's no mention of Warner.

All right.  Okay.  Mr. Fritsch asks for edits.  He asks for a fully agnostic version.  Mr. Fritsch -- and that's Exhibit, sorry, 43 again.

Mr. Fritsch in Exhibit 45 says, "Wonderful work.  Hey, could you turn this around into a generic one pager?  I learned that one of our shareholders has landed an important meeting with a PE fund," private equity fund, "in San Francisco."

And Mr. O'Reilly says, "Sure."

Down below the same exhibit -- now we're on October 9,

2015, Exhibit 45.  And Mr. Fritsch says, "This is the priority for the morning.  David Cohen is in San Francisco all day today with a PE firm which he believes might produce a US $20 million investment within the coming four weeks."

So you heard about David Cohen from Mr. Guy.  He's another one of those people that Mr. Guy recruited.

And so Mr. O'Reilly sends back revision again.  In Mr. O'Reilly's revision, there's no reference to Access, no reference to Credit Suisse, or to Warner.  This is Exhibit 46.

Thus the next day -- or let's see, it's the -- later the same day.  This is October 9, 2015.  Later the same day, Mr. Fritsch sends a key modification of this document to Mr. Guy.  And here all of a sudden are the current investors, which I believe presentation amply proves that these people were not investors.  This statement was false.  Here it is.

And why?  He knows that Danny Guy is going to send this out.  And on the 9th of October, Mr. Guy says, "Can I send this out?"  And Mr. Fritsch says, "Yes," exclamation mark.  And that again is Exhibit 201, which is the one pager.

Let me address just briefly the argument that -- the argument regarding 3229 Rambla, Inc., and Greenwich Music, Inc., and the management agreement and lease agreements.  The expert for the defense conceded that, when the same person is on both sides of the deal, that's not an arm's length deal.  And he conceded that that person could just set the price for

that deal if they wanted to collude with themselves and just pick a price for that deal.

And so the fact that Mr. Fritsch is on both sides of these managing agreements is important.  He wanted to hide the fact that he was taking the money out of the company this way because, if you look at the bank records -- or if you look at the contracts, it looks like it's some other company because Mr. Fritsch doesn't sign both as the landlord and the tenant for the 3229 agreement.  Mr. Fritsch doesn't sign both as the management and as StarClub in the GMI agreement.  He has another person do the signing because he's the sole shareholder of 3229, Inc.

And he is the control person, as you know from Kim Frederick's testimony over Greenwich Music.  He controls those -- the bank accounts.  And you can infer that he is the controlling person.

So why not?  Why do it this way?  This is a way to loot StarClub in order to rent your house for a huge dollar amount per month when people are only going over there a few times a month.  This is a way to just take as much money as you can out of StarClub and paper it over by making it look like a business expense, 100% business expense.

If Mr. Fritsch really thought it was okay to take all that money out of StarClub via those managers, the money that's listed in those management agreements for 3229 Rambla and for

Greenwich, he would have just had StarClub write him a check to Bernhard Fritsch and he would have deposited that check in his own personal bank account instead of having these young, inexperienced, nonaccounting people pay bills for him and his estate manager pay bills for him and pay his personal bills.

The fact that he does it this way and doesn't just take it as his own payment shows to you that it's not his money. And he doesn't think it's all his money. He thinks that he needs to hide it. And that's why he's done that. He would not have gone to this trouble. He knew instead that this was a way to steal from the company. This also supports his intent to defraud in this case and his commission of a scheme to defraud, I should say.

And again, remember that the management of the lease agreements were not enough for Mr. Fritsch because he also took money from StarClub through the Amex accounts that we've already detailed.

One more argument from the defense side I'd like to address is the idea that the defense financial expert, actually he was not testifying as an expert at this time, but the fact that there were all of these transfers prior to the time Danny Guy and his friends ever put any money into the company.

But the bank statements for two of those accounts are also in the evidence. And the witness conceded that, by the time the end of 2013 rolled around, whatever money had been paid

into those bank accounts was dissipated.  We don't know where it went.  It was gone.  So that money is not there.

The argument, as I understand it, is that, if I have a bank account and I control it -- it's in the name of Acme, Inc. And in 2013, I deposited $100,000 from who knows where into Acme, Inc.  And then I spent it on whatever, whatever I spent it on.  And it was all gone by the end of 2013, all gone, not in those accounts.

And then I go to my colleague, and I steal money from my colleague, and I put that money in the same bank account the next year in 2014.  But it's stolen money, and I knew that because I stole it.

The money in the bank account doesn't suddenly become my money just because it's in the same place.  That doesn't make any sense.  So you should use your common sense with respect to those arguments.  It does not matter.  The fact that there were deposits that were already gone by the time Danny Guy ever first showed up to give money to StarClub.

And the same with respect to the lawyer, Mr. Fritsch's personal lawyer, who testified he took over Mr. Fritsch's family Trust.  That lawyer waffled over whether this Euro-Dutch Trust was or was not the original Trustee of the family Trust. And even if that corporation was the Trustee of the family Trust, it doesn't mean that every act that that corporation does relates to your family Trust or you.  They're just a

corporation.

So there's no evidence that Mr. Fritsch had anything to do with Euro-Dutch Trust. It's the -- the record is simply silent on that.

So I would like to -- I would like to leave you, while we still have you, with just a few reminders of things that you're not going to be able to see again.

Before I do that, I want to address one thing. The idea that Mr. Polsen has testified; right? He hasn't. Who's in control of the bank accounts? You have to decide whether you have enough information to be able to make your decision. You know who is in control of StarClub. You know Mr. Fritsch ruled everything at StarClub based on what you've heard in the testimony. You know that he controlled those bank accounts. He was the one with the signature.

Mr. Polsen wasn't on those accounts for StarClub. He's not a signatory on those accounts. And so you need to decide whether this is enough evidence. And I submit to you that it is. We have plenty of evidence indicating what happened to the money. Mr. Fritsch controlled what happened to the money. You don't need to hear from anybody else to know that.

So again, let me just turn to -- before I display, hold on. All right. Interesting. It's a blank turn.

Okay. So I've labeled this Trust. You can see it now because, if you're interested, this is your last chance to see

it.  And so here we go.  This is -- first of all, this was the evidence that you -- that Mr. Guy testified to.  And these are Mr. Guy's investment rounds.

And you'll note again, round one and round two, he testified -- those came through agents.  The documentation is in the evidence.  It shows the names of the agents.  And you'll be able to see that.  And you should be able to match up in our chart regarding the 7995 account.  You should be able to match up large amounts of money coming in on that date, although you're not going to see Danny Guy's name there because it came through agents and they were offerings, as you've seen the evidence of, that were multiple people giving money.

So again, this totals to the $22.4 million.

I see some people writing, so I'm going to give a moment.

All right.  And so now here's another chart that you're not going to see again.  This one was Exhibit 909.  We showed this in the testimony of Mr. Bouchard, the analyst of the bank accounts.  And he explained to you how he came up with these numbers, how he reviewed the bank accounts for StarClub.  And he was able to try to find external money that wasn't in that 7995 account.  That didn't look like investor money.  That was his aim.

You're going to actually see that he actually listed this yellow -- the number $370,000.  I think this actually is in the 7995 account.  But Mr. Bouchard put it in the unknown category.

So he gave it, as you know, maybe this is possible revenue for 2016.

And so we add it all up, and you'll see for 2015 that the only possible sources of revenue, according to just the bank record, if you exclude intercompany transfers and if you exclude what looks like investor money through the account, you know that investors were told to wire to, it's $46,700 for 2015.  It's $100,000 for 2014, which is the year the company soft launched, according to the document Mr. Fritsch sent out, which I guess that doesn't look very good.  That whatever the possible number went, the direction's going in the wrong way.

And then in 2016, it said $386,000, mostly because of this yellow number.  So this is the truth about the revenue.  And so you won't be able to see this again.  But this is -- you can also just look at the underlying charts yourself, and you'll see the credits, and you'll see that most of the credits are intercompany transfers.  So I will leave that to you.

And here's a chart about the purchase of the McLaren. This was Exhibit 935.  This one was pretty simple.  Basically just demonstrates to you that the money came in through the 7995 account, which is, again, that investor account, and then went out through these various ways to purchase the McLaren for $292,000 at McLaren Scottsdale.

And here's the chart for the Rolls Royce.  Again, not going back to the jury room, showing the $455,000 originating

from StarClub first, then to GMI, then also to Rambla, and ultimately to Rusnak Pasadena.  And so that's basically it for the charts that you're no longer going to see.

And so I will leave you with our thanks and with our request that you follow the law and follow the judge's jury instructions, that you review the evidence carefully, and that you fulfill your oaths as jurors.  But I submit to you that, if you do all that, that you will find Mr. Fritsch guilty on both Count 1 and Count 2.  And thank you very much.

THE COURT:  Thank you.

Just a couple more minutes.

When you begin your deliberations, elect one member of the jury as your foreperson who will preside over the deliberation and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so.  Your verdict, whether guilty or not guilty, must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not be afraid to change your opinion if the discussion persuades you that you should.  But do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous

verdict, but of course, only if each of you can do so after having made your own conscientious decision.  Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.

Perform these duties fairly and impartially.  You should also, as I've said, not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.  Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion, or biases, including unconscious biases.  Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control, or intention.

It is your duty as jurors to consult with one another and to deliberate with one another with a view towards reaching an agreement if you can do so during your deliberations.  You should not hesitate to re-examine your own views and change your opinion if you become persuaded that it is wrong.

Because you must base your verdict only on the evidence received in the case and on these instructions, I remind you that you must not be exposed to any other information about the case or the issues it involves.  Except for discussing the case with your fellow jurors during your deliberations:

Do not communicate with anyone in any way and do not let

anyone else communicate with you in any way about the merits of the case or anything to do with it.  This restriction includes discussing the case in person, in writing, by phone, tablet, computer, or any other means, via e-mail, text messaging, or any Internet, chat room, blog, website, or any other forms of social media.  This restriction applies to communicating with your family members, your employer, the media or press, and the people involved in the trial.  If you are asked or approached in any way about your jury service or anything about this case, you must respond that you have been ordered not to discuss the matter and to report the contact to the Court.

Do not read, watch, or listen to any news media or accounts or commentary about the case or anything to do with it.  Do not do any research, such as consulting dictionaries, searching the Internet, or using other reference materials, and do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address.  A juror who violates these restrictions jeopardizes the fairness of the proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, the juror must notify the Court immediately.

Some of you have taken notes during the trial.  Whether or

not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  They should not be overly influenced -- you should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the Court to decide.  You may not consider punishment in deciding whether the government has proved its case against the Defendant beyond a reasonable doubt.

The Verdict Form has been prepared for you.  The form will ask you to render a verdict on each count of wire fraud charged in the indictment.  Each of these counts relates to a specific transaction identified in the indictment.  These alleged transactions are as follows:

For Count 1, a wire transfer of $7 million from D.G. to StarClub on or about January 30, 2015; and

For Count 2, a wire transfer of $1 million from I.M. to StarClub on or about January 25, 2016.

After you have reached unanimous verdict -- unanimous agreement on a verdict, your foreperson should complete the Verdict Form, according to your deliberations, sign and date it, and advise the Clerk, or the Bailiff, that you're ready to return to the courtroom.

If it becomes necessary during your deliberations to communicate with me, you may send a note through the Clerk signed by any one or more of you.  No member of the jury should

ever attempt to communicate with me except by a signed writing. And I will respond to the jury concerning the case only in writing or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.

Important instruction, remember that you are not to tell anyone, including me, how the jury stands numerically or otherwise on any questions submitted to you, including the question of the guilt of the Defendant, until after you have reached a unanimous verdict or have been discharged.

That's it.

Let's swear in our Bailiff.

THE COURTROOM DEPUTY:  Do you solemnly swear to keep this jury together in some private and convenient place, that you will not permit any person to speak or communicate with them, nor do so yourself, unless by order of the Court, or to ask them whether they have agreed upon a verdict, and that you will return them into court when they have so agreed or when ordered by the Court, so help you God?

THE BAILIFF:  I do.

THE COURTROOM DEPUTY:  Thank you.

THE COURT:  All right.  Thank you.

I'm going to ask the alternates, the four of you, to remain out in the hallway.  If you have stuff in the jury room,

you can pick that up.

And is the lunch there?

THE COURTROOM DEPUTY:  I don't think so, but should be.

THE COURT:  Okay.  So it should be shortly.

We got to make sure then, T.J., that the alternates get their lunches.  But once you get your stuff, just wait out in the hallway.  And I'll say a few more things to you.  You are to continue with my admonition not to talk to anyone about the case or form or express any opinions about the case until you are substituted in for one of our 12 jurors.

I'm going to ask you -- you told us you want to stay longer today.  Every morning when you come in, let me know if you want to stay longer and get lunch.  If you want to go back to the shortened trial schedule, that's up to you.  But I'm ordering you now from day to day to be here for deliberations.

I'll let you decide whether you want to make it 8:00 or 8:30, but one of those two.  And again, you all have to agree. But you will continue that schedule.  I'm not going to bring you back here at the end of the day to order you to come back. That's my order now until I've discharged you.

I remind you again that we will be in session on Monday, if you haven't reached a verdict yet by Friday afternoon.  And I do have Juror Number 7's issue in mind.  We'll deal with that.  So I think that's it.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

THE COURTROOM DEPUTY:  All rise.

(Jury exited.)

THE COURT:  You can have a seat.  I just want to wait to bring in the first alternate, so they can leave after he eats his lunch.

If the jury asks for more soda, magic markers, stuff like that, our CRD will just bring that to them.  I won't call you in, but obviously, if there's any substantive question, I will wait for you.  But somebody from each side needs to be in the building at all times.  Don't leave until T.J. tells you that the jurors have left.

I assume Mr. Fritsch is interested in hearing whatever goes on, so he needs to be available in very short notice. Don't leave the building.

MR. THREATT:  Understood, Your Honor.

THE COURT:  I should -- we will be down to three alternates, and then we'll need one if deliberations go through Monday.  So I don't know.  I can bring all three of them back every day and have them sit here.

MS. TAIT:  Your Honor, that's option one.  And what's option two?

THE COURT:  We want at least one or at least the next in line to be here, because I don't want to wait for somebody to come back.

MS. TAIT:  Well, Your Honor, if we could -- having

had three people take three weeks out of their lives, could we just keep them all?

THE COURT: I can. I can order them to stay, yes.

MR. AMINOFF: You're not proposing to excuse them; right?

THE COURT: No, no, no.

MR. AMINOFF: No. They just go home.

MS. TAIT: Oh, I see what you mean, Your Honor. I misunderstood. So, in other words, they don't have to come downtown.

MS. ABEL: I just don't recall where they're from in terms of the --

THE COURT: Yes. Okay. And where are the other alternates?

THE COURTROOM DEPUTY: I have them waiting in the hall.

Do you want them all?

THE COURT: Let's talk to Alternate Number 1 first, and then I'll talk to them.

(Alternate Number One entered.)

THE COURT: Thank you for being with us. I don't know if it'll resolve before Monday. But I don't want to get you stuck here if we need an alternate on Friday. So thank you for your service. Apparently, lunch will be waiting for you, so you're now excused.

ALTERNATE NUMBER ONE:  Thank you.  So just to be clear, I don't need to come back?

THE COURT:  You do not need to come back.  Make sure you check in with your badge so the jury commissioner, jury manager, knows that you've completed your service.

ALTERNATE NUMBER ONE:  Is that with T.J.?

THE COURT:  No, that's downstairs on the first floor where you originally were assembled.

ALTERNATE NUMBER ONE:  Okay.

THE COURT:  Okay.  I think that may be where the food will be.

ALTERNATE NUMBER ONE:  Thank you, Your Honor.

(Alternate Number One exited.)

THE COURT:  All right.  So what do we --

MS. LEE:  I think we're fine with having one come back.  Okay.  Yes.

THE COURT:  So that will be Alternate Number Two.

MS. LEE:  Yes.

MS. ABEL:  That's correct.

(Alternate Numbers Two, Three, and Four entered.)

THE COURT:  Hi, there.  Okay.  That's okay.  Just some quick instructions.  You are, sir, our Alternate Number One.  I need you to stay here and be available whenever the jury is deliberating.  So you will come and go on the same schedule as they do.  You'll leave your contact information if

you haven't already, with our CRD.  Your lunch is downstairs. And as I said, every morning at the same time as the jury, you need to come in.  And you won't leave until the jury leaves. So I don't have to take a lot of time bringing you in from someplace else, that gives us one alternate to work with.

You are still alternates.  You are still -- the two of you are still under orders not to speak to anyone about the case. Don't read anything about the case.  But I'm going to allow you to remain on call in case I need another alternate.

How far away do you live?

THE COURT:  All right.  Well, we've got one at 20. Which one is Emma?

Okay, perfect.  So you're 25 minutes away.  Make sure we have your contact information, but you don't need to come every day unless I need to substitute you in.  Make sure you have a cell phone at all times so we wouldn't have to wait.   We will let you know if we substitute in Alternate Number Three, and you're next up.  And then depending on where we are, I might ask you to come down.  But for now, I think we're probably be good.

But again, you're both still alternate jurors in the case. You have not been excused, and all the admonitions apply. Okay.

All right.  And your lunches are downstairs, apparently tomorrow.

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov     (213) 894-3913

ALTERNATE JUROR:  Should I not come in?

THE COURT:  This gentleman needs to come in.  Neither one of you needs to come in unless we call you.  So you need to make sure you have that cell phone glued to your hand or ears or something.

ALTERNATE JUROR:  And then a follow up.  When will we know we're no longer on?

THE COURT:  We will let you know.

Okay.  Thank you.  Have a good lunch.

(Alternate Numbers Two, Three, and Four exited.)

THE COURT:  All right.  So we will get -- have you work and sit in.  This is a good time for me to start blabbering.

Have you finalized all the exhibits with T.J.?

MR. AMINOFF:  We're working on it.

MS. ABEL:  I think we have.

MS. TAIT:  I think we were just --

MS. ABEL:  We're resuming right now.

MR. DE LEON:  We were getting to it.

THE COURT:  Yep.  All right, great.

(Jury deliberated from 12:52 p.m. to 3:18 p.m.)

(Verdict filed at Docket 544.)

-oOo-

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

REPORTER'S CERTIFICATE


     I certify that the foregoing is a correct transcript of proceedings in the above-entitled matter.


/s/ Suzanne M. McKennon, CSR, CRR, RMR
_____          Date:   12/30/2025
United States Court Reporter