UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE DALE S. FISCHER, U.S. DISTRICT JUDGE


UNITED STATES OF AMERICA,               )
                                        )
                 Plaintiff,             ) CASE NO.
                                        ) CR 17-00520-DSF
          vs.                           )
                                        )
BERNHARD EUGEN FRITSCH,                 ) PAGES 93 TO 133
                                        )
                 Defendant.             )
_____)


REPORTER'S TRANSCRIPT OF

JURY TRIAL DAY 1 - P.M. SESSION

TUESDAY, MARCH 18, 2025

1:32 P.M.

LOS ANGELES, CALIFORNIA


_____

MAREA WOOLRICH, CSR 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, SUITE 4311
LOS ANGELES, CALIFORNIA 90012
mareawoolrich@aol.com


**UNITED STATES DISTRICT COURT**

94

**APPEARANCES OF COUNSEL:**


**FOR THE PLAINTIFF:**

BILAL A. ESSAYLI
United States Attorney
BY:  MONICA E. TAIT
BY:  SARAH SUN LEE
BY:  JOSEPH DE LEON
Assistant United States Attorneys
1100 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012


**FOR THE DEFENDANT:**

OFFICE OF THE FEDERAL PUBLIC DEFENDER
BY:  JAMES THREATT
BY:  JONATHAN AMINOFF
BY:  REBECCA ABEL
Deputy Federal Public Defenders
321 East Second Street
Los Angeles, CA 90012

**UNITED STATES DISTRICT COURT**

95

LOS ANGELES, CALIFORNIA; TUESDAY, MARCH 18, 2025

1:32 P.M.

-oOo-

(Outside the presence of the jury.)

THE COURT:  Anything we need to discuss?

MR. DE LEON:  Nothing from the government.

MR. AMINOFF:  Not from the defense, Your Honor.

(In the presence of the jury.)

THE COURT:  Prospective Juror No. 18, please take seat No. 13.

PROSPECTIVE JUROR:  You got it.

THE COURT:  All right.  Please be seated.

All right.  As I said, we are now going to choose our alternates and fill up seats 14 through 18.

Ms. Orozco, would you start with 18?

THE CLERK:  Hue Q., please take a seat in seat 14; Jose R., take a seat in seat 15; Eurenie F., take a seat in seat 16; Kevin Q., take a seat in seat 17; Susan P., take a seat in seat 18.

THE COURT:  All right.  Thank you.

Do you all have that single sheet?  If not, we'll get you one.

Let's start with our new Juror No. 14, sir.

PROSPECTIVE JUROR:  Good afternoon.  I live in the

**UNITED STATES DISTRICT COURT**

city of Monrovia.  My highest education is I have a graduate degree in public administration.  I'm currently self-employed as a consultant for municipal finance -- municipal finance departments.

I'm currently married.  My wife works for USC.  And we have two adult sons.  One is in Chicago working for -- well, he's actually transitioning to a new job.  But he was formerly working as a person overseeing an e-commerce store for fish aquariums and accessories.  And my younger son is currently also going to graduate school at USC and working part time with a consultant company that also does work for municipal government.

THE COURT:  Thank you.  Does your spouse work outside the home?

PROSPECTIVE JUROR:  Yes.

THE COURT:  All right.  Let's go right on to Juror No. 15.

PROSPECTIVE JUROR:  Good afternoon.  I live in Thousand Oaks.  I didn't go to the school.  My employer is Stay Green.  I'm married, and I'm a gardener.

THE COURT:  Does your wife work outside the home?

PROSPECTIVE JUROR:  Excuse me?

THE COURT:  Your wife.

PROSPECTIVE JUROR:  My wife is Patricia Avila.

THE COURT:  Does she have a job outside the home?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  What does she do?

PROSPECTIVE JUROR:  No.

THE COURT:  Do you know what she does for a living?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  What?

PROSPECTIVE JUROR:  Well, I can -- I can say I don't understand.

THE COURT:  Sir, do you have trouble speaking English?

PROSPECTIVE JUROR:  Yeah.

THE COURT:  Do you speak English at work?

PROSPECTIVE JUROR:  Half.  All employers are Mexicans and didn't speak English.  Only my boss is a white guy.  And I'm --

THE COURT:  Counsel, I'm inclined to excuse this juror.

MR. DE LEON:  The government has no objection, Your Honor.

MS. ABEL:  No objection from the defense.

THE COURT:  Sir, I'm going to send you back down to the jury room.  Go back down to the jury room.  Okay?

PROSPECTIVE JUROR:  Okay.

THE COURT:  Thank you.

THE CLERK:  Walter P., take seat 15.

98

THE COURT: All right. Sir, give us that information, please.

PROSPECTIVE JUROR: I live in Santa Clarita. I'm a high school graduate. I'm self-employed as a handyman. I'm single. I have a roommate that works in dental supply. I did serve on an alternate -- as an alternate on a jury. There was a verdict.

THE COURT: So did you listen through the entire trial?

PROSPECTIVE JUROR: Yes.

THE COURT: All right. Were you ever substituted in for one of the -- no? Okay. All right. Thank you.

Juror No. 16?

PROSPECTIVE JUROR: Good afternoon, Your Honor. My area of residence is Los Angeles. I have a bachelors. My employer is Bet Tzedek legal services. I'm married. My husband works as a clinical driver for LA County Women's Reentry Program. And I have no prior jury service.

THE COURT: What do you do for Bet Tzedek?

PROSPECTIVE JUROR: I'm a volunteer coordinator.

THE COURT: What do you coordinate?

PROSPECTIVE JUROR: Law students coming in and wanting to get experience.

THE COURT: Great.

Juror No. 17?

UNITED STATES DISTRICT COURT

PROSPECTIVE JUROR:  Good afternoon.  I live in Sherman Oaks.  Graduated high school.  I'm self-employed, tattoo artist, semi-retired, single.  I have a girlfriend that I live with who is a personal assistant.  And I have no prior jury service.

THE COURT:  Thank you.

Juror No. 18?

PROSPECTIVE JUROR:  Good afternoon, Your Honor.  I reside in the city of Mission Hills.  I have some college in teaching.  I am now retired.  I was a special ed assistant for the Los Angeles District.  My husband is also retired.  And he was a Los Angeles police officer for 30 years.

I am married.  I have four children.  One adult son living with us.  And he is currently employed through Amazon. And I have had civil service, criminal service.  We did receive a verdict on all of -- well, on one of them.  I'm sorry.  And I have been on the grand jury maybe about ten years ago.

THE COURT:  Well, you've done a lot of service for juries.  Thanks very much.  Do you remember what that criminal case was about?

PROSPECTIVE JUROR:  Because I would let the jury know -- I mean, the lawyers know that my husband was a police officer, they would always excuse me.  So I'm the only one that I actually got to stay on was a lawsuit against Rite Aid.

THE COURT: All right. We'll see what happens today. Is there anything about having a spouse who spent 30 years on LAPD that causes you to think you'll be unfair on this case?

PROSPECTIVE JUROR: No.

THE COURT: No? Okay. Thank you.

All right. Let's go to the longer list of questions. The first question was whether you know anyone or any location that's on that list. And I added some names just to refresh your memory. I added Annabelle Burguiere, Taylor Ehrlich, Trevor Sturges, Eugene Izumo. And then the entities Warner Music Group, Credit Suisse, UBS, Access Industries, Disney, Moonbug Entertainment, Yucaipa Maker Studios, and of course StarClub.

Does anyone have -- yes, Juror No. 13?

PROSPECTIVE JUROR: I had experience with Moonbug and Disney and Warner Brothers Music. I'm sorry I didn't hear that the last time around.

THE COURT: Okay. So again, you work in animation --

PROSPECTIVE JUROR: I work in animation. So I know all of those companies, and we are all trying to get projects started.

THE COURT: Okay. Anything about this that makes you think you couldn't be fair in this case?

PROSPECTIVE JUROR:  No.

THE COURT:  Thank you.  Anybody else?

Okay.  Question 2.  Do you know or recognize me or any of the attorneys or the Court staff?  I don't see any hands.

Question 4.  Have you or anyone close to you had any particularly positive or particularly negative opinions about or experiences with the FBI or FBI agents, the U.S. Department of Justice or any other law enforcement agency, or do you have any feelings or beliefs regarding the criminal justice system or law enforcement generally that might affect your ability to be a fair and impartial juror?  Anyone have a yes answer to those?  Okay.

Question 5.  Have you or anyone close to you been a victim of, investigated, or arrested for, accused of or charged with or convicted of a crime including wire or investment fraud or any other kind of financial crime or been treated badly by the government, law enforcement, or the courts?  And then I also group that with Question 6.  Have you or anyone close to you ever sued a local, state, or federal government?  Anybody have -- yes, juror No. 16?

PROSPECTIVE JUROR:  Yes.  On Question 5, my family and I were victims of like a Ponzi scheme.  Ten years ago we lost everything.  And you just pick up the pieces, and you move on.  But I just wanted to give you that out of full disclosure.

THE COURT:  Absolutely.  We appreciate that.  Would you -- wait a minute.  Will that impact your ability to be fair in this case?

PROSPECTIVE JUROR:  I feel like I can be fair in this case.

THE COURT:  All right.  Thank you.  If at any time you don't feel you can be fair, please let me know immediately.  Okay?

PROSPECTIVE JUROR:  (No audible response.)

THE COURT:  All right?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Thank you.

Anybody else?  Okay.

Do you or anyone close to you work for a social media company such as Facebook, YouTube, Snapchat, Instagram, TikTok, any of those?  No.

Have you or anyone close to you been an influencer on social media such that you or they make money from social media activity, and are you an actor, musician, influencer, or other public figure with more than 1,000 social media followers?  Anybody have a yes answer to that?

PROSPECTIVE JUROR:  Oh, I have -- I have over a thousand followers, but I'm hardly an influencer.

THE COURT:  Okay.  What kind of site do you have?

PROSPECTIVE JUROR:  Tattoo work.

THE COURT:  Oh, yes, of course.  All right.  Thank you.

Question 9.  Have you or anyone close to you ever solicited anyone to invest or been solicited to invest in a company whether the company stock was traded on the public markets or not?  And let's group that with the next question.

Have you or anyone close to you ever purchased stock in or otherwise invested in a company whose stock is not traded on the public stock markets, and if so, have you or that other person experienced a loss from that investment?

Anybody out here have a yes answer?  I don't see any hands.

Have you or anyone else close to you ever invested in a company based on a private placement memorandum?  That's a PPM sometimes called.  No hands.

Have you or someone close to you had experience with privately managed investment funds that pool multiple people's assets or a hedge fund?  Anybody?  I don't see any hands.

Question 13.  You must follow the law as I state it to you whether you approve of the law or not.  Is there anybody who can't or won't follow that instruction?  Great.  Thank you.

Is there anything about just the general charge of wire fraud that would make you unable to reach a verdict regardless of whether the case is proven beyond a reasonable doubt?

As I've said many times and I will say again, it is the burden of the government to prove the case beyond a reasonable doubt.  Is there anyone who can't follow that instruction?  Thank you.

There are some people, as indicated in Question 15, who for moral, ethical or religious or other reasons may find it difficult to pass judgment on the conduct of others.  Do you hold such beliefs?  Anybody out there?  Okay.

And do you know of any reason at all why you cannot be a completely fair and impartial juror in this case?  I don't see any hands.

Would the government like a few minutes?

MS. TAIT:  Yes.  Just a moment, Your Honor.

(Discussion held off the record.)

MS. TAIT:  The government passes.

THE COURT:  For the defense?

(Discussion held off the record.)

THE COURT:  Does the defense have a challenge?

MR. AMINOFF:  Sorry, Your Honor.  Your Honor, defense would like to thank and excuse Juror No. 13, please.

THE COURT:  All right.  Juror No. 13, thank you very much.  You are ordered to return to the jury room.

Peremptory with the government.

MS. TAIT:  The government thanks and excuses Juror No. 17.

THE COURT:  Juror No. 17, thank you very much.  You are excused.  You are ordered to return to the jury room.

Another peremptory with the defense.

(Discussion held off the record.)

MR. AMINOFF:  Thank you, Your Honor.  Defense would thank and excuse Juror No. 18, please.

THE COURT:  Juror No. 18, thank you very much.  You are excused.

Peremptory with the government.

MS. TAIT:  We pass, Your Honor.

THE COURT:  Peremptory with the defense.

MS. TAIT:  Your Honor, was there a -- the defense has exercised two peremptories --

THE COURT:  That's what I thought.  So these four are our alternate jurors.  Everyone agree?

MR. AMINOFF:  I think we need one more, Your Honor.

Ms. TAIT:  We only have three I think right now.

THE COURT:  Okay.  I need to get more glasses.  This is going to seem silly to you, but I'm going to ask you to move so you are filling all the seats in order.  Let's just get --

THE CLERK:  Emma F., take seat 16.

THE COURT:  That's all we need.

All right.  That one page.

PROSPECTIVE JUROR:  Good afternoon.  I live in Arcadia.  I have a doctorate in chemical engineering.  My

employer is Ellison Medical Institute.  I'm a cancer research scientist.  I'm married to a civil engineer who works at LADWP.  No adults living with me.  And this is my first time on a jury.

THE COURT:  All right.  Excellent.  How about the questions on that longer list?  Why don't you just go through those.  You've heard them several times and give us any yes answers.

PROSPECTIVE JUROR:  The only thing that maybe stood out was the last question.  It seemed like there was a little bit of focus on MLMs during one of -- part of the session.  And I think the reason why it resonated with me is my cousin is part of that type of business, I guess you would say, and she did try to get me to join.

And so I declined.  And she, I guess, joined a different type of MLM which I didn't know was an MLM at some point.  And I did buy life insurance from her.  And eventually that company went into a class action lawsuit which I joined in on and obtained a settlement from.  So I no longer have life insurance through that company that she was working with.  But that's the only thing that stood out.  So I kind of have a negative, I guess, view of MLMs in general.

THE COURT:  Okay.  I can't remember how exactly that came up.  This case is not about an MLM.  Does that --

PROSPECTIVE JUROR:  Yes.

THE COURT:  -- address your issue?  Is there any

reason you can't be fair and impartial to both sides in this case?

PROSPECTIVE JUROR:  I don't think so.

THE COURT:  Again, that word "think."  You are hesitating.  And I recall, I think, that you hadn't served on a jury before.

PROSPECTIVE JUROR:  No.

THE COURT:  So I understand you don't know what it's like.  But both sides are going to produce evidence, as I've said.  The government has to prove its case beyond a reasonable doubt.  The defense never has to do anything if it doesn't want to.

Is there any reason you think that having that experience with an MLM would impact your ability to be fair in this case based on that information?

PROSPECTIVE JUROR:  No.

THE COURT:  All right.  Any questions from the government?

MS. LEE:  No, Your Honor.

THE COURT:  Any questions from the defense?

MR. AMINOFF:  No, Your Honor.

THE COURT:  Peremptory with the government.

MS. TAIT:  We pass.

THE COURT:  All right.  Then these four are our alternates; correct?  Everybody agree?

MS. LEE:  Yes, Your Honor.

MR. AMINOFF:  Yes.

THE COURT:  I'm going to ask Juror No. 13 and 14 to take the two seats at the top row there and Juror 15 and 16 to take the two seats in the second row.

Ms. Orozco, would you swear in our alternates, please.

THE CLERK:  Do each of you as alternate jurors solemnly swear that you will well and truly try the cause now before this Court and a true verdict therein render according to the evidence and instructions of the Court, so help you God?

ALTERNATE JURORS:  We do.

THE COURT:  All right.  Thank you.

Ladies and gentlemen, the rest of our prospective jurors here and the prospective jurors in Courtroom 7A, you are ordered to go back to the jury room.  You are all excused.

I don't know if we've completed all of our trials for this building for today.  But we might be able to find another one for you.  Make sure you check in down in the jury room so they know you've done your service.  Both courtrooms are now excused.  Thank you.

All right.  Sit back and relax.

Ladies and gentlemen, you are now the jurors and alternate jurors in this case.  And I'm going to take a few minutes to tell you about your duties as jurors and to give you

some preliminary instructions.

At the end of the trial, I will give you more detailed written instructions that will control your deliberations.  All of the Court's instructions, whether given before, during, or after the taking of testimony, including the instructions I gave you before you were chosen as jurors, are important.

When you deliberate, it will be your duty to weigh and to evaluate all the evidence in the case and in that process, to decide the facts.  You must apply the law as I state it to you to the facts as you determine them.  In this way, you will arrive at your verdict.

You must decide the case solely on the evidence received in the trial and not from any other source and on the law as I have given it to you, as I said, whether you agree with it or not.

Perform these duties fairly and impartially.  You should not be influenced by any person's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances.

Also, do not allow yourself to be influenced by personal likes or dislikes, sympathy, prejudice, fear, public opinion or biases, including unconscious biases.

Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be

expressed without conscious awareness, control, or intention.

Like conscious bias, unconscious bias can affect how we evaluate information and make decisions.  Do not read anything into these instructions, and do not take anything I may say or do during the trial as indicating what I think of the evidence or what your verdict should be.  That is a matter entirely up to you.

Before we do anything else, there are some very important rules I need to tell you about that apply to the conduct outside of the courtroom and the courthouse.  I know they described some of these to you in the jury assembly room, but they are so important I need to repeat them.  I don't want to sound mean or threatening, but what I'm going to tell you is not what I'm asking you to do.  It's what I'm ordering you to do.  And my orders have the same effect as laws.  If you violate those orders, it is the same as violating the law.

For some reason, jurors seem to have difficulty with these.  So please listen carefully.  Keep an open mind during trial, and do not decide what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.

Because you must decide the case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or the issues it involves during the

course of your jury service.

Therefore, until the end of the case or until I tell you otherwise, do not communicate with anyone outside the jury about the case or about anyone who has anything to do with it until the trial has ended and you've been discharged as a juror.

Anyone includes your spouse, your partner, your family, anyone at home, your employer, anyone at work, your friends and neighbors, the media or the press, anyone at all. You may tell them that you are a juror on a case and how long the trial may last but say nothing else about it until you are discharged by the Court.

This case includes anything you see or hear in the courtroom such as the testimony of witnesses, the physical evidence, and anything said by the lawyers, the Court, court staff, and anybody else in the courtroom such as spectators. This means you are ordered not to communicate in any way with the attorneys, the parties, or any witness called in this proceeding.

When you see any of these people in the hall or anywhere else, you are not to greet them. Don't ask for directions to anywhere. Don't ask how much longer the trial will last. There should be no communication of any kind.

Of course, you probably won't know who the witnesses are. So it's best not to talk to anyone who isn't wearing a

juror's badge.  If you are in the hall or the restroom and you hear someone talking about the case, ask them not to talk about it in your presence or simply leave.  Don't get into an elevator with anyone you recognize other than another juror.

The parties and the attorneys will not be offended if you ignore them.  And please don't be offended if they ignore you.  They are also under orders not to speak to you.  So please wear your juror's badge where everyone can see it so no one speaks to you accidentally.

Don't be concerned though if you see witnesses talking to each other or to the attorneys.  That is permissible.  Just stay far enough away from them that you won't overhear any of their conversations.

Do not let anyone communicate with you about the case or about anyone who has anything to do with it.  If someone does try to communicate with you about it, tell them you will not speak to them.  Then immediately inform the bailiff when we have one or Ms. Orozco of this conduct.

This restriction includes discussing the case in person, in writing, by phone, tablet or computer or any other means via e-mail, via text messaging or any Internet chat room, blog, website, or application including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok or any other form of social media.

This restriction also applies to communicating with

your fellow jurors about the case until I instruct you otherwise.  That's after you go into about the jury room for your deliberation at the end of the case.

You must not independently investigate the facts or the law or consider or discuss facts as to which there is no evidence.  This means, for example, that you may not visit or view any place that you hear described in the case.

Do not search for information on any of the parties, witnesses, attorneys, or law firms or me at least until the case is over.  If you look for those people, you may accidentally find information about the case.

Do not conduct experiments.  Do not read, listen to, or watch any news or media accounts or commentary about the case or about anyone who has anything to do with it.  I don't have any information that suggests there would be media or news coverage.  But just keep that in mind if there are.

These rules protect each parties' right to have the case decided only on evidence that's been presented here in court.  Witnesses here in court take an oath to tell the truth. And the accuracy of their testimony is tested through the trial process.  If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been testified by the trial process.

You cannot even ask anyone for information relating to the case even if you don't say that it has anything to do with the case or that you are on a jury.  You can't look up a word in the dictionary if you don't know or don't all agree on the meaning of the word.  If you have any questions at all, send them in writing to me, and I will try to help you answer them.

Each of the parties is entitled to a fair trial by an impartial jury.  And if you decide the case based on information not presented in court, you will have denied the parties a fair trial.  And remember, you've taken an oath to follow these rules, and it's very important you follow them.

These and my other orders are not just my preferences or requests.  They are serious and important, and they are the law.  The law requires these restrictions to ensure that the parties have a fair trial with a fair and unbiased jury.  That's a juror that will base its decision only on the evidence presented in this courtroom.

It is common for the media, whether television, radio, newspaper or online source to report about lawsuits, parties to lawsuits, witnesses in lawsuits and their lawyers. The media coverage may be accurate, or it may be inaccurate. Coverage may be complete and thorough or may be incomplete and not thorough.  It might portray both sides of the story fairly, or it may be one sided.

If you do your own research, look on the internet, or view media coverage relating to the case, you will have no way of knowing whether what you are reading is accurate, complete, or fair.

In addition, the parties and the Court will have no way of knowing what you've seen or read, and they will be deprived of the opportunity to confront and explain whatever is said in those accounts.  And you will have more information, possibly inaccurate information, than your fellow jurors.

That's why your information about the case must be limited to what's presented in this courtroom.  That way all the jurors will see and hear the same evidence, and the parties will have an opportunity to address that evidence, engage in what we call cross-examination, and talk to you about the evidence in their opening statements and closing arguments.

And you can't fix the problem by sharing with your fellow jurors information that you shouldn't have in the first place.  A juror who violates these restrictions jeopardizes the fairness of the proceedings, and a mistrial could result.  A mistrial means that no matter how far we are into the case, we have to start over.  It means that the jurors, the court staff, and the attorneys and the parties will have wasted their time. You will have also wasted the tax dollars, your tax dollars, that it takes to provide the trial.

If you hear any other juror talking about having

**UNITED STATES DISTRICT COURT**

done research, seen news coverage outside the courtroom or if you do so yourself, you must inform Ms. Orozco immediately so we can address the situation.

And I can't emphasize these rules enough.  Judges in every court across the country advise juries of these same rules, and yet sometimes we hear that jurors are ignoring them. Sometimes it's just curiosity.  Sometimes it's because jurors believe they need to know more about the case than the lawyers have told them in order do their jobs as jurors.

But there is absolutely no excuse or justification for violating these rules.  So don't even try to think of one. If you have any question at all about whether something you are about to do is okay, just don't do it.

As I told you, Mr. Fritsch has pleaded not guilty to the charges and is presumed innocent unless and until the government proves him guilty beyond a reasonable doubt.  In addition, he has the right to remain silent and never has to prove innocence or present any evidence.

Evidence is the sworn testimony of witnesses, the exhibits that are received into evidence, and any facts to which the parties agree.  If the parties agree to a fact, they will tell you exactly what they agree to.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of

it or none of it.  In evaluating the testimony of witnesses, consider the following questions:

How well could the witness see or hear or otherwise sense the things about which the witness testified?  How well was the witness able to remember and describe what happened?  What was the witness's behavior while testifying?  Did the witness understand the questions and answer them directly?  Did the witness have a reason to lie such as bias or prejudice or a personal interest in how the case is decided?

What was the witness's attitude about the case or about testifying?  How reasonable is the testimony when you consider all the other evidence in the case?  Did other evidence in the case prove or disprove any fact about which the witness testified?

Consider any other factors that bear on credibility, and use your common sense and good judgment to evaluate the testimony based on all the circumstances.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told truth about others, you may accept the part you think is true and ignore the rest.

You must avoid bias, conscious or unconscious, based on a witness's race, color, religious beliefs, national ancestry, sexual orientation, gender identity, gender, or economic circumstances in your determination of credibility.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses are and how much weight you think their testimony deserves.

There are two kinds of evidence, direct and circumstantial.  Direct evidence is direct proof of a fact such as testimony by a witness about what that witness personally saw or heard or did.

Circumstantial evidence is indirect evidence; that is, it is proof of one or more facts from which you could conclude that other facts exist.

For example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence such as a garden hose that was a left turned on may provide an

explanation for the water on the sidewalk.

Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

You are to consider both direct and circumstantial evidence.  Either can be used to prove any fact.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of this case.  Statements or arguments by attorneys are not evidence.  That includes statements or arguments made by Mr. Fritsch when -- I'm sorry.  That includes, for example, statements and arguments by the attorneys, when the attorney is giving an opening statement or closing argument, and other portions of the proceeding.

You cannot consider as evidence anything you may see or hear when the Court is not in session even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Do not assume to be true any insinuation suggested by a question asked a witness.  A question may be considered only as it helps you to understand the answer.

There are rules that control what evidence can be

presented in a case.  When an attorney asks a question or offers an exhibit in evidence and the attorney on the other side thinks it is not permitted by the rules, that attorney may object.  If a question is objected to and the objection is sustained, which means the witness may not respond, you must not guess about what the answer might have been or the reason for the objection.

If the objection is overruled and the witness is allowed to answer, you may consider that answer as you would any other evidence in the case.

Please remember that it's an attorney's duty to object to questions that the attorney believes are not proper, and you should not show prejudice toward the attorney or the side the attorney represents because the attorney makes an objection.

Sometimes I may order that evidence be stricken and that you disregard or order the evidence -- or ignore the evidence.  That means that when you are deciding the case, you must not consider that evidence for any purpose.  Treat it as though you had never heard it.

Some evidence may be admitted only for a limited purpose.  When I tell you that certain evidence has been admitted for a limited purpose, you may consider it for that purpose only and not for any other purpose.

At times, I may find it necessary to direct one or

**UNITED STATES DISTRICT COURT**

more of the attorneys to do or not to do certain things.  I may even find it necessary to make some criticism of an attorney's conduct.  If I do so, you must not show prejudice toward the attorney or the side the attorney represents simply because I have found it necessary to say something to the attorney.

You'll be given notebooks and pencils.  If you wish, you may take notes to help you remember the evidence.  If you do take notes, keep them to yourself until you and your fellow jurors go to the jury room to decide the case.  You should not permit note taking to distract you or prevent you from listening carefully to other testimony.  Remember, you are the judges of the believability of the witnesses.

Notes are only to assist your memory and should not take the place of your memory.  Jurors should not be overly influenced by what that juror or any other juror writes down.

Some testimony might have seemed unimportant at the time it was presented, and therefore, it was not written down.  But it might turn out to be important later in the trial after all the evidence is submitted and you've heard the arguments of counsel and the jury instructions.

A juror who does not take notes should rely on his or her recollection of the evidence and not be influenced by the fact that other jurors do take notes.

Leave the notebooks on your seat when you leave each day and at each recess.  You will be able to take them into the

122

jury room when you deliberate.

By the way, you'll see me taking notes, but I take notes for different reasons.  So when you see me writing something down, it doesn't necessarily mean that you should write it down.

At the end of the trial, you will have to make your decision based on what you recall of the evidence.  You will not have a written transcript of the trial.  I urge you to pay close attention to the testimony as it's given.

You will be permitted to separate at recesses.  You must return following the recesses at such times as I instruct you.  During recesses, as I said, you must not discuss with anyone any subject connected with this trial.  You cannot even discuss it among yourselves.  When you are together in the hall or jury room or anywhere else, you must speak only of matters entirely unrelated to the trial.

During the course of the trial and before you begin your deliberations, you must keep an open mind on this case and on all issues you'll be asked to decide.  In other words, you must not form or express any opinion about the case until it's finally submitted to you.  And remember all the other orders I gave you at the start of the proceedings.  Don't talk to anyone or allow anyone to talk to you.  And don't attempt to do research of any kind on the Internet or otherwise on any subject connected with the trial.

If you need to communicate with me at any time, just give a signed note to the bailiff when we have one or Ms. Orozco.

By the way, as you may know, all of our courtrooms are public courtrooms. People sometimes like to come and watch trials. That's perfectly all right, and you shouldn't let it distract you if people come in and out.

Also, my law clerks may watch portions of the trial whenever they have time. You've met one of them already. They generally sit over there. Please be sure that none of your friends or relatives are present in the courtroom without my knowledge. It's particularly important that you do not hear from them what happened during the times the jury is not in the courtroom and also that you did not discuss with them what happened when you were present.

If at any time you see a friend or a relative come into the courtroom, you should be sure to send a note to me through Ms. Orozco or the bailiff at the first opportunity.

And as you see, we now have some spectators in the courtroom. People come in and out to watch various parts of the proceedings. Just ignore them.

As for our alternate jurors, you are bound by all of these admonitions. You must not converse among yourselves or with anyone else on any subject connected with this trial, and you must not form or express any opinion on it until the case

is submitted to you which means until such time as you're substituted in for one of the 12 jurors and begin deliberating on the case.

This means that you must not decide how you would vote if you were deliberating with the other jurors, and you must not form or express any opinion about the case unless and until you have been substituted in as a juror in the case.

The next phase of the trial will now begin.  First, both sides may make an opening statement if they choose to do so.  And an opening statement is not evidence.  Neither side is required to make an opening statement.  You don't need to take any notes during the statements.

It's also not an argument.  Attorneys are not permitted to argue the case at this point in the proceedings. It's simply an outline by counsel of what he or she expects the evidence will show in the trial, and its purpose is to assist you in understanding the case as it's presented to you.

Next the government will present evidence, and defense may cross-examine the witnesses called by the government.  Then the defendant may present evidence if he chooses to do so, and the government may cross-examine those witnesses.

Witnesses don't necessarily testify about things in the order in which they happened.  Sometimes I will allow witnesses to testify out of order to accommodate their

schedules.  So you should be sure to keep an open mind until you've heard all the evidence.

After the evidence has been presented, I'll instruct you on the law that applies to the case, and the attorneys will make their closing arguments.  After that, you'll go into the jury room to deliberate on your verdict.

Is the government prepared to proceed?

MR. DE LEON:  Yes, Your Honor.

THE COURT:  All right.  So I think we'll just hear from the government first, and then we'll recess until Thursday.

MR. DE LEON:  This is a case about how the defendant, Bernhard Fritsch, methodically stacked lies on top of lies on top of lies to get investors to invest into his company called StarClub.  It's about how the defendant used investor money to spend it on himself and his fancy lifestyle.

The evidence will show that around the beginning of 2014, the defendant began telling potential investors that his company, StarClub, had technology that allowed celebrities to make money off of advertisements associated with their social media posts.

You will hear how the defendant told investors that their money would be used to develop that technology and on general business expenses.

To make StarClub seem credible to investors, the

UNITED STATES DISTRICT COURT

evidence will show that the defendant told three categories of lies.  First, a lie about how much revenue StarClub made.  Second, lies about how StarClub was on the verge of deals with well-known companies.  And third, lies about how well-known companies already invested into StarClub.

During this trial, you will hear from the main outside investor into StarClub from 2014 to 2017.  His name is Danny Guy.  Mr. Guy managed an investment fund that pooled together money from different investors.  He will sit up there and tell you how the defendant told him all his lies and how after those lies, Mr. Guy invested over $20 million into StarClub over the course of just a few years.

But what Mr. Guy didn't know and what the evidence will show is that after StarClub would receive the investor funds in its bank account, the defendant would funnel those investor funds to non-StarClub corporate bank accounts that he controlled to make it look like all the money going to the non-StarClub bank accounts were StarClub business expenses and to make it harder to track the money.

Later on in this trial, you'll hear about the several company names the defendant used for these non-StarClub bank accounts, including U.S. Mastertec, Greenwich Music Inc., DER HUT LLC, and 3229 Rambla Pacifico.  In that last one, 3229 Rambla Pacifico, also happens to be the address to defendant's Malibu mansion.

Then from these non-StarClub bank accounts, the evidence will show that the defendant used millions of dollars in investor funds to spend it on himself, to buy luxury cars such as a McLaren, a Rolls Royce, to pay his mortgage, taxes, and home improvements on his Malibu mansion and to pay for expenses associated with his yacht which he called Madame Musique.

Let's talk about the three categories of lies that you will hear defendant told to investors. First beginning with how much the defendant told investors StarClub had generated in revenue. In simple terms, revenue is just the amount of money that StarClub would have made from its normal business operations which would have been the use of its technology to sell advertisements.

The evidence will show that in January of 2016, Mr. Guy and another investor named Ian Mann attended a presentation by the defendant. At that meeting, the defendant represented that StarClub had generated $15 million in revenue in 2015.

But the evidence will show that this was a lie. In fact, StarClub never made much revenue at all. During this trial, you'll hear from an FBI financial accountant who reviewed all of StarClub's bank accounts and will testify that StarClub only made around $47,000 in revenue in 2015, nothing close to the $15 million that the defendant had told investors

128

StarClub made that year.

The evidence will show that the defendant's lies didn't stop there.  Next moving to the second category of lies, you will hear how the defendant told investors that StarClub was on the verge of deals with well-known companies.

Specifically, you will see that the defendant sent an e-mail to Mr. Guy saying that Disney was planning on entering into a commercial deal with StarClub, which the evidence will show was just not true.

You'll hear from two former Disney employees who will tell you they met with the defendant but they were not interested in a commercial deal with StarClub.  And at no point do they recall ever saying anything that would have left the defendant with the impression that Disney was going to invest into StarClub.

But the defendant didn't stop with just Disney.  You are also going to see another e-mail that the defendant sent to Mr. Guy saying that StarClub had a deal with a big company called Yucaipa and that the paperwork would be handled by Yucaipa's CFO Richard D'Abo.

You'll hear from Richard D'Abo himself during this trial, a Yucaipa partner who will tell you he never handled any paperwork because there was never a deal between Yucaipa and StarClub.

Finally, the defendant will show that the defendant

spread a final category of lies about well-known companies already investing into StarClub.  The evidence will show that on a one-page document that the defendant provided to investors, the defendant lied about Access Industries, Credit Suisse, and Warner being current investors into StarClub.

You'll hear how these companies are the kinds of companies that people recognize and that people want to be in business with.

You'll also hear directly from representatives from each one of these companies who will all sit up there in that chair and each testify that their companies never invested into StarClub.

Members of the jury, for his actions, the defendant has been charged with two counts of wire fraud.  At the end of this trial, the judge will instruct you on the legal elements of these crimes, and the lawyers will have one last opportunity to speak with you.

Until then, throughout this trial the evidence will show that the defendant was deliberate, organized, and methodical with his stack of lies.  And critically, the evidence will show that the defendant knew exactly which lies to use to lure in more investment.

And after making money from those lies, the defendant used that money to enrich himself, to buy a McLaren,

to buy a Rolls Royce, to pay for Malibu mansion expenses, and to pay for yacht expenses.

At the end of this trial, we'll have another opportunity to speak with you, and at that time, we'll ask you to return the only verdict consistent with the evidence, a verdict of guilty on all counts.

THE COURT:  Thank you.

Ladies and gentlemen, I think we have accomplished quite a bit for the day.  So I'm going to let you go.

But first, Ms. Orozco will speak to you in the jury room.  She'll give you some instructions, some contact information if you don't already have it.  And you need to make sure, as I think I mentioned early on, that if you are delayed for any reason, you let us know so we can figure out what to do about it.

This is Downtown LA.  If you are not familiar with it, there's traffic.  You probably saw long lines coming into the building with a lot of jurors today.  I don't know what we have going on for the rest of the week.  But remember that it does take a little bit of time to get into the building.

Sometimes it takes a little bit of time to get up in the elevators.  So please consider all of that in determining when you need to leave your home to get here.

And as I said and I will say every day at the end of the day, don't talk about the case or form or express any

opinions about the case until it's finally submitted to you.

Our schedule, as I said, will be 8:00 a.m. to 2:30 now with two about 20-minute breaks.  You can bring something to eat or drink.  We have sodas stocked in the jury room.  We might be missing a chair right now, but we'll get it for you before tomorrow.

So you are ordered, as soon as Ms. Orozco releases you, to return tomorrow at 8:00 a.m., and you are ordered to have a good evening.

MR. AMINOFF:  Your Honor --

MS. TAIT:  Your Honor, you said tomorrow at 8:00 a.m.

THE COURT:  I'm sorry.  Not tomorrow.  Thursday at 8:00 a.m.  So be my guest and visit if you want.  But we won't be here.  So put that in your calendars so you don't mess up like I just did.  We will see you to -- I did it again.  Thursday at 8:00 a.m.  Thank you.

THE CLERK:  All rise.

(Outside the presence of the jury.)

THE COURT:  You may be seated.

All right.  I'm planning on working from home tomorrow.  So no e-mails asking for hearings, please.

Anything we need to discuss?

MR. DE LEON:  Nothing from the government, Your Honor.

**UNITED STATES DISTRICT COURT**

MS. ABEL:  No, nothing from defense.  Thank you.

THE COURT:  All right.  So you are going to cooperate with exhibits and witnesses and all that other stuff?

MS. ABEL:  That's the plan, Your Honor.

MR. DE LEON:  Yes, Your Honor.

THE COURT:  All right.  You are ordered to have, as much as possible, a good evening, a good Wednesday, and we'll see you Thursday.  You are ordered to return by 7:45.

MS. ABEL:  Thank you, Your Honor.

MR. DE LEON:  Thank you, Your Honor.

(At 2:40 p.m. the proceedings adjourned.)

**UNITED STATES DISTRICT COURT**

**CERTIFICATE OF OFFICIAL REPORTER**

I, MAREA WOOLRICH, FEDERAL OFFICIAL REALTIME COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATION OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

DATED THIS _23RD_ DAY OF DECEMBER, 2025.

/S/ MAREA WOOLRICH
_____
MAREA WOOLRICH, CSR NO. 12698, CCRR
FEDERAL OFFICIAL COURT REPORTER

**UNITED STATES DISTRICT COURT**