ORIGINAL

FILED

2026 MAY 12  PM 3: 06

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY:_____

Vincent D. Louwagie (MN #194335)
Samuel N. Louwagie (MN #0400885)
*Applications for Pro Hac Vice Forthcoming*
ANTHONY OSTLUND LOUWAGIE DRESSEN
& BOYLAN P.A.
60 South Sixth Street, Suite 3900
Minneapolis, Minnesota 55402
Telephone: (612) 349-6969
Fax: (612) 349-6996
Emails: vlouwagie@anthonyostlund.com
        slouwagie@anthonyostlund.com

Douglas F. Galanter (SBN 93740)
GALANTER ASSOCIATES
800 West 1st Street, Suite 2905
Los Angeles, California 90012
Telephone: (310) 880-9454
Fax:  (213) 402-6584
Email: dgalanter@galanterassociates.com

Attorneys for Sureties Marc Montgomery and
Teresa P. Montgomery

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BERNHARD EUGEN FRITSCH,<br><br>Defendant. | CR No. 17-00520-DSF<br><br>**SURETY'S OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION OF OBLIGATION WITH RESPECT TO MARC MONTGOMERY AND TERESA P. MONTGOMERY, AND/OR ALTERNATIVELY SURETY'S MOTION TO SET ASIDE BOND FORFEITURE AND REMIT BOND**<br><br>[Declaration of Marc Montgomery Filed Concurrently]<br><br>Hearing: June 1, 2026<br><br>Time: 8:30 a.m.<br><br>Place: Courtroom 7D, before the Honorable Dale S. Fischer, United States District Judge |

1

SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION

Sureties Marc Montgomery ("Montgomery") and Teresa P. Montgomery (together, "Sureties"), in response to the Government's Motion for Summary Adjudication of Obligation, hereby file their opposition, and/or in the alternative, their motion to set aside bond forfeiture, pursuant to Fed. R. Crim. P. 46(f), (f)(2) and (f)(4), as follows:

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Marc Montgomery posted bond for his cousin, Defendant Bernhard Fritsch, because Fritsch reached out to him in desperation and assured Montgomery that he was innocent, was being wrongfully accused, and that this would all be quickly sorted out. Montgomery's wife, Teresa, joined him in posting that bond, which was secured by the deeding of their home. Thereafter, Fritsch further took advantage of the Montgomerys' trust and generosity by borrowing hundreds of thousands of dollars from Marc Montgomery to pay his living expenses and fund his legal defense. After it became clear that Fritsch had deceived Montgomery about his innocence and intention to repay him, Montgomery was forced to sue Fritsch. In other words, Montgomery is a victim of Bernhard Fritsch's deceitful conduct, just like those who Fritsch was prosecuted and convicted for defrauding.

The Government now seeks to further victimize the Montgomerys, and increase the amount of harm caused by Fritsch, by demanding that Marc and Teresa forfeit their $134,129.07 bond, secured by their house in St. Paul, Minnesota. This despite the fact that the *Government*, rather than Montgomery, could have and should have sought protection from Fritsch fleeing the country after Fritsch was convicted.

The Government's motion is fundamentally unfair and inequitable under these circumstances. It should be denied, and Montgomery's forfeiture should be set aside, pursuant to Federal Rule of Criminal Procedure 46(f)(2)(B).

## BACKGROUND

Marc Montgomery lives in Minnesota, where he owns a dental practice. (Declaration of Marc Montgomery ("Montgomery Dec."), ¶ 1.) Bernhard Fritsch ("Fritsch"), the Defendant in this case, is Montgomery's first cousin. (*Id.* ¶ 2.) Montgomery and Fritsch have been close since childhood, when Montgomery would spend many summers living with his grandparents in the same small town in Germany where Fritsch grew up. (*Id.*) The cousins stayed close into adulthood, taking trips together as young adults. (*Id.*) Later on, Fritsch would be a groomsman in Montgomery's wedding. (*Id.*) While they had less contact as the years passed, Fritsch and Montgomery still found time to meet periodically, and Fritsch often gave Montgomery the impression that he was an extremely successful (and legitimate) businessman. In January 2011, for instance, Fritsch flew Montgomery to New York for a weekend, and told Montgomery that he had sold a music download technology to Steve Jobs which became iTunes. (*Id.* at ¶ 3.) That weekend, Fritsch showed Montgomery a photo album of pictures of him with many famous music artists, a picture of Fritsch sitting in the oval office with President Bill Clinton, and a picture of Fritsch with Pope John Paul II. (*Id.*)

In or around August 2017, eight years before a trial was held, Fritsch was indicted for wire fraud. The federal government alleged that between 2014 and 2017, Fritsch had defrauded investors in his company, StarClub, Inc. (Dkt. No. 19.) On August 3, 2017, the Court ordered that Fritsch be detained until trial, based in part on its conclusions that Fritsch was a "risk of non-appearance" due to his "lack of bail resources; foreign ties; access to overseas bank accounts; [and] Germany's position on refusing to extradite German citizens to the United States[.]." (Dkt. No. 8.)

On August 8, 2017, around 10 p.m., Montgomery received a phone call out of the blue from Michelle Maher, who he had not met but knew to be Fritsch's girlfriend at the time. (Montgomery Dec. at ¶ 4.) Ms. Maher was crying

3

**SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION**

hysterically. (*Id*.) She said that Fritsch had been arrested by the FBI and had asked her to call Montgomery to bail him out of jail. (*Id*.) This was the first Montgomery learned of Fritsch's arrest, and he was unsure if the call was a prank. (*Id*.) The next day, Montgomery received a call from Mark J. Werksman, an attorney representing Fritsch, asking Montgomery to be part of a bail package. (*Id*.)

About two months later, on October 6, 2017, Montgomery spoke with Rueven Cohen, another attorney representing Fritsch. (*Id*. at ¶ 5.) Cohen asked Montgomery to put his home up to secure a bond for Fritsch, explaining that the Court would not accept funds or real estate from Germany, where Fritsch had other family, and that only real estate in the United States would suffice. (*Id*.) Montgomery at first was unwilling to do this. (*Id*.)

But over the course of the next month, Montgomery received pleading calls from Fritsch's son David Stocker; his ex-wife Lisa Short, and his brother in Germany, Clemens. (*Id*. at ¶ 6.) Finally, Montgomery spoke to Fritsch on the phone from jail. (*Id*.) In that call, Fritsch told Montgomery that using his home as security was critical to his release. Fritsch assured Montgomery that he was innocent and would be cleared (*Id*.) Fritsch specifically promised that he would never return to Germany as his family was in the United States. (*Id*.) In addition, the attorney Cohen promised Montgomery that they would get the hold on Montgomery's house cleared by the end of the following year, 2018. (*Id*.)

In the face of all this emotional pressure, plus his lifelong relationship with and trust in Fritsch, Montgomery and his wife, Teresa, agreed to help. (*Id*.) On November 27, 2017, Montgomery executed an affidavit of surety in the amount of $134,129.07, secured by the deeding of his house in St. Paul, Minnesota. (Dkt. No. 56.) On November 30, the Court ordered that Fritsch be released from pre-trial custody on bond. (Dkt. No. 48.) Thereafter, Montgomery's wife, Teresa, executed an affidavit of surety as an additional surety for the same bond. (Dkt. No. 67.) In addition to the Montgomerys' bond, Fritsch's release was conditioned,

4

**SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION**

among other things, upon a $680,000 bond secured by the deeding of property located in Milford, Connecticut, owned by Lisa Short, Fritsch's ex-wife. (Dkt. No. 48.) However, in June 2021, Ms. Short would be released as a surety by stipulation of Fritsch and the government. (Dkt. Nos. 157, 158.)

After being released from custody, Fritsch returned to Montgomery for more help. This time, Fritsch said he needed to borrow large amounts of money to pay his mortgage, car payments, utilities, and—not least—legal fees to fight the allegations against him in Court. (Montgomery Dec. ¶ 7.) Again, Montgomery agreed to help. On or about November 18, 2019, Montgomery opened a line of credit for Fritsch, and they agreed that Fritsch would repay principal owed from the line of credit and accrued interest at varying rates. (*Id.*) Fritsch would draw more than $70,000 on the line of credit over the course of the next four years, drawing more than $70,000. (*Id.*) In October 2021, Montgomery made a second loan, memorialized by a promissory note and personally guaranteed by Fritsch. (*Id.* ¶ 8, Ex. A.) On October 14, 2021, Montgomery deposited $220,000 with the Law Offices of Ginger R. Kelley to fund Fritsch's legal defense. (*Id.*)

As is now clear, Fritsch never intended to return any of those funds. Montgomery was just another victim of Fritsch's deceit. Despite repeated demands by Montgomery, Fritsch has failed or refused to repay a penny of what Montgomery loaned him. On August 2, 2024, Montgomery filed a lawsuit against Fritsch, alleging breach of the promissory note. (*Id.* ¶ 9, Ex. B.) The Government has acknowledged in a filing in this case that "Mr. Montgomery is no longer a willing surety," but maintained that it would "object to Mr. Montgomery's withdrawal as surety." (Dkt. No. 524 at 5, n. 4.)

On April 3, 2025—almost *eight years* after the Montgomerys posted bond—Fritsch was convicted by a jury of wire fraud. Following the return of the jury verdict, the Government orally moved to remand Fritsch into custody until sentencing. (Dkt. No. 509.) The Court ordered counsel for the parties to confer

5

about a briefing schedule on that motion. On April 16, the parties stipulated that the motion for remand would be heard on June 2, 2025. (Dkt. No. 521.) In the meantime, the Government did *not* ask that Fritsch be ordered to wear a location-monitoring bracelet until the motion was heard or decided. Fritsch had originally been required to wear such a device upon release, but this requirement was dropped upon Fritsch's motion in October 2021. (Dkt. No. 165.) Despite considering him a "flight risk" who had just been convicted of fraud which would likely have resulted in a prison sentence of more than 10 years (Dkt. No. 524 at 11), the Government took no action to prevent Fritsch from fleeing to Germany in the two months before its motion to remand was to be heard.

Not surprisingly, that is exactly what happened. At the June 2 hearing, Fritsch failed to appear, and the Court issued a bench warrant. (Dkt. No. 536.) Fritsch has not been apprehended. Now, almost a year later, the Government brings this motion.

## ARGUMENT

### I.    The Court Has Discretion to Set Aside Forfeiture of Bail Bonds

While a bail is forfeited automatically when a condition of the bond is breached, the Federal Rules of Criminal Procedure give courts full discretion to "set aside in whole or in part a bail forfeiture upon any condition the court may impose if … it appears that justice does not require bail forfeiture." Fed. R. Crim. P. 46(f)(2)(B). "In determining whether or not to grant relief from a forfeiture, a court has wide discretion." *U.S.A. v. Gifford*, 423 F. Supp. 3d 819, 823 (C.D. Cal. 2019) (quoting *United States v. Stanley*, 601 F.2d 380, 382 (9th Cir. 1979)).

In deciding whether justice requires forfeiture, Courts consider six factors:

> 1) the defendant's willfulness in breaching a release condition; 2) the sureties' participation in apprehending the defendant; 3) the cost, inconvenience, and prejudice suffered by the government; 4) mitigating factors; 5) whether the surety is a professional or a member of the

6

**SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION**

family or a friend; and 6) the appropriateness of the amount of the bond.

*Gifford*, 423 F. Supp. 3d at 823 (quoting *United States v. Nguyen*, 279 F.3d 1112, 1115-16 (9th Cir. 2002)). Analysis of these factors requires setting aside the Montgomerys' forfeiture in whole.

## II.    Justice Requires Setting Aside Montgomery's Forfeiture

In this case, the second, fourth and fifth factors under the *Nguyen* test weigh heavily against forfeiture. The Montgomerys concede that, as to the first factor, Fritsch has absconded willfully (though with no involvement on their part); and as to the third factor, the government could show that Fritsch's fleeing to Germany and remaining there as a fugitive has caused it inconvenience and prejudice. But those considerations do not outweigh the Montgomerys' plight as victims of Fritsch's deceitful and fraudulent conduct.

### A. Montgomery could not have prevented Fritsch from fleeing, but the Government should have

As to the second *Nguyen* factor: Montgomery, of course, has had no more success than the Government in apprehending Fritsch. But this factor does not weigh against Montgomery, who—unlike the Government—could not reasonably have prevented Fritsch from fleeing. The Montgomerys' role as sureties was solely financial. They live in Minnesota, while Fritsch lived in California, and they "did not agree to act as Defendant's custodian." *United States v. Gladding*, No. 1:09-CR-00265OWWSMS, 2010 WL 3075653, at *4 (E.D. Cal. Aug. 5, 2010) (finding second factor "weighs in favor of set-aside and remission" when it was unclear "how Surety could have participated in this case."). In *Gifford*, this Court found that the second factor weighed in favor of the surety when she "did not assist Defendant in committing the violations of his bond conditions." *Gifford*, 423 F. Supp. 3d at 824. The same is true here.

On the other hand, the Government could have—indeed, *should* have—prevented Fritsch from absconding. With respect to a surety's obligation, the

7

Government "may not enforce the obligation if its actions materially increase the risk of the surety without the surety's knowledge and consent." *United States v. Galvez-Uriarte*, 709 F.2d 1323, 1324 (9th Cir. 1983). Indeed, "***any Government action*** that substantially encourages the defendant to leave the country in violation of the terms of the bond is a material breach of the Government's implied covenant not to interfere with the covenant between the defendant and the surety." *Id.* (emphasis added); *see also United States v. Aguilar*, 813 F. Supp. 727, 730 (N.D. Cal. 1993) ("However, such harm is due to no action by the Sureties. The government could have avoided the risk that the bond forfeiture would be set aside simply by adhering to the terms of the bond. Furthermore, the Sureties are not professionals, but Defendant's family members. They have done what they can to apprehend Defendant.").

Here, the Government materially increased the Montgomerys' risk by taking no action to re-implement a location-monitoring bracelet after Fritsch was convicted. While Montgomery consented to the removal of the location-monitoring bracelet four years earlier, in 2021, Fritsch's conviction fundamentally changed the situation. Once he was convicted and awaiting sentencing, the risk that Fritsch would flee the country to his native Germany, which does not extradite citizens to the United States, increased dramatically. The Government should have anticipated that Fritsch would not simply wait for two months until its motion for remand could be heard, and it should have requested some measure of protection in the interim. Its failure to do so should not be held against the Montgomerys.

Because the Montgomerys could not have prevented Fritsch's flight and the Government should have, this factor weighs heavily in favor of setting aside the forfeiture.

**B. Montgomery is a victim, and further harm to him does not serve justice**

The fourth and fifth factors of the Nguyen test—mitigating factors and the surety's status—are interrelated in this case and will be addressed together here. As

SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION

to the surety's status, courts routinely recognize that "[i]f the surety is a defendant's family member or friend, rather than a professional bondsman, this factor weighs in favor of setting aside the bond forfeiture." *Gifford*, 423 F. Supp. 3d at 825 (quoting *United States v. Martinez*, 2013 WL 6002441, at *7 (S.D. Cal. Nov. 12, 2013); *See also Gladding,* 2010 WL 3075653 at *6; *United States v. Castaldo*, 667 F.2d 20, 21 (9th Cir. 1981)). "Friends and relatives have been among the collateral victims of the old bail bond system sought to be eliminated by the Congress" in enacting the Bail Reform Act. *United States v. Kirkman*, 426 F.2d 747, 751 (4th Cir. 1970) Because Montgomery is Fritsch's cousin, and the Montgomerys are not professional bondsmen, this factor weighs against forfeiture.

The other mitigating factor, heightened by their family relationship, is that Fritsch lied to and deceived Montgomery, just like he did to the victims for whom he was prosecuted. Federal courts in California have recognized that mitigating considerations "might arise out of the circumstances in which the surety made the decision to sign the bond," including the precise circumstances of this case: "For example … a surety who is a close relative or friend of the defendant might have been pressured to make a hasty and only emotionally driven decision immediately following the defendant's arrest when she was first informed of the charges." *United States v. Villalobos*, No. 00-40242 CW WDB, 2005 WL 6127290, at *3 n.3 (N.D. Cal. Feb. 17, 2005). In addition, courts have set aside forfeiture of family and friend sureties who "did not fully comprehend the risks associated with the Appearance Bond." *United States v. Jimenez*, No. 3:24-CV-00016-2 (VDO), 2025 WL 2178456, at *6 (D. Conn. Mar. 7, 2025). "Of great import to the Court is whether the sureties knowingly and voluntarily entered into the agreement." *Id*. at *7.

The mitigating circumstances here demand that forfeiture be set aside. Montgomery received a sobbing, hysterical phone call from Fritsch's girlfriend shortly after his arrest. He was pleaded with by Fritsch's son, ex-wife, and even Fritsch himself from jail. Fritsch repeatedly assured him that he was innocent and

9

**SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION**

being wrongly accused, and that he would never think of fleeing the country. Fritsch's attorney assured Montgomery that the hold on his house would be released within a year. Under these circumstances, it is clear that Montgomery was pressured into making an emotionally driven decision. It is equally clear that he was prevented from fully understanding or appreciating the risk he was taking on, and that he did not enter the transaction knowingly or voluntarily.

Montgomery's willingness to help his cousin has already cost him hundreds of thousands of dollars, not to mention incalculable time, stress and energy. Indeed, Montgomery is currently suing Fritsch in a civil action to recover some of these harms. (Montgomery Decl. Ex. B.) In other words, at the time Fritsch fled, Montgomery was an *adverse litigant* to him—far from someone who assisted him in escaping custody. Enforcing the surety obligation against Montgomery would thus do nothing more than increase the amount of victimization left in Fritsch's wake.

Yet another mitigating factor here is that the Government released Lisa Short, Fritsch's ex-wife, from her bond, which was approximately five times larger than Montgomery's. This decision was not explained by the Government. It further adds to the unfairness of the Government's motion against Montgomery. It is unclear why Montgomery must bear the brunt of Fritsch's flight, when other family members were released. This arbitrary enforcement is inequitable.

The "purpose of bail bond is not punitive. The object of a bail bond is not to enrich the government or punish the defendant. A forfeiture should not be motivated by frustration or vindictiveness." *Gladding*, 2010 WL 3075653 at *7 (citing *United States v. Parr*, 594 F.2d 440, 444 (5th Cir.1979)). Forfeiture in this case would be egregious, punitive, and inequitable. Fundamental fairness and equity require setting it aside.

SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION

## CONCLUSION

For the reasons stated above, sureties Marc Montgomery and Teresa P. Montgomery ask that this Court set aside the forfeiture of their bond pursuant to Rule 46(f)(2)(B) of the Federal Rules of Criminal Procedure.

Dated: May 11, 2026                    ANTHONY OSTLUND LOUWAGIE
                                       DRESSEN & BOYLAN P.A.


                                              Vincent D. Louwagie
                                       By_____
                                       Vincent D. Louwagie
                                       Attorneys for Sureties Marc Montgomery
                                       and Teresa P. Montgomery

11

**SURETIES' OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION**

## PROOF OF SERVICE

I am a resident of the State of Minnesota, am over the age of eighteen (18) years and am not a party to the within action. My business address is 60 South Sixth Street, Suite 3900, Minneapolis, MN 55402 . On May 11, 2026, I served the following document described as:

**SURETY'S OPPOSITION TO GOVERNMENT'S MOTION FOR SUMMARY ADJUDICATION OF OBLIGATION WITH RESPECT TO MARC MONTGOMERY AND TERESA P. MONTGOMERY, AND/OR ALTERNATIVELY SURETY'S MOTION TO SET ASIDE BOND FOREFEITURE AND REMIT BOND**

on the interested parties, addressed as follows and in the manner indicated below:

**Monica E. Tait, Assistant U.S. Attorney
1100 United States Courthouse
312 North Spring St.
Los Angeles, CA 90012
Monica.tait@usdoj.gov**

____**U.S. MAIL:** I enclosed the document(s) in sealed envelopes or packages with postage fully prepaid for delivery by First Class Mail, and addressed to the person(s) listed in the "Service List" below, and placed the envelopes for collection and mailing pursuant to our ordinary business practices. I am readily familiar with this business' practice for collecting and processing correspondences for mailing. On the same day that correspondences are placed for collection and mailing, they are deposited with the U.S. Postal Service.

_X_**ELECTRONIC SERVICE (Email):** Based on a court order, rule of court, or an agreement of the parties to accept electronic service, I transmitted electronically, or caused to be transmitted electronically, the document(s) set forth above to the addressee Monica Tait, Esq. at the e-mail address set forth above, from the email address slouwagie@anthonyostlund.com.

____

____**PERSONAL SERVICE:** I placed true and correct copies of the above-described documents enclosed in a sealed envelope addressed as described herein and caused them to be personally delivered by a professional messenger service, BFRM Legal Support Service, to the interested parties at the addresses described herein.

____

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on May 11, 2026 at Minneapolis, Minnesota.

Samuel N. Louwagie

-1-

PROOF OF SERVICE